No. 2019-2041

# In the United States Court of Appeals
# For the Federal Circuit

PACKET INTELLIGENCE LLC,

*Plaintiff-Appellee,*

v.

NETSCOUT SYSTEMS, INC., NETSCOUT SYSTEMS TEXAS, LLC, FKA TEKTRONIX TEXAS, LLC DBA TEKTRONIX COMMUNICATIONS,

*Defendant-Appellants.*

Appeal from the United States District Court for the Eastern District of Texas, No. 2:16-cv-00230-JRG, Chief District Judge J. Rodney Gilstrap

## BRIEF OF APPELLANTS

Michael J. Lyons
Ahren C. Hsu-Hoffman
Michael F. Carr
Thomas Y. Nolan
Morgan, Lewis & Bockius LLP
1400 Page Mill Road
Palo Alto, CA 94304
650.843.4000

William R. Peterson
Morgan, Lewis & Bockius LLP
1000 Louisiana St., Suite 4000
Houston, TX 77002
713.890.5000

Eric Kraeutler
Julie Goldemberg
Morgan, Lewis & Bockius LLP
1701 Market St.
Philadelphia, PA 19103
215.963.5000

Karon N. Fowler
Morgan, Lewis & Bockius LLP
77 West Wacker Drive
Chicago, IL 60601
312.324.1000

***Counsel for Defendant-Appellants NetScout Systems, Inc., NetScout Systems Texas, LLC fka Tektronix Texas, LLC dba Tektronix Communications***

# CERTIFICATE OF INTEREST

Counsel for Appellants NetScout Systems, Inc. and NetScout Systems Texas, LLC (fka Tektronix Texas, LLC dba Tektronix Communications) certify the following:

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10% or more of stock in the party |
|---|---|---|
| NetScout Systems, Inc. | None | BlackRock Inc. |
| NetScout Systems Texas, LLC | None | NetScout Systems, Inc. |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

Morgan, Lewis & Bockius LLP: Jason D. Frank, Adam A. Allgood,* W. Scott Tester

Gillam & Smith, LLP: Harry L. Gillam, Jr., Melissa R. Smith

Locke Lord LLP: Paul D. Lein, Scott D. Wofsy, Christopher Capelli, Charles E. Phipps

*No longer with Morgan, Lewis & Bockius LLP.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47. 4(a)(5) and 47.5(b). (The parties should attach continuation pages as necessary).

*Packet Intelligence LLC v. Nokia Solutions and Networks US LLC*, 2:18-cv-00382-JRG (E.D. Tex.); *Packet Intelligence LLC v. Ericsson Inc.*, 2:18-CV-00381-JRG (E.D. Tex.); *Palo Alto Networks, Inc. v. Packet Intelligence LLC*, 3-19-cv-02471 (N.D. Cal.); *Nokia of America Corporation et al v. Packet*

*Intelligence LLC*, IPR2019-01289 (PTAB); *Nokia of America Corporation et al v. Packet Intelligence LLC*, IPR2019-01291 (PTAB); *Nokia of America Corporation et al v. Packet Intelligence LLC*, IPR2019-01293 (PTAB).

Respectfully submitted,

By: */s/ Eric Kraeutler*

Dated: August 19, 2019


Michael J. Lyons
Ahren C. Hsu-Hoffman
Michael F. Carr
Thomas Y. Nolan
Morgan, Lewis & Bockius LLP
1400 Page Mill Road
Palo Alto, CA 94304
650.843.4000

William R. Peterson
Morgan, Lewis & Bockius LLP
1000 Louisiana St., Suite 4000
Houston, TX 77002
713.890.5000

Eric Kraeutler
Julie Goldemberg
Morgan, Lewis & Bockius LLP
1701 Market St.
Philadelphia, PA 19103
215.963.5000

Karon N. Fowler
Morgan, Lewis & Bockius LLP
77 West Wacker Drive
Chicago, IL 60601
312.324.1000

***Counsel for Defendant-Appellants NetScout Systems, Inc., NetScout Systems Texas, LLC fka Tektronix Texas, LLC dba Tektronix Communications***

# TABLE OF CONTENTS

Certificate of Interest ......................................................................................i

Table of Authorities .........................................................................................v

Statement of Related Cases................................................................................1

Jurisdictional Statement .....................................................................................2

Statement of the Issues.......................................................................................3

Introduction........................................................................................................4

Statement of the Case.........................................................................................6

A. The RMON Working Group Addresses the Disjointed Flow Problem with the Track Sessions Standard.........................................9

B. NetScout Implements RMON2 .........................................................10

C. Russell Dietz and His Team Patent the Technology Devised by the RMON Working Group...............................................................11

D. Packet Intelligence Sues NetScout for Patent Infringement .............14

Standard of Review ..........................................................................................21

Summary of the Argument...............................................................................22

Argument..........................................................................................................26

I. The Asserted Claims Are Not Patent Eligible Under Section 101..............26

A. The Asserted Claims Are Directed to the Abstract Idea of Collecting, Comparing, and Classifying Packet Information ............26

B. The Asserted Claims Do Not Contain an Inventive Concept that Transforms this Abstract Idea Into a Patent Eligible Application .....30

II. As a Matter of Law, the Accused Products—Which Do Not Correlate Connection Flows Into “Conversational Flows”—Do Not Infringe the Asserted Claims .........................................................................................35

A. Each Asserted Claim Requires Correlating Connection Flows Into “Conversational Flows.” ..........................................................36

B. Packet Intelligence Presented No Evidence that the Accused Products Correlate Connection Flows Into “Conversational Flows.”.............................................................................................38

## TABLE OF CONTENTS
(continued)

III. The Asserted Claims Are Invalid in Light of the Track Sessions Technology Invented by the RMON Working Group and Implemented by the NetScout Track Sessions Probe....42

A. The Asserted Claims Are Invalid Under Section 102(f) for Failing to List All Inventors....43

B. The Asserted Claims Are Anticipated by the NetScout Track Sessions Probe....50

1. The NetScout Track Sessions Probe constitutes prior art....50

2. The NetScout Track Sessions Probe disclosed each limitation of each asserted claim....51

IV. Packet Intelligence Is Not Entitled To Presuit Damages....53

A. Packet Intelligence Failed to Prove Marking under Section 287(a)....53

1. NetScout identified MeterFlow as an unmarked "patented article."....55

2. There was no evidence that MeterFlow does not practice the '789 patent....56

3. NetScout identified additional unmarked patented articles....59

B. There Was No Evidence of Damages for the Remaining Patents....61

V. The Willfulness Verdict Was Not Supported by Substantial Evidence....66

Conclusion & Prayer for Relief....70

Addendum

Proof of Service

Certificate of Compliance

# TABLE OF AUTHORITIES

## CASES

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,
728 F.3d 1336 (Fed. Cir. 2013) ....................................................................32

*ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*,
501 F.3d 1307 (Fed. Cir. 2007) ..............................................................38, 41

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
134 S. Ct. 2347 (2014).........................................................................26, 31

*Allstate Ins. Co. v. Receivable Fin. Co. LLC*,
501 F.3d 398 (5th Cir. 2007) .......................................................................66

*Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*,
2018 WL 1525686 (E.D.N.Y. Mar. 27, 2018)..................................................61

*Arctic Cat Inc. v. Bombardier Rec'l Prods. Inc.*,
876 F.3d 1350 (Fed. Cir. 2017) ..........................................................54, 59, 60

*Avocent Huntsville Corp. v. ClearCube Tech., Inc.*,
2006 WL 2109503 (N.D. Ala. July 28, 2006) ..................................................68

*Bellows v. Amoco Oil Co.*,
118 F.3d 268 (5th Cir. 1997) .......................................................................21

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018) ....................................................................21

*Blackboard Inc. v. Desire2Learn, Inc.*,
574 F.3d 1371 (Fed. Cir. 2009) ....................................................................51

*Broadcom Corp. v. Emulex Corp.*,
732 F.3d 1325 (Fed. Cir. 2013) ....................................................................57

*BSG Tech LLC v. Buyseasons, Inc.*,
899 F.3d 1281 (Fed. Cir. 2018) ...................................................22, 29, 34, 35

*Comcast Corp v. Behrend*,
569 U.S. 27 (2013)........................................................................................63

**TABLE OF AUTHORITIES**
(continued)

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
776 F.3d 1343 (Fed. Cir. 2014) ....................27

*Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*,
880 F.3d 1356 (Fed. Cir. 2018) ....................26

*Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*,
558 F. App'x 988 (Fed. Cir. 2014) ....................32

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) ....................42

*Elec. Power Grp., LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016) ....................27, 28, 29, 31

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) ....................29

*FairWarning IP, LLC v. Iatric Systems, Inc.*,
839 F.3d 1089 (Fed. Cir. 2016) ....................31

*Finjan, Inc. v. Juniper Networks, Inc.*,
2019 WL 2289483 (N.D. Cal. May 29, 2019)....................61

*Fujitsu Ltd. v. Netgear Inc.*,
620 F.3d 1321 (Fed. Cir. 2010) ....................38, 41

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
136 S. Ct. 1923 (2016)....................66, 68

*Hewlett-Packard Co. v. Mustek Sys., Inc.*,
340 F.3d 1314 (Fed. Cir. 2003) ....................48, 49

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*,
49 F.3d 1551 (Fed. Cir. 1995) ....................38, 41

*In re VerHoef*,
888 F.3d 1362 (Fed. Cir. 2018) ....................42, 43

# TABLE OF AUTHORITIES
(continued)

*Intellectual Ventures I LLC v. Capital One Bank (USA)*
792 F.3d 1363 (Fed. Cir. 2015) ....................28

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
850 F.3d 1332 (Fed. Cir. 2017) ....................31, 32

*Intellectual Ventures I LLC v. Erie Indem. Co.*,
711 F. App'x 1015 (Fed. Cir. 2017) ....................33

*Intellectual Ventures I LLC v. Symantec Corp.*
838 F.3d 1307 (Fed. Cir. 2016) ....................27, 31, 32, 34

*Internet Patents Corp. v. Active Network, Inc.*,
790 F.3d 1343 (Fed. Cir. 2015) ....................31

*Interval Licensing LLC v. AOL, Inc.*,
896 F.3d 1335 (Fed. Cir. 2018) ....................33

*M&C Innovs, LLC v. Igloo Prods Corp.*,
2018 U.S. Dist. LEXIS 152075 (S.D. Tex. July 31, 2018) ....................68

*Markman v. Westview Instruments, Inc.*,
517 U.S. 370 (1996)....................48, 49

*Milwaukee Elec. Tool Corp. v. Snap-On Inc.*,
288 F. Supp. 3d 872, 887 (E.D. Wis. 2017) ....................68

*Ormco Corp. v. Align Tech., Inc.*,
463 F.3d 1299 (Fed. Cir. 2006) ....................62, 64

*Polara Eng'g, Inc. v. Campbell Co.*,
894 F.3d 1339 (Fed. Cir. 2018) ....................68

*Sanghvi v. City of Claremont*,
328 F.3d 532 (9th Cir. 2003) ....................60

*Semcon IP Inc. v. Huawei Device USA Inc.*,
2017 WL 6343771 (E.D. Tex. Dec. 12, 2017) ....................60

## TABLE OF AUTHORITIES
(continued)

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
918 F.3d 1368 (Fed. Cir. 2019) ....................67, 68

*TechSearch, L.L.C. v. Intel Corp.*,
286 F.3d 1360 (Fed. Cir. 2002) ....................57

*Trading Techs. Int'l, Inc. v. IBG LLC*,
921 F.3d 1084 (Fed. Cir. 2019) ....................33

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*,
699 F.3d 1340 (Fed. Cir. 2012) ....................21

*Two-Way Media Ltd. v. Comcast Cable Communications, LLC*,
874 F.3d 1329 (Fed. Cir. 2017) ....................30, 32

*Walther v. Lone Star Gas Co.*,
952 F.2d 119 (5th Cir. 1992) ....................60

*Whitserve, LLC v. Computer Packages, Inc.*,
694 F.3d 10 (Fed. Cir. 2012) ....................64

**STATUTES**

28 U.S.C.
§ 1295....................2
§ 1331....................2

35 U.S.C.
§ 102....................43
§ 284....................65
§ 287....................24

## STATEMENT OF RELATED CASES

U.S. Patent Nos. 6,665,725 ("the '725 patent"), 6,839,751 ("the '751 patent"), and 6,954,789 ("the '789 patent"), the patents at issue in this appeal, are the subject of the two following cases pending in the U.S. District Court for the Eastern District of Texas: *Packet Intelligence LLC v. Nokia of Am. Corp.*, No. 2:18-cv-00382 and *Packet Intelligence LLC v. Ericsson Inc.*, No. 2:18-cv-00381. They are also the subject of the following case pending in the U.S. District Court for the Northern District of California: *Palo Alto Networks, Inc. v. Packet Intelligence LLC*, No. 3:19-cv-02471.

Each of the patents at issue in this appeal is also the subject of a pending petition for *inter partes* review filed with the Patent Trial and Appeal Board: *Nokia of Am. Corp. v. Packet Intelligence*, Nos. IPR2019-01291 ('725 patent), IPR2019-01289 ('751 patent), and IPR2019-01293 ('789 patent).

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331, and issued its final ruling on post-trial motions on June 5, 2019. Appx22. NetScout timely appealed on June 12, 2019. Appx115. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the asserted claims are eligible for patent protection under Section 101.

2. Whether NetScout is entitled to judgment as a matter of law regarding infringement.

3. Whether NetScout is entitled to judgment as a matter of law regarding invalidity.

4. Whether Packet Intelligence could recover presuit damages.

5. Whether Packet Intelligence could recover enhanced damages, including whether NetScout was entitled to judgment as a matter of law regarding willfulness.

## INTRODUCTION

This appeal raises three separate grounds that each warrants a complete reversal of the judgment.

To begin, the asserted claims are invalid because the patented subject matter was not conceived by the named inventors. The patents are directed to the idea of monitoring data packets on a computer network to recognize packets related to a particular activity, such as the running of an application on a server as requested by a client. While prior art computer network probes routinely tracked connection flows—packets sent back and forth over an established network connection—the named inventors purported to invent the idea of identifying the packets from multiple such connection flows, correlated with the same activity, as belonging to one so-called "conversational flow." But recognizing "conversational flows" is the named inventors' coined term for existing technology called "Track Sessions," a standard conceived and published by an industry working group to achieve this same objective. The named inventors appropriated Track Sessions as the basis for their patents, failing to name the working group as the true inventors. Moreover, NetScout's own early network probe that implemented Track Sessions anticipates each of the asserted claims.

Further, the accused products do not infringe. The accused products were independently developed to monitor telephone networks by a company that

NetScout acquired, and do not use Track Sessions or any similar technology. At trial, both parties' experts agreed that the accused products—like the prior art—merely stored information on **connection flows**, and never classified them as belonging to a "**conversational flow**." The district court nonetheless upheld the infringement verdict on the erroneous theory that the accused products stored information from which the infringing correlation could be performed, even though the correlation was never actually performed.

But even more fundamentally, the asserted claims are directed to ineligible subject matter. The idea of associating multiple computer network connection flows into what the patents call "conversational flows" is abstract and ineligible, as it is merely a form of collecting, storing, and associating packet information using standard network technology. This Court routinely finds similar data processing claims to be abstract and ineligible under Section 101.

Judgment should be rendered in favor of NetScout. To the extent any liability survives review, this Court should correct the errors made below respecting the imposition of presuit and enhanced damages.

## STATEMENT OF THE CASE

NetScout is a leader in the field of computer network monitors—also known as "probes"—that monitor and track the flow of data packets through a network.

The company was co-founded in 1984 by Anil Singhal. Appx1480-1481(99:24-100:8); Appx1539(24:7-10). He built the company by leveraging his deep experience in network design and management and with the goal of delivering products that would help make networks operate better. Appx1540-1541(25:17-26:19); Appx1542(27:5-24); Appx1550-1551(35:16-36:9); Appx1557(42:8-13). In 1989, after years of consulting and network problem solving for a host of customers, the company released its first network probe. Appx1555-1556(40:22-41:16); Appx1550-1551(35:16-36:9).

In the early 1980s, when NetScout was starting out, computer networks were unreliable and prone to frequent malfunctions. Appx1555(40:3-16). Computer engineers from private industry and academia joined together to develop standards for operating and monitoring networks. Appx1557-1559(42:23-44:17). They worked through the Internet Engineering Task Force, which formed the Remote Monitoring ("RMON") Working Group to develop standards for probes. Appx1558-1561(43:13-46:18); Appx1677-1678(162:24-163:5).

Mr. Singhal was one of the original participants and a leading contributor to the RMON Working Group. Appx1682(167:11-18); Appx1689-1690(174:20-

175:10). He is specifically acknowledged and thanked for his contributions in several RMON publications. Appx1678(163:11-23); Appx11072; Appx1289.

One key early member of the RMON Working Group was Steve Waldbusser, then head of the Information Technology Department at Carnegie Mellon University. Appx1633(118:1-22). Mr. Waldbusser (who served as NetScout's technical expert and a fact witness at trial) authored many key documents for the RMON Working Group. *Id.*; Appx1681(166:20-22). In 1991, he published the first RMON standard, widely referred to as "RMON1." Appx1682-1683(167:19-168:23).

At the time of RMON1, probes could track "connection flows." Appx367 ("Network monitors that could recognize various packets as belonging to the same connection flow were well-known in the prior art when the Asserted Patents were filed."); Appx1311(181:8-182:8). A "connection flow" is a single connection between two points on a network for packets to flow back and forth. Appx1645-1646(130:10-131:7); Appx1647-1648(132:17-133:10); Appx363. A single connection flow is typically defined by a "5-tuple": (1) source IP address; (2) source port number; (3) destination IP address; (4) destination port number; and (5) protocol. Appx1640-1645(125:22-130:9). The 5-tuple is stored in the header of each packet and is used by the network to route the packet from its source to its destination. *Id*. Packet monitors parse the packet header, extract the 5-tuple, and

use this information to classify packets as belonging to a given connection flow. Appx1646-1647(131:8-132:16). The 5-tuple is the "key" used by a packet monitor to identify and classify packets as belonging to the same connection flow. Appx1644-1645(129:15-130:9); Appx1645-1651(130:10-136:6).

Ordinarily, each device on a network receives a single IP address. But each device may have multiple ports, *i.e.*, channels for communication. Appx1642-1643(127:3-128:5). A rough analogy would be a single house that has multiple phone lines. When different port numbers are involved, there can be multiple connection flows between the same two devices. Appx1651-1652(136:7-137:25).

Although tracking connection flows provides valuable information, this approach cannot always associate network traffic with specific user activities because some user activities involve multiple connection flows. Appx1651-1652(136:10-137:24).

For example, multiple connection flows are created when a user requests a service from a remote server using a Remote Procedure Call ("RPC") application.[1] Appx1654-1655(139:16-140:25). An RPC client device transmits an RPC application request to an RPC server at a well-known destination port (*i.e.*, port 111). Appx1657-1658(142:7-143:16). This is known as a "port mapper" request.

---

[1] Also referred to as "SunRPC" because it was developed by Sun Microsystems, Inc. Appx232(30:47-48).

Appx1663(148:15-25). After a "port mapper" program determines which port should be used to provide the requested service, the RPC server responds with a message telling the client which port to use. Appx1658-1659(143:17-144:12). All subsequent packet exchanges relating to the requested service then occur over the newly assigned port. Appx1658-1660(143:17-145:11). Because the client communicates with two different ports on the RPC server, there are two different connection flows. *Id*.

A probe that only tracked connection flows is unable to relate the second connection flow to the first one, despite the fact that they stem from the same activity. Appx1660(145:2-11). These uncorrelated connection flows arising from a single activity are referred to in the asserted patents as "disjointed flows." Appx175(3:15-16); Appx1651-1652(136:7-137:24).

### A. The RMON Working Group Addresses the Disjointed Flow Problem with the Track Sessions Standard

The RMON Working Group addressed the disjointed flow problem by ensuring that probes could track and associate related connection flows. Appx1669-16701(154:11-155:11); Appx1675-1678(160:9-163:10). In November 1996, the RMON Working Group published a draft standard including "Track Sessions," which describes how a probe can correlate the disjointed connection flows resulting from a request for an RPC application. Appx1669-1671(154:21-156:4).

To associate the two connection flows from a single RPC request, Track Sessions taught that a probe had to monitor portmap requests, decode the responses, and remember the port to which the client was assigned:

> The first packet of many SUNRPC transactions is sent to the port-mapper program, and therefore decoded statically by monitoring RPC portmap requests[.] … Any subsequent packets must be decoded and correctly identified by 'remembering' the port assignments used in each RPC function call.

Appx11040-11041; Appx11019; Appx1670-1672(155:22-157:25).

Track Sessions was adopted by the RMON Working Group in the updated standard called "RMON2." Appx1582-1583(67:15-68:7); Appx1670(155:8-21).

### B. NetScout Implements RMON2

In 1992, NetScout was one of the first companies to produce an RMON1-compliant probe when it released the "6010 probe." Appx1569(54:5-12); Appx1600(85:14-19); Appx1612(97:5-8). In October 1998, NetScout released a software update that implemented RMON2 functionality, including Track Sessions. Appx1614-1615(99:6-100:2). NetScout called this release "Version 4.5." *Id*. This software was included in 6010 probes sold on or around the release date. Appx1614-1615(99:25-100:19). Customers could also upgrade existing probes. *Id.*; *see also* Appx1618-1627. The 6010 probe with Version 4.5 is referred to herein as the "NetScout Track Sessions Probe."

The NetScout Track Sessions Probe decodes the first packet of the RPC request to generate a 5-tuple "key" for that connection flow. Appx1673-1674(158:13-159:3). When the RPC server responds with the newly assigned port, the probe decodes the response to "remember" this new port number and then generates a new 5-tuple "key" for the second connection flow (based on the new port number). Appx1674-1675(159:4-160:15); Appx1724-1725.

The NetScout Track Sessions Probe then uses this updated key to capture the packet information generated by the second "connection flow" and to store them in the same flow entry used for the first "connection flow." Appx1674-1677(159:16-162:23); Appx1725-1728; Appx1965-1966(70:18-71:10). By storing them together, the probe identifies the two connection flows as belonging to the same RPC activity. *Id.*

### C. Russell Dietz and His Team Patent the Technology Devised by the RMON Working Group

NetScout was not the only participant in the RMON Working Group. The first-named inventor, Russel Dietz, was also heavily involved in the RMON Working Group. He took meeting minutes and recalled "rigorous discussion" about Track Sessions. Appx1085-1086(86:21-87:6). Another named inventor, Andrew "Skip" Koppenhaver, commented on the Track Sessions publication and even reviewed it for errors using software he developed for that purpose. Appx11479-

11481. Named inventor Joseph Maixner also stayed up-to-date on the RMON Working Group's publications. Appx1154(24:2-18).

Mr. Dietz and the other named inventors filed a provisional application on June 30, 1999—after the 1996 publication of the Track Sessions standard. Appx1870(120:7-23). The patents that issued claim as an invention correlating disjointed connection flows related to a single user activity: precisely the method taught in the published Track Sessions standard and previously implemented in the NetScout Track Sessions Probe.

The patents expressly identify RPC—the same application addressed in the Track Sessions standard—as giving rise to the "disjointed flow" problem. Appx175(3:15-16) ("Other protocols that may lead to disjointed flows, include RPC"). The patents describe the invention as linking two connection flows (resulting from protocols such as an RPC request) into a "conversational flow." *See also* Appx174(2:48-50) ("It is desirable to be able **to identify and classify conversational flows** rather than only connection flows").[2] The patents explain that "to eliminate the possibility of disjointed conversational exchanges," a network packet monitor must "'virtually concatenate'—that is, to link—the first exchange with the second" so that "the two packet exchanges would then be correctly identified as being part of the same conversational flow." Appx175(3:8-14).

[2] All emphasis added, unless identified as in the original.

The patents describe this identifying and linking of multiple disjointed flows as belonging to the same "conversational flow" as the point of the novelty: "What distinguishes this invention from prior art network monitors is that it has the ability to recognize disjointed flows as belonging to the same conversational flow." Appx175(3:56-59). The patents acknowledge that "prior art packet monitors classify packets into connection flows." Appx174(2:42-43); Appx367. Thus, the only purported improvement over this prior art was **identifying** connection flows as belonging to the same "conversational flow."

Although the patents do not claim any specific method for recognizing a "conversational flow," the specification provides an example of linking connection flows resulting from a request for an RPC application by remembering the port number assigned through the portmap request for use in the second disjointed connection flow. *See* Appx189(31:32-35) ("[R]emembering the exchange so that future packets that use the port number 'port' will be associated by the network monitor with the application program."); Appx188-189(30:50-31:35). This language in the patent echoes the directive in the Track Sessions standard to "'remember[]' the port assignments" so that "subsequent packets" belonging to the requested RPC application can be "correctly identified." Appx11040-11041; Appx11019.

Although the patents acknowledge that RMON2 probes existed at the time, Appx174(2:33-37), they do not reference or disclose RMON2's Track Sessions standard or explain that RMON2 probes were capable of associating disjointed connection flows. Nor do the patents credit the RMON Working Group as inventors.

A company co-founded by Mr. Dietz initially owned the patent applications. During the pendency of the applications, Mr. Dietz sold his company and the patent rights to Hi/Fn, which was subsequently acquired by Exar Corporation. Appx1187. Exar made a product called "MeterFlow," from 2009 to 2017, which NetScout identified as practicing the asserted claims (although MeterFlow was not marked with the patents). Appx11000-11003; Appx1889-1890(139:16-140:25).

Brad Brunell, a former Microsoft patent licensing manager, learned about the patents from the patent agent, Dov Rosenfeld, who prosecuted them and who is entitled to a 10% share of any revenues from them as part of his fee arrangement. Appx1858-1859(108:9-109:22); Appx1187(57:10-21). Packet Intelligence was co-founded by Mr. Brunell to purchase the patents from Exar and monetize them. Appx1208-1210(78:7-80:6).

### D. Packet Intelligence Sues NetScout for Patent Infringement

On March 15, 2016, without any prior notice of its infringement claims, Packet Intelligence sued NetScout. Appx74; Appx1209(79:1-11).

Packet Intelligence did not accuse the NetScout Track Sessions Probe or any of its successors sold today. Instead, Packet Intelligence accused products known as the "G10" and "GeoBlade" (collectively, the "accused products") that were originally developed by Tektronix Communications, a company NetScout acquired in 2015. Appx1230(100:16-20); Appx1477-1482; Appx1767-1769.

At trial, Packet Intelligence asserted claims 19 and 20 of the '789 patent, claims 10 and 17 of the '725 patent, and claims 1 and 5 of the '751 patent. Each of the asserted claims requires correlating connection flows into "conversational flows." Appx7611 (Packet Intelligence not disputing "[e]ach of the asserted claims requires determining whether packets flowing through a network are part of a 'conversational flow'"). Claim 19 is representative:

> 19. A packet monitor for examining packets passing through a connection point on a computer network, each packets conforming to one or more protocols, the monitor comprising:
>
> (a) a packet acquisition device coupled to the connection point and configured to receive packets passing through the connection point;
>
> (b) an input buffer memory coupled to and configured to accept a packet from the packet acquisition device;
>
> (c) a parser subsystem coupled to the input buffer memory and including a slicer, the parsing subsystem configured to extract selected portions of the accepted packet and to output a parser record containing the selected portions;
>
> (d) a memory for storing a database comprising none or more flow-entries for previously encountered **conversational flows**, each flow-entry identified by identifying information stored in the flow-entry;

(e) a lookup engine coupled to the output of the parser subsystem and to the flow-entry memory and configured to lookup whether the particular packet whose parser record is output by the parser subsystem has a matching flow-entry, the looking up using at least some of the selected packet portions and determining if the packet is of an existing **flow**; and

(f) a flow insertion engine coupled to the flow-entry memory and to the lookup engine and configured to create a flow-entry in the flow-entry database, the flow-entry including identifying information for future packets to be identified with the new flow-entry, the lookup engine configured such that if the packet is of an existing **flow**, the monitor classifies the packet as belonging to the found existing **flow**; and if the packet is of a new **flow**, the flow insertion engine stores a new flow-entry for the new **flow** in the flow-entry database, including identifying information for future packets to be identified with the new flow-entry,

wherein the operation of the parser subsystem depends on one or more of the protocols to which the packet conforms.

Following the recital of a database for storing flow-entries for "conversational flows," the claim uses the term "flows" (in bold above) in subsequent limitations as shorthand for "conversational flows" that may be identified and stored in these entries. Packet Intelligence stipulated that claim 19 specifically requires "determining if the packet is of an existing [conversational] flow,"[3] thus conceding the recited "flows" are "conversational flows." Appx7612-7613.

The parties agreed on the construction of the term "conversational flows":

[3] In its motion for summary judgment of noninfringement, NetScout included "conversational" in brackets before the term "flow" in its presentation of portions of claim 19 in its statement of facts. Appx6036-6037. Packet Intelligence stipulated to this insertion of "conversational" in brackets in its response. Appx7612-7613.

> [T]he sequence of packets that are exchanged in any direction as a result of an activity—for instance, the running of an application on a server as requested by a client—and where some conversational flows involve more than one connection, and some even involve more than one exchange of packets between a client and server.

Appx417.

Before trial, the district court granted—and Packet Intelligence has not appealed—NetScout's motion for summary judgment of no presuit indirect infringement. Appx406. Thus, the only theory tried regarding presuit infringement of the asserted method claims was direct infringement based on NetScout's use of the accused products.

At trial, NetScout moved for judgment as a matter of law regarding invalidity and non-infringement. Appx1979-1980(84:15-85:12). NetScout contended the patents were invalid because the alleged point of novelty of the asserted claims—associating connection flows into a "conversational flow"—was invented by the RMON Working Group in Track Sessions and not the named inventors. Appx1701(186:13-189:25). Packet Intelligence's expert, Dr. Kevin Almeroth, testified that Track Sessions differed from the patents because Track Sessions did not maintain information in separate connection flow entries and lacked certain advantages, such as providing "application visibility." But as NetScout explained, these distinctions are irrelevant to the asserted claims.

NetScout also argued that the asserted claims were anticipated by the NetScout Track Sessions Probe. Appx1705-1747(190:1-232:13); Appx1756(6:3-11:5). The named inventors—Mr. Dietz and Mr. Maixner—testified that the invention was simply associating connection flows, precisely what Track Sessions taught and the NetScout Track Sessions Probe implemented. Appx1056(57:5-12) (Mr. Dietz: "[W]hat we came up with was a way to … create a conversational flow. … [T]he conversational flow … can be 3 or 300 or 30 different connection flows[.]"); Appx10187; Appx1145-1146(15:18-16:5) (Mr. Maixner: "[W]e were able to abstract [those connections] as [a] conversational flow. It's a combination of multiple flows[.]"). Mr. Maixner even admitted that Figure 2 of the asserted patents describes the same technique as Track Sessions for correlating the disjointed connection flows resulting from an RPC request. Appx1171-1172(41:8-42:18).

To distinguish the NetScout Track Sessions Probe, Dr. Almeroth again pointed to irrelevant distinctions between the claims and Track Sessions. Appx1923-1926(28:15-31:15). He also expressed skepticism that Track Sessions had been incorporated into the NetScout Track Sessions Probe before the priority date, but neither identified any evidence rebutting nor provided any reason to doubt the detailed testimony and documentary evidence confirming the probe and this functionality predated the patents. Appx1935-1937(40:9-42:12).

With respect to non-infringement, NetScout presented uncontroverted evidence that the accused products—like the prior art—tracked connection flows rather than "conversational flows." Appx1770-1773(20:1-23:24). NetScout explained that because the accused products were developed to monitor large **telephone** networks, they do not perform detailed tracking of **data traffic** and thus do not implement Track Sessions or any similar functionality. Appx1553(38:2-19); Appx1769-1770(19:11-20:8). The accused products track only individual connection flows and store information and statistics for each connection flow in a separate flow entry. Appx1770-1773(20:1-23:24). These facts were all undisputed.

In response, Packet Intelligence admitted that the accused products did not correlate connection flows, but argued that they nonetheless infringed because, according to Dr. Almeroth, they stored information that "can be used" to correlate connection flows into "conversational flows," even if they never actually do so. Appx1266-1267(136:25-137:2); Appx1321(191:7-14). NetScout asserted that a hypothetical possibility that the products could be modified to correlate connection flows into "conversational flows" is not evidence of infringement. Appx1986(91:18-25). The district court permitted Packet Intelligence to proceed to verdict on this flawed theory of infringement. Appx2001-2002(106:11-107:12).

The jury found in favor of Packet Intelligence on all counts, including willfulness. Appx117-123. The jury awarded Packet Intelligence $3.5 million in

presuit damages (based on a royalty applied to presuit sales) and $2.25 million in post-suit damages. Appx121. NetScout renewed its motions for judgment as a matter of law. Appx111-112. The district court denied each of NetScout's JMOLs. Appx22; Appx40.

NetScout also moved to declare the asserted claims invalid under Section 101 as directed to the abstract idea of collecting, storing, and associating packet data. Appx107. The district court denied this motion as well. The district court enhanced the jury's damages award by $2.8 million and set an ongoing royalty rate of 1.55% of revenue. Appx345; Appx353.

## STANDARD OF REVIEW

Patent eligibility under Section 101 is an issue of law, which this Court reviews *de novo*, and may contain underlying issues of fact. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018).

This Court reviews the denial of a motion for JMOL *de novo* and determines whether "the facts and inferences point so strongly and overwhelmingly in favor of one party that the court concludes that reasonable jurors could not arrive at a contrary verdict." *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 273 (5th Cir. 1997). This Court has "interpreted the Fifth Circuit's JMOL standard to mean that the jury's determination must be supported by substantial evidence." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1347 (Fed. Cir. 2012).

## SUMMARY OF THE ARGUMENT

The district court erred in finding the asserted claims eligible under Section 101 and in denying NetScout's motions for JMOL on the issues of infringement, invalidity, presuit damages, and willfulness.

The asserted claims are ineligible for patent protection under Section 101 because they are directed to the abstract idea of recognizing "conversational flows," a form of collecting, storing, and associating packet data. The claims add no inventive concept to this abstract idea. Rather than claiming any particular method of correlating connection flows into "conversational flows," they simply claim the idea of achieving this goal. The district court found that correlating connection flows into a "conversational flow" was a "particular approach" and "unconventional technological solution." Appx387-391. But "narrowing or reformulating an abstract idea" cannot be an inventive concept, and "it is irrelevant whether [use of the abstract idea] may have been non-routine or unconventional as a factual matter." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1291 (Fed. Cir. 2018).

Even if the claims were eligible for patent protection, NetScout cannot be liable for patent infringement because the accused products do not infringe. Both parties' experts agreed that, just like the prior art, the accused products store information for separate connection flows in separate connection flow entries. It is undisputed that the accused products do not associate these connection flows into

"conversational flows." Packet Intelligence's theory at trial was that the accused products nonetheless infringe because they allegedly store information in the connection flows that "can be used" to associate them into "conversational flows." But this is not evidence of infringement—the claims require actually associating connection flows into "conversational flows," not merely storing information that theoretically could be used to do so.

The asserted claims are also invalid in light of the Track Sessions technology invented by the RMON Working Group and implemented in the NetScout Track Sessions Probe. Because the Track Sessions standard invented by the RMON Working Group was the true source of what the patentee claimed as "conversational flows," the asserted claims are invalid under Section 102(f) for failing to name the true inventors. Because the NetScout Track Sessions Probe predates the patents, the asserted claims are also invalid as anticipated under Section 102(a).

At trial, Packet Intelligence failed to identify any relevant differences between Track Sessions and "conversational flows." Its expert, Dr. Almeroth, claimed that Track Sessions was different only because Track Sessions stored the related connection flow data together in a single flow entry for the entire "conversational flow" instead of storing each connection flow separately and correlating them. But this alleged distinction actually confirms anticipation. There is no requirement in any asserted claim to separately store connection flow data. Indeed, the NetScout

Track Sessions Probe identifies disjointed connection flows as belonging to the same "conversational flow" by storing the information for multiple connection flows together in a single "conversational flow" entry. This is precisely what the asserted claims require.

Each of the foregoing is an independent ground requiring reversal of the judgment below. Liability cannot stand where the claimed invention is directed to the abstract idea of correlating "conversational flows," an idea invented by others and incorporated into NetScout's own prior art probe. And there can be no liability when it is undisputed that the accused products do not conduct the critical correlation described as the point of novelty. To the extent any liability survives review, this Court should correct the errors made below regarding damages.

Specifically, the $3.5 million presuit damages award should be vacated. Packet Intelligence is not entitled to presuit damages for the asserted apparatus claims because it failed to prove marking under 35 U.S.C. § 287(a). Packet Intelligence presented no evidence that licensed, unmarked Exar, Cisco, and Huawei products did not practice the '789 patent. Packet Intelligence is not entitled to presuit damages for the asserted method claims because Packet Intelligence presented no evidence of any actual damages—much less $3.5 million—from NetScout's own internal use and testing of the accused products.

In addition, the willfulness verdict should be reversed and the $2,800,000 in enhanced damages should be vacated. That NetScout executives allegedly did not study the patents in detail and, instead, relied on their experts and counsel to develop NetScout's defenses, does not demonstrate wanton or malicious infringement. Nor does NetScout's post-filing sales of accused products. Packet Intelligence did not seek an injunction to prevent those sales. To the contrary, because it does not sell anything and its only business is monetizing its patents, Packet Intelligence sought and secured an ongoing royalty.

## ARGUMENT

### I. The Asserted Claims Are Not Patent Eligible Under Section 101.

In evaluating eligibility, a court must first "determine whether the claims at issue are directed to a patent-ineligible concept." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). If so, the court "examine[s] the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018) (citation omitted).

The district court erred at both steps of the *Alice* inquiry. The asserted claims are directed to the abstract idea of recognizing "conversational flows," a form of collecting, storing, and associating packet data. And the claims add no inventive concept to this abstract idea. Rather than claiming any particular method of associating connection flows into "conversational flows," they simply claim the idea of achieving this goal.

#### A. The Asserted Claims Are Directed to the Abstract Idea of Collecting, Comparing, and Classifying Packet Information.

Packet Intelligence agreed that claim 19 of the '789 patent is representative of the asserted claims, and this was the claim the district court focused on for its Section 101 analysis. Appx367. Claim 19 is merely directed to the abstract idea of collecting packet information flowing through a network, comparing information in the

collected packets to other stored information, and classifying the packets as belonging to the same "conversational flow" as other packets.

The specification makes clear that "[w]hat distinguishes this invention from prior art network monitors is that it has the ability to recognize disjointed flows as belonging to the same conversational flow." Appx175(3:56-59). The asserted claims thus "fall into a familiar class of claims 'directed to' a patent-ineligible concept" of "collecting information, analyzing it, and displaying certain results of the collection and analysis." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016).

This Court has repeatedly recognized that "claims directed to the collection, storage and recognition of data" are ineligible as abstract ideas. *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2016); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014). In other words, claims for "collecting information, including when limited to particular content," are "within the realm of abstract ideas." *Elec. Power*, 830 F.3d at 1354. "[M]erely presenting the results of abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation), is abstract as an ancillary part of such collection and analysis." *Id.*

Here, as in *Electric Power Group*, the claims are "focused on the combination of these abstract-idea processes." *Id.* "The advance they purport to make is a process of gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions." *Id.* Here, the claims merely require gathering and analyzing information regarding connection flows, and then using the analysis to correlate connection flows of the same "conversational flow."

Notably, the claims do not purport to cover any inventive technology for performing this correlation. Instead, the claims recite the result without specifying how to achieve it.

Nonetheless, the district court found that "the Asserted Claims are oriented towards solving a discrete technical problem: relating disjointed connection flows to each other." Appx387-388.

But merely attempting to address a technical problem does not mean that a claim survives Step 1 of *Alice*. For example, *Intellectual Ventures I LLC v. Capital One Bank (USA)* involved claims that relate "to customizing web page content as a function of navigation history and information known about the user." 792 F.3d 1363, 1369 (Fed. Cir. 2015). Despite the technological environment, this Court readily recognized "tailoring the information presented to the user" as an abstract idea. *Id.* at 1369-70.

A patentee cannot claim an abstract idea, even when that abstract idea purports to solve a problem using computers or software. Instead, as this Court has explained, claims are patent eligible when they "are directed to **a specific implementation of a solution** to a problem in the software arts." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016); *see also BSG Tech*, 899 F.3d at 1287 ("[A] claim is not patent eligible merely because it applies an abstract idea in a narrow way.").

Although, as the district court recognized, the asserted claims are directed to a technical problem (*i.e.*, the need to correlate disjointed connection flows), they are not directed to a specific implementation of a solution. They are simply directed to the abstract idea of gathering and parsing packet data, and then identifying this data as belonging to "conversational flows."

The district court did not challenge NetScout's observation that the asserted claims fail to recite any specific means or method for accomplishing the goal of correlating data into "conversational flows." Rather, the district court found that "[t]his argument fails because it focuses only on the claims in isolation" and that "[t]aken together, the claims and specification do teach how to identify that certain packets belong to the same conversational flow." Appx390. This is legal error. In assessing eligibility, the focus is on the patent claims and whether they are "directed to" an abstract idea. *See Elec. Power*, 830 F.3d at 1353. A claim to an abstract idea is not any less abstract simply because the specification may include an exemplary

embodiment that is more concrete. *See Two-Way Media Ltd. v. Comcast Cable Communications, LLC*, 874 F.3d 1329, 1338-39 (Fed. Cir. 2017) ("While the specification may describe a purported innovative 'scalable architecture,' [the claim] does not.").

Here, the claims are directed to the abstract idea of correlating connection flows. The fact that the Figure 2 embodiment describes a specific technique for correlating connection flows—the very same technique called Track Sessions by the RMON Working Group—is not relevant to eligibility. The claims do not recite the particular implementation described in the specification (and the prior art) for this embodiment of remembering the assigned port in an RPC exchange, claiming instead the abstract notion of using any possible technique to make the correlation. The district court erred by relying on unclaimed features of the disclosed embodiments at Step 1 of *Alice*.

### B. The Asserted Claims Do Not Contain an Inventive Concept that Transforms this Abstract Idea Into a Patent Eligible Application.

The claims add nothing to this abstract idea, much less an inventive concept that transforms them into a patent-eligible application. Claim 19, for example, does not recite any specific method for determining whether packets belong to a "conversational flow." The limitation is purely functional: anything that results in packets being correlated into a "conversational flow" is covered.

The various components recited by claim 19 —a "packet acquisition device,"

"buffer memory," "parser subsystem," "memory," "lookup engine," and "flow insertion engine"—are standard "off-the-shelf, conventional" components used in every probe. *Elec. Power*, 830 F.3d at 1355; Appx174(2:42-43) ("Some prior art packet monitors classify packets into connection flows."); *see also* Appx1719-1730(204:6-215:12) (anticipation testimony as to claims 19 and 20 of the '789 patent); Appx1730-1740(215:13-225:10) (anticipation testimony as to claims 1 and 5 of the '751 patent); Appx1740-1747(225:11-232:15), Appx1756-1761(6:3-11:5) (anticipation testimony as to claim 10 and 17 of the '725 patent).

These types of components have repeatedly been found conventional and non-inventive. *See, e.g., Elec. Power*, 830 F.3d at 1355 (noting the "conventional computer, network, or display technology" recited in the claims); *FairWarning IP, LLC v. Iatric Systems, Inc.*, 839 F.3d 1089, 1096 (Fed. Cir. 2016); *Symantec*, 838 F.3d at 1318. Reciting such conventional components and functionality imposes no "meaningful limit on the abstract idea" and is insufficient to create eligible subject matter. *See Alice*, 573 U.S. at 225-27.

The asserted claims do not provide any meaningful detail on "how a computer [or other device] accomplishes" the claimed functions, *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1342 (Fed. Cir. 2017), or "how the result" of the various generic components are "configured to" accomplish the purported result, *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir.

2015). For example, claim 19 is silent as to how a "packet acquisition device" is "configured to receive packets," an "input buffer memory" is "configured to accept a packet from the packet acquisition device," or a "parser subsystem" is "configured to extract selected portions of the accepted packet."

The use of conventional hardware to implement generically claimed functions—like the asserted claims here—adds nothing inventive to the underlying abstract idea. *See Symantec*, 838 F.3d at 1316-17 (claims recited functional computer components such as a "receipt mechanism," a "rule engine," and a "distribution mechanism" for performing the claimed steps"); *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1338-39 (Fed. Cir. 2013) (claims recited "event processor" without implementation details); *Capital One Fin. Corp.*, 850 F.3d at 1341 (claims recited "a generic computer element—a processor—and a series of generic computer 'components' that merely restate[d] their individual functions").

This conventional combination of these standard components is not unexpected and adds nothing "because it follows from the underlying idea" of classifying packets based on information found within the packets. *See Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 988, 993 (Fed. Cir. 2014) (nonprecedential); *see also Two-Way Media*, 874 F.3d at 1339 (finding no inventive

concept when "claim uses a conventional ordering of steps … with conventional technology to achieve its desired result").

These are precisely the sort of "generic and conventional information acquisition and organization steps that are connected to, but do not convert, the abstract idea … into a particular conception of how to carry out that concept." *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1346 (Fed. Cir. 2018); *see also Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084, 1093 (Fed. Cir. 2019) ("The claims of the '999 patent do not improve the functioning of the computer, make it operate more efficiently, or solve any technological problem. Instead, they recite a purportedly new arrangement of generic information that assists traders in processing information more quickly.").

The district court incorrectly concluded that the asserted claims recite an "unconventional technological solution" for "constructing conversational flows that associate connection flows with each other and ultimately specific applications or protocols." Appx389 (citations omitted).

But the creation of "conversational flows" is the abstract idea—that cannot be the inventive concept added to the abstract idea. Merely classifying and correlating information is not an unconventional technological solution. *Intellectual Ventures I LLC v. Erie Indem. Co.*, 711 F. App'x 1015 (Fed. Cir. 2017) ("identifying and characterizing files based on one of three selection criteria" does not satisfy Section

101) (nonprecedential); *Symantec*, 838 F.3d at 1313, 1315 ("characterizing e-mail based on the identifiers" was not inventive).

The asserted claims do not recite using any specific methodology (much less any specific criteria or signatures) to construct "conversational flows." Nothing in the claims amounts to an inventive concept that transforms the abstract idea of data processing into a patent-eligible application of that idea.

Similarly, the district court's incorrect conclusion that NetScout "failed to show that the combination of elements recited in the [a]sserted [c]laims would have been regarded as conventional, routine, or well-known by a skilled artisan" is irrelevant. Appx392. *BSG Tech* makes clear that "[i]f a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application of an abstract idea." *BSG Tech*, 899 F.3d at 1290-91. Because, as a matter of law, "narrowing or reformulating an abstract idea" cannot be an inventive concept, "it is irrelevant whether [use of the abstract idea] may have been non-routine or unconventional as a factual matter." *Id.* at 1291.

Here, the only alleged unconventional feature of the asserted claims is "the ability to recognize disjointed flows as belonging to the same conversational flow." Appx367-370. But this "simply restates" the abstract idea without adding a transformative inventive concept. *BSG Tech*, 899 F.3d at 1291. Like the patentee

in *BSG Tech*, Packet Intelligence "does not argue that other, non-abstract features of the claimed inventions, alone or in combination, are not well-understood, routine and conventional." *Id.*

In sum, the asserted claims are directed to an abstract idea and lack an inventive concept sufficient to transform this abstract idea into a patent-eligible application. They are ineligible for patent protection under Section 101.

## II. As a Matter of Law, the Accused Products—Which Do Not Correlate Connection Flows Into "Conversational Flows"—Do Not Infringe the Asserted Claims.

Even if the claims were patent-eligible, NetScout is not liable because the accused products do not infringe. The district court erred in denying judgment as a matter of law.

The material facts are undisputed: both parties' experts agreed that the accused products store information for separate connection flows in separate connection flow entries. It is undisputed that the accused products do not correlate these connection flows into "conversational flows."[4]

Packet Intelligence's theory at trial was that the accused products nonetheless infringe because they store information in the connection flow entries that "can be

[4] Before trial, Packet Intelligence argued that an optional feature, the Web Page Download Time KPI, could associate connection flows into "conversational flows." Appx1317(187:10-23). But at trial Packet Intelligence's expert, Dr. Almeroth, conceded this feature was never used or sold. Appx1327(196:5-7). The district court also noted this feature was "not itself accused of infringement." Appx51.

used" to correlate connection flows into "conversational flows." Appx1266-1267(136:25-137:13); Appx1328(198:1-8) (Packet Intelligence's expert testifying that an accused product infringes even though it "only contains connection flows, and it never correlates them").

But this is not evidence of infringement—the claims require correlating connection flows into "conversational flows," not merely storing information that theoretically could be used to do so. This Court should render judgment of no infringement.

### A. Each Asserted Claim Requires Correlating Connection Flows Into "Conversational Flows."

The agreed construction of "conversational flow" defines it to be "the sequence of packets that are exchanged in any direction as a result of an activity[.]" Appx417. Thus, to "recognize disjointed flows as belonging to the same conversational flow," Appx175(3:56-59), the asserted claims require a probe to classify packets based on *the activity* generating them, not based on the connection flows in which the packets are found, Appx174(2:42-43).

For example, claim 19 of the '789 patent (which Packet Intelligence agreed is representative) recites a "memory for storing a database comprising none or more **flow-entries for previously encountered conversational flows**," a "lookup engine" which is configured to "look up whether the particular packet ... has a **matching [conversational] flow-entry**" and "determining if the packet is of an

**existing [conversational] flow**." Appx191-192(claim 19). The only flow referenced in claim 19 is a "conversational flow"—not a "connection flow"—and the only "flow-entries" recited are for "conversational flows." The district court concurred, noting that Packet Intelligence's expert, Dr. Almeroth, "stated that the claim required that such flow-entries be 'for previously encountered conversational flows.'" Appx51; *see also* Appx7611(Packet Intelligence's stipulation that "[e]ach of the asserted claims requires determining whether packets flowing through a network are part of a 'conversational flow'"); *see supra* Statement of Case, Part D. Dependent claim 20 includes all of claim 19's limitations.

Claims 10 and 17 of the '725 patent, as the district court recognized, "recite similar steps, including performing certain operations on packets after determining the conversational flow to which they belong." Appx366-367; *see also* Appx265(claim 10) (reciting function "for identifying the packet as belonging to a **conversational flow**"); Appx266(claim 17) (reciting "state processing operations that are a function of the state of the **conversational flow** of the packet, the state of the **conversational flow** of the packet being indicative of the sequence of any previously encountered packets of the **same conversational flow** as the packet"). Claims 1 and 5 of the '751 patent likewise both require the step of "looking up a flow-entry database for … flow-entries for previously encountered conversational

flows, the looking up to determine if the received packet is of an existing [conversational] flow." Appx313-314.

### B. Packet Intelligence Presented No Evidence that the Accused Products Correlate Connection Flows Into "Conversational Flows."

To infringe the asserted claims, the accused products must literally perform the step of correlating flows into "conversational flows."[5] "A device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim." *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1555 (Fed. Cir. 1995); *see also ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007) (hypothetical instances of direct infringement will not suffice).

Because the asserted claims are not written in terms of "the capacity to perform a particular claim element," "it is not enough to simply show that a product is capable of infringement." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010).

Packet Intelligence failed to present sufficient evidence of infringement under this standard. At trial, the testimony of Packet Intelligence's expert focused on the "flow state block" (or "FSB"), a data structure in the accused products used to track

---

[5] At trial, Packet Intelligence neither sought nor secured a finding of infringement under the doctrine of equivalents. Appx2031-2032.

connection flows. *See, e.g.*, Appx1265(135:5-7) ("FSB, and that stands for flow state block. That's the portion of the memory where the database is stored that contains the flow-entries."); *see also* Appx1265-1267(135:11-137:13). Dr. Almeroth acknowledged that the FSB only stores "connection flows." Appx1320(190:2-15) (Dr. Almeroth agreeing that the flow records in the FSB "are connection flows"); Appx1321-1322(191:7-192:7).

He opined that the connection flow entries stored in the FSB **could be** used to correlate the connection flows into "conversational flows." *See* Appx1266-1267(136:25-137:2) ("I've shown you some of the information in the flow record that **can be** used to correlate or associate flow-entries into conversational flows."). Dr. Almeroth did not believe that he needed to show that any connection flows were actually correlated in order to prove infringement. Appx1327(197:24-25) ("I don't think that the actual correlation is a requirement of any of the asserted claims.").

Critically, Dr. Almeroth **never** identified functionality in the FSB that actually **correlates** connection flows into "conversational flows." To the contrary, Dr. Almeroth conceded that the accused products do not correlate connection flows into "conversational flows":

> Q. Now, does the flow state block correlate connection flows?
>
> A. No. It's a passive data structure. It includes the information necessary to do so.

Q. But the flow state block itself doesn't make that correlation, correct?

A. That's correct. It's a – it's a passive data structure.

Appx1321(191:7-14).[6] NetScout's expert, Mr. Waldbusser, confirmed that the FSB stores entries for multiple connection flows, but the connection flows "end up in different entries," are "organized as … separate connection flows," and never "join together into the same [conversational] flow." Appx1770-1773(20:1-23:24). The undisputed fact that the accused products only store connection flows and do not correlate them into "conversational flows"—confirmed by the experts of both parties—is dispositive proof of non-infringement.

The district court erred in denying JMOL of no infringement to NetScout. The district court ignored and did not address Dr. Almeroth's admissions and the evidence of record that confirmed the accused products only track connection flows and never join them together. Instead, the district court found substantial evidence based merely on Dr. Almeroth's testimony that the accused products store information that "can be used" to correlate or associate connection flows. Appx51. This is legal error.

[6] Dr. Almeroth testified that an optional feature, the Web Page Download Time KPI ("WPDT"), would have permitted association of the connection flows into "conversational flows." But it is undisputed that WPDT was never sold or used. *See, e.g.*, Appx1527-1528(12:21-13:1) ("Q. Has any customer ever bought or licensed that [web page] KPI feature? [Ms. Broughton:] No."); *see also* Appx1327(197:5-7); Appx1953-1954(58:24-59:3).

Representative claim 19 requires "storing … flow entries for previously encountered conversational flows" and then actually "determining if the packet is of an existing [conversational] flow" and "if the packet is of an existing [conversational] flow, the monitor classifies the packet as belonging to the found existing [conversational] flow." Packet Intelligence presented no evidence that any accused product actually had any "conversational flow" entries or that any accused monitor classified any packet as belonging to a "conversational flow." A hypothetical possibility that the products could be modified to associate connection flows into "conversational flows" is, as a matter of law, no evidence of infringement. *See High Tech Med.*, *ACCO Brands*, and *Fujitsu* cases cited *supra*.

The district court's analysis of infringement cannot be reconciled with its analysis of eligibility under Section 101. When considering eligibility, the district court emphasized "the need to associate various connection flows with the same conversational flow," Appx367,n.2, and noted that the claims recited "a particular approach focused on constructing conversational flows that associate connection flows with each other," Appx389. This requirement to construct the "conversational flow" confirms the irrelevancy of Dr. Almeroth's assertions that the connection flow records contain information that "can be used" to make a correlation that the accused products do not actually make.

Because it is undisputed that the accused products never actually correlate any connection flows or otherwise construct any "conversational flows," this Court should reverse the judgment.

## III. The Asserted Claims Are Invalid in Light of the Track Sessions Technology Invented by the RMON Working Group and Implemented by the NetScout Track Sessions Probe.

At trial, uncontroverted evidence confirmed that the Track Sessions standard invented by the RMON Working Group was the true source of what the patentee claimed as "conversational flows."

This fact invalidates the asserted claims as a matter of law in two ways. First, because the named inventors did not "invent the subject matter" described in the asserted claims, those claims are invalid under Section 102(f). *See In re VerHoef*, 888 F.3d 1362, 1366 (Fed. Cir. 2018) (finding claims invalid under Section 102(f) where an unnamed inventor contributed an "essential feature" of the claimed invention). Second, because the NetScout Track Sessions Probe implemented Track Sessions, the asserted claims are invalid as anticipated under Section 102(a).

The undisputed facts "point so strongly and overwhelmingly" towards invalidity that "reasonable jurors could not" conclude otherwise. *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1252 (Fed. Cir. 2014) (internal quotations omitted). This Court should render judgment that the asserted claims are invalid.

### A. The Asserted Claims Are Invalid Under Section 102(f) for Failing to List All Inventors.

Under the pre-AIA Patent Code, a patent is invalid if the inventor "did not himself invent the subject matter sought to be patented." 35 U.S.C. § 102(f) (2006); *see also In re VerHoef*, 888 F.3d at 1363 & n.1. Section 102(f) "requires that a patent accurately name the correct inventors of a claimed invention." *In re VerHoef*, 888 F.3d at 1365. If an unnamed inventor contributed any "essential feature" of a claimed invention, the claim is invalid under Section 102(f), even if other limitations were contributed by named inventors. *Id.* at 1366.

The RMON Working Group was the true inventor of the "essential feature" of associating flows into "conversational flows." Track Sessions allows probe software to join together first connections starting on well-known ports with second connections that are on dynamically assigned ports by "'remembering' the port assignments." Appx11040-11041.

NetScout's expert, Mr. Waldbusser, explained that Track Sessions enabled probes to correlate packets exchanged in separate connection flows resulting from the same RPC activity. Appx1673-1677(158:13-162:23); Appx1723-1726(208:15-211-5); Appx11182(lines 1814-1817, 1832-1836); Appx11150-11153.

Named inventor Mr. Maixner admitted that the Track Sessions technique (Appx11005, 11019, 11040-11041) mirrors his patent's Figure 2 embodiment:

Q. And then the subsequent packets would be decoded and correctly identified by remembering the port assignment that was identified by the port mapper program, right? That's how it's described [in the Track Sessions standard]?

A. That's how it's described, yes.

Q. And **that's also how you describe practicing your patent** in **Figure 2**, correct?

A. **Yes**, I believe that would be consistent.

Appx1172(42:11-18); Appx1171-1172(41:19-42:10).

The equivalence is not a coincidence—the named inventors knew about the RMON Working Group's Track Sessions before pursuing the patents. Mr. Dietz was "intimately involved" with the RMON Working Group's publications, including Track Sessions, prior to his alleged conception of the subject matter claimed in the asserted patents. Appx1070(71:1-4); Appx1083-1084(84:25-85:3); Appx1086(87:1-6) (admitting there was "rigorous discussion" about "Track Sessions"). Indeed, according to Packet Intelligence, it was "Mr. Dietz's very involvement [with the RMON Working Group] which allowed him to describe at trial the very nuances of … what TrackSessions was[.]" Appx10644.

Mr. Maixner similarly kept himself up-to-date on the RMON Working Group's published works. Appx1153-1154(23:24-24:18). Mr. Koppenhaver was also intimately familiar with the Track Sessions publication. Years before the patent applications were filed, he commented on the Track Sessions publication and

reviewed it for errors using software he developed. Appx11480; Appx1696-1697(181:10-182:14).

At trial, Packet Intelligence failed to identify any relevant differences between the Track Sessions technique and "conversational flows." Instead, Packet Intelligence relied on a purported distinction with no basis in the claims. Packet Intelligence's expert, Dr. Almeroth, opined that the asserted claims require that each correlated connection flow must be "maintain[ed]" in its own separate connection flow-entry rather than in a single aggregate flow entry for the entire "conversational flow." *See, e.g.*, Appx1940(44:7-45:16). For this reason, he opined, the "conversational flows" of the asserted claims did not read on Track Sessions:

> So even though there's two different connections that are happening here, what TrackSessions is trying to do is put them into a single flow entry. … It's not two flow entries. It's a single flow-entry.
>
> …
>
> So in this instance, you have one flow entry. And, for example, all of the packets that were exchanged over these two different connections are counted as the one flow-entry. These aren't two separate flow-entries. They aren't – they aren't tied together. So, it's a very different concept.

Appx1923-1924(28:15-29:14); *see also* Appx57 (the district court relying on same testimony).[7]

[7] The district court asserted that Dr. Almeroth testified that "the [NetScout Track Sessions] Probe did not associate different connection flows with the same conversational flow and **instead replaces one flow with another**." Appx57. To

But this testimony is irrelevant because it has no grounding in the asserted claims. Claim 19 of the '789 patent, for example, expressly requires storing "flow-entries for … **conversational** flows." Appx191-192(claims 19 & 20). Dr. Almeroth's testimony—that the asserted claims require maintaining separate flow entries for each **connection** flow—cannot be squared with the plain language of the claims.[8] Indeed, claims 10 and 17 of the '725 patent do not even recite "flow entries," let alone require separate connection flow entries. Appx265-266. And the remaining asserted claims, claims 1 and 5 of the '751 patent, never recite "connections flows," only "flow entries for previously identified conversational

---

the contrary, Dr. Almeroth never said the probe replaced one flow with another, he said the NetScout Track Sessions Probe would "just swap out the port number and maintain one flow-entry." Appx1940(45:11-16). By swapping out or replacing the port number for the key used to generate the flow entry, in Dr. Almeroth's words, "**all** of the packets that were exchanged over these two different connections are counted as the one flow-entry." Appx1924(29:1-3). Thus, rather than saying the NetScout Track Sessions Probe "replaced one flow with another," Dr. Almeroth said **all** of the packets of both connection flows were aggregated together in one flow-entry.

[8] Dr. Almeroth attempted to justify his distinction by arguing that an embodiment would function better (and preserve more data) if the connection flows were stored separately. Appx1925-1926(30:11-31:15). But this is counter to the patents' premise. The stated goal of the patents is to link separate connection flows relating to the same activity into a single "conversational flow." The patents explain that by aggregating this information into a "conversational flow," the alleged invention allowed "disjointed" activities occurring on multiple connection flows to be tracked. *See, e.g.*, Appx174-175(2:42-44, 3:10-12, 3:56-59).

flows." Appx313-314. No asserted claim requires a separate flow entry for each connection flow.

The specifications further confirm that separate connection flow entries are not required. The specifications describe using a single flow entry to associate packets belonging to a "conversational flow." *See, e.g.*, Appx181(16:1-4) ("**The flow entry also is updated** … **so that any further packets belonging to this flow will be readily identified from their signature as belonging to this fully analyzed conversational flow**.").

Thus, the claims and specification refute Packet Intelligence's trial argument that Track Sessions did not teach "conversational flows" because Track Sessions used a single flow entry to track a "conversational flow."

Indeed, in its post-judgment briefing, even Packet Intelligence conceded that use of a single flow entry to track an entire "conversational flow" could not distinguish Track Sessions from the asserted patents. Packet Intelligence thus abandoned its expert's testimony that it had relied upon at trial to distinguish Track Sessions. *See* Appx10638, n.4 ("But Dr. Almeroth's opinion was not that single flow entries cannot meet the claim limitations[.]"); Appx10640 ("But PI–or Dr.

Almeroth–has never asserted that a single flow-entry cannot meet the claim limitations.").[9]

Despite Packet Intelligence's retreat, in denying judgment as a matter of law, the district court relied on Dr. Almeroth's trial testimony distinguishing Track Sessions because "[t]here aren't two separate flow entries" for a single "conversational flow." Appx57-58. The district court justified this reliance by characterizing "Dr. Almeroth's opinions [as] represent[ing] one fair reading of the claims." Appx58. This is error not only because it endorses Dr. Almeroth's baseless claim construction, but also because it improperly delegates the court's obligation to interpret the claim. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996) ("[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court.").

Further, the district court's post-judgment analysis violates the rule against "reserv[ing] issues of claim construction for the stage of post-trial motions." *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1320 (Fed. Cir. 2003). It is "too late at the JMOL stage" to argue for or adopt a new construction. *Id.* at 1321.

[9] In its post-judgment briefing, Packet Intelligence raised for the first time a different argument, asserting that the RMON Working Group did not invent the asserted patents because Track Sessions "lack[s] visibility into application content and [is] typically limited to providing network layer information." Appx10637. This purported distinction is entirely without support in the patents. Nothing in the asserted claims refers to "application content/layer visibility."

If Packet Intelligence believed that a further construction was necessary for its claims to be valid under Section 102(f), then Packet Intelligence needed to pursue that construction at the *Markman* stage or during trial. Packet Intelligence cannot argue post-trial in favor of a new and different construction. *Id.*

Nor does any "other evidence in the record" support the district court's decision. Appx58. The first piece of evidence cited by the district court, Mr. Dietz's testimony about "application layer" visibility, *id.* (citing Appx1088(89:22-25); Appx1089(90:13-23); Appx1098-1099(99:24-100:21); Appx1108-1109(109:13-110:5); Appx1113-1114(114:10-115:10); Appx126-128(125:14-127:5)), is irrelevant because the asserted claims do not require visibility into application content.

The second piece of evidence cited by the district court, testimony that NetScout's expert, Mr. Waldbusser, took time to reach his conclusions and was being paid, Appx58-59 (citing Appx1790(40:13-16)), is also irrelevant. Both sides relied on paid experts. And even if this evidence somehow affected the credibility of Mr. Waldbusser, it cannot justify disregarding the undisputed and controlling facts about the prior art—agreed to by both parties' experts—that demonstrate invalidity.

In sum, the uncontroverted evidence shows that the RMON Working Group (in its creation of Track Sessions) invented an "essential feature" of the alleged

inventions. The RMON Working Group was not named in the patents, and this Court should render judgment that the asserted claims are invalid under Section 102(f).

If this Court renders judgment that the asserted claims are invalid, it should also vacate the district court's finding of no inequitable conduct (which rests on the erroneous conclusion that Track Sessions is not material to the asserted claims, Appx329-330) and remand for further consideration.

### B. The Asserted Claims Are Anticipated by the NetScout Track Sessions Probe.

Because the NetScout Track Sessions Probe implemented Track Sessions, the asserted claims are anticipated and invalid under Section 102(a).

#### 1. The NetScout Track Sessions Probe constitutes prior art.

NetScout began selling the 6010 probe in 1992. Appx1612-1613(97:5-98:11). In October 1998, NetScout added Track Sessions functionality in its software Version 4.5. Appx1613-1615(98:12-100:19); Appx1583-1585(68:23-70:14). After that date, as confirmed by the guide for "Release Version 4.5, "[a]ll NetScout probes ha[d] TrackSession capability." Appx11081-11082, 11135-11136; *see also* Appx1608-1627; Appx11151-11152.

The priority date of the asserted claims was June 30, 1999. Because the NetScout Track Sessions Probe, which had software Version 4.5, was sold and used before that date, it constitutes prior art to the asserted claims.

**2. The NetScout Track Sessions Probe disclosed each limitation of each asserted claim.**

In his trial testimony, Mr. Waldbusser detailed how the NetScout Track Sessions Probe disclosed each limitation of each asserted claim. Appx1719-1730(204:6-215:12) (anticipation testimony as to claim 19 and 20 of the '789 patent); Appx1730-1740(215:13-225:10) (anticipation testimony as to claims 1 and 5 of the '751 patent); Appx1740-1747(225:11-232:15), Appx1756-1761(6:3-11:5) (anticipation testimony as to claim 10 and 17 of the '725 patent).

Mr. Waldbusser specifically explained that the implementation of Track Sessions allowed the NetScout Track Sessions Probe to correlate packets associated with an activity (*i.e.*, a request for an RPC service), even though packets associated with the activity were exchanged through different connection flows with different port numbers. Appx1723-1728(208:15-213:5); Appx1673-1677(128:13-162:23); Appx11182-11183(lines 1814-1817, 1832-1836); Appx11150-11153.

Packet Intelligence's expert conceded that Track Sessions enabled the NetScout Track Sessions Probe to monitor an activity's first connection flow, identify its second connection flow, and store information about both connection flows in a single flow entry. *See* Appx1923-1926(28:15-31:15); Appx1939(44:17-19); Appx1965-1966(70:25-71:10); Appx1969-1970(74:25-75:4).

Given these undisputed facts, anticipation was "dictated" by the evidence. *See Blackboard Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1380-81 (Fed. Cir. 2009)

(reversing denial of JMOL where "the conclusion of anticipation is dictated by the testimony of [the plaintiff's] own witnesses and the documentary evidence that was presented to the jury").

The district court erred by relying on Dr. Almeroth's testimony that the NetScout Track Sessions Probe failed to anticipate because the claims require "separate connection flow entries" to create "conversational flows." Appx56-58; Appx1923-1926(28:15-31:15). But, as discussed above, none of the asserted claims requires "separate connection flow entries." This distinction is simply irrelevant. And no other limitations were challenged by Packet Intelligence. *See* Appx1915(20:18-20); Appx1918(23:12-14); Appx1937-1938(42:13-43:18); Appx1969(74:10-18).

Because the NetScout Track Sessions Probe met all claim limitations, this Court should render judgment that the claims are invalid as anticipated under Section 102(a).

As set forth above, each of the preceding grounds dictate that the liability judgment should be reversed. Packet Intelligence is not entitled to any damages because it has asserted invalid patents claiming ideas of the RMON Working Group. The patents claim only the ineligible abstract idea of recognizing "conversational flows." Remarkably, Packet Intelligence has asserted these patents of such dubious provenance against accused products that merely track and store connection flows,

just like the prior art, and that do not infringe by correlating connection flows into "conversational flows" regardless of Packet Intelligence's contentions about how they "can be used."

Each of these grounds independently merits reversal of the judgment, obviating any need for this Court to proceed further. Nonetheless, it merits mention that the district court also erred in connection with the imposition of damages. As discussed below, Packet Intelligence was entitled neither to presuit damages nor to enhanced damages based on willfulness.

## IV. Packet Intelligence Is Not Entitled To Presuit Damages.

Packet Intelligence is not entitled to presuit damages because: (a) it failed to prove marking under Section 287(a); and (b) offered no proof of presuit damages based on NetScout's own internal use of the method claims.

### A. Packet Intelligence Failed to Prove Marking under Section 287(a).

While NetScout believes no damages award can be justified, there is certainly no basis for the award of $3.5 million in presuit damages because Packet Intelligence failed to prove marking under Section 287(a).

It is undisputed that Packet Intelligence licensed the asserted patents to Exar, Cisco, and Huawei and that there is no evidence that any licensed products were marked with the patents. Appx1983(88:20-23); Appx4717; Appx4678-4680;

Appx4685; Appx7941-7944. Having failed to prove that these products do not practice the patented invention, Packet Intelligence cannot recover presuit damages.

"[A]n alleged infringer who challenges the patentee's compliance with Section 287 bears an initial burden of production to articulate the products it believes are unmarked 'patented articles' subject to Section 287." *Arctic Cat Inc. v. Bombardier Rec'l Prods. Inc.*, 876 F.3d 1350, 1368 (Fed. Cir. 2017). This initial burden is a "low bar" and "the alleged infringer need only put the patentee on notice that he or his authorized licensee sold specific unmarked products which the alleged infringer believes to practice the patent." *Id.* "Once the alleged infringer meets its burden of production, however, the patentee bears the burden to prove the products identified do not practice the patented invention." *Id.*

NetScout identified the products it believes are unmarked, patent-practicing products. Packet Intelligence failed to offer evidence—let alone prove—that these products do not practice the claimed invention, relying instead on the erroneous contention that NetScout bore the burden to prove that these licensed products practice the patented inventions. *See* Appx10460 ("NetScout … failed to establish that any licensed products (those of Cisco, Huawei, and Exar) practice any claim of the '789 patent[.]"). The district court erred in denying judgment as a matter of law on presuit damages.

### 1. NetScout identified MeterFlow as an unmarked "patented article."

It is undisputed that NetScout sufficiently identified MeterFlow as an unmarked product that practices the '789 patent. Appx1923(88:22-23) (Packet Intelligence's counsel acknowledging MeterFlow was identified). MeterFlow is a software product sold by Exar, a prior owner of the patents and a current licensee of Packet Intelligence. Appx11999-12002.

NetScout introduced evidence identifying MeterFlow as a product that practices the '789 patent. For example, Exar's corporate witness, Michael Ham, testified that the patents "were underlying the technology that was being sold as MeterFlow." Appx1888(138:12-25). The provisional application for the '789 patent provides that "MeterFlow is to be understood to mean the preferred embodiment of the invention." Appx11219; Appx1105-1106(106:21-107:23). The first named inventor of the '789 patent, Mr. Dietz, testified that "Meter[F]low 5.5" in 1999 "incorporated technology" of the Patents-in-Suit. Appx2099(95:9-16). He also referred to the patent applications as the "official patents for MeterFlow" and proclaimed "[w]e now have 5 patents pending on the MeterFlow system." Appx11476. And he submitted a sworn declaration to the USPTO calling the "MeterFlow Accelerator" software evidence of the conception of the '789 patent 's claimed invention. Appx11672.

The MeterFlow products were not marked. Packet Intelligence's managing

member and corporate representative, Brad Brunell, conceded (1) he was not aware of any of the prior owners of the patents, including Exar, marking their products with any patent numbers, and (2) Packet Intelligence's licenses do not "requir[e] that products covered by the patent claims be marked." Appx1175(45:10-11); Appx1218-1219(88:20-89:14); *see also* Appx11999-12002 (PI-Exar license lacking marking provision).

Unmarked MeterFlow products were sold from 2009 to 2017, covering the entire presuit damages period. *See* Appx11000-11003 (Exar Corporation "MeterFlow and MeterWorks Invoices" dated 11/05/09 to 1/30/17); Appx1889-1890(139:16-140:25).

Thus, the sole question on the marking issue is whether Packet Intelligence met its burden to prove MeterFlow products do not practice the '789 patent. It did not.

#### 2. There was no evidence that MeterFlow does not practice the '789 patent.

The district court erred in holding that Packet Intelligence "was not obligated to mark the Meter Products." Appx33.[10] The district court relied upon three pieces

[10] The court referred to both of the distinct MeterFlow and MeterWorks products collectively as "the Meter Products." Both products were licensed under the '789 patent and both were sold by Exar during the entire presuit damages period. Appx11000-11003; Appx12000.

of evidence in denying NetScout's motion for judgment as a matter of law.

First, the district court relied on the testimony of Mr. Dietz, who asserted noninfringement without any explanation and who failed to identify any claim elements that were purportedly missing. Appx33-34. Such a conclusory "blanket statement" of noninfringement is no evidence that a product does not infringe. *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013); *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1372 (Fed. Cir. 2002) (when determining infringement, "general assertions of facts, general denials, and conclusory statements are insufficient"). In any event, Mr. Dietz's testimony concerned only the "**Meter*Works***" product, not the **Meter*Flow*** products sold by Exar during the presuit damages period. Appx1104-1105(105:14-106:3). As to MeterFlow, Mr. Dietz admitted that MeterFlow 5.5 "incorporated technology of the patents." Appx2099(95:9-16).[11]

Second, the district court noted that although Exar's corporate witness testified that the patents were "related [to] flow classification, which is what [MeterFlow] was based on," he could not confirm with certainty that MeterFlow was a commercial embodiment of the patents. Appx33 (citing Appx1892). Even if this

[11] While Mr. Dietz testified generally that there were "many different versions of MeterFlow" leading up to version 5.5 that "differ[ed] in capability from version to version," he lacked any knowledge (and offered no testimony) regarding the later versions of MeterFlow sold during the relevant presuit period. Appx1121(122:12-25); *see also* Appx32.

testimony would not have been sufficient on its own to establish that MeterFlow practiced the claims of the ’789 patent, it is no evidence at all that MeterFlow did *not* practice that patent.

Third, the district court stated that “while the provisional application for the ’789 patent referenced MeterFlow as a preferred embodiment, the final application omitted any such statements because the inventors did not think MeterFlow practiced the invention.” Appx34 (citing Appx1121-1123(122:6-124:1)). This is not an accurate summary of the evidence presented at trial. Mr. Dietz did not testify that “he did not think Meterflow practiced the invention.” Rather, he testified only that MeterFlow “was not to be … used as a preferred embodiment going forward” because MeterFlow was “a piece of software … that evolved.” Appx1122-1123(123:6-124:1). This testimony concerned a patent prosecution strategy at the time of filing to avoid referring to a product that may change over time. The testimony said nothing about whether later versions of MeterFlow actually practiced the invention or identified any way in which MeterFlow “evolved” not to practice the patents.

None of the cited testimony on which the district court relied even supports the proposition—let alone meets Packet Intelligence’s burden to prove—that MeterFlow products sold during the presuit damages period did not practice the ’789 patent.

Nor is there other evidence in the record that could support the district court's conclusion. Packet Intelligence offered no evidence comparing MeterFlow to the claims of the '789 patent and never identified any purportedly missing claim limitations. Indeed, in opposing NetScout's motion for judgment as a matter of law, Packet Intelligence conceded "[t]here is no evidence whatsoever in the record showing what the 2009 and later Meter products did." Appx10467, n.3. This concession is fatal. Packet Intelligence bore the burden of proof, and with no evidence in the record, Packet Intelligence failed. Judgment as a matter of law in favor of NetScout is warranted.

**3. NetScout identified additional unmarked patented articles.**

In addition to MeterFlow, NetScout identified unmarked Cisco and Huawei products that practice the '789 patent in its summary judgment motion. *See* Appx4717 ("Cisco ASR 1000 Series Aggregation Service Routers (ASR 1000s), and Cisco Wireless LAN Controllers"); Appx4678-4680; Appx4685; Appx7941-7944; Appx7988; Appx4761-4762 (Huawei "Routers (including but not limited to AR 150, AR 200, AR1200, AR1220"). This identification in NetScout's summary judgment motion easily met the "low bar" needed to provide notice to patentee. *Arctic Cat*, 876 F.3d at 1368.

The district court erred by holding that "NetScout bore the initial burden of production *at trial*" and that identification of those products at summary judgment

was insufficient. Appx29-30. Under *Arctic Cat*, "[t]he alleged infringer need only put the *patentee* on notice," there is no obligation to put the *jury* on notice. 876 F.3d at 1368.[12] The district court's "jury notice" requirement makes little sense—the burden of production is simply to provide the patentee "some notice of what market products [defendant] believes required marking" to enable fair and efficient resolution of marking issues. *Id.*[13] By identifying specific unmarked and licensed Huawei and Cisco products at the summary judgment stage, NetScout easily satisfied *Arctic Cat*'s "low bar" of production.[14] *Semcon IP Inc. v. Huawei Device*

---

[12] The district court appears to acknowledge the burden of production can be met pretrial during summary judgment, Appx29 (citing *Semcon*), but that jury notice would still be required when pretrial notice is provided in connection with a summary judgment motion that is denied "in totality" and marking is declared "'a live issue' for trial." *Id.* Since the "notice" requirement is simply intended to alert the patentee of products subject to a marking defense, however, there is no reason to require further notice during trial regardless of the pretrial context of the notice.

[13] Indeed, instructing juries on a burden-shifting framework has "significant potential to confuse juries." *Sanghvi v. City of Claremont*, 328 F.3d 532, 541 (9th Cir. 2003); *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 127 (5th Cir. 1992) ("Instructing the jury on the elements of a *prima facie* case, presumptions, and the shifting burden of proof is unnecessary and confusing.").

[14] The district court "agrees the [marking] instruction [to the jury] was consistent with *Arctic Cat*." Appx30, n.3. The jury was instructed only that "NetScout must first show the existence of a patented article," and not that NetScout was required to prove infringement by demonstrating that a product "met each and every limitation of at least one claim of the asserted patents," as Packet Intelligence wrongly contended. *Compare* Appx2051-2052(47:14-48:25) *with* Appx2029(25:17-22). Under both *Arctic Cat* and the jury instructions, NetScout was only required to identify "products it believes are unmarked patented articles." *Id.*; *Arctic Cat*, 876

*USA Inc.*, 2017 WL 6343771, *1 (E.D. Tex. Dec. 12, 2017) ("initial burden of production" was met at summary judgment); *Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, 2018 WL 1525686, *6 (E.D.N.Y. Mar. 27, 2018) (same); *Finjan, Inc. v. Juniper Networks, Inc.*, 2019 WL 2289483, *9 (N.D. Cal. May 29, 2019) (same).

Packet Intelligence presented no evidence that these products were marked or that they do not practice the '789 patent. For this additional reason, Packet Intelligence failed to prove compliance with Section 287(a) to obtain presuit damages for the '789 patent.

### B. There Was No Evidence of Damages for the Remaining Patents.

Packet Intelligence asserted only method claims of the '751 and '725 patents, thus avoiding the marking requirement for those patents. For these patents, Packet Intelligence's presuit claims were limited to direct infringement, based on NetScout's internal use and testing.[15] Thus, even if NetScout made an allegedly infringing sale to a customer prior to March 15, 2016 (the filing date of the Complaint), the sale could not give rise to any liability. This is because "[m]ethod

F.3d at 1366. NetScout's identification of specific Huawei and Cisco products prior to trial met that burden.

[15] The district court correctly entered summary judgment of no presuit indirect infringement of those patents and instructed the jury that "any damages for indirect infringement … may only be awarded" from the date of the Complaint. Appx406; Appx2050(46:18-24).

claims are only infringed when the claimed process is *performed*, not by the *sale* of an apparatus that is capable of infringing use." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006); *see also* Appx2030(26:9-13). Accordingly, presuit sales of accused products cannot support presuit damages under either of these patents.

But Packet Intelligence nonetheless sought (and received) presuit damages of $3,500,000 based on a reasonable royalty applied to revenue from NetScout's presuit **sales**, not NetScout's own use. Despite the fact that the presuit sales could not infringe the '751 and '725 patents, Packet Intelligence's damages expert, Jim Bergman, included presuit revenues in his royalty base comprised of "the overall [sales] revenue associated with the accused G10 and GeoBlade products." Appx1442-1443(61:22-62:6); Appx1406(25:2-14); Appx1420(39:1-23) (Mr. Bergman: "[t]his analysis only takes into account the [sales] revenue …. I didn't include anything other than that").

But this analysis at trial was based entirely on infringement of the apparatus patent and assumed that Packet Intelligence would prevail on its argument—rejected by *Arctic Cat* which issued shortly after trial—that the burden of proof on marking remained on NetScout. *See* Appx10460. Indeed, Mr. Bergman never made distinct prefiling and post-filing damages arguments, advocating instead that the same rate should be applied uniformly to all revenue for the accused products, including both

prefiling and post-filing sales. Appx1440(59:7-12); Appx1442(61:12-21); Appx1443-1444(62:17-63:1). It was only **after trial** and after Packet Intelligence became aware of *Arctic Cat* that it first argued that infringement of the asserted method claims based on NetScout's internal use could purportedly support the $3.5 million presuit award.

NetScout challenged the presuit damages award based on the complete disconnect between Packet Intelligence's presuit liability theory (based on internal use and testing) and its presuit damages theory (based on non-infringing sales to customers). Appx10201-10203; *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (damages theory "must measure only those damages attributable" to liability theory).

The district court denied NetScout's motion for judgment as a matter of law, holding that "NetScout's own use of the Accused Products" supports the presuit damages award because that internal use "drove U.S. sales of [a]ccused [p]roducts." Appx36. This is error and improperly permitted Packet Intelligence to pursue indirect infringement by another name.

As an initial matter, there was no evidence of any specific instances of NetScout's use of the accused products, much less how often such use occurred. Appx35. Nor was there evidence of what any tests or uses specifically entailed, how such testing or usage infringed, or the frequency of any testing or usage. *Id.* Rather, the court relied on isolated comments by witnesses that referred generally to internal

"testing" and "instances" of use "out in the field" or "at customer sites." *Id.* No testimony explained how any of these instances of use or testing somehow drove even a single sale, let all of the presuit sales. Simply put, there was no basis to attribute any damages—much less millions of dollars—to vaguely referenced internal use and testing by NetScout.

Packet Intelligence certainly provided no analysis or evidence of damages attributable to internal testing or use. Therefore, the jury had no basis to award presuit damages based on such testing or use. *See Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 32 (Fed. Cir. 2012) (vacating damages holding that "[w]ithout some guideposts, the task of determining a reasonable royalty under 35 U.S.C. § 284 is impossible").

The district court erred when it stated that NetScout "fail[ed] to respond to" evidence that its own use "drove U.S. sales of the Accused Products." Appx36. NetScout did respond, explaining that internal testing and use could not support damages based on a "royalty base … comprised solely of U.S. sales of the accused G10 and GeoBlade products." *See, e.g.*, Appx10202; Appx10697-10698.

But the district court's error is even more fundamental—as a matter of law, those non-infringing presuit product sales could not provide a measure of damages for direct infringement of the asserted method claims. *See Ormco*, 463 F.3d at 1311.

Damages "compensate for the infringement," not for non-infringing sales. 35 U.S.C. § 284.

The district court also erred when it held that the damages could have been based on "the effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensee as a generator of sales of its non-patented items, and the extent of such derivative or convoyed sales." Appx35-36. That holding lacked any basis in the record evidence. Packet Intelligence's damages expert, Mr. Bergman, made no damages calculation based upon "derivative or convoyed sales." *Id*. Mr. Bergman testified only that sales of unaccused products might justify "some adjustment to the royalty **rate**," not the royalty base. Appx1438-1440(57:22–59:12). Even if Mr. Bergman considered the benefits of the patents to adjust his royalty rate, that does not provide a basis for damages when there is no evidence of any presuit royalty base. Indeed, Mr. Bergman testified he considered unaccused features but did not include their revenues in the royalty base. Appx1439(58:12-24) ("This is revenue outside of the accused products."); Appx1443(62:4-7) ("[T]he total base is the—is the overall revenue associated with the accused G10 and GeoBlade products."); Appx1420(39:1-23). In sum, there was no damages evidence based on NetScout's internal use of the patents, and no evidence supports any damages for NetScout's alleged presuit infringing use of the '751 and '725 patents.

This failure of proof of presuit damages from the ’751 and ’725 method patents, combined with PI’s failure to prove compliance with Section 287(a)’s marking requirement for the ’789 patent, precludes the jury’s $3.5 million presuit damages award. Appx121. In short, there was no “legally sufficient evidentiary basis for a reasonable jury to find” any presuit damages. *Allstate Ins. Co. v. Receivable Fin. Co. LLC*, 501 F.3d 398, 405 (5th Cir. 2007).

This Court should vacate the presuit damages award. To the extent the willfulness judgment remains, the $2.8 million enhancement should be similarly reduced to correspond with the reduced damages award. As discussed below, however, that enhancement should be vacated in its entirety.

## V. The Willfulness Verdict Was Not Supported by Substantial Evidence.

Packet Intelligence presented no evidence that any infringement by NetScout “was wanton, malicious, in bad faith, deliberate, consciously wrong, or flagrant.” *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1935 (2016).

It is undisputed Packet Intelligence provided no presuit notice of its infringement claims. Packet Intelligence did not allege copying. The accused products were designed years before Packet Intelligence provided NetScout notice of its claims through its Complaint. Appx1209(79:1-6); Appx1511-1512(130:19-131:1). And once NetScout received notice, it vigorously and steadfastly maintained its non-infringement and invalidity defenses—defenses the district court confirmed

were raised in good faith. Appx335-336 (recognizing that NetScout's "good faith" defenses weighed against enhancement). Indeed, as discussed above, NetScout has strong arguments that it has proven both invalidity and non-infringement as a matter of law.

The evidence cited by the district court as support for the willfulness verdict does not show bad faith or deliberate infringement. The court noted evidence suggesting that NetScout's most senior executives did not carefully study the patents. Appx37-38. Although NetScout's President of New Markets, Richard Kenedi (a marketing executive with no legal training), did not read the patents, his understanding of NetScout's defenses was reasonably based upon consultation with "the experts within" NetScout and was "also formed from both internal and external counsel[.]" Appx1491(110:13-22); Appx1497(116:18-19). The notion that to avoid willfulness, all executives (even those with no legal background) must read all patents personally has no grounding in this Court's jurisprudence.

The district court also erroneously stated that NetScout's CEO, Mr. Singhal, "could not remember if he had read the patents-in-suit or even a summary about them." Appx37. To the contrary, Mr. Singhal testified he read the patents "at a high level and enough to have a good discussion with my Counsel." Appx1602-1603(87:11-88:4). And even if Mr. Singhal had not personally studied the patents in detail, none of this evidence supports willfulness. *See SRI Int'l, Inc. v. Cisco Sys.*,

*Inc*., 918 F.3d 1368, 1381 (Fed. Cir. 2019) (vacating willfulness and enhanced damages, holding that it was "unremarkable" that "engineers without legal training" "as opposed to Cisco's in-house or outside counsel" did not analyze the patents-in-suit).

The district court also erred in concluding that NetScout's post-filing sales of accused products supported the willfulness verdict. Appx37-38. Packet Intelligence did not seek an injunction to prevent those sales. To the contrary, Packet Intelligence sought and recovered an ongoing royalty on them. Appx353.

In addition, the cases cited by the district court in which sales of competing products harmed the plaintiff are inapplicable. Appx37.[16] Packet Intelligence does not sell any products at all. At most, continued sales "is nothing more than proof" of ordinary infringement, not willfulness. *See SRI*, 918 F.3d at 1381; *M&C Innovs, LLC v. Igloo Prods Corp*., 2018 U.S. Dist. LEXIS 152075, at *14 (S.D. Tex. July 31, 2018) ("continu[ing] its manufacturing [of] infringing products … [is] simply … the kind of 'garden-variety' patent case that *Halo* affirms is ill-suited for a finding

[16] *See Milwaukee Elec. Tool Corp. v. Snap-On Inc*., 288 F. Supp. 3d 872, 887 (E.D. Wis. 2017) (defendant's "response [to presuit license offer] was inadequate and it continued to manufacture and sell closely competing products"); *Polara Eng'g, Inc. v. Campbell Co*., 894 F.3d 1339, 1354 (Fed. Cir. 2018) (defendant "developed [infringing product] to compete with Polara's [product]"); *Avocent Huntsville Corp. v. ClearCube Tech., Inc*., 2006 WL 2109503, at *7 (N.D. Ala. July 28, 2006) (describing the parties' competing bids for sales of products embodying patents-in-suit).

of willfulness.”). A defendant continuing to sell accused products when it holds a good-faith belief in its defenses and no injunction is sought is the norm in a “typical infringement case,” in which enhanced damages are inappropriate. *Halo*, 136 S. Ct. at 1932.

Because there is no evidence of willfulness, this Court should reverse the willfulness judgment and vacate the $2.8 million in enhanced damages.

## CONCLUSION & PRAYER FOR RELIEF

The judgment below should be reversed.

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: */s/ Eric Kraeutler*

Eric Kraeutler

Dated: August 19, 2019

Michael J. Lyons
Ahren C. Hsu-Hoffman
Michael F. Carr
Thomas Y. Nolan
Morgan, Lewis & Bockius LLP
1400 Page Mill Road
Palo Alto, CA 94304
650.843.4000

William R. Peterson
Morgan, Lewis & Bockius LLP
1000 Louisiana St., Suite 4000
Houston, TX 77002
713.890.5000

Eric Kraeutler
Julie Goldemberg
Morgan, Lewis & Bockius LLP
1701 Market St.
Philadelphia, PA 19103
215.963.5000

Karon N. Fowler
Morgan, Lewis & Bockius LLP
77 West Wacker Drive
Chicago, IL 60601
312.324.1000

***Counsel for Defendant-Appellants NetScout Systems, Inc., NetScout Systems Texas, LLC fka Tektronix Texas, LLC dba Tektronix Communications***

# ADDENDUM

| Description | Page Nos. |
|---|---|
| Final Judgment | Appx19-21 |
| Memorandum Opinion and Order Denying JMOL Motions (No Presuit Damages and No Willful Infringement) | Appx22-39 |
| Memorandum Opinion and Order Denying JMOL Motions (Non-Infringement and Invalidity) | Appx40-59 |
| U.S. Patent 6,954,789 | Appx154-195 |
| U.S. Patent 6,665,725 | Appx196-269 |
| U.S. Patent 6,839,751 | Appx270-315 |
| Order Adopting Packet Intelligence's Proposed Findings of Fact And Conclusions of Law (Equitable Defenses) | Appx329-330 |
| Findings of Fact and Conclusions of Law (Section 101 Patent Eligibility) | Appx359-393 |
| Packet Intelligence's Proposed Findings of Fact and Conclusions of Law (Equitable Defenses) (adopted by the district court) | Appx10032-10085 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| PACKET INTELLIGENCE LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>NETSCOUT SYSTEMS, INC., TEKTRONIX COMMUNICATIONS, TEKTRONIX TEXAS, LLC,<br><br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CIVIL ACTION NO. 2:16-CV-00230-JRG** |

**FINAL JUDGMENT**

A jury trial commenced in this case on October 10, 2017 and evidence closed on October 13, 2017. (Dkt. Nos. 239-42.). Following submission of the evidence to the jury and while the jury deliberated, a bench trial was conducted as to the equitable issues and concluded on October 13, 2017. (Dkt. No. 242.) The jury returned a verdict on October 13, 2017, finding that Defendants NetScout Systems, Inc., Tektronix Communications, and Tektronix Texas, LLC (collectively "Defendant" or "NetScout") willfully infringed Claims 10 and 17 of U.S. Patent No. 6,665,725, Claims 1 and 5 of U.S. Patent No. 6,839,751, and Claims 19 and 20 of U.S. Patent No. 6,954,789 (collectively the "Asserted Claims"); that none of the Asserted Claims were invalid; and that Plaintiff Packet Intelligence LLC ("Plaintiff" or "Packet Intelligence") was entitled to damages in the amount of $5.75 million dollars as a running royalty. (Dkt. No. 237.)

Pursuant to Rule 58 of the Federal Rules of Civil Procedure, in accordance with the

jury's unanimous verdict and the entirety of the record, the Court hereby **ORDERS** and **ENTERS JUDGMENT** as follows:

1. Defendant NetScout has directly infringed the Asserted Claims.
2. The Asserted Claims are not invalid.
3. Plaintiff is hereby **AWARDED COMPENSATORY DAMAGES** against Defendant and shall accordingly have and recover from Defendant the sum of $5,750,000 U.S. Dollars.
4. Plaintiff Packet Intelligence is the prevailing party.
5. As explained in the concurrently issued Order on Plaintiff's Motion for Enhanced Damages and Entry of Judgment and pursuant to 35 U.S.C. § 284, Plaintiff is hereby **AWARDED ENHANCED DAMAGES** against Defendant and shall further have and recover from Defendant the sum of $2,800,000 U.S. Dollars.
6. As explained in the concurrently issued Order on Plaintiff's Motion for Pre- and Post-Judgment Interest and pursuant to 35 U.S.C. § 284, Plaintiff is **AWARDED PRE-JUDGMENT INTEREST** in the amount calculated at the five-year U.S. Treasury Bill rate, compounded monthly, adjusting the effective rate with each and every change in said five-year U.S. Treasury Bill rate from the date of first infringement.
7. As explained in the concurrently issued Order on Plaintiff's Motion for Pre- and Post-Judgment Interest and pursuant to 28 U.S.C. § 1961, the Court **AWARDS PLAINTIFF POST-JUDGMENT INTEREST** on all sums awarded herein, at the statutory rate, from the entry of this Final Judgment until paid.
8. As explained in the concurrently issued Order on Plaintiff's Motion for Enhanced Damages and Entry of Judgment and pursuant to 35 U.S.C. § 285, the Court finds the

case is **NOT EXCEPTIONAL.**

9. As explained in the concurrently issued Order on Plaintiff's Motion for Ongoing Royalty, **THE ONGOING ROYALTY RATE IN THIS CASE IS HEREBY SET AT 1.55%** of the revenue received by Defendant produced by the post-verdict infringing conduct (use, sales, offers for sale, or importation into the United States) of the accused G10 and GeoBlade products through the life of the asserted patents.
10. As reflected in the Court's previously issued Findings of Fact and Conclusions of Law (Dkt. No. 298), the Court concludes that Defendant has failed to show that the Asserted Claims are ineligible under § 101.
11. As explained in the concurrently issued Findings of Fact and Conclusions of Law, the Court concludes that Defendant has failed to show that the Asserted Claims are barred under the doctrines of either unclean hands or inequitable conduct, and accordingly the affirmative defenses of unclean hands and inequitable conduct are denied and dismissed.
12. All other relief requested by either party and not specifically awarded herein is **DENIED**. The Clerk is **DIRECTED TO CLOSE** the above referenced case.

**So ORDERED and SIGNED this 7th day of September, 2018.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| **PACKET INTELLIGENCE LLC,** | § | |
| | § | |
| ***Plaintiff*,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. 2:16-CV-00230-JRG** |
| **NETSCOUT SYSTEMS, INC.,** | § | |
| **TEKTRONIX COMMUNICATIONS,** | § | |
| **TEKTRONIX TEXAS, LLC,** | § | |
| | § | |
| ***Defendants*.** | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants NetScout Systems, Inc. and NetScout Systems Texas, LLC's (f/k/a Tektronix Texas, LLC d/b/a Tektronix Communications) (collectively, "NetScout") Motion for Judgment as a Matter of Law of No Pre-Suit Damages Pursuant to Fed. R. Civ. P. 50(b) (Dkt. No. 315) and Renewed Motion for Judgment as a Matter of Law of No Willful Infringement Pursuant to Fed. R. Civ. P. 50(b) (Dkt. No. 316). The Court heard oral argument on the motions on May 21, 2019. (Dkt. No. 339.) Having considered the parties' motions, briefing, oral arguments, and trial record, the Court is of the opinion that each motion should be and hereby is **DENIED**.

## I. BACKGROUND

Plaintiff Packet Intelligence LLC ("PI") sued NetScout for patent infringement on March 15, 2016. (Dkt. No. 1.) PI alleged that NetScout's GeoProbe 10 ("G10") and GeoBlade (collectively, the "Accused Products") literally[1] infringe Claims 10 and 17 of U.S. Patent No. 6,665,725 (the "'725 Patent"); Claims 1 and 5 of U.S. Patent No. 6,839,751 (the "'751 Patent");

[1] PI did not assert infringement under the theory of doctrine of equivalents.

and Claims 19 and 20 of U.S. Patent No. 6,954,789 (the "'789 Patent") (collectively, the "Asserted Claims" or "Patents-in-Suit").[2] (*Id.*) PI also alleged willful infringement and sought pre-suit damages. (*Id.*) NetScout asserted several defenses, including invalidity under 35 U.S.C. §§ 101, 102, 103, and 112; failure to properly name all inventors under 35 U.S.C. § 102(f); inequitable conduct; and unclean hands. (Dkt. No. 205 at 9–11.) The case proceeded to trial, and the jury returned a verdict in favor of PI, finding that the Asserted Claims were willfully infringed, none of the Asserted Claims were invalid, and that PI was entitled to damages in the amount of $5.75 million as a running royalty. (Dkt. No. 237.) Following submission of the evidence to the jury, the Court conducted a bench trial as to the equitable issues and concluded that NetScout had failed to show that PI's claims were barred under the doctrines of unclean hands or inequitable conduct. (Dkt. Nos. 242, 306.) The Court entered final judgment on September 7, 2018, designating PI as the prevailing party. (Dkt. No. 307 at 2.)

NetScout now moves pursuant to Federal Rule of Civil Procedure 50(b) for an order that vacates (1) the jury's award of $3.5 million in pre-suit damages (Dkt. No. 315) and (2) the jury's finding of willful infringement (Dkt. No. 316).

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 50(b)

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party" on an issue. Fed. R. Civ. P. 50(a)(1). "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from

[2] In the complaint, PI also alleged infringement of U.S. Patent Nos. 6,771,646 and 6,651,099, but withdrew its claims relating to those patents before trial. (Dkt. No. 132 at 13.)

the district would usually lie." *Finisar Corp. v. DirectTV Grp., Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). The Fifth Circuit "uses the same standard to review the verdict that the district court used in first passing on the motion." *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995). Thus, "a jury verdict must be upheld unless 'there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did.'" *Id.* at 700 (quoting Fed. R. Civ. P. 50(a)(1)). The jury's verdict must be supported by "substantial evidence" for each claim. *Am. Home Assurance Co. v. United Space All.*, 378 F.3d 482, 487 (5th Cir. 2004).

Under Fifth Circuit law, the court is to be "especially deferential" to a jury's verdict and must not reverse the jury's findings unless they are not supported by substantial evidence. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men [and women] in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). The moving party is entitled to judgment as a matter of law unless "the evidence points so strongly and so overwhelmingly in favor of the nonmoving party that no reasonable juror could return a contrary verdict." *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 296 (5th Cir. 2005) (citing *Cousin v. Tran Union Corp.*, 246 F.3d 359, 366 (5th Cir. 2001)). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

In evaluating a motion under Rule 50, the court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 451 (5th Cir. 2013) (internal citation omitted). "[T]he court must give credence to the evidence favoring the

nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *See Ellis v. Weasler Eng'g Inc.*, 258 F.3d 326, 337 (5th Cir. 2001) (quoting 9A WRIGHT & MILLER § 2529). However, in doing so, the court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *See id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000)).

**B. Pre-Suit Damages**

To obtain pre-suit damages, a patent owner must show either that it (1) provided the accused infringer with actual notice of infringement or (2) complied with the marking requirements of 35 U.S.C. § 287(a). If a patent owner fails to comply with the marking statute, then it may only recover damages from the time it provided actual notice of the alleged infringement. 35 U.S.C. §287(a).

The marking statute provides:

> Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States, may give notice to the public that the same is patented, either by [1] fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or [2] by fixing thereon the word "patent" or the abbreviation "pat." together with an address of a posting on the Internet, accessible to the public without charge for accessing the address, that associates the patented article with the number of the patent, or when, from the character of the article, this cannot be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

35 U.S.C. § 287(a).

The marking statute applies to both the patentee and those who make and sell patented articles under the patentee's authorization. *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed.

Cir. 1996). "[W]ith third parties unrelated to the patentee, it is often more difficult for a patentee to ensure compliance with the marking provisions. A 'rule of reason' approach is justified in such a case and substantial compliance may be found to satisfy the statute." *Id.* Thus, "[w]hen the failure to mark is caused by someone other than the patentee, the court may consider whether the patentee made reasonable efforts to ensure compliance with the marking requirements. The rule of reason is consistent with the purpose of the constructive notice provision—to encourage patentees to mark their products in order to provide notice to the public of the existence of the patent and to prevent innocent infringement." *Id.* at 1111–12.

"[A]n alleged infringer who challenges the patentee's compliance with § 287 bears an initial burden of production to articulate the products it believes are unmarked 'patented articles' subject to § 287." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1368 (Fed. Cir. 2017). This initial burden is a "low bar" and "the alleged infringer need only put the patentee on notice that he or his authorized licensees sold specific unmarked products which the alleged infringer believes practice the patent. The alleged infringer's burden is a burden of production, not one of persuasion or proof." *Id.* "Once the alleged infringer meets its burden of production, however, the patentee bears the burden to prove the products identified do not practice the patented invention." *Id.* The patentee bears the ultimate burden of proving compliance with marking. *Id.*

**C. Willful Infringement**

Section 284 of the Patent Act provides that, in the case of infringement, courts "may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. Whether enhanced damages are warranted and in what amount are within the sound discretion of the trial court. *Halo Elects., Inc. v. Pulse Elects., Inc.*, 136 S. Ct. 1923, 1932 (2016). The Supreme Court

has explained that such damages "are not to be meted out in a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior." *Id.* at 1932. Conduct warranting enhancement has been variously described as "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Id.*

Willful infringement may justify, but does not mandate, an award of enhanced damages. *Read Corp. v. Protec, Inc.*, 970 F.2d 816, 816 (Fed. Cir. 1992). "To willfully infringe a patent, the patent must exist and one must have knowledge of it." *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985); *see also WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016) ("Knowledge of the patent alleged to be willfully infringed continues to be a prerequisite to enhanced damages."). Willful infringement requires some sort of intentional conduct—whether it be subjective or objective. *Halo*, 136 S. Ct. at 1932; *see also Arctic Cat*, 876 F.3d at 137 (explaining that "*Halo* emphasized that subjective willfulness alone—i.e., proof that the defendant acted despite a risk of infringement that was 'either known or so obvious that it should have been known to the accused infringer,' can support an award of enhanced damages").

Willful infringement is a question of fact reviewed for substantial evidence. *WBIP*, 829 at 1341–42. It is "generally measured against the knowledge of the actor at the time of the challenged conduct" and "can arise pre- or post-suit." *Huawei Techs. Co. v. T-Mobile U.S., Inc.*, No. 2:16-cv-00052-JRG-RSP, 2017 WL 1129951, at *4 (E.D. Tex. Feb. 21, 2017), *report and recommendation adopted*, No. 2:16-cv-00052-JRG-RSP, 2017 WL 1109875 (E.D. Tex. Mar. 24, 2018) (quoting *Halo*, 136 S. Ct. at 1933). "Whether an act is 'willful' is by definition a question of the actor's intent, the answer to which must be inferred from *all the circumstances*."

*Indus., Inc. v. IPS Corp.*, 721 Fed. Appx. 959, 970 (Fed. Cir. 2018) (quoting *Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 510–511 (Fed. Cir. 1990) (emphasis in original)).

**III. DISCUSSION**

**A. Pre-Suit Damages**

At trial, PI alleged, and the jury found, that PI was entitled to $3.5 million for NetScout's pre-suit infringement of the Asserted Claims. (Dkt. No. 237 at 5.) NetScout moves to vacate that finding. (Dkt. No. 315.) The Court denies the motion for the reasons set forth below.

**i. The '789 Patent—Apparatus Claims**

The Asserted Claims of the '789 Patent are apparatus claims and subject to the marking statute, 35 U.S.C. §287(a). *See* '789 Patent, Claims 19–20. NetScout contends that PI cannot recover pre-suit damages for those claims because it failed to mark products that practice the claimed inventions. (Dkt. No. 315 at 1.) Specifically, NetScout argues that PI failed to prove marking for (1) the Cisco and Huawei products and (2) the MeterFlow and MeterWorks products. (*Id.* at 4–10.)

a. <u>Cisco and Huawei Products</u>

With respect to Cisco and Huawei, NetScout argues that it identified products that practiced the Asserted Claims of the '789 Patent. (Dkt. No. 315 at 5 n.2.) It contends that PI submitted no evidence to the jury that such products do not practice the patent or that they were properly marked. (*Id.* at 4–5.) NetScout points to testimony from Brad Brunell, PI's corporate representative, who admitted that the Cisco and Huawei license agreements do not require marking products covered by the '789 Patent. (*Id.* at 4 (citing Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 45:10–11, 75:19–25, 89:5–14; PTX-320 (PI-Cisco license agreement); PTX-301 (PI-Huawei license agreement).))

PI argues that NetScout defaulted on its initial burden of production. (Dkt. No. 321 at 6.) According to the jury instructions, "NetScout [had to] first show the existence of a patented article" "that practices one or more of the claims of the '789 patent" and that failure to do so meant that "Packet Intelligence [was] permitted to collect damages going six years before the filing of the complaint." (*Id.* at 3 (citing Dkt. No. 252, 10/13/17 A.M. Trial. Tr. at 47:10–49:2).) PI states that "NetScout's citations to the trial record only establish that there were prior litigations and licenses." (*Id.* at 6.) It explains that NetScout directs the Court to products that were identified in the "summary judgment briefing and [in] the complaint filed in the Cisco and Huawei litigations." (*Id.* at 8.) Since "none of those materials were presented to the jury," PI contends that it had no burden to prove marking at trial. (*Id.*)

As an initial matter, the Court finds that NetScout bore the initial burden of production *at trial*. NetScout argues that it met this burden because it identified specific products in its *summary judgment* briefing, citing Magistrate Judge Payne's decision in *Semcon IP Inc. v. Huawei Device USA, Inc.*, 2:16-cv-00437-JRG-RSP, 2017 WL 6343771, at *1 (E.D. Tex. Dec. 12, 2017) ("Accordingly, because Huawei has met its initial burden of production of notifying Semcon of products covered by the '061 Patent that Huawei believes were not marked, Semcon must satisfy its burden of showing compliance with the marking statute at trial."). In *Semcon*, Judge Payne held that the defendant had met its initial burden of production at summary judgment and that the burden automatically shifted to the plaintiff at trial. *Semcon*, 2017 WL 6343771, at *1. Here, however, the Court denied NetScout's motion for summary judgment as to pre-suit damages *in totality* (Dkt. No. 228 at 13), and confirmed at the pretrial conference that marking was "a live issue" for trial. (Dkt. No. 225, 9/19/17 Pretrial Conf. at 101:13–17; *see also* Dkt. No. 221, 9/18/17

Pretrial Conf. at 165:18–20). As such, NetScout still had to identify for the jury specific patented articles that required marking.[3]

Having reviewed the trial record, the Court determines that the jury had a "sufficient evidentiary basis" to find that NetScout failed to identify specific Huawei or Cisco products that should have been marked for the '789 Patent. Fed. R. Civ. P. 50(a)(1). NetScout only presented the jury with evidence that PI had entered into prior litigations and license agreements with Huawei and Cisco that covered "products" under the '789 Patent. (*See* Dkt. No. 234, 10/10/17 P.M. Trial Tr. at 68:14–69:8, 71:15–72:10, 76:6–20, 88:20–89:12, 106:21–107:23; Dkt. No. 246, 10/10/17 P.M. Sealed Tr. 3:17–19; Dkt. No. 249, 10/12/17 A.M. Trial Tr. at 121:5–125:10; Dkt. No. 300, 10/11/17 A.M. Trial Tr. at 75:19–25.) The license agreements did not identify any specific licensed products (*See* PTX-301 (Huawei license); PTX-320 (Cisco License), and at no time during the trial did NetScout identify any for the jury. Consistent with the Court's instructions to the jury and given that no specific Huawei or Cisco products had been sufficiently identified, the jury had a reasonable basis to find that PI did not have to prove marking for those unidentified products. *Compare Arctic Cat*, 876 F.3d at 1368 (finding defendant met initial burden of production because it "introduced the licensing agreement between Honda and Arctic Cat" and identified "fourteen Honda PWCs from three versions of its Aquatrax series sold between 2002 and 2009"), *with Lexos Media IP, LLC v. Jos. A. Bank Clothiers, Inc.*, No. 14-cv-6544(KAM) (GRB), 2018 WL 2684104, at *2 (D. Del. June 5, 2018) (finding defendant had not met initial burden of production because "Defendant had not yet identified what licensees were at issue, *or*

[3] This case was tried before the Federal Circuit decided *Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*, 876 F.3d 1350 (Fed. Cir. 2017). NetScout does not object to the marking instruction given to the jury and agrees that the instruction was consistent with *Arctic Cat.* (Dkt. No. 342, JMOL Hearing at 38:23–25 ("Now, this Court's marking instruction to the jury was consistent with that holding from the Federal Circuit.").)

*which 'specific unmarked products' those licensees sold* that Defendant believes read on the patents-in-suit") (emphasis added).

b. <u>MeterFlow and MeterWorks Products</u>

NetScout also argues that PI failed to mark the MeterFlow and MeterWorks products (collectively, the "Meter Products"). (Dkt. No. 315 at 5–10.) According to NetScout, Exar, a predecessor-in-interest to the Patents-in-Suit, sold "unmarked MeterFlow software products" that "practice the '789 Patent." (*Id.* at 5–7.) NetScout explains that the following evidence establishes the Meter Products as patented articles:

- Testimony from Mr. Ham, Exar's corporate representative, that the Patents-in-Suit "were underlying the technology that was being sold as MeterFlow and MeterWorks" and that those patents "were derived from the development work that was done to generate the products" of "MeterFlow, MeterWorks" and "were related [to] flow classification." (Dkt. No. 249, 10/12/17 A.M. Trial Tr. at 138:12–25, 141:1–23.)

- Testimony and evidence showing that the provisional application for the '789 Patent represented MeterFlow as a preferred embodiment of the invention. (Dkt. No. 244, 10/10/17 A.M. Trial Tr. at 106:21–107:23 (testimony of Mr. Dietz, named inventor of Patents-in-Suit); Dkt. No. 249, 10/12/17 A.M. Trial Tr. at 121:5–125:10 (testimony of Mr. Rosenfeld, prosecuting attorney for the '789 Patent); PT-X010 (sworn declaration from Mr. Dietz for the '789 Patent); DX-274 (email from Mr. Dietz to the "MeterFlow team"); DX524 (email from Mr. Lazar, VP and CFO of Apptitude, another company that previously owned the Patents-in-Suit).)

(*Id.* at 5–7.) NetScout argues that PI provided no evidence that such products had been marked and that PI's own corporate representative, Mr. Burnell, "conceded that he was not aware of any prior owners of the Patents-in-Suit, including Exar, marking their products with any patent numbers." (*Id.* at 5 (citing Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 88:20–89:4); *id.* at 7–10.)

In response, PI argues that "there was substantial evidence before the jury showing that no version of the Meter [P]roducts practiced any claim of the '789 patent." (Dkt. No. 332 at 4.) PI identifies the following evidence from the trial:

- Testimony from Mr. Dietz, a named inventor of the Patents-in-Suit, that "MeterWorks never embodied the inventions." (Dkt. No. 244, 10/10/17 A.M. Trial Tr. at 105:5–106:3.)

- Testimony from Mr. Dietz that (1) there were "many versions of MeterFlow;" (2) MeterFlow "differ[ed] in capability from version to version;" and (3) while the provisional application stated that MeterFlow was to be a preferred embodiment, the final application changed that; "Dr. Rosenfeld [the prosecuting attorney] knew. . . that [MeterFlow] was not to be. . . used as a preferred embodiment going forward, and it was removed from all of the patents that were actually filed and finally issued" because "[MeterFlow] was a piece of software . . . that evolved" and "it was going to give the wrong indication that all of those past versions that use that marketing term, MeterFlow, were – were the current version, and they weren't." (*Id.* at 122:6–124:1.)

(Dkt. No. 321 at 9–11; Dkt. No. 332 at 3–4.) PI also argues that "NetScout selectively quotes Mr. Ham to imply that the underlying technology for the patents was sold as MeterFlow and MeterWorks." (Dkt. No. 321 at 10.) PI argues that Mr. Ham "testified that he had not read the patents or compared the claims to any Meter [P]roducts":

> Q. Now, you mentioned that you weren't supporting any products anymore for the patents. Is it your understanding that certain products were covered by these patents?
>
> A. I can't draw a direct correlation because I don't – I haven't looked at the patents or – or read the patents, but I believe that they were underlying the technology that was being sold as MeterFlow and MeterWorks.
>
> . . . .
>
> Q. Now, I believe you testified – you mentioned earlier that – that certain products – at least it was your understanding that certain products sold by Hi/Fn were protected by at least some of the patents; is that right?
>
> A. I believe that some of the patents were the basis – that they were derived from the development work that was done to generate the products.
>
> Q. And these are patents that were ultimately sold by Exar to Packet Intelligence?
>
> A. I – I don't know specifics of the patents, but I believe that they were related to those products, yes.
>
> Q. Okay. And in – when you say related, what – what is your understanding of—

> A. That they were basic flow classification – they were related [to] flow classification, which is what the product was based on.
>
> Q. And when you say products, which products are you referring to?
>
> A. MeterFlow, MeterWorks.
>
> Q. But outside of kind of that general understanding, you – you haven't looked at the – at the patents themselves; is that right?
>
> A. That's correct.
>
> Q. And you haven't actually compared those products to the patent claims; that right?
>
> A. That's correct.
>
> Q. And you haven't actually consulted any Markman orders or other documentation concerning how the claims of the patents are interpreted; is that right?
>
> A. That's correct.
>
> Q. So sitting here today, you can't actually make a representation that any of those products were actual commercial embodiments of the – of any of the patents; is that right?
>
> A. That's correct.

(Dkt. No. 321 at 10–11 (citing Dkt. No. 249, 10/12/17 A.M. Trial Tr., at 138:17–142:16).) PI submits that based on the foregoing, the jury had a reasonable basis to find that NetScout had not identified any patented articles for the '789 Patent that should have been marked.

The Court has conducted a careful review of the trial record and finds that the jury had a substantial evidentiary basis to conclude that PI was not obligated to mark the Meter Products. Mr. Ham, Exar's corporate representative, testified that he "[could not] actually make a representation that any of [the Meter] [P]roducts were actual commercial embodiments of the – of any of the patents." (Dkt. No. 249, 10/12/17 A.M. Trial Tr. at 142:12–16.) Similarly, Mr. Dietz, an inventor of the Patents-in-Suit, testified that none of those products practiced the claimed

inventions. (Dkt. No. 244, 10/10/17 A.M. Trial Tr. at 105:14–16, 105:24–106:3.) In fact, PI presented *unrebutted* testimony that while the *provisional* application for the '789 Patent referenced MeterFlow as a preferred embodiment, the *final* application omitted any such statements because the inventors did not think MeterFlow practiced the invention. (*Id.* at 122:6–124:1.) The jury was entitled to credit this evidence over the competing testimony and evidence from NetScout, including Mr. Ham's competing testimony that he "believed" the MeterFlow and MeterWorks products were the "underlying technology" of the Patents-in-Suit, and that the Patents-in-Suit were "derived from" and "related to" those products. (Dkt. No. 249, 10/12/17 A.M. Trial Tr., at 138:17–142:16.)

In deciding a Rule 50(b) motion, the Court is careful to "draw all reasonable inferences in the light most favorable to the verdict," and to not substitute its own inferences for those made by the jury. *Boh Bros.*, 731 F.3d at 451; *Ellis*, 258 F.3d at 337. Ultimately, the Court finds that there is more than a "mere scintilla of evidence" favoring the nonmovant, and as such, denies NetScout's judgment as a matter of law of no pre-suit damages as it relates to the Meter Products. *Arismendez*, 493 F.3d at 606.

**ii. The '725 and '751 Patents—Method Claims**

The Asserted Claims of the '725 and '751 Patents are not subject to the marking statute because they are method claims. *See* '725 Patent, Claims 10, 17; '751 Patent, Claims 1, 5; *see also ActiveVideo Networks v. Verizon Commc'ns*, 694 F.3d 1312, 1335 (Fed. Cir. 2012) ("[I]f the patent is directed only to method claims, marking is not required."). Since the Court granted NetScout's motion for summary judgment of no pre-suit indirect infringement, PI could only obtain pre-suit damages based on NetScout's direct infringement of those claims. (Dkt. No. 228 at 13.) NetScout argues that PI "presented no evidence of revenue or damages resulting from

testing or internal use of [the] accused products by NetScout itself." (Dkt. No. 315 at 11.) Instead, PI's damages expert, Mr. Bergman, calculated the royalty base using only the U.S. *sales* of the Accused Products. (*Id.* at 11 (citing Dkt. No. 300, 10/11/17 A.M. Trial Tr. at 25:2–14) (emphasis added).) As a result, "there was no damages argument, theory, or evidence based on NetScout's own use of the asserted patents" that "supports any damages for pre-suit infringement of the '751 and '725 method patents." (Dkt. No. 329 at 5.)

Having reviewed the evidence at trial, the Court finds no reason to vacate the jury's damages award. PI has identified substantial evidence in the record showing that it is entitled to pre-suit damages based on NetScout's own use of the Accused Products:

- Dr. Alermoth testified that his infringement opinions were based on NetScout's admissions that it used the Accused Products in the United States, which he understood included "both testing . . . [and] instances where [NetScout] used those probes out in the field." (Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 156:4–25.)
- "Mr. Mawraha, NetScout's Product Manager, testified that NetScout technicians implement the infringing systems and methods at customer sites . . . through the NetScout Service Delivery Organization." (Dkt. No. 321 at 11 (citing Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 2:11:5–212:25).)
- "Mr. Lindahl, NetScout's Former Sr. Finance and Accounting Director, testified that NetScout 'customer[s] will pay [NetScout] to use [its] own equipment to monitor the network to do an analysis, a study, to help them solve some sort of issue'" and that NetScout has "a business where [it] monitor[s] – where [it] test[s] cell phone towers, network-planning type work," which may include "tak[ing] one of [its] own probes and go[ing] into a network to perform service." (*Id.* at 11–12 (citing Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 232:7–24).)

PI explains that its damages expert, Mr. Bergman, testified that the above activities "drive sales of the products and revenue to NetScout." (Dkt. No. 321 at 12 (citing Dkt. No. 300, 10/11/17 A.M. Trial Tr. at 57:22–59:6).) Such testimony was consistent with the Court's jury instructions, which provided that, in its damages calculation, the jury may consider "the effect of selling the patented

specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensee as a generator of sales of its non-patented items, and the extent of such derivative or convoyed sales." (Dkt. No. 252, 10/13/17 All Day Trial Tr. at 42:34–43:3).) The jury, therefore, had a sufficient basis to find that NetScout's own use of the claimed methods drove U.S. sales of the Accused Products and justified an award of pre-suit damages for the '725 and '751 method patents. NetScout's failure to respond to the above evidence in its briefing only reinforces this conclusion.

### B. Willful Infringement

NetScout argues that there is no substantial evidence to support the jury's finding of willfulness. First, NetScout states that in briefing on PI's motion for enhanced damages (Dkt. No. 269), "PI conceded there was no evidence of copying or motivation to harm" and "this Court determined that NetScout's noninfringement and invalidity defenses were in good faith." (Dkt. No. 316 at 1 (citing Dkt. No. 305 at 6 (Court's order granting PI's motion for enhanced damages)).) NetScout also argues that it had no pre-suit knowledge of the Patents-in-Suit and that "[o]nce apprised of PI's infringement claims, NetScout promptly investigated and, relying on technical experts and its counsel, formed noninfringement and invalidity defenses in good faith." (*Id.* at 3 (citing Dkt. No. 300, 10/11/17 A.M. Trial. Tr. at 110:11–12, 116:18–19; Dkt. No. 248, 10/11/17 P.M. Trial Tr. at 87:11–16).) Finally, NetScout argues that there was no willful infringement because it began to "phase out sales of the accused G10 and GeoBlade products before trial." (*Id.* at 4 (citing Dkt. No. 248, 10/11/17 P.M. Trial Tr. at 38:20–39:21; Dkt. No. 303 at 6 (Court's order granting-in-part PI's motion for an on-going royalty)).) In view of the foregoing, NetScout submits that there "is no evidence in the record that shows infringement that 'was wanton,

malicious, in bad faith, deliberate, consciously wrong, or flagrant," and is therefore entitled to judgment as a matter of law of no willful infringement. (*Id.* at 1.)

The Court disagrees. As an initial matter, NetScout's motion is partly based on material that was not before the jury. (*See* Dkt. No. 316 at 1 (citing Dkt. No. 305 at 6 (Court's order granting PI's motion for enhanced damages)).) Such evidence is irrelevant because under Rule 50(b), "the Court is limited to reviewing only the evidence presented to the jury at trial." *West v. Media Gen. Operations, Inc.*, 250 F. Supp. 2d 923, 947 (E.D. Tenn. 2002); *see also Paez v. Gelboym*, 578 Fed. Appx. 407, 408 n.1 (5th Cir. 2014) ("We do not consider evidence that was not presented to the jury."). NetScout also misstates the law. NetScout argues that there can be no willful infringement because it did not have pre-suit knowledge of the Patents-in-Suit. (Dkt. No. 316 at 3.) It claims that "'whether a willful infringement claim based solely on post-suit conduct is cognizable" "is an open question." (*Id.* (internal citations omitted).) It is well-settled, *at least in this District*, that post-conduct behavior can establish willful infringement. *See Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*, No. 2:15-cv-00011-RSP, 2017 WL 5137401, at *5 (E.D. Tex. Nov. 4, 2017) ("The Federal Circuit, however, has at least suggested that there is no per se rule precluding a finding of willful infringement based solely on conduct occurring after the lawsuit is filed) (citing *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1295–96 (Fed. Cir. 2017)).

Finally, notwithstanding the above, PI presented substantial evidence at trial that supports the jury's verdict of willful infringement. For example, Mr. Kenedi, NetScout's corporate representative, admitted that even though he had not read the Patents-in-Suit, his position was that Mr. Dietz lied and stole the claimed inventions. (Dkt. No. 300, 10/11/17 A.M. Trial. Tr. at 116:18–22.) Similarly, NetScout's CEO, Mr. Singhal, testified that he could not remember if he had read the Patents-in-Suit or even a summary about them. (Dkt. No. 248, 10/11/17 P.M. Trial Tr. at

87:11–88:4.) NetScout argues that it presented testimony that it began to phase out the Accused Products before trial. However, as PI points out in its Opposition and Sur-Reply, Mr. Singhal confirmed that "if a customer demands the old product, we [i.e., NetScout] *will sell* to [the customer]." (*Id.* at 39:1–2 (emphasis added).) The jury was entitled to consider NetScout's decision to continue selling the Accused Products in its willfulness calculation. *See Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 288 F. Supp. 3d 872, 887 (E.D. Wis. 2017) ("Here, there was far more evidence that Snap-On carried on years of lucrative infringing sales after failing to respond to the October 2011 licensing letter with a minimally adequate analysis of whether a license would be necessary. Snap-On's knowledge of the existence of the patent was not the sole basis for the jury's finding [of willfulness]."); *Polara Eng'g, Inc. v. Campbell Co.*, 237 F. Supp. 3d 956, 978–79 (C.D. Cal. 2017), *aff'd in part, vacated in part, remanded sub nom.*, 894 F.3d 1339 (Fed. Cir. 2018) (holding that defendant Campbell's decision to continue sales "was among the 'totality of the circumstances' that was appropriately considered by the jury to assess the egregiousness of Campbell's conduct"); *see also Avocent Huntsville Corp. v. ClearCube Tech., Inc.*, No. 03-02875, 2006 WL 2109503, at *27 (N.D. Ala. July 28, 2006) (finding that defendant's continued sales of accused products "may fall under the rubric of the 'totality of the circumstances' test, tending to show [defendant's] infringement was (and continues to be) willful").

Accordingly, the Court finds that the jury's verdict of willfulness is more than adequately supported by the record. NetScout's motion to vacate the same is denied.

## IV. CONCLUSION

For the reasons set forth above, NetScout's Motion for Judgment as a Matter of Law of No Pre-Suit Damages Pursuant to Fed. R. Civ. P. 50(b) (Dkt. No. 315) and Renewed Motion for

Judgment as a Matter of Law of No Willful Infringement Pursuant to Fed. R. Civ. P. 50(b) (Dkt. No. 316) are each **DENIED**.

**So ORDERED and SIGNED this 4th day of June, 2019.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| PACKET INTELLIGENCE LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>NETSCOUT SYSTEMS, INC., TEKTRONIX COMMUNICATIONS, TEKTRONIX TEXAS, LLC,<br><br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CIVIL ACTION NO. 2:16-CV-00230-JRG** |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants NetScout Systems, Inc. and NetScout Systems Texas, LLC's (f/k/a Tektronix Texas, LLC d/b/a Tektronix Communications) (collectively, "NetScout") Rule 50(b) Renewed Motion for Judgment as a Matter of Law of No Infringement (Dkt. No. 314) and Rule 50(b) Renewed Motion for Judgment as a Matter of Law of Invalidity Under 35 U.S.C. §§ 102(a), 102(f), and 101 (Dkt. No. 317). The Court heard oral argument on the motions on May 21, 2019. (Dkt. No. 339.) Having considered the motions, briefing, the parties' oral arguments, and trial record, the Court is of the opinion that each motion should be and hereby is **DENIED**.

## I. BACKGROUND

Plaintiff Packet Intelligence LLC ("PI") sued NetScout for patent infringement on March 15, 2016. (Dkt. No. 1.) PI alleged that NetScout's GeoProbe 10 ("G10") and GeoBlade (collectively, the "Accused Products") literally[1] infringe Claims 10 and 17 of U.S. Patent No. 6,665,725 (the "'725 Patent"); Claims 1 and 5 of U.S. Patent No. 6,839,751 (the "'751 Patent"); and Claims 19 and 20 of U.S. Patent No. 6,954,789 (the "'789 Patent") (collectively, the "Asserted

[1] PI did not assert infringement under the theory of doctrine of equivalents.

Claims" or "Patents-in-Suit").[2] (*Id.*) PI also alleged willful infringement and sought pre-suit damages. (*Id.*) NetScout asserted several defenses, including invalidity under 35 U.S.C. §§ 101, 102, 103, and 112; failure to properly name all inventors under 35 U.S.C. § 102(f); inequitable conduct; and unclean hands. (Dkt. No. 205 at 9–11.) The case proceeded to trial, and the jury returned a verdict in favor of PI, finding that the Asserted Claims were willfully infringed, none of the Asserted Claims were invalid, and that PI was entitled to damages in the amount of $5.75 million as a running royalty. (Dkt. No. 237.) Following submission of the evidence to the jury, the Court conducted a bench trial as to the equitable issues and concluded that NetScout had failed to show that PI's claims were barred under the doctrines of unclean hands or inequitable conduct. (Dkt. Nos. 242, 306.) The Court entered final judgment on September 7, 2018, designating PI as the prevailing party. (Dkt. No. 307 at 2.)

NetScout now moves pursuant to Federal Rule of Civil Procedure 50(b) for an order that (1) the Accused Products, G10 and GeoBlade, do not infringe the Asserted Claims (Dkt. No. 314) and (2) the Asserted Claims are invalid under 35 U.S.C. §§ 102(a), 102(f), and 101 (Dkt. No. 317).[3]

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 50(b)

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party" on an issue. Fed. R. Civ. P. 50(a)(1). "The grant or denial of a motion for judgment as a matter of law is a procedural issue

[2] In the complaint, PI also alleged infringement of U.S. Patent Nos. 6,771,646 and 6,651,099, but withdrew its claims relating to those patents before trial. (Dkt. No. 132 at 13.)
[3] NetScout only raises 35 U.S.C. §101 "to remove any doubt that that [*sic*] its invalidity arguments based upon 35 U.S.C. § 101 are preserved for appeal." (Dkt. No. 317 at 20.)

not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district would usually lie." *Finisar Corp. v. DirectTV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). The Fifth Circuit "uses the same standard to review the verdict that the district court used in first passing on the motion." *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995). Thus, "a jury verdict must be upheld unless 'there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did.'" *Id.* at 700 (quoting Fed. Civ. R. P. 50(a)(1)). The jury's verdict must be supported by "substantial evidence" for each claim. *Am. Home Assurance Co. v. United Space All.*, 378 F.3d 482, 487 (5th Cir. 2004).

Under Fifth Circuit law, the court is to be "especially deferential" to a jury's verdict and must not reverse the jury's findings unless they are not supported by substantial evidence. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men [and women] in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). The moving party is entitled to judgment as a matter of law unless "the evidence points so strongly and so overwhelmingly in favor of the nonmoving party that no reasonable juror could return a contrary verdict." *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 296 (5th Cir. 2005) (citing *Cousin v. Tran Union Corp.*, 246 F.3d 359, 366 (5th Cir. 2001)). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

In evaluating a motion under Rule 50, the court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 451 (5th Cir.

2013) (internal citation omitted). "[T]he court must give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *See Ellis v. Weasler Eng'g Inc.*, 258 F.3d 326, 337 (5th Cir. 2001) (quoting 9A WRIGHT & MILLER § 2529). However, in doing so, the court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *See id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000)).

**B. Infringement**

To prove patent infringement under 35 U.S.C. § 271, a plaintiff must show by a preponderance of the evidence the presence of every element, or its equivalent, in the accused product or service. *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985). First, the claim must be construed to determine its scope and meaning; and second, the construed claim must be compared to the accused device or service. *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129 (Fed. Cir. 2011) (citing *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993)). "A determination of infringement is a question of fact that is reviewed for substantial evidence when tried to a jury." *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1311 (Fed. Cir. 2007).

**C. Invalidity**

An issued patent is presumed valid. 35 U.S.C. § 282(a). To rebut this presumption, a party must prove invalidity by clear and convincing evidence. *Id.* ("The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."); *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011) ("We consider whether § 282 requires an invalidity defense to be proved by clear and convincing evidence. We hold that it does.").

**i. Anticipation**

A patent claim is invalid as anticipated if "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent." 35 U.S.C. § 102(a) (2012) (pre-AIA). "A claim is anticipated only if each and every element is found within a single prior art reference, arranged as claimed." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1323 (Fed. Cir. 2014). Anticipation is a factual question reviewed for substantial evidence. *Id.*

**ii. Inventorship**

Under 35 U.S.C. §102(f) (pre-AIA), "[a] person shall be entitled to a patent unless—he did not himself invent the subject matter sought to be patented." 35 U.S.C. §102(f). "[T]his subsection mandates that a patent accurately list the correct inventors of a claimed invention" and "failure to name them renders a patent invalid." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1349–50 (Fed. Cir. 1998). The Federal Circuit has explained that "[d]etermining 'inventorship' is nothing more than determining who conceived the subject matter at issue." *In re VerHoef*, 888 F.3d 1362, 1365 (Fed. Cir. 2018) (internal citation omitted). "When an invention is made jointly, the joint inventors need not contribute equally to its conception." *Id.* at 1366. All that is required is that the joint inventor made a significant contribution to the conception or reduction to practice of the invention. *Id.* (quoting *Pannu*, 155 F.3d at 1351). Proper inventorship is reviewed for substantial evidence. *Id.* at 1365.

## III. DISCUSSION

### A. The Patents-in-Suit

The Patents-in-Suit are directed to monitoring and classifying information that is transmitted over a network. (Dkt. No. 245, 10/17/17 P.M. Trial Tr. at 102:12–14.) *See also* '789 Patent at 1:48–51 ("The present invention relates to computer networks, specifically to the real-time elucidation of packets communicated within a data network, including classification according to protocol and application program."); '751 Patent at 1:38–41 (same); '725 Patent at 1:41–44 (same). Information is generally transmitted over a network via groups of "packets" that flow from one connection point to another. (Dkt. No. 244, 10/17/17 A.M. Trial Tr. at 51:11–52:13.) For example, to display an advertisement on a webpage, a request is sent over the Internet (the network) from the user's device (first connection point) to the server (second connection point). The server responds to the request by delivering the appropriate information in the form of packets back to the device. This singular flow of packets between the user and the server is called a "connection flow." *See, e.g.*, '789 Patent 2:41–43 ("The term 'connection flow' is commonly used to describe all the packets involved with a single connection."); (Dkt. No. 245, 10/17/17 P.M. Trial Tr. at 109:15–19 (Dr. Almeroth, PI's infringement expert, explained that a "connection flow" is "kind of one sequence of requests and responses" and "can involve multiple requests over the same connection").)

Transmitting information over a network usually involves transferring packets across multiple connection flows. (Dkt. No. 245, 10/17/17 P.M. Trial Tr. at 108:23–111:12.) For example, if a user opens Facebook on her phone, multiple requests will be sent from the phone to individual servers to access different pieces of information that are necessary to fill in the entire

webpage—*e.g.*, a request to display images of the user's news feed, a request to play a video, a request to display an advertisement. (*Id.*) The individual servers will then respond to those requests by sending the appropriate packets of information back to the phone. (*Id.*) Each of those requests and responses are different connection flows that are ultimately assembled for display as a single website by a browser. (*Id.*)

As the number of users and networks have grown over time, there has been a corresponding increase in the number of services that require multiple servers—and hence, an increase in the number of connection flows transmitted over the network. '789 Patent at 1:55–67. (*See also* Dkt. No. 244, 10/17/17 A.M. Trial Tr. at 53:5–56:16.) To ensure the continued operation of such services, network providers need to determine which flows are related to the same application or online service. (Dkt. No. 244, 10/17/17 A.M. Trial Tr. at 53:5–56:16.) For example, Facebook may generate two different connection flows to display information on the user's device—a first flow in which Facebook is sending pictures and a second flow in which Facebook is sending videos. If the network monitor cannot associate those two flows as belonging to Facebook, then it will have an incomplete view of how much traffic is attributable to that particular online service. (*Id.* at 55:23–56:16 ("[T]hat web page that you're using [is] made up of lots of these different connection flows. And the problem is . . . how do I know that that's all related to that one app or . . . web page . . . .").)

Network monitors that could recognize packets as belonging to the same connection flow were well-known in the prior art when the Patents-in-Suit were filed. *See, e.g.*, '789 Patent at 2:42–44. (*See also* Dkt. No. 245, 10/10/2017 P.M. Trial Tr. at 181:22–182:8.) However, these prior art monitors could not identify *disjointed* connection flows as belonging to the *same conversational flow*. *See, e.g.*, '789 Patent at 3:56–59 ("What distinguishes this invention from

prior art network monitors is that it has the ability to recognize disjointed flows as belonging to the same conversational flow.”). (*See also* Dkt. No. 245, 10/10/2017 P.M. Trial Tr. at 189:1–5 (“Q. Would you agree that the prior art does not link, in your opinion, conversation – connection flows into conversation flows? A. Yes.”); Dkt. No. 248, 10/11/2017 P.M. Trial Tr. at 132:17–138:16; Dkt. No. 250, 10/12/2017 P.M. Trial Tr. at 42:15–48:22.) This inability to associate different connection flows was a crucial limitation in the prior art because applications often transmit data via multiple connection flows. *See* ’751 Patent at 3:2–5 (“[P]rior art systems cannot collect some important performance metrics that are related to a complete sequence of packets of a flow or to several disjointed sequences of the same flow in a network.”); ’725 Patent at 12:29–33 (explaining that using the disclosed inventions reveals “[w]hat may seem to prior art monitors to be some unassociated flow . . . to be a sub-flow associated with a previously encountered sub-flow”); ’789 Patent at 15:31–34 (same).

The Patents-in-Suit address this problem and describe how disjointed connection flows can be associated with a single conversational flow to more precisely associate traffic with a particular application or protocol. *See* ’789 Patent at 1:48–51 (“The present invention relates to computer networks, specifically to the real-time elucidation of packets communicated within a data network, including classification according to protocol and application program.”); ’751 Patent at 3:2–5 (“[P]rior-art systems cannot collect some important performance metrics that are related to a complete sequence of packets of a flow or to several disjointed sequences of the same flow in a network.”); ’725 Patent at 1:66–2:6 (“Not only should all the packets be detected and analyzed, but for each of these packets the network monitor should determine the protocol (e.g., http, ftp, H.323, VPN, etc.), the application/use within the protocol (e.g., voice, video, data, real-time data, etc.), and an end user’s pattern of use within each application or the application context (e.g.,

options selected, service delivered, duration, time of day, data requested, etc.).”). (Dkt. No. 245, 10/10/2017 P.M. Trial Tr. at 12:7–23, 102:12–20 (“[W]hat we’re talking about . . . [i]dentifying the underlying protocols, the applications that are being used, and the user activity that’s caused those packets to flow through the network to try and achieve an understanding about how the network is being used.”).)

**B. Infringement**

At trial, PI alleged, and the jury found, that NetScout’s G10 and GeoBlade products practice the Asserted Claims. Specifically, the jury found that the Accused Products literally infringe Claims 10 and 17 of the ’725 Patent; Claims 1 and 5 of the ’751 Patent; and Claims 19 and 20 of the ’789 Patent. (Dkt. No. 237 at 2.)

Pursuant to Rule 50(b), NetScout moves to vacate the verdict. It contends that the Accused Products do not practice what it calls the “conversational flow” limitations and is therefore entitled to judgment as a matter of law of no infringement. (Dkt. No. 314.) NetScout argues that each Asserted Claim requires associating connection flows into conversational flows. This position stems from (1) PI’s repeated assertions before trial that the Asserted Claims require associating packets into conversational flows; (2) this Court’s decision finding the claims patent-eligible because they include this requirement; and (3) the Parties’ agreed upon construction of “conversational flows,” the elements and steps recited in the Asserted Claims, the patents’ specifications and intrinsic record, and the named inventors’ testimony. (*Id.* at 4–13.) NetScout asserts that PI failed to present any evidence that the Accused Products ever actually associate connection flows into conversational flows. (*Id.* at 16–20.) Instead, PI’s infringement expert, Dr. Alermoth, allegedly presented a new theory at trial that the “Asserted Claims do not actually *require* associating or correlating flows of packets into ‘conversational flows’” and “that the

Accused Products still infringe because they store information that '*can be used*' to associate connection flows into 'conversational flows.'" (*Id.* at 1 (emphasis added).) NetScout contends that "Dr. Alermoth's new interpretation, heard for the first time at trial, is not correct" and "impermissibly broadened the scope of the claims to read them onto the Accused Products." (*Id.* at 2.)

NetScout also argues that the only product that supposedly did correlate connection flows into conversational flows was an optional feature that was never used or sold with the Accused Products. (*Id.* at 18–22.) According to NetScout, PI presented evidence that the Web Page Download Time KPI feature in the Accused Products associates connection flows into conversational flows. (*Id.*) However, Dr. Alermoth admitted at trial that this feature was never used or sold. (*Id.*) As a result, NetScout asserts that no reasonable jury could have found that the Accused Products infringe the Asserted Claims.

The Court has conducted a careful review of the trial record and concludes that "a reasonable jury would . . . have a legally sufficient evidentiary basis to find" infringement. Fed. R. Civ. P. 50(a). For each Asserted Claim, PI's infringement expert, Dr. Alermoth, applied the Court's claim constructions to determine their scope. (Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 121:16–123:8.) He then provided the jury a claim-by-claim, element-by-element analysis of how each claim limitation, as construed, reads on the Accused Products. He explained that based on a review of source code, internal documents, and deposition testimony regarding the Accused Products, each element of the Asserted Claims is present in the Accused Products. He began his analysis with Claim 19 of the '789 Patent, which PI told the jury was an "exemplary claim" of the Asserted Claims. (Dkt. No. 244, 10/10/17 A.M. Trial Tr. at 14:23–25; Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 144:4–152:16 (Claim 19 of the '789 Patent).) Dr. Alermoth then testified about

the remaining claims, referring back to his testimony on Claim 19 where the limitations were the same and providing additional evidence for new or different limitations. (Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 152:17–153:19 (Claim 10 of the '789 Patent), 155:14–165:20 (Claim 1 of the '751 Patent); 165:24–166:20 (Claim 5 of the '751 Patent), 167:3–176:7 (Claim 10 of the '725 Patent); 176:11–178:7 (Claim 17 of the '725 Patent).)

"For most of [the claim] elements . . . NetScout never challenged Dr. Alermoth's opinion during trial and does not appear to contest them now [on Rule 50(b)]." (Dkt. No. 323 at 2 (citing Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 127:8–134:1, 138:16–144:4).) Rather, NetScout challenges the sufficiency of Dr. Alermoth's testimony regarding "conversational flows" and asserts that such testimony does not support the jury's finding of infringement. (*See* Dkt. No. 314.) Having reviewed the trial record, however, the Court finds that substantial evidence supports the jury's finding that the Accused Products did meet the "conversational flow" limitations.

Most relevant here is Dr. Alermoth's testimony regarding elements 19(d)–(f) of Claim 19 of the '789 Patent. Those elements recite:

> . . . . (d) a memory for storing a database comprising none or more flow-entries for previously encountered conversational flows, each flow-entry identified by identifying information stored in the flow-entry;
>
> (e) a lookup engine coupled to the output of the parser subsystem and to the flow-entry memory and configured to lookup whether the particular packet whose parser record is output by the parser subsystem has a matching flow-entry, the looking up using at least some of the selected packet portions and determining if the packet is of an existing flow; and
>
> (f) a flow insertion engine coupled to the flow-entry memory and to the lookup engine and configured to create a flow-entry in the flow-entry database, the flow-entry including identifying information for future packets to be identified with the new flow-entry, the lookup engine configured such that if the packet is of an existing flow, the monitor classifies the packet as belonging to the found existing flow; and if the packet is of a new flow, the flow insertion engine stores a new flow-entry for the new flow in the flow-entry database, including identifying information for future packets to be identified with the new flow-entry . . . .

Claim 19, '789 Patent. Applying the Court's claim constructions, Dr. Alermoth explained what these elements require and how the Accused Products meet each of them.

With respect to element 19(d), Dr. Alermoth testified that "the idea would be that you're keeping track of not only the connection flows, but also the conversational flows. And you do that by keeping a copy of them in the memory." (Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 117:18–21.) He stated that the "flow state block" or "FSB" in the Accused Products is "the portion of the memory where the database is stored that contained the flow-entries." (*Id.* at 135:5–7.) He showed the jury "corresponding source code for this called Fsb.c," which "defines the source code in the computer that's used to – to then track flows." (*Id.* at 135:8–10.) He explained that information stored in the FSB is "a whole number of fields that get associated with a particular flow-entry." (*Id.* at 136:2–5.) He concluded that "the requirement of the claim is to have a memory for storing a database comprising none or more flow-entries" and that he had "shown what the flow-entries are." (*Id.* at 136:21–23.) He further stated that the claim required that such flow-entries be "for previously encountered conversational flows" and that he had similarly "shown . . . some of the information in the flow record that can be used to correlate or associate flow-entries into conversational flows." (*Id.* at 136:24–137:2.) *To confirm that the Accused Products practice the claimed limitations*, Dr. Alermoth described an optional feature—not itself accused of infringement—called the Web Page Download Time Estimation, which generates data analytics based on information stored in the FSB. (*Id.* at 137:8–138:14.) He explained that this feature "demonstrate[s] that information in the flow record is *sufficient to identify* the flow-entry and also

to allow it to associate with previously-encountered conversational flows," as required by the claim. (*Id.* at 138:8–11 (emphasis added).)[4]

Dr. Alermoth engaged in a similar analysis for element 19(e). He explained that this element recites a "look-up engine. And the function of the look-up engine, as it's described in the words of the claim here, roughly is to look at packets that come in and determine whether they're for an existing flow or whether they're for a new flow." (*Id.* at 138:20–25.) He showed the jury a source code file, FSPP_G10.c, and testified that "on Page 3 of this source code file, there is a function to search the FSB, to search the flow state block, and determine if packets coming in match with an existing flow-entry or not." (*Id.* at 139:9–13.)[5]

Finally, Dr. Alermoth stated that element 19(f) requires a "flow insertion engine." (*Id.* at 139:23–24.) He explained that "once you looked up the flow, if it finds a flow, it can update that flow-entry with information from the packet that was just observed. If there isn't an existing flow that's found, then it can create a new flow-entry." (*Id.* at 139:24–140:3.) Based on source code for the FSB, he opined that the Accused Products practice these limitations. (*Id.* at 140:8–142:12 (explaining that source code says "[c]reate and initialize a new flow," "talks about monitoring and classifying the packet," and "looking at updating elements of that flow-entry," as required by element 19(f)).)[6]

[4] Dr. Alermoth testified that for element 19(d), "the documentation and evidence that shows that the way that GeoBlade works is similar to the G10." (Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 149:20–21; *see also id.* at 150:19–22 ("So all of the evidence that I pointed to earlier about Fsb.c source code file, the flow header document, all of that is exactly the same evidence that I've relied on for the rest of this limitation."); *id.* at 150:3–22 (citing deposition testimony from Mr. Curtin, who testified about a document that "show[ed] how the functions of the G10 map to the GeoBlade").)

[5] For the GeoBlade, Dr. Alermoth presented source code that met this limitation. (Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 151:4–10.) *See also* PTX-203.

[6] For the GeoBlade, Dr. Almeroth presented source code that met this limitation. (Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 151:17–21.) *See also* PTX-203.

The Court finds that the strength and sufficiency of record evidence, as discussed above, adequately supports the jury's verdict of infringement. NetScout contends that Dr. Alermoth presented a "new (and erroneous) interpretation of the Asserted Claims" at trial that contradicted his deposition testimony and expert report, and that had he provided testimony on the "proper interpretation" of the claims, no reasonable jury could have found infringement. (Dkt. No. 314 at 1, 22.) Even if true, NetScout never raised the issue during its cross-examination of Dr. Alermoth. Nor did it object at trial to his testimony as beyond the scope of his expert report. The argument was simply never raised prior to the return of the jury's verdict, and as such, is irrelevant and improper under Rule 50(b). *See Paez v. Gelboym*, 578 Fed. Appx. 407, 408 n.1 (5th Cir. 2014) ("We do not consider evidence that was not presented to the jury."); *see also West v. Media Gen. Operations, Inc.*, 250 F. Supp. 2d 923, 947 (E.D. Tenn. 2002) ("When deciding the plaintiffs' Rule 50(b) motion, the Court is limited to reviewing only the evidence presented to the jury at trial. The Court cannot grant a Rule 50(b) motion and set aside the jury's verdict based on information that was not introduced into evidence at trial and not taken into consideration by the jury.").

The Court's role in ruling on a Rule 50(b) motion is to determine whether there is a "legally sufficient evidentiary basis" from the trial record to support the jury's verdict. Fed. R. Civ. P. 50(a). "Where a jury [such as here] is presented with two conflicting positions at trial and there is reasonable evidence and argument to support both positions, the fact that the jury ultimately sided with one party over the other does not support entry of JMOL." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, No. 2:14-cv-00911-JRG, 2016 WL 4440255, at *7 (E.D. Tex. Aug. 23, 2016), *aff'd*, 880 F.3d 1356 (Fed. Cir. 2018). Ultimately, the jury was entitled to credit Dr. Alermoth's testimony over NetScout's expert. *Id.* ("[T]he Court will not supplant the judgment of the jury."). Accordingly, the jury's verdict of infringement must stand undisturbed.

### C. Invalidity

At trial, NetScout alleged that the Asserted Claims are invalid because (1) the claims are anticipated under 35 U.S.C. §102(a) (pre-AIA) and (2) the Patents-in-Suit fail to name all inventors as required by 35 U.S.C. §102(f) (pre-AIA). Specifically, NetScout argued that its network monitor, the 6010 probe with software version 4.5 (the "NetScout Probe"), implemented the industry-standard "Track Sessions" functionality. (*Id.* at 1.) NetScout submits that it presented evidence and testimony from Rajeev Nadkarni, a NetScout engineer, and its expert, Mr. Waldbusser, which showed that Track Sessions "actually associated related connection flows into 'conversational flows,' just like the invention described and claimed in the Asserted Patents." (*Id.*) NetScout also argued that the Asserted Claims are invalid because the Patents-in-Suit do not name the RMON working group as an inventor. The RMON working group "devised . . . 'Track Sessions'" and "was the true source of the essential feature of the Asserted Claims, [which was] what Russel Dietz and the other named inventors claimed in the patents as 'conversational flows.'" (*Id.* at 2.)

NetScout asserts that PI's attempts to rebut invalidity do not provide substantial evidence for the jury to find that NetScout failed to show anticipation or improper inventorship. (*Id.* at 13–20; Dkt. No. 328 at 3–4.) First, PI's expert, Dr. Alermoth, testified that there were different versions of Track Sessions implemented in the NetScout Probe and that these differences cast doubt as to (1) whether Mr. Waldbusser "follow[ed] a proper methodology with respect to anticipation" and (2) whether the NetScout Probe with version 4.5 of Track Sessions actually functioned in the manner set forth in the claims. (Dkt. No. 250, 10/12/17 P.M. Trial Tr. at 40:9–42:12.) NetScout concedes that its fact witness, Mr. Nadkarni, did testify that there were two versions of Track Sessions—version 4.5 (the initial release) and version 4.5.3 (the patch release).

(Dkt. No. 317 at 14.) NetScout argues, however, that Mr. Nadkarni confirmed at trial that Version 4.5.3 addressed "small problems, like bugs" and "would [not] have changed the functionality of 'Track Sessions' [in version 4.5]." (*Id.* (citing Dkt. No. 248, 10/11/17 P.M. Trial Tr. at 107:15–23).)

NetScout also argues that Dr. Alermoth's testimony about the differences between Track Sessions and the Asserted Claims was premised on "phantom claim limitations." (*Id.* at 15.) According to NetScout, Dr. Alermoth first told the jury that the claims require conversational flows to be comprised of separate connection flows and that every connection flow of a conversational flow had to be maintained in a *separate* flow-entry. (*Id.* at 16 (citing Dkt. No. 250, 10/12/17 P.M. Trial Tr. at 45:3–6).) He allegedly opined that the NetScout Probe does not anticipate because it maintained information about different connections all in *one* flow-entry and not in separate entries. (*Id.* at 16–17.) NetScout further characterizes PI's Opposition as stating that the claims require the tracking of simultaneous or parallel connection flows and that since the NetScout Probe describes a sequence of flows, there is no anticipation. (Dkt. No. 328 at 3–4.) NetScout claims that neither of these purported limitations is required by the Patents-in-Suit and that such an interpretation would exclude a preferred embodiment of the claims. (*Id.*) As a result, NetScout contends that no reasonable jury could have found that the Asserted Claims are not invalid, and moves to vacate the jury's finding of no invalidity. (*See* Dkt. No. 237 at 4.)

The Court has conducted a careful review of the trial record and finds no valid reason to depart from the jury's verdict. Judgment as a matter of law is granted only if the jury's verdict has no legally sufficient evidentiary basis. Fed. R. Civ. P. 50(a)(1). NetScout does not show this in its motion. Instead, NetScout summarizes the competing evidence presented at trial and asks the Court to reweigh the evidence in its favor. For example, NetScout complains about Dr. Alermoth's

testimony in response to its expert, Mr. Waldbusser. At trial, Mr. Waldbusser opined that the NetScout Probe with Track Sessions anticipated the Asserted Claims because it practiced the "conversational flow" limitation. He explained that Track Sessions "links together, ***join[s] together connections*** starting on well-known ports with second connections that --- that are on dynamically assigned ports." (Dkt. No. 248, 10/11/17 P.M. Trial Tr. at 156:6–9 (emphasis added).) In particular, he testified that the NetScout Probe with Track Sessions practiced the "conversational flow" limitation recited in element 19(d) of the '789 Patent:

> Well, this limitation also required that – evidence of conversational flows, and remember that's where we're going to remember the port number and ***join the connections together*** and so
>
> . . .
>
> So here we remember the port number. We – we put the port number in this port mapper packet, examine that packet, correlate the red key to the new purple key where we're – where we're remembering the port number. That's the process that I'm about to show you. So it – part of it is unsurprisingly in trackses.h with – for TrackSessions.
>
> . . .
>
> The pp.c has the – has the code that remembers the port. That Line 1817 actually remembers the port, and the highlighted comment above it tells a little bit about what it's doing. It's assigning the new port for the previously asked program, and then assigning the port. And then on the next slide it shows the – ***the code that swaps the hash bucket***. And then it –
>
> . . .
>
> Well, it means that we're – it essentially means we're adding this new entry to the table.
>
> . . .
>
> Oh, when I found those things, I realized that I found all the elements for the conversational flow.

(*Id.* at 209:18–211:5 (emphasis added).)

PI's expert, Dr. Alermoth, disagreed. He opined that (1) Mr. Waldbusser's analysis was flawed because he focused only on two words in the claim— "conversational flow"—as a single limitation, when in fact the claims required much more, and (2) the NetScout Probe did not associate different connection flows with the same conversational flow and instead replaced one flow with another. He explained to the jury:

> But when Mr. Waldbusser did an analysis of this claim with respect to conversational flows, the only thing that he looked at was the two words "conversational flows" and one limitation of Claim 19(d). Two words out of 29 words for that limitation and nothing for any of the other limitations
>
> . . .
>
> It's two words as part of a --- of other words in a single limitation. ***And it's important to read the rest of the words.***
>
> . . .
>
> So if you go to the next slide from Waldbusser, 211, he then talks about how --- well, the first part was packets of a protocol start on a well-known port, and then transfer them to dynamically assigned ports. That means that it goes to this new port that's different than what the original port was.
>
> So even though there's two different connections that are happening here, what TrackSessions is trying to do is put them into a single flow-entry. And that's what he's shown down here at the bottom. It's not two flow-entries. It's a single flow-entry.
>
> . . .
>
> So in this instance, you have one flow-entry. And, for example, all of the packets that were exchanged over these two different connections are counted as the one flow-entry. There aren't two separate flow-entries. They aren't – they then aren't tied together. So it's a very different concept.
>
> ***On cross-examination, he was asked whether or not there was a way to determine, using this flow-entry, how many packets could be attributed to this first connection versus packets attributed to the second connection. And he answered that there was not. And I agree with that. Because there's the only one flow-entry, all of the packets are associated with that one flow-entry. And so there isn't the concept of a conversational flow that can relate different independent flows to each other***.

> . . .
>
> And ***so this idea of just having one flow-entry that's changed***, ***as opposed to maintaining existing flow-entries, creating new flow-entries, and then correlating and relating those flow-entries together to create conversational flows is not what happens when you just swap out the port number and maintain one flow-entry***.

(Dkt. No. 250, 10/12/17 P.M. Trial Tr. at 21:7–19; 28:9–29:14; 45:11–16 (emphasis added).)

NetScout claims that Dr. Alermoth manufactured "phantom claim limitations" to side-step invalidation. (Dkt. No. 317 at 1–2.) However, Dr. Alermoth's opinions represent one fair reading of the claims. Each party's expert applied the Court's claim constructions to opine on what a person of ordinary skill in the art would understand the claims to require. (Dkt. No. 248, 10/11/17 P.M. Trial Tr. at 202:11–203:8; Dkt. No. 250, 10/12/17 P.M. Trial Tr. at 17:18–21.) In view of those competing opinions, the jury was entitled to credit the testimony of Dr. Alermoth over Mr. Waldbusser and find that the NetScout Probe does not practice each limitation in the Asserted Claims. "The Court will not supplant the judgment of the jury." *Core Wireless*, 2016 WL 4440255, at *7.

Even in the absence of Dr. Alermoth's rebuttal testimony, PI has pointed to other evidence in the record that supports the jury's verdict of no invalidity:

- "Mr. Dietz [a named inventor] testified that the Track Sessions port-swapping technique was very different than the claimed technique—and those differences were intentional because RMON left implementation techniques open, and he further testified (consistent with Dr. Alermoth) that the NS Probe did not have application layer visibility and thus could not have classified conversational flows as claimed." (Dkt. No. 333 at 2; *see also* Dkt. No. 244, 10/10/17 A.M. Trial Tr. at 89:22–25; 90:13–23; 99:24–100:21; 109:13–110:5; 114:10–115:10; 125:14–127:5.)

- Mr. Waldbusser admitted on cross-examination that he initially "did not think PI's claims were the same as the NS Probe with Track Sessions," (Dkt. No. 333 at 1), and that he concluded that "what the patent was describing

was the same thing as TrackSessions" "during [his] work for this case." (Dkt. No. 249, 10/12/17 A.M. Trial Tr. at 40:13–16).) According to PI, this exposed Mr. Waldbusser to the jury "as being more of a hired gun than an objective expert." (Dkt. No. 333 at 1.)

Each of these are different reasons why the jury could have found that NetScout failed to prove invalidity by clear and convincing evidence. Nothing more is required to defeat a Rule 50(b) motion. Drawing all reasonable inferences in favor of the verdict and without making any credibility decisions, the Court finds that the verdict is supported by substantial evidence presented at trial. Accordingly, NetScout's motion for judgment as a matter of law of no invalidity should be denied.[7]

## IV. CONCLUSION

For the reasons set forth above, NetScout's Rule 50(b) Renewed Motion for Judgment as a Matter of Law of No Infringement (Dkt. No. 314) and NetScout's Rule 50(b) Renewed Motion for Judgment as a Matter of Law of Invalidity Under 35 U.S.C. §§ 102(a), 102(f) and 101 (Dkt. No. 317) are each **DENIED**.

**So ORDERED and SIGNED this 31st day of May, 2019.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

[7] NetScout argues that the NetScout Probe with Track Sessions anticipates the Asserted Claims. NetScout also argues that since the RMON working group devised Track Sessions, it should have been a named inventor of the Patents-in-Suit per 35 U.S.C. § 102(f). Since the Court finds that the jury had a reasonable basis to find that the NetScout Probe with Track Sessions does not anticipate, the jury necessarily had a reasonable basis to reject NetScout's argument that RMON, the group that devised Track Sessions, should have been a named inventor on the Patents-in-Suit.

US006954789B2

(12) **United States Patent**
**Dietz et al.**

(10) **Patent No.: US 6,954,789 B2**
(45) **Date of Patent: Oct. 11, 2005**

(54) **METHOD AND APPARATUS FOR MONITORING TRAFFIC IN A NETWORK**

(75) Inventors: **Russell S. Dietz**, San Jose, CA (US); **Joseph R. Maixner**, Aptos, CA (US); **Andrew A. Koppenhaver**, Littleton, CO (US); **William H. Bares**, Germantown, TN (US); **Haig A. Sarkissian**, San Antonio, TX (US); **James F. Torgerson**, Andover, MN (US)

(73) Assignee: **Hi/fn, Inc.**, Los Gatos, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/684,776**

(22) Filed: **Oct. 14, 2003**

(65) **Prior Publication Data**

US 2004/0083299 A1 Apr. 29, 2004

**Related U.S. Application Data**

(63) Continuation of application No. 09/608,237, filed on Jun. 30, 2000, now Pat. No. 6,651,099.

(60) Provisional application No. 60/141,903, filed on Jun. 30, 1999.

(51) **Int. Cl.**[7] ............................................ **G06F 15/173**

(52) **U.S. Cl.** ...................................... **709/224**; 370/392

(58) **Field of Search** ................................ 709/200, 201, 709/220, 223, 224, 231, 232, 236, 238–240, 246; 370/389, 392

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,949,369 A 4/1976 Churchill, Jr. .............. 711/128
4,458,310 A 7/1984 Chang ........................ 711/119
4,559,618 A 12/1985 Houseman et al. ........... 365/49

(Continued)

FOREIGN PATENT DOCUMENTS

JP 2003-44510 A 2/2003

OTHER PUBLICATIONS

Advanced Methods for Storage and Retrieval in Image; http://www.cs.tulane.edu/ww/Prototype/proposal.html; 1998.

(Continued)

*Primary Examiner*—Moustafa M. Meky
(74) *Attorney, Agent, or Firm*—Dov Rosenfeld; Inventek

(57) **ABSTRACT**

A monitor for and a method of examining packets passing through a connection point on a computer network. Each packets conforms to one or more protocols. The method includes receiving a packet from a packet acquisition device and performing one or more parsing/extraction operations on the packet to create a parser record comprising a function of selected portions of the packet. The parsing/extraction operations depend on one or more of the protocols to which the packet conforms. The method further includes looking up a flow-entry database containing flow-entries for previously encountered conversational flows. The lookup uses the selected packet portions and determining if the packet is of an existing flow. If the packet is of an existing flow, the method classifies the packet as belonging to the found existing flow, and if the packet is of a new flow, the method stores a new flow-entry for the new flow in the flow-entry database, including identifying information for future packets to be identified with the new flow-entry. For the packet of an existing flow, the method updates the flow-entry of the existing flow. Such updating may include storing one or more statistical measures. Any stage of a flow, state is maintained, and the method performs any state processing for an identified state to further the process of identifying the flow. The method thus examines each and every packet passing through the connection point in real time until the application program associated with the conversational flow is determined.

**49 Claims, 18 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 4,736,320 | A | | 4/1988 | Bristol | 364/300 |
| 4,891,639 | A | | 1/1990 | Nakamura | 340/825.5 |
| 4,910,668 | A | | 3/1990 | Okamoto et al. | 711/207 |
| 4,972,453 | A | | 11/1990 | Daniel, III et al. | 379/10 |
| 5,101,402 | A | | 3/1992 | Chiu et al. | 370/17 |
| 5,247,517 | A | | 9/1993 | Ross et al. | 370/85.5 |
| 5,247,693 | A | | 9/1993 | Bristol | 395/800 |
| 5,249,292 | A | | 9/1993 | Chiappa | 395/650 |
| 5,315,580 | A | | 5/1994 | Phaal | 370/13 |
| 5,339,268 | A | | 8/1994 | Machida | 365/49 |
| 5,351,243 | A | | 9/1994 | Kalkunte et al. | 370/92 |
| 5,365,514 | A | | 11/1994 | Hershey et al. | 370/17 |
| 5,375,070 | A | | 12/1994 | Hershey et al. | 364/550 |
| 5,394,394 | A | | 2/1995 | Crowther et al. | 370/60 |
| 5,414,650 | A | | 5/1995 | Hekhuis | 364/715.02 |
| 5,414,704 | A | | 5/1995 | Spinney | 370/60 |
| 5,430,709 | A | | 7/1995 | Galloway | 370/13 |
| 5,432,776 | A | | 7/1995 | Harper | 370/17 |
| 5,493,689 | A | | 2/1996 | Waclawsky et al. | 395/821 |
| 5,500,855 | A | | 3/1996 | Hershey et al. | 370/17 |
| 5,511,213 | A | | 4/1996 | Correa | 395/800 |
| 5,511,215 | A | | 4/1996 | Terasaka et al. | 395/800 |
| 5,530,834 | A | | 6/1996 | Colloff et al. | 711/136 |
| 5,530,958 | A | | 6/1996 | Agarwal et al. | 711/3 |
| 5,535,338 | A | | 7/1996 | Krause et al. | 395/200.2 |
| 5,568,471 | A | | 10/1996 | Hershey et al. | 370/17 |
| 5,574,875 | A | | 11/1996 | Stansfield et al. | 395/403 |
| 5,586,266 | A | | 12/1996 | Hershey et al. | 395/200.11 |
| 5,606,668 | A | | 2/1997 | Shwed | 395/200.11 |
| 5,608,662 | A | | 3/1997 | Large et al. | 364/724.01 |
| 5,634,009 | A | | 5/1997 | Iddon et al. | 395/200.11 |
| 5,651,002 | A | | 7/1997 | Van Seters et al. | 370/392 |
| 5,680,585 | A | | 10/1997 | Bruell | 703/26 |
| 5,684,954 | A | | 11/1997 | Kaiserswerth et al. | 395/200.2 |
| 5,703,877 | A | | 12/1997 | Nuber et al. | 370/395 |
| 5,720,032 | A | | 2/1998 | Picazo, Jr. et al. | 395/200.2 |
| 5,721,827 | A | | 2/1998 | Logan et al. | 709/217 |
| 5,732,213 | A | | 3/1998 | Gessel et al. | 395/200.11 |
| 5,740,355 | A | | 4/1998 | Watanabe et al. | 395/183.21 |
| 5,749,087 | A | | 5/1998 | Hoover et al. | 711/108 |
| 5,761,424 | A | | 6/1998 | Adams et al. | 395/200.47 |
| 5,761,429 | A | | 6/1998 | Thompson | 709/224 |
| 5,764,638 | A | | 6/1998 | Ketchum | 370/401 |
| 5,781,735 | A | | 7/1998 | Southard | 395/200.54 |
| 5,784,298 | A | | 7/1998 | Hershey et al. | 364/557 |
| 5,787,253 | A | | 7/1998 | McCreery et al. | 395/200.61 |
| 5,799,154 | A | | 8/1998 | Kuriyan | 709/223 |
| 5,802,054 | A | | 9/1998 | Bellenger | 370/401 |
| 5,805,808 | A | | 9/1998 | Hasani et al. | 395/200.2 |
| 5,812,529 | A | | 9/1998 | Czarnik et al. | 370/245 |
| 5,819,028 | A | | 10/1998 | Manghirmalani et al. | 395/185.1 |
| 5,825,774 | A | | 10/1998 | Ready et al. | 370/401 |
| 5,835,726 | A | | 11/1998 | Shwed et al. | 395/200.59 |
| 5,838,919 | A | | 11/1998 | Schwaller et al. | 395/200.54 |
| 5,841,895 | A | | 11/1998 | Huffman | 382/155 |
| 5,850,386 | A | | 12/1998 | Anderson et al. | 370/241 |
| 5,850,388 | A | | 12/1998 | Anderson et al. | 370/252 |
| 5,862,335 | A | | 1/1999 | Welch, Jr. et al. | 395/200.54 |
| 5,878,420 | A | | 3/1999 | de la Salle | 707/10 |
| 5,893,155 | A | | 4/1999 | Cheriton | 711/144 |
| 5,903,754 | A | | 5/1999 | Pearson | 395/680 |
| 5,917,821 | A | | 6/1999 | Gobuyan et al. | 370/392 |
| 6,003,123 | A | | 12/1999 | Carter et al. | 711/207 |
| 6,014,380 | A | | 1/2000 | Hendel et al. | 370/392 |
| 6,097,699 | A | | 8/2000 | Chen et al. | 370/231 |
| 6,115,393 | A | | 9/2000 | Engel et al. | 370/469 |
| 6,118,760 | A | * | 9/2000 | Zaumen et al. | 370/229 |
| 6,243,667 | B1 | * | 6/2001 | Kerr et al. | 703/27 |
| 6,269,330 | B1 | | 7/2001 | Cidon et al. | 704/43 |
| 6,272,151 | B1 | | 8/2001 | Gupta et al. | 370/489 |
| 6,279,113 | B1 | | 8/2001 | Vaidya | 713/201 |
| 6,282,570 | B1 | | 8/2001 | Leung et al. | 709/224 |
| 6,330,226 | B1 | | 12/2001 | Chapman et al. | 370/232 |
| 6,363,056 | B1 | | 3/2002 | Beigi et al. | 370/252 |
| 6,381,306 | B1 | | 4/2002 | Lawson et al. | 379/32 |
| 6,424,624 | B1 | | 7/2002 | Galand et al. | 370/231 |
| 6,430,409 | B1 | | 8/2002 | Rossmann | 455/422.1 |
| 6,452,915 | B1 | * | 9/2002 | Jorgensen | 370/238 |
| 6,453,345 | B2 | | 9/2002 | Trcka et al. | 709/224 |
| 6,453,360 | B1 | * | 9/2002 | Muller et al. | 709/250 |
| 6,466,985 | B1 | * | 10/2002 | Goyal et al. | 709/238 |
| 6,483,804 | B1 | * | 11/2002 | Muller et al. | 370/230 |
| 6,510,509 | B1 | * | 1/2003 | Chopra et al. | 712/13 |
| 6,516,337 | B1 | | 2/2003 | Tripp et al. | 709/202 |
| 6,519,568 | B1 | | 2/2003 | Harvey et al. | 705/1 |
| 6,570,875 | B1 | * | 5/2003 | Hegde | 370/389 |
| 6,625,657 | B1 | | 9/2003 | Bullard | 709/237 |
| 6,651,099 | B1 | | 11/2003 | Dietz et al. | 709/224 |
| 6,791,947 | B2 | * | 9/2004 | Oskouy et al. | 370/238 |

OTHER PUBLICATIONS

Measurement and Analysis of the Digital DECT propagation Channel; IEEE; 1998.

R, Periakaruppam and E. Nemeth. "GTrace–A Graphical Traceroute Tool." 1999 Usenix LISA. Available on www.caida.org, URL: http://www.caida.org/outreach/papers/1999/GTrace/GTrace.pdf.

W. Stallings. "Packet Filtering in the SNMP Remote Monitor." Nov. 1994. Available on www.ddj.com, URL: http://www.ddj.com/documents/s=1013/ddj9411h/9411h.htm.

"Technical Note: the Narus System," Downloaded Apr. 29, 1999 from www.narus.com, Narus Corporation, Redwood City California.

* cited by examiner


100
CLIENT 4
107
ANALYZER
108
116
SERVER 2
110
121
CLIENT 3
106
DATA COMMUNICATIONS
NETWORK
102
125
123
118
SERVER 2
112
CLIENT 2
105
CLIENT 1
104

FIG. 1


APPLICATION SERVER 2
CLIENT 3
KEY-1
KEY-2
datum request
datum reply
QP
QA
204
202 (106)
206
207
208
209
210
212
265
275

FIG. 2


300
PACKET
302
PARSER 301
ANALYZE AND RECOGNIZE PATTERN INFORMATION (PAR)
304
EXTRACT IDENTIFYING INFORMATION (EII)
306
PATTERN, PARSE AND EXTRACTION DATABASE
308
BUILD UNIQUE CONVERSATION "FLOW" KEY
312
LOOKUP FROM KNOWN RECORDS (DB 324 VIA CACHE)
314
NEW "FLOW" RECORD?
316
YES
NO
PROTOCOL & STATE IDENTIFICATION
318
MORE CLASSIFICATION?
320
YES
NO
UPDATE "FLOW" KNOWN RECORD
322
DATABASE OF FLOWS
324
STATE PROCESSOR INSTRUCTION DATABASE
326
STATE PROCESSNG OPERATIONS
328
MORE OPERATIONS?
330
YES
NO
MORE STATES?
332
YES
NO
CLASSIFICATN FINALIZATION
334
ANALYZER 303
COMPILER AND OPTIMIZER
310
PROTOCOL DESCRIPTION LANGUAGE
336
DATAGRAM LAYER SELECTIONS
338

FIG. 3


401
HIGH LEVEL PACKET DECODING DESCRIPTIONS
402
404
GENERATE PACKET PARSE AND EXTRACT OPERATIONS
COMPILE DESCRIPTIONS
403
405
GENERATE PACKET STATE INSTRUCTIONS AND OPERATIONS
406
PATTERN, PARSE AND EXTRACTION DATABASE
407
STATE PROCESSOR INSTRUCTION DATABASE
408
LOAD PARSING SUBSYSTEM MEMORY
409
LOAD STATE INSTRUCTION DATABASE MEMORY
400
410

FIG. 4


501
INPUT PACKET
502
503
LOAD PACKET COMPONENT
504
MORE IN PACKET?
NO
YES
512
BUILD PACKET KEY
F 6
513
FETCH NODE AND PROCESS FROM PATTERNS
505
MORE PATTERN NODES?
506
NO
NEXT PACKET COMPONENT
511
YES
APPLY NODE AND PROCESS TO COMPONENT
507
500
510
NEXT PATTERN NODE
NO
PATTERN MATCH?
508
YES
EXTRACT ELEMENTS
509

FIG. 5


601
PACKET COMPONENT AND PATTERN NODE
602
603
LOAD PACKET COMPONENT
604
MORE PACKET COMPONENTS?
NO
610
LOAD KEY BUFFER
F 7
611
YES
FETCH EXTRACTION AND PROCESS FROM PATTERNS
605
NO
606
MORE EXTRACTION ELEMENTS?
NO
NEXT PACKET COMPONENT
609
YES
607
APPLY EXTRACTION PROCESS TO COMPONENT
600
MORE TO EXTRACT?
608
YES

FIG. 6


701
KEY BUFFER AND PATTERN NODES
702
LOAD PATTERN NODE ELEMENT
703
MORE PATTERN NODES?
704
NO
YES
OUTPUT TO ANALYZER
708
F 8
709
HASH KEY BUFFER ELEMENT FROM PATTERN NODE
705
PACK KEY & HASH
706
NEXT PACKET COMPONENT
707
700

FIG. 7


801
UFKB ENTRY FOR PACKET
802
800
COMPUTE CONVERSATION RECORD BIN FROM HASH
803
REQUEST RECORD BIN/ BUCKET FROM CACHE
804
806
805
MORE BUCKETS IN THE BIN?
NO
SET UFKB FOR PACKET AS 'NEW'
YES
COMPARE CURRENT BIN AND BUCKET RECORD KEY TO PACKET
807
NEXT BUCKET
NO
KEY MATCH?
808
809
YES
MARK RECORD BIN AND BUCKET 'IN PROCESS' IN CACHE AND TIMESTAMP
810
811
SET UFKB FOR PACKET AS 'FOUND'
812
UPDATE STATISTICS FOR RECORD IN CACHE
813

FIG. 8


901
RPC REPLY PORTMAPPER
902
RPC ANNOUNCMENT PORTMAPPER
910
RPC BIND LOOKUP REQUEST
909
903
EXTRACT PROGRAM
GET 'PROGRAM', 'VERSION', 'PORT' AND 'PROTOCOL (TCP OR UDP)
EXTRACT PORT
GET 'PROGRAM', 'VERSION' AND 'PROTOCOL (TCP OR UDP)'
908
SAVE REQUEST
SAVE 'PROGRAM', 'VERSION' AND 'PROTOCOL (TCP OR UDP)' WITH DESTINATION NETWORK ADDRESS. BOTH MAKE A KEY.
904
CREATE SERVER STATE
SAVE 'PROGRAM', 'VERSION', 'PORT' AND 'PROTOCOL (TCP OR UDP)' WITH NETWORK ADDRESS IN SERVER STATE DATABASE. KEY ON SERVER ADDRESS AND TCP OR UDP PORT.
907
RPC BIND LOOKUP REPLY
905
906
LOOKUP REQUEST
FIND 'PROGRAM' AND 'VERSION' WITH LOOKUP OF SOURCE NETWORK ADDRESS.
EXTRACT PROGRAM
GET 'PORT' AND 'PROTOCOL (TCP OR UDP)'.
900

FIG. 9


1000
PATTERN RECOGNITION DATABASE MEMORY
1001
1002
EXTRACTION OPERATIONS DATABASE MEMORY
1003
1005
1004
1031
HOST INTERFACE MULTIPLEXR & CONTROL REGISTERS
INFO OUT
CONTRL IN
1031
1006
PATTERN RECOGNITN ENGINE (PRE)
EXTRACTION ENGINE (SLICER)
1007
1008
1013
PACKET INPUT
PARSER INPUT BUFFER MEMORY
PARSER OUTPUT BUFFER MEMORY
PACKET KEY AND PAYLOAD
1012
1010
1021
1025
PACKET START
INPUT BUFFER INTERFACE CONTROL
1011
ANALYZER INTERFACE CONTROL
DATA READY
NEXT PACKET
ANALYZER READY
1022
1023
1027

FIG. 10


1100
1101
1103
1107
1115
1118
1122
LOOKUP/ UPDATE ENGINE (LUE)
ANALYZER HOST INTERFACE AND CONTROL (ACIC)
HOST BUS INTER-FACE (HIB)
STATE PROCESSR INSTRUCN DATABASE (SPID)
1109
1108
PARSER INTER-FACE
UNIFIED FLOW KEY BUFFER (UFKB)
CACHE
STATE PROCESSR (SP)
1119
1123
UNIFIED MEMORY CONTROL (UMC)
MEMORY INTER-FACE
FLOW INSERTION/ DELETION ENGINE (FIDE)
1110

FIG. 11


1201
UFKB ENTRY FOR PACKET WITH STATUS 'NEW'
1202
1200
ACCESS CONVERSATION RECORD BIN
1203
REQUEST RECORD BIN/ BUCKET FROM CACHE
1204
REQUEST NEXT BUCKET FROM CACHE
1206
NO
BIN/BUCKET EMPTY?
1205
YES
BUCKET VALID?
1208
NO
INSERT KEY AND HASH IN BUCKET, MARK 'USED' WITH TIMESTAMP
1207
YES
1210
SET UFKB FOR PACKET AS 'DROP'
COMPARE CURRENT BIN AND BUCKET RECORD KEY TO PACKET
1209
MARK RECORD BIN AND BUCKET 'IN PROCESS' AND 'NEW' IN CACHE
1211
1212
SET INITIAL STATISTICS FOR RECORD IN CACHE
1213

FIG. 12


1301
1300
UFKB ENTRY FOR PACKET WITH STATUS 'NEW' OR 'FOUND'
1302
SET STATE PROCESSOR INSTRUCTION POINTER TO VALUE FOUND IN UFKB ENTRY
1303
FETCH INSTRUCTION FROM STATE PROCESSOR INSTRUCTION MEMORY
1304
PERFORM OPERATION BASED ON THE STATE INSTRUCTION
1305
DONE PROCESSING STATES FOR THIS PACKET?
1307
NO
SET STATE PROCESSOR INSTRUCTION POINTER TO VALUE FOUND IN CURRENT STATE
1308
YES
1310
SAVE STATE PROCESSOR INSTRUCTION POINTER IN CURRENT FLOW RECORD
NO
DONE PROCESSING STATES FOR THIS FLOW?
1309
YES
SET AND SAVE FLOW REMOVAL STATE PROCESSOR INSTRUCTION IN CURRENT FLOW RECORD
1311
1313

FIG. 13


PACKET
1402
ANALYZE AND RECOGNIZE PATTERN INFORMATION
1404
EXTRACT IDENTIFYING INFO & PROCL /STATE
1406
PATTERN STRUCTURES AND EXTRACTION OPERATIONS
1408
PARSER SUBSYSEM
BUILD "FLOW" KEY
1412
LOOKUP KNOWN RECORDS (DB 1424)
1414
NEW "FLOW" RECORD?
1416
YES
NO
DATABASE OF FLOWS
1424
MORE CLASSIFICATION?
1420
YES
NO
UPDATE "FLOW" KNOWN RECORD
1422
STATE MACHINE SELECTOR
1426
STATE ANALYSIS OPERATIONS
1428
MORE STATES?
1432
YES
NO
CLASSIFICATN FINALIZATION
1434
ANALYZER SUBSYSTEM
1400

FIG. 14


1506
HOST MEMORY
1508
DISK & DB
324
DATABASE OF FLOWS (MEMORY)
1504
HOST PROCESSOR
1510
NETWORK INTERFACE CARD
ANALYZER 303
PARSER 301
MONITOR 300
1502
PACKET ACQUISITION DEVICE
102
121
PACKETS

FIG. 15


1602
0 - 3 Bytes
1600
Dst MAC
offset 0 - 11
Dst MAC
Src MAC
1604
Src MAC
1606
1608
Dst MAC (6)
Dst Hash (2)
1610
1612
Src MAC (6)
Src Hash (2)
1614
L2 Offset = 12

FIG. 16




FIG. 17A




FIG. 17B




FIG. 18A




FIG. 18B

## METHOD AND APPARATUS FOR MONITORING TRAFFIC IN A NETWORK

### CROSS-REFERENCE TO RELATED APPLICATION

This invention is a continuation of U.S. patent application Ser. No. 09/608,237 for METHOD AND APPARATUS FOR MONITORING TRAFFIC IN A NETWORK to inventors Dietz, et al., filed Jun. 30, 2000, now U.S. Pat. No. 6,651, 099, the contents of which are incorporated herein by reference.

This invention claims the benefit of U.S. Provisional Patent Application Ser. No.: 60/141,903 for METHOD AND APPARATUS FOR MONITORING TRAFFIC IN A NETWORK to inventors Dietz, et al., filed Jun. 30, 1999, the contents of which are incorporated herein by reference.

This application is related to the following U.S. patent applications, each filed concurrently with the present application, and each assigned to the assignee of the present invention:

U.S. patent application Ser. No. 09/609,179 for PROCESSING PROTOCOL SPECIFIC INFORMATION IN PACKETS SPECIFIED BY A PROTOCOL DESCRIPTION LANGUAGE, to inventors Koppenhaver, et al., filed Jun. 30, 2000, now U.S. Pat. No. 6,665,725, and incorporated herein by reference.

U.S. patent application Ser. No. 09/608,126 for RE-USING INFORMATION FROM DATA TRANSACTIONS FOR MAINTAINING STATISTICS IN NETWORK MONITORING, to inventors Dietz, et al., filed Jun. 30, 2000, now U.S. Pat. No. 6,839,751, and incorporated herein by reference.

U.S. patent application Ser. No. 09/608,266 for ASSOCIATIVE CACHE STRUCTURE FOR LOOKUPS AND UPDATES OF FLOW RECORDS IN A NETWORK MONITOR, to inventors Sarkissian, et al., filed Jun. 30, 2000, now U.S. Pat No. 6,771,646, and incorporated herein by reference.

U.S. patent application Ser. No. 09/608,267 for STATE PROCESSOR FOR PATTERN MATCHING IN A NETWORK MONITOR DEVICE, to inventors Sarkissian, et al., filed Jun. 30, 2000, now U.S. Pat. No. 6,789,116, and incorporated herein by reference.

### FIELD OF INVENTION

The present invention relates to computer networks, specifically to the real-time elucidation of packets communicated within a data network, including classification according to protocol and application program.

### BACKGROUND TO THE PRESENT INVENTION

There has long been a need for network activity monitors. This need has become especially acute, however, given the recent popularity of the Internet and other internets—an "internet" being any plurality of interconnected networks which forms a larger, single network. With the growth of networks used as a collection of clients obtaining services from one or more servers on the network, it is increasingly important to be able to monitor the use of those services and to rate them accordingly. Such objective information, for example, as which services (i.e., application programs) are being used, who is using them, how often they have been accessed, and for how long, is very useful in the maintenance and continued operation of these networks. It is especially important that selected users be able to access a network remotely in order to generate reports on network use in real time. Similarly, a need exists for a real-time network monitor that can provide alarms notifying selected users of problems that may occur with the network or site.

One prior art monitoring method uses log files. In this method, selected network activities may be analyzed retrospectively by reviewing log files, which are maintained by network servers and gateways. Log file monitors must access this data and analyze ("mine") its contents to determine statistics about the server or gateway. Several problems exist with this method, however. First, log file information does not provide a map of real-time usage; and secondly, log file mining does not supply complete information. This method relies on logs maintained by numerous network devices and servers, which requires that the information be subjected to refining and correlation. Also, sometimes information is simply not available to any gateway or server in order to make a log file entry.

One such case, for example, would be information concerning NetMeeting® (Microsoft Corporation, Redmond, Wash.) sessions in which two computers connect directly on the network and the data is never seen by a server or a gateway.

Another disadvantage of creating log files is that the process requires data logging features of network elements to be enabled, placing a substantial load on the device, which results in a subsequent decline in network performance. Additionally, log files can grow rapidly, there is no standard means of storage for them, and they require a significant amount of maintenance.

Though Netflow® (Cisco Systems, Inc., San Jose, Calif.), RMON2, and other network monitors are available for the real-time monitoring of networks, they lack visibility into application content and are typically limited to providing network layer level information.

Pattern-matching parser techniques wherein a packet is parsed and pattern filters are applied are also known, but these too are limited in how deep into the protocol stack they can examine packets.

Some prior art packet monitors classify packets into connection flows. The term "connection flow" is commonly used to describe all the packets involved with a single connection. A conversational flow, on the other hand, is the sequence of packets that are exchanged in any direction as a result of an activity—for instance, the running of an application on a server as requested by a client. It is desirable to be able to identify and classify conversational flows rather than only connection flows. The reason for this is that some conversational flows involve more than one connection, and some even involve more than one exchange of packets between a client and server. This is particularly true when using client/server protocols such as RPC, DCOMP, and SAP, which enable a service to be set up or defined prior to any use of that service.

An example of such a case is the SAP (Service Advertising Protocol), a NetWare (Novell Systems, Provo, Utah) protocol used to identify the services and addresses of servers attached to a network. In the initial exchange, a client might send a SAP request to a server for print service. The server would then send a SAP reply that identifies a particular address—for example, SAP#5—as the print service on that server. Such responses might be used to update a table in a router, for instance, known as a Server Information Table. A client who has inadvertently seen this reply or who has access to the table (via the router that has the Service

Information Table) would know that SAP#5 for this particular server is a print service. Therefore, in order to print data on the server, such a client would not need to make a request for a print service, but would simply send data to be printed specifying SAP#5. Like the previous exchange, the transmission of data to be printed also involves an exchange between a client and a server, but requires a second connection and is therefore independent of the initial exchange. In order to eliminate the possibility of disjointed conversational exchanges, it is desirable for a network packet monitor to be able to "virtually concatenate"—that is, to link—the first exchange with the second. If the clients were the same, the two packet exchanges would then be correctly identified as being part of the same conversational flow.

Other protocols that may lead to disjointed flows, include RPC (Remote Procedure Call); DCOM (Distributed Component Object Model), formerly called Network OLE (Microsoft Corporation, Redmond, Wash.); and CORBA (Common Object Request Broker Architecture). RPC is a programming interface from Sun Microsystems (Palo Alto, Calif.) that allows one program to use the services of another program in a remote machine. DCOM, Microsoft's counterpart to CORBA, defines the remote procedure call that allows those objects—objects are self-contained software modules—to be run remotely over the network. And CORBA, a standard from the Object Management Group (OMG) for communicating between distributed objects, provides a way to execute programs (objects) written in different programming languages running on different platforms regardless of where they reside in a network.

What is needed, therefore, is a network monitor that makes it possible to continuously analyze all user sessions on a heavily trafficked network. Such a monitor should enable non-intrusive, remote detection, characterization, analysis, and capture of all information passing through any point on the network (i.e., of all packets and packet streams passing through any location in the network). Not only should all the packets be detected and analyzed, but for each of these packets the network monitor should determine the protocol (e.g., http, ftp, H.323, VPN, etc.), the application/use within the protocol (e.g., voice, video, data, real-time data, etc.), and an end user's pattern of use within each application or the application context (e.g., options selected, service delivered, duration, time of day, data requested, etc.). Also, the network monitor should not be reliant upon server resident information such as log files. Rather, it should allow a user such as a network administrator or an Internet service provider (ISP) the means to measure and analyze network activity objectively; to customize the type of data that is collected and analyzed; to undertake real time analysis; and to receive timely notification of network problems.

Considering the previous SAP example again, because one features of the invention is to correctly identify the second exchange as being associated with a print service on that server, such exchange would even be recognized if the clients were not the same. What distinguishes this invention from prior art network monitors is that it has the ability to recognize disjointed flows as belonging to the same conversational flow.

The data value in monitoring network communications has been recognized by many inventors. Chiu, et al., describe a method for collecting information at the session level in a computer network in U.S. Pat. No. 5,101,402, titled "APPARATUS AND METHOD FOR REAL-TIME MONITORING OF NETWORK SESSIONS AND A LOCAL AREA NETWORK" (the "402 patent"). The 402 patent specifies fixed locations for particular types of packets to extract information to identify session of a packet. For example, if a DECnet packet appears, the 402 patent looks at six specific fields (at 6 locations) in the packet in order to identify the session of the packet. If, on the other hand, an IP packet appears, a different set of six different locations is specified for an IP packet. With the proliferation of protocols, clearly the specifying of all the possible places to look to determine the session becomes more and more difficult. Likewise, adding a new protocol or application is difficult. In the present invention, the locations examined and the information extracted from any packet are adaptively determined from information in the packet for the particular type of packet. There is no fixed definition of what to look for and where to look in order to form an identifying signature. A monitor implementation of the present invention, for example, adapts to handle differently IEEE 802.3 packet from the older Ethernet Type 2 (or Version 2) DIX (Digital-Intel-Xerox) packet.

The 402 patent system is able to recognize up to the session layer. In the present invention, the number of levels examined varies for any particular protocol. Furthermore, the present invention is capable of examining up to whatever level is sufficient to uniquely identify to a required level, even all the way to the application level (in the OSI model).

Other prior art systems also are known. Phael describes a network activity monitor that processes only randomly selected packets in U.S. Pat. No. 5,315,580, titled "NETWORK MONITORING DEVICE AND SYSTEM." Nakamura teaches a network monitoring system in U.S. Pat. No. 4,891,639, titled "MONITORING SYSTEM OF NETWORK." Ross, et al., teach a method and apparatus for analyzing and monitoring network activity in U.S. Pat. No. 5,247,517, titled "METHOD AND APPARATUS FOR ANALYSIS NETWORKS," McCreery, et al., describe an Internet activity monitor that decodes packet data at the Internet protocol level layer in U.S. Pat. No. 5,787,253, titled "APPARATUS AND METHOD OF ANALYZING INTERNET ACTIVITY." The McCreery method decodes IP-packets. It goes through the decoding operations for each packet, and therefore uses the processing overhead for both recognized and unrecognized flows. In a monitor implementation of the present invention, a signature is built for every flow such that future packets of the flow are easily recognized. When a new packet in the flow arrives, the recognition process can commence from where it last left off, and a new signature built to recognize new packets of the flow.

## SUMMARY

In its various embodiments the present invention provides a network monitor that can accomplish one or more of the following objects and advantages:

- Recognize and classify all packets that are exchanges between a client and server into respective client/server applications.
- Recognize and classify at all protocol layer levels conversational flows that pass in either direction at a point in a network.
- Determine the connection and flow progress between clients and servers according to the individual packets exchanged over a network.
- Be used to help tune the performance of a network according to the current mix of client/server applications requiring network resources.
- Maintain statistics relevant to the mix of client/server applications using network resources.
- Report on the occurrences of specific sequences of packets used by particular applications for client/server network conversational flows.

Other aspects of embodiments of the invention are:

Properly analyzing each of the packets exchanged between a client and a server and maintaining information relevant to the current state of each of these conversational flows.

Providing a flexible processing system that can be tailored or adapted as new applications enter the client/server market.

Maintaining statistics relevant to the conversational flows in a client/sever network as classified by an individual application.

Reporting a specific identifier, which may be used by other network-oriented devices to identify the series of packets with a specific application for a specific client/server network conversational flow.

In general, the embodiments of the present invention overcome the problems and disadvantages of the art.

As described herein, one embodiment analyzes each of the packets passing through any point in the network in either direction, in order to derive the actual application used to communicate between a client and a server. Note that there could be several simultaneous and overlapping applications executing over the network that are independent and asynchronous.

A monitor embodiment of the invention successfully classifies each of the individual packets as they are seen on the network. The contents of the packets are parsed and selected parts are assembled into a signature (also called a key) that may then be used identify further packets of the same conversational flow, for example to further analyze the flow and ultimately to recognize the application program. Thus the key is a function of the selected parts, and in the preferred embodiment, the function is a concatenation of the selected parts. The preferred embodiment forms and remembers the state of any conversational flow, which is determined by the relationship between individual packets and the entire conversational flow over the network. By remembering the state of a flow in this way, the embodiment determines the context of the conversational flow, including the application program it relates to and parameters such as the time, length of the conversational flow, data rate, etc.

The monitor is flexible to adapt to future applications developed for client/server networks. New protocols and protocol combinations may be incorporated by compiling files written in a high-level protocol description language.

The monitor embodiment of the present invention is preferably implemented in application-specific integrated circuits (ASIC) or field programmable gate arrays (FPGA). In one embodiment, the monitor comprises a parser subsystem that forms a signature from a packet. The monitor further comprises an analyzer subsystem that receives the signature from the parser subsystem.

A packet acquisition device such as a media access controller (MAC) or a segmentation and reassemble module is used to provide packets to the parser subsystem of the monitor.

In a hardware implementation, the parsing subsystem comprises two sub-parts, the pattern analysis and recognition engine (PRE), and an extraction engine (slicer). The PRE interprets each packet, and in particular, interprets individual fields in each packet according to a pattern database.

The different protocols that can exist in different layers may be thought of as nodes of one or more trees of linked nodes. The packet type is the root of a tree. Each protocol is either a parent node or a terminal node. A parent node links a protocol to other protocols (child protocols) that can be at



higher layer levels. For example, An Ethernet packet (the root node) may be an Ethertype packet—also called an Ethernet Type/Version 2 and a DIX (DIGITAL-Intel-Xerox packet)—or an IEEE 802.3 packet. Continuing with the IEEE 802.3-type packet, one of the children nodes may be the IP protocol, and one of the children of the IP protocol may be the TCP protocol.

The pattern database includes a description of the different headers of packets and their contents, and how these relate to the different nodes in a tree. The PRE traverses the tree as far as it can. If a node does not include a link to a deeper level, pattern matching is declared complete. Note that protocols can be the children of several parents. If a unique node was generated for each of the possible parent/child trees, the pattern database might become excessively large. Instead, child nodes are shared among multiple parents, thus compacting the pattern database.

Finally the PRE can be used on its own when only protocol recognition is required.

For each protocol recognized, the slicer extracts important packet elements from the packet. These form a signature (i.e., key) for the packet. The slicer also preferably generates a hash for rapidly identifying a flow that may have this signature from a database of known flows.

The flow signature of the packet, the hash and at least some of the payload are passed to an analyzer subsystem. In a hardware embodiment, the analyzer subsystem includes a unified flow key buffer (UFKB) for receiving parts of packets from the parser subsystem and for storing signatures in process, a lookup/update engine (LUE) to lookup a database of flow records for previously encountered conversational flows to determine whether a signature is from an existing flow, a state processor (SP) for performing state processing, a flow insertion and deletion engine (FIDE) for inserting new flows into the database of flows, a memory for storing the database of flows, and a cache for speeding up access to the memory containing the flow database. The LUE, SP, and FIDE are all coupled to the UFKB, and to the cache.

The unified flow key buffer thus contains the flow signature of the packet, the hash and at least some of the payload for analysis in the analyzer subsystem. Many operations can be performed to further elucidate the identity of the application program content of the packet involved in the client/server conversational flow while a packet signature exists in the unified flow signature buffer. In the particular hardware embodiment of the analyzer subsystem several flows may be processed in parallel, and multiple flow signatures from all the packets being analyzed in parallel may be held in the one UFKB.

The first step in the packet analysis process of a packet from the parser subsystem is to lookup the instance in the current database of known packet flow signatures. A lookup/update engine (LUE) accomplishes this task using first the hash, and then the flow signature. The search is carried out in the cache and if there is no flow with a matching signature in the cache, the lookup engine attempts to retrieve the flow from the flow database in the memory. The flow-entry for previously encountered flows preferably includes state information, which is used in the state processor to execute any operations defined for the state, and to determine the next state. A typical state operation may be to search for one or more known reference strings in the payload of the packet stored in the UFKB.

Once the lookup processing by the LUE has been completed a flag stating whether it is found or is new is set within the unified flow signature buffer structure for this packet

flow signature. For an existing flow, the flow-entry is updated by a calculator component of the LUE that adds values to counters in the flow-entry database used to store one or more statistical measures of the flow. The counters are used for determining network usage metrics on the flow.

After the packet flow signature has been looked up and contents of the current flow signature are in the database, a state processor can begin analyzing the packet payload to further elucidate the identity of the application program component of this packet. The exact operation of the state processor and functions performed by it will vary depending on the current packet sequence in the stream of a conversational flow. The state processor moves to the next logical operation stored from the previous packet seen with this same flow signature. If any processing is required on this packet, the state processor will execute instructions from a database of state instruction for this state until there are either no more left or the instruction signifies processing.

In the preferred embodiment, the state processor functions are programmable to provide for analyzing new application programs, and new sequences of packets and states that can arise from using such application.

If during the lookup process for this particular packet flow signature, the flow is required to be inserted into the active database, a flow insertion and deletion engine (FIDE) is initiated. The state processor also may create new flow signatures and thus may instruct the flow insertion and deletion engine to add a new flow to the database as a new item.

In the preferred hardware embodiment, each of the LUE, state processor, and FIDE operate independently from the other two engines.

## BRIEF DESCRIPTION OF THE DRAWINGS

Although the present invention is better understood by referring to the detailed preferred embodiments, these should not be taken to limit the present invention to any specific embodiment because such embodiments are provided only for the purposes of explanation. The embodiments, in turn, are explained with the aid of the following figures.

FIG. **1** is a functional block diagram of a network embodiment of the present invention in which a monitor is connected to analyze packets passing at a connection point.

FIG. **2** is a diagram representing an example of some of the packets and their formats that might be exchanged in starting, as an illustrative example, a conversational flow between a client and server on a network being monitored and analyzed. A pair of flow signatures particular to this example and to embodiments of the present invention is also illustrated. This represents some of the possible flow signatures that can be generated and used in the process of analyzing packets and of recognizing the particular server applications that produce the discrete application packet exchanges.

FIG. **3** is a functional block diagram of a process embodiment of the present invention that can operate as the packet monitor shown in FIG. **1**. This process may be implemented in software or hardware.

FIG. **4** is a flowchart of a high-level protocol language compiling and optimization process, which in one embodiment may be used to generate data for monitoring packets according to versions of the present invention.

FIG. **5** is a flowchart of a packet parsing process used as part of the parser in an embodiment of the inventive packet monitor.

FIG. **6** is a flowchart of a packet element extraction process that is used as part of the parser in an embodiment of the inventive packet monitor.

FIG. **7** is a flowchart of a flow-signature building process that is used as part of the parser in the inventive packet monitor.

FIG. **8** is a flowchart of a monitor lookup and update process that is used as part of the analyzer in an embodiment of the inventive packet monitor.

FIG. **9** is a flowchart of an exemplary Sun Microsystems Remote Procedure Call application than may be recognized by the inventive packet monitor.

FIG. **10** is a functional block diagram of a hardware parser subsystem including the pattern recognizer and extractor that can form part of the parser module in an embodiment of the inventive packet monitor.

FIG. **11** is a functional block diagram of a hardware analyzer including a state processor that can form part of an embodiment of the inventive packet monitor.

FIG. **12** is a functional block diagram of a flow insertion and deletion engine process that can form part of the analyzer in an embodiment of the inventive packet monitor.

FIG. **13** is a flowchart of a state processing process that can form part of the analyzer in an embodiment of the inventive packet monitor.

FIG. **14** is a simple functional block diagram of a process embodiment of the present invention that can operate as the packet monitor shown in FIG. **1**. This process may be implemented in software.

FIG. **15** is a functional block diagram of how the packet monitor of FIG. **3** (and FIGS. **10** and **11**) may operate on a network with a processor such as a microprocessor.

FIG. **16** is an example of the top (MAC) layer of an Ethernet packet and some of the elements that may be extracted to form a signature according to one aspect of the invention.

FIG. **17A** is an example of the header of an Ethertype type of Ethernet packet of FIG. **16** and some of the elements that may be extracted to form a signature according to one aspect of the invention.

FIG. **17B** is an example of an IP packet, for example, of the Ethertype packet shown in FIGS. **16** and **17A**, and some of the elements that may be extracted to form a signature according to one aspect of the invention.

FIG. **18A** is a three dimensional structure that can be used to store elements of the pattern, parse and extraction database used by the parser subsystem in accordance to one embodiment of the invention.

FIG. **18B** is an alternate form of storing elements of the pattern, parse and extraction database used by the parser subsystem in accordance to another embodiment of the invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Note that this document includes hardware diagrams and descriptions that may include signal names. In most cases, the names are sufficiently descriptive, in other cases however the signal names are not needed to understand the operation and practice of the invention.

### Operation in a Network

FIG. **1** represents a system embodiment of the present invention that is referred to herein by the general reference

numeral **100**. The system **100** has a computer network **102** that communicates packets (e.g., IP datagrams) between various computers, for example between the clients **104–107** and servers **110** and **112**. The network is shown schematically as a cloud with several network nodes and links shown in the interior of the cloud. A monitor **108** examines the packets passing in either direction past its connection point **121** and, according to one aspect of the invention, can elucidate what application programs are associated with each packet. The monitor **108** is shown examining packets (i.e., datagrams) between the network interface **116** of the server **110** and the network. The monitor can also be placed at other points in the network, such as connection point **123** between the network **102** and the interface **118** of the client **104**, or some other location, as indicated schematically by connection point **125** somewhere in network **102**. Not shown is a network packet acquisition device at the location **123** on the network for converting the physical information on the network into packets for input into monitor **108**. Such packet acquisition devices are common.

Various protocols may be employed by the network to establish and maintain the required communication, e.g., TCP/IP, etc. Any network activity—for example an application program run by the client **104** (CLIENT **1**) communicating with another running on the server **110** (SERVER **2**)—will produce an exchange of a sequence of packets over network **102** that is characteristic of the respective programs and of the network protocols. Such characteristics may not be completely revealing at the individual packet level. It may require the analyzing many packets by the monitor **108** to have enough information needed to recognize particular application programs. The packets may need to be parsed then analyzed in the context of various protocols, for example, the transport through the application session layer protocols for packets of a type conforming to the ISO layered network model.

Communication protocols are layered, which is also referred to as a protocol stack. The ISO (International Standardization Organization) has defined a general model that provides a framework for design of communication protocol layers. This model, shown in table form below, serves as a basic reference for understanding the functionality of existing communication protocols.

ISO MODEL

| Layer | Functionality | Example |
|---|---|---|
| 7 | Application | Telnet, NFS, Novell NCP, HTTP, H.323 |
| 6 | Presentation | XDR |
| 5 | Session | RPC, NETBIOS, SNMP, etc. |
| 4 | Transport | TCP, Novel SPX, UDP, etc. |
| 3 | Network | IP, Novell IPX, VIP, AppleTalk, etc. |
| 2 | Data Link | Network Interface Card (Hardware Interface). MAC layer |
| 1 | Physical | Ethernet, Token Ring, Frame Relay, ATM, T1 (Hardware Connection) |

Different communication protocols employ different levels of the ISO model or may use a layer model that is similar to but which does not exactly conform to the ISO model. A protocol in a certain layer may not be visible to protocols employed at other layers. For example, an application (Level **7**) may not be able to identify the source computer for a communication attempt (Levels **2–3**).

In some communication arts, the term "frame" generally refers to encapsulated data at OSI layer **2**, including a destination address, control bits for flow control, the data or payload, and CRC (cyclic redundancy check) data for error checking. The term "packet" generally refers to encapsulated data at OSI layer **3**. In the TCP/IP world, the term "datagram" is also used. In this specification, the term "packet" is intended to encompass packets, datagrams, frames, and cells. In general, a packet format or frame format refers to how data is encapsulated with various fields and headers for transmission across a network. For example, a data packet typically includes an address destination field, a length field, an error correcting code (ECC) field, or cyclic redundancy check (CRC) field, as well as headers and footers to identify the beginning and end of the packet. The terms "packet format" and "frame format," also referred to as "cell format," are generally synonymous.

Monitor **108** looks at every packet passing the connection point **121** for analysis. However, not every packet carries the same information useful for recognizing all levels of the protocol. For example, in a conversational flow associated with a particular application, the application will cause the server to send a type-A packet, but so will another. If, though, the particular application program always follows a type-A packet with the sending of a type-B packet, and the other application program does not, then in order to recognize packets of that application's conversational flow, the monitor can be available to recognize packets that match the type-B packet to associate with the type-A packet. If such is recognized after a type-A packet, then the particular application program's conversational flow has started to reveal itself to the monitor **108**.

Further packets may need to be examined before the conversational flow can be identified as being associated with the application program. Typically, monitor **108** is simultaneously also in partial completion of identifying other packet exchanges that are parts of conversational flows associated with other applications. One aspect of monitor **108** is its ability to maintain the state of a flow. The state of a flow is an indication of all previous events in the flow that lead to recognition of the content of all the protocol levels, e.g., the ISO model protocol levels. Another aspect of the invention is forming a signature of extracted characteristic portions of the packet that can be used to rapidly identify packets belonging to the same flow.

In real-world uses of the monitor **108**, the number of packets on the network **102** passing by the monitor **108**'s connection point can exceed a million per second. Consequently, the monitor has very little time available to analyze and type each packet and identify and maintain the state of the flows passing through the connection point. The monitor **108** therefore masks out all the unimportant parts of each packet that will not contribute to its classification. However, the parts to mask-out will change with each packet depending on which flow it belongs to and depending on the state of the flow.

The recognition of the packet type, and ultimately of the associated application programs according to the packets that their executions produce, is a multi-step process within the monitor **108**. At a first level, for example, several application programs will all produce a first kind of packet. A first "signature" is produced from selected parts of a packet that will allow monitor **108** to identify efficiently any packets that belong to the same flow. In some cases, that packet type may be sufficiently unique to enable the monitor to identify the application that generated such a packet in the conversational flow. The signature can then be used to efficiently identify all future packets generated in traffic related to that application.

In other cases, that first packet only starts the process of analyzing the conversational flow, and more packets are necessary to identify the associated application program. In such a case, a subsequent packet of a second type—but that potentially belongs to the same conversational flow—is recognized by using the signature. At such a second level, then, only a few of those application programs will have conversational flows that can produce such a second packet type. At this level in the process of classification, all application programs that are not in the set of those that lead to such a sequence of packet types may be excluded in the process of classifying the conversational flow that includes these two packets. Based on the known patterns for the protocol and for the possible applications, a signature is produced that allows recognition of any future packets that may follow in the conversational flow.

It may be that the application is now recognized, or recognition may need to proceed to a third level of analysis using the second level signature. For each packet, therefore, the monitor parses the packet and generates a signature to determine if this signature identified a previously encountered flow, or shall be used to recognize future packets belonging to the same conversational flow. In real time, the packet is further analyzed in the context of the sequence of previously encountered packets (the state), and of the possible future sequences such a past sequence may generate in conversational flows associated with different applications. A new signature for recognizing future packets may also be generated. This process of analysis continues until the applications are identified. The last generated signature may then be used to efficiently recognize future packets associated with the same conversational flow. Such an arrangement makes it possible for the monitor **108** to cope with millions of packets per second that must be inspected.

Another aspect of the invention is adding Eavesdropping. In alternative embodiments of the present invention capable of eavesdropping, once the monitor **108** has recognized the executing application programs passing through some point in the network **102** (for example, because of execution of the applications by the client **105** or server **110**), the monitor sends a message to some general purpose processor on the network that can input the same packets from the same location on the network, and the processor then loads its own executable copy of the application program and uses it to read the content being exchanged over the network. In other words, once the monitor **108** has accomplished recognition of the application program, eavesdropping can commence.

## The Network Monitor

FIG. **3** shows a network packet monitor **300**, in an embodiment of the present invention that can be implemented with computer hardware and/or software. The system **300** is similar to monitor **108** in FIG. **1**. A packet **302** is examined, e.g., from a packet acquisition device at the location **121** in network **102** (FIG. **1**), and the packet evaluated, for example in an attempt to determine its characteristics, e.g., all the protocol information in a multilevel model, including what server application produced the packet.

The packet acquisition device is a common interface that converts the physical signals and then decodes them into bits, and into packets, in accordance with the particular network (Ethernet, frame relay, ATM, etc.). The acquisition device indicates to the monitor **108** the type of network of the acquired packet or packets.

Aspects shown here include: (1) the initialization of the monitor to generate what operations need to occur on packets of different types—accomplished by compiler and optimizer **310**, (2) the processing—parsing and extraction of selected portions—of packets to generate an identifying signature—accomplished by parser subsystem **301**, and (3) the analysis of the packets—accomplished by analyzer **303**.

The purpose of compiler and optimizer **310** is to provide protocol specific information to parser subsystem **301** and to analyzer subsystem **303**. The initialization occurs prior to operation of the monitor, and only needs to re-occur when new protocols are to be added.

A flow is a stream of packets being exchanged between any two addresses in the network. For each protocol there are known to be several fields, such as the destination (recipient), the source (the sender), and so forth, and these and other fields are used in monitor **300** to identify the flow. There are other fields not important for identifying the flow, such as checksums, and those parts are not used for identification.

Parser subsystem **301** examines the packets using pattern recognition process **304** that parses the packet and determines the protocol types and associated headers for each protocol layer that exists in the packet **302**. An extraction process **306** in parser subsystem **301** extracts characteristic portions (signature information) from the packet **302**. Both the pattern information for parsing and the related extraction operations, e.g., extraction masks, are supplied from a parsing-pattern-structures and extraction-operations database (parsing/extractions database) **308** filled by the compiler and optimizer **310**.

The protocol description language (PDL) files **336** describes both patterns and states of all protocols that an occur at any layer, including how to interpret header information, how to determine from the packet header information the protocols at the next layer, and what information to extract for the purpose of identifying a flow, and ultimately, applications and services. The layer selections database **338** describes the particular layering handled by the monitor. That is, what protocols run on top of what protocols at any layer level. Thus **336** and **338** combined describe how one would decode, analyze, and understand the information in packets, and, furthermore, how the information is layered. This information is input into compiler and optimizer **310**.

When compiler and optimizer **310** executes, it generates two sets of internal data structures. The first is the set of parsing/extraction operations **308**. The pattern structures include parsing information and describe what will be recognized in the headers of packets; the extraction operations are what elements of a packet are to be extracted from the packets based on the patterns that get matched. Thus, database **308** of parsing/extraction operations includes information describing how to determine a set of one or more protocol dependent extraction operations from data in the packet that indicate a protocol used in the packet.

The other internal data structure that is built by compiler **310** is the set of state patterns and processes **326**. These are the different states and state transitions that occur in different conversational flows, and the state operations that need to be performed (e.g., patterns that need to be examined and new signatures that need to be built) during any state of a conversational flow to further the task of analyzing the conversational flow.

Thus, compiling the PDL files and layer selections provides monitor **300** with the information it needs to begin processing packets. In an alternate embodiment, the contents of one or more of databases **308** and **326** may be manually or otherwise generated. Note that in some embodiments the

layering selections information is inherent rather than explicitly described. For example, since a PDL file for a protocol includes the child protocols, the parent protocols also may be determined.

In the preferred embodiment, the packet **302** from the acquisition device is input into a packet buffer. The pattern recognition process **304** is carried out by a pattern analysis and recognition (PAR) engine that analyzes and recognizes patterns in the packets. In particular, the PAR locates the next protocol field in the header and determines the length of the header, and may perform certain other tasks for certain types of protocol headers. An example of this is type and length comparison to distinguish an IEEE 802.3 (Ethernet) packet from the older type 2 (or Version 2) Ethernet packet, also called a DIGITAL-Intel-Xerox (DIX) packet. The PAR also uses the pattern structures and extraction operations database **308** to identify the next protocol and parameters associated with that protocol that enables analysis of the next protocol layer. Once a pattern or a set of patterns has been identified, it/they will be associated with a set of none or more extraction operations. These extraction operations (in the form of commands and associated parameters) are passed to the extraction process **306** implemented by an extracting and information identifying (EII) engine that extracts selected parts of the packet, including identifying information from the packet as required for recognizing this packet as part of a flow. The extracted information is put in sequence and then processed in block **312** to build a unique flow signature (also called a "key") for this flow. A flow signature depends on the protocols used in the packet. For some protocols, the extracted components may include source and destination addresses. For example, Ethernet frames have end-point addresses that are useful in building a better flow signature. Thus, the signature typically includes the client and server address pairs. The signature is used to recognize further packets that are or may be part of this flow.

In the preferred embodiment, the building of the flow key includes generating a hash of the signature using a hash function. The purpose if using such a hash is conventional—to spread flow-entries identified by the signature across a database for efficient searching. The hash generated is preferably based on a hashing algorithm and such hash generation is known to those in the art.

In one embodiment, the parser passes data from the packet—a parser record—that includes the signature (i.e., selected portions of the packet), the hash, and the packet itself to allow for any state processing that requires further data from the packet. An improved embodiment of the parser subsystem might generate a parser record that has some predefined structure and that includes the signature, the hash, some flags related to some of the fields in the parser record, and parts of the packet's payload that the parser subsystem has determined might be required for further processing, e.g., for state processing.

Note that alternate embodiments may use some function other than concatenation of the selected portions of the packet to make the identifying signature. For example, some "digest function" of the concatenated selected portions may be used.

The parser record is passed onto lookup process **314** which looks in an internal data store of records of known flows that the system has already encountered, and decides (in **316**) whether or not this particular packet belongs to a known flow as indicated by the presence of a flow-entry matching this flow in a database of known flows **324**. A record in database **324** is associated with each encountered flow.

The parser record enters a buffer called the unified flow key buffer (UFKB). The UFKB stores the data on flows in a data structure that is similar to the parser record, but that includes a field that can be modified. In particular, one or the UFKB record fields stores the packet sequence number, and another is filled with state information in the form of a program counter for a state processor that implements state processing **328**.

The determination (**316**) of whether a record with the same signature already exists is carried out by a lookup engine (LUE) that obtains new UFKB records and uses the hash in the UFKB record to lookup if there is a matching known flow. In the particular embodiment, the database of known flows **324** is in an external memory. A cache is associated with the database **324**. A lookup by the LUE for a known record is carried out by accessing the cache using the hash, and if the entry is not already present in the cache, the entry is looked up (again using the hash) in the external memory.

The flow-entry database **324** stores flow-entries that include the unique flow-signature, state information, and extracted information from the packet for updating flows, and one or more statistical about the flow. Each entry completely describes a flow. Database **324** is organized into bins that contain a number, denoted N, of flow-entries (also called flow-entries, each a bucket), with N being 4 in the preferred embodiment. Buckets (i.e., flow-entries) are accessed via the hash of the packet from the parser subsystem **301** (i.e., the hash in the UFKB record). The hash spreads the flows across the database to allow for fast lookups of entries, allowing shallower buckets. The designer selects the bucket depth N based on the amount of memory attached to the monitor, and the number of bits of the hash data value used. For example, in one embodiment, each flow-entry is 128 bytes long, so for 128 K flow-entries, 16 Mbytes are required. Using a 16-bit hash gives two flow-entries per bucket. Empirically, this has been shown to be more than adequate for the vast majority of cases. Note that another embodiment uses flow-entries that are 256 bytes long.

Herein, whenever an access to database **324** is described, it is to be understood that the access is via the cache, unless otherwise stated or clear from the context.

If there is no flow-entry found matching the signature, i.e., the signature is for a new flow, then a protocol and state identification process **318** further determines the state and protocol. That is, process **318** determines the protocols and where in the state sequence for a flow for this protocol's this packet belongs. Identification process **318** uses the extracted information and makes reference to the database **326** of state patterns and processes. Process **318** is then followed by any state operations that need to be executed on this packet by a state processor **328**.

If the packet is found to have a matching flow-entry in the database **324** (e.g., in the cache), then a process **320** determines, from the looked-up flow-entry, if more classification by state processing of the flow signature is necessary. If not, a process **322** updates the flow-entry in the flow-entry database **324** (e.g., via the cache). Updating includes updating one or more statistical measures stored in the flow-entry. In our embodiment, the statistical measures are stored in counters in the flow-entry.

If state processing is required, state process **328** is commenced. State processor **328** carries out any state operations specified for the state of the flow and updates the state to the next state according to a set of state instructions obtained form the state pattern and processes database **326**.

The state processor **328** analyzes both new and existing flows in order to analyze all levels of the protocol stack, ultimately classifying the flows by application (level 7 in the ISO model). It does this by proceeding from state-to-state based on predefined state transition rules and state operations as specified in state processor instruction database **326**. A state transition rule is a rule typically containing a test followed by the next-state to proceed to if the test result is true. An operation is an operation to be performed while the state processor is in a particular state—for example, in order to evaluate a quantity needed to apply the state transition rule. The state processor goes through each rule and each state process until the test is true, or there are no more tests to perform.

In general, the set of state operations may be none or more operations on a packet, and carrying out the operation or operations may leave one in a state that causes exiting the system prior to completing the identification, but possibly knowing more about what state and state processes are needed to execute next, i.e., when a next packet of this flow is encountered. As an example, a state process (set of state operations) at a particular state may build a new signature for future recognition packets of the next state.

By maintaining the state of the flows and knowing that new flows may be set up using the information from previously encountered flows, the network traffic monitor **300** provides for (a) single-packet protocol recognition of flows, and (b) multiple-packet protocol recognition of flows. Monitor **300** can even recognize the application program from one or more disjointed sub-flows that occur in server announcement type flows. What may seem to prior art monitors to be some unassociated flow, may be recognized by the inventive monitor using the flow signature to be a sub-flow associated with a previously encountered sub-flow.

Thus, state processor **328** applies the first state operation to the packet for this particular flow-entry. A process **330** decides if more operations need to be performed for this state. If so, the analyzer continues looping between block **330** and **328** applying additional state operations to this particular packet until all those operations are completed—that is, there are no more operations for this packet in this state. A process **332** decides if there are further states to be analyzed for this type of flow according to the state of the flow and the protocol, in order to fully characterize the flow. If not, the conversational flow has now been fully characterized and a process **334** finalizes the classification of the conversational flow for the flow.

In the particular embodiment, the state processor **328** starts the state processing by using the last protocol recognized by the parser as an offset into a jump table (jump vector). The jump table finds the state processor instructions to use for that protocol in the state patterns and processes database **326**. Most instructions test something in the unified flow key buffer, or the flow-entry in the database of known flows **324**, if the entry exists. The state processor may have to test bits, do comparisons, add, or subtract to perform the test. For example, a common operation carried out by the state processor is searching for one or more patterns in the payload part of the UFKB.

Thus, in **332** in the classification, the analyzer decides whether the flow is at an end state. If not at an end state, the flow-entry is updated (or created if a new flow) for this flow-entry in process **322**.

Furthermore, if the flow is known and if in **332** it is determined that there are further states to be processed using later packets, the flow-entry is updated in process **322**.

The flow-entry also is updated after classification finalization so that any further packets belonging to this flow will be readily identified from their signature as belonging to this fully analyzed conversational flow.

After updating, database **324** therefore includes the set of all the conversational flows that have occurred.

Thus, the embodiment of present invention shown in FIG. **3** automatically maintains flow-entries, which in one aspect includes storing states. The monitor of FIG. **3** also generates characteristic parts of packets—the signatures—that can be used to recognize flows. The flow-entries may be identified and accessed by their signatures. Once a packet is identified to be from a known flow, the state of the flow is known and this knowledge enables state transition analysis to be performed in real time for each different protocol and application. In a complex analysis, state transitions are traversed as more and more packets are examined. Future packets that are part of the same conversational flow have their state analysis continued from a previously achieved state. When enough packets related to an application of interest have been processed, a final recognition state is ultimately reached, i.e., a set of states has been traversed by state analysis to completely characterize the conversational flow. The signature for that final state enables each new incoming packet of the same conversational flow to be individually recognized in real time.

In this manner, one of the great advantages of the present invention is realized. Once a particular set of state transitions has been traversed for the first time and ends in a final state, a short-cut recognition pattern—a signature—can be generated that will key on every new incoming packet that relates to the conversational flow. Checking a signature involves a simple operation, allowing high packet rates to be successfully monitored on the network.

In improved embodiments, several state analyzers are run in parallel so that a large number of protocols and applications may be checked for. Every known protocol and application will have at least one unique set of state transitions, and can therefore be uniquely identified by watching such transitions.

When each new conversational flow starts, signatures that recognize the flow are automatically generated on-the-fly, and as further packets in the conversational flow are encountered, signatures are updated and the states of the set of state transitions for any potential application are further traversed according to the state transition rules for the flow. The new states for the flow—those associated with a set of state transitions for one or more potential applications—are added to the records of previously encountered states for easy recognition and retrieval when a new packet in the flow is encountered.

Detailed Operation

FIG. **4** diagrams an initialization system **400** that includes the compilation process. That is, part of the initialization generates the pattern structures and extraction operations database **308** and the state instruction database **328**. Such initialization can occur off-line or from a central location.

The different protocols that can exist in different layers may be thought of as nodes of one or more trees of linked nodes. The packet type is the root of a tree (called level 0). Each protocol is either a parent node or a terminal node. A parent node links a protocol to other protocols (child protocols) that can be at higher layer levels. Thus a protocol may have zero or more children. Ethernet packets, for example, have several variants, each having a basic format

that remains substantially the same. An Ethernet packet (the root or level 0 node) may be an Ethertype packet-also called an Ethernet Type/Version 2 and a DIX (DIGITAL-Intel-Xerox packet)—or an IEEE 802.2 packet. Continuing with the IEEE 802.3 packet, one of the children nodes may be the IP protocol, and one of the children of the IP protocol may be the TCP protocol.

FIG. **16** shows the header **1600** (base level 1) of a complete Ethernet frame (i.e., packet) of information and includes information on the destination media access control address (Dst MAC **1602**) and the source media access control address (Src MAC **1604**). Also shown in FIG. **16** is some (but not all) of the information specified in the PDL files for extraction the signature.

FIG. **17**A now shows the header information for the next level (level-2) for an Ethertype packet **1700**. For an Ethertype packet **1700**, the relevant information from the packet that indicates the next layer level is a two-byte type field **1702** containing the child recognition pattern for the next level. The remaining information **1704** is shown hatched because it not relevant for this level. The list **1712** shows the possible children for an Ethertype packet as indicated by what child recognition pattern is found offset **12**. FIG. **17**B shows the structure of the header of one of the possible next levels, that of the IP protocol. The possible children of the IP protocol are shown in table **1752**.

The pattern, parse, and extraction database (pattern recognition database, or PRD) **308** generated by compilation process **310**, in one embodiment, is in the form of a three dimensional structure that provides for rapidly searching packet headers for the next protocol. FIG. **18**A shows such a 3-D representation **1800** (which may be considered as an indexed set of 2-D representations). A compressed form of the 3-D structure is preferred.

An alternate embodiment of the data structure used in database **308** is illustrated in FIG. **18**B. Thus, like the 3-D structure of FIG. **18**A, the data structure permits rapid searches to be performed by the pattern recognition process **304** by indexing locations in a memory rather than performing address link computations. In this alternate embodiment, the PRD **308** includes two parts, a single protocol table **1850** (PT) which has an entry for each protocol known for the monitor, and a series of Look Up Tables **1870** (LUT's) that are used to identify known protocols and their children. The protocol table includes the parameters needed by the pattern analysis and recognition process **304** (implemented by PRE **1006**) to evaluate the header information in the packet that is associated with that protocol, and parameters needed by extraction process **306** (implemented by slicer **1007**) to process the packet header. When there are children, the PT describes which bytes in the header to evaluate to determine the child protocol. In particular, each PT entry contains the header length, an offset to the child, a slicer command, and some flags.

The pattern matching is carried out by finding particular "child recognition codes" in the header fields, and using these codes to index one or more of the LUT's. Each LUT entry has a node code that can have one of four values, indicating the protocol that has been recognized, a code to indicate that the protocol has been partially recognized (more LUT lookups are needed), a code to indicate that this is a terminal node, and a null node to indicate a null entry. The next LUT to lookup is also returned from a LUT lookup.

Compilation process is described in FIG. **4**. The source-code information in the form of protocol description files is shown as **402**. In the particular embodiment, the high level decoding descriptions includes a set of protocol description files **336**, one for each protocol, and a set of packet layer selections **338**, which describes the particular layering (sets of trees of protocols) that the monitor is to be able to handle.

A compiler **403** compiles the descriptions. The set of packet parse-and-extract operations **406** is generated (**404**), and a set of packet state instructions and operations **407** is generated (**405**) in the form of instructions for the state processor that implements state processing process **328**. Data files for each type of application and protocol to be recognized by the analyzer are downloaded from the pattern, parse, and extraction database **406** into the memory systems of the parser and extraction engines. (See the parsing process **500** description and FIG. **5**; the extraction process **600** description and FIG. **6**; and the parsing subsystem hardware description and FIG. **10**). Data files for each type of application and protocol to be recognized by the analyzer are also downloaded from the state-processor instruction database **407** into the state processor. (see the state processor **1108** description and FIG. **11**.).

Note that generating the packet parse and extraction operations builds and links the three dimensional structure (one embodiment) or the or all the lookup tables for the PRD.

Because of the large number of possible protocol trees and subtrees, the compiler process **400** includes optimization that compares the trees and subtrees to see which children share common parents. When implemented in the form of the LUT's, this process can generate a single LUT from a plurality of LUT's. The optimization process further includes a compaction process that reduces the space needed to store the data of the PRD.

As an example of compaction, consider the 3-D structure of FIG. **18**A that can be thought of as a set of 2-D structures each representing a protocol. To enable saving space by using only one array per protocol which may have several parents, in one embodiment, the pattern analysis subprocess keeps a "current header" pointer. Each location (offset) index for each protocol 2-D array in the 3-D structure is a relative location starting with the start of header for the particular protocol. Furthermore, each of the two-dimensional arrays is sparse. The next step of the optimization, is checking all the 2-D arrays against all the other 2-D arrays to find out which ones can share memory. Many of these 2-D arrays are often sparsely populated in that they each have only a small number of valid entries. So, a process of "folding" is next used to combine two or more 2-D arrays together into one physical 2-D array without losing the identity of any of the original 2-D arrays (i.e., all the 2-D arrays continue to exist logically). Folding can occur between any 2-D arrays irrespective of their location in the tree as long as certain conditions are met. Multiple arrays may be combined into a single array as long as the individual entries do not conflict with each other. A fold number is then used to associate each element with its original array. A similar folding process is used for the set of LUTs **1850** in the alternate embodiment of FIG. **18**B.

In **410**, the analyzer has been initialized and is ready to perform recognition.

FIG. **5** shows a flowchart of how actual parser subsystem **301** functions. Starting at **501**, the packet **302** is input to the packet buffer in step **502**. Step **503** loads the next (initially the first) packet component from the packet **302**. The packet components are extracted from each packet **302** one element at a time. A check is made (**504**) to determine if the load-packet-component operation **503** succeeded, indicating

that there was more in the packet to process. If not, indicating all components have been loaded, the parser subsystem **301** builds the packet signature (**512**)—the next stage (FIG. **6**).

If a component is successfully loaded in **503**, the node and processes are fetched (**505**) from the pattern, parse and extraction database **308** to provide a set of patterns and processes for that node to apply to the loaded packet component. The parser subsystem **301** checks (**506**) to determine if the fetch pattern node operation **505** completed successfully, indicating there was a pattern node that loaded in **505**. If not, step **511** moves to the next packet component. If yes, then the node and pattern matching process are applied in **507** to the component extracted in **503**. A pattern match obtained in **507** (as indicated by test **508**) means the parser subsystem **301** has found a node in the parsing elements; the parser subsystem **301** proceeds to step **509** to extract the elements.

If applying the node process to the component does not produce a match (test **508**), the parser subsystem **301** moves (**510**) to the next pattern node from the pattern database **308** and to step **505** to fetch the next node and process. Thus, there is an "applying patterns" loop between **508** and **505**. Once the parser subsystem **301** completes all the patterns and has either matched or not, the parser subsystem **301** moves to the next packet component (**511**).

Once all the packet components have been the loaded and processed from the input packet **302**, then the load packet will fail (indicated by test **504**), and the parser subsystem **301** moves to build a packet signature which is described in FIG. **6**

FIG. **6** is a flow chart for extracting the information from which to build the packet signature. The flow starts at **601**, which is the exit point **513** of FIG. **5**. At this point parser subsystem **301** has a completed packet component and a pattern node available in a buffer (**602**). Step **603** loads the packet component available from the pattern analysis process of FIG. **5**. If the load completed (test **604**), indicating that there was indeed another packet component, the parser subsystem **301** fetches in **605** the extraction and process elements received from the pattern node component in **602**. If the fetch was successful (test **606**), indicating that there are extraction elements to apply, the parser subsystem **301** in step **607** applies that extraction process to the packet component based on an extraction instruction received from that pattern node. This removes and saves an element from the packet component.

In step **608**, the parser subsystem **301** checks if there is more to extract from this component, and if not, the parser subsystem **301** moves back to **603** to load the next packet component at hand and repeats the process. If the answer is yes, then the parser subsystem **301** moves to the next packet component ratchet. That new packet component is then loaded in step **603**. As the parser subsystem **301** moved through the loop between **608** and **603**, extra extraction processes are applied either to the same packet component if there is more to extract, or to a different packet component if there is no more to extract.

The extraction process thus builds the signature, extracting more and more components according to the information in the patterns and extraction database **308** for the particular packet. Once loading the next packet component operation **603** fails (test **604**), all the components have been extracted. The built signature is loaded into the signature buffer (**610**) and the parser subsystem **301** proceeds to FIG. **7** to complete the signature generation process.

Referring now to FIG. **7**, the process continues at **701**. The signature buffer and the pattern node elements are available (**702**). The parser subsystem **301** loads the next pattern node element. If the load was successful (test **704**) indicating there are more nodes, the parser subsystem **301** in **705** hashes the signature buffer element based on the hash elements that are found in the pattern node that is in the element database. In **706** the resulting signature and the hash are packed. In **707** the parser subsystem **301** moves on to the next packet component which is loaded in **703**.

The **703** to **707** loop continues until there are no more patterns of elements left (test **704**). Once all the patterns of elements have been hashed, processes **304**, **306** and **312** of parser subsystem **301** are complete. Parser subsystem **301** has generated the signature used by the analyzer subsystem **303**.

A parser record is loaded into the analyzer, in particular, into the UFKB in the form of a UFKB record which is similar to a parser record, but with one or more different fields.

FIG. **8** is a flow diagram describing the operation of the lookup/update engine (LUE) that implements lookup operation **314**. The process starts at **801** from FIG. **7** with the parser record that includes a signature, the hash and at least parts of the payload. In **802** those elements are shown in the form of a UFKB-entry in the buffer. The LUE, the lookup engine **314** computes a "record bin number" from the hash for a flow-entry. A bin herein may have one or more "buckets" each containing a flow-entry. The preferred embodiment has four buckets per bin.

Since preferred hardware embodiment includes the cache, all data accesses to records in the flowchart of FIG. **8** are stated as being to or from the cache.

Thus, in **804**, the system looks up the cache for a bucket from that bin using the hash. If the cache successfully returns with a bucket from the bin number, indicating there are more buckets in the bin, the lookup/update engine compares (**807**) the current signature (the UFKB-entry's signature) from that in the bucket (i.e., the flow-entry signature). If the signatures match (test **808**), that record (in the cache) is marked in step **810** as "in process" and a timestamp added. Step **811** indicates to the UFKB that the UFKB-entry in **802** has a status of "found." The "found" indication allows the state processing **328** to begin processing this UFKB element. The preferred hardware embodiment includes one or more state processors, and these can operate in parallel with the lookup/update engine.

In the preferred embodiment, a set of statistical operations is performed by a calculator for every packet analyzed. The statistical operations may include one or more of counting the packets associated with the flow; determining statistics related to the size of packets of the flow; compiling statistics on differences between packets in each direction, for example using timestamps; and determining statistical relationships of timestamps of packets in the same direction. The statistical measures are kept in the flow-entries. Other statistical measures also may be compiled. These statistics may be used singly or in combination by a statistical processor component to analyze many different aspects of the flow. This may include determining network usage metrics from the statistical measures, for example to ascertain the network's ability to transfer information for this application. Such analysis provides for measuring the quality of service of a conversation, measuring how well an application is performing in the network, measuring network resources consumed by an application, and so forth.

To provide for such analyses, the lookup/update engine updates one or more counters that are part of the flow-entry (in the cache) in step **812**. The process exits at **813**. In our embodiment, the counters include the total packets of the flow, the time, and a differential time from the last timestamp to the present timestamp.

It may be that the bucket of the bin did not lead to a signature match (test **808**). In such a case, the analyzer in **809** moves to the next bucket for this bin. Step **804** again looks up the cache for another bucket from that bin. The lookup/update engine thus continues lookup up buckets of the bin until there is either a match in **808** or operation **804** is not successful (test **805**), indicating that there are no more buckets in the bin and no match was found.

If no match was found, the packet belongs to a new (not previously encountered) flow. In **806** the system indicates that the record in the unified flow key buffer for this packet is new, and in **812**, any statistical updating operations are performed for this packet by updating the flow-entry in the cache. The update operation exits at **813**. A flow insertion/deletion engine (FIDE) creates a new record for this flow (again via the cache).

Thus, the update/lookup engine ends with a UFKB-entry for the packet with a "new" status or a "found" status.

Note that the above system uses a hash to which more than one flow-entry can match. A longer hash may be used that corresponds to a single flow-entry. In such an embodiment, the flow chart of FIG. **8** is simplified as would be clear to those in the art.

## The Hardware System

Each of the individual hardware elements through which the data flows in the system are now described with reference to FIGS. **10** and **11**. Note that while we are describing a particular hardware implementation of the invention embodiment of FIG. **3**, it would be clear to one skilled in the art that the flow of FIG. **3** may alternatively be implemented in software running on one or more general-purpose processors, or only partly implemented in hardware. An implementation of the invention that can operate in software is shown in FIG. **14**. The hardware embodiment (FIGS. **10** and **11**) can operate at over a million packets per second, while the software system of FIG. **14** may be suitable for slower networks. To one skilled in the art it would be clear that more and more of the system may be implemented in software as processors become faster.

FIG. **10** is a description of the parsing subsystem (**301**, shown here as subsystem **1000**) as implemented in hardware. Memory **1001** is the pattern recognition database memory, in which the patterns that are going to be analyzed are stored. Memory **1002** is the extraction-operation database memory, in which the extraction instructions are stored. Both **1001** and **1002** correspond to internal data structure **308** of FIG. **3**. Typically, the system is initialized from a microprocessor (not shown) at which time these memories are loaded through a host interface multiplexor and control register **1005** via the internal buses **1003** and **1004**. Note that the contents of **1001** and **1002** are preferably obtained by compiling process **310** of FIG. **3**.

A packet enters the parsing system via **1012** into a parser input buffer memory **1008** using control signals **1021** and **1023**, which control an input buffer interface controller **1022**. The buffer **1008** and interface control **1022** connect to a packet acquisition device (not shown). The buffer acquisition device generates a packet start signal **1021** and the interface control **1022** generates a next packet (i.e., ready to receive data) signal **1023** to control the data flow into parser input buffer memory **1008**. Once a packet starts loading into the buffer memory **1008**, pattern recognition engine (PRE) **1006** carries out the operations on the input buffer memory described in block **304** of FIG. **3**. That is, protocol types and associated headers for each protocol layer that exist in the packet are determined.

The PRE searches database **1001** and the packet in buffer **1008** in order to recognize the protocols the packet contains. In one implementation, the database **1001** includes a series of linked lookup tables. Each lookup table uses eight bits of addressing. The first lookup table is always at address zero. The Pattern Recognition Engine uses a base packet offset from a control register to start the comparison. It loads this value into a current offset pointer (COP). It then reads the byte at base packet offset from the parser input buffer and uses it as an address into the first lookup table.

Each lookup table returns a word that links to another lookup table or it returns a terminal flag. If the lookup produces a recognition event the database also returns a command for the slicer. Finally it returns the value to add to the COP.

The PRE **1006** includes of a comparison engine. The comparison engine has a first stage that checks the protocol type field to determine if it is an 802.3 packet and the field should be treated as a length. If it is not a length, the protocol is checked in a second stage. The first stage is the only protocol level that is not programmable. The second stage has two full sixteen bit content addressable memories (CAMs) defined for future protocol additions.

Thus, whenever the PRE recognizes a pattern, it also generates a command for the extraction engine (also called a "slicer") **1007**. The recognized patterns and the commands are sent to the extraction engine **1007** that extracts information from the packet to build the parser record. Thus, the operations of the extraction engine are those carried out in blocks **306** and **312** of FIG. **3**. The commands are sent from PRE **1006** to slicer **1007** in the form of extraction instruction pointers which tell the extraction engine **1007** where to a find the instructions in the extraction operations database memory (i.e., slicer instruction database) **1002**.

Thus, when the PRE **1006** recognizes a protocol it outputs both the protocol identifier and a process code to the extractor. The protocol identifier is added to the flow signature and the process code is used to fetch the first instruction from the instruction database **1002**. Instructions include an operation code and usually source and destination offsets as well as a length. The offsets and length are in bytes. A typical operation is the MOVE instruction. This instruction tells the slicer **1007** to copy n bytes of data unmodified from the input buffer **1008** to the output buffer **1010**. The extractor contains a byte-wise barrel shifter so that the bytes moved can be packed into the flow signature. The extractor contains another instruction called HASH. This instruction tells the extractor to copy from the input buffer **1008** to the HASH generator.

Thus these instructions are for extracting selected element(s) of the packet in the input buffer memory and transferring the data to a parser output buffer memory **1010**. Some instructions also generate a hash.

The extraction engine **1007** and the PRE operate as a pipeline. That is, extraction engine **1007** performs extraction operations on data in input buffer **1008** already processed by PRE **1006** while more (i.e., later arriving) packet information is being simultaneously parsed by PRE **1006**. This provides high processing speed sufficient to accommodate the high arrival rate speed of packets.

Once all the selected parts of the packet used to form the signature are extracted, the hash is loaded into parser output buffer memory **1010**. Any additional payload from the packet that is required for further analysis is also included. The parser output memory **1010** is interfaced with the analyzer subsystem by analyzer interface control **1011**. Once all the information of a packet is in the parser output buffer memory **1010**, a data ready signal **1025** is asserted by analyzer interface control. The data from the parser subsystem **1000** is moved to the analyzer subsystem via **1013** when an analyzer ready signal **1027** is asserted.

FIG. **11** shows the hardware components and dataflow for the analyzer subsystem that performs the functions of the analyzer subsystem **303** of FIG. **3**. The analyzer is initialized prior to operation, and initialization includes loading the state processing information generated by the compilation process **310** into a database memory for the state processing, called state processor instruction database (SPID) memory **1109**.

The analyzer subsystem **1100** includes a host bus interface **1122** using an analyzer host interface controller **1118**, which in turn has access to a cache system **1115**. The cache system has bidirectional access to and from the state processor of the system **1108**. State processor **1108** is responsible for initializing the state processor instruction database memory **1109** from information given over the host bus interface **1122**.

With the SPID **1109** loaded, the analyzer subsystem **1100** receives parser records comprising packet signatures and payloads that come from the parser into the unified flow key buffer (UFKB) **1103**. UFKB is comprised of memory set up to maintain UFKB records. A UFKB record is essentially a parser record; the UFKB holds records of packets that are to be processed or that are in process. Furthermore, the UFKB provides for one or more fields to act as modifiable status flags to allow different processes to run concurrently.

Three processing engines run concurrently and access records in the UFKB **1103**: the lookup/update engine (LUE) **1107**, the state processor (SP) **1108**, and the flow insertion and deletion engine (FIDE) **1110**. Each of these is implemented by one or more finite state machines (FSM's). There is bidirectional access between each of the finite state machines and the unified flow key buffer **1103**. The UFKB record includes a field that stores the packet sequence number, and another that is filled with state information in the form of a program counter for the state processor **1108** that implements state processing **328**. The status flags of the UFKB for any entry includes that the LUE is done and that the LUE is transferring processing of the entry to the state processor. The LUE done indicator is also used to indicate what the next entry is for the LUE. There also is provided a flag to indicate that the state processor is done with the current flow and to indicate what the next entry is for the state processor. There also is provided a flag to indicate the state processor is transferring processing of the UFKB-entry to the flow insertion and deletion engine.

A new UFKB record is first processed by the LUE **1107**. A record that has been processed by the LUE **1107** may be processed by the state processor **1108**, and a UFKB record data may be processed by the flow insertion/deletion engine **1110** after being processed by the state processor **1108** or only by the LUE. Whether or not a particular engine has been applied to any unified flow key buffer entry is determined by status fields set by the engines upon completion. In one embodiment, a status flag in the UFKB-entry indicates whether an entry is new or found. In other embodiments, the LUE issues a flag to pass the entry to the state processor for processing, and the required operations for a new record are included in the SP instructions.

Note that each UFKB-entry may not need to be processed by all three engines. Furthermore, some UFKB entries may need to be processed more than once by a particular engine.

Each of these three engines also has bi-directional access to a cache subsystem **1115** that includes a caching engine. Cache **1115** is designed to have information flowing in and out of it from five different points within the system: the three engines, external memory via a unified memory controller (UMC) **1119** and a memory interface **1123**, and a microprocessor via analyzer host interface and control unit (ACIC) **1118** and host interface bus (HIB) **1122**. The analyzer microprocessor (or dedicated logic processor) can thus directly insert or modify data in the cache.

The cache subsystem **1115** is an associative cache that includes a set of content addressable memory cells (CAMs) each including an address portion and a pointer portion pointing to the cache memory (e.g., RAM) containing the cached flow-entries. The CAMs are arranged as a stack ordered from a top CAM to a bottom CAM. The bottom CAM's pointer points to the least recently used (LRU) cache memory entry. Whenever there is a cache miss, the contents of cache memory pointed to by the bottom CAM are replaced by the flow-entry from the flow-entry database **324**. This now becomes the most recently used entry, so the contents of the bottom CAM are moved to the top CAM and all CAM contents are shifted down. Thus, the cache is an associative cache with a true LRU replacement policy.

The LUE **1107** first processes a UFKB-entry, and basically performs the operation of blocks **314** and **316** in FIG. **3**. A signal is provided to the LUE to indicate that a "new" UFKB-entry is available. The LUE uses the hash in the UFKB-entry to read a matching bin of up to four buckets from the cache. The cache system attempts to obtain the matching bin. If a matching bin is not in the cache, the cache **1115** makes the request to the UMC **1119** to bring in a matching bin from the external memory.

When a flow-entry is found using the hash, the LUE **1107** looks at each bucket and compares it using the signature to the signature of the UFKB-entry until there is a match or there are no more buckets.

If there is no match, or if the cache failed to provide a bin of flow-entries from the cache, a time stamp in set in the flow key of the UFKB record, a protocol identification and state determination is made using a table that was loaded by compilation process **310** during initialization, the status for the record is set to indicate the LUE has processed the record, and an indication is made that the UFKB-entry is ready to start state processing. The identification and state determination generates a protocol identifier which in the preferred embodiment is a "jump vector" for the state processor which is kept by the UFKB for this UFKB-entry and used by the state processor to start state processing for the particular protocol. For example, the jump vector jumps to the subroutine for processing the state.

If there was a match, indicating that the packet of the UFKB-entry is for a previously encountered flow, then a calculator component enters one or more statistical measures stored in the flow-entry, including the timestamp. In addition, a time difference from the last stored timestamp may be stored, and a packet count may be updated. The state of the flow is obtained from the flow-entry is examined by looking at the protocol identifier stored in the flow-entry of database **324**. If that value indicates that no more classifi-

cation is required, then the status for the record is set to indicate the LUE has processed the record. In the preferred embodiment, the protocol identifier is a jump vector for the state processor to a subroutine to state processing the protocol, and no more classification is indicated in the preferred embodiment by the jump vector being zero. If the protocol identifier indicates more processing, then an indication is made that the UFKB-entry is ready to start state processing and the status for the record is set to indicate the LUE has processed the record.

The state processor **1108** processes information in the cache system according to a UFKB-entry after the LUE has completed. State processor **1108** includes a state processor program counter SPPC that generates the address in the state processor instruction database **1109** loaded by compiler process **310** during initialization. It contains an Instruction Pointer (SPIP) which generates the SPID address. The instruction pointer can be incremented or loaded from a Jump Vector Multiplexor which facilitates conditional branching. The SPIP can be loaded from one of three sources: (1) A protocol identifier from the UFKB, (2) an immediate jump vector form the currently decoded instruction, or (3) a value provided by the arithmetic logic unit (SPALU) included in the state processor.

Thus, after a Flow Key is placed in the UFKB by the LUE with a known protocol identifier, the Program Counter is initialized with the last protocol recognized by the Parser. This first instruction is a jump to the subroutine which analyzes the protocol that was decoded.

The State Processor ALU (SPALU) contains all the Arithmetic, Logical and String Compare functions necessary to implement the State Processor instructions. The main blocks of the SPALU are: The A and B Registers, the Instruction Decode & State Machines, the String Reference Memory the Search Engine, an Output Data Register and an Output Control Register

The Search Engine in turn contains the Target Search Register set, the Reference Search Register set, and a Compare block which compares two operands by exclusive-or-ing them together.

Thus, after the UFKB sets the program counter, a sequence of one or more state operations are be executed in state processor **1108** to further analyze the packet that is in the flow key buffer entry for this particular packet.

FIG. **13** describes the operation of the state processor **1108**. The state processor is entered at **1301** with a unified flow key buffer entry to be processed. The UFKB-entry is new or corresponding to a found flow-entry. This UFKB-entry is retrieved from unified flow key buffer **1103** in **1301**. In **1303**, the protocol identifier for the UFKB-entry is used to set the state processor's instruction counter. The state processor **1108** starts the process by using the last protocol recognized by the parser subsystem **301** as an offset into a jump table. The jump table takes us to the instructions to use for that protocol. Most instructions test something in the unified flow key buffer or the flow-entry if it exists. The state processor **1108** may have to test bits, do comparisons, add or subtract to perform the test.

The first state processor instruction is fetched in **1304** from the state processor instruction database memory **1109**. The state processor performs the one or more fetched operations (**1304**). In our implementation, each single state processor instruction is very primitive (e.g., a move, a compare, etc.), so that many such instructions need to be performed on each unified flow key buffer entry. One aspect of the state processor is its ability to search for one or more (up to four) reference strings in the payload part of the UFKB entry. This is implemented by a search engine component of the state processor responsive to special searching instructions.

In **1307**, a check is made to determine if there are any more instructions to be performed for the packet. If yes, then in **1308** the system sets the state processor instruction pointer (SPIP) to obtain the next instruction. The SPIP may be set by an immediate jump vector in the currently decoded instruction, or by a value provided by the SPALU during processing.

The next instruction to be performed is now fetched (**1304**) for execution. This state processing loop between **1304** and **1307** continues until there are no more instructions to be performed.

At this stage, a check is made in **1309** if the processing on this particular packet has resulted in a final state. That is, is the analyzer is done processing not only for this particular packet, but for the whole flow to which the packet belongs, and the flow is fully determined. If indeed there are no more states to process for this flow, then in **1311** the processor finalizes the processing. Some final states may need to put a state in place that tells the system to remove a flow—for example, if a connection disappears from a lower level connection identifier. In that case, in **1311**, a flow removal state is set and saved in the flow-entry. The flow removal state may be a NOP (no-op) instruction which means there are no removal instructions.

Once the appropriate flow removal instruction as specified for this flow (a NOP or otherwise) is set and saved, the process is exited at **1313**. The state processor **1108** can now obtain another unified flow key buffer entry to process.

If at **1309** it is determined that processing for this flow is not completed, then in **1310** the system saves the state processor instruction pointer in the current flow-entry in the current flow-entry. That will be the next operation that will be performed the next time the LRE **1107** finds packet in the UFKB that matches this flow. The processor now exits processing this particular unified flow key buffer entry at **1313**.

Note that state processing updates information in the unified flow key buffer **1103** and the flow-entry in the cache. Once the state processor is done, a flag is set in the UFKB for the entry that the state processor is done. Furthermore, If the flow needs to be inserted or deleted from the database of flows, control is then passed on to the flow insertion/deletion engine **1110** for that flow signature and packet entry. This is done by the state processor setting another flag in the UFKB for this UFKB-entry indicating that the state processor is passing processing of this entry to the flow insertion and deletion engine.

The flow insertion and deletion engine **1110** is responsible for maintaining the flow-entry database. In particular, for creating new flows in the flow database, and deleting flows from the database so that they can be reused.

The process of flow insertion is now described with the aid of FIG. **12**. Flows are grouped into bins of buckets by the hash value. The engine processes a UFKB-entry that may be new or that the state processor otherwise has indicated needs to be created. FIG. **12** shows the case of a new entry being created. A conversation record bin (preferably containing 4 buckets for four records) is obtained in **1203**. This is a bin that matches the hash of the UFKB, so this bin may already have been sought for the UFKB-entry by the LUE. In **1204** the FIDE **1110** requests that the record bin/bucket be maintained in the cache system **1115**. If in **1205** the cache system

**1115** indicates that the bin/bucket is empty, step **1207** inserts the flow signature (with the hash) into the bucket and the bucket is marked "used" in the cache engine of cache **1115** using a timestamp that is maintained throughout the process. In **1209**, the FIDE **1110** compares the bin and bucket record flow signature to the packet to verify that all the elements are in place to complete the record. In **1211** the system marks the record bin and bucket as "in process" and as "new" in the cache system (and hence in the external memory). In **1212**, the initial statistical measures for the flow-record are set in the cache system. This in the preferred embodiment clears the set of counters used to maintain statistics, and may perform other procedures for statistical operations requires by the analyzer for the first packet seen for a particular flow.

Back in step **1205**, if the bucket is not empty, the FIDE **1110** requests the next bucket for this particular bin in the cache system. If this succeeds, the processes of **1207**, **1209**, **1211** and **1212** are repeated for this next bucket. If at **1208**, there is no valid bucket, the unified flow key buffer entry for the packet is set as "drop," indicating that the system cannot process the particular packet because there are no buckets left in the system. The process exits at **1213**. The FIDE **1110** indicates to the UFKB that the flow insertion and deletion operations are completed for this UFKB-entry. This also lets the UFKB provide the FIDE with the next UFKB record.

Once a set of operations is performed on a unified flow key buffer entry by all of the engines required to access and manage a particular packet and its flow signature, the unified flow key buffer entry is marked as "completed." That element will then be used by the parser interface for the next packet and flow signature coming in from the parsing and extracting system.

All flow-entries are maintained in the external memory and some are maintained in the cache **1115**. The cache system **1115** is intelligent enough to access the flow database and to understand the data structures that exists on the other side of memory interface **1123**. The lookup/update engine **1107** is able to request that the cache system pull a particular flow or "buckets" of flows from the unified memory controller **1119** into the cache system for further processing. The state processor **1108** can operate on information found in the cache system once it is looked up by means of the lookup/update engine request, and the flow insertion/deletion engine **1110** can create new entries in the cache system if required based on information in the unified flow key buffer **1103**. The cache retrieves information as required from the memory through the memory interface **1123** and the unified memory controller **1119**, and updates information as required in the memory through the memory controller **1119**.

There are several interfaces to components of the system external to the module of FIG. **11** for the particular hardware implementation. These include host bus interface **1122**, which is designed as a generic interface that can operate with any kind of external processing system such as a microprocessor or a multiplexor (MUX) system. Consequently, one can connect the overall traffic classification system of FIGS. **11** and **12** into some other processing system to manage the classification system and to extract data gathered by the system.

The memory interface **1123** is designed to interface to any of a variety of memory systems that one may want to use to store the flow-entries. One can use different types of memory systems like regular dynamic random access memory (DRAM), synchronous DRAM, synchronous graphic memory (SGRAM), static random access memory (SRAM), and so forth.

FIG. **10** also includes some "generic" interfaces. There is a packet input interface **1012**—a general interface that works in tandem with the signals of the input buffer interface control **1022**. These are designed so that they can be used with any kind of generic systems that can then feed packet information into the parser. Another generic interface is the interface of pipes **1031** and **1033** respectively out of and into host interface multiplexor and control registers **1005**. This enables the parsing system to be managed by an external system, for example a microprocessor or another kind of external logic, and enables the external system to program and otherwise control the parser.

The preferred embodiment of this aspect of the invention is described in a hardware description language (HDL) such as VHDL or Verilog. It is designed and created in an HDL so that it may be used as a single chip system or, for instance, integrated into another general-purpose system that is being designed for purposes related to creating and analyzing traffic within a network. Verilog or other HDL implementation is only one method of describing the hardware.

In accordance with one hardware implementation, the elements shown in FIGS. **10** and **11** are implemented in a set of six field programmable logic arrays (FPGA's). The boundaries of these FPGA's are as follows. The parsing subsystem of FIG. **10** is implemented as two FPGAS; one FPGA, and includes blocks **1006**, **1008** and **1012**, parts of **1005**, and memory **1001**. The second FPGA includes **1002**, **1007**, **1013**, **1011** parts of **1005**. Referring to FIG. **11**, the unified look-up buffer **1103** is implemented as a single FPGA. State processor **1108** and part of state processor instruction database memory **1109** is another FPGA. Portions of the state processor instruction database memory **1109** are maintained in external SRAM's. The lookup/update engine **1107** and the flow insertion/deletion engine **1110** are in another FPGA. The sixth FPGA includes the cache system **1115**, the unified memory control **1119**, and the analyzer host interface and control **1118**.

Note that one can implement the system as one or more VSLI devices, rather than as a set of application specific integrated circuits (ASIC's) such as FPGA's. It is anticipated that in the future device densities will continue to increase, so that the complete system may eventually form a sub-unit (a "core") of a larger single chip unit.

## Operation of the Invention

FIG. **15** shows how an embodiment of the network monitor **300** might be used to analyze traffic in a network **102**. Packet acquisition device **1502** acquires all the packets from a connection point **121** on network **102** so that all packets passing point **121** in either direction are supplied to monitor **300**. Monitor **300** comprises the parser sub-system **301**, which determines flow signatures, and analyzer sub-system **303** that analyzes the flow signature of each packet. A memory **324** is used to store the database of flows that are determined and updated by monitor **300**. A host computer **1504**, which might be any processor, for example, a general-purpose computer, is used to analyze the flows in memory **324**. As is conventional, host computer **1504** includes a memory, say RAM, shown as host memory **1506**. In addition, the host might contain a disk. In one application, the system can operate as an RMON probe, in which case the host computer is coupled to a network interface card **1510** that is connected to the network **102**.

The preferred embodiment of the invention is supported by an optional Simple Network Management Protocol (SNMP) implementation. FIG. **15** describes how one would,

for example, implement an RMON probe, where a network interface card is used to send RMON information to the network. Commercial SNMP implementations also are available, and using such an implementation can simplify the process of porting the preferred embodiment of the invention to any platform.

In addition, MIB Compilers are available. An MIB Compiler is a tool that greatly simplifies the creation and maintenance of proprietary MIB extensions.

### Examples of Packet Elucidation

Monitor **300**, and in particular, analyzer **303** is capable of carrying out state analysis for packet exchanges that are commonly referred to as "server announcement" type exchanges. Server announcement is a process used to ease communications between a server with multiple applications that can all be simultaneously accessed from multiple clients. Many applications use a server announcement process as a means of multiplexing a single port or socket into many applications and services. With this type of exchange, messages are sent on the network, in either a broadcast or multicast approach, to announce a server and application, and all stations in the network may receive and decode these messages. The messages enable the stations to derive the appropriate connection point for communicating that particular application with the particular server. Using the server announcement method, a particular application communicates using a service channel, in the form of a TCP or UDP socket or port as in the IP protocol suite, or using a SAP as in the Novell IPX protocol suite.

The analyzer **303** is also capable of carrying out "in-stream analysis" of packet exchanges. The "in-stream analysis" method is used either as a primary or secondary recognition process. As a primary process, in-stream analysis assists in extracting detailed information which will be used to further recognize both the specific application and application component. A good example of in-stream analysis is any Web-based application. For example, the commonly used PointCast Web information application can be recognized using this process; during the initial connection between a PointCast server and client, specific key tokens exist in the data exchange that will result in a signature being generated to recognize PointCast.

The in-stream analysis process may also be combined with the server announcement process. In many cases in-stream analysis will augment other recognition processes. An example of combining in-stream analysis with server announcement can be found in business applications such as SAP and BAAN.

"Session tracking" also is known as one of the primary processes for tracking applications in client/server packet exchanges. The process of tracking sessions requires an initial connection to a predefined socket or port number. This method of communication is used in a variety of transport layer protocols. It is most commonly seen in the TCP and UDP transport protocols of the IP protocol.

During the session tracking, a client makes a request to a server using a specific port or socket number. This initial request will cause the server to create a TCP or UDP port to exchange the remainder of the data between the client and the server. The server then replies to the request of the client using this newly created port. The original port used by the client to connect to the server will never be used again during this data exchange.

One example of session tracking is TFTP (Trivial File Transfer Protocol), a version of the TCP/IP FTP protocol that has no directory or password capability. During the client/server exchange process of TFTP, a specific port (port number **69**) is always used to initiate the packet exchange. Thus, when the client begins the process of communicating, a request is made to UDP port **69**. Once the server receives this request, a new port number is created on the server. The server then replies to the client using the new port. In this example, it is clear that in order to recognize TFTP; network monitor **300** analyzes the initial request from the client and generates a signature for it. Monitor **300** uses that signature to recognize the reply. Monitor **300** also analyzes the reply from the server with the key port information, and uses this to create a signature for monitoring the remaining packets of this data exchange.

Network monitor **300** can also understand the current state of particular connections in the network. Connection-oriented exchanges often benefit from state tracking to correctly identify the application. An example is the common TCP transport protocol that provides a reliable means of sending information between a client and a server. When a data exchange is initiated, a TCP request for synchronization message is sent. This message contains a specific sequence number that is used to track an acknowledgement from the server. Once the server has acknowledged the synchronization request, data may be exchanged between the client and the server. When communication is no longer required, the client sends a finish or complete message to the server, and the server acknowledges this finish request with a reply containing the sequence numbers from the request. The states of such a connection-oriented exchange relate to the various types of connection and maintenance messages.

### Server Announcement Example

The individual methods of server announcement protocols vary. However, the basic underlying process remains similar. A typical server announcement message is sent to one or more clients in a network. This type of announcement message has specific content, which, in another aspect of the invention, is salvaged and maintained in the database of flow-entries in the system. Because the announcement is sent to one or more stations, the client involved in a future packet exchange with the server will make an assumption that the information announced is known, and an aspect of the inventive monitor is that it too can make the same assumption.

Sun-RPC is the implementation by Sun Microsystems, Inc. (Palo Alto, Calif.) of the Remote Procedure Call (RPC), a programming interface that allows one program to use the services of another on a remote machine. A Sun-RPC example is now used to explain how monitor **300** can capture server announcements.

A remote program or client that wishes to use a server or procedure must establish a connection, for which the RPC protocol can be used.

Each server running the Sun-RPC protocol must maintain a process and database called the port Mapper. The port Mapper creates a direct association between a Sun-RPC program or application and a TCP or UDP socket or port (for TCP or UDP implementations). An application or program number is a 32-bit unique identifier assigned by ICANN (the Internet Corporation for Assigned Names and Numbers, www.icann.org), which manages the huge number of parameters associated with Internet protocols (port numbers, router protocols, multicast addresses, etc.) Each port Mapper on a Sun-RPC server can present the mappings between a unique program number and a specific transport socket

through the use of specific request or a directed announcement. According to ICANN, port number **111** is associated with Sun RPC.

As an example, consider a client (e.g., CLIENT **3** shown as **106** in FIG. **1**) making a specific request to the server (e.g., SERVER **2** of FIG. **1**, shown as **10**) on a predefined UDP or TCP socket. Once the port Mapper process on the sun RPC server receives the request, the specific mapping is returned in a directed reply to the client.

1. A client (CLIENT **3**, **106** in FIG. **1**) sends a TCP packet to SERVER **2** (**110** in FIG. **1**) on port **111**, with an RPC Bind Lookup Request (rpcBindLookup). TCP or UDP port **111** is always associated Sun RPC. This request specifies the program (as a program identifier), version, and might specify the protocol (UDP or TCP).
2. The server SERVER **2** (**110** in FIG. **1**) extracts the program identifier and version identifier from the request. The server also uses the fact that this packet came in using the TCP transport and that no protocol was specified, and thus will use the TCP protocol for its reply.
3. The server **110** sends a TCP packet to port number **111**, with an RPC Bind Lookup Reply. The reply contains the specific port number (e.g., port number 'port') on which future transactions will be accepted for the specific RPC program identifier (e.g., Program 'program') and the protocol (UDP or TCP) for use.

It is desired that from now on every time that port number 'port' is used, the packet is associated with the application program 'program' until the number 'port' no longer is to be associated with the program 'program'. Network monitor **300** by creating a flow-entry and a signature includes a mechanism for remembering the exchange so that future packets that use the port number 'port' will be associated by the network monitor with the application program 'program'.

In addition to the Sun RPC Bind Lookup request and reply, there are other ways that a particular program—say 'program'—might be associated with a particular port number, for example number 'port'. One is by a broadcast announcement of a particular association between an application service and a port number, called a Sun RPC portMapper Announcement. Another, is when some server—say the same SERVER **2**—replies to some client—say CLIENT **1**—requesting some portMapper assignment with a RPC portMapper Reply. Some other client—say CLIENT **2**—might inadvertently see this request, and thus know that for this particular server, SERVER **2**, port number 'port' is associated with the application service 'program'. It is desirable for the network monitor **300** to be able to associate any packets to SERVER **2** using port number 'port' with the application program 'program'.

FIG. **9** represents a dataflow **900** of some operations in the monitor **300** of FIG. **3** for Sun Remote Procedure Call. Suppose a client **106** (e.g., CLIENT **3** in FIG. **1**) is communicating via its interface to the network **118** to a server **110** (e.g., SERVER **2** in FIG. **1**) via the server's interface to the network **116**. Further assume that Remote Procedure Call is used to communicate with the server **110**. One path in the data flow **900** starts with a step **910** that a Remote Procedure Call bind lookup request is issued by client **106** and ends with the server state creation step **904**. Such RPC bind lookup request includes values for the 'program,' 'version,' and 'protocol' to use, e.g., TCP or UDP. The process for Sun RPC analysis in the network monitor **300** includes the following aspects.:

Process **909**: Extract the 'program,' 'version,' and 'protocol' (UDP or TCP). Extract the TCP or UDP port (process **909**) which is **111** indicating Sun RPC.

Process **908**: Decode the Sun RPC packet. Check RPC type field for ID. If value is portMapper, save paired socket (i.e., dest for destination address, src for source address). Decode ports and mapping, save ports with socket/addr key. There may be more than one pairing per mapper packet. Form a signature (e.g., a key). A flow-entry is created in database **324**. The saving of the request is now complete.

At some later time, the server (process **907**) issues a RPC bind lookup reply. The packet monitor **300** will extract a signature from the packet and recognize it from the previously stored flow. The monitor will get the protocol port number (**906**) and lookup the request (**905**). A new signature (i.e., a key) will be created and the creation of the server state (**904**) will be stored as an entry identified by the new signature in the flow-entry database. That signature now may be used to identify packets associated with the server.

The server state creation step **904** can be reached not only from a Bind Lookup Request/Reply pair, but also from a RPC Reply portMapper packet shown as **901** or an RPC Announcement portMapper shown as **902**. The Remote Procedure Call protocol can announce that it is able to provide a particular application service. Embodiments of the present invention preferably can analyze when an exchange occurs between a client and a server, and also can track those stations that have received the announcement of a service in the network.

The RPC Announcement portMapper announcement **902** is a broadcast. Such causes various clients to execute a similar set of operations, for example, saving the information obtained from the announcement. The RPC Reply portMapper step **901** could be in reply to a portMapper request, and is also broadcast. It includes all the service parameters.

Thus monitor **300** creates and saves all such states for later classification of flows that relate to the particular service 'program'.

FIG. **2** shows how the monitor **300** in the example of Sun RPC builds a signature and flow states. A plurality of packets **206**–**209** are exchanged, e.g., in an exemplary Sun Microsystems Remote Procedure Call protocol. A method embodiment of the present invention might generate a pair of flow signatures, "signature-1" **210** and "signature—2" **212**, from information found in the packets **206** and **207** which, in the example, correspond to a Sun RPC Bind Lookup request and reply, respectively.

Consider first the Sun RPC Bind Lookup request. Suppose packet **206** corresponds to such a request sent from CLIENT **3** to SERVER **2**. This packet contains important information that is used in building a signature according to an aspect of the invention. A source and destination network address occupy the first two fields of each packet, and according to the patterns in pattern database **308**, the flow signature (shown as KEY1 **230** in FIG. **2**) will also contain these two fields, so the parser subsystem **301** will include these two fields in signature KEY **1** (**230**). Note that in FIG. **2**, if an address identifies the client **106** (shown also as **202**), the label used in the drawing is "$C_1$". If such address identifies the server **110** (shown also as server **204**), the label used in the drawing is "$S_1$". The first two fields **214** and **215** in packet **206** are "$S_1$" and $C_1$" because packet **206** is provided from the server **110** and is destined for the client **106**. Suppose for this example, "$S_1$" is an address numerically less than address "$C_1$". A third field "$p^1$" **216** identifies the particular protocol being used, e.g., TCP, UDP, etc.

In packet **206**, a fourth field **217** and a fifth field **218** are used to communicate port numbers that are used. The

conversation direction determines where the port number field is. The diagonal pattern in field **217** is used to identify a source-port pattern, and the hash pattern in field **218** is used to identify the destination-port pattern. The order indicates the client-server message direction. A sixth field denoted "$i^1$" **219** is an element that is being requested by the client from the server. A seventh field denoted "$s_1a$" **220** is the service requested by the client from server **110**. The following eighth field "QA" **221** (for question mark) indicates that the client **106** wants to know what to use to access application "$s_1a$". A tenth field "QP" **223** is used to indicate that the client wants the server to indicate what protocol to use for the particular application.

Packet **206** initiates the sequence of packet exchanges, e.g., a RPC Bind Lookup Request to SERVER **2**. It follows a well-defined format, as do all the packets, and is transmitted to the server **110** on a well-known service connection identifier (port **111** indicating Sun RPC).

Packet **207** is the first sent in reply to the client **106** from the server. It is the RPC Bind Lookup Reply as a result of the request packet **206**.

Packet **207** includes ten fields **224–233**. The destination and source addresses are carried in fields **224** and **225**, e.g., indicated "$C_1$" and "$S_1$", respectively. Notice the order is now reversed, since the client-server message direction is from the server **110** to the client **106**. The protocol "$p^1$" is used as indicated in field **226**. The request "$i^1$" is in field **229**. Values have been filled in for the application port number, e.g., in field **233** and protocol ""$p^2$"" in field **233**.

The flow signature and flow states built up as a result of this exchange are now described. When the packet monitor **300** sees the request packet **206** from the client, a first flow signature **210** is built in the parser subsystem **301** according to the pattern and extraction operations database **308**. This signature **210** includes a destination and a source address **240** and **241**. One aspect of the invention is that the flow keys are built consistently in a particular order no matter what the direction of conversation. Several mechanisms may be used to achieve this. In the particular embodiment, the numerically lower address is always placed before the numerically higher address. Such least to highest order is used to get the best spread of signatures and hashes for the lookup operations. In this case, therefore, since we assume "$S_1$"<"$C_1$", the order is address "$S_1$" followed by client address "$C_1$". The next field used to build the signature is a protocol field **242** extracted from packet **206**'s field **216**, and thus is the protocol "$p^1$". The next field used for the signature is field **243**, which contains the destination source port number shown as a crosshatched pattern from the field **218** of the packet **206**. This pattern will be recognized in the payload of packets to derive how this packet or sequence of packets exists as a flow. In practice, these may be TCP port numbers, or a combination of TCP port numbers. In the case of the Sun RPC example, the crosshatch represents a set of port numbers of UDS for $p^1$ that will be used to recognize this flow (e.g., port **111**). Port **111** indicates this is Sun RPC. Some applications, such as the Sun RPC Bind Lookups, are directly determinable ("known") at the parser level. So in this case, the signature KEY-**1** points to a known application denoted "$a^1$" (Sun RPC Bind Lookup), and a denoted as state "$st_D$" is placed in the field **245** of the flow-entry.

When the Sun RPC Bind Lookup reply is acquired, a flow signature is again built by the parser. This flow signature is identical to KEY-**1**. Hence, when the signature enters the analyzer subsystem **303** from the parser subsystem **301**, the complete flow-entry is obtained, and in this flow-entry indicates state "$st_D$". The operations for state "$st_D$" in the state processor instruction database **326** instructs the state processor to build and store a new flow signature, shown as KEY-**2** (**212**) in FIG. **2**. This flow signature built by the state processor also includes the destination and a source addresses **250** and **251**, respectively, for server "$S_1$" followed by (the numerically higher address) client "$C_1$". A protocol field **252** defines the protocol to be used, e.g., "$p^2$" which is obtained from the reply packet. A field **253** contains a recognition pattern also obtained from the reply packet. In this case, the application is Sun RPC, and field **254** indicates this application "$a^2$". A next-state field **255** defines the next state that the state processor should proceed to for more complex recognition jobs, e.g., a state "$st^1$". In this particular example, this is a final state. Thus, KEY-**2** may now be used to recognize packets that are in any way associated with the application "$a^2$". Two such packets **208** and **209** are shown, one in each direction. They use the particular application service requested in the original Bind Lookup Request, and each will be recognized because the signature KEY-**2** will be built in each case.

The two flow signatures **210** and **212** always order the destination and source address fields with server "$S_1$" followed by client "$C_1$". Such values are automatically filled in when the addresses are first created in a particular flow signature. Preferably, large collections of flow signatures are kept in a lookup table in a least-to-highest order for the best spread of flow signatures and hashes.

Thereafter, the client and server exchange a number of packets, e.g., represented by request packet **208** and response packet **209**. The client **106** sends packets **208** that have a destination and source address $S_1$ and $C_1$, in a pair of fields **260** and **261**. A field **262** defines the protocol as "$p^2$", and a field **263** defines the destination port number.

Some network-server application recognition jobs are so simple that only a single state transition has to occur to be able to pinpoint the application that produced the packet. Others require a sequence of state transitions to occur in order to match a known and predefined climb from state-to-state.

Thus the flow signature for the recognition of application "$a^2$" is automatically set up by predefining what packet-exchange sequences occur for this example when a relatively simple Sun Microsystems Remote Procedure Call bind lookup request instruction executes. More complicated exchanges than this may generate more than two flow signatures and their corresponding states. Each recognition may involve setting up a complex state transition diagram to be traversed before a "final" resting state such as "$st_1$" in field **255** is reached. All these are used to build the final set of flow signatures for recognizing a particular application in the future.

Embodiments of the present invention automatically generate flow signatures with the necessary recognition patterns and state transition climb procedure. Such comes from analyzing packets according to parsing rules, and also generating state transitions to search for. Applications and protocols, at any level, are recognized through state analysis of sequences of packets.

Note that one in the art will understand that computer networks are used to connect many different types of devices, including network appliances such as telephones, "Internet" radios, pagers, and so forth. The term computer as used herein encompasses all such devices and a computer network as used herein includes networks of such computers.

Although the present invention has been described in terms of the presently preferred embodiments, it is to be

understood that the disclosure is not to be interpreted as limiting. Various alterations and modifications will no doubt become apparent to those or ordinary skill in the art after having read the above disclosure. Accordingly, it is intended that the claims be interpreted as covering all alterations and modifications as fall within the true spirit and scope of the present invention.

We claim:

1. A method of examining packets passing through a connection point on a computer network, each packets conforming to one or more protocols, the method comprising:

(a) receiving a packet from a packet acquisition device;

(b) performing one or more parsing/extraction operations on the packet to create a parser record comprising a function of selected portions of the packet;

(c) looking up a flow-entry database comprising none or more flow-entries for previously encountered conversational flows, the looking up using at least some of the selected packet portions and determining if the packet is of an existing flow;

(d) if the packet is of an existing flow, classifying the packet as belonging to the found existing flow; and

(e) if the packet is of a new flow, storing a new flow-entry for the new flow in the flow-entry database, including identifying information for future packets to be identified with the new flow-entry,

wherein the parsing/extraction operations depend on one or more of the protocols to which the packet conforms.

2. A method according to claim 1, wherein each packet passing through the connection point is examined in real time.

3. A method according to claim 1, wherein classifying the packet as belonging to the found existing flow includes updating the flow-entry of the existing flow.

4. A method according to claim 3, wherein updating includes storing one or more statistical measures stored in the flow-entry of the existing flow.

5. A method according to claim 4, wherein the one or more statistical measures include measures selected from the set consisting of the total packet count for the flow, the time, and a differential time from the last entered time to the present time.

6. A method according to claim 1, wherein the function of the selected portions of the packet forms a signature that includes the selected packet portions and that can identify future packers, wherein the lookup operation uses the signature and wherein the identifying information stored in the new or updated flow-entry is a signature for identifying future packets.

7. A method according to clalm 1, wherein at least one of the protocols of the packet uses source and destination addresses, and wherein the selected portions of the packet include the source and destination addresses.

8. A method according to claim 7, wherein the function of the selected portions for packets of the same flow is consistent independent of the direction of the packets.

9. A method according to claim 8, wherein the source and destination addresses are placed in an order determined by the order of numerical values of the addresses in the function of selected portions.

10. A method according to claim 9, wherein the numerically lower address is placed before the numerically higher address in the function of selected portions.

11. A method according to claim 1, wherein the looking up of the flow-entry database uses a hash of the selected packet portions.

12. A method according to claim 1, wherein the parsing/extraction operations are according to a database of parsing/extraction operations that includes information describing how to determine a set of one or more protocol dependent extraction operations from data in the packet that indicate a protocol used in the packet.

13. A method according to claim 1, wherein step (d) includes if the packet is of an existing flow, obtaining the last encountered state of the flow and performing any state operations specified for the state of the flow starting from the last encountered state of the flow; and wherein step (e) includes if the packet is of a new flow, performing any state operations required for the initial state of the new flow.

14. A method according to claim 13, wherein the state processing of each received packet of a flow furthers the identifying of the application program of the flow.

15. A method according to claim 13, wherein the state operations include updating the flow-entiy, including storing identifying information for future packets to be identified with the flow-entry.

16. A method according to claim 15, wherein the state processing of each received packet of a flow furthers the identifying of the application program of the flow.

17. A method according to claim 13, wherein the state operations include searching the parser record for the existence of one or more reference strings.

18. A method according to claim 13, wherein the state operations are carried out by a programmable state processor according to a database of protocol dependent state operations.

19. A packet monitor for examining packets passing through a connection point on a computer network, each packets conforming to one or more protocols, the monitor comprising:

(a) a packet acquisition device coupled to the connection point and configured to receive packets passing through the connection point;

(b) an input buffer memory coupled to and configured to accept a packet from the packet acquisition device;

(c) a parser subsystem coupled to the input buffer memory and including a slicer, the parsing subsystem configured to extract selected portions of the accepted packet and to output a parser record containing the selected portions;

(d) a memory for storing a database comprising none or more flow-entries for previously encountered conversational flows, each flow-entry identified by identifying information stored in the flow-entry;

(e) a lookup engine coupled to the output of the parser subsystem and to the flow-entry memory and configured to lookup whether the particular packet whose parser record is output by the parser subsystem has a matching flow-entry, the looking up using at least some of the selected packet portions and determining if the packet is of an existing flow; and

(f) a flow insertion engine coupled to the flow-entry memory and to the lookup engine and configured to create a flow-entry in the flow-entry database, the flow-entry including identifying information for future packets to be identified with the new flow-entry, the lookup engine configured such that if the packet is of an existing flow, the monitor classifies the packet as belonging to the found existing flow; and if the packet is of a new flow, the flow insertion engine stores a new flow-entry for the new flow in the flow-entry database, including identifying information for future packets to be identified with the new flow-entry,

wherein the operation of the parser subsystem depends on one or more of the protocols to which the packet conforms.

**20**. A monitor according to claim **19**, wherein each packet passing through the connection point is accepted by the packet buffer memory and examined by the monitor in real time.

**21**. A monitor according to claim **19**, wherein the lookup engine updates the flow-entry of an existing flow in the case that the lookup is successful.

**22**. A monitor according to claim **19**, further including a mechanism for building a hash from the selected portions, wherein the hash is included in the input for a particular packet to the lookup. engine, and wherein the hash is used by the lookup engine to search the flow-entry database.

**23**. A monitor according to claim **19**, further including a memory containing a database of parsing/extraction operations, the parsing/extraction database memory coupled to the parser subsystem, wherein the parsing/extraction operations are according to one or more parsing/extraction operations looked up from the parsing/extraction database.

**24**. A monitor according to claim **23**, wherein the database of parsing/extraction operations includes information describing how to determine a set of one or more protocol dependent extraction operations from data in the packet that indicate a protocol used in the packet.

**25**. A monitor according to claim **19**, further including a flow-key-buffer (UFKB) coupled to the output of the parser subsystem and to the lookup engine and to the flow insertion engine, wherein the output of the parser monitor is coupled to the lookup engine via the UFKB, and wherein the flow insertion engine is coupled to the lookup engine via the UFKB.

**26**. A method according to claim **19**, further including a state processor coupled to the lookup engine and to the flow-entry-database memory, and configured to perform any state operations specified for the state of the flow starting from the last encountered state of the flow in the case that the packet is from an existing flow, and to perform any state operations required for the initial state of the new flow in the case that the packet is from an existing flow.

**27**. A method according to claim **19**, wherein the set of possible state operations that the state processor is configured to perform includes searching for one or more patterns in the packet portions.

**28**. A monitor according to claim **26**, wherein the state processor is programmable, the monitor further including a state patterns/operations memory coupled to the state processor, the state operations memory configured to store a database of protocol dependent state patterns/operations.

**29**. A monitor according to claim **25**, further including a state processor coupled to the UFKB and to the flow-entry-database memory, and configured to perform any state operations specified for the state of the flow starting from the last encountered state of the flow in the case that the packet is from an existing flow, and to perform any state operations required for the initial state of the new flow in the case that the packet is from an existing flow.

**30**. A monitor according to claim **26**, wherein the state operations include updating the flow-entry, including identifying information for future packets to be identified with the flow-entry.

**31**. A packet monitor according to claim **19**, further comprising:

a compiler processor coupled to the parsing/extraction operations memory, the compiler processor configured to run a compilation process that includes:

receiving commands in a high-level protocol description language that describe the protocols that may be used in packets encountered by the monitor and any children protocols thereof, and

translating the protocol description language commands into a plurality of parsing/extraction operations that are initialized into the parsing/extraction operations memory.

**32**. A packet monitor according to claim **28**, further comprising:

a compiler processor coupled to the parsing/extraction operations memory, the compiler processor configured to run a compilation process that includes:

receiving commands in a high-level protocol description language that describe a correspondence between a set of one or more application programs and the state transition patterns/operations that occur as a result of particular conversational flow-sequences associated with an application programs, and

translating the protocol description language commands into a plurality of state patterns and state operations that are initialized into the state patterns/operations memory.

**33**. A packet monitor according to claim **19**, further comprising:

a cache subsystem coupled to and between the lookup engine and the flow-entry database memory providing for fast access of a set of likely-to-be-accessed flow-entries from the flow-entry database.

**34**. A packet monitor according to claim **33**, wherein the cache subsystem is an associative cache subsystem including one or more content addressable memory cells (CAMs).

**35**. A packet monitor according to claim **34**, wherein the cache subsystem is also a least-recently-used cache memory such that a cache miss updates the least recently used cache entry.

**36**. A packet monitor according to claim **19**, wherein each flow-entry stores one or more statistical measures about the flow, the monitor further comprising

a calculator for updating at least one of the statistical measures in the flow-entry of the accepted packet.

**37**. A packet monitor according to claim **36**, wherein the one or more statistical measures include measures selected from the set consisting of the total packet count for the flow, the time, and a differential time from the last entered time to the present time.

**38**. A packet monitor according to claim **36**, further including a statistical processor configured to determine one or more network usage metrics related to the flow from one or more of the statistical measures in a flow-entry.

**39**. A monitor according to claim **19**, wherein:

flow-entry-database is organized into a plurality of bins that each contain N-number of flow-entries, and wherein said bins are accessed via a hash data value created by a parser subsystem based on the selected packet portions, wherein N is one or more.

**40**. A monitor according to claim **39**, wherein the hash data value is used to spread a plurality of flow-entries across the flow-entry-database and allows fast lookup of a flow-entry and shallower buckets.

**41**. A monitor according to claim **26**, wherein the state processor analyzes both new and existing flows in order to classify them by application and proceeds from state-to-state based on a set of predefined rules.

**42**. A monitor according to claim **19**, wherein the lookup engine begins processing as soon as a parser record arrives from the parser subsystem.

**43**. A monitor according to claim **26**, wherein the lookup engine provides for flow state entry checking to see if a flow

key should be sent to the state processor, and that outputs a protocol identifier for the flow.

**44**. A method of examining packets passing through a connection point on a computer network, the method comprising:

(a) receiving a packet from a packet acquisition device;

(b) performing one or more parsing/extraction operations on the packet according to a database of parsing/extraction operations to create a parser record comprising a function of selected portions of the packet, the database of parsing/extraction operations including information on how to determine a set of one or more protocol dependent extraction operations from data in the packet that indicate a protocol is used in the packet;

(c) looking up a flow-entry database comprising none or more flow-entries for previously encountered conversational flows, the looking up using at least some of the selected packet portions, and determining if the packet is of an existing flow;

(d) if the packet is of an existing flow, obtaining the last encountered state of the flow and performing any state operations specified for the state of the flow starting from the last encountered state of the flow; and

(e) if the packet is of a new flow, performing any analysis required for the initial state of the new flow and storing a new flow-entry for the new flow in the flow-entry database, including identifying information for future packets to be identified with the new flow-entry.

**45**. A method according to claim **44**, wherein one of the state operations specified for at least one of the states includes updating the flow-entry, including identifying information for future packets to be identified with the flow-entry.

**46**. A method according to claim **44**, wherein one of the state operations specified for at least one of the states includes searching the contents of the packet for at least one reference string.

**47**. A method according to claim **45**, wherein one of the state operations specified for at least one of the states includes creating a new flow-entry for future packets to be identified with the flow, the new flow-entry including identifying information for future packets to be identified with the flow-entry.

**48**. A method according to claim **44**, further comprising forming a signature from the selected packet portions, wherein the lookup operation uses the signature and wherein the identifying information stored in the new or updated flow-entry is a signature for identifying future packets.

**49**. A method according to claim **44**, wherein the state operations are according to a database of protocol dependent state operations.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 6,954,789 B2
DATED : October 11, 2005
INVENTOR(S) : Dietz et al.

Page 1 of 1

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 9,
Line 60, change “layer model” to -- layered model --.

Column 33,
Line 60, insert between “and a” and “denoted as” the phrase -- next-state that the state processor should proceed to for more complex recognition jobs, --.

Column 35,
Lline 51, change “clalm” to -- claim --.

Column 37,
Line 14, change “ciaim” to -- claim --.

Signed and Sealed this

Seventh Day of March, 2006

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 6,954,789 B2
APPLICATION NO. : 10/684776
DATED : October 11, 2005
INVENTOR(S) : Russell S. Dietz et al.



It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

IN THE CLAIMS:

Column 35, line 47, claim 6, change “packers” to --packets--.

Column 36, line 18, claim 15, change “entiy” to --entry--.

Column 37, line 32, claim 26, change “method” to --monitor--.

Column 37, line 40, claim 27, change “method” to --monitor--.

Column 37, lines 55 and 56, claim 29, change “for the initial state of the new flow in the case that the packet is from an existing flow” to --for the initial state of the new flow in the case that the packet is not from an existing flow--.

Signed and Sealed this
First Day of October, 2013

Teresa Stanek Rea
*Deputy Director of the United States Patent and Trademark Office*

US006665725B1

(12) **United States Patent**
**Dietz et al.**

(10) **Patent No.: US 6,665,725 B1**
(45) **Date of Patent: Dec. 16, 2003**

(54) **PROCESSING PROTOCOL SPECIFIC INFORMATION IN PACKETS SPECIFIED BY A PROTOCOL DESCRIPTION LANGUAGE**

(75) Inventors: **Russell S. Dietz**, San Jose, CA (US); **Andrew A. Koppenhaver**, Littleton, CO (US); **James F. Torgerson**, Andover, MN (US)

(73) Assignee: **Hi/fn, Inc.**, Los Gatos, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 537 days.

(21) Appl. No.: **09/609,179**

(22) Filed: **Jun. 30, 2000**

**Related U.S. Application Data**

(60) Provisional application No. 60/141,903, filed on Jun. 30, 1999.

(51) **Int. Cl.**[7] .............................................. **G06F 13/00**

(52) **U.S. Cl.** ...................... **709/230**; 709/246; 709/228; 370/389

(58) **Field of Search** ................................ 709/203, 206, 709/216, 217, 222, 246, 225, 228, 230, 232; 703/26; 370/489, 13, 17

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,736,320 A | 4/1988 | Bristol | 364/300 |
| 4,891,639 A | 1/1990 | Nakamura | 340/825.5 |
| 5,101,402 A | 3/1992 | Chui et al. | 370/17 |
| 5,247,517 A | 9/1993 | Ross et al. | 370/85.5 |
| 5,247,693 A | 9/1993 | Bristol | 709/203 |
| 5,315,580 A | 5/1994 | Phaal | 370/13 |
| 5,339,268 A | 8/1994 | Machida | 365/49 |
| 5,351,243 A | 9/1994 | Kalkunte et al. | 370/92 |
| 5,365,514 A | 11/1994 | Hershey et al. | 370/17 |
| 5,375,070 A | 12/1994 | Hershey et al. | 364/550 |
| 5,394,394 A | 2/1995 | Crowther et al. | 370/60 |
| 5,414,650 A | 5/1995 | Hekhuis | 364/715.02 |
| 5,414,704 A | 5/1995 | Spinney | 370/60 |

(List continued on next page.)

OTHER PUBLICATIONS

"Technical Note: the Narus System," Downloaded Apr. 29, 1999 from www.narus.com, Narus Corporation, Redwood City California.

*Primary Examiner*—Hosain T. Alam
*Assistant Examiner*—Khanh Quang Dinh
(74) *Attorney, Agent, or Firm*—Dov Rosenfeld; Inventek

(57) **ABSTRACT**

A method of performing protocol specific operations on a packet passing through a connection point on a computer network. The packet contents conform to protocols of a layered model wherein the protocol at a at a particular layer level may include one or a set of child protocols defined for that level. The method includes receiving the packet and receiving a set of protocol descriptions for protocols may be used in the packet. A protocol description for a particular protocol at a particular layer level includes any child protocols of the particular protocol, and for any child protocol, where in the packet information related to the particular child protocol may be found. A protocol description also includes any protocol specific operations to be performed on the packet for the particular protocol at the particular layer level. The method includes performing the protocol specific operations on the packet specified by the set of protocol descriptions based on the base protocol of the packet and the children of the protocols used in the packet. A particular embodiment includes providing the protocol descriptions in a high-level protocol description language, and compiling to the descriptions into a data structure. The compiling may further include compressing the data structure into a compressed data structure. The protocol specific operations may include parsing and extraction operations to extract identifying information. The protocol specific operations may also include state processing operations defined for a particular state of a conversational flow of the packet.

**17 Claims, 20 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,430,709 A | | 7/1995 | Galloway | 370/13 |
| 5,432,776 A | | 7/1995 | Harper | 370/17 |
| 5,493,689 A | | 2/1996 | Waclawsky et al. | 709/206 |
| 5,500,855 A | | 3/1996 | Hershey et al. | 370/17 |
| 5,511,215 A | | 4/1996 | Terasaka et al. | 709/246 |
| 5,568,471 A | | 10/1996 | Hershey et al. | 370/17 |
| 5,574,875 A | | 11/1996 | Stansfield et al. | 395/403 |
| 5,586,266 A | | 12/1996 | Hershey et al. | 709/216 |
| 5,606,668 A | | 2/1997 | Shwed | 709/216 |
| 5,608,662 A | | 3/1997 | Large et al. | 364/724.01 |
| 5,634,009 A | | 5/1997 | Iddon et al. | 709/206 |
| 5,651,002 A | | 7/1997 | Van Seters et al. | 370/392 |
| 5,680,585 A | * | 10/1997 | Bruell | 703/26 |
| 5,684,954 A | | 11/1997 | Kaiserswerth et al. | 709/203 |
| 5,703,877 A | | 12/1997 | Nuber et al. | 370/395 |
| 5,721,827 A | * | 2/1998 | Logan et al. | 709/217 |
| 5,732,213 A | | 3/1998 | Gessel et al. | 709/216 |
| 5,740,355 A | | 4/1998 | Watanabe et al. | 395/183.21 |
| 5,761,424 A | | 6/1998 | Adams et al. | 709/232 |
| 5,764,638 A | | 6/1998 | Ketchum | 370/401 |
| 5,781,735 A | | 7/1998 | Southard | 709/238 |
| 5,784,298 A | | 7/1998 | Hershey et al. | 364/557 |
| 5,787,253 A | | 7/1998 | McCreery et al. | 709/227 |
| 5,805,808 A | | 9/1998 | Hansani et al. | 709/203 |
| 5,812,529 A | | 9/1998 | Czarnik et al. | 370/245 |
| 5,819,028 A | | 10/1998 | Manghirmalani et al. | 709/203 |
| 5,825,774 A | | 10/1998 | Ready et al. | 370/401 |
| 5,826,017 A | | 10/1998 | Holzmann | 709/206 |
| 5,835,726 A | | 11/1998 | Shwed et al. | 709/228 |
| 5,838,919 A | | 11/1998 | Schwaller et al. | 709/208 |
| 5,841,895 A | | 11/1998 | Huffman | 382/155 |
| 5,850,386 A | | 12/1998 | Anderson et al. | 370/241 |
| 5,850,388 A | | 12/1998 | Anderson et al. | 370/252 |
| 5,862,335 A | | 1/1999 | Welch, Jr. et al. | 709/232 |
| 5,878,420 A | | 3/1999 | de la Salle | 707/10 |
| 5,893,155 A | | 4/1999 | Cheriton | 711/144 |
| 5,903,754 A | | 5/1999 | Pearson | 709/238 |
| 5,917,821 A | | 6/1999 | Gobuyan et al. | 370/392 |
| 6,014,380 A | | 1/2000 | Hendel et al. | 370/392 |
| 6,272,151 B1 | * | 8/2001 | Gupta et al. | 370/489 |
| 6,430,409 B1 | * | 8/2002 | Rossmann | 455/422.1 |
| 6,516,337 B1 | * | 2/2003 | Tripp et al. | 709/202 |
| 6,519,568 B1 | * | 2/2003 | Harvey et al. | 705/1 |

* cited by examiner


100
CLIENT 4
107
ANALYZER
108
116
SERVER 2
110
121
CLIENT 3
106
DATA COMMUNICATIONS NETWORK
102
125
SERVER 2
112
CLIENT 2
105
123
118
CLIENT 1
104

FIG. 1


APPLICATION SERVER 2
S2
204
CLIENT 3
C3
202 (106)
KEY-1
KEY-2
210
212
datum request
datum reply
S1
C1
p1
p2
i1
s1a
s1b
QA
QP
a1
a2
stD
st1
1
2
n1
n2
206
207
208
209
214
215
216
217
218
219
220
221
222
223
224
225
226
227
228
229
230
231
232
233
240
241
242
243
244
245
250
251
252
253
254
255
260
261
262
263
264
265
270
271
272
273
274
275

FIG. 2


300
PARSER 301
ANALYZER 303
302
PACKET
304
ANALYZE AND RECOGNIZE PATTERN INFORMATION (PAR)
306
EXTRACT IDENTIFYING INFORMATION (EII)
308
PATTERN, PARSE AND EXTRACTION DATABASE
312
BUILD UNIQUE CONVERSATION "FLOW" KEY
314
LOOKUP FROM KNOWN RECORDS (DB 324 VIA CACHE)
316
NEW "FLOW" RECORD?
YES
NO
318
PROTOCOL & STATE IDENTIFICATION
320
MORE CLASSIFICATION?
YES
NO
322
UPDATE "FLOW" KNOWN RECORD
324
DATABASE OF FLOWS
326
STATE PROCESSOR INSTRUCTION DATABASE
328
STATE PROCESSNG OPERATIONS
330
MORE OPERATIONS?
YES
NO
332
MORE STATES?
YES
NO
334
CLASSIFICATN FINALIZATION
310
COMPILER AND OPTIMIZER
336
PROTOCOL DESCIPTION LANGUAGE
338
DATAGRAM LAYER SELECTIONS

FIG. 3


401
HIGH LEVEL PACKET DECODING DESCRIPTIONS
402
404
GENERATE PACKET PARSE AND EXTRACT OPERATIONS
COMPILE DESCRIPTIONS
403
405
GENERATE PACKET STATE INSTRUCTIONS AND OPERATIONS
406
PATTERN, PARSE AND EXTRACTION DATABASE
407
STATE PROCESSOR INSTRUCTION DATABASE
408
LOAD PARSING SUBSYSTEM MEMORY
409
LOAD STATE INSTRUCTION DATABASE MEMORY
400
410

FIG. 4


501
INPUT PACKET
502
503
LOAD PACKET COMPONENT
512
BUILD PACKET KEY
504
MORE IN PACKET?
NO
YES
FETCH NODE AND PROCESS FROM PATTERNS
505
F 6
513
MORE PATTERN NODES?
NO
NEXT PACKET COMPONENT
506
511
YES
APPLY NODE AND PROCESS TO COMPONENT
507
500
510
NEXT PATTERN NODE
NO
PATTERN MATCH?
508
YES
EXTRACT ELEMENTS
509

FIG. 5


601
PACKET COMPONENT AND PATTERN NODE
602
603
LOAD PACKET COMPONENT
610
604
MORE PACKET COMPONENTS?
NO
LOAD KEY BUFFER
YES
FETCH EXTRACTION AND PROCESS FROM PATTERNS
605
F 7
611
NO
606
MORE EXTRACTION ELEMENTS?
NO
NEXT PACKET COMPONENT
609
YES
607
APPLY EXTRACTION PROCESS TO COMPONENT
600
MORE TO EXTRACT?
608
YES

FIG. 6


701
KEY BUFFER AND PATTERN NODES
702
LOAD PATTERN NODE ELEMENT
703
708
MORE PATTERN NODES?
704
NO
OUTPUT TO ANALYZER
YES
F 8
HASH KEY BUFFER ELEMENT FROM PATTERN NODE
705
709
PACK KEY & HASH
706
700
NEXT PACKET COMPONENT
707

FIG. 7


801
UFKB ENTRY FOR PACKET
802
800
COMPUTE CONVERSATION RECORD BIN FROM HASH
803
REQUEST RECORD BIN/ BUCKET FROM CACHE
804
806
805
MORE BUCKETS IN THE BIN?
NO
SET UFKB FOR PACKET AS 'NEW'
YES
COMPARE CURRENT BIN AND BUCKET RECORD KEY TO PACKET
807
NEXT BUCKET
NO
KEY MATCH?
808
YES
809
MARK RECORD BIN AND BUCKET 'IN PROCESS' IN CACHE AND TIMESTAMP
810
811
SET UFKB FOR PACKET AS 'FOUND'
812
UPDATE STATISTICS FOR RECORD IN CACHE
813

FIG. 8


901
RPC REPLY PORTMAPPER
902
RPC ANNOUNCMENT PORTMAPPER
910
RPC BIND LOOKUP REQUEST
909
903
EXTRACT PROGRAM
GET 'PROGRAM', 'VERSION', 'PORT' AND 'PROTOCOL (TCP OR UDP)
EXTRACT PORT
GET 'PROGRAM', 'VERSION' AND 'PROTOCOL (TCP OR UDP)'
908
SAVE REQUEST
SAVE 'PROGRAM', 'VERSION' AND 'PROTOCOL (TCP OR UDP)' WITH DESTINATION NETWORK ADDRESS. BOTH MAKE A KEY.
904
CREATE SERVER STATE
SAVE 'PROGRAM', 'VERSION', 'PORT' AND 'PROTOCOL (TCP OR UDP)' WITH NETWORK ADDRESS IN SERVER STATE DATABASE. KEY ON SERVER ADDRESS AND TCP OR UDP PORT.
907
RPC BIND LOOKUP REPLY
905
906
LOOKUP REQUEST
FIND 'PROGRAM' AND 'VERSION' WITH LOOKUP OF SOURCE NETWORK ADDRESS.
EXTRACT PROGRAM
GET 'PORT' AND 'PROTOCOL (TCP OR UDP)'.
900

FIG. 9


1000
PATTERN RECOGNITION DATABASE MEMORY
1001
1002
EXTRACTION OPERATIONS DATABASE MEMORY
1003
1005
1004
1031
HOST INTERFACE MULTIPLEXR & CONTROL REGISTERS
INFO OUT
CONTRL IN
1031
1006
PATTERN RECOGNITN ENGINE (PRE)
EXTRACTION ENGINE (SLICER)
1007
1008
1013
PACKET INPUT
PARSER INPUT BUFFER MEMORY
PARSER OUTPUT BUFFER MEMORY
PACKET KEY AND PAYLOAD
1012
1010
1021
1025
PACKET START
INPUT BUFFER INTERFACE CONTROL
1011
ANALYZER INTERFACE CONTROL
DATA READY
NEXT PACKET
ANALYZER READY
1022
1023
1027

FIG. 10


1100
1101
1103
1107
1115
1118
1122
LOOKUP/ UPDATE ENGINE (LUE)
ANALYZER HOST INTERFACE AND CONTROL (ACIC)
HOST BUS INTER-FACE (HIB)
STATE PROCESSR INSTRUCN DATABASE (SPID)
1109
1108
UNIFIED FLOW KEY BUFFER (UFKB)
PARSER INTER-FACE
CACHE
STATE PROCESSR (SP)
1119
1123
UNIFIED MEMORY CONTROL (UMC)
MEMORY INTER-FACE
FLOW INSERTION/ DELETION ENGINE (FIDE)
1110

FIG. 11


1201
UFKB ENTRY FOR PACKET WITH STATUS 'NEW'
1202
1200
ACCESS CONVERSATION RECORD BIN
1203
REQUEST RECORD BIN/ BUCKET FROM CACHE
1204
REQUEST NEXT BUCKET FROM CACHE
1206
NO
BIN/BUCKET EMPTY?
1205
YES
INSERT KEY AND HASH IN BUCKET, MARK 'USED' WITH TIMESTAMP
1207
1208
BUCKET VALID?
NO
YES
COMPARE CURRENT BIN AND BUCKET RECORD KEY TO PACKET
1209
1210
SET UFKB FOR PACKET AS 'DROP'
MARK RECORD BIN AND BUCKET 'IN PROCESS' AND 'NEW' IN CACHE
1211
1212
SET INITIAL STATISTICS FOR RECORD IN CACHE
1213

FIG. 12


1301
1300
UFKB ENTRY FOR PACKET WITH STATUS 'NEW' OR 'FOUND'
1302
SET STATE PROCESSOR INSTRUCTION POINTER TO VALUE FOUND IN UFKB ENTRY
1303
FETCH INSTRUCTION FROM STATE PROCESSOR INSTRUCTION MEMORY
1304
PERFORM OPERATION BASED ON THE STATE INSTRUCTION
1305
SET STATE PROCESSOR INSTRUCTION POINTER TO VALUE FOUND IN CURRENT STATE
NO
DONE PROCESSING STATES FOR THIS PACKET?
1307
1308
YES
1310
SAVE STATE PROCESSOR INSTRUCTION POINTER IN CURRENT FLOW RECORD
NO
DONE PROCESSING STATES FOR THIS FLOW?
1309
YES
SET AND SAVE FLOW REMOVAL STATE PROCESSOR INSTRUCTION IN CURRENT FLOW RECORD
1311
1313

FIG. 13


PACKET
1402
ANALYZE AND RECOGNIZE PATTERN INFORMATION
1404
EXTRACT IDENTIFYING INFO & PROCL /STATE
1406
PATTERN STRUCTURES AND EXTRACTION OPERATIONS
1408
BUILD "FLOW" KEY
1412
LOOKUP KNOWN RECORDS (DB 1424)
1414
NEW "FLOW" RECORD?
1416
YES
NO
DATABASE OF FLOWS
1424
MORE CLASSIFICATION?
1420
YES
NO
UPDATE "FLOW" KNOWN RECORD
1422
STATE MACHINE SELECTOR
1426
STATE ANALYSIS OPERATIONS
1428
MORE STATES?
1432
YES
NO
CLASSIFICATN FINALIZATION
1434
PARSER SUBSYSEM
ANALYZER SUBSYSTEM
1400

FIG. 14


HOST MEMORY
1506
1508
DISK & DB
1504
HOST PROCESSOR
324
DATABASE OF FLOWS (MEMORY)
NETWORK INTERFACE CARD
1510
ANALYZER 303
PARSER 301
MONITOR 300
1502
PACKET ACQUISITION DEVICE
102
PACKETS
121

FIG. 15


1602
0 - 3 Bytes
1600
Dst MAC
offset 0 - 11
Dst MAC
Src MAC
1604
Src MAC
1606
1608
Dst MAC (6)
Dst Hash (2)
1610
1612
Src MAC (6)
Src Hash (2)
1614
L2 Offset = 12

FIG. 16




FIG. 17A




FIG. 17B




FIG. 18A




FIG. 18B


1901
COMMON.PDL
1903
FLOWS.PDL
1905
VIRTUAL.PDL
1907
1911
ETHERNET.PDL
ETHERTYPE
1913
IP.PDL
1915
TCP.PDL
1917
RPC.PDL
1919
1921
NFS.PDL
1923

FIG. 19


2001
READ IN PDL SOURCE MODULES
2003
PARSE MODULES FOR SYNTAX
2005
FIRST PASS, CREATE ALL PARSE ELEMENTS
2007
2009
2ND PASS, BUILD FLOW SIGNATURE ELEMENTS
THIRD PASS, CREATE PAYLOAD ELEMENTS
2011
FORTH PASS, BUILD STATES FOR EACH LINK
2013
READ IN LAYERING SOURCE MODULES
2015
WALK LAYERING LINKS FOR EACH PDL
2017
2019
OUTPUT CPL INTERMEDIATE FILE
2021

FIG. 20

# PROCESSING PROTOCOL SPECIFIC INFORMATION IN PACKETS SPECIFIED BY A PROTOCOL DESCRIPTION LANGUAGE

## CROSS-REFERENCE TO RELATED APPLICATION

This application claims the benefit of U.S. Provisional Patent Application Serial No.: 60/141,903 for METHOD AND APPARATUS FOR MONITORING TRAFFIC IN A NETWORK to inventors Dietz, et al., filed Jun. 30, 1999, the contents of which are incorporated herein by reference.

This application is related to the following U.S. patent applications, each filed concurrently with the present application, and each assigned to Apptitude, Inc., the assignee of the present invention:

U.S. patent application Ser. No. 09/608,237 for METHOD AND APPARATUS FOR MONITORING TRAFFIC IN A NETWORK, to inventors Dietz, et al., filed Jun. 30, 2000, and incorporated herein by reference.

U.S. patent application Ser. No. 09/608,126 for RE-USING INFORMATION FROM DATA TRANSACTIONS FOR MAINTAINING STATISTICS IN NETWORK MONITORING, to inventors Dietz, et al., filed Jun. 30, 2000, and incorporated herein by reference.

U.S. patent application Ser. No. 09/608,266 for ASSOCIATIVE CACHE STRUCTURE FOR LOOKUPS AND UPDATES OF FLOW RECORDS IN A NETWORK MONITOR, to inventors Sarkissian, et al., filed Jun. 30, 2000, and incorporated herein by reference.

U.S. patent application Ser. No. 09/608,267 for STATE PROCESSOR FOR PATTERN MATCHING IN A NETWORK MONITOR DEVICE, to inventors Sarkissian, et al., filed Jun. 30, 2000, and incorporated herein by reference.

## FIELD OF INVENTION

The present invention relates to computer networks, specifically to the real-time elucidation of packets communicated within a data network, including classification according to protocol and application program.

## COPYRIGHT NOTICE

A portion of the disclosure of this patent document contains material that is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the patent document or the patent disclosure, as it appears in the Patent and Trademark Office patent file or records, but otherwise reserves all copyright rights whatsoever.

## BACKGROUND

There has long been a need for network activity monitors. This need has become especially acute, however, given the recent popularity of the Internet and other interconnected networks. In particular, there is a need for a real-time network monitor that can provide details as to the application programs being used. Such a monitor should enable non-intrusive, remote detection, characterization, analysis, and capture of all information passing through any point on the network (i.e., of all packets and packet streams passing through any location in the network). Not only should all the packets be detected and analyzed, but for each of these packets the network monitor should determine the protocol (e.g., http, ftp, H.323, VPN, etc.), the application/use within the protocol (e.g., voice, video, data, real-time data, etc.), and an end user's pattern of use within each application or the application context (e.g., options selected, service delivered, duration, time of day, data requested, etc.). Also, the network monitor should not be reliant upon server resident information such as log files. Rather, it should allow a user such as a network administrator or an Internet service provider (ISP) the means to measure and analyze network activity objectively; to customize the type of data that is collected and analyzed; to undertake real time analysis; and to receive timely notification of network problems.

The recognizing and classifying in such a network monitor should be at all protocol layer levels in conversational flows that pass in either direction at a point in a network. Furthermore, the monitor should provide for properly analyzing each of the packets exchanged between a client and a server, maintaining information relevant to the current state of each of these conversational flows.

Related and incorporated by reference U.S. patent application Ser. No. 09/608,237 for METHOD AND APPARATUS FOR MONITORING TRAFFIC IN A NETWORK, to inventors Dietz, et al, describes a network monitor that includes carrying out protocol specific operations on individual packets including extracting information from header fields in the packet to use for building a signature for identifying the conversational flow of the packet and for recognizing future packets as belonging to a previously encountered flow. A parser subsystem includes a parser for recognizing different patterns in the packet that identify the protocols used. For each protocol recognized, a slicer extracts important packet elements from the packet. These form a signature (i.e., key) for the packet. The slicer also preferably generates a hash for rapidly identifying a flow that may have this signature from a database of known flows.

The flow signature of the packet, the hash and at least some of the payload are passed to an analyzer subsystem. In a hardware embodiment, the analyzer subsystem includes a unified flow key buffer (UFKB) for receiving parts of packets from the parser subsystem and for storing signatures in process, a lookup/update engine (LUE) to lookup a database of flow records for previously encountered conversational flows to determine whether a signature is from an existing flow, a state processor (SP) for performing state processing, a flow insertion and deletion engine (FIDE) for inserting new flows into the database of flows, a memory for storing the database of flows, and a cache for speeding up access to the memory containing the flow database. The LUE, SP, and FIDE are all coupled to the UFKB, and to the cache.

Each flow-entry includes one or more statistical measures, e.g., the packet count related to the flow, the time of arrival of a packet, the time differential.

In the preferred hardware embodiment, each of the LUE, state processor, and FIDE operate independently from the other two engines. The state processor performs one or more operations specific to the state of the flow.

A network analyzer should be able to analyze many different protocols. At a base level, there are a number of standards used in digital telecommunications, including Ethernet, HDLC, ISDN, Lap B, ATM, X.25, Frame Relay, Digital Data Service, FDDI (Fiber Distributed Data Interface), T1, and others. Many of these standards employ different packet and/or frame formats. For example, data is

transmitted in ATM and frame-relay systems in the form of fixed length packets (called "cells") that are 53 octets (i.e., bytes) long. Several such cells may be needed to make up the information that might be included in the packet employed by some other protocol for the same payload information—for example in a conversational flow that uses the frame-relay standard or the Ethernet protocol.

In order for a network monitor to be able to analyze different packet or frame formats, the monitor needs to be able to perform protocol specific operations on each packet with each packet carrying information conforming to different protocols and related to different applications. For example, the monitor needs to be able to parse packets of different formats into fields to understand the data encapsulated in the different fields. As the number of possible packet formats or types increases, the amount of logic required to parse these different packet formats also increases.

Prior art network monitors exist that parse individual packets and look for information at different fields to use for building a signature for identifying packets. Chiu, et al., describe a method for collecting information at the session level in a computer network in U.S. Pat. No. 5,101,402, titled "APPARATUS AND METHOD FOR REAL-TIME MONITORING OF NETWORK SESSIONS AND A LOCAL AREA NETWORK." In this patent, there are fixed locations specified for particular types of packets. For example, if a DECnet packet appears, the Chiu system looks at six specific fields (at 6 locations) in the packet in order to identify the session of the packet. If, on the other hand, an IP packet appears, a different set of six locations are examined. The system looks only at the lowest levels up to the protocol layer. There are fixed locations for each of the fields that specified the next level. With the proliferation of protocols, clearly the specifying of all the possible places to look to determine the session becomes more and more difficult. Likewise, adding a new protocol or application is difficult.

It is desirable to be able to adaptively determine the locations and the information extracted from any packet for the particular type of packet. In this way, an optimal signature may be defined using a protocol-dependent and packet-content-dependent definition of what to look for and where to look for it in order to form a signature.

There thus is also a need for a network monitor that can be tailored or adapted for different protocols and for different application programs. There thus is also a need for a network monitor that can accommodate new protocols and for new application programs. There also is a need for means for specifying new protocols and new levels, including new applications. There also is a need for a mechanism to describe protocol specific operations, including, for example, what information is relevant to packets and packets that need to be decoded, and to include specifying parsing operations and extraction operations. There also is a need for a mechanism to describe state operations to perform on packets that are at a particular state of recognition of a flow in order to further recognize the flow.

## SUMMARY

One embodiment of the invention is a method of performing protocol specific operations on a packet passing through a connection point on a computer network. The packet contents conform to protocols of a layered model wherein the protocol at a particular layer level may include one or a set of child protocols defined for that level. The method includes receiving the packet and receiving a set of



protocol descriptions for protocols may be used in the packet. A protocol description for a particular protocol at a particular layer level includes any child protocols of the particular protocol, and for any child protocol, where in the packet information related to the particular child protocol may be found. A protocol description also includes any protocol specific operations to be performed on the packet for the particular protocol at the particular layer level. The method includes performing the protocol specific operations on the packet specified by the set of protocol descriptions based on the base protocol of the packet and the children of the protocols used in the packet. A particular embodiment includes providing the protocol descriptions in a high-level protocol description language, and compiling to the descriptions into a data structure. The compiling may further include compressing the data structure into a compressed data structure. The protocol specific operations may include parsing and extraction operations to extract identifying information. The protocol specific operations may also include state processing operations defined for a particular state of a conversational flow of the packet.

## BRIEF DESCRIPTION OF THE DRAWINGS

Although the present invention is better understood by referring to the detailed preferred embodiments, these should not be taken to limit the present invention to any specific embodiment because such embodiments are provided only for the purposes of explanation. The embodiments, in turn, are explained with the aid of the following figures.

FIG. **1** is a functional block diagram of a network embodiment of the present invention in which a monitor is connected to analyze packets passing at a connection point.

FIG. **2** is a diagram representing an example of some of the packets and their formats that might be exchanged in starting, as an illustrative example, a conversational flow between a client and server on a network being monitored and analyzed. A pair of flow signatures particular to this example and to embodiments of the present invention is also illustrated. This represents some of the possible flow signatures that can be generated and used in the process of analyzing packets and of recognizing the particular server applications that produce the discrete application packet exchanges.

FIG. **3** is a functional block diagram of a process embodiment of the present invention that can operate as the packet monitor shown in FIG. **1**. This process may be implemented in software or hardware.

FIG. **4** is a flowchart of a high-level protocol language compiling and optimization process, which in one embodiment may be used to generate data for monitoring packets according to versions of the present invention.

FIG. **5** is a flowchart of a packet parsing process used as part of the parser in an embodiment of the inventive packet monitor.

FIG. **6** is a flowchart of a packet element extraction process that is used as part of the parser in an embodiment of the inventive packet monitor.

FIG. **7** is a flowchart of a flow-signature building process that is used as part of the parser in the inventive packet monitor.

FIG. **8** is a flowchart of a monitor lookup and update process that is used as part of the analyzer in an embodiment of the inventive packet monitor.

FIG. **9** is a flowchart of an exemplary Sun Microsystems Remote Procedure Call application than may be recognized by the inventive packet monitor.

FIG. **10** is a functional block diagram of a hardware parser subsystem including the pattern recognizer and extractor that can form part of the parser module in an embodiment of the inventive packet monitor.

FIG. **11** is a functional block diagram of a hardware analyzer including a state processor that can form part of an embodiment of the inventive packet monitor.

FIG. **12** is a functional block diagram of a flow insertion and deletion engine process that can form part of the analyzer in an embodiment of the inventive packet monitor.

FIG. **13** is a flowchart of a state processing process that can form part of the analyzer in an embodiment of the inventive packet monitor.

FIG. **14** is a simple functional block diagram of a process embodiment of the present invention that can operate as the packet monitor shown in FIG. **1**. This process may be implemented in software.

FIG. **15** is a functional block diagram of how the packet monitor of FIG. **3** (and FIGS. **10** and **11**) may operate on a network with a processor such as a microprocessor.

FIG. **16** is an example of the top (MAC) layer of an Ethernet packet and some of the elements that may be extracted to form a signature according to one aspect of the invention.

FIG. **17**A is an example of the header of an Ethertype type of Ethernet packet of FIG. **16** and some of the elements that may be extracted to form a signature according to one aspect of the invention.

FIG. **17**B is an example of an IP packet, for example, of the Ethertype packet shown in FIGS. **16** and **17**A, and some of the elements that may be extracted to form a signature according to one aspect of the invention.

FIG. **18**A is a three dimensional structure that can be used to store elements of the pattern, parse and extraction database used by the parser subsystem in accordance to one embodiment of the invention.

FIG. **18**B is an alternate form of storing elements of the pattern, parse and extraction database used by the parser subsystem in accordance to another embodiment of the invention.

FIG. **19** shows various PDL file modules to be compiled together by the compiling process illustrated in FIG. **20** as an example, in accordance with a compiling aspect of the invention.

FIG. **20** is a flowchart of the process of compiling high-level language files according to an aspect of the invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Note that this document includes hardware diagrams and descriptions that may include signal names. In most cases, the names are sufficiently descriptive, in other cases however the signal names are not needed to understand the operation and practice of the invention.

### Operation in a Network

FIG. **1** represents a system embodiment of the present invention that is referred to herein by the general reference numeral **100**. The system **100** has a computer network **102** that communicates packets (e.g., IP datagrams) between various computers, for example between the clients **104–107** and servers **110** and **112**. The network is shown schematically as a cloud with several network nodes and links shown in the interior of the cloud. A monitor **108** examines the packets passing in either direction past its connection point **121** and, according to one aspect of the invention, can elucidate what application programs are associated with each packet. The monitor **108** is shown examining packets (i.e., datagrams) between the network interface **116** of the server **110** and the network. The monitor can also be placed at other points in the network, such as connection point **123** between the network **102** and the interface **118** of the client **104**, or some other location, as indicated schematically by connection point **125** somewhere in network **102**. Not shown is a network packet acquisition device at the location **123** on the network for converting the physical information on the network into packets for input into monitor **108**. Such packet acquisition devices are common.

Various protocols may be employed by the network to establish and maintain the required communication, e.g., TCP/IP, etc. Any network activity—for example an application program run by the client **104** (CLIENT **1**) communicating with another running on the server **110** (SERVER **2**)—will produce an exchange of a sequence of packets over network **102** that is characteristic of the respective programs and of the network protocols. Such characteristics may not be completely revealing at the individual packet level. It may require the analyzing of many packets by the monitor **108** to have enough information needed to recognize particular application programs. The packets may need to be parsed then analyzed in the context of various protocols, for example, the transport through the application session layer protocols for packets of a type conforming to the ISO layered network model.

Communication protocols are layered, which is also referred to as a protocol stack. The ISO (International Standardization Organization) has defined a general model that provides a framework for design of communication protocol layers. This model, shown in table from below, serves as a basic reference for understanding the functionality of existing communication protocols.

ISO MODEL

| Layer | Functionality | Example |
|---|---|---|
| 7 | Application | Telnet, NFS, Novell NCP, HTTP, H.323 |
| 6 | Presentation | XDR |
| 5 | Session | RPC, NBTBIOS, SNMP, etc. |
| 4 | Transport | TCP, Novel SPX, UDP, etc. |
| 3 | Network | IP, Novell IPX, VIP, AppleTalk, etc. |
| 2 | Data Link | Network Interface Card (Hardware Interface). MAC layer |
| 1 | Physical | Ethernet, Token Ring, Frame Relay, ATM, T1 (Hardware Connection) |

Diferent communications protocols employ different levels of the ISO model or may use a layered model that is similar to but which does not exactly conform to the ISO model. A protocol in a certain layer may not be visible to protocols employed at other layers. For example, an application (Level **7**) may not be able to identify the source computer for a communication attempt (Levels **2–3**).

In some communication arts, the term "frame" generally refers to encapsulated data at OSI layer 2, including a destination address, control bits for flow control, the data or payload, and CRC (cyclic redundancy check) data for error checking. The term "packet" generally refers to encapsulated data at OSI layer 3. In the TCP/IP world, the term

"datagram" is also used. In this specification, the term "packet" is intended to encompass packets, datagrams, frames, and cells. In general, a packet format or frame format refers to how data is encapsulated with various fields and headers for transmission across a network. For example, a data packet typically includes an address destination field, a length field, an error correcting code (ECC) field, or cyclic redundancy check (CRC) field, as well as headers and footers to identify the beginning and end of the packet. The terms "packet format" and "frame format," also referred to as "cell format," are generally synonymous.

Monitor **108** looks at every packet passing the connection point **121** for analysis. However, not every packet carries the same information useful for recognizing all levels of the protocol. For example, in a conversational flow associated with a particular application, the application will cause the server to send a type-A packet, but so will another. If, though, the particular application program always follows a type-A packet with the sending of a type-B packet, and the other application program does not, then in order to recognize packets of that application's conversational flow, the monitor can be available to recognize packets that match the type-B packet to associate with the type-A packet. If such is recognized after a type-A packet, then the particular application program's conversational flow has started to reveal itself to the monitor **108**.

Further packets may need to be examined before the conversational flow can be identified as being associated with the application program. Typically, monitor **108** is simultaneously also in partial completion of identifying other packet exchanges that are parts of conversational flows associated with other applications. One aspect of monitor **108** is its ability to maintain the state of a flow. The state of a flow is an indication of all previous events in the flow that lead to recognition of the content of all the protocol levels, e.g., the ISO model protocol levels. Another aspect of the invention is forming a signature of extracted characteristic portions of the packet that can be used to rapidly identify packets belonging to the same flow.

In real-world uses of the monitor **108**, the number of packets on the network **102** passing by the monitor **108**'s connection point can exceed a million per second. Consequently, the monitor has very little time available to analyze and type each packet and identify and maintain the state of the flows passing through the connection point. The monitor **108** therefore masks out all the unimportant parts of each packet that will not contribute to its classification. However, the parts to mask-out will change with each packet depending on which flow it belongs to and depending on the state of the flow.

The recognition of the packet type, and ultimately of the associated application programs according to the packets that their executions produce, is a multi-step process within the monitor **108**. At a first level, for example, several application programs will all produce a first kind of packet. A first "signature" is produced from selected parts of a packet that will allow monitor **108** to identify efficiently any packets that belong to the same flow. In some cases, that packet type may be sufficiently unique to enable the monitor to identify the application that generated such a packet in the conversational flow. The signature can then be used to efficiently identify all future packets generated in traffic related to that application.

In other cases, that first packet only starts the process of analyzing the conversational flow, and more packets are necessary to identify the associated application program. In such a case, a subsequent packet of a second type—but that potentially belongs to the same conversational flow—is recognized by using the signature. At such a second level, then, only a few of those application programs will have conversational flows that can produce such a second packet type. At this level in the process of classification, all application programs that are not in the set of those that lead to such a sequence of packet types may be excluded in the process of classifying the conversational flow that includes these two packets. Based on the known patterns for the protocol and for the possible applications, a signature is produced that allows recognition of any future packets that may follow in the conversational flow.

It may be that the application is now recognized, or recognition may need to proceed to a third level of analysis using the second level signature. For each packet, therefore, the monitor parses the packet and generates a signature to determine if this signature identified a previously encountered flow, or shall be used to recognize future packets belonging to the same conversational flow. In real time, the packet is further analyzed in the context of the sequence of previously encountered packets (the state), and of the possible future sequences such a past sequence may generate in conversational flows associated with different applications. A new signature for recognizing future packets may also be generated. This process of analysis continues until the applications are identified. The last generated signature may then be used to efficiently recognize future packets associated with the same conversational flow. Such an arrangement makes it possible for the monitor **108** to cope with millions of packets per second that must be inspected.

Another aspect of the invention is adding Eavesdropping. In alternative embodiments of the present invention capable of eavesdropping, once the monitor **108** has recognized the executing application programs passing through some point in the network **102** (for example, because of execution of the applications by the client **105** or server **110**), the monitor sends a message to some general purpose processor on the network that can input the same packets from the same location on the network, and the processor then loads its own executable copy of the application program and uses it to read the content being exchanged over the network. In other words, once the monitor **108** has accomplished recognition of the application program, eavesdropping can commence.

## The Network Monitor

FIG. **3** shows a network packet monitor **300**, in an embodiment of the present invention that can be implemented with computer hardware and/or software. The system **300** is similar to monitor **108** in FIG. **1**. A packet **302** is examined, e.g., from a packet acquisition device at the location **121** in network **102** (FIG. **1**), and the packet evaluated, for example in an attempt to determine its characteristics, e.g., all the protocol information in a multilevel model, including what server application produced the packet.

The packet acquisition device is a common interface that converts the physical signals and then decodes them into bits, and into packets, in accordance with the particular network (Ethernet, frame relay, ATM, etc.). The acquisition device indicates to the monitor **108** the type of network of the acquired packet or packets.

Aspects shown here include: (1) the initialization of the monitor to generate what operations need to occur on packets of different types—accomplished by compiler and optimizer **310**, (2) the processing—parsing and extraction of

selected portions—of packets to generate an identifying signature—accomplished by parser subsystem **301**, and (3) the analysis of the packets—accomplished by analyzer **303**.

The purpose of compiler and optimizer **310** is to provide protocol specific information to parser subsystem **301** and to analyzer subsystem **303**. The initialization occurs prior to operation of the monitor, and only needs to re-occur when new protocols are to be added.

A flow is a stream of packets being exchanged between any two addresses in the network. For each protocol there are known to be several fields, such as the destination (recipient), the source (the sender), and so forth, and these and other fields are used in monitor **300** to identify the flow. There are other fields not important for identifying the flow, such as checksums, and those parts are not used for identification.

Parser subsystem **301** examines the packets using pattern recognition process **304** that parses the packet and determines the protocol types and associated headers for each protocol layer that exists in the packet **302**. An extraction process **306** in parser subsystem **301** extracts characteristic portions (signature information) from the packet **302**. Both the pattern information for parsing and the related extraction operations, e.g., extraction masks, are supplied from a parsing-pattern-structures and extraction-operations database (parsing/extractions database) **308** filled by the compiler and optimizer **310**.

The protocol description language (PDL) files **336** describes both patterns and states of all protocols that an occur at any layer, including how to interpret header information, how to determine from the packet header information the protocols at the next layer, and what information to extract for the purpose of identifying a flow, and ultimately, applications and services. The layer selections database **338** describes the particular layering handled by the monitor. That is, what protocols run on top of what protocols at any layer level. Thus **336** and **338** combined describe how one would decode, analyze, and understand the information in packets, and, furthermore, how the information is layered. This information is input into compiler and optimizer **310**.

When compiler and optimizer **310** executes, it generates two sets of internal data structures. The first is the set of parsing/extraction operations **308**. The pattern structures include parsing information and describe what will be recognized in the headers of packets; the extraction operations are what elements of a packet are to be extracted from the packets based on the patterns that get matched. Thus, database **308** of parsing/extraction operations includes information describing how to determine a set of one or more protocol dependent extraction operations from data in the packet that indicate a protocol used in the packet.

The other internal data structure that is built by compiler **310** is the set of state patterns and processes **326**. These are the different states and state transitions that occur in different conversational flows, and the state operations that need to be performed (e.g., patterns that need to be examined and new signatures that need to be built) during any state of a conversational flow to further the task of analyzing the conversational flow.

Thus, compiling the PDL files and layer selections provides monitor **300** with the information it needs to begin processing packets. In an alternate embodiment, the contents of one or more of databases **308** and **326** may be manually or otherwise generated. Note that in some embodiments the layering selections information is inherent rather than explicitly described. For example, since a PDL file for a protocol includes the child protocols, the parent protocols also may be determined.

In the preferred embodiment, the packet **302** from the acquisition device is input into a packet buffer. The pattern recognition process **304** is carried out by a pattern analysis and recognition (PAR) engine that analyzes and recognizes patterns in the packets. In particular, the PAR locates the next protocol field in the header and determines the length of the header, and may perform certain other tasks for certain types of protocol headers. An example of this is type and length comparison to distinguish an IEEE 802.3 (Ethernet) packet from the older type 2 (or Version 2) Ethernet packet, also called a DIGITAL-Intel-Xerox (DIX) packet. The PAR also uses the pattern structures and extraction operations database **308** to identify the next protocol and parameters associated with that protocol that enables analysis of the next protocol layer. Once a pattern or a set of patterns has been identified, it/they will be associated with a set of none or more extraction operations. These extraction operations (in the form of commands and associated parameters) are passed to the extraction process **306** implemented by an extracting and information identifying (EII) engine that extracts selected parts of the packet, including identifying information from the packet as required for recognizing this packet as part of a flow. The extracted information is put in sequence and then processed in block **312** to build a unique flow signature (also called a "key") for this flow. A flow signature depends on the protocols used in the packet. For some protocols, the extracted components may include source and destination addresses. For example, Ethernet frames have end-point addresses that are useful in building a better flow signature. Thus, the signature typically includes the client and server address pairs. The signature is used to recognize further packets that are or may be part of this flow.

In the preferred embodiment, the building of the flow key includes generating a hash of the signature using a hash function. The purpose if using such a hash is conventional—to spread flow-entries identified by the signature across a database for efficient searching. The hash generated is preferably based on a hashing algorithm and such hash generation is known to those in the art.

In one embodiment, the parser passes data from the packet—a parser record—that includes the signature (i.e., selected portions of the packet), the hash, and the packet itself to allow for any state processing that requires further data from the packet. An improved embodiment of the parser subsystem might generate a parser record that has some predefined structure and that includes the signature, the hash, some flags related to some of the fields in the parser record, and parts of the packet's payload that the parser subsystem has determined might be required for further processing, e.g., for state processing.

Note that alternate embodiments may use some function other than concatenation of the selected portions of the packet to make the identifying signature. For example, some "digest function" of the concatenated selected portions may be used.

The parser record is passed onto lookup process **314** which looks in an internal data store of records of known flows that the system has already encountered, and decides (in **316**) whether or not this particular packet belongs to a known flow as indicated by the presence of a flow-entry matching this flow in a database of known flows **324**. A record in database **324** is associated with each encountered flow.

The parser record enters a buffer called the unified flow key buffer (UFKB). The UFKB stores the data on flows in

a data structure that is similar to the parser record, but that includes a field that can be modified. In particular, one or the UFKB record fields stores the packet sequence number, and another is filled with state information in the form of a program counter for a state processor that implements state processing **328**.

The determination (**316**) of whether a record with the same signature already exists is carried out by a lookup engine (LUE) that obtains new UFKB records and uses the hash in the UFKB record to lookup if there is a matching known flow. In the particular embodiment, the database of known flows **324** is in an external memory. A cache is associated with the database **324**. A lookup by the LUE for a known record is carried out by accessing the cache using the hash, and if the entry is not already present in the cache, the entry is looked up (again using the hash) in the external memory.

The flow-entry database **324** stores flow-entries that include the unique flow-signature, state information, and extracted information from the packet for updating flows, and one or more statistical about the flow. Each entry completely describes a flow. Database **324** is organized into bins that contain a number, denoted N, of flow-entries (also called flow-entries, each a bucket), with N being 4 in the preferred embodiment. Buckets (i.e., flow-entries) are accessed via the hash of the packet from the parser subsystem **301** (i.e., the hash in the UFKB record). The hash spreads the flows across the database to allow for fast lookups of entries, allowing shallower buckets. The designer selects the bucket depth N based on the amount of memory attached to the monitor, and the number of bits of the hash data value used. For example, in one embodiment, each flow-entry is 128 bytes long, so for 128K flow-entries, 16 Mbytes are required. Using a 16-bit hash gives two flow-entries per bucket. Empirically, this has been shown to be more than adequate for the vast majority of cases. Note that another embodiment uses flow-entries that are 256 bytes long.

Herein, whenever an access to database **324** is described, it is to be understood that the access is via the cache, unless otherwise stated or clear from the context.

If there is no flow-entry found matching the signature, i.e., the signature is for a new flow, then a protocol and state identification process **318** further determines the state and protocol. That is, process **318** determines the protocols and where in the state sequence for a flow for this protocol's this packet belongs. Identification process **318** uses the extracted information and makes reference to the database **326** of state patterns and processes. Process **318** is then followed by any state operations that need to be executed on this packet by a state processor **328**.

If the packet is found to have a matching flow-entry in the database **324** (e.g., in the cache), then a process **320** determines, from the looked-up flow-entry, if more classification by state processing of the flow signature is necessary. If not, a process **322** updates the flow-entry in the flow-entry database **324** (e.g., via the cache). Updating includes updating one or more statistical measures stored in the flow-entry. In our embodiment, the statistical measures are stored in counters in the flow-entry.

If state processing is required, state process **328** is commenced. State processor **328** carries out any state operations specified for the state of the flow and updates the state to the next state according to a set of state instructions obtained form the state pattern and processes database **326**.

The state processor **328** analyzes both new and existing flows in order to analyze all levels of the protocol stack, ultimately classifying the flows by application (level **7** in the ISO model). It does this by proceeding from state-to-state based on predefined state transition rules and state operations as specified in state processor instruction database **326**. A state transition rule is a rule typically containing a test followed by the next-state to proceed to if the test result is true. An operation is an operation to be performed while the state processor is in a particular state—for example, in order to evaluate a quantity needed to apply the state transition rule. The state processor goes through each rule and each state process until the test is true, or there are no more tests to perform.

In general, the set of state operations may be none or more operations on a packet, and carrying out the operation or operations may leave one in a state that causes exiting the system prior to completing the identification, but possibly knowing more about what state and state processes are needed to execute next, i.e., when a next packet of this flow is encountered. As an example, a state process (set of state operations) at a particular state may build a new signature for future recognition packets of the next state.

By maintaining the state of the flows and knowing that new flows may be set up using the information from previously encountered flows, the network traffic monitor **300** provides for (a) single-packet protocol recognition of flows, and (b) multiple-packet protocol recognition of flows. Monitor **300** can even recognize the application program from one or more disjointed sub-flows that occur in server announcement type flows. What may seem to prior art monitors to be some unassociated flow, may be recognized by the inventive monitor using the flow signature to be a sub-flow associated with a previously encountered sub-flow.

Thus, state processor **328** applies the first state operation to the packet for this particular flow-entry. A process **330** decides if more operations need to be performed for this state. If so, the analyzer continues looping between block **330** and **328** applying additional state operations to this particular packet until all those operations are completed—that is, there are no more operations for this packet in this state. A process **332** decides if there are further states to be analyzed for this type of flow according to the state of the flow and the protocol, in order to fully characterize the flow. If not, the conversational flow has now been fully characterized and a process **334** finalizes the classification of the conversational flow for the flow.

In the particular embodiment, the state processor **328** starts the state processing by using the last protocol recognized by the parser as an offset into a jump table (jump vector). The jump table finds the state processor instructions to use for that protocol in the state patterns and processes database **326**. Most instructions test something in the unified flow key buffer, or the flow-entry in the database of known flows **324**, if the entry exists. The state processor may have to test bits, do comparisons, add, or subtract to perform the test. For example, a common operation carried out by the state processor is searching for one or more patterns in the payload part of the UFKB.

Thus, in **332** in the classification, the analyzer decides whether the flow is at an end state. If not at an end state, the flow-entry is updated (or created if a new flow) for this flow-entry in process **322**.

Furthermore, if the flow is known and if in **332** it is determined that there are further states to be processed using later packets, the flow-entry is updated in process **322**.

The flow-entry also is updated after classification finalization so that any further packets belonging to this flow will

be readily identified from their signature as belonging to this fully analyzed conversational flow.

After updating, database **324** therefore includes the set of all the conversational flows that have occurred.

Thus, the embodiment of present invention shown in FIG. **3** automatically maintains flow-entries, which in one aspect includes storing states. The monitor of FIG. **3** also generates characteristic parts of packets—the signatures—that can be used to recognize flows. The flow-entries may be identified and accessed by their signatures. Once a packet is identified to be from a known flow, the state of the flow is known and this knowledge enables state transition analysis to be performed in real time for each different protocol and application. In a complex analysis, state transitions are traversed as more and more packets are examined. Future packets that are part of the same conversational flow have their state analysis continued from a previously achieved state. When enough packets related to an application of interest have been processed, a final recognition state is ultimately reached, i.e., a set of states has been traversed by state analysis to completely characterize the conversational flow. The signature for that final state enables each new incoming packet of the same conversational flow to be individually recognized in real time.

In this manner, one of the great advantages of the present invention is realized. Once a particular set of state transitions has been traversed for the first time and ends in a final state, a short-cut recognition pattern—a signature—can be generated that will key on every new incoming packet that relates to the conversational flow. Checking a signature involves a simple operation, allowing high packet rates to be successfully monitored on the network.

In improved embodiments, several state analyzers are run in parallel so that a large number of protocols and applications may be checked for. Every known protocol and application will have at least one unique set of state transitions, and can therefore be uniquely identified by watching such transitions.

When each new conversational flow starts, signatures that recognize the flow are automatically generated on-the-fly, and as further packets in the conversational flow are encountered, signatures are updated and the states of the set of state transitions for any potential application are further traversed according to the state transition rules for the flow. The new states for the flow—those associated with a set of state transitions for one or more potential applications—are added to the records of previously encountered states for easy recognition and retrieval when a new packet in the flow is encountered.

## Detailed Operation

FIG. **4** diagrams an initialization system **400** that includes the compilation process. That is, part of the initialization generates the pattern structures and extraction operations database **308** and the state instruction database **328**. Such initialization can occur off-line or from a central location.

The different protocols that can exist in different layers may be thought of as nodes of one or more trees of linked nodes. The packet type is the root of a tree (called level **0**). Each protocol is either a parent node or a terminal node. A parent node links a protocol to other protocols (child protocols) that can be at higher layer levels. Thus a protocol may have zero or more children. Ethernet packets, for example, have several variants, each having a basic format that remains substantially the same. An Ethernet packet (the root or level **0** node) may be an Ethertype packet—also called an Ethernet Type/Version **2** and a DIX (DIGITAL-Intel-Xerox packet)—or an IEEE 803.2 packet. Continuing with the IEEE 802.3 packet, one of the children nodes may be the IP protocol, and one of the children of the IP protocol may be the TCP protocol.

FIG. **16** shows the header **1600** (base level **1**) of a complete Ethernet frame (i.e., packet) of information and includes information on the destination media access control address (Dst MAC **1602**) and the source media access control address (Src MAC **1604**). Also shown in FIG. **16** is some (but not all) of the information specified in the PDL files for extraction the signature.

FIG. **17**A now shows the header information for the next level (level-**2**) for an Ethertype packet **1700**. For an Ethertype packet **1700**, the relevant information from the packet that indicates the next layer level is a two-byte type field **1702** containing the child recognition pattern for the next level. The remaining information **1704** is shown hatched because it not relevant for this level. The list **1712** shows the possible children for an Ethertype packet as indicated by what child recognition pattern is found offset **12**. FIG. **17**B shows the structure of the header of one of the possible next levels, that of the IP protocol. The possible children of the IP protocol are shown in table **1752**.

The pattern, parse, and extraction database (pattern recognition database, or PRD) **308** generated by compilation process **310**, in one embodiment, is in the form of a three dimensional structure that provides for rapidly searching packet headers for the next protocol. FIG. **18**A shows such a 3-D representation **1800** (which may be considered as an indexed set of 2-D representations). A compressed form of the 3-D structure is preferred.

An alternate embodiment of the data structure used in database **308** is illustrated in FIG. **18**B. Thus, like the 3-D structure of FIG. **18**A, the data structure permits rapid searches to be performed by the pattern recognition process **304** by indexing locations in a memory rather than performing address link computations. In this alternate embodiment, the PRD **308** includes two parts, a single protocol table **1850** (PT) which has an entry for each protocol known for the monitor, and a series of Look Up Tables **1870** (LUT's) that are used to identify known protocols and their children. The protocol table includes the parameters needed by the pattern analysis and recognition process **304** (implemented by PRE **1006**) to evaluate the header information in the packet that is associated with that protocol, and parameters needed by extraction process **306** (implemented by slicer **1007**) to process the packet header. When there are children, the PT describes which bytes in the header to evaluate to determine the child protocol. In particular, each PT entry contains the header length, an offset to the child, a slicer command, and some flags.

The pattern matching is carried out by finding particular "child recognition codes" in the header fields, and using these codes to index one or more of the LUT's. Each LUT entry has a node code that can have one of four values, indicating the protocol that has been recognized, a code to indicate that the protocol has been partially recognized (more LUT lookups are needed), a code to indicate that this is a terminal node, and a null node to indicate a null entry. The next LUT to lookup is also returned from a LUT lookup.

Compilation process is described in FIG. **4**. The source-code information in the form of protocol description files is shown as **402**. In the particular embodiment, the high level decoding descriptions includes a set of protocol description files **336**, one for each protocol, and a set of packet layer

selections **338**, which describes the particular layering (sets of trees of protocols) that the monitor is to be able to handle.

A compiler **403** compiles the descriptions. The set of packet parse-and-extract operations **406** is generated (**404**), and a set of packet state instructions and operations **407** is generated (**405**) in the form of instructions for the state processor that implements state processing process **328**. Data files for each type of application and protocol to be recognized by the analyzer are downloaded from the pattern, parse, and extraction database **406** into the memory systems of the parser and extraction engines. (See the parsing process **500** description and FIG. **5**; the extraction process **600** description and FIG. **6**; and the parsing subsystem hardware description and FIG. **10**). Data files for each type of application and protocol to be recognized by the analyzer are also downloaded from the state-processor instruction database **407** into the state processor. (see the state processor **1108** description and FIG. **11**.).

Note that generating the packet parse and extraction operations builds and links the three dimensional structure (one embodiment) or the or all the lookup tables for the PRD.

Because of the large number of possible protocol trees and subtrees, the compiler process **400** includes optimization that compares the trees and subtrees to see which children share common parents. When implemented in the form of the LUT's, this process can generate a single LUT from a plurality of LUT's. The optimization process further includes a compaction process that reduces the space needed to store the data of the PRD.

As an example of compaction, consider the 3-D structure of FIG. **18**A that can be thought of as a set of 2-D structures each representing a protocol. To enable saving space by using only one array per protocol which may have several parents, in one embodiment, the pattern analysis subprocess keeps a "current header" pointer. Each location (offset) index for each protocol 2-D array in the 3-D structure is a relative location starting with the start of header for the particular protocol. Furthermore, each of the two-dimensional arrays is sparse. The next step of the optimization, is checking all the 2-D arrays against all the other 2-D arrays to find out which ones can share memory. Many of these 2-D arrays are often sparsely populated in that they each have only a small number of valid entries. So, a process of "folding" is next used to combine two or more 2-D arrays together into one physical 2-D array without losing the identity of any of the original 2-D arrays (i.e., all the 2-D arrays continue to exist logically). Folding can occur between any 2-D arrays irrespective of their location in the tree as long as certain conditions are met. Multiple arrays may be combined into a single array as long as the individual entries do not conflict with each other. A fold number is then used to associate each element with its original array. A similar folding process is used for the set of LUTs **1850** in the alternate embodiment of FIG. **18**B.

In **410**, the analyzer has been initialized and is ready to perform recognition.

FIG. **5** shows a flowchart of how actual parser subsystem **301** functions. Starting at **501**, the packet **302** is input to the packet buffer in step **502**. Step **503** loads the next (initially the first) packet component from the packet **302**. The packet components are extracted from each packet **302** one element at a time. A check is made (**504**) to determine if the load-packet-component operation **503** succeeded, indicating that there was more in the packet to process. If not, indicating all components have been loaded, the parser subsystem **301** builds the packet signature (**512**)—the next stage (FIG. **6**).

If a component is successfully loaded in **503**, the node and processes are fetched (**505**) from the pattern, parse and extraction database **308** to provide a set of patterns and processes for that node to apply to the loaded packet component. The parser subsystem **301** checks (**506**) to determine if the fetch pattern node operation **505** completed successfully, indicating there was a pattern node that loaded in **505**. If not, step **511** moves to the next packet component. If yes, then the node and pattern matching process are applied in **507** to the component extracted in **503**. A pattern match obtained in **507** (as indicated by test **508**) means the parser subsystem **301** has found a node in the parsing elements; the parser subsystem **301** proceeds to step **509** to extract the elements.

If applying the node process to the component does not produce a match (test **508**), the parser subsystem **301** moves (**510**) to the next pattern node from the pattern database **308** and to step **505** to fetch the next node and process. Thus, there is an "applying patterns" loop between **508** and **505**. Once the parser subsystem **301** completes all the patterns and has either matched or not, the parser subsystem **301** moves to the next packet component (**511**).

Once all the packet components have been the loaded and processed from the input packet **302**, then the load packet will fail (indicated by test **504**), and the parser subsystem **301** moves to build a packet signature which is described in FIG. **6** FIG. **6** is a flow chart for extracting the information from which to build the packet signature. The flow starts at **601**, which is the exit point **513** of FIG. **5**. At this point parser subsystem **301** has a completed packet component and a pattern node available in a buffer (**602**). Step **603** loads the packet component available from the pattern analysis process of FIG. **5**. If the load completed (test **604**), indicating that there was indeed another packet component, the parser subsystem **301** fetches in **605** the extraction and process elements received from the pattern node component in **602**. If the fetch was successful (test **606**), indicating that there are extraction elements to apply, the parser subsystem **301** in step **607** applies that extraction process to the packet component based on an extraction instruction received from that pattern node. This removes and saves an element from the packet component.

In step **608**, the parser subsystem **301** checks if there is more to extract from this component, and if not, the parser subsystem **301** moves back to **603** to load the next packet component at hand and repeats the process. If the answer is yes, then the parser subsystem **301** moves to the next packet component ratchet. That new packet component is then loaded in step **603**. As the parser subsystem **301** moved through the loop between **608** and **603**, extra extraction processes are applied either to the same packet component if there is more to extract, or to a different packet component if there is no more to extract.

The extraction process thus builds the signature, extracting more and more components according to the information in the patterns and extraction database **308** for the particular packet. Once loading the next packet component operation **603** fails (test **604**), all the components have been extracted. The built signature is loaded into the signature buffer (**610**) and the parser subsystem **301** proceeds to FIG. **7** to complete the signature generation process.

Referring now to FIG. **7**, the process continues at **701**. The signature buffer and the pattern node elements are available (**702**). The parser subsystem **301** loads the next pattern node element. If the load was successful (test **704**) indicating there are more nodes, the parser subsystem **301** in **705**

hashes the signature buffer element based on the hash elements that are found in the pattern node that is in the element database. In **706** the resulting signature and the hash are packed. In **707** the parser subsystem **301** moves on to the next packet component which is loaded in **703**.

The **703** to **707** loop continues until there are no more patterns of elements left (test **704**). Once all the patterns of elements have been hashed, processes **304**, **306** and **312** of parser subsystem **301** are complete. Parser subsystem **301** has generated the signature used by the analyzer subsystem **303**.

A parser record is loaded into the analyzer, in particular, into the UFKB in the form of a UFKB record which is similar to a parser record, but with one or more different fields.

FIG. **8** is a flow diagram describing the operation of the lookup/update engine (LUE) that implements lookup operation **314**. The process starts at **801** from FIG. **7** with the parser record that includes a signature, the hash and at least parts of the payload. In **802** those elements are shown in the form of a UFKB-entry in the buffer. The LUE, the lookup engine **314** computes a "record bin number" from the hash for a flow-entry. A bin herein may have one or more "buckets" each containing a flow-entry. The preferred embodiment has four buckets per bin.

Since preferred hardware embodiment includes the cache, all data accesses to records in the flowchart of FIG. **8** are stated as being to or from the cache.

Thus, in **804**, the system looks up the cache for a bucket from that bin using the hash. If the cache successfully returns with a bucket from the bin number, indicating there are more buckets in the bin, the lookup/update engine compares (**807**) the current signature (the UFKB-entry's signature) from that in the bucket (i.e., the flow-entry signature). If the signatures match (test **808**), that record (in the cache) is marked in step **810** as "in process" and a timestamp added. Step **811** indicates to the UFKB that the UFKB-entry in **802** has a status of "found." The "found" indication allows the state processing **328** to begin processing this UFKB element. The preferred hardware embodiment includes one or more state processors, and these can operate in parallel with the lookup/update engine.

In the preferred embodiment, a set of statistical operations is performed by a calculator for every packet analyzed. The statistical operations may include one or more of counting the packets associated with the flow; determining statistics related to the size of packets of the flow; compiling statistics on differences between packets in each direction, for example using timestamps; and determining statistical relationships of timestamps of packets in the same direction. The statistical measures are kept in the flow-entries. Other statistical measures also may be compiled. These statistics may be used singly or in combination by a statistical processor component to analyze many different aspects of the flow. This may include determining network usage metrics from the statistical measures, for example to ascertain the network's ability to transfer information for this application. Such analysis provides for measuring the quality of service of a conversation, measuring how well an application is performing in the network, measuring network resources consumed by an application, and so forth.

To provide for such analyses, the lookup/update engine updates one or more counters that are part of the flow-entry (in the cache) in step **812**. The process exits at **813**. In our embodiment, the counters include the total packets of the flow, the time, and a differential time from the last timestamp to the present timestamp.

It may be that the bucket of the bin did not lead to a signature match (test **808**). In such a case, the analyzer in **809** moves to the next bucket for this bin. Step **804** again looks up the cache for another bucket from that bin. The lookup/update engine thus continues lookup up buckets of the bin until there is either a match in **808** or operation **804** is not successful (test **805**), indicating that there are no more buckets in the bin and no match was found.

If no match was found, the packet belongs to a new (not previously encountered) flow. In **806** the system indicates that the record in the unified flow key buffer for this packet is new, and in **812**, any statistical updating operations are performed for this packet by updating the flow-entry in the cache. The update operation exits at **813**. A flow insertion/deletion engine (FIDE) creates a new record for this flow (again via the cache).

Thus, the updatelookup engine ends with a UFKB-entry for the packet with a "new" status or a "found" status.

Note that the above system uses a hash to which more than one flow-entry can match. A longer hash may be used that corresponds to a single flow-entry. In such an embodiment, the flow chart of FIG. **8** is simplified as would be clear to those in the art.

## The Hardware System

Each of the individual hardware elements through which the data flows in the system are now described with reference to FIGS. **10** and **11**. Note that while we are describing a particular hardware implementation of the invention embodiment of FIG. **3**, it would be clear to one skilled in the art that the flow of FIG. **3** may alternatively be implemented in software running on one or more general-purpose processors, or only partly implemented in hardware. An implementation of the invention that can operate in software is shown in FIG. **14**. The hardware embodiment (FIGS. **10** and **11**) can operate at over a million packets per second, while the software system of FIG. **14** may be suitable for slower networks. To one skilled in the art it would be clear that more and more of the system may be implemented in software as processors become faster.

FIG. **10** is a description of the parsing subsystem (**301**, shown here as subsystem **1000**) as implemented in hardware. Memory **1001** is the pattern recognition database memory, in which the patterns that are going to be analyzed are stored. Memory **1002** is the extraction-operation database memory, in which the extraction instructions are stored. Both **1001** and **1002** correspond to internal data structure **308** of FIG. **3**. Typically, the system is initialized from a microprocessor (not shown) at which time these memories are loaded through a host interface multiplexor and control register **1005** via the internal buses **1003** and **1004**. Note that the contents of **1001** and **1002** are preferably obtained by compiling process **310** of FIG. **3**.

A packet enters the parsing system via **1012** into a parser input buffer memory **1008** using control signals **1021** and **1023**, which control an input buffer interface controller **1022**. The buffer **1008** and interface control **1022** connect to a packet acquisition device (not shown). The buffer acquisition device generates a packet start signal **1021** and the interface control **1022** generates a next packet (i.e., ready to receive data) signal **1023** to control the data flow into parser input buffer memory **1008**. Once a packet starts loading into the buffer memory **1008**, pattern recognition engine (PRE) **1006** carries out the operations on the input buffer memory described in block **304** of FIG. **3**. That is, protocol types and associated headers for each protocol layer that exist in the packet are determined.

The PRE searches database **1001** and the packet in buffer **1008** in order to recognize the protocols the packet contains. In one implementation, the database **1001** includes a series of linked lookup tables. Each lookup table uses eight bits of addressing. The first lookup table is always at address zero. The Pattern Recognition Engine uses a base packet offset from a control register to start the comparison. It loads this value into a current offset pointer (COP). It then reads the byte at base packet offset from the parser input buffer and uses it as an address into the first lookup table.

Each lookup table returns a word that links to another lookup table or it returns a terminal flag. If the lookup produces a recognition event the database also returns a command for the slicer. Finally it returns the value to add to the COP.

The PRE **1006** includes of a comparison engine. The comparison engine has a first stage that checks the protocol type field to determine if it is an 802.3 packet and the field should be treated as a length. If it is not a length, the protocol is checked in a second stage. The first stage is the only protocol level that is not programmable. The second stage has two full sixteen bit content addressable memories (CAMs) defined for future protocol additions.

Thus, whenever the PRE recognizes a pattern, it also generates a command for the extraction engine (also called a "slicer") **1007**. The recognized patterns and the commands are sent to the extraction engine **1007** that extracts information from the packet to build the parser record. Thus, the operations of the extraction engine are those carried out in blocks **306** and **312** of FIG. **3**. The commands are sent from PRE **1006** to slicer **1007** in the form of extraction instruction pointers which tell the extraction engine **1007** where to a find the instructions in the extraction operations database memory (i.e., slicer instruction database) **1002**.

Thus, when the PRE **1006** recognizes a protocol it outputs both the protocol identifier and a process code to the extractor. The protocol identifier is added to the flow signature and the process code is used to fetch the first instruction from the instruction database **1002**. Instructions include an operation code and usually source and destination offsets as well as a length. The offsets and length are in bytes. A typical operation is the MOVE instruction. This instruction tells the slicer **1007** to copy n bytes of data unmodified from the input buffer **1008** to the output buffer **1010**. The extractor contains a byte-wise barrel shifter so that the bytes moved can be packed into the flow signature. The extractor contains another instruction called HASH. This instruction tells the extractor to copy from the input buffer **1008** to the HASH generator.

Thus these instructions are for extracting selected element (s) of the packet in the input buffer memory and transferring the data to a parser output buffer memory **1010**. Some instructions also generate a hash.

The extraction engine **1007** and the PRE operate as a pipeline. That is, extraction engine **1007** performs extraction operations on data in input buffer **1008** already processed by PRE **1006** while more (i.e., later arriving) packet information is being simultaneously parsed by PRE **1006**. This provides high processing speed sufficient to accommodate the high arrival rate speed of packets.

Once all the selected parts of the packet used to form the signature are extracted, the hash is loaded into parser output buffer memory **1010**. Any additional payload from the packet that is required for further analysis is also included. The parser output memory **1010** is interfaced with the analyzer subsystem by analyzer interface control **1011**. Once all the information of a packet is in the parser output buffer memory **1010**, a data ready signal **1025** is asserted by analyzer interface control. The data from the parser subsystem **1000** is moved to the analyzer subsystem via **1013** when an analyzer ready signal **1027** is asserted.

FIG. **11** shows the hardware components and dataflow for the analyzer subsystem that performs the functions of the analyzer subsystem **303** of FIG. **3**. The analyzer is initialized prior to operation, and initialization includes loading the state processing information generated by the compilation process **310** into a database memory for the state processing, called state processor instruction database (SPID) memory **1109**.

The analyzer subsystem **1100** includes a host bus interface **1122** using an analyzer host interface controller **1118**, which in turn has access to a cache system **1115**. The cache system has bi-directional access to and from the state processor of the system **1108**. State processor **1108** is responsible for initializing the state processor instruction database memory **1109** from information given over the host bus interface **1122**.

With the SPID **1109** loaded, the analyzer subsystem **1100** receives parser records comprising packet signatures and payloads that come from the parser into the unified flow key buffer (UFKB) **1103**. UFKB is comprised of memory set up to maintain UFKB records. A UFKB record is essentially a parser record; the UFKB holds records of packets that are to be processed or that are in process. Furthermore, the UFKB provides for one or more fields to act as modifiable status flags to allow different processes to run concurrently.

Three processing engines run concurrently and access records in the UFKB **1103**: the lookup/update engine (LUE) **1107**, the state processor (SP) **1108**, and the flow insertion and deletion engine (FIDE) **1110**. Each of these is implemented by one or more finite state machines (FSM's). There is bi-directional access between each of the finite state machines and the unified flow key buffer **1103**. The UFKB record includes a field that stores the packet sequence number, and another that is filled with state information in the form of a program counter for the state processor **1108** that implements state processing **328**. The status flags of the UFKB for any entry includes that the LUE is done and that the LUE is transferring processing of the entry to the state processor. The LUE done indicator is also used to indicate what the next entry is for the LUE. There also is provided a flag to indicate that the state processor is done with the current flow and to indicate what the next entry is for the state processor. There also is provided a flag to indicate the state processor is transferring processing of the UFKB-entry to the flow insertion and deletion engine.

A new UFKB record is first processed by the LUE **1107**. A record that has been processed by the LUE **1107** may be processed by the state processor **1108**, and a UFKB record data may be processed by the flow insertion/deletion engine **110** after being processed by the state processor **1108** or only by the LUE. Whether or not a particular engine has been applied to any unified flow key buffer entry is determined by status fields set by the engines upon completion. In one embodiment, a status flag in the UFKB-entry indicates whether an entry is new or found. In other embodiments, the LUE issues a flag to pass the entry to the state processor for processing, and the required operations for a new record are included in the SP instructions.

Note that each UFKB-entry may not need to be processed by all three engines. Furthermore, some UFKB entries may need to be processed more than once by a particular engine.

Each of these three engines also has bi-directional access to a cache subsystem **1115** that includes a caching engine. Cache **1115** is designed to have information flowing in and out of it from five different points within the system: the three engines, external memory via a unified memory controller (UMC) **1119** and a memory interface **1123**, and a microprocessor via analyzer host interface and control unit (ACIC) **1118** and host interface bus (HIB) **1122**. The analyzer microprocessor (or dedicated logic processor) can thus directly insert or modify data in the cache.

The cache subsystem **1115** is an associative cache that includes a set of content addressable memory cells (CAMs) each including an address portion and a pointer portion pointing to the cache memory (e.g., RAM) containing the cached flow-entries. The CAMs are arranged as a stack ordered from a top CAM to a bottom CAM. The bottom CAM's pointer points to the least recently used (LRU) cache memory entry. Whenever there is a cache miss, the contents of cache memory pointed to by the bottom CAM are replaced by the flow-entry from the flow-entry database **324**. This now becomes the most recently used entry, so the contents of the bottom CAM are moved to the top CAM and all CAM contents are shifted down. Thus, the cache is an associative cache with a true LRU replacement policy.

The LUE **1107** first processes a UFKB-entry, and basically performs the operation of blocks **314** and **316** in FIG. **3**. A signal is provided to the LUE to indicate that a "new" UFKB-entry is available. The LUE uses the hash in the UFKB-entry to read a matching bin of up to four buckets from the cache. The cache system attempts to obtain the matching bin. If a matching bin is not in the cache, the cache **1115** makes the request to the UMC **1119** to bring in a matching bin from the external memory.

When a flow-entry is found using the hash, the LUE **1107** looks at each bucket and compares it using the signature to the signature of the UFKB-entry until there is a match or there are no more buckets.

If there is no match, or if the cache failed to provide a bin of flow-entries from the cache, a time stamp in set in the flow key of the UFKB record, a protocol identification and state determination is made using a table that was loaded by compilation process **310** during initialization, the status for the record is set to indicate the LUE has processed the record, and an indication is made that the UFKB-entry is ready to start state processing. The identification and state determination generates a protocol identifier which in the preferred embodiment is a "jump vector" for the state processor which is kept by the UFKB for this UFKB-entry and used by the state processor to start state processing for the particular protocol. For example, the jump vector jumps to the subroutine for processing the state.

If there was a match, indicating that the packet of the UFKB-entry is for a previously encountered flow, then a calculator component enters one or more statistical measures stored in the flow-entry, including the timestamp. In addition, a time difference from the last stored timestamp may be stored, and a packet count may be updated. The state of the flow is obtained from the flow-entry is examined by looking at the protocol identifier stored in the flow-entry of database **324**. If that value indicates that no more classification is required, then the status for the record is set to indicate the LUE has processed the record. In the preferred embodiment, the protocol identifier is a jump vector for the state processor to a subroutine to state processing the protocol, and no more classification is indicated in the preferred embodiment by the jump vector being zero. If the protocol identifier indicates more processing, then an indication is made that the UFKB-entry is ready to start state processing and the status for the record is set to indicate the LUE has processed the record.

The state processor **1108** processes information in the cache system according to a UFKB-entry after the LUE has completed. State processor **1108** includes a state processor program counter SPPC that generates the address in the state processor instruction database **1109** loaded by compiler process **310** during initialization. It contains an Instruction Pointer (SPIP) which generates the SPID address. The instruction pointer can be incremented or loaded from a Jump Vector Multiplexor which facilitates conditional branching. The SPIP can be loaded from one of three sources: (1) A protocol identifier from the UFKB, (2) an immediate jump vector form the currently decoded instruction, or (3) a value provided by the arithmetic logic unit (SPALU) included in the state processor.

Thus, after a Flow Key is placed in the UFKB by the LUE with a known protocol identifier, the Program Counter is initialized with the last protocol recognized by the Parser. This first instruction is a jump to the subroutine which analyzes the protocol that was decoded.

The State Processor ALU (SPALU) contains all the Arithmetic, Logical and String Compare functions necessary to implement the State Processor instructions. The main blocks of the SPALU are: The A and B Registers, the Instruction Decode & State Machines, the String Reference Memory the Search Engine, an Output Data Register and an Output Control Register

The Search Engine in turn contains the Target Search Register set, the Reference Search Register set, and a Compare block which compares two operands by exclusive-or-ing them together.

Thus, after the UFKB sets the program counter, a sequence of one or more state operations are be executed in state processor **1108** to further analyze the packet that is in the flow key buffer entry for this particular packet.

FIG. **13** describes the operation of the state processor **1108**. The state processor is entered at **1301** with a unified flow key buffer entry to be processed. The UFKB-entry is new or corresponding to a found flow-entry. This UFKB-entry is retrieved from unified flow key buffer **1103** in **1301**. In **1303**, the protocol identifier for the UFKB-entry is used to set the state processor's instruction counter. The state processor **1108** starts the process by using the last protocol recognized by the parser subsystem **301** as an offset into a jump table. The jump table takes us to the instructions to use for that protocol. Most instructions test something in the unified flow key buffer or the flow-entry if it exists. The state processor **1108** may have to test bits, do comparisons, add or subtract to perform the test.

The first state processor instruction is fetched in **1304** from the state processor instruction database memory **1109**. The state processor performs the one or more fetched operations (**1304**). In our implementation, each single state processor instruction is very primitive (e.g., a move, a compare, etc.), so that many such instructions need to be performed on each unified flow key buffer entry. One aspect of the state processor is its ability to search for one or more (up to four) reference strings in the payload part of the UFKB entry. This is implemented by a search engine component of the state processor responsive to special searching instructions.

In **1307**, a check is made to determine if there are any more instructions to be performed for the packet. If yes, then

in **1308** the system sets the state processor instruction pointer (SPIP) to obtain the next instruction. The SPIP may be set by an immediate jump vector in the currently decoded instruction, or by a value provided by the SPALU during processing.

The next instruction to be performed is now fetched **(1304)** for execution. This state processing loop between **1304** and **1307** continues until there are no more instructions to be performed.

At this stage, a check is made in **1309** if the processing on this particular packet has resulted in a final state. That is, is the analyzer is done processing not only for this particular packet, but for the whole flow to which the packet belongs, and the flow is fully determined. If indeed there are no more states to process for this flow, then in **1311** the processor finalizes the processing. Some final states may need to put a state in place that tells the system to remove a flow—for example, if a connection disappears from a lower level connection identifier. In that case, in **1311**, a flow removal state is set and saved in the flow-entry. The flow removal state may be a NOP (no-op) instruction which means there are no removal instructions.

Once the appropriate flow removal instruction as specified for this flow (a NOP or otherwise) is set and saved, the process is exited at **1313**. The state processor **1108** can now obtain another unified flow key buffer entry to process.

If at **1309** it is determined that processing for this flow is not completed, then in **1310** the system saves the state processor instruction pointer in the current flow-entry in the current flow-entry. That will be the next operation that will be performed the next time the LRE **1107** finds packet in the UFKB that matches this flow. The processor now exits processing this particular unified flow key buffer entry at **1313**.

Note that state processing updates information in the unified flow key buffer **1103** and the flow-entry in the cache. Once the state processor is done, a flag is set in the UFKB for the entry that the state processor is done. Furthermore, If the flow needs to be inserted or deleted from the database of flows, control is then passed on to the flow insertion/deletion engine **1110** for that flow signature and packet entry. This is done by the state processor setting another flag in the UFKB for this UFKB-entry indicating that the state processor is passing processing of this entry to the flow insertion and deletion engine.

The flow insertion and deletion engine **1110** is responsible for maintaining the flow-entry database. In particular, for creating new flows in the flow database, and deleting flows from the database so that they can be reused.

The process of flow insertion is now described with the aid of FIG. **12**. Flows are grouped into bins of buckets by the hash value. The engine processes a UFKB-entry that may be new or that the state processor otherwise has indicated needs to be created. FIG. **12** shows the case of a new entry being created. A conversation record bin (preferably containing 4 buckets for four records) is obtained in **1203**. This is a bin that matches the hash of the UFKB, so this bin may already have been sought for the UFKB-entry by the LUE. In **1204** the FIDE **1110** requests that the record bin/bucket be maintained in the cache system **1115**. If in **1205** the cache system **1115** indicates that the bin/bucket is empty, step **1207** inserts the flow signature (with the hash) into the bucket and the bucket is marked "used" in the cache engine of cache **1115** using a timestamp that is maintained throughout the process. In **1209**, the FIDE **1110** compares the bin and bucket record flow signature to the packet to verify that all the elements are in place to complete the record. In **1211** the system marks the record bin and bucket as "in process" and as "new" in the cache system (and hence in the external memory). In **1212**, the initial statistical measures for the flow-record are set in the cache system. This in the preferred embodiment clears the set of counters used to maintain statistics, and may perform other procedures for statistical operations requires by the analyzer for the first packet seen for a particular flow.



Back in step **1205**, if the bucket is not empty, the FIDE **1110** requests the next bucket for this particular bin in the cache system. If this succeeds, the processes of **1207**, **1209**, **1211** and **1212** are repeated for this next bucket. If at **1208**, there is no valid bucket, the unified flow key buffer entry for the packet is set as "drop," indicating that the system cannot process the particular packet because there are no buckets left in the system. The process exits at **1213**. The FIDE **1110** indicates to the UFKB that the flow insertion and deletion operations are completed for this UFKB-entry. This also lets the UFKB provide the FIDE with the next UFKB record.

Once a set of operations is performed on a unified flow key buffer entry by all of the engines required to access and manage a particular packet and its flow signature, the unified flow key buffer entry is marked as "completed." That element will then be used by the parser interface for the next packet and flow signature coming in from the parsing and extracting system.

All flow-entries are maintained in the external memory and some are maintained in the cache **1115**. The cache system **1115** is intelligent enough to access the flow database and to understand the data structures that exists on the other side of memory interface **1123**. The lookup/update engine **1107** is able to request that the cache system pull a particular flow or "buckets" of flows from the unified memory controller **1119** into the cache system for further processing. The state processor **1108** can operate on information found in the cache system once it is looked up by means of the lookup/update engine request, and the flow insertion/deletion engine **1110** can create new entries in the cache system if required based on information in the unified flow key buffer **1103**. The cache retrieves information as required from the memory through the memory interface **1123** and the unified memory controller **1119**, and updates information as required in the memory through the memory controller **1119**.

There are several interfaces to components of the system external to the module of FIG. **11** for the particular hardware implementation. These include host bus interface **1122**, which is designed as a generic interface that can operate with any kind of external processing system such as a microprocessor or a multiplexor (MUX) system. Consequently, one can connect the overall traffic classification system of FIGS. **11** and **12** into some other processing system to manage the classification system and to extract data gathered by the system.

The memory interface **1123** is designed to interface to any of a variety of memory systems that one may want to use to store the flow-entries. One can use different types of memory systems like regular dynamic random access memory (DRAM), synchronous DRAM, synchronous graphic memory (SGRAM), static random access memory (SRAM), and so forth.

FIG. **10** also includes some "generic" interfaces. There is a packet input interface **1012**—a general interface that works in tandem with the signals of the input buffer interface control **1022**. These are designed so that they can be used with any kind of generic systems that can then feed packet information into the parser. Another generic interface is the

interface of pipes **1031** and **1033** respectively out of and into host interface multiplexor and control registers **1005**. This enables the parsing system to be managed by an external system, for example a microprocessor or another kind of external logic, and enables the external system to program and otherwise control the parser.

The preferred embodiment of this aspect of the invention is described in a hardware description language (HDL) such as VHDL or Verilog. It is designed and created in an HDL so that it may be used as a single chip system or, for instance, integrated into another general-purpose system that is being designed for purposes related to creating and analyzing traffic within a network. Verilog or other HDL implementation is only one method of describing the hardware.

In accordance with one hardware implementation, the elements shown in FIGS. **10** and **11** are implemented in a set of six field programmable logic arrays (FPGA's). The boundaries of these FPGA's are as follows. The parsing subsystem of FIG. **10** is implemented as two FPGAS; one FPGA, and includes blocks **1006**, **1008** and **1012**, parts of **1005**, and memory **1001**. The second FPGA includes **1002**, **1007**, **1013**, **1011** parts of **1005**. Referring to FIG. **11**, the unified look-up buffer **1103** is implemented as a single FPGA. State processor **1108** and part of state processor instruction database memory **1109** is another FPGA. Portions of the state processor instruction database memory **1109** are maintained in external SRAM's. The lookup/update engine **1107** and the flow insertion/deletion engine **1110** are in another FPGA. The sixth FPGA includes the cache system **1115**, the unified memory control **1119**, and the analyzer host interface and control **1118**.

Note that one can implement the system as one or more VSLI devices, rather than as a set of application specific integrated circuits (ASIC's) such as FPGA's. It is anticipated that in the future device densities will continue to increase, so that the complete system may eventually form a sub-unit (a "core") of a larger single chip unit.

### Operation of the Invention

FIG. **15** shows how an embodiment of the network monitor **300** might be used to analyze traffic in a network **102**. Packet acquisition device **1502** acquires all the packets from a connection point **121** on network **102** so that all packets passing point **121** in either direction are supplied to monitor **300**. Monitor **300** comprises the parser sub-system **301**, which determines flow signatures, and analyzer subsystem **303** that analyzes the flow signature of each packet. A memory **324** is used to store the database of flows that are determined and updated by monitor **300**. A host computer **1504**, which might be any processor, for example, a general-purpose computer, is used to analyze the flows in memory **324**. As is conventional, host computer **1504** includes a memory, say RAM, shown as host memory **1506**. In addition, the host might contain a disk. In one application, the system can operate as an RMON probe, in which case the host computer is coupled to a network interface card **1510** that is connected to the network **102**.

The preferred embodiment of the invention is supported by an optional Simple Network Management Protocol (SNMP) implementation. FIG. **15** describes how one would, for example, implement an RMON probe, where a network interface card is used to send RMON information to the network. Commercial SNMP implementations also are available, and using such an implementation can simplify the process of porting the preferred embodiment of the invention to any platform.

In addition, MIB Compilers are available. An MIB Compiler is a tool that greatly simplifies the creation and maintenance of proprietary MIB extensions.

### Examples of Packet Elucidation

Monitor **300**, and in particular, analyzer **303** is capable of carrying out state analysis for packet exchanges that are commonly referred to as "server announcement" type exchanges. Server announcement is a process used to ease communications between a server with multiple applications that can all be simultaneously accessed from multiple clients. Many applications use a server announcement process as a means of multiplexing a single port or socket into many applications and services. With this type of exchange, messages are sent on the network, in either a broadcast or multicast approach, to announce a server and application, and all stations in the network may receive and decode these messages. The messages enable the stations to derive the appropriate connection point for communicating that particular application with the particular server. Using the server announcement method, a particular application communicates using a service channel, in the form of a TCP or UDP socket or port as in the IP protocol suite, or using a SAP as in the Novell IPX protocol suite.

The analyzer **303** is also capable of carrying out "in-stream analysis" of packet exchanges. The "in-stream analysis" method is used either as a primary or secondary recognition process. As a primary process, in-stream analysis assists in extracting detailed information which will be used to further recognize both the specific application and application component. A good example of in-stream analysis is any Web-based application. For example, the commonly used PointCast Web information application can be recognized using this process; during the initial connection between a PointCast server and client, specific key tokens exist in the data exchange that will result in a signature being generated to recognize PointCast.

The in-stream analysis process may also be combined with the server announcement process. In many cases in-stream analysis will augment other recognition processes. An example of combining in-stream analysis with server announcement can be found in business applications such as SAP and BAAN.

"Session tracking" also is known as one of the primary processes for tracking applications in client/server packet exchanges. The process of tracking sessions requires an initial connection to a predefined socket or port number. This method of communication is used in a variety of transport layer protocols. It is most commonly seen in the TCP and UDP transport protocols of the IP protocol.

During the session tracking, a client makes a request to a server using a specific port or socket number. This initial request will cause the server to create a TCP or UDP port to exchange the remainder of the data between the client and the server. The server then replies to the request of the client using this newly created port. The original port used by the client to connect to the server will never be used again during this data exchange.

One example of session tracking is TFTP (Trivial File Transfer Protocol), a version of the TCP/IP FTP protocol that has no directory or password capability. During the client/server exchange process of TFTP, a specific port (port number **69**) is always used to initiate the packet exchange. Thus, when the client begins the process of communicating, a request is made to UDP port **69**. Once the server receives this request, a new port number is created on the server. The

server then replies to the client using the new port. In this example, it is clear that in order to recognize TFTP; network monitor **300** analyzes the initial request from the client and generates a signature for it. Monitor **300** uses that signature to recognize the reply. Monitor **300** also analyzes the reply from the server with the key port information, and uses this to create a signature for monitoring the remaining packets of this data exchange.

Network monitor **300** can also understand the current state of particular connections in the network. Connection-oriented exchanges often benefit from state tracking to correctly identify the application. An example is the common TCP transport protocol that provides a reliable means of sending information between a client and a server. When a data exchange is initiated, a TCP request for synchronization message is sent. This message contains a specific sequence number that is used to track an acknowledgement from the server. Once the server has acknowledged the synchronization request, data may be exchanged between the client and the server. When communication is no longer required, the client sends a finish or complete message to the server, and the server acknowledges this finish request with a reply containing the sequence numbers from the request. The states of such a connection-oriented exchange relate to the various types of connection and maintenance messages.

Server Announcement Example

The individual methods of server announcement protocols vary. However, the basic underlying process remains similar. A typical server announcement message is sent to one or more clients in a network. This type of announcement message has specific content, which, in another aspect of the invention, is salvaged and maintained in the database of flow-entries in the system. Because the announcement is sent to one or more stations, the client involved in a future packet exchange with the server will make an assumption that the information announced is known, and an aspect of the inventive monitor is that it too can make the same assumption.

Sun-RPC is the implementation by Sun Microsystems, Inc. (Palo Alto, Calif.) of the Remote Procedure Call (RPC), a programming interface that allows one program to use the services of another on a remote machine. A Sun-RPC example is now used to explain how monitor **300** can capture server announcements.

A remote program or client that wishes to use a server or procedure must establish a connection, for which the RPC protocol can be used.

Each server running the Sun-RPC protocol must maintain a process and database called the port Mapper. The port Mapper creates a direct association between a Sun-RPC program or application and a TCP or UDP socket or port (for TCP or UDP implementations). An application or program number is a 32-bit unique identifier assigned by ICANN (the Internet Corporation for Assigned Names and Numbers, www.icann.org), which manages the huge number of parameters associated with Internet protocols (port numbers, router protocols, multicast addresses, etc.) Each port Mapper on a Sun-RPC server can present the mappings between a unique program number and a specific transport socket through the use of specific request or a directed announcement. According to ICANN, port number **111** is associated with Sun RPC.

As an example, consider a client (e.g., CLIENT **3** shown as **106** in FIG. **1**) making a specific request to the server (e.g., SERVER **2** of FIG. **1**, shown as **110**) on a predefined UDP or TCP socket. Once the port Mapper process on the sun RPC server receives the request, the specific mapping is returned in a directed reply to the client.

1. A client (CLIENT **3**, **106** in FIG. **1**) sends a TCP packet to SERVER **2** (**110** in FIG. **1**) on port **111**, with an RPC Bind Lookup Request (rpcBindLookup). TCP or UDP port **111** is always associated Sun RPC. This request specifies the program (as a program identifier), version, and might specify the protocol (UDP or TCP).
2. The server SERVER **2** (**110** in FIG. **1**) extracts the program identifier and version identifier from the request. The server also uses the fact that this packet came in using the TCP transport and that no protocol was specified, and thus will use the TCP protocol for its reply.
3. The server **110** sends a TCP packet to port number **111**, with an RPC Bind Lookup Reply. The reply contains the specific port number (e.g., port number 'port') on which future transactions will be accepted for the specific RPC program identifier (e.g., Program 'program') and the protocol (UDP or TCP) for use.

It is desired that from now on every time that port number 'port' is used, the packet is associated with the application program 'program' until the number 'port' no longer is to be associated with the program 'program'. Network monitor **300** by creating a flow-entry and a signature includes a mechanism for remembering the exchange so that future packets that use the port number 'port' will be associated by the network monitor with the application program 'program'.

In addition to the Sun RPC Bind Lookup request and reply, there are other ways that a particular program—say 'program'—might be associated with a particular port number, for example number 'port'. One is by a broadcast announcement of a particular association between an application service and a port number, called a Sun RPC portMapper Announcement. Another, is when some server-say the same SERVER **2**—replies to some client—say CLIENT **1**—requesting some portMapper assignment with a RPC portMapper Reply. Some other client—say CLIENT **2**—might inadvertently see this request, and thus know that for this particular server, SERVER **2**, port number 'port' is associated with the application service 'program'. It is desirable for the network monitor **300** to be able to associate any packets to SERVER **2** using port number 'port' with the application program 'program'.

FIG. **9** represents a dataflow **900** of some operations in the monitor **300** of FIG. **3** for Sun Remote Procedure Call. Suppose a client **106** (e.g., CLIENT **3** in FIG. **1**) is communicating via its interface to the network **118** to a server **110** (e.g., SERVER **2** in FIG. **1**) via the server's interface to the network **116**. Further assume that Remote Procedure Call is used to communicate with the server **110**. One path in the data flow **900** starts with a step **910** that a Remote Procedure Call bind lookup request is issued by client **106** and ends with the server state creation step **904**. Such RPC bind lookup request includes values for the 'program,' 'version,' and 'protocol' to use, e.g., TCP or UDP. The process for Sun RPC analysis in the network monitor **300** includes the following aspects.:

Process **909**: Extract the 'program,' 'version,' and 'protocol' (UDP or TCP). Extract the TCP or UDP port (process **909**) which is **111** indicating Sun RPC.

Process **908**: Decode the Sun RPC packet. Check RPC type field for ID. If value is portMapper, save paired socket (i.e., dest for destination address, src for source

address). Decode ports and mapping, save ports with socket/addr key. There may be more than one pairing per mapper packet. Form a signature (e.g., a key). A flow-entry is created in database **324**. The saving of the request is now complete.

At some later time, the server (process **907**) issues a RPC bind lookup reply. The packet monitor **300** will extract a signature from the packet and recognize it from the previously stored flow. The monitor will get the protocol port number (**906**) and lookup the request (**905**). A new signature (i.e., a key) will be created and the creation of the server state (**904**) will be stored as an entry identified by the new signature in the flow-entry database. That signature now may be used to identify packets associated with the server.

The server state creation step **904** can be reached not only from a Bind Lookup Request/Reply pair, but also from a RPC Reply portMapper packet shown as **901** or an RPC Announcement portMapper shown as **902**. The Remote Procedure Call protocol can announce that it is able to provide a particular application service. Embodiments of the present invention preferably can analyze when an exchange occurs between a client and a server, and also can track those stations that have received the announcement of a service in the network.

The RPC Announcement portMapper announcement **902** is a broadcast. Such causes various clients to execute a similar set of operations, for example, saving the information obtained from the announcement. The RPC Reply portMapper step **901** could be in reply to a portMapper request, and is also broadcast. It includes all the service parameters.

Thus monitor **300** creates and saves all such states for later classification of flows that relate to the particular service 'program'.

FIG. **2** shows how the monitor **300** in the example of Sun RPC builds a signature and flow states. A plurality of packets **206**–**209** are exchanged, e.g., in an exemplary Sun Microsystems Remote Procedure Call protocol. A method embodiment of the present invention might generate a pair of flow signatures, "signature-**1**" **210** and "signature-**2**" **212**, from information found in the packets **206** and **207** which, in the example, correspond to a Sun RPC Bind Lookup request and reply, respectively.

Consider first the Sun RPC Bind Lookup request. Suppose packet **206** corresponds to such a request sent from CLIENT **3** to SERVER **2**. This packet contains important information that is used in building a signature according to an aspect of the invention. A source and destination network address occupy the first two fields of each packet, and according to the patterns in pattern database **308**, the flow signature (shown as KEY**1** **230** in FIG. **2**) will also contain these two fields, so the parser subsystem **301** will include these two fields in signature KEY **1** (**230**). Note that in FIG. **2**, if an address identifies the client **106** (shown also as **202**), the label used in the drawing is "$C_1$". If such address identifies the server **110** (shown also as server **204**), the label used in the drawing is "$S_1$". The first two fields **214** and **215** in packet **206** are "$S_1$" and $C_1$" because packet **206** is provided from the server **110** and is destined for the client **106**. Suppose for this example, "$S_1$" is an address numerically less than address "$C_1$". A third field "$p^1$" **216** identifies the particular protocol being used, e.g., TCP, UDP, etc.

In packet **206**, a fourth field **217** and a fifth field **218** are used to communicate port numbers that are used. The conversation direction determines where the port number field is. The diagonal pattern in field **217** is used to identify a source-port pattern, and the hash pattern in field **218** is used to identify the destination-port pattern. The order indicates the client-server message direction. A sixth field denoted "$i^1$" **219** is an element that is being requested by the client from the server. A seventh field denoted "$s_1a$" **220** is the service requested by the client from server **110**. The following eighth field "QA" **221** (for question mark) indicates that the client **106** wants to know what to use to access application "$s_1a$". A tenth field "QP" **223** is used to indicate that the client wants the server to indicate what protocol to use for the particular application.

Packet **206** initiates the sequence of packet exchanges, e.g., a RPC Bind Lookup Request to SERVER **2**. It follows a well-defined format, as do all the packets, and is transmitted to the server **110** on a well-known service connection identifier (port **111** indicating Sun RPC).

Packet **207** is the first sent in reply to the client **106** from the server. It is the RPC Bind Lookup Reply as a result of the request packet **206**.

Packet **207** includes ten fields **224**–**233**. The destination and source addresses are carried in fields **224** and **225**, e.g., indicated "$C_1$" and "$S_1$", respectively. Notice the order is now reversed, since the client-server message direction is from the server **110** to the client **106**. The protocol "$p^1$" is used as indicated in field **226**. The request "$i^1$" is in field **229**. Values have been filled in for the application port number, e.g., in field **233** and protocol ""$p^2$"" in field **233**.

The flow signature and flow states built up as a result of this exchange are now described. When the packet monitor **300** sees the request packet **206** from the client, a first flow signature **210** is built in the parser subsystem **301** according to the pattern and extraction operations database **308**. This signature **210** includes a destination and a source address **240** and **241**. One aspect of the invention is that the flow keys are built consistently in a particular order no matter what the direction of conversation. Several mechanisms may be used to achieve this. In the particular embodiment, the numerically lower address is always placed before the numerically higher address. Such least to highest order is used to get the best spread of signatures and hashes for the lookup operations. In this case, therefore, since we assume "$S_1$"<"$C_1$", the order is address "$S_1$" followed by client address "$C_1$". The next field used to build the signature is a protocol field **242** extracted from packet **206**'s field **216**, and thus is the protocol "$p^1$". The next field used for the signature is field **243**, which contains the destination source port number shown as a crosshatched pattern from the field **218** of the packet **206**. This pattern will be recognized in the payload of packets to derive how this packet or sequence of packets exists as a flow. In practice, these may be TCP port numbers, or a combination of TCP port numbers. In the case of the Sun RPC example, the crosshatch represents a set of port numbers of UDS for $p^1$ that will be used to recognize this flow (e.g., port **111**). Port **111** indicates this is Sun RPC. Some applications, such as the Sun RPC Bind Lookups, are directly determinable ("known") at the parser level. So in this case, the signature KEY-**1** points to a known application denoted "$a^1$" (Sun RPC Bind Lookup), and a next-state that the state processor should proceed to for more complex recognition jobs, denoted as state "$st_D$" is placed in the field **245** of the flow-entry.

When the Sun RPC Bind Lookup reply is acquired, a flow signature is again built by the parser. This flow signature is identical to KEY-**1**. Hence, when the signature enters the analyzer subsystem **303** from the parser subsystem **301**, the complete flow-entry is obtained, and in this flow-entry indicates state "$st_D$". The operations for state "$st_D$" in the state processor instruction database **326** instructs the state

processor to build and store a new flow signature, shown as KEY-2 (**212**) in FIG. **2**. This flow signature built by the state processor also includes the destination and a source addresses **250** and **251**, respectively, for server "$S_1$" followed by (the numerically higher address) client "$C_1$". A protocol field **252** defines the protocol to be used, e.g., "$p^2$", which is obtained from the reply packet. A field **253** contains a recognition pattern also obtained from the reply packet. In this case, the application is Sun RPC, and field **254** indicates this application "$a^2$". A next-state field **255** defines the next state that the state processor should proceed to for more complex recognition jobs, e.g., a state "$st^1$". In this particular example, this is a final state. Thus, KEY-**2** may now be used to recognize packets that are in any way associated with the application "$a^2$". Two such packets **208** and **209** are shown, one in each direction. They use the particular application service requested in the original Bind Lookup Request, and each will be recognized because the signature KEY-**2** will be built in each case.

The two flow signatures **210** and **212** always order the destination and source address fields with server "$S_1$" followed by client "$C_1$". Such values are automatically filled in when the addresses are first created in a particular flow signature. Preferably, large collections of flow signatures are kept in a lookup table in a least-to-highest order for the best spread of flow signatures and hashes.

Thereafter, the client and server exchange a number of packets, e.g., represented by request packet **208** and response packet **209**. The client **106** sends packets **208** that have a destination and source address $S_1$ and $C_1$, in a pair of fields **260** and **261**. A field **262** defines the protocol as "$p^2$", and a field **263** defines the destination port number.

Some network-server application recognition jobs are so simple that only a single state transition has to occur to be able to pinpoint the application that produced the packet. Others require a sequence of state transitions to occur in order to match a known and predefined climb from state-to-state.

Thus the flow signature for the recognition of application "$a^2$" is automatically set up by predefining what packet-exchange sequences occur for this example when a relatively simple Sun Microsystems Remote Procedure Call bind lookup request instruction executes. More complicated exchanges than this may generate more than two flow signatures and their corresponding states. Each recognition may involve setting up a complex state transition diagram to be traversed before a "final" resting state such as "$st_1$" in field **255** is reached. All these are used to build the final set of flow signatures for recognizing a particular application in the future.

Embodiments of the present invention automatically generate flow signatures with the necessary recognition patterns and state transition climb procedure. Such comes from analyzing packets according to parsing rules, and also generating state transitions to search for. Applications and protocols, at any level, are recognized through state analysis of sequences of packets.

Note that one in the art will understand that computer networks are used to connect many different types of devices, including network appliances such as telephones, "Internet" radios, pagers, and so forth. The term computer as used herein encompasses all such devices and a computer network as used herein includes networks of such computers.

Although the present invention has been described in terms of the presently preferred embodiments, it is to be understood that the disclosure is not to be interpreted as limiting. Various alterations and modifications will no doubt become apparent to those or ordinary skill in the art after having read the above disclosure. Accordingly, it is intended that the claims be interpreted as covering all alterations and modifications as fall within the true spirit and scope of the present invention.

## The Pattern Parse and Extraction Database Format

The different protocols that can exist in different layers may be thought of as nodes of one or more trees of linked nodes. The packet type is the root of a tree (called base level). Each protocol is either a parent node of some other protocol at the next later or a terminal node. A parent node links a protocol to other protocols (child protocols) that can be at higher layer levels. Thus a protocol may have zero or more children.

As an example of the tree structure, consider an Ethernet packet. One of the children nodes may be the IP protocol, and one of the children of the IP protocol may be the TCP protocol. Another child of the IP may be the UDP protocol.

A packet includes at least one header for each protocol used. The child protocol of a particular protocol used in a packet is indicated by the contents at a location within the header of the particular protocol. The contents of the packet that specify the child are in the form of a child recognition pattern.

A network analyzer preferably can analyze many different protocols. At a base level, there are a number of packet types used in digital telecommunications, including Ethernet, HDLC, ISDN, Lap B, ATM, X.25, Frame Relay, Digital Data Service, FDDI (Fiber Distributed Data Interface), and T1, among others. Many of these packet types use different packet and/or frame formats. For example, data is transmitted in ATM and frame-relay systems in the form of fixed length packets (called "cells") that are 53 octets (i.e., bytes) long; several such cells may be needed to make up the information that might be included in a single packet of some other type.

Note that the term packet herein is intended to encompass packets, datagrams, frames and cells. In general, a packet format or frame format refers to how data is encapsulated with various fields and headers for transmission across a network. For example, a data packet typically includes an address destination field, a length field, an error correcting code (ECC) field or cyclic redundancy check (CRC) field, as well as headers and footers to identify the beginning and end of the packet. The terms "packet format," "frame format" and "cell format" are generally synonymous.

The packet monitor **300** can analyze different protocols, and thus can perform different protocol specific operations on a packet wherein the protocol headers of any protocol are located at different locations depending on the parent protocol or protocols used in the packet. Thus, the packet monitor adapts to different protocols according to the contents of the packet. The locations and the information extracted from any packet are adaptively determined for the particular type of packet. For example, there is no fixed definition of what to look for or where to look in order to form the flow signature. In some prior art systems, such as that described in U.S. Pat. No. 5,101,402 to Chiu, et al., there are fixed locations specified for particular types of packets. With the proliferation of protocols, the specifying of all the possible places to look to determine the session becomes more and more difficult. Likewise, adding a new protocol or application is difficult. In the present invention, the number of levels is variable for any protocol and is whatever number

is sufficient to uniquely identify as high up the level system as we wish to go, all the way to the application level (in the OSI model).

Even the same protocol may have different variants. Ethernet packets for example, have several known variants, each having a basic format that remains substantially the same. An Ethernet packet (the root node) may be an Ethertype packet—also called an Ethernet Type/Version **2** and a DIX (DIGITAL-Intel-Xerox packet)—or an IEEE Ethernet (IEEE 803.x) packet. A monitor should be able to handle all types of Ethernet protocols. With the Ethertype protocol, the contents that indicate the child protocol is in one location, while with an IEEE type, the child protocol is specified in a different location. The child protocol is indicated by a child recognition pattern.

FIG. **16** shows the header **1600** (base level **1**) of a complete Ethernet frame (i.e., packet) of information and includes information on the destination media access control address (Dst MAC **1602**) and the source media access control address (Src MAC **1604**). Also shown in FIG. **16** is some (but not all) of the information specified in the PDL files for extraction the signature. Such information is also to be specified in the parsing structures and extraction operations database **308**. This includes all of the header information at this level in the form of 6 bytes of Dst MAC information **1606** and 6 bytes of Src MAC information **1610**. Also specified are the source and destination address components, respectively, of the hash. These are shown as 2 byte Dst Hash **1608** from the Dst MAC address and the 2 byte Src Hash **1612** from the Src MAC address. Finally, information is included (**1614**) on where to the header starts for information related to the next layer level. In this case the next layer level (level **2**) information starts at packet offset **12**.

FIG. **17**A now shows the header information for the next level (level-**2**) for an Ethertype packet **1700**.

For an Ethertype packet **1700**, the relevant information from the packet that indicates the next layer level is a two-byte type field **1702** containing the child recognition pattern for the next level. The remaining information **1704** is shown hatched because it not relevant for this level. The list **1712** shows the possible children for an Ethertype packet as indicated by what child recognition pattern is found offset **12**.

Also shown is some of the extracted part used for the parser record and to locate the next header information. The signature part of the parser record includes extracted part **1702**. Also included is the 1-byte Hash component **1710** from this information.

An offset field **1710** provides the offset to go to the next level information, i.e., to locate the start of the next layer level header. For the Ethertype packet, the start of the next layer header 14 bytes from the start of the frame.

Other packet types are arranged differently. For example, in an ATM system, each ATM packet comprises a five-octet "header" segment followed by a forty-eight octet "payload" segment. The header segment of an ATM cell contains information relating to the routing of the data contained in the payload segment. The header segment also contains traffic control information. Eight or twelve bits of the header segment contain the Virtual Path Identifier (VPI), and sixteen bits of the header segment contain the Virtual Channel Identifier (VCI). Each ATM exchange translates the abstract routing information represented by the VPI and VCI bits into the addresses of physical or logical network links and routes each ATM cell appropriately.

FIG. **17**B shows the structure of the header of one of the possible next levels, that of the IP protocol. The possible children of the IP protocol are shown in table **1752**. The header starts at a different location (**L3**) depending on the parent protocol. Also included in FIG. **17**B are some of the fields to be extracted for the signature, and an indication of where the next level's header would start in the packet.

Note that the information shown in FIGS. **16**, **17**A, and **17**B would be specified to the monitor in the form of PDL files and compiled into the database **308** of pattern structures and extraction operations.

The parsing subsystem **301** performs operations on the packet header data based on information stored in the database **308**. Because data related to protocols can be considered as organized in the form of a tree, it is required in the parsing subsystem to search through data that is originally organized in the form of a tree. Since real time operation is preferable, it is required to carry out such searches rapidly.

Data structures are known for efficiently storing information organized as trees. Such storage-efficient means typically require arithmetic computations to determine pointers to the data nodes. Searching using such storage-efficient data structures may therefore be too time consuming for the present application. It is therefore desirable to store the protocol data in some form that enables rapid searches.

In accordance with another aspect of the invention, the database **308** is stored in a memory and includes a data structure used to store the protocol specific operations that are to be performed on a packet. In particular, a compressed representation is used to store information in the pattern parse and extraction database **308** used by the pattern recognition process **304** and the extraction process **306** in the parser subsystem **301**. The data structure is organized for rapidly locating the child protocol related information by using a set of one or more indices to index the contents of the data structure. A data structure entry includes an indication of validity. Locating and identifying the child protocol includes indexing the data structure until a valid entry is found. Using the data structure to store the protocol information used by the pattern recognition engine (PRE) **1006** enables the parser subsystem **301** to perform rapid searches.

In one embodiment, the data structure is in the form of a three-dimensional structure. Note that this three dimensional structure in turn is typically stored in memory as a set of two-dimensional structures whereby one of the three dimensions of the 3-D structure is used as an index to a particular 2-D array. This forms a first index to the data structure.

FIG. **18**A shows such a 3-D representation **1800** (which may be considered as an indexed set of 2-D representations). The three dimensions of this data structure are:

1. Type identifier [1:M]. This is the identifier that identifies a type of protocol at a particular level. For example, 01 indicates an Ethernet frame. 64 indicates IP, 16 indicates an IEEE type Ethernet packet, etc. Depending on how many protocols the packet parser can handle, M may be a large number; M may grow over time as the capability of analyzing more protocols is added to monitor **300**. When the 3-D structure is considered a set of 2-D structures, the type ID is an index to a particular 2-D structure.
2. Size [1:64]. The size of the field of interest within the packet.
3. Location [1:512]. This is the offset location within the packet, expressed as a number of octets (bytes).

At any one of these locations there may or may not be valid data. Typically, there will not be valid data in most

locations. The size of the 3-D array is M by 64 by 512, which can be large; M for example may be 10,000. This is a sparse 3-D matrix with most entries empty (i.e., invalid).

Each array entry includes a "node code" that indicates the nature of the contents. This node code has one of four values: (1) a "protocol" node code indicating to the pattern recognition process **304** that a known protocol has been recognized as the next (i.e., child) protocol; (2) a "terminal" node code indicating that there are no children for the protocol presently being searched, i.e., the node is a final node in the protocol tree; (3) a "null" (also called "flush") node code indicating that there is no valid entry.

In the preferred embodiment, the possible children and other information are loaded into the data structure by an initialization that includes compilation process **310** based on the PDL files **336** and the layering selections **338**. The following information is included for any entry in the data structure that represents a protocol.

(a) A list of children (as type IDs) to search next. For example, for an Ethernet type 2, the children are Ethertype (IP, IPX, etc, as shown in **1712** of FIG. **17**). These children are compiled into the type codes. The code for IP is 64, that for IPX is 83, etc.

(b) For each of the IDs in the list, a list of the child recognition patterns that need to be compared. For example, $64{:}0800_{16}$ in the list indicates that the value to look for is 0800 (hex) for the child to be type ID 64 (which is the IP protocol). $83{:}8137_{16}$ in the list indicates that the value to look for is 8137 (hex) for the child to be type ID **83** (which is the IPX protocol), etc.

(c) The extraction operations to perform to build the identifying signature for the flow. The format used is (offset, length, flow_signature_value_identifier), the flow_signature_value_identifier indicating where the extracted entry goes in the signature, including what operations (AND, ORs, etc.) may need to be carried out. If there is also a hash key component, for instance, then information on that is included. For example, for an Ethertype packet, the 2-byte type (**1706** in FIG. **17**) is used in the signature. Furthermore, a 1-byte hash (**1708** in FIG. **17**A) of the type is included. . Note furthermore, the child protocol starts at offset **14**.

An additional item may be the "fold." Folding is used to reduce the storage requirements for the 3-D structure. Since each 2-D array for each protocol ID may be sparsely populated, multiple arrays may be combined into a single 2-D array as long as the individual entries do not conflict with each other. A fold number is then used to associate each element. For a given lookup, the fold number of the lookup must match the fold number entry. Folding is described in more detail below.

In the case of the Ethernet, the next protocol field may indicate a length, which tells the parser that this is a IEEE type packet, and that the next protocol is elsewhere. Normally, the next protocol field contains a value which identifies the next, i.e., child protocol.

The entry point for the parser subsystem is called the virtual base layer and contains the possible first children, i.e., the packet types. An example set of protocols written in a high level protocol description language (PDL) is included herein. The set includes PDL files, and the file describing all the possible entry points (i.e., the virtual base) is called virtual.pdl. There is only one child, 01, indicating the Ethernet, in this file. Thus, the particular example can only handle Ethernet packets. In practice, there can be multiple entry points.

In one embodiment, the packet acquisition device provides a header for every packet acquired and input into monitor **300** indicating the type of packet. This header is used to determine the virtual base layer entry point to the parser subsystem. Thus, even at the base layer, the parser subsystem can identify the type of packet.

Initially, the search starts at the child of the virtual base, as obtained in the header supplied by the acquisition device. In the case of the example, this has ID value 01, which is the 2-D array in the overall 3-D structure for Ethernet packets.

Thus hardware implementing pattern analysis process **304** (e.g., pattern recognition engine (PRE) **1006** of FIG. **10**) searches to determine the children (if any) for the 2-D array that has protocol ID 01. In the preferred embodiment that uses the 3-D data structure, the hardware PRE **1006** searches up to four lengths (i.e., sizes) simultaneously. Thus, the process **304** searches in groups of four lengths. Starting at protocol ID 01, the first two sets of 3-D locations searched are

| | | |
|---|---|---|
| (1, 1, 1) | (1, 1, 2) | . . . |
| (1, 2, 1) | (1, 2, 2) | |
| (1, 3, 1) | (1, 3, 2) | |
| (1, 4, 1) | (1, 4, 2) | |

At each stage of a search, the analysis process **304** examines the packet and the 3-D data structure to see if there is a match (by looking at the node code). If no valid data is found, e.g., using the node code, the size is incremented (to maximum of 4) and the offset is then incremented as well.

Continuing with the example, suppose the pattern analysis process **304** finds something at 1, 2, 12. By this, we mean that the process **304** has found that for protocol ID value 01 (Ethernet) at packet offset **12**, there is information in the packet having a length of 2 bytes (octets) that may relate to the next (child) protocol. The information, for example, may be about a child for this protocol expressed as a child recognition pattern. The list of possible child recognition patterns that may be in that part of the packet is obtained from the data structure.

The Ethernet packet structure comes in two flavors, the Ethertype packet and newer IEEE types, and the packet location that indicates the child is different for both. The location that for the Ethertype packet indicates the child is a "length" for the IEEE type, so a determination is made for the Ethernet packet whether the "next protocol" location contains a value or a length (this is called a "LENGTH" operation). A successful LENGTH operation is indicated by contents less than or equal to $05DC_{16}$, then this is an IEEE type Ethernet frame. In such a case, the child recognition pattern is looked for elsewhere. Otherwise, the location contains a value that indicates the child.

Note that while this capability of the entry being a value (e.g., for a child protocol ID) or a length (indicating further analysis to determine the child protocol) is only used for Ethernet packets, in the future, other packets may end up being modified. Accordingly, this capability in the form of a macro in the PDL files still enables such future packets to be decoded.

Continuing with the example, suppose that the LENGTH operation fails. In that case, we have an Ethertype packet, and the next protocol field (containing the child recognition pattern) is 2 bytes long starting at offset **12** as shown as packet field **1702** in FIG. **17**A. This will be one of the children of the Ethertype shown in table **1712** in FIG. **17**A. The PRE uses the information in the data structure to check what the ID code is for the found 2-byte child recognition pattern. For example, if the child recognition pattern is 0800

(Hex), then the protocol is IP. If the child recognition pattern is 0BAD (Hex) the protocol is VIP (VINES).

Note that an alternate embodiment may keep a separate table that includes all the child recognition patterns and their corresponding protocol ID's

To follow the example, suppose the child recognition pattern at **1, 2, 12** is $0800_{16}$, indicating IP. The ID code for the IP protocol is $64_{10}$). To continue with the Ethertype example, once the parser matches one of the possible children for the protocl—in the example, the protocol type is IP with an ID of 64—then the parser continues the search for the next level. The ID is 64, the length is unknown, and offset is known to be equal or larger than 14 bytes (**12** offset for type, plus 2, the length of type), so the search of the 3-D structure commences from location **(64, 1)** at packet offset **14**. A populated node is found at **(64, 2)** at packet offset **14**. Heading details are shown as **1750** in FIG. **17**B. The possible children are shown in table **1752**.

Alternatively, suppose that at **(1, 2, 12)** there was a length $\mathbf{1211}_{10}$. This indicates that this is an IEEE type Ethernet frame, which stores its type elsewhere. The PRE now continues its search at the same level, but for a new ID, that of an IEEE type Ethernet frame. An IEEE Ethernet packet has protocol ID 16, so the PRE continues its search of the three-dimensional space with ID 16starting at packet offset **14**.

In our example, suppose there is a "protocol" node code found at **(16, 2)** at packet offset **14**, and the next protocol is specified by child recognition pattern $0800_{16}$. This indicates that the child is the IP protocol, which has type ID 64. Thus the search continues, starting at **(64, 1)** at packet offset **16**.

Compression.

As noted above, the 3-D data structure is very large, and sparsely populated. For example, if 32 bytes are stored at each location, then the length is M by 64 by 512 by 32 bytes, which is M megabytes. If M=10,000, then this is about 10 gigabytes. It is not practical to include 10 Gbyte of memory in the parser subsystem for storing the database **308**. Thus a compressed form of storing the data is used in the preferred embodiment. The compression is preferably carried out by an optimizer component of the compilation process **310**.

Recall that the data structure is sparse. Different embodiments may use different compression schemes that take advantage of the sparseness of the data structure. One embodiment uses a modification of multi-dimensional run length encoding.

Another embodiment uses a smaller number two-dimensional structures to store the information that otherwise would be in one large three-dimensional structure. The second scheme is used in the preferred embodiment.

FIG. **18**A illustrated how the 3-D array **1800** can be considered a set of 2-D arrays, one 2-D array for each protocol (i.e., each value of the protocol ID). The 2-D structures are shown as **1802**-1, **1802**-2, . . . , **1802**-M for up to M protocol ID's. One table entry is shown as **1804**. Note that the gaps in table are used to illustrate that each 2-D structure table is typically large.

Consider the set of trees that represent the possible protocols. Each node represents a protocol, and a protocol may have a child or be a terminal protocol. The base (root) of the tree has all packet types as children. The other nodes form the nodes in the tree at various levels from level **1** to the final terminal nodes of the tree. Thus, one element in the base node may reference node ID **1**, another element in the base node may reference node ID **2** and so on. As the tree is traversed from the root, there may be points in the tree where the same node is referenced next. This would occur, for example, when an application protocol like Telnet can run on several transport connections like TCP or UDP. Rather than repeating the Telnet node, only one node is represented in the patterns database **308** which can have several parents. This eliminates considerable space explosion.

Each 2-D structure in FIG. **18**A represents a protocol. To enable saving space by using only one array per protocol which may have several parents, in one embodiment, the pattern analysis subprocess keeps a "current header" pointer. Each location (offset) index for each protocol 2-D array in the 3-D structure is a relative location starting with the start of header for the particular protocol.

Each of the two-dimensional arrays is sparse. The next step of the optimization, is checking all the 2-D arrays against all the other 2-D arrays to find out which ones can share memory. Many of these 2-D arrays are often sparsely populated in that they each have only a small number of valid entries. So, a process of "folding" is next used to combine two or more 2-D arrays together into one physical 2-D array without losing the identity of any of the original 2-D arrays (i.e., all the 2-D arrays continue to exist logically). Folding can occur between any 2-D arrays irrespective of their location in the tree as long as certain conditions are met.

Assume two 2-D arrays are being considered for folding. Call the first 2-D arrays A and the second 2-D array B. Since both 2-D arrays are partially populated, 2-D array B can be combined with 2-D arrays A if and only if none of the individual elements of these two 2-D arrays that have the same 2-D location conflict. If the result is foldable, then the valid entries of 2-D array B are combined with the valid entries of 2-D array A yielding one physical 2-D array. However, it is necessary to be able to distinguish the original 2-D array A entries from those of 2-D array B. For example, if a parent protocol of the protocol represented by 2-D array B wants to reference the protocol ID of 2-D array B, it must now reference 2-D array A instead. However, only the entries that were in the original 2-D array B are valid entries for that lookup. To accomplish this, each element in any given 2-D array is tagged with a fold number. When the original tree is created, all elements in all the 2-D arrays are initialized with a fold value of zero. Subsequently, if 2-D array B is folded into 2-D array A, all valid elements of 2-D array B are copied to the corresponding locations in 2-D array A and are given different fold numbers than any of the elements in 2-D array A. For example, if both 2-D array A and 2-D array B were original 2-D arrays in the tree (i.e., not previously folded) then, after folding, all the 2-D array A entries would still have fold **0** and the 2-D array B entries would now all have a fold value of 1. After 2-D array B is folded into 2-D array A, the parents of 2-D array B need to be notified of the change in the 2-D array physical location of their children and the associated change in the expected fold value.

This folding process can also occur between two 2-D arrays that have already been folded, as long as none of the individual elements of the two 2-D arrays conflict for the same 2-D array location. As before, each of the valid elements in 2-D array B must have fold numbers assigned to them that are unique from those of 2-D array A. This is accomplished by adding a fixed value to all the 2-D array B fold numbers as they are merged into 2-D array A. This fixed value is one larger than the largest fold value in the original 2-D array A. It is important to note that the fold number for any given 2-D array is relative to that 2-D array only and does not span across the entire tree of 2-D arrays.

This process of folding can now be attempted between all combinations of two 2-D arrays until there are no more candidates that qualify for folding. By doing this, the total number of 2-D arrays can be significantly reduced.

Whenever a fold occurs, the 3-D structure (i.e., all 2-D arrays) must be searched for the parents of the 2-D array being folded into another array. The matching pattern which previously was mapped to a protocol ID identifying a single 2-D array must now be replaced with the 2-D array ID and the next fold number (i.e., expected fold).

Thus, in the compressed data structure, each entry valid entry includes the fold number for that entry, and additionally, the expected fold for the child.

An alternate embodiment of the data structure used in database **308** is illustrated in FIG. **18B**. Thus, like the 3-D structure described above, it permits rapid searches to be performed by the pattern recognition process **304** by indexing locations in a memory rather than performing address link computations. The structure, like that of FIG. **18A**, is suitable for implementation in hardware, for example, for implementation to work with the pattern recognition engine (PRE) **1006** of FIG. **10**.

A table **1850**, called the protocol table (PT) has an entry for each protocol known by the monitor **300**, and includes some of the characteristics of each protocol, including a description of where the field that specifies next protocol (the child recognition pattern) can be found in the header, the length of the next protocol field, flags to indicate the header length and type, and one or more slicer commands, the slicer can build the key components and hash components for the packet at this protocol at this layer level.

For any protocol, there also are one or more lookup tables (LUTs). Thus database **308** for this embodiment also includes a set of LUTs **1870**. Each LUT has 256 entries indexed by one byte of the child recognition pattern that is extracted from the next protocol field in the packet. Such a protocol specification may be several bytes long, and so several of LUTs **1870** may need to be looked up for any protocol.

Each LUT's entry includes a 2-bit "node code" that indicates the nature of the contents, including its validity. This node code has one of four values: (1) a "protocol" node code indicating to the pattern recognition engine **1006** that a known protocol has been recognized; (2) an "intermediate" node code, indicating that a multi-byte protocol code has been partially recognized, thus permitting chaining a series of LUTs together before; (3) a "terminal" node code indicating that there are no children for the protocol presently being searched, i.e., the node is a final node in the protocol tree; (4) a "null" (also called "flush" and "invalid") node code indicating that there is no valid entry.

In addition to the node code, each LUT entry may include the next LUT number, the next protocol number (for looking up the protocol table **1850**), the fold of the LUT entry, and the next fold to expect. Like in the embodiment implementing a compressed form of the 3-D representation, folding is used to reduce the storage requirements for the set of LUTs. Since the LUTs **1870** may be sparsely populated, multiple LUTs may be combined into a single LUT as long as the individual entries do not conflict with each other. A fold number is then used to associate each element with its original LUT.

For a given lookup, the fold number of the lookup must match the fold number in the lookup table. The expected fold is obtained from the previous table lookup (the "next fold to expect" field). The present implementation uses 5-bits to describe the fold and thus allows up to 32 tables to be folded into one table.



When using the data structure of FIG. **18B**, when a packet arrives at the parser, the virtual base has been pre-pended or is known. The virtual base entry tells the packet recognition engine where to find the first child recognition pattern in the packet. The pattern recognition engine then extracts the child recognition pattern bytes from the packet and uses them as an address into the virtual base table (the first LUT). If the entry looked up in the specified next LUT by this method matches the expected next fold value specified in the virtual base entry, the lookup is deemed valid. The node code is then examined. If it is an intermediate node then the next table field obtained from the LUT lookup is used as the most significant bits of the address. The next expected fold is also extracted from the entry. The pattern recognition engine **1006** then uses the next byte from the child recognition pattern as the for the next LUT lookup.

Thus, the operation of the PRE continues until a terminal code is found. The next (initially base layer) protocol is looked up in the protocol table **1850** to provide the PRE **1006** with information on what field in the packet (in input buffer memory **1008** of parser subsystem **1000**) to use for obtaining the child recognition pattern of the next protocol, including the size of the field. The child recognition pattern bytes are fetched from the input buffer memory **1008**. The number of bytes making up the child recognition pattern is also now known.

The first byte of the protocol code bytes is used as the lookup in the next LUT. If a LUT lookup results in a node code indicating a protocol node or a terminal node, the Next LUT and next expected fold is set, and the "next protocol" from LUT lookup is used as an index into the protocol table **1850**. This provides the instructions to the slicer **1007**, and where in the packet to obtain the field for the next protocol. Thus, the PRE **1006** continues until it is done processing all the fields (i.e., the protocols), as indicated by the terminal node code reached.

Note that when a child recognition pattern is checked against a table there is always an expected fold. If the expected fold matches the fold information in the table, it is used to decide what to do next. If the fold does not match, the optimizer is finished.

Note also that an alternate embodiment may use different size LUTs, and then index a LUT by a different amount of the child recognition pattern.

The present implementation of this embodiment allows for child recognition patterns of up to four bytes. Child recognition patterns of more than 4 bytes are regarded as special cases.

In the preferred embodiment, the database is generated by the compiler process **310**. The compiler process first builds a single protocol table of all the links between protocols. Links consist of the connection between parent and child protocols. Each protocol can have zero or more children. If a protocol has children, a link is created that consists of the parent protocol, the child protocol, the child recognition pattern, and the child recognition pattern size. The compiler first extracts child recognition patterns that are greater than two bytes long. Since there are only a few of these, they are handled separately. Next sub links are created for each link that has a child recognition pattern size of two.

All the links are then formed into the LUTs of 256 entries.

Optimization is then carried out. The first step in the optimization is checking all the tables against all the other tables to find out which ones can share a table. This process proceeds the same way as described above for two-dimensional arrays, but now for the sparse lookup tables.

Part of the initialization process (e.g., compiler process **310**) loads a slicer instruction database with data items

including of instruction, source address, destination address, and length. The PRE **1006** when it sends a slicer instruction sends this instruction as an offset into the slicer instruction database. The instruction or Op code tells the slicer what to extract from the incoming packet and where to put it in the flow signature. Writing into certain fields of the flow signature automatically generates a hash. The instruction can also tell the slicer how to determine the connection status of certain protocols.

Note that alternate embodiments may generate the pattern, parse and extraction database other than by compiling PDL files.

The Compilation Process

The compilation process **310** is now described in more detail. This process **310** includes creating the parsing patterns and extractions database **308** that provides the parsing subsystem **301** with the information needed to parse packets and extract identifying information, and the state processing instructions database **326** that provides the state processes that need to be performed in the state processing operation **328**.

Input to the compiler includes a set of files that describe each of the protocols that can occur. These files are in a convenient protocol description language (PDL) which is a high level language. PDL is used for specifying new protocols and new levels, including new applications. The PDL is independent of the different types of packets and protocols that may be used in the computer network. A set of PDL files is used to describe what information is relevant to packets and packets that need to be decoded. The PDL is further used to specify state analysis operations. Thus, the parser subsystem and the analyzer subsystems can adapt and be adapted to a variety of different kinds of headers, layers, and components and need to be extracted or evaluated, for example, in order to build up a unique signature.

There is one file for each packet type and each protocol. Thus there is a PDL file for Ethernet packets and there is a PDL file for frame relay packets. The PDL files are compiled to form one or more databases that enable monitor **300** to perform different protocol specific operations on a packet wherein the protocol headers of any protocol are located at different locations depending on the parent protocol or protocols used in the packet. Thus, the packet monitor adapts to different protocols according to the contents of the packet. In particular, the parser subsystem **301** is able to extract different types of data for different types of packets. For example, the monitor can know how to interpret a Ethernet packet, including decoding the header information, and also how to interpret an frame relay packet, including decoding the header information.

The set of PDL files, for example, may include a generic Ethernet packet file. There also is included a PDL file for each variation Ethernet file, for example, an EEE Ethernet file.

The PDL file for a protocol provides the information needed by compilation process **310** to generate the database **308**. That database in turn tells the parser subsystem how to parse and/or extract information, including one or more of what protocol-specific components of the packet to extract for the flow signature, how to use the components to build the flow signature, where in the packet to look for these components, where to look for any child protocols, and what child recognition patterns to look for. For some protocols, the extracted components may include source and destination addresses, and the PDL file may include the order to use these addresses to build the key. For example, Ethernet frames have end-point addresses that are useful in building a better flow signature. Thus the PDL file for an Ethernet packet includes information on how the parsing subsystem is to extract the source and destination addresses, including where the locations and sizes of those addresses are. In a frame-relay base layer, for example, there are no specific end point addresses that help to identify the flow better, so for those type of packets, the PDL file does not include information that will cause the parser subsystem to extract the end-point addresses.

Some protocols also include information on connections. TCP is an example of such a protocol. Such protocol use connection identifiers that exist in every packet. The PDL file for such a protocol includes information about what those connection identifiers are, where they are, and what their length is. In the example of TCP, for example running over IP, these are port numbers. The PDL file also includes information about whether or not there are states that apply to connections and disconnections and what the possible children are states. So, at each of these levels, the packet monitor **300** learns more about the packet. The packet monitor **300** can identify that a particular packet is part of a particular flow using the connection identifier. Once the flow is identified, the system can determine the current state and what states to apply that deal with connections or disconnections that exist in the next layer up to these particular packets.

For the particular PDL used in the preferred embodiment, a PDL file may include none or more FIELD statement each defining a specific string of bits or bytes (i.e., a field) in the packet. A PDL file may further include none or more GROUP statements each used to tie together several defined fields. A set of such tied together fields is called a group. A PDL file may further include none or more PROTOCOL statements each defining the order of the fields and groups within the header of the protocol. A PDL file may further include none or more FLOW statements each defining a flow by describing where the address, protocol type, and port numbers are in a packet. The FLOW statement includes a description of how children flows of this protocol are determined using state operations. States associated may have state operations that may be used for managing and maintaining new states learned as more packets of a flow are analyzed.

FIG. **19** shows a set of PDL files for a layering structure for an Ethernet packet that runs TCP on top of IP. The contents of these PDL files are attached as an APPENDIX hereto. Common.pdl **(1903)** is a file containing the common protocol definitions, i.e., some field definitions for commonly used fields in various network protocols. Flows.pdl **(1905)** is a file containing general flow definitions. Virtual.pdl **(1907)** is a PDL file containing the definition for the VirtualBase layer used. Ethernet.pdl **(1911)** is the PDL file containing the definition for the Ethernet packet. The decision on Ethertype vs. IEEE type Ethernet file is described herein. If this is Ethertype, the selection is made from the file Ethertype.pdl **(1913)**. In an alternate embodiment, the Ethertype selection definition may be in the same Ethernet file **1911**. In a typical implementation, PDL files for other Ethernet types would be included. IP.pdl **(1915)** is a PDL file containing the packet definitions for the Internet Protocol. TCP.pdl **(1917)** is the PDL file containing the packet definitions for the Transmission Control Protocol, which in this case is a transport service for the IP protocol. In addition to extracting the protocol information the TCP protocol definition file assists in the process of identification of connec-

tions for the processing of states. In a typical set of files, there also would be a file UDP.pdl for the User Datagram Protocol (UDP) definitions. RPC.pdl (**1919**) is a PDL file file containing the packet definitions for Remote Procedure Calls.

NFS.pdl (**1921**) is a PDL file containing the packet definitions for the Network File System. Other PDL files would typically be included for all the protocols that might be encountered by monitor **300**.

Input to the compilation process **310** is the set of PDL files (e.g., the files of FIG. **19**) for all protocols of interest. Input to process **310** may also include layering information shown in FIG. **3** as datagram layer selections **338**. The layer selections information describes the layering of the protocols—what protocol(s) may be on top of any particular protocols. For example, IP may run over Ethernet, and also over many other types of packets. TCP may run on top of IP. UDP also may run on top of IP. When no layering information is explicitly included, it is inherent; the PDL files include the children protocols, and this provides the layering information.

The compiling process **310** is illustrated in FIG. **20**. The compiler loads the PDL source files into a scratch pad memory (step **2003**) and reviews the files for the correct syntax (parse step **2005**). Once completed, the compiler creates an intermediate file containing all the parse elements (step **2007**). The intermediate file in a format called "Compiled Protocol Language" (CPL). CPL instructions have a fixed layer format, and include all of the patterns, extractions, and states required for each layer and for the entire tree for a layer. The CPL file includes the number of protocols and the protocol definitions. A protocol definition for each protocol can include one or more of the protocol name, the protocol ID, a header section, a group identification section, sections for any particular layers, announcement sections, a payload section, a children section, and a states section. The CPL file is then run by the optimizer to create the final databases that will be used by monitor **300**. It would be clear to those in the art that alternate implementations of the compilation process **310** may include a different form of intermediate output, or no intermediate output at all, directly generating the final database(s).

After the parse elements have been created, the compiler builds the flow signature elements (step **2009**). This creates the extraction operations in CPL that are required at each level for each PDL module for the building of the flow signature (and hash key) and for links between layers (**2009**).

With the flow signature operations complete, the PDL compiler creates (step **2011**) the operations required to extract the payload elements from each PDL module. These payload elements are used by states in other PDL modules at higher layers in the processing.

The last pass is to create the state operations required by each PDL module. The state operations are complied from the PDL files and created in CPL form for later use (**2013**).

The CPL file is now run through an optimizer that generates the final databases used by monitor **300**.

## PROTOCOL DEFINITION LANGUAGE (PDL) REFERENCE GUIDE (VERSION A0.02)

Included herein is this reference guide (the "guide") for the page description language (PDL) which, in one aspect of the invention, permits the automatic generation of the databases used by the parser and analyzer sub-systems, and also allows for including new and modified protocols and applications to the capability of the monitor.

## COPYRIGHT NOTICE

A portion of this of this document included with the patent contains material which is subject to copyright protection. The copyright owner (Apptitude, Inc., of San Jose, Calif., formerly Technically Elite, Inc.) has no objection to the facsimile reproduction by anyone of the patent document or the patent disclosure or this document, as it appears in the Patent and Trademark Office patent file or records, but otherwise reserves all copyright rights whatsoever. Copyright© 1997–1999 by Apptitude, Inc. (formerly Technically Elite, Inc.). All Rights Reserved.

## 1. INTRODUCTION

The inventive protocol Definition Language (PDL) is a special purpose language used to describe network protocols and all the fields within the protocol headers. Within this guide, protocol descriptions (PDL files) are referred to as PDL or rules when there in no risk of confusion with other types of descriptions.

PDL uses both form and organization similar to the data structure definition part of the C programming language and the PERL scripting language. Since PDL was derived from a language used to decode network packet contact, the authors have mixed the language format with the requirements of packet decoding. This results in an expressive language that is very familiar and comfortable for describing packet content and the details required representing a flow.

### 1.1 Summary

The PDL is a non-procedural Forth Generation language (4GL). This means is describes what needs to be done without describing how to do it. The details of how are hidden in the compiler and the Compiled Protocol Layout (CPL) optimization utility.

In addition, it is used to describe network flows by defining which fields are the address fields, which are the protocol type fields, etc.

Once a PDL file is written, it is compiled using the Netscope compiler (nsc), which produces the MeterFlow database (MeterFlow.db) and the Netscope database (Netscope.db). The MeterFlow database contains the flow definitions and the Netscope database contains the protocol header definitions.

These databases are used by programs like: mfkeys, which produces flow keys (also called flow signatures); mfcpl, which produces flow definitions in CPL format; mfpkts which produces sample packets of all known protocols; and netscope, which decodes Sniffer™ and tcpdump files.

### 1.2 Guide Conventions

The following conventions will be used throughout this guide:

Small courier typeface indicates C code examples or function names. Functions are written with parentheses after them [function ()], variables are written just as their names [variables], and structure names are written prefixed with "struct" [struct packet].

Italics indicate a filename (for instance, mworks/base/h/base.h). Filenames will usually be written relative to the root directory of the distribution.

Constants are expressed in decimal, unless written "0x . . . ", the C language notation for hexadecimal numbers.

Note that any contents on any line in a PDL file following two hyphen (--) are ignored by the compiler. That is, they are comments.

2. PROGRAM STRUCTURE

A MeterFlow PDL decodes and flow set is a non-empty sequence of statements.

There are four basic types of statements or definitions available in MeterFlow PDL:

FIELD,

GROUP,

PROTOCOL and

FLOW.

2.1 Field Definitions

The FIELD definition is used to define a specific string of bits or bytes in the packet. The FIELD definition has the following format:

Name FIELD
SYNTAX Type [{Enums }]
DISPLAY-HINT "FormatString"
LENGTH "Expression"
FLAGS FieldFlags
ENCAP FieldName [, FieldName2]
LOOKUP LookupType [Filename]
ENCODING EncodingType
DEFAULT "value"
DESCRIPTION "Description"

Where only the FIELD and SYNTAX lines are required. All the other lines are attribute lines, which define special characteristics about the FIELD. Attribute lines are optional and may appear in any order. Each of the attribute lines are described in detail below:

2.1.1 SYNTAX Type [{Enums}]

This attribute defines the type and, if the type is an INT, BYTESTRING, BITSTRING, or SNMPSEQUENCE type, the enumerated values for the FIELD. The currently defined types are:

| | |
|---|---|
| INT(numBits) | Integer that is numBits bits long. |
| UNSIGNED INT(numBits) | Unsigned integer that is numBits bits long. |
| BYTESTRING(numBytes) | String that is numBytes bytes long. |
| BYTESTRING(R1 . . . R2) | String that ranges in size from R1 to R2 bytes. |
| BITSTRING(numBits) | String that is numBits bits long. |
| LSTRING(lenBytes) | String with lenBytes header. |
| NSTRING | Null terminated string. |
| DNSSTRING | DNS encoded string. |
| SNMPOID | SNMP Object Identifier. |
| SNMPSEQUENCE | SNMP Sequence. |
| SNMPTIMETICKS | SNMP TimeTicks. |
| COMBO field1 field2 | Combination pseudo field. |

2.1.2 DISPLAY-HINT "FormatString"

This attribute is for specifying how the value of the FIELD is displayed. The currently supported formats are:

| | |
|---|---|
| Numx | Print as a num byte hexidecimal number. |
| Numd | Print as a num byte decimal number. |
| Numo | Print as a num byte octal number. |
| Numb | Print as a num byte binary number. |
| Numa | Print num bytes in ASCII format. |
| Text | Print as ASCII text. |
| HexDump | Print in hexdump format. |

2.1.3 LENGTH "Expression"

This attribute defines an expression for determining the FIELD's length. Expressions are arithmetic and can refer to the value of other FIELD's in the packet by adding a $ to the referenced field's name. For example, "($tcpHeaderLen*4)–20" is a valid expression if tcpHeaderLen is another field defined for the current packet.

2.1.4 FLAGS FieldFlags

The attribute defines some special flags for a FIELD. The currently supported FieldFlags are:

| | |
|---|---|
| SAMELAYER | Display field on the same layer as the previous field. |
| NOLABEL | Don't display the field name with the value. |
| NOSHOW | Decode the field but don't display it. |
| SWAPPED | The integer value is swapped. |

2.1.5 ENCAP FieldName [, FieldName2]

This attribute defines how one packet is encapsulated inside another. Which packet is determined by the value of the FieldName field. If no packet is found using FieldName then FieldName2 is tried.

2.1.6 LOOKUP LookupType [Filename]

This attribute defines how to lookup the name for a particular FIELD value. The currently supported LookupTypes are:

| | |
|---|---|
| SERVICE | Use getservbyport( ). |
| HOSTNAME | Use gethostbyaddr( ). |
| MACADDRESS | Use $METERFLOW/conf/mac2ip.cf. |
| FILE file | Use file to lookup value. |

2.1.7 ENCODING EncodingType

This attribute defines how a FIELD is encoded. Currently, the only supported EncodingType is BER (for Basic Encoding Rules defined by ASN.1).

2.1.8 DEFAULT "value"

This attribute defines the default value to be used for this field when generating sample packets of this protocol.

2.1.9 DESCRIPTION "Description"

This attribute defines the description of the FIELD. It is used for informational purposes only.

2.2 Group Definitions

The GROUP definition is used to tie several related FIELDs together. The GROUP definition has the following format:

Name GROUP
LENGTH "Expression"
OPTIONAL "Condition"
SUMMARIZE "Condition":"FormatString" ["Condition": "FormatString" . . . ]
DESCRIPTION "Description"
::={Name=FieldOrGroup [, Name=FieldorGroup . . . ]}

Where only the GROUP and ::=lines are required. All the other lines are attribute lines, which define special characteristics for the GROUP. Attribute lines are optional and may appear in any order. Each attribute line is described in detail below:

2.2.1 LENGTH "Expression"

This attribute defines an expression for determining the GROUP's length. Expressions are arithmetic and can refer to the value of other FIELD's in the packet by adding a $ to the referenced field's name. For example,

"($tcpHeaderLen*4)−20" is a valid expression if tcpHeaderLen is another field defined for the current packet.

2.2.2 OPTIONAL "Condition"

This attribute defines a condition for determining whether a GROUP is present or not. Valid conditions are defined in the Conditions section below.

2.2.3 SUMMARIZE "Condition":"FormatString" ["Condition":"FormatString" . . . ]

This attribute defines how a GROUP will be displayed in Detail mode. A different format (FormatString) can be specified for each condition (Condition). Valid conditions are defined in the Conditions section below. Any FIELD's value can be referenced within the FormatString by proceeding the FIELD's name with a $. In addition to FIELD names there are several other special $ keywords:

| | |
|---|---|
| $LAYER | Displays the current protocol layer. |
| $GROUP | Displays the entire GROUP as a table. |
| $LABEL | Displays the GROUP label. |
| $field | Displays the field value (use enumerated name if available). |
| $:field | Displays the field value (in raw format). |

2.2.4 DESCRIPITION "Description"

This attribute defines the description of the GROUP. It is used for informational purposes only.

2.2.5 ::={Name=FieldOrGroup [, Name=FieldOrGroup . . . ]}

This defines the order of the fields and subgroups within the GROUP.

2.3 PROTOCOL Definitions

The PROTOCOL definition is used to define the order of the FIELDs and GROUPs within the protocol header. The PROTOCOL definition has the following format:

Name PROTOCOL

SUMMARIZE "Condition":"FormatString"] "Condition-":"FormatString" . . . ]

DESCRIPTION "Description"

REFERENCE "Reference"

::={Name=FieldOrGroup [, Name=FieldOrGroup . . . ]}

Where only the PROTOCOL and ::=lines are required. All the other lines are attribute lines, which define special characteristics for the PROTOCOL. Attribute lines are optional and may appear in any order. Each attribute line is described in detail below:

2.3.1 SUMMARIZE "Condition":"FormatString" ["Condition":"FormatString". . . ]

This attribute defines how a PROTOCOL will be displayed in Summary mode. A different format (FormatString) can be specified for each condition (Condition). Valid conditions are defined in the Conditions section below. Any FIELD's value can be referenced within the FormatString by proceeding the FIELD's name with a $. In addition to FIELD names there are several other special $ keywords:

| | |
|---|---|
| $LAYER | Displays the current protocol layer. |
| $VARBIND | Displays the entire SNMP VarBind list. |
| $field | Displays the field value (use enumerated name if available). |
| $:field | Displays the field value (in raw format). |
| $#field | Counts all occurrences of field. |
| $*field | Lists all occurrences of field. |

2.3.2 DESCRIPTION "Description"

This attribute defines the description of the PROTOCOL. It is used for informational purposes only.

2.3.3 REFERENCE "Reference"

This attribute defines the reference material used to determine the protocol format. It is used for informational purposes only.

2.3.4 ::={Name=FieldOrGroup [, Name=FieldOrGroup . . . ]}

This defines the order of the FIELDs and GROUPs within the PROTOCOL.

2.4 FLOW Definitions

The FLOW definition is used to define a network flow by describing where the address, protocol type, and port numbers are in a packet. The FLOW definition has the following format:

Name FLOW

HEADER {Option [, Option . . . ]}

DLC-LAYER {Option [, Option . . . ]}

NET-LAYER {Option [, Option . . . ]}

CONNECTION {Option [, Option . . . ]}

PAYLOAD {Option [, Option . . . ]}

CHILDREN {Option [, Option . . . ]}

STATE-BASED

STATES "Definitions"

Where only the FLOW line is required. All the other lines are attribute lines, which define special characteristics for the FLOW. Attribute lines are optional and may appear in any order. However, at least one attribute line must be present. Each attribute line is described in detail below:

2.4.1 HEADER {Option [, Option . . . ]}

This attribute is used to describe the length of the protocol header. The currently supported Options are:

| | |
|---|---|
| LENGTH = number | Header is a fixed length of size number. |
| LENGTH = field | Header is variable length determined by value of field. |
| IN-WORDS | The units of the header length are in 32-bit words rather than bytes. |

2.4.2 DLC-LAYER {Option [, Option . . . ]}

If the protocol is a data link layer protocol, this attribute describes it. The currently supported Options are:

| | |
|---|---|
| DESTINATION = field | Indicates which field is the DLC destination address. |
| SOURCE = field | Indicates which field is the DLC source address. |
| PROTOCOL | Indicates this is a data link layer protocol. |
| TUNNELING | Indicates this is a tunneling protocol. |

2.4.3 NET-LAYER {Option [, Option . . . ]}

If the protocol is a network layer protocol, then this attribute describes it. The currently supported Options are:

| | |
|---|---|
| DESTINATION = field | Indicates which field is the network destination address. |
| SOURCE = field | Indicates which field is the network source address. |
| TUNNELING | Indicates this is a tunneling protocol. |
| FRAGMENTATION = type | Indicates this protocol supports fragmentation. There are currently two fragmentation types: IPV4 and IPV6. |

2.4.4 CONNECTION {Option [, Option . . . ]}

If the protocol is a connection-oriented protocol, then this attribute describes how connections are established and torn down. The currently supported Options are:

| | |
|---|---|
| IDENTIFIER = field | Indicates the connection identifier field. |
| CONNECT-START = "flag" | Indicates when a connection is being initiated. |
| CONNECT-COMPLETE = "flag" | Indicates when a connection has been established. |
| DISCONNECT-START = "flag" | Indicates when a connection is being torn down. |
| DISCONNECT-COMPLETE = "flag" | Indicates when a connection has been torn down. |
| INHERITED | Indicates this is a connection-oriented protocol but the parent protocol is where the connection is established. |

2.4.5 PAYLOAD {Option [, Option . . . ]}

This attribute describes how much of the payload from a packet of this type should be stored for later use during analysis. The currently supported Options are:

| | |
|---|---|
| INCLUDE-HEADER | Indicates that the protocol header should be included. |
| LENGTH = number | Indicates how many bytes of the payload should be stored. |
| DATA = field | Indicates which field contains the payload. |

2.4.6 CHILDREN {Option [, Option . . . ]}

This attribute describes how children protocols are determined. The currently supported Options are:

| | |
|---|---|
| DESTINATION = field | Indicates which field is the destination port. |
| SOURCE = field | Indicates which field is the source port. |
| LLCCHECK = flow | Indicates that if the DESTINATION field is less than 0 × 05DC then use flow instead of the current flow definition. |

2.4.7 STATE-BASED

This attribute indicates that the flow is a state-based flow.

2.4.8 STATES "Definitions"

This attribute describes how children flows of this protocol are determined using states. See the State Definitions section below for how these states are defined.

2.5 CONDITIONS

Conditions are used with the OPTIONAL and SUMMARIZE attributes and may consist of the following:

| | |
|---|---|
| Value1 == Value2 | Value1 equals Value2. Works with string values. |
| Value1 != Value2 | Value1 does not equal Value2. Works with string values. |
| Value1 <= Value2 | Value1 is less than or equal to Value2. |
| Value1 >= Value2 | Value1 is greater than or equal to Value2. |
| Value1 < Value2 | Value1 is less than Value2. |
| Value1 > Value2 | Value1 is greater than Value2. |
| Field m/regex/ | Field matches the regular expression regex. |

Where Value1 and Value2 can be either FIELD references (field names preceded by a $) or constant values. Note that compound conditional statements (using AND and OR) are not currently supported.

2.6 STATE DEFINITIONS

Many applications running over data networks utilize complex methods of classifying traffic through the use of multiple states. State definitions are used for managing and maintaining learned states from traffic derived from the network.

The basic format of a state definition is:

StateName: Operand Parameters [Operand Parameters . . . ]

The various states of a particular flow are described using the following operands:

2.6.1 CHECKCONNECT, Operand

Checks for connection. Once connected executes operand.

2.6.2 GOTO State

Goes to state, using the current packet.

2.6.3 NEXT State

Goes to state, using the next packet.

2.6.4 DEFAULT Operand

Executes operand when all other operands fail.

2.6.5 CHILD Protocol

Jump to child protocol and perform state-based processing (if any) in the child.

2.6.6 WAIT Numpackets, Operand**1**, Operand**2**

Waits the specified number of packets. Executes operand**1** when the specified number of packets have been received. Executes operand**2** when a packet is received but it is less than the number of specified packets.

2.6.7 MATCH 'String' Weight Offset LF-offset Range LF-range, Operand

Searches for a string in the packet, executes operand if found.

2.6.8 CONSTANT Number Offset Range, Operand

Checks for a constant in a packet, executes operand if found.

2.6.9 EXTRACTIP Offset Destination, Operand

Extracts an IP address from the packet and then executes operand.

2.6.10 EXTRACTPORT Offset Destination, Operand

Extracts a port number from the packet and then executes operand.

2.6.11 CREATEREDIRECTEDFLOW, Operand

Creates a redirected flow and then executes operand.

3. EXAMPLE PDL RULES

The following section contains several examples of PDL Rule files.

3.1 Ethernet

The following is an example of the PDL for Ethernet:

```
MacAddress    FIELD
              SYNTAX          BYTESTRING (6)
              DISPLAY-HINT    "1x:"
              LOOKUP          MACADDRESS
              DESCRIPTION
                    "MAC layer physical address"
etherType     FIELD
              SYNTAX          INT(16)
              DISPLAY-HINT    "1x:"
              LOOKUP          FILE "EtherType.cf"
              DESCRIPTION
                    "Ethernet type field"
etherData     FIELD
              SYNTAX          BYTESTRING(46..1500)
              ENCAP             etherType
              DISPLAY-HINT    "HexDump"
              DESCRIPTION
                    "Ethernet data"
ethernet      PROTOCOL
              DESCRIPTION
                "Protocol format for an Ethernet frame"
              REFERENCE       "RFC 894"
::= { MacDest=macAddress, MacSrc=macAddress, EtherType=etherType,
  Data=etherData }
ethernet      FLOW
              HEADER { LENGTH=14 }
              DLC-LAYER {
                SOURCE=MacSrc,
                DESTINATION=MacDest,
                TUNNELING,
                PROTOCOL
              }
              CHILDREN { DESTINATION=EtherType,
              LLC-CHECK=llc }
```

3.2 IP Version 4

Here is an example of the PDL for the IP protocol:

```
ipAddress     FIELD
              SYNTAX          BYTESTRING(4)
              DISPLAY-HINT    "1d."
              LOOKUP          HOSTNAME
              DESCRIPTION
  "IP address"
ipversion     FIELD
              SYNTAX          INT(4)
              DEFAULT         "4"
ipHeaderLength    FIELD
                  SYNTAX INT(4)
ipTypeOfService   FIELD
                  SYNTAX          BITSTRING(8) { minCost(1),
                                  maxReliability(2),
                                  maxThruput(3),
                                  minDelay(4) }
ipLength      FIELD
              SYNTAX UNSIGNED INT(16)
ipFlags       FIELD
              SYNTAX          BITSTRING(3) { moreFrags(0),
                              dontFrag(1) }
IpFragmentOffset  FIELD
                  SYNTAX          INT(13)
ipProtocol    FIELD
              SYNTAX INT(8)
              LOOKUP FILE "IpProtocol.cf"
```

-continued

```
ipData FIELD
              SYNTAX          BYTESTRING(0..1500)
              ENCAP           ipProtocol
              DISPLAY-HINT    "HexDump"
ip        PROTOCOL
          SUMMARIZE
          "$FragmentOffset != 0"
            "IpFragment ID=$Identification Offset=$Fragmentoffset"
          *"Default" :
            "IP Protocol=$Protocol"
          DESCRIPTION
            "Protocol format for the Internet Protocol"
          REFERENCE    "RFC 791"
::= { Version=ipVersion, HeaderLength=ipHeaderLength,
          TypeOfService=ipTypeOfService, Length=ipLength,
          Identification=UInt16, IpFlags=ipFlags,
          FragmentOffset=ipFragmentOffset, TimeToLive=Int8,
          Protocol=ipProtocol, Checksum=ByteStr2,
          IpSrc=ipAddress, IpDest=ipAddress, Options=ipOptions,
          Fragment=ipFragment, Data=ipData }
ip        FLOW
          HEADER { LENGTH=HeaderLength, IN-WORDS }
          NET-LAYER {
              SOURCE=IpSrc,
              DESTINATION=IpDest,
              FRAGMENTATION=IPV4,
              TUNNELING
          }
          CHILDREN { DESTINATION=Protocol }
ipFragData    FIELD
              SYNTAX          BYTESTRING(1..1500)
              LENGTH          "ipLength - ipHeaderLength * 4"
              DISPLAY-HINT    "HexDump"
ipFragment    GROUP
              OPTIONAL        "$FragmentOffset != 0"
::= { Data=ipFragData }
ipOptionCode  FIELD
              SYNTAX INT(8) { ipRR(0x07), ipTimestamp(0x44),
                              ipLSRR(0x83),
                              ipSSRR(0x89) }
              DESCRIPTION
                "IP option code"
ipOptionLength    FIELD
                  SYNTAX UNSIGNED INT(8)
                  DESCRIPTION
                    "Length of IP option"
ipOptionData  FIELD
                  SYNTAX          BYTESTRING(0..1500)
                  ENCAP             ipOptionCode
                  DISPLAY-HINT    "HexDump"
ipOptions     GROUP
              LENGTH          "(ipHeaderLength * 4) - 20"
::= { Code=ipOptionCode, Length=ipOptionLength, Pointer=UInt8,
          Data=ipOptionData }
```

3.3 TCP

Here is an example of the PDL for the TCP protocol:

```
tcpPort FIELD
        SYNTAX UNSIGNED INT(16)
        LOOKUP FILE "TcpPort.cf"
tcpHeaderLen FIELD
        SYNTAX INT(4)
tcpFlags FIELD
        SYNTAX BITSTRING(12) { fin(0), syn(1), rst(2), psh(3),
                               ack(4), urg(5) }
tcpData FIELD
        SYNTAX BYTESTRING(0..1564)
        LENGTH " ($ipLength- ($ipHeaderLength*4)) -
        ($tcpHeaderLen*4) "
        ENCAP          tcpport
        DISPLAY-HINT   "HexDump"
tcp     PROTOCOL
```

-continued

```
        SUMMARIZE
          "Default"
            "TCP ACK=$Ack WIN=$WindowSize"
        DESCRIPTION
          "Protocol format for the Transmission Control Protocol"
        REFERENCE        "RFC 793"
::= { SrcPort=tcpPort, DestPort=tcpPort, SequenceNum=UInt32,
        Ack=UInt32, HeaderLength=tcpHeaderLen, TcpFlags=tcpFlags,
        WindowSize=UInt16, Checksum=ByteStr2,
        UrgentPointer=UInt16, Options=tcpOptions, Data=tcpData }
tcp     FLOW
        HEADER { LENGTH=HeaderLength, IN-WORDS }
        CONNECTION {
                IDENTIFIER=SequenceNum,
                CONNECT-START="TcpFlags:1",
                CONNECT-COMPLETE="TcpFlags:4",
                DISCONNECT-START="TcpFlags:0",
                DISCONNECT-COMPLETE="TcpFlags:4"
         }
        PAYLOAD { INCLUDE-HEADER }
        CHILDREN { DESTINATION=DestPort, SOURCE=SrcPort }
tcpOptionKind FIELD
                SYNTAX UNSIGNED INT(8) { tcpOptEnd(0),
                tcpNop(1),
tcpMSS(2), tcpWscale(3), tcpTimestamp(4) }
                DESCRIPTION
                        "Type of TCP option"
tcpOptionDataFIELD
                SYNTAX          BYTESTRING(0..1500)
                ENCAP           tcpOptionKind
                FLAGS           SAMELAYER
                DISPLAY-HINT    "HexDump"
tcpOptions      GROUP
                LENGTH          "($tcpHeaderLen * 4) - 20"
::= { Option=tcpOptionKind, OptionLength=UInt8,
        OptionData=tcpOptionData }
tcpMSS PROTOCOL
::= { MaxSegmentSize=UInt16 }
```

### 3.4 HTTP (With State)

Here is an example of the PDL for the HTTP protocol:

```
httpData FIELD
     SYNTAX    BYTESTRING(1..1500)
     LENGTH       "($ipLength - ($ipHeaderLength * 4)) -
                  ($tcpHeaderLen * 4) "
DISPLAY-HINT      "Text"
FLAGS             NOLABEL
http           PROTOCOL
               SUMMARIZE
                  "$httpData m/^GET|^HTTP|^HEAD|^POST/" :
                       "HTTP $httpData"
                  "$httpData m/^[Dd]ate|^[Ss]erver|^[Ll]ast-
                  [Mm]odified/" :
                       "HTTP $httpData"
                  "$httpData m/^[Cc]ontent-/" :
                       "HTTP $httpData"
                  $httpData m/^<HTML>/" :
                       "HTTP [HTML document]"
                  $httpData m/^GIF/" :
                       "HTTP [GIF image]"
                  "Default" :
                       "HTTP [Data]"
               DESCRIPTION
                  "Protocol format for HTTP."
::= { Data=httpData }
http   FLOW
HEADER { LENGTH=0 }
CONNECTION { INHERITED }
PAYLOAD { INCLUDE-HEADER, DATA=Data, LENGTH=256 }
STATES
                  "S0: CHECKCONNECT, GOTO S1
                       DEFAULT NEXT S0
```

-continued

```
                  S1: WAIT 2, GOTO S2, NEXT S1
                       DEFAULT NEXT S0
                  S2: MATCH
                            '\n\r\n'          900 0 0 255 0, NEXT S3
                            '\n\n'            900 0 0 255 0, NEXT S3
                            'POST /tds?'       50 0 0 127 1,
                                              CHILD sybaseWebsql
                            '.hts HTTP/1.0'    50 4 0 127 1,
                                              CHILD sybaseJdbc
                            'jdbc:sybase:Tds'  50 4 0 127 1,
                                              CHILD sybaseTds
                            'PCN-The Poin'    500 4 1 255 0,
                                              CHILD pointcast
                            't: BW-C-'        100 4 1 255 0,
                                              CHILD backweb
                       DEFAULT NEXT S3
                  s3: MATCH
                            '\n\r\n'           50 0 0   0 0, NEXT S3
                            '\n\n'             50 0 0   0 0, NEXT S3
                            'Content-Type:'   800 0 0 255 0,
                                              CHILD mime
                            'PCN-The Poin'    500 4 1 255 0,
                                              CHILD pointcast
                            't: BW-C-'        100 4 1 255 0,
                                              CHILD backweb
                            DEFAULT NEXT S0"
sybaseWebsql         FLOW
                     STATE-BASED
sybaseJdbc           FLOW
                     STATE-BASED
sybaseTds            FLOW
                     STATE-BASED
pointcast            FLOW
                     STATE-BASED
backweb              FLOW
                     STATE-BASED
mime                 FLOW
                     STATE-BASED
                     STATES
"   S0:   MATCH
'application'        900 0 0    1 0,
                     CHILD mimeApplication
'audio'              900 0 0    1 0,
                     CHILD mimeAudio
'image'               50 0 0    1 0,
                     CHILD mimeImage
'text'                50 0 0    1 0,
                     CHILD mimeText
'video'               50 0 0    1 0,
                     CHILD mimeVideo
'x-world'            500 4 1 255 0,
                     CHILD mimeXworld
DEFAULT GOTO S0"
mimApplication       FLOW
                     STATE-BASED
mimeAudio         FLOW
                  STATE-BASED
                  STATES
                   "S0: MATCH
                            'basic'           100 0 0 1 0,
                                              CHILD pdBasicAudio
                            'midi'            100 0 0 1 0,
                                              CHILD pdMidi
                            'mpeg'            100 0 0 1 0,
                                              CHILD pdMpeg2Audio
                            'vnd.rn-realaudio' 100 0 0 1 0,
                                              CHILD pdRealAudio
                            'wav'             100 0 0 1 0,
                                              CHILD pdWav
                            'x-aiff'          100 0 0 1 0,
                                              CHILD pdAiff
                            'x-midi'          100 0 0 1 0,
                                              CHILD pdMidi
                            'x-mpeg'          100 0 0 1 0,
                                              CHILD pdMpeg2Audio
                            'x-mpgurl'        100 0 0 1 0,
                                              CHILD pdMpeg3Audio
```

-continued

```
                     'x-pn-realaudio'   100 0 0 1 0,
                                        CHILD pdRealAudio
                     'x-wav'            100 0 0 1 0,
                                        CHILD pdWav
                  DEFAULT GOTO S0"
mimeImage     FLOW
              STATE-BASED
mimeText      FLOW
              STATE-BASED
mimeVideo     FLOW
              STATE-BASED
mimeXworld    FLOW
              STATE-BASED
pdBasicAudio     FLOW
              STATE-BASED
pdMidi           FLOW
              STATE-BASED
pdMpeg2Audio     FLOW
              STATE-BASED
pdMpeg3Audio     FLOW
              STATE-BASED
pdRealAudio      FLOW
              STATE-BASED
pdWav            FLOW
              STATE-BASED
pdAiff           FLOW
              STATE-BASED
```

Embodiments of the present invention automatically generate flow signatures with the necessary recognition patterns and state transition climb procedure. Such comes from analyzing packets according to parsing rules, and also generating state transitions to search for. Applications and protocols, at any level, are recognized through state analysis of sequences of packets.

Note that one in the art will understand that computer networks are used to connect many different types of devices, including network appliances such as telephones, "Internet" radios, pagers, and so forth. The term computer as used herein encompasses all such devices and a computer network as used herein includes networks of such computers.

Although the present invention has been described in terms of the presently preferred embodiments, it is to be understood that the disclosure is not to be interpreted as limiting. Various alterations and modifications will no doubt become apparent to those or ordinary skill in the art after having read the above disclosure. Accordingly, it is intended that the claims be interpreted as covering all alterations and modifications as fall within the true spirit and scope of the present invention.

## APPENDIX: SOME PDL FILES

The following pages include some PDL files as examples. Included herein are the PDL contents of the following files. A reference to PDL is also included herein. Note that any contents on any line following two hyphen (--) are ignored by the compiler. That is, they are comments.

common.pdl;
flows.pdl;
virtual.pdl;
ethernet.pdl;
IEEE8032.pdl and IEEE8033.pdl (ethertype files);
IP.pdl;
TCP.pdl and UDP.pdl;
RPC.pdl;
NFS.pdl; and
HTTP.pdl.

```
----------------------------------------------------------------------------
--
--   Common.pdl - Common protocol definitions
--
--   Description:
--      This file contains some field definitions for commonly used fields
--      in various network protocols.
--
--   Copyright:
--      Copyright (c) 1996–1999 Apptitude, Inc.
--        (formerly Technically Elite, Inc.)
--      All rights reserved.
--
--   RCS:
--      $Id: Common.pdl,v 1.7 1999/04/13 15:47:56 skip Exp $
----------------------------------------------------------------------------
Int4      FIELD
          SYNTAX INT(4)
Int8      FIELD
          SYNTAX INT(8)
Int16     FIELD
          SYNTAX INT(16)
Int24     FIELD
          SYNTAX INT(24)
Int32     FIELD
          SYNTAX INT(32)
Int64     FIELD
          SYNTAX INT(64)
UInt8     FIELD
          SYNTAX UNSIGNED INT(8)
UInt16    FIELD
          SYNTAX UNSIGNED INT(16)
UInt24    FIELD
          SYNTAX UNSIGNED INT(24)
UInt32    FIELD
```

-continued

```
        SYNTAX UNSIGNED INT(32)
UInt64  FIELD
        SYNTAX UNSIGNED INT(64)
SInt16  FIELD
        SYNTAX INT(16)
        FLAGS SWAPPED
SUInt16     FIELD
        SYNTAX UNSIGNED INT(16)
        FLAGS SWAPPED
SInt32  FIELD
        SYNTAX INT(32)
        FLAGS SWAPPED
ByteStr1        FIELD
                SYNTAX BYTESTRING(1)
ByteStr2        FIELD
                SYNTAX BYTESTRING(2)
ByteStr4        FIELD
                SYNTAX BYTESTRING(4)
Pad1            FIELD
                SYNTAX BYTESTRING(1)
                FLAGS NOSHOW
Pad2            FIELD
                SYNTAX BYTESTRING(2)
                FLAGS NOSHOW
Pad3            FIELD
                SYNTAX BYTESTRING(3)
                FLAGS NOSHOW
Pad4            FIELD
                SYNTAX BYTESTRING(4)
                FLAGS NOSHOW
Pad5            FIELD
                SYNTAX BYTESTRING(5)
                FLAGS NOSHOW
macAddress      FIELD
    SYNTAX          BYTESTRING(6)
    DISPLAY-HINT    "1x:"
    LOOKUP          MACADDRESS
    DESCRIPTION
        "MAC layer physical address"
ipAddress       FIELD
    SYNTAX          BYTESTRING(4)
    DISPLAY-HINT    "1d."
    LOOKUP          HOSTNAME
    DESCRIPTION
        "IP address"
ipv6Address     FIELD
    SYNTAX          BYTESTRING(16)
    DISPLAY-HINT    "1d."
    DESCRIPTION
        "IPV6 address"
------------------------------------------------------------------------
--
--  Flows.pdl - General FLOW definitions
--
--  Description:
--    This file contains general flow definitions.
--
--  Copyright:
--    Copyright (c) 1998-1999 Apptitude, Inc.
--      (fomerly Technically Elite, Inc.)
--    All rights reserved.
--
--  RCS:
--    $Id: Flows.pdl,v 1.12 1999/04/13 15:47:57 skip Exp $
--
------------------------------------------------------------------------
chaosnet    FLOW
spanningTree FLOW
sna         FLOW
oracleTNS FLOW
        PAYLOAD { INCLUDE-HEADER, LENGTH=256 }
ciscoOUI FLOW
------------------------------------------------------------------------
--  IP Protocols
------------------------------------------------------------------------
igmp        FLOW
GGP         FLOW
ST          FLOW
UCL         FLOW
```

-continued

```
egp         FLOW
igp         FLOW
BBN-RCC-MON   FLOW
NVP2        FLOW
PUP         FLOW
ARGUS       FLOW
EMCON       FLOW
XNET        FLOW
MUX         FLOW
DCN-MEAS   FLOW
HMP         FLOW
PRM         FLOW
TRUNK1      FLOW
TRUNK2      FLOW
LEAF1       FLOW
LEAF2       FLOW
RDP         FLOW
IRTP        FLOW
ISO-TP4         FLOW
NETBLT      FLOW
MFE-NSP         FLOW
MERIT-INP       FLOW
SEP         FLOW
PC3         FLOW
IDPR        FLOW
XTP         FLOW
DDP         FLOW
IDPR-CMTP       FLOW
TPPlus      FLOW
IL          FLOW
SIP         FLOW
SDRP        FLOW
SIP-SR      FLOW
SIP-FRAG      FLOW
IDRP        FLOW
RSVP        FLOW
MHRP        FLOW
BNA         FLOW
SIPP-ESP      FLOW
SIPP-AH         FLOW
INLSP       FLOW
SWIPE       FLOW
NHRP        FLOW
CFTP        FLOW
SAT-EXPAK       FLOW
KRYPTOLAN   FLOW
RVD         FLOW
IPPC        FLOW
SAT-MON         FLOW
VISA        FLOW
IPCV        FLOW
CPNX        FLOW
CPHB        FLOW
WSN         FLOW
PVP         FLOW
BR-SAT-MON  FLOW
SUN-ND    FLOW
WB-MON    FLOW
WB-EXPAK  FLOW
ISO-IP      FLOW
VMTP        FLOW
SECURE-VMTP   FLOW
TTP         FLOW
NSFNET-IGP      FLOW
DGP         FLOW
TCF         FLOW
IGRP        FLOW
OSPFIGP             FLOW
Sprite-RPC          FLOW
LARP        FLOW
MTP         FLOW
AX25        FLOW
IPIP        FLOW
MICP        FLOW
SCC-SP      FLOW
ETHERIP         FLOW
encap       FLOW
GMTP        FLOW
---------------------------------------------------------------------------
```

-continued

```
-- UDP Protocols
compressnet FLOW
rje FLOW
echo FLOW
discard FLOW
systat FLOW
daytime FLOW
qotd FLOW
msp FLOW
chargen FLOW
biff FLOW
who FLOW
syslog FLOW
loadav FLOW
notify FLOW
acmaint_dbd FLOW
acmaint_transd FLOW
puparp FLOW
applix FLOW
ock FLOW
--------------------------------------------------------------------------
-- TCP Protocols
--------------------------------------------------------------------------
tcpmux FLOW
telnet FLOW
       CONNECTION { INHERITED }
privMail FLOW
nsw-fe FLOW
msg-icp FLOW
msg-auth FLOW
dsp FLOW
privPrint FLOW
time FLOW
rap FLOW
rip FLOW
graphics FLOW
nameserver FLOW
nicname FLOW
mpm-flags FLOW
mpm FLOW
mpm-snd FLOW
ni-ftp FLOW
auditd FLOW
finger FLOW
re-mail-ck FLOW
la-maint FLOW
xns-time FLOW
xns-ch FLOW
isi-gl FLOW
xns-auth FLOW
privTerm FLOW
xns-mail FLOW
privFile FLOW
ni-mail FLOW
acas FLOW
covia FLOW
tacacs-ds FLOW
sqlnet FLOW
gopher FLOW
netrjs-1 FLOW
netrjs-2 FLOW
netrjs-3 FLOW
netrjs-4 FLOW
privDial FLOW
deos FLOW
privRJE FLOW
vettcp FLOW
hosts2-ns FLOW
xfer FLOW
ctf FLOW
mit-ml-dev FLOW
mfcobol FLOW
kerberos FLOW
su-mit-tg FLOW
dnsix FLOW
mit-dov FLOW
npp FLOW
dcp FLOW
objcall FLOW
```

-continued

| | |
|---|---|
| supdup | FLOW |
| dixie | FLOW |
| swift-rvf | FLOW |
| tacnews | FLOW |
| metagram | FLOW |
| newacct | FLOW |
| hostname | FLOW |
| iso-tsap | FLOW |
| gppitnp | FLOW |
| csnet-ns | FLOW |
| threeCom-tsmux | FLOW |
| rtelnet | FLOW |
| snagas | FLOW |
| mcidas | FLOW |
| auth | FLOW |
| audionews | FLOW |
| sftp | FLOW |
| ansanotify | FLOW |
| uucp-path | FLOW |
| sqlserv | FLOW |
| cfdptkt | FLOW |
| erpc | FLOW |
| smakynet | FLOW |
| ntp | FLOW |
| ansatrader | FLOW |
| locus-map | FLOW |
| unitary | FLOW |
| locus-con | FLOW |
| gss-xlicen | FLOW |
| pwdgen | FLOW |
| cisco-fna | FLOW |
| cisco-tna | FLOW |
| cisco-sys | FLOW |
| statsrv | FLOW |
| ingres-net | FLOW |
| loc-srv | FLOW |
| profile | FLOW |
| emfis-data | FLOW |
| emfis-cntl | FLOW |
| bl-idm | FLOW |
| imap2 | FLOW |
| news | FLOW |
| uaac | FLOW |
| iso-tp0 | FLOW |
| iso-ip | FLOW |
| cronus | FLOW |
| aed-512 | FLOW |
| sql-net | FLOW |
| hems | FLOW |
| bftp | FLOW |
| sgmp | FLOW |
| netsc-prod | FLOW |
| netsc-dev | FLOW |
| sqlsrv | FLOW |
| knet-cmp | FLOW |
| pcmail-srv | FLOW |
| nss-routing | FLOW |
| sgmp-traps | FLOW |
| cmip-man | FLOW |
| cmip-agent | FLOW |
| xns-courier | FLOW |
| s-net | FLOW |
| namp | FLOW |
| rsvd | FLOW |
| send | FLOW |
| print-srv | FLOW |
| multiplex | FLOW |
| cl-1 | FLOW |
| xyplex-mux | FLOW |
| mailq | FLOW |
| vmnet | FLOW |
| genrad-mux | FLOW |
| xdmcp | FLOW |
| nextstep | FLOW |
| bgp | FLOW |
| ris | FLOW |
| unify | FLOW |
| audit | FLOW |
| ocbinder | FLOW |

-continued

| | |
|---|---|
| ocserver | FLOW |
| remote-kis | FLOW |
| kis | FLOW |
| aci | FLOW |
| mumps | FLOW |
| qft | FLOW |
| gacp | FLOW |
| prospero | FLOW |
| osu-nms | FLOW |
| srmp | FLOW |
| irc | FLOW |
| dn6-nlm-aud | FLOW |
| dn6-smm-red | FLOW |
| dls | FLOW |
| dls-mon | FLOW |
| smux | FLOW |
| src | FLOW |
| at-rtmp | FLOW |
| at-nbp | FLOW |
| at-3 | FLOW |
| at-echo | FLOW |
| at-5 | FLOW |
| at-zis | FLOW |
| at-7 | FLOW |
| at-8 | FLOW |
| tam | FLOW |
| z39-50 | FLOW |
| anet | FLOW |
| vmpwscs | FLOW |
| softpc | FLOW |
| atls | FLOW |
| dbase | FLOW |
| mpp | FLOW |
| uarps | FLOW |
| imap3 | FLOW |
| fln-spx | FLOW |
| rsh-spx | FLOW |
| cdc | FLOW |
| sur-meas | FLOW |
| link | FLOW |
| dsp3270 | FLOW |
| pdap | FLOW |
| pawserv | FLOW |
| zserv | FLOW |
| fatserv | FLOW |
| csi-sgwp | FLOW |
| clearcase | FLOW |
| ulistserv | FLOW |
| legent-1 | FLOW |
| legent-2 | FLOW |
| hassle | FLOW |
| nip | FLOW |
| tnETOS | FLOW |
| dsETOS | FLOW |
| is99c | FLOW |
| is99s | FLOW |
| hp-collector | FLOW |
| hp-managed-node | FLOW |
| hp-alarm-mgr | FLOW |
| arns | FLOW |
| ibm-app | FLOW |
| asa | FLOW |
| aurp | FLOW |
| unidata-ldm | FLOW |
| ldap | FLOW |
| uis | FLOW |
| synotics-relay | FLOW |
| synotics-broker | FLOW |
| dis | FLOW |
| embl-ndt | FLOW |
| netcp | FLOW |
| netware-ip | FLOW |
| mptn | FLOW |
| kryptolan | FLOW |
| work-sol | FLOW |
| ups | FLOW |
| genie | FLOW |
| decap | FLOW |
| nced | FLOW |

-continued

| | |
|---|---|
| ncld | FLOW |
| imsp | FLOW |
| timbuktu | FLOW |
| prm-sm | FLOW |
| prm-nm | FLOW |
| decladebug | FLOW |
| rmt | FLOW |
| synoptics-trap | FLOW |
| smsp | FLOW |
| infoseek | FLOW |
| bnet | FLOW |
| silverplatter | FLOW |
| onmux | FLOW |
| hyper-g | FLOW |
| ariel1 | FLOW |
| smpte | FLOW |
| ariel2 | FLOW |
| ariel3 | FLOW |
| opc-job-start | FLOW |
| opc-job-track | FLOW |
| icad-el | FLOW |
| smartsdp | FLOW |
| svrloc | FLOW |
| ocs_cmu | FLOW |
| ocs_amu | FLOW |
| utmpsd | FLOW |
| utmpcd | FLOW |
| iasd | FLOW |
| nnsp | FLOW |
| mobileip-agent | FLOW |
| mobilip-mn | FLOW |
| dna-cml | FLOW |
| comscm | FLOW |
| dsfgw | FLOW |
| dasp | FLOW |
| sgcp | FLOW |
| decvms-sysmgt | FLOW |
| cvc_hostd | FLOW |
| https | FLOW |
| | CONNECTION { INHERITED } |
| snpp | FLOW |
| microsoft-ds | FLOW |
| ddm-rdb | FLOW |
| ddm-dfm | FLOW |
| ddm-byte | FLOW |
| as-servermap | FLOW |
| tserver | FLOW |
| exec | FLOW |
| | CONNECTION { INHERITED } |
| login | FLOW |
| | CONNECTION { INHERITED } |
| cmd | FLOW |
| | CONNECTION { INHERITED } |
| printer | FLOW |
| | CONNECTION { INHERITED } |
| talk | FLOW |
| | CONNECTION { INHERITED } |
| ntalk | FLOW |
| | CONNECTION { INHERITED } |
| utime | FLOW |
| efs | FLOW |
| timed | FLOW |
| tempo | FLOW |
| courier | FLOW |
| conference | FLOW |
| netnews | FLOW |
| netwall | FLOW |
| apertus-ldp | FLOW |
| uucp | FLOW |
| uucp-rlogin | FLOW |
| klogin | FLOW |
| kshell | FLOW |
| new-rwho | FLOW |
| dsf | FLOW |
| remotefs | FLOW |
| rmonitor | FLOW |
| monitor | FLOW |
| chshell | FLOW |
| p9fs | FLOW |

-continued

```
whoami      FLOW
meter       FLOW
ipcserver       FLOW
urm         FLOW
nqs         FLOW
sift-uft        FLOW
npmp-trap       FLOW
npmp-local      FLOW
npmp-gui        FLOW
ginad       FLOW
doom        FLOW
mdqs        FLOW
elcsd       FLOW
entrustmanager      FLOW
netviewdm1      FLOW
netviewdm2      FLOW
netviewdm3      FLOW
netgw       FLOW
netrcs      FLOW
flexlm      FLOW
fujitsu-dev     FLOW
ris-cm      FLOW
kerberos-adm    FLOW
rfile       FLOW
pump        FLOW
qrh         FLOW
rrh         FLOW
tell        FLOW
nlogin      FLOW
con         FLOW
ns          FLOW
rxe         FLOW
quotad      FLOW
cycleserv       FLOW
omserv      FLOW
webster         FLOW
phonebook       FLOW
vid         FLOW
cadlock         FLOW
rtip        FLOW
cycleserv2      FLOW
submit      FLOW
rpasswd         FLOW
entomb      FLOW
wpages      FLOW
wpgs        FLOW
concert         FLOW
mdbs_daemon     FLOW
device      FLOW
xtreelic        FLOW
maitrd      FLOW
busboy      FLOW
garcon      FLOW
puprouter       FLOW
socks       FLOW
--------------------------------------------------------------------------
--
-- Virtual.pdl - Virtual Layer definition
--
-- Description:
--   This file contains the definition for the VirtualBase layer used
--   by the embodiment.
-- Copyright:
--   Copyright (c) 1998–1999 Apptitude,
--    (formerly Technically Elite, Inc.)
--   All rights reserved.
--
-- RCS:
--   $Id: Virtual.pdl,v 1.13 1999/04/13 15:48:03 skip Exp $
--------------------------------------------------------------------------
-- This includes two things: the flow signature (called FLOWKEY) that the
-- system that is going to use.
--
-- note that not all elements are in the HASH. Reason is that these non-HASHED
-- elements may be varied without the HASH changing, which allows the system
-- to look up multiple buckets with a single HASH. That is, the MeyMatchFlag,
-- StateStatus Flag and MulipacketID may be varied.
--
FLOWKEY {
```

-continued

```
     KeyMatchFlags, -- to tell the system which of the in-HASH elements have to
-- match for the this particular flow record.
                         -- Flows for which complete signatures may not yet have
                         -- been generated may then be stored in the system
--
StateStatusFlags,
     GroupId1               IN-HASH,  -- user defined
     GroupId2               IN-HASH,  -- user defined
     DLCProtocol            IN-HASH, ,   -- data link protocol - lowest level we
                                         -- evaluate. It is the type for the
-- Ethernet V 2
     NetworkProtocol        IN-HASH,     -- IP, etc.
     TunnelProtocol         IN-HASH,     -- IP over IPx, etc.
     TunnelTransport        IN-HASH,
     TransportProtocol      IN-HASH,
     ApplicationProtocol    IN-HASH,
     DLCAddresses(8)        IN-HASH,  -- lowest level address
     NetworkAddresses(16)   IN-HASH,
     TunnelAddresses(16)    IN-HASH,
     ConnectionIds          IN-HASH,
     MultiPacketId                    -- used for fragmentaion purposes
}
--   now define all of the children. In this example, only one virtual
--   child - Ethernet.
virtualChildren     FIELD
               SYNTAX INT(*) { ethernet(1) }
--   now define the base for the children. In this case, it is the same as
--   for the overall system. There may be multiples.
VirtualBase    PROTOCOL
::= { VirtualChildren=virtualChildren }
--
--   The following is the header that every packet has to have and
--   that is placed into the system by the packet acquisition system.
--
VirtualBase    FLOW
               HEADER { LENGTH=8 }
               CHILDREN { DESTINATION=VirtualChildren } -- this will be
--   Ethernet for this example.
--
--   the VirtualBAse will be 01 for these packets.
------------------------------------------------------------------------------
--
--   Ethernet.pdl - Ethernet frame definition
--
--   Description:
--      This file contains the definition for the Ethernet frame. In this
--   PDL file, the decision on EtherType vs. IEEE is made. If this is
--   EtherType, the selection is made from this file. It would be possible
--   to move the EtherType selection to another file, if that would assist
--   in the modularity.
--
--   Copyright:
--      Copyright (c) 1994–1998 Apptitude, Inc.
--       (formerly Technically Elite, Inc.)
--      All rights reserved.
--
--   RCS:
--      $Id: Ethernet.pdl,v 1.13 1999/01/26 15:15:57 skip Exp $
------------------------------------------------------------------------------
--
--   Enumerated type of a 16 bit integer that contains all of the
--   possible values of interest in the etherType field of an
--   Ethernet V2 packet.
--
etherType      FIELD
               SYNTAX         INT(16) { xns(0x0600), ip(0x0800),
                              chaosnet(0x0804), arp(0x0806),
                              vines(0xbad),
                              vinesLoop(0x0bae), vinesLoop(0x80c4),
                              vinesEcho(0xbaf), vinesEcho(0x80c5),
                              netbios(0x3c00, netbios(0x3c01),
                              netbios(0x3c02), netbios(0x3c03),
                              netbios(0x3c04), netbios(0x3c05),
                              netbios(0x3c06), netbios(0x3c07)
                              netbios(0x3c08), netbios(0x3c09)
                              netbios(0x3c0a), netbios(0x3c0b),
                              netbios(0x3c0c), netbios(0x3c0d)
                              dec(0x6000), mop(0x6001), mop2(0x6002)
                              drp(0x6003), lat(0x6004), decDiag(0x6005),
```

-continued

```
                          lavc(0x6007), rarp(0x8035), appleTalk(0x809b),
                          sna(0x80d5), aarp(0x80f3), ipx(0x8137)
                          snmp(0x814c), ipv6(0x86dd), loopback(0x9000) }
          DISPLAY-HINT    "1x:"
          LOOKUP          FILE "EtherType.cf"
          DESCRIPTION
              "Ethernet type field"
--
--  The unformatted data field in and Ethernet V2 type frame
--
etherData FIELD
          SYNTAX          BYTESTRING(46..1500)
          ENCAP           etherType
          DISPLAY-HINT    "HexDump"
          DESCRIPTION
              "Ethernet data"
--
--  The layout and structure of an Ethernet V2 type frame with
--  the address and protocol fields in the correct offset position
ethernet  PROTOCOL
          DESCRIPTION
              "Protocol format for an Ethernet frame"
          REFERENCE       "RFC 894"
::= { MacDest=macAddress, MacSrc=macAddress, EtherType=etherType,
    Data=etherData )
--
--  The elements from this Ethernet frame used to build a flow key
--  to classify and track the traffic. Notice that the total length
--  of the header for this tyoe of packet is fixed and at 14 bytes or
--  octets in length. The special field, LLC-CHECK, is specific to
--  Ethernet frames for the decoding of the base Ethernet type value.
--  If it is NOT LLC, the protocol field in the flow is set to the
--  EtherType value decoded from the packet.
--
ethernet  FLOW
          HEADER { LENGTH=14 }
          DLC-LAYER {
              SOURCE=MacSrc,
              DESTINATION=MacDest,
              TUNNELING,
              PROTOCOL
          }
          CHILDREN { DESTINATION=EtherType, LLC-CHECK=11c }
--------------------------------------------------------------------------
--
--  IEEE8022.pdl - IEEE 802.2 frame definitions
--
--  Description:
--     This file contains the definition for the IEEE 802.2 Link Layer
--     protocols including the SNAP (Sub-network Access Protocol).
--
--  Copyright:
--     Copyright (c) 1994–1998 Apptitude, Inc.
--      (formerly Technically Elite, Inc.)
--     All rights reserved.
--
--  RCS:
--     $Id: IEEE8022.pdi,v i.18 1999/01/26 15:15:58 skip Exp $
--------------------------------------------------------------------------
--
--  IEEE 802.2 LLC
--
11cSap  FIELD
        SYNTAX          INT(16) { ipx(0xFFFF), ipx(0xE0E0), isoNet(0xFEFE),
                        netbios(0xF0F0), vsnap(0XAAAA), ip(0x0606),
                        vines(0xBCBC), xns(0x8080), spanningTree(0x4242),
                        sna(0x0c0c), sna(0x0808), sna(0x0404) }
        DISPLAY-HINT    "ix:"
        DESCRIPTION
            "Service Access Point"
11cControl  FIELD
        -- This is a special field. When the decoder encounters this field, it
        -- invokes the hard-coded LLC decoder to decode the rest of the packet.
        -- This is necessary because LLC decoding requires the ability to
        -- handle forward references which the current PDL format does not
        -- support at this time.
        SYNTAX          UNSIGNED INT(8)
        DESCRIPTION
            "Control field"
```

-continued

```
11cPduType      FIELD
          SYNTAX BITSTRING(2) { 11cInformation(0), 11cSupervisory(1),
                11cInformation(2), 11cUnnumbererd(3) }
11cData         FIELD
          SYNTAX          BYTESTRING(38..1492)
          ENCAP           11cPduType
          FLAGS           SAMELAYER
          DISPLAY-HINT    "HexDump"
11c       PROTOCOL
          SUMMARIZE
               "$11cPduType == 11cUnnumbered" :
                 "LLC ($SAP) $Modifier"
               "$11cPduType == 11cSupervisory" :
                 "LLC ($SAP) $Function N(R)=$NR"
               "$11cPduType == 0|2" :
                 "LLC ($SAP) N(R)=$NR N(S)=$NS"
               "Default"
                 "LLC ($SAP) $11cPduType"
          DESCRIPTION
               "IEEE 802.2 LLC frame format"
::= { SAP=11cSap, Control=11cControl, Data=11cData }
11c        FLOW
          HEADER { LENGTH=3 }
          DLC-LAYER { PROTOCOL }
          CHILDREN { DESTINATION=SAP }
11cUnnumberedData FIELD
          SYNTAX          BYTESTRING(0..1500)
          ENCAP           11cSap
          DISPLAY-HINT    "HexDump"
11cUnnumbered PROTOCOL
          SUMMARIZE
               "Default" :
                 "LLC ($SAP) $Modifier"
::= { Data=11cUnnumberedData }
11cSupervisoryData        FIELD
          SYNTAX          BYTESTRING(0..1500)
          DISPLAY-HINT    "HexDump"
11cSupervisory            PROTOCOL
          SUMMARIZE
               "Default" :
                 "LLC ($SAP) $Function N(R)=$NR"
::= { Data=11cSupervisoryData }
11cInformationData        FIELD
          SYNTAX          BYTESTRING(0..1500)
          ENCAP           11cSap
          DISPLAY-HINT    "HexDump"
11cInformation            PROTOCOL
          SUMMARIZE
               "Default" :
                 "LLC ($SAP) N(R)=$NR N(S)=$NS"
::= { Data=11cInformationData }
--
--   SNAP
--
snapOrgCode     FIELD
          SYNTAX          BYTESTRING(3) { snap("00:00:00"}, ciscoOUI("00:00:0C"),
                          appleOUI("08:00:07") }
          DESCRIPTION
               "Protocol ID or Organizational Code"
vsnapData       FIELD
          SYNTAX          BYTESTRING(46..1500)
          ENCAP           snapOrgCode
          FLAGS           SAMELAYER
          DISPLAY-HINT    "HexDump"
          DESCRIPTION
               "SNAP LLC data"
vsnap     PROTOCOL
          DESCRIPTION
               "SNAP LLC Frame"
::= { OrgCode=snapOrgCode, Data=vsnapData }
vsnap          FLOW
               HEADER { LENGTH=3 }
               DLC-LAYER { PROTOCOL }
               CHILDREN { DESTINATION=OrgCode }
snapType        FIELD
               SYNTAX     INT(16) { xns(0x0600), ip(0x0800), arp(0x0806)
                          vines (0xbad),
                          mop(0x6001), mop2(0x6002), drp(0x6003),
                          lat(0x6004), decDiag(0x6005), lavc(0x6007)
```

-continued

```
                        rarp(0x8035), appleTalk(0x809B), sna(0x80d5),
                        aarp(0x80F3), ipx(0x8137), snmp(0x814c), ipv6(0x86dd) }
                DISPLAY-HINT    "1x:"
                LOOKUP          FILE "EtherType.cf"
                DESCRIPTION
                  "SNAP type field"
snapData            FIELD
        SYNTAX          BYTESTRING(46..1500)
        ENCAP           snapType
        DISPLAY-HINT    "HexDump"
        DESCRIPTION
            "SNAP data"
snap    PROTOCOL
        SUMMARIZE
                "$OrgCode == 00:00:00"
                  "SNAP Type=$SnapType"
                "Default"
                  "VSNAP Org=$OrgCode Type=$SnapType"
        DESCRIPTION
                "SNAP Frame"
::={ SnapType=snapType, Data=snapData }
snap     FLOW
        HEADER { LENGTH=2 }
        DLC-LAYER { PROTOCOL }
        CHILDREN { DESTINATION=SnapType }
------------------------------------------------------------------------------
--
--  IEEE8023.pdl - IEEE 802.3 frame definitions
--  Description:
--     This file contains the definition for the IEEE 802.3 (Ethernet)
--     protocols.
--
--  Copyright:
--     Copyright (c) 1994–1998 Apptitude, Inc.
--      (formerly Technically Elite, Inc.)
--     All rights reserved.
--
--  RCS:
--     $Id: IEEE8023.pdl,v 1.7 1999/01/26 15:15:58 skip Exp $
--
------------------------------------------------------------------------------
--
--  IEEE 802.3
--
ieee8023Length              FIELD
        SYNTAX UNSIGNED INT(16)
ieee8023Data    FIELD
        SYNTAX          BYTESTRING(38..1492)
        ENCAP           =11c
        LENGTH          "$ieee8023Length"
        DISPLAY-HINT    "HexDump"
ieee8023        PROTOCOL
        DESCRIPTION
            "IEEE 802.3 (Ethernet) frame"
        REFERENCE       "RFC 1042"
::= { MacDest=macAddress, Mac:Src=macAddress, Length=ieee8023Length,
        Data=ieee8023Data }
------------------------------------------------------------------------------
--
--  IP.pdl - Internet Protocol (IP) definitions
--
--  Description:
--     This file contains the packet definitions for the Internet
--     Protocol. These elements are all of the fields, templates and
--  processes required to recognize, decode and classify IP datagrams
--  found within packets.
--
--  Copyright:
--     Copyright (c) 1994–1998 Apptitude, Inc.
--      (formerly Technically Elite, Inc.)
--     All rights reserved.
--
--  RCS:
--     $Id: IP.pdl,v 1.14 1999/01/26 15:15:58 skip Exp $
--
------------------------------------------------------------------------------
--
--  The following are the fields that make up an IP datagram.
--  Some of these fields are used to recognize datagram elements, build
```

-continued

```
--    flow signatures and determine the next layer in the decode process.
--
ipVersion       FIELD
                SYNTAX INT(4)
                DEFAULT      "4"
ipHeaderLength       FIELD
                SYNTAX INT(4)
ipTypeOfService      FIELD
                SYNTAXBITSTRING(8) { minCost(1), maxReliability(2),
                     maxThruput(3), minDelay(4) }
ipLength        FIELD
                SYNTAX UNSIGNED INT(16)
--
--    This field will tell us if we need to do special processing to support
--    the payload of the datagram existing in multiple packets.
--
ipFlags              FIELD
                SYNTAX BITSTRING(3) { moreFrags(0), dontFrag(1) }
ipFragmentOffset FIELD
                SYNTAX INT(13)
--
--    This field is used to determine the children or next layer of the
--    datagram.
--
ipProtocol      FIELD
                SYNTAX INT(8)
                LOOKUP FILE "IpProtocol.cf"
ipData          FIELD
                SYNTAX          BYTESTRING(0..1500)
                ENCAP           ipProtocol
                DISPLAY-HINT    "HexDump"
--
--    Detailed packet layout for the IP datagram. This includes all fields
--    and format. All offsets are relative to the beginning of the header.
ip    PROTOCOL
          SUMMARIZE
               "$FragmentOffset != 0":
                    "IPFragment ID=$Identification Offset=$FragmentOffset"
               "Default" :
                    "IP Protocol=$Protocol"
          DESCRIPTION
             "Protocol format for the Internet Protocol"
          REFERENCE       "RFC 791"
::= {     Version=ipVersion, HeaderLength=ipHeaderLength,
          TypeOfService=ipTypeOfService, Length=ipLength,
          Identification=UInt16, IpFlags=ipFlags,
          FragmentOffset=ipFragmentOffset, TimeToLive=Int8,
          Protocol=ipProtocol, Checksum=ByteStr2,
          IpSrc=ipAddress, IpDest=ipAddress, Options=ipOptions,
          Fragment=ipFragment, Data=ipData }
--
--    This is the description of the signature elements required to build a flow
--    that includes the IP network layer protocol. Notice that the flow builds on
--    the lower layers. Only the fields required to complete IP are included.
--    This flow requires the support of the fragmentation engine as well as the
--    potential of having a tunnel. The child field is found from the IP
--    protocol field
--
ip        FLOW
          HEADER { LENGTH=HeaderLength, IN-WORDS }
          NET-LAYER {
             SOURCE=IpSrc,
             DESTINATION=IpDest,
             FRAGMENTATION=IPV4,
             TUNNELING
          }
          CHILDREN { DESTINATION=Protocol }
ipFragData      FIELD
                SYNTAX          BYTESTRING(1..1500)
                LENGTH          "$ipLength - $ipHeaderLength * 4"
                DISPLAY-HINT    "HexDump"
ipFragment      Group
                OPTIONAL        "$FragmentOffset != 0"
::= { Data=ipFragData }
ipOptionCode    FIELD
                SYNTAXINT(8) { ipRR(0x07), ipTimestamp(0x44),
                     ipLSRR(0x83), ipSSRR(0x89) }
                DESCRIPTION
                   "IP option code"
```

-continued

```
ipOptionLength      FIELD
                SYNTAX UNSIGNED INT(8)
                DESCRIPTION
                  "Length of IP option"
ipOptionData    FIELD
                SYNTAX          BYTESTRING(0..1500)
                ENCAP           ipOptionCode
                DISPLAY-HINT    "HexDump"
ipOptions       GROUP
                LENGTH          "($ipHeaderLength * 4) - 20"
::= {     Code=ipOptionCode, Length=ipOptionLength, Pointer=UInt8,
          Data=ipOptionData }
--------------------------------------------------------------------------
--
--   TCP.pdl - Transmission Control Protocol (TCP) definitions
--   Description:
--      This file contains the packet definitions for the Transmission
--      Control Protocol. This protocol is a transport service for
--   the IP protocol. In addition to extracting the protocol information
--   the TCP protocol assists in the process of identification of connections
--   for the processing of states.
--
--   Copyright:
--      Copyright (c) 1994-1998 Apptitude, Inc.
--        (formerly Technically Elite, Inc.)
--      All rights reserved.
--   RCS:
--      $Id: TCP.pdl,v 1.9 1999/01/26 15:16:02 skip Exp $
--
--------------------------------------------------------------------------
--
--   This is the 16 bit field where the child protocol is located for
--   the next layer beyond TCP.
--
tcpPort FIELD
    SYNTAX UNSIGNED INT(16)
    LOOKUP FILE "TcpPort.cf"
tcpHeaderLen FIELD
    SYNTAX INT(4)
tcpFlags FIELD
    SYNTAXBITSTRING(12) { fin(0), syn(1), rst(2), psh(3), ack(4), urg(5) }
tcpData FIELD
          SYNTAX          BYTESTRING(0..1564)
          LENGTH          "($ipLength - ($ipHeaderLength * 4)) - ($tcpHeaderLen * 4)"
          ENCAP           tcpPort
          DISPLAY-HINT    "HexDump"
--
--   The layout of the TCP datagram found in a packet. Offset based on the
--   beginning of the header for TCP.
tcp PROTOCOL
          SUMMARIZE
              "Default" :
                  "TCP ACK=$Ack WIN=$WindowSize"
          DESCRIPTION
              "Protocol format for the Transmission Control Protocol"
          REFERENCE       "RFC 793"
::= {     Srcport=tcpPort, DestPort=tcpPort, SequenceNum=UInt32,
          Ack=UInt32, HeaderLength=tcpHeaderLen, TcpFlags=tcpFlags,
          WindowSize=UInt16, Checksum=ByteStr2,
          UrgentPointer=UInt16, Options=tcpOptions, Data=tcpData }
--
--   The flow elements required to build a key for a TCP datagram.
--   Noticed that this FLOW description has a CONNECTION section. This is
--   used to describe what connection state is reached for each setting
--   of the TcpFlags field.
--
tcp            FLOW
          HEADER { LENGTH=HeaderLength, IN-WORDS }
          CONNECTION {
              IDENTIFIER=SequenceNum,
              CONNECT-START="TcpFlags:1",
              CONNECT-COMPLETE="TcpFlags:4",
              DISCONNECT-START="TcpFlags:0",
              DISCONNECT-COMPLETE="TcpFlags:4"
          }
          PAYLOAD { INCLUDE-HEADER }
          CHILDREN { DESTINATION=DestPort, SOURCE=SrcPort }
tcpOptionKind   FIELD
                SYNTAX UNSIGNED INT(8) { tcpOptEnd(0), tcpNop(1), tcpMSS(2),
```

-continued

```
                         tcpWscale(3), tcpTimestamp(4) }
              DESCRIPTION
                   "Type of TCP option"
tcpOptionData FIELD
              SYNTAX     BYTESTRING(0..1500)
              ENCAP      tcpOptionKind
              FLAGS      SAMELAYER
              DISPLAY-HINT "HexDump"
tcpOptions    GROUP
              LENGTH     "($tcpHeaderLen * 4) - 20"
--            SUMMARIZE
--                 "Default" :
--                   "Option=$Option, Len=$OptionLength, $OptionData"
::= { Option=tcpOptionKind, optionLength=UInt8, OptionData=tcpOptionData }
tcpMSS        PROTCCOL
::= { MaxSegmentSize=UInt16 }
---------------------------------------------------------------------------
--
-- UDP.pdl - User Datagram Protocol (UDP) definitions
--
-- Description:
--   This file contains the packet definitions for the User Datagram
--   Protocol.
--
-- Copyright:
--   Copyright (c) 1994-1998 Apptitude, Inc.
--    (formerly Technically Elite, Inc.)
--   All rights reserved.
--
-- RCS:
--   $Id: UDP.pdl,v 1.9 1999/01/26 15:16:02 skip Exp $
--
---------------------------------------------------------------------------
udpPort       FIELD
        SYNTAX UNSIGNED INT(16)
        LOOKUPFILE "Udpport.cf"
udpLength FIELD
        SYNTAX         UNSIGNED INT(16)
udpData FIELD
        SYNTAX         BYTESTRING(0..1500)
        ENCAP          udpPort
        DISPLAY-HINT   "HexDump"
udp     PROTOCOL
        SUMARIZE
             "Default" :
                  "UDP Dest=$DestPort Src=$SrcPort"
        DESCRIPTION
             "Protocol format for the User Datagram Protocol."
        REFERENCE      "RFC 768"
::= {   SrcPort=udpPort, DestPort=udpPort, Length=udpLength,
        Checksum=ByteStr2, Data=udpData }
udp     FLOW
        HEADER { LENGTH=8 }
        CHILDREN { DESTINATION=DestPort, SOURCE=Srcport }
---------------------------------------------------------------------------
--
-- RPC.pdl - Remote Procedure Calls (RPC) definitions
--
-- Description:
--   This file contains the packet definitions for Remote Procedure
--   Calls.
--
-- Copyright:
--   Copyright (c) 1994-1999 Apptitude,
--    (formerly Technically Elite, Inc.)
--   All rights reserved.
-- RCS:
--   $Id: RPC.pdl,v 1.7 1999/01/26 15:16:01 skip Exp $
---------------------------------------------------------------------------
rpcType      FIELD
      SYNTAX UNSIGNED INT(32) { rpcCall(0), rpcReply(1) }
rpcData      FIELD
      SYNTAX         BYTESTRING(0..100)
      ENCAP          rpcType
      FLAGS          SAMELAYER
      DISPLAY-HINT   "HexDump"
rpc   PROTOCOL
      SUMMARIZE
           "$Type == rpcCall"
```

-continued

```
            "RPC $Program"
          "$ReplyStatus == rpcAcceptedReply" :
            "RPC Reply Status=$Status"
          "$ReplyStatus == rpcDeniedReply"
            "RPC Reply Status=$:Status, AuthStatus=$AuthStatus"
          "Default"
            "RPC $Program"
      DESCRIPTION
          "Protocol format for RPC"
      REFERENCE
          "RFC 1057"
::= {  XID=UInt32, Type=rpcType, Data=rpcData }
rpc    FLOW
       HEADER { LENGTH=0 }
       PAYLOAD { DATA=XID, LENGTH=256 }
-------------
--  RPC Call
-------------
rpcProgram FIELD
       SYNTAX UNSIGNED INT(32) { portMapper(100000), nfs(100003),
          mount(100005), lockManager(100021), statusMonitor(100024) }
rpcProcedure GROUP
       SUMMARIZE
          "Default" :
            "Program=$Program, Version=$Version, Procedure=$Procedure"
::= {  Program=rpcProgram, Version=UInt32, Procedure=UInt32 }
rpcAuthFlavor FIELD
       SYNTAX UNSIGNED INT(32) { null(0), unix(1), short(2) }
rpcMachine   FIELD
       SYNTAX LSTRING(4)
rpcGroup     GROUP
       LENGTH "$NumGroups * 4"
::= {  Gid=Int32 }
rpcCredentials      GROUP
       LENGTH "$CredentialLength"
::= {  Stamp=UInt32, Machine=rpcMachine, Uid=Int32, Gid=Int32,
       NumGroups=UInt32, Groups=rpcGroup }
rpcVerifierData      FIELD
       SYNTAX          BYTESTRING(0..400)
       LENGTH          "$VerifierLength"
rpcEncap      FIELD
       SYNTAX COMBO Program Procedure
       LOOKUP FILE "RPC.cf"
rpcCallData   FIELD
       SYNTAX          BYTESTRING(0..100)
       ENCAP           rpcEncap
       DISPLAY-HINT    "HexDump"
rpcCall      PROTOCOL
       DESCRIPTION
          "Protocol format for RPC call"
::= {  RPCVersion=UInt32, Procedure=rpcProcedure,
       CredentialAuthFlavor=rpcAuthFlavor, CredentialLength=UInt32,
       Credentials=rpcCredentials,
       VerifierAuthFlavor=rpcAuthFlavor, VerifierLength=UInt32,
       Verifier=rpcVerifierData, Encap=rpcEncap, Data=rpcCallData }
-------------
--  RPC Reply
-------------
rpcReplyStatus      FIELD
       SYNTAX INT(32) { rpcAcceptedReply(0), rpcDeniedReply(1) }
rpcReplyData  FIELD
       SYNTAX          BYTESTRING(0..40000)
       ENCAP           rpcReplyStatus
       FLAGS           SAMELAYER
       DISPLAY-HINT    "HexDump"
rpcReply      PROTOCOL
       DESCRIPTION
          "Protocol format for RPC reply"
::= {  ReplyStatus=rpcReplyStatus, Data=rpcReplyData }
rpcAcceptStatus      FIELD
       SYNTAX INT(32) { Success(0), ProgUnavail(1), ProgMismatch(2),
            ProcUnavail(3), GarbageArgs(4), SystemError(5)
rpcAcceptEncap       FIELD
       SYNTAX BYTESTRING(0)
       FLAGS   NOSHOW
rpcAcceptData FIELD
       SYNTAX          BYTESTRING(0..40000)
       ENCAP           rpcAcceptEncap
       DISPLAY-HINT    "HexDump"
```

-continued

```
rpcAcceptedReply PROTOCOL
::= {   VerifierAuthFlavor=rpcAuthFlavor, VerifierLength=UInt32,
        Verifier=rpcVerifierData, Status=rpcAcceptStatus,
        Encap=rpcAcceptEncap, Data=rpcAcceptData }
rpcDeniedstatus       FIELD
        SYNTAX INT(32) { rpcVersionMismatch(0), rpcAuthError(1) }
rpcAuthStatus FIELD
        SYNTAX INT(32) { Okay(0), BadCredential(1), RejectedCredential(2),
              BadVerifier(3), ReDectedVerifier(4), TooWeak(5),
              InvalidResponse(6), Failed(7) }
rpcDeniedReply       PROTOCOL
::= {   Status=rpcDeniedStatus, AuthStatus=rpcAuthStatus }
------------------
--   RPC Transactions
------------------
rpcBindLookup PROTOCOL
        SUMMARIZE
              "Default" :
                 "RPC GetPort Prog=$Prog, Ver=$Ver, Proto=$Protocol"
::= {   Prog=rpcProgram, Ver=UInt32, Protocol=UInt32 }
rpcBindLookupReply PROTOCOL
        SUMMARIZE
              "Default"
                 "RPC GetPortReply Port=$Port"
::= { Port=UInt32 }
--------------------------------------------------------------------------
--
--   NFS.pdl - Network File System (NFS) definitions
--
--   Description:
--      This file contains the packet definitions for the Network File
--      System.
--   Copyright:
--      Copyright (c) 1994–1998 Apptitude, Inc.
--        (formerly Techhically Elite, Inc.)
--      All rights reserved.
--   RCS:
--      $Id: NFS.pdl,v 1.3 1999/01/26 15:15:59 skip Exp $
--------------------------------------------------------------------------
nfsString       FIELD
        SYNTAX LSTRING(4)
nfsHandle       FIELD
        SYNTAX          BYTESTRING(32)
        DISPLAY-HINT    "16x\n          "
nfsData         FIELD
        SYNTAX          BYTESTRING(0..100)
        DISPLAY-HINT    "HexDump"
nfsAccess       PROTOCOL
        SUMMARIZE
              "Default" :
                 "NFS Access $Filename"
::= { Handle=nfsHandle, Filename=nfsString }
nfsStatus       FIELD
        SYNTAX INT(32) { OK(0), NoSuchFile(2) }
nfsAccessReply       PROTOCOL
        SUMMARIZE
              "Default" :
                 "NFS AccessReply $Status"
::= { Status=nfsStatus }
nfsMode               FIELD
        SYNTAX UNSIGNED INT(32)
        DISPLAY-HINT "4o"
nfsCreate       PROTOCOL
        SUMMARIZE
              "Default" :
                 "NFS Create $Filename"
::= { Handle=nfsHandle, Filename=nfsString, Filler=Int8, Mode=nfsMode,
        Uid=Int32, Gid=Int32, Size=Int32, AccessTime=Int64, ModTime=Int64 }
nfsFileType    FIELD
        SYNTAX INT(32) { Regular(1), Directory(2) }
nfsCreateReply       PROTOCOL
        SUMMARIZE
              "Default" :
                 "NFS CreateReply $Status"
::= { Status=nfsStatus, Handle=nfsHandle, FileType=nfsFileType,
        Mode=nfsMode, Links=UInt32, Uid=Int32, Gid=Int32, Size=Int32,
        BlockSize=Int32, NumBlocks=Int64, FileSysId=UInt32, FileId=UInt32,
        AccessTime=Int64, ModTime=Int64, InodeChangeTime=Int64 }
nfsRead       PROTOCOL
```

-continued

```
        SUMMARIZE
            "Default" :
              "NFS Read Offset=$Offset Length=$Length"
::= { Length=Int32, Handle=nfsHandle, Offset=UInt64, Count=Int32 }
nfsReadReply  PROTOCOL
        SUMMARIZE
            "Default" :
              "NFS ReadReply $Status"
::= { Status=nfsStatus, FileType=nfsFileType,
        Mode=nfsMode, Links=UInt32, Uid=Int32, Gid=Int32, Size=Int32,
        BlockSize=Int32, NumBlocks=Int64, FileSysId=UInt32, FileId=UInt32,
        AccessTime=Int64, ModTime=Int64, InodeChangeTime=Int64 }
nfsWrite PROTOCOL
        SUMMARIZE
            "Default" :
              "NFS Write Offset=$Offset"
::= { Handle=nfsHandle, Offset=Int32, Data=nfsData }
nfsWriteReply PROTOCOL
        SUMMARIZE
            "Default" :
              "NFS WriteReply $Status"
::= { Status=nfsStatus, FileType=nfsFileType,
        Mode=nfsMode, Links=UInt32, Uid=Int32, Gid=Int32, Size=Int32,
        BlockSize=Int32, NumBlocks=Int64, FileSysId=UInt32, FileId=UInt32,
        AccessTime=Int64, ModTime=Int64, InodeChangeTime=Int64 }
nfsReadDir   PROTOCOL
        SUMMARIZE
            "Default" :
              "NFS ReadDir"
::= { Handle=nfsHandle, Cookie=Int32, Count=Int32 }
nfsReadDirReply     PROTOCOL
        SUMMARIZE
            "Default" :
              "NFS ReadDirReply $Status"
::= { Status=nfsStatus, Data=nfsData }
nfsGetFileAttr     PROTOCOL
        SUMMARIZE
            "Default" :
              "NFS GetAttr"
::= { Handle=nfsHandle }
nfsGetFileAttrReply PROTOCOL
        SUMMARIZE
            "Default" :
              "NFS GetAttrReply $Status $FileType"
::= { Status=nfsStatus, FileType=nfsFileType,
        Mode=nfsMode, Links=UInt32, Uid=Int32, Gid=Int32, Size=Int32,
        BlockSize=Int32, NumBlocks=Int64, FileSysId=UInt32, FileId=UInt32,
        AccessTime=Int64, ModTime=Int64, InodeChangeTime=Int64 }
nfsReadLink   PROTOCOL
        SUMMARIZE
            "Default" :
              "NFS ReadLink"
::= { Handle=nfsHandle }
nfsReadLinkReply  PROTOCOL
        SUMMARIZE
            "Default" :
              "NFS ReadLinkReply Path=$Path"
::= { Status=nfsStatus, Path=nfsString }
nfsMount        PROTOCOL
        SUMMARIZE
            "Default" :
              "NFS Mount $Path"
::= { Path=nfsstring
nfsMountReply PROTOCOL
        SUMMARIZE
            "Default" :
              "NFS MountReply $MountStatus"
::= { MountStatus=nfsStatus, Handle=nfsHandle }
nfsStatFs      PROTOCOL
        SUMMARIZE
            "Default" :
              "NFS StatFs"
::= { Handle=nfsHandle }
nfsStatFsReply      PROTOCOL
        SUMMARIZE
            "Default" :
              "NFS StatFsReply $Status"
::= { Status=nfsStatus, TransferSize=UInt32, BlockSize=UInt32,
        TotalBlocks=UInt32, FreeBlocks=UInt32, AvailBlocks=UInt32 }
```

-continued

```
nfsRemoveDir   PROTOCOL
        SUMMARIZE
             "Default" :
                "NFS RmDir $Name"
::= { Handle=nfsHandle, Name=nfsString }
nfsRemoveDirReply   PROTOCOL
        SUMMARIZE
             "Default" :
                "NFS RmDirReply $Status"
::= { Status=nfsStatus }
nfsMakeDir    PROTOCOL
        SUMMARIZE
             "Default" :
                "NFS MkDir $Name"
::= { Handle=nfsHandle, Name=nfsString }
nfsMakeDirReply   PROTOCOL
        SUMMARIZE
             "Default" :
                "NFS MkDirReply $Status"
::= { Status=nfsStatus }
nfsRemove       PROTOCOL
        SUMMARIZE
             "Default" :
                "NFS Remove $Name"
::= { Handle=nfsHandle, Name=nfsString }
nfsRemoveReply   PROTOCOL
        SUMMARIZE
             "Default" :
                "NFS RemoveReply $Status"
::= { Status=nfsStatus
--------------------------------------------------------------------------
--
--   HTTP.pdl - Hypertext Transfer Protocol (HTTP) definitions
--
--   Description:
--      This file contains the packet definitions for the Hypertext Transfer
--      Protocol.
--
--   Copyright:
--      Copyright (c) 1994–1999 Apptitude, Inc.
--      (formerly Technically Elite, Inc.)
--      All rights reserved.
--   RCS:
--      $Id: HTTP.pdl,v 1.13 1999/04/13 15:47:57 skip Exp $
--
--------------------------------------------------------------------------
httpData    FIELD
            SYNTAX          BYTESTRING(1..1500)
            LENGTH             "($ipLength - ($ipHeaderLength * 4)) - ($tcpHeaderLen
* 4)"
            DISPLAY-HINT    "Text"
            FLAGS           NOLABEL
http        PROTOCOL
            SUMMARIZE
                 "$httpData m/^GET|^HTTP|^HEAD|^POST/" :
                    "HTTP $httpData"
                 "$httpData m/^[Dd]ate|^[Ss]erver|^[L1]ast-[Mm]odified/" :
                    "HTTP $httpData"
                 "$httpData m/^[Cc]ontent-/" :
                    "HTTP $httpData"
                 "$httpData m/^<HTML>/" :
                    "HTTP [HTML document]"
                 "$httpData m/^GIF/" :
                    "HTTP [GIF image]"
                 "Default" :
                    "HTTP [Data]"
            DESCRIPTION
                 "Protocol format for HTTP."
::= { Data=httpData }
http        FLOW
            CONNECTION { INHERITED }
            PAYLOAD { INCLUDE-HEADER, DATA=Data, LENGTH=256 }
            STATES
                 "S0:   CHECKCONNECT, GOTO S1
                        DEFAULT NEXT S0
                  S1:   WAIT 2, GOTO S2, NEXT S1
                        DEFAULT NEXT S0
                  S2:   NATCH
                           '\n\r\n'                 900 0 0 255 0, NEXT S3
```

-continued

```
                        '\n\n'          900 0 0 255 0, NEXT 53
                        'POST /tds?'     50 0 0 127 1, CHILD sybaseWebsql
                        '.hts HTTP/1.0'  50 4 0 127 1, CHILD sybaseJdbc
                        'jdbc:sybase:Tds' 50 4 0 127 1, CHILD sybaseTds
                        'PCN-The Poin'  500 4 1 255 0, CHILD pointcast
                        't: BW-C-'      100 4 1 255 0, CHILD backweb
                        DEFAULT NEXT S3
               S3:    MATCH
                        '\n\r\n'        50 0 0    0 0, NEXT S3
                        '\n\n'           50 0 0    0 0, NEXT S3
                        'Content-Type:' 800 0 0 255 0, CHILD mime
                        'PCN-The Poin'  500 4 1 255 0, CHILD pointcast
                        't: BW-C-'      100 4 1 255 0, CHILD backweb
                        DEFAULT NEXT S0"
sybaseWebsql   FLOW
               STATE-BASED
sybaseJdbc     FLOW
               STATE-BASED
sybaseTds      FLOW
               STATE-BASED
pointcast      FLOW
               STATE-BASED
backweb        FLOW
               STATE-BASED
mime           FLOW
               STATE-BASED
               STATES
                 "S0:      MATCH
                             'application'  900 0 0    1 0, CHILD mimeApplication
                             'audio'        900 0 0    1 0, CHILD mimeAudio
                             'image'         50 0 0    1 0, CHILD mimeImage
                             'text'          50 0 0    1 0, CHILD mimeText
                             'video'         50 0 0    1 0, CHILD mimeVideo
                             'x-world'      500 4 1 255 0, CHILD mimeXworld
                           DEFAULT GOTO S0"
mimeApplication  FLOW
                 STATE-BASED
mimeAudio    FLOW
             STATE-BASED
             STATES
               "S0:   MATCH
                        'basic'            100 0 0 1 0, CHILD pdBasicAudio
                        'midi'             100 0 0 1 0, CHILD pdMidi
                        'mpeg'             100 0 0 1 0, CHILD pdMpeg2Audio
                        'vnd.m-realaudio'  100 0 0 1 0, CHILD pdRealAudio
                        'wav'              100 0 0 1 0, CHILD pdWav
                        'x-aiff'           100 0 0 1 0, CHILD pdAiff
                        'x-midi'           100 0 0 1 0, CHILD pdMidi
                        'x-mpeg'           100 0 0 1 0, CHILD pdMpeg2Audio
                        'x-mpgurl'         100 0 0 1 0, CHILD pdMpeg3Audio
                        'x-pn-realaudio'   100 0 0 1 0, CHILD pdRealAudio
                        'x-wav'            100 0 0 1 0, CHILD pdWav
                      DEFAULT GOTO S0"
mimeImage      FLOW
               STATE-BASED
mimeText       FLOW
               STATE-BASED
mimeVideo      FLOW
               STATE-BASED
mimeXworld     FLOW
               STATE-BASED
pdBasicAudio   FLOW
               STATE-BASED
pdMidi         FLOW
               STATE-BASED
pdMpeg2Audio   FLOW
               STATE-BASED
pdMpeg3Audio   FLOW
               STATE-BASED
pdRealAudio    FLOW
               STATE-BASED
pdWav          FLOW
               STATE-BASED
pdAiff         FLOW
               STATE-BASED
```

What is claimed is:

1. A method of performing protocol specific operations on a packet passing through a connection point on a computer network, the method comprising:

(a) receiving the packet:

(b) receiving a set of protocol descriptions for a plurality of protocols that conform to a layered model, a protocol description for a particular protocol at a particular layer level including:

(i) if there is at least one child protocol of the protocol at the particular layer level, the-one or more child protocols of the particular protocol at the particular layer level, the packet including for any particular child protocol of the particular protocol at the particular layer level information at one or more locations in the packet related to the particular child protocol,

(ii) the one or more locations in the packet where information is stored related to any child protocol of the particular protocol, and

(iii) if there is at least one protocol specific operation to be performed on the packet for the particular protocol at the particular layer level, the one or more protocol specific operations to be performed on the packet for the particular protocol at the particular layer level; and

(c) performing the protocol specific operations on the packet specified by the set of protocol descriptions based on the base protocol of the packet and the children of the protocols used in the packet,

the method further comprising:

storing a database in a memory, the database generated from the set of protocol descriptions and including a data structure containing information on the possible protocols and organized for locating the child protocol related information for any protocol, the data structure contents indexed by a set of one or more indices, the database entry indexed by a particular set of index values including an indication of validity,

wherein the child protocol related information includes a child recognition pattern,

wherein step (c) of performing the protocol specific operations includes, at any particular protocol layer level starting from the base level, searching the packet at the particular protocol for the child field, the searching including indexing the data structure until a valid entry is found, and

whereby the data structure is configured for rapid searches using the index set.

2. A method according to claim 1, wherein the protocol descriptions are provided in a protocol description language, the method further comprising:

compiling the PDL descriptions to produce the database.

3. A method according to claim 1, wherein the data structure comprises a set of arrays, each array identified by a first index, at least one array for each protocol, each array further indexed by a second index being the location in the packet where the child protocol related information is stored, such that finding a valid entry in the data structure provides the location in the packet for finding the child recognition pattern for an identified protocol.

4. A method according to claim 3, wherein each array is further indexed by a third index being the size of the region in the packet where the child protocol related information is stored, such that finding a valid entry in the data structure provides the location and the size of the region in the packet for finding the child recognition pattern.

5. A method according to claim 4, wherein the data structure is compressed according to a compression scheme that takes advantage of the sparseness of valid entries in the data structure.

6. A method according to claim 5, wherein the compression scheme combines two or more arrays that have no conflicting common entries.

7. A method according to claim 1, wherein the data structure includes a set of tables, each table identified by a first index, at least one table for each protocol, each table further indexed by a second index being the child recognition pattern, the data structure further including a table that for each protocol provides the location in the packet where the child protocol related information is stored, such that finding a valid entry in the data structure provides the location in the packet for finding the child recognition pattern for an identified protocol.

8. A method according to claim 7, wherein the data structure is compressed according to a compression scheme that takes advantage of the sparseness of valid entries in the set of tables.

9. A method according to claim 8, wherein the compression scheme combines two or more tables that have no conflicting common entries.

10. A method of performing protocol specific operations on a packet passing through a connection point on a computer network, the method comprising:

(a) receiving the packet;

(b) receiving a set of protocol descriptions for a plurality of protocols that conform to a layered model, a protocol description for a particular protocol at a particular layer level including:

(i) if there is at least one child protocol of the protocol at the particular layer level, the-one or more child protocols of the particular protocol at the particular layer level, the packet including for any particular child protocol of the particular protocol at the particular layer level information at one or more locations In the packet related to the particular child protocol,

(ii) the one or more locations in the packet where information is stored related to any child protocol of the particular protocol, and

(iii) if there is at least one protocol specific operation to be performed on the packet for the particular protocol at the particular layer level, the one or more protocol specific operations to be performed on the packet for the particular protocol at the particular layer level: and

(c) performing the protocol specific operations on the packet specified by the set of protocol descriptions based on the base protocol of the packet and the children of the protocols used in the packet,

wherein the protocol specific operations include one or more parsing and extraction operations on the packet to extract selected portions of the packet to form a function of the selected portions for identifying the packet as belonging to a conversational flow.

11. A method according to claim 10, wherein step (c) of performing protocol specific operations is performed recursively for any children of the children.

12. A method according to claim 10, wherein which protocol specific operations are performed is step (c) depends on the contents of the packet such that the method adapts to different protocols according to the contents of the packet.

13. A method according to claim 10, wherein the protocol descriptions are provided in a protocol description language.

14. A method according to claim 13, further comprising:

compiling the PDL descriptions to produce a database and store the database in a memory, the database generated from the set of protocol descriptions and including a data structure containing information on the possible protocols and organized for locating the child protocol related information for any protocol, the data structure contents indexed by a set of one or more indices, the database entry indexed by a particular set of index values including an indication of validity,

wherein the child protocol related information includes a child recognition pattern, and

wherein the step of performing the protocol specific operations includes, at any particular protocol layer level starting from the base level, searching the packet at the particular protocol for the child field, the searching including indexing the data structure until a valid entry is found,

whereby the data structure is configured for rapid searches using the index set.

15. A method according to claim 10, further comprising:

looking up a flow-entry database comprising at least one flow-entry for each previously encountered conversational flow, the looking up using at least some of the selected packet portions and determining if the packet matches an flow-entry in the flow-entry database

if the packet is of an existing flow, classifying the packet as belonging to the found existing flow; and

if the packet is of a new flow, storing a new flow-entry for the new flow in the flow-entry database, including identifying information for future packets to be identified with the new flow-entry;

wherein for at least one protocol, the parsing and extraction operations depend on the contents of one or more packet headers.

16. A method according to claim 10, wherein the protocol specific operations further include one or more state processing operations that are a function of the state of the flow of the packet.

17. A method of performing protocol specific operations on a packet passing through a connection point on a computer network, the method comprising:

(a) receiving the packet;

(b) receiving a set of protocol descriptions for a plurality of protocols that conform to a layered model, a protocol description for a particular protocol at a particular layer level including:

(i) if there is at least one child protocol of the protocol at the particular layer level, the one or more child protocols of the particular protocol at the particular layer level, the packet including for any particular child protocol of the particular protocol at the particular layer level information at one or more locations in the packet related to the particular child protocol,

(ii) the one or more locations in the packet where information is stored related to any child protocol of the particular protocol, and

(iii) if there is at least one protocol specific operation to be performed on the packet for the particular protocol at the particular layer level, the one or more protocol specific operations to be performed on the packet for the particular protocol at the particular layer level; and

(c) performing the protocol specific operations on the packet specified by the set of protocol descriptions based on the base protocol of the packet and the children of the protocols used in the packet,

wherein the packet belongs to a conversational flow of packets having a set of one or more states, and wherein the protocol specific operations include one or more state processing operations that are a function of the state of the conversational flow of the packet, the state of the conversational flow of the packet being indicative of the sequence of any previously encountered packets of the same conversational flow as the packet.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 6,665,725 B1 Page 1 of 2
DATED : December 16, 2003
INVENTOR(S) : Dietz et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 6,
Line 47, change "NBTBIOS" to -- NETBIOS --.
Line 55, change "Diferent" to -- Different --.

Column 16,
Line 27, change "FIG. 6 FIG 6" to
-- FIG. 6.
FIG6 --.

Column 18,
Line 17, change "updatelookup" to -- update-lookup --.

Column 25,
Line 38, change "server-say" to -- server—say --.

Column 53,
Line 4, change ""Default"" to -- "Default" : --.
Line 45, shift "DISPLAY-HINT" to the right so its beginning lines up with the beginning of "SYNTAX" in line 42 and with the beginning of "LENGTH" in line 43.
Line 46, shift "FLAGS" to the right so its beginning lines up with the beginning of "SYNTAX" in line 42 and with the beginning of "LENGTH" in line 43.

Column 61,
Aprox. linc 32, changc "rip" to -- r1p --.

Column 71,
Line 9, from the bottom, change "netbios (0x3c00," to -- netbios (0x3c00) --.

Column 73,
Aprox. Line 25, change "tyop" to -- type --.

Column 79,
Line 4 from the bottom, change "SYNTAXINT(8)" to -- SYNTAX INT (8) --.

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 6,665,725 B1 Page 2 of 2
DATED : December 16, 2003
INVENTOR(S) : Dietz et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 81,
Approx. line 41, change "SYNTAXBITSRING(12)" to -- SYNTAX BITSTRING (12) --.

Column 83,
Approx. line 36, change "LOOKUPFILE" to -- LOOKUP FILE --.

Column 93,
Approx. line 45, change "vnd.m-relaudio" to -- 'vnd.rn-realaudio' --.

Column 96,
Line 38, change "In" to -- in --.

Signed and Sealed this

Twenty-ninth Day of June, 2004



JON W. DUDAS
*Acting Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 6,665,725 B1

Page 1 of 1

APPLICATION NO. : 09/609179

DATED : December 16, 2003

INVENTOR(S) : Russell S. Dietz, Andrew A. Koppenhaver and James F. Torgerson

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

IN THE CLAIMS:

Column 1, lines 15 and 16, claim 14, change "searching the packet at the particular protocol" to --searching the packet at the particular protocol level--.

Signed and Sealed this
Eighth Day of October, 2013

Teresa Stanek Rea

*Deputy Director of the United States Patent and Trademark Office*

US006839751B1

(12) **United States Patent**
**Dietz et al.**

(10) **Patent No.: US 6,839,751 B1**
(45) **Date of Patent: Jan. 4, 2005**

(54) **RE-USING INFORMATION FROM DATA TRANSACTIONS FOR MAINTAINING STATISTICS IN NETWORK MONITORING**

(75) Inventors: **Russell S. Dietz**, San Jose, CA (US); **Joseph R. Maixner**, Aptos, CA (US); **Andrew A. Koppenhaver**, Littleton, CO (US)

(73) Assignee: **Hi/fn, Inc.**, Los Gatos, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 728 days.

(21) Appl. No.: **09/608,126**

(22) Filed: **Jun. 30, 2000**

**Related U.S. Application Data**

(60) Provisional application No. 60/141,903, filed on Jun. 30, 1999.

(51) **Int. Cl.**[7] .............................................. **G06F 15/173**

(52) **U.S. Cl.** ........................ **709/224**; 709/223; 709/230

(58) **Field of Search** ................................ 709/223, 224, 709/231, 232, 230; 370/252, 231; 379/32; 704/43; 714/39; 340/825

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 4,972,453 | A | * | 11/1990 | Daniel et al. | 379/9.03 |
| 5,535,338 | A | * | 7/1996 | Krause et al. | 709/222 |
| 5,703,877 | A | | 12/1997 | Nuber et al. | 370/395 |
| 5,720,032 | A | * | 2/1998 | Picazo, Jr. et al. | 709/250 |
| 5,761,429 | A | * | 6/1998 | Thompson | 709/224 |
| 5,799,154 | A | * | 8/1998 | Kuriyan | 709/223 |
| 5,802,054 | A | * | 9/1998 | Bellenger | 370/401 |
| 5,850,388 | A | * | 12/1998 | Anderson et al. | 370/252 |
| 5,892,754 | A | | 4/1999 | Kompella et al. | 370/236 |
| 6,097,699 | A | * | 8/2000 | Chen et al. | 370/231 |
| 6,115,393 | A | * | 9/2000 | Engel et al. | 370/469 |
| 6,269,330 | B1 | * | 7/2001 | Cidon et al. | 704/43 |
| 6,279,113 | B1 | * | 8/2001 | Vaidya | 713/201 |
| 6,282,570 | B1 | * | 8/2001 | Leung et al. | 709/224 |
| 6,330,226 | B1 | * | 12/2001 | Chapman et al. | 370/232 |
| 6,363,056 | B1 | * | 3/2002 | Beigi et al. | 370/252 |
| 6,381,306 | B1 | * | 4/2002 | Lawson et al. | 379/32 |
| 6,424,624 | B1 | * | 7/2002 | Galand et al. | 370/231 |
| 6,453,345 | B2 | * | 9/2002 | Trcka et al. | 709/224 |
| 6,625,657 | B1 | * | 9/2003 | Bullard | 709/237 |
| 6,651,099 | B1 | * | 11/2003 | Dietz et al. | 709/224 |

OTHER PUBLICATIONS

NOV94: Packet Filtering in the SNMP Remote Monitor ; www.skrymir.com/dobbs/articles/1994/9411/9411h/9411h.htm.*

GTrace—A Graphical Traceroute Tool authored by Ram Periakaruppan, Evi Nemeth ; http://www.caida.org/outreach/papers/1999/GTrace/index.xml.*

Advanced Methods for Storage and Retrieval in Image ; http://www.cs.tulane.edu/www/Prototype/proposal.html; 1998.*

Measurement and analysis of the digital DECT propagation channel; IEEE 1998.*

* cited by examiner

*Primary Examiner*—Thong Vu
(74) *Attorney, Agent, or Firm*—Dov Rosenfeld; Inventek

(57) **ABSTRACT**

A method of and monitor apparatus for analyzing a flow of packets passing through a connection point on a computer network. The method includes receiving a packet from a packet acquisition device, and looking up a flow-entry database containing flow-entries for previously encountered conversational flows. The looking up to determine if the received packet is of an existing flow. Each and every packet is processed. If the packet is of an existing flow, the method updates the flow-entry of the existing flow, including storing one or more statistical measures kept in the flow-entry. If the packet is of a new flow, the method stores a new flow-entry for the new flow in the flow-entry database, including storing one or more statistical measures kept in the flow-entry. The statistical measures are used to determine metrics related to the flow. The metrics may be base metrics from which quality of service metrics are determined, or may be the quality of service metrics.

**21 Claims, 18 Drawing Sheets**




100
CLIENT 4
107
ANALYZER
108
116
SERVER 2
110
121
CLIENT 3
106
DATA COMMUNICATIONS
NETWORK
102
125
123
118
SERVER 2
112
CLIENT 2
105
CLIENT 1
104

FIG. 1


APPLICATION SERVER 2
S2
204
CLIENT 3
C3
202 (106)
KEY-1
KEY-2
210
212
datum request
datum reply
206
207
208
209
1
2
n1
n2
214
215
216
217
218
219
220
221
222
223
224
225
226
227
228
229
230
231
232
233
240
241
242
243
244
245
250
251
252
253
254
255
260
261
262
263
264
265
270
271
272
273
274
275

FIG. 2


300
PACKET
302
PARSER 301
ANALYZE AND RECOGNIZE PATTERN INFORMATION (PAR)
304
EXTRACT IDENTIFYING INFORMATION (EII)
306
BUILD UNIQUE CONVERSATION "FLOW" KEY
312
PATTERN, PARSE AND EXTRACTION DATABASE
308
LOOKUP FROM KNOWN RECORDS (DB 324 VIA CACHE)
314
NEW "FLOW" RECORD?
316
YES
NO
DATABASE OF FLOWS
324
UPDATE "FLOW" KNOWN RECORD
322
MORE CLASSIFICATION?
320
PROTOCOL & STATE IDENTIFICATION
318
CLASSIFICATN FINALIZATION
334
MORE STATES?
332
MORE OPERATIONS?
330
STATE PROCESSING OPERATIONS
328
STATE PROCESSOR INSTRUCTION DATABASE
326
ANALYZER 303
COMPILER AND OPTIMIZER
310
DATAGRAM LAYER SELECTIONS
338
PROTOCOL DESCIPTION LANGUAGE
336

FIG. 3


401
HIGH LEVEL PACKET DECODING DESCRIPTIONS
402
404
405
GENERATE PACKET PARSE AND EXTRACT OPERATIONS
COMPILE DESCRIPTIONS
GENERATE PACKET STATE INSTRUCTIONS AND OPERATIONS
403
406
PATTERN, PARSE AND EXTRACTION DATABASE
407
STATE PROCESSOR INSTRUCTION DATABASE
408
409
LOAD PARSING SUBSYSTEM MEMORY
LOAD STATE INSTRUCTION DATABASE MEMORY
400
410

FIG. 4


501
INPUT PACKET
502
503
LOAD PACKET COMPONENT
512
504
MORE IN PACKET?
NO
BUILD PACKET KEY
YES
FETCH NODE AND PROCESS FROM PATTERNS
505
F 6
513
MORE PATTERN NODES?
NO
NEXT PACKET COMPONENT
506
511
YES
APPLY NODE AND PROCESS TO COMPONENT
507
500
510
NEXT PATTERN NODE
NO
PATTERN MATCH?
508
YES
EXTRACT ELEMENTS
509

FIG. 5


601
PACKET COMPONENT AND PATTERN NODE
602
603
LOAD PACKET COMPONENT
610
604
MORE PACKET COMPONENTS?
NO
LOAD KEY BUFFER
YES
FETCH EXTRACTION AND PROCESS FROM PATTERNS
605
F 7
611
NO
606
MORE EXTRACTION ELEMENTS?
NO
NEXT PACKET COMPONENT
609
YES
607
APPLY EXTRACTION PROCESS TO COMPONENT
600
608
MORE TO EXTRACT?
YES

FIG. 6


701
KEY BUFFER AND PATTERN NODES
702
703
LOAD PATTERN NODE ELEMENT
708
704
MORE PATTERN NODES?
NO
OUTPUT TO ANALYZER
YES
F 8
HASH KEY BUFFER ELEMENT FROM PATTERN NODE
705
709
PACK KEY & HASH
706
700
NEXT PACKET COMPONENT
707

FIG. 7


801
UFKB ENTRY FOR PACKET
802
800
COMPUTE CONVERSATION RECORD BIN FROM HASH
803
REQUEST RECORD BIN/ BUCKET FROM CACHE
804
806
805
MORE BUCKETS IN THE BIN?
NO
SET UFKB FOR PACKET AS 'NEW'
YES
COMPARE CURRENT BIN AND BUCKET RECORD KEY TO PACKET
807
NEXT BUCKET
NO
KEY MATCH?
808
809
YES
MARK RECORD BIN AND BUCKET 'IN PROCESS' IN CACHE AND TIMESTAMP
810
811
SET UFKB FOR PACKET AS 'FOUND'
812
UPDATE STATISTICS FOR RECORD IN CACHE
813

FIG. 8


901
RPC REPLY PORTMAPPER
902
RPC ANNOUNCMENT PORTMAPPER
910
RPC BIND LOOKUP REQUEST
909
903
EXTRACT PROGRAM
GET 'PROGRAM', 'VERSION', 'PORT' AND 'PROTOCOL (TCP OR UDP)
EXTRACT PORT
GET 'PROGRAM', 'VERSION' AND 'PROTOCOL (TCP OR UDP)'
908
SAVE REQUEST
SAVE 'PROGRAM', 'VERSION' AND 'PROTOCOL (TCP OR UDP)' WITH DESTINATION NETWORK ADDRESS. BOTH MAKE A KEY.
904
CREATE SERVER STATE
SAVE 'PROGRAM', 'VERSION', 'PORT' AND 'PROTOCOL (TCP OR UDP)' WITH NETWORK ADDRESS IN SERVER STATE DATABASE. KEY ON SERVER ADDRESS AND TCP OR UDP PORT.
907
RPC BIND LOOKUP REPLY
905
906
LOOKUP REQUEST
FIND 'PROGRAM' AND 'VERSION' WITH LOOKUP OF SOURCE NETWORK ADDRESS.
EXTRACT PROGRAM
GET 'PORT' AND 'PROTOCOL (TCP OR UDP)'.
900

FIG. 9


1000
PATTERN RECOGNITION DATABASE MEMORY
1001
1002
EXTRACTION OPERATIONS DATABASE MEMORY
1003
1005
1004
1031
HOST INTERFACE MULTIPLEXR & CONTROL REGISTERS
INFO OUT
CONTRL IN
1031
1006
PATTERN RECOGNITN ENGINE (PRE)
EXTRACTION ENGINE (SLICER)
1007
1008
1013
PACKET INPUT
PARSER INPUT BUFFER MEMORY
PARSER OUTPUT BUFFER MEMORY
PACKET KEY AND PAYLOAD
1012
1010
1021
1025
PACKET START
INPUT BUFFER INTERFACE CONTROL
1011
ANALYZER INTERFACE CONTROL
DATA READY
NEXT PACKET
ANALYZER READY
1022
1023
1027

FIG. 10


1100
1101
1103
1107
1115
1118
1122
LOOKUP/ UPDATE ENGINE (LUE)
ANALYZER HOST INTERFACE AND CONTROL (ACIC)
HOST BUS INTER-FACE (HIB)
STATE PROCESSR INSTRUCN DATABASE (SPID)
1109
1108
PARSER INTER-FACE
UNIFIED FLOW KEY BUFFER (UFKB)
CACHE
STATE PROCESSR (SP)
1119
1123
UNIFIED MEMORY CONTROL (UMC)
MEMORY INTER-FACE
FLOW INSERTION/ DELETION ENGINE (FIDE)
1110

FIG. 11


1201
UFKB ENTRY FOR PACKET WITH STATUS 'NEW'
1202
1200
ACCESS CONVERSATION RECORD BIN
1203
REQUEST RECORD BIN/ BUCKET FROM CACHE
1204
REQUEST NEXT BUCKET FROM CACHE
1206
NO
BIN/BUCKET EMPTY?
1205
YES
BUCKET VALID?
1208
NO
INSERT KEY AND HASH IN BUCKET, MARK 'USED' WITH TIMESTAMP
1207
YES
COMPARE CURRENT BIN AND BUCKET RECORD KEY TO PACKET
1209
1210
SET UFKB FOR PACKET AS 'DROP'
MARK RECORD BIN AND BUCKET 'IN PROCESS' AND 'NEW' IN CACHE
1211
1212
SET INITIAL STATISTICS FOR RECORD IN CACHE
1213

FIG. 12


1301
1300
UFKB ENTRY FOR PACKET WITH STATUS 'NEW' OR 'FOUND'
1302
SET STATE PROCESSOR INSTRUCTION POINTER TO VALUE FOUND IN UFKB ENTRY
1303
FETCH INSTRUCTION FROM STATE PROCESSOR INSTRUCTION MEMORY
1304
PERFORM OPERATION BASED ON THE STATE INSTRUCTION
1305
SET STATE PROCESSOR INSTRUCTION POINTER TO VALUE FOUND IN CURRENT STATE
NO
DONE PROCESSING STATES FOR THIS PACKET?
1307
1308
YES
1310
SAVE STATE PROCESSOR INSTRUCTION POINTER IN CURRENT FLOW RECORD
NO
DONE PROCESSING STATES FOR THIS FLOW?
1309
YES
SET AND SAVE FLOW REMOVAL STATE PROCESSOR INSTRUCTION IN CURRENT FLOW RECORD
1311
1313

FIG. 13


PACKET
1402
ANALYZE AND RECOGNIZE PATTERN INFORMATION
1404
EXTRACT IDENTIFYING INFO & PROCL /STATE
1406
PATTERN STRUCTURES AND EXTRACTION OPERATIONS
1408
BUILD "FLOW" KEY
1412
LOOKUP KNOWN RECORDS (DB 1424)
1414
NEW "FLOW" RECORD?
1416
YES
NO
DATABASE OF FLOWS
1424
MORE CLASSIFICATION?
1420
UPDATE "FLOW" KNOWN RECORD
1422
STATE MACHINE SELECTOR
1426
STATE ANALYSIS OPERATIONS
1428
MORE STATES?
1432
CLASSIFICATN FINALIZATION
1434
PARSER SUBSYSEM
ANALYZER SUBSYSTEM
1400

FIG. 14


1506
HOST MEMORY
1508
DISK & DB
324
DATABASE OF FLOWS (MEMORY)
1504
HOST PROCESSOR
1510
NETWORK INTERFACE CARD
ANALYZER 303
PARSER 301
MONITOR 300
1502
PACKET ACQUISITION DEVICE
102
PACKETS
121

FIG. 15


1602
0 - 3 Bytes
1600
Dst MAC
offset 0 - 11
Dst MAC
Src MAC
1604
Src MAC
1606
1608
Dst MAC (6)
Dst Hash (2)
1610
1612
Src MAC (6)
Src Hash (2)
1614
L2 Offset = 12

FIG. 16




FIG. 17A




FIG. 17B




FIG. 18A




FIG. 18B

# RE-USING INFORMATION FROM DATA TRANSACTIONS FOR MAINTAINING STATISTICS IN NETWORK MONITORING

## CROSS-REFERENCE TO RELATED APPLICATION

This application claims the benefit of U.S. Provisional Patent Application Ser. No. 60/141,903 for METHOD AND APPARATUS FOR MONITORING TRAFFIC IN A NETWORK to inventors Dietz, et al., filed Jun. 30, 1999, the contents of which are incorporated herein by reference.

This application is related to the following U.S. patent applications, each filed concurrently with the present application, and each assigned to Apptitude, Inc., the assignee of the present invention:

U.S. patent application Ser. No. 09/608,237 for METHOD AND APPARATUS FOR MONITORING TRAFFIC IN A NETWORK, to inventors Dietz, et al., filed Jun. 30, 2000, and incorporated herein by reference.

U.S. patent application Ser. No. 09/609,179 for PROCESSING PROTOCOL SPECIFIC INFORMATION IN PACKETS SPECIFIED BY A PROTOCOL DESCRIPTION LANGUAGE, to inventors Koppenhaver, et al., filed Jun. 30, 2000, and incorporated herein by reference.

U.S. patent application Ser. No. 09/608,266 for ASSOCIATIVE CACHE STRUCTURE FOR LOOKUPS AND UPDATES OF FLOW RECORDS IN A NETWORK MONITOR, to inventors Sarkissian, et al., filed Jun. 30, 2000, and incorporated herein by reference.

U.S. patent application Ser. No. 09/608,267 for STATE PROCESSOR FOR PATTERN MATCHING IN A NETWORK MONITOR DEVICE, to inventors Sarkissian, et al., filed Jun. 30, 2000, and incorporated herein by reference.

## FIELD OF INVENTION

The present invention relates to computer networks, specifically to the real-time elucidation of packets communicated within a data network, including classification according to protocol and application program.

## COPYRIGHT NOTICE

A portion of the disclosure of this patent document contains material that is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the patent document or the patent disclosure, as it appears in the Patent and Trademark Office patent file or records, but otherwise reserves all copyright rights whatsoever.

## BACKGROUND

There has long been a need for network activity monitors. This need has become especially acute, however, given the recent popularity of the Internet and other interconnected networks. In particular, there is a need for a real-time network monitor that can provide details as to the application programs being used. Such a monitor should enable non-intrusive, remote detection, characterization, analysis, and capture of all information passing through any point on the network (i.e., of all packets and packet streams passing through any location in the network). Not only should all the packets be detected and analyzed, but for each of these packets the network monitor should determine the protocol (e.g., http, ftp, H.323, VPN, etc.), the application/use within the protocol (e.g., voice, video, data, real-time data, etc.),



and an end user's pattern of use within each application or the application context (e.g., options selected, service delivered, duration, time of day, data requested, etc.). Also, the network monitor should not be reliant upon server resident information such as log files. Rather, it should allow a user such as a network administrator or an Internet service provider (ISP) the means to measure and analyze network activity objectively; to customize the type of data that is collected and analyzed; to undertake real time analysis; and to receive timely notificatior of network problems.

Related and incorporated by reference U.S. patent application Ser. No. 09/607,237 for METHOD AND APPARATUS FOR MONITORING TRAFFIC IN A NETWORK, to inventors Dietz, et al, describes a network monitor that includes carrying out protocol specific operations on individual packets including extracting information from header fields in the packet to use for building a signature for identifying the conversational flow of the packet and for recognizing future packets as belonging to a previously encountered flow. A parser subsystem includes a parser for recognizing different patterns in the packet that identify the protocols used. For each protocol recognized, a slicer extracts important packet elements from the packet. These form a signature (i.e., key) for the packet. The slicer also preferably generates a hash for rapidly identifying a flow that may have this signature from a database of known flows.

The flow signature of the packet, the hash and at least some of the payload are passed to an analyzer subsystem. In a hardware embodiment, the analyzer subsystem includes a unified flow key buffer (UFKB) for receiving parts of packets from the parser subsystem and for storing signatures in process, a lookup/update engine (LUE) to lookup a database of flow records for previously encountered conversational flows to determine whether a signature is from an existing flow, a state processor (SP) for performing state processing, a flow insertion and deletion engine (FIDE) for inserting new flows into the database of flows, a memory for storing the database of flows, and a cache for speeding up access to the memory containing the flow database. The LUE, SP, and FIDE are all coupled to the UFKB, and to the cache.

Each flow-entry includes one or more statistical measures, e.g., the packet count related to the flow, the time of arrival of a packet, the time differential.

In the preferred hardware embodiment, each of the LUE, state processor, and FIDE operate independently from the other two engines. The state processor performs one or more operations specific to the state of the flow.

It is advantageous to collect statistics on packets passing through a point in a network rather than to simply count each and every packet. By maintaining statistical measures in the flow-entries related to a conversational flow, embodiments of the present invention enable specific metrics to be collected in real-time that otherwise would not be possible. For example, it is desirable to maintain metrics related to bi-directional conversations based on the entire flow for each exchange in the conversation. By maintaining the state of flow, embodiments of the present invention also enable certain metrics related to the states of flows to be determined.

Most prior-art network traffic monitors that use statistical metrics collect only end-point and end-of-session related statistics. Examples of such commonly used metrics include packet counts, byte counts, session connection time, session timeouts, session and transport response times and others.

All of these deal with events that can be directly related to an event in a single packet. These prior-art systems cannot collect some important performance metrics that are related to a complete sequence of packets of a flow or to several disjointed sequences of the same flow in a network.

Time based metrics on application data packets are important. Such metrics could be determined if all the timestamps and related data could be stored and forwarded for later analysis. However when faced with thousands or millions of conversations per second on ever faster networks, storing all the data, even if compressed, would take too much processing, memory, and manager down load time to be practical.

Thus there is a need for maintaining and reporting time-base metrics from statistical measures accumulated from packets in a flow.

Network data is properly modeled as a population and not a sample. Thus, all the data needs to be processed. Because of the nature of application protocols, just sampling some of the packets may not give good measured related to flows. Missing just one critical packet, such as one the specified an additional port that data will be transmitted on, or what application will be run, can cause valid data to be lost.

Thus there is also a need for maintaining and reporting time-base metrics from statistical measures accumulated from every packet in a flow.

There also is a need to determine metrics related to a sequence of events. A good example is relative jitter. Measuring the time from the end of one packet in one direction to another packet with the same signature in the same direction collects data that relates normal jitter. This type of jitter metric is good for measuring broad signal quality in a packet network. However, it is not specific to the payload or data item being transported in a cluster of packets.

Using the state processing described herein, because the state processor can search for specific data payloads, embodiments of monitor **300** can be programmed to collect the same jitter metric for a group of packets in a flow that are all related to a specific data payload. This allows the inventive system to provide metrics more focused on the type of quality related to a set of packets. This in general is more desirable than metrics related to single packets when evaluating the performance of a system in a network.

Specifically, the monitor system **300** can be programmed to maintain any type of metric at any state of a conversational flow. Also the system **300** can have the actual statistics programmed into the state at any point. This enables embodiments of the monitor system to collect metrics related to network usage and performance, as well as metrics related to specific states or sequences of packets.

Some of the specific metrics that can be collected only with states are events related to a group of traffic in one direction, events related to the status of a communication sequence in one or both directions, events related to the exchange of packets for a specific application in a specific sequence. This is only a small sample of the metrics that requires an engine that can relate the state of a flow to a set of metrics.

In addition, because the monitor **300** provides greater visibility to the specific application in a conversation or flow, the monitor **300** can be programmed to collect metrics that may be specific to that type of application or service. In other word, if a flow is for an Oracle Database server, an embodiment of monitor **300** could collect the number of packets required to complete a transaction. Only with both state and application classification can this type of metric be derived from the network.



Because the monitor **300** can be programmed to collect a diverse set of metrics, the system can be used as a data source for metrics required in a number of environments. In particular, the metrics may be used to monitor and analyze the quality and performance of traffic flows related to a specific set of applications. Other implementation could include metrics related to billing and charge-back for specific traffic flow and events with the traffic flows. Yet other implementations could be programmed to provide metrics useful for troubleshooting and capacity planning and related directly to a focused application and service.

## SUMMARY

Another aspect of the invention is determining quality of service metrics based on each and every packet. A method of and monitor apparatus for analyzing a flow of packets passing through a connection point on a computer network are disclosed that may include such quality of service metrics. The method includes receiving a packet from a packet acquisition device, and looking up a flow-entry database containing flow-entries for previously encountered conversational flows. The looking up to determine if the received packet is of an existing flow. Each and every packet is processed. If the packet is of an existing flow, the method updates the flow-entry of the existing flow, including storing one or more statistical measures kept in the flow-entry. If the packet is of a new flow, the method stores a new flow-entry for the new flow in the flow-entry database, including storing one or more statistical measures kept in the flow-entry. The statistical measures are used to determine metrics related to the flow. The metrics may be base metrics from which quality of service metrics are determined, or may be the quality of service metrics.

## BRIEF DESCRIPTION OF THE DRAWINGS

Although the present invention is better understood by referring to the detailed preferred embodiments, these should not be taken to limit the present invention to any specific embodiment because such embodiments are provided only for the purposes of explanation. The embodiments, in turn, are explained with the aid of the following figures.

FIG. **1** is a functional block diagram of a network embodiment of the present invention in which a monitor is connected to analyze packets passing at a connection point.

FIG. **2** is a diagram representing an example of some of the packets and their formats that might be exchanged in starting, as an illustrative example, a conversational flow between a client and server on a network being monitored and analyzed. A pair of flow signatures particular to this example and to embodiments of the present invention is also illustrated. This represents some of the possible flow signatures that can be generated and used in the process of analyzing packets and of recognizing the particular server applications that produce the discrete application packet exchanges.

FIG. **3** is a functional block diagram of a process embodiment of the present invention that can operate as the packet monitor shown in FIG. **1**. This process may be implemented in software or hardware.

FIG. **4** is a flowchart of a high-level protocol language compiling and optimization process, which in one embodiment may be used to generate data for monitoring packets according to versions of the present invention.

FIG. **5** is a flowchart of a packet parsing process used as part of the parser in an embodiment of the inventive packet monitor.

FIG. **6** is a flowchart of a packet element extraction process that is used as part of the parser in an embodiment of the inventive packet monitor.

FIG. **7** is a flowchart of a flow-signature building process that is used as part of the parser in the inventive packet monitor.

FIG. **8** is a flowchart of a monitor lookup and update process that is used as part of the analyzer in an embodiment of the inventive packet monitor.

FIG. **9** is a flowchart of an exemplary Sun Microsystems Remote Procedure Call application than may be recognized by the inventive packet monitor.

FIG. **10** is a functional block diagram of a hardware parser subsystem including the pattern recognizer and extractor that can form part of the parser module in an embodiment of the inventive packet monitor.

FIG. **11** is a functional block diagram of a hardware analyzer including a state processor that can form part of an embodiment of the inventive packet monitor.

FIG. **12** is a functional block diagram of a flow insertion and deletion engine process that can form part of the analyzer in an embodiment of the inventive packet monitor.

FIG. **13** is a flowchart of a state processing process that can form part of the analyzer in an embodiment of the inventive packet monitor.

FIG. **14** is a simple functional block diagram of a process embodiment of the present invention that can operate as the packet monitor shown in FIG. **1**. This process may be implemented in software.

FIG. **15** is a functional block diagram of how the packet monitor of FIG. **3** (and FIGS. **10** and **11**) may operate on a network with a processor such as a microprocessor.

FIG. **16** is an example of the top (MAC) layer of an Ethernet packet and some of the elements that may be extracted to form a signature according to one aspect of the invention.

FIG. **17A** is an example of the header of an Ethertype type of Ethernet packet of FIG. **16** and some of the elements that may be extracted to form a signature according to one aspect of the invention.

FIG. **17B** is an example of an IP packet, for example, of the Ethertype packet shown in FIGS. **16** and **17A**, and some of the elements that may be extracted to form a signature according to one aspect of the invention.

FIG. **18A** is a three dimensional structure that can be used to store elements of the pattern, parse and extraction database used by the parser subsystem in accordance to one embodiment of the invention.

FIG. **18B** is an alternate form of storing elements of the pattern, parse and extraction database used by the parser subsystem in accordance to another embodiment of the invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Note that this document includes hardware diagrams and descriptions that may include signal names. In most cases, the names are sufficiently descriptive, in other cases however the signal names are not needed to understand the operation and practice of the invention.

Operation in a Network

FIG. **1** represents a system embodiment of the present invention that is referred to herein by the general reference numeral **100**. The system **100** has a computer network **102** that communicates packets (e.g., IP datagrams) between various computers, for example between the clients **104–107** and servers **110** and **112**. The network is shown schematically as a cloud with several network nodes and links shown in the interior of the cloud. A monitor **108** examines the packets passing in either direction past its connection point **121** and, according to one aspect of the invention, can elucidate what application programs are associated with each packet. The monitor **108** is shown examining packets (i.e., datagrams) between the network interface **116** of the server **110** and the network. The monitor can also be placed at other points in the network, such as connection point **123** between the network **102** and the interface **118** of the client **104**, or some other location, as indicated schematically by connection point **125** somewhere in network **102**. Not shown is a network packet acquisition device at the location **123** on the network for converting the physical information on the network into packets for input into monitor **108**. Such packet acquisition devices are common.

Various protocols may be employed by the network to establish and maintain the required communication, e.g., TCP/IP, etc. Any network activity—for example an application program run by the client **104** (CLIENT **1**) communicating with another running on the server **110** (SERVER **2**)—will produce an exchange of a sequence of packets over network **102** that is characteristic of the respective programs and of the network protocols. Such characteristics may not be completely revealing at the individual packet level. It may require the analyzing of many packets by the monitor **108** to have enough information needed to recognize particular application programs. The packets may need to be parsed then analyzed in the context of various protocols, for example, the transport through the application session layer protocols for packets of a type conforming to the ISO layered network model.

Communication protocols are layered, which is also referred to as a protocol stack. The ISO (International Standardization Organization) has defined a general model that provides a framework for design of communication protocol layers. This model, shown in table form below, serves as a basic reference for understanding the functionality of existing communication protocols.

ISO MODEL

| Layer | Functionality | Example |
|---|---|---|
| 7 | Application | Telnet, NFS, Novell NCP, HTTP, H.323 |
| 6 | Presentation | XDR |
| 5 | Session | RPC, NETBIOS, SNMP, etc. |
| 4 | Transport | TCP, Novel SPX, UDP, etc. |
| 3 | Network | IP, Novell IPX, VIP, AppleTalk, etc. |
| 2 | Data Link | Network Interface Card (Hardware Interface). MAC layer |
| 1 | Physical | Ethernet, Token Ring, Frame Relay, ATM, T1 (Hardware Connection) |

Different communication protocols employ different levels of the ISO model or may use a layered model that is similar to but which does not exactly conform to the ISO model. A protocol in a certain layer may not be visible to protocols employed at other layers. For example, an application (Level 7) may not be able to identify the source computer for a communication attempt (Levels 2–3).

In so communication arts, the term "frame" generally refers to encapsulated data at OSI layer 2, including a destination address, control bits for flow control, the data or

payload, and CRC (cyclic redundancy check) data for error checking. The term "packet" generally refers to encapsulated data at OSI layer 3. In the TCP/IP world, the term "datagram" is also used. In this specification, the term "packet" is intended to encompass packets, datagrams, frames, and cells. In general, a packet format or frame format refers to how data is encapsulated with various fields and headers for transmission across a network. For example, a data packet typically includes an address destination field, a length field, an error correcting code (ECC) field, or cyclic redundancy check (CRC) field, as well as headers and footers to identify the beginning and end of the packet. The terms "packet format" and "frame format," also referred to as "cell format," are generally synonymous.

Monitor **108** looks at every packet passing the connection point **121** for analysis. However, not every packet carries the same information useful for recognizing all levels of the protocol. For example, in a conversational flow associated with a particular application, the application will cause the server to send a type-A packet, but so will another. If, though, the particular application program always follows a type-A packet with the sending of a type-B packet, and the other application program does not, then in order to recognize packets of that application's conversational flow, the monitor can be available to recognize packets that match the type-B packet to associate with the type-A packet. If such is recognized after a type-A packet, then the particular application program's conversational flow has started to reveal itself to the monitor **108**.

Further packets may need to be examined before the conversational flow can be identified as being associated with the application program. Typically, monitor **108** is simultaneously also in partial completion of identifying other packet exchanges that are parts of conversational flows associated with other applications. One aspect of monitor **108** is its ability to maintain the state of a flow. The state of a flow is an indication of all previous events in the flow that lead to recognition of the content of all the protocol levels, e.g., the ISO model protocol levels. Another aspect of the invention is forming a signature of extracted characteristic portions of the packet that can be used to rapidly identify packets belonging to the same flow.

In real-world uses of the monitor **108**, the number of packets on the network **102** passing by the monitor **108**'s connection point can exceed a million per second. Consequently, the monitor has very little time available to analyze and type each packet and identify and maintain the state of the flows passing through the connection point. The monitor **108** therefore masks out all the unimportant parts of each packet that will not contribute to its classification. However, the parts to mask-out will change with each packet depending on which flow it belongs to and depending on the state of the flow.

The recognition of the packet type, and ultimately of the associated application programs according to the packets that their executions produce, is a multi-step process within the monitor **108**. At a first level, for example, several application programs will all produce a first kind of packet. A first "signature" is produced from selected parts of a packet that will allow monitor **108** to identify efficiently any packets that belong to the same flow. In some cases, that packet type may be sufficiently unique to enable the monitor to identify the application that generated such a packet in the conversational flow. The signature can then be used to efficiently identify all future packets generated in traffic related to that application.

In other cases, that first packet only starts the process of analyzing the conversational flow, and more packets are necessary to identify the associated application program. In such a case, a subsequent packet of a second type—but that potentially belongs to the same conversational flow—is recognized by using the signature. At such a second level, then, only a few of those application programs will have conversational flows that can produce such a second packet type. At this level in the process of classification, all application programs that are not in the set of those that lead to such a sequence of packet types may be excluded in the process of classifying the conversational flow that includes these two packets. Based on the known patterns for the protocol and for the possible applications, a signature is produced that allows recognition of any future packets that may follow in the conversational flow.

It may be that the application is now recognized, or recognition may need to proceed to a third level of analysis using the second level signature. For each packet, therefore, the monitor parses the packet and generates a signature to determine if this signature identified a previously encountered flow, or shall be used to recognize future packets belonging to the same conversational flow. In real time, the packet is further analyzed in the context of the sequence of previously encountered packets (the state), and of the possible future sequences such a past sequence may generate in conversational flows associated with different applications. A new signature for recognizing future packets may also be generated. This process of analysis continues until the applications are identified. The last generated signature may then be used to efficiently recognize future packets associated with the same conversational flow. Such an arrangement makes it possible for the monitor **108** to cope with millions of packets per second that must be inspected.

Another aspect of the invention is adding Eavesdropping. In alternative embodiments of the present invention capable of eavesdropping, once the monitor **108** has recognized the executing application programs passing through some point in the network **102** (for example, because of execution of the applications by the client **105** or server **110**), the monitor sends a message to some general purpose processor on the network that can input the same packets from the same location on the network, and the processor then loads its own executable copy of the application program and uses it to read the content being exchanged over the network. In other words, once the monitor **108** has accomplished recognition of the application program, eavesdropping can commence.

The Network Monitor

FIG. **3** shows a network packet monitor **300**, in an embodiment of the present invention that can be implemented with computer hardware and/or software. The system **300** is similar to monitor **108** in FIG. **1**. A packet **302** is examined, e.g., from a packet acquisition device at the location **121** in network **102** (FIG. **1**), and the packet evaluated, for example in an attempt to determine its characteristics, e.g., all the protocol information in a multilevel model, including what server application produced the packet.

The packet acquisition device is a common interface that converts the physical signals and then decodes them into bits, and into packets, in accordance with the particular network (Ethernet, frame relay, ATM, etc.). The acquisition device indicates to the monitor **108** the type of network of the acquired packet or packets.

Aspects shown here include: (1) the initialization of the monitor to generate what operations need to occur on packets of different types—accomplished by compiler and optimizer **310**, (2) the processing—parsing and extraction of selected portions—of packets to generate an identifying

signature—accomplished by parser subsystem **301**, and (3) the analysis of the packets—accomplished by analyzer **303**.

The purpose of compiler and optimizer **310** is to provide protocol specific information to parser subsystem **301** and to analyzer subsystem **303**. The initialization occurs prior to operation of the monitor, and only needs to re-occur when new protocols are to be added.

A flow is a stream of packets being exchanged between any two addresses in the network. For each protocol there are known to be several fields, such as the destination (recipient), the source (the sender), and so forth, and these and other fields are used in monitor **300** to identify the flow. There are other fields not important for identifying the flow, such as checksums, and those parts are not used for identification.

Parser subsystem **301** examines the packets using pattern recognition process **304** that parses the packet and determines the protocol types and associated headers for each protocol layer that exists in the packet **302**. An extraction process **306** in parser subsystem **301** extracts characteristic portions (signature information) from the packet **302**. Both the pattern information for parsing and the related extraction operations, e.g., extraction masks, are supplied from a parsing-pattern-structures and extraction-operations database (parsing/extractions database) **308** filled by the compiler and optimizer **310**.

The protocol description language (PDL) files **336** describes both patterns and states of all protocols that an occur at any layer, including how to interpret header information, how to determine from the packet header information the protocols at the next layer, and what information to extract for the purpose of identifying a flow, and ultimately, applications and services. The layer selections database **338** describes the particular layering handled by the monitor. That is, what protocols run on top of what protocols at any layer level. Thus **336** and **338** combined describe how one would decode, analyze, and understand the information in packets, and, furthermore, how the information is layered. This information is input into compiler and optimizer **310**.

When compiler and optimizer **310** executes, it generates two sets of internal data structures. The first is the set of parsing/extraction operations **308**. The pattern structures include parsing information and describe what will be recognized in the headers of packets; the extraction operations are what elements of a packet are to be extracted from the packets based on the patterns that get matched. Thus, database **308** of parsing/extraction operations includes information describing how to determine a set of one or more protocol dependent extraction operations from data in the packet that indicate a protocol used in the packet.

The other internal data structure that is built by compiler **310** is the set of state patterns and processes **326**. These are the different states and state transitions that occur in different conversational flows, and the state operations that need to be performed (e.g., patterns that need to be examined and new signatures that need to be built) during any state of a conversational flow to further the task of analyzing the conversational flow.

Thus, compiling the PDL files and layer selections provides monitor **300** with the information it needs to begin processing packets. In an alternate embodiment, the contents of one or more of databases **308** and **326** may be manually or otherwise generated. Note that in some embodiments the layering selections information is inherent rather than explicitly described. For example, since a PDL file for a protocol includes the child protocols, the parent protocols also may be determined.

In the preferred embodiment, the packet **302** from the acquisition device is input into a packet buffer. The pattern recognition process **304** is carried out by a pattern analysis and recognition (PAR) engine that analyzes and recognizes patterns in the packets. In particular, the PAR locates the next protocol field in the header and determines the length of the header, and may perform certain other tasks for certain types of protocol headers. An example of this is type and length comparison to distinguish an IEEE 802.3 (Ethernet) packet from the older type 2 (or Version 2) Ethernet packet, also called a DIGITAL-Intel-Xerox (DIX) packet. The PAR also uses the pattern structures and extraction operations database **308** to identify the next protocol and parameters associated with that protocol that enables analysis of the next protocol layer. Once a pattern or a set of patterns has been identified, it/they will be associated with a set of none or more extraction operations. These extraction operations (in the form of commands and associated parameters) are passed to the extraction process **306** implemented by an extracting and information identifying (EII) engine that extracts selected parts of the packet, including identifying information from the packet as required for recognizing this packet as part of a flow. The extracted information is put in sequence and then processed in block **312** to build a unique flow signature (also called a "key") for this flow. A flow signature depends on the protocols used in the packet. For some protocols, the extracted components may include source and destination addresses. For example, Ethernet frames have end-point addresses that are useful in building a better flow signature. Thus, the signature typically includes the client and server address pairs. The signature is used to recognize further packets that are or may be part of this flow.

In the preferred embodiment, the building of the flow key includes generating a hash of the signature using a hash function. The purpose if using such a hash is conventional—to spread flow-entries identified by the signature across a database for efficient searching. The hash generated is preferably based on a hashing algorithm and such hash generation is known to those in the art.

In one embodiment, the parser passes data from the packet—a parser record—that includes the signature (i.e., selected portions of the packet), the hash, and the packet itself to allow for any state processing that requires further data from the packet. An improved embodiment of the parser subsystem might generate a parser record that has some predefined structure and that includes the signature, the hash, some flags related to some of the fields in the parser record, and parts of the packet's payload that the parser subsystem has determined might be required for further processing, e.g., for state processing.

Note that alternate embodiments may use some function other than concatenation of the selected portions of the packet to make the identifying signature. For example, some "digest function" of the concatenated selected portions may be used.

The parser record is passed onto lookup process **314** which looks in an internal data store of records of known flows that the system has already encountered, and decides (in **316**) whether or not this particular packet belongs to a known flow as indicated by the presence of a flow-entry matching this flow in a database of known flows **324**. A record in database **324** is associated with each encountered flow.

The parser record enters a buffer called the unified flow key buffer (UFKB). The UFKB stores the data on flows in a data structure that is similar to the parser record, but that includes a field that can be modified. In particular, one or the

UFKB record fields stores the packet sequence number, and another is filled with state information in the form of a program counter for a state processor that implements state processing **328**.

The determination (**316**) of whether a record with the same signature already exists is carried out by a lookup engine (LUE) that obtains new UFKB records and uses the hash in the UFKB record to lookup if there is a matching known flow. In the particular embodiment, the database of known flows **324** is in an external memory. A cache is associated with the database **324**. A lookup by the LUE for a known record is carried out by accessing the cache using the hash, and if the entry is not already present in the cache, the entry is looked up (again using the hash) in the external memory.

The flow-entry database **324** stores flow-entries that include the unique flow-signature, state information, and extracted information from the packet for updating flows, and one or more statistical about the flow. Each entry completely describes a flow. Database **324** is organized into bins that contain a number, denoted N, of flow-entries (also called flow-entries, each a bucket), with N being 4 in the preferred embodiment. Buckets (i.e., flow-entries) are accessed via the hash of the packet from the parser subsystem **301** (i.e., the hash in the UFKB record). The hash spreads the flows across the database to allow for fast lookups of entries, allowing shallower buckets. The designer selects the bucket depth N based on the amount of memory attached to the monitor, and the number of bits of the hash data value used. For example, in one embodiment, each flow-entry is 128 bytes long, so for 128K flow-entries, 16 Mbytes are required. Using a 16-bit hash gives two flow-entries per bucket. Empirically, this has been shown to be more than adequate for the vast majority of cases. Note that another embodiment uses flow-entries that are 256 bytes long.

Herein, whenever an access to database **324** is described, it is to be understood that the access is via the cache, unless otherwise stated or clear from the context.

If there is no flow-entry found matching the signature, i.e., the signature is for a new flow, then a protocol and state identification process **318** further determines the state and protocol. That is, process **318** determines the protocols and where in the state sequence for a flow for this protocol's this packet belongs. Identification process **318** uses the extracted information and makes reference to the database **326** of state patterns and processes. Process **318** is then followed by any state operations that need to be executed on this packet by a state processor **328**.

If the packet is found to have a matching flow-entry in the database **324** (e.g., in the cache), then a process **320** determines, from the looked-up flow-entry, if more classification by state processing of the flow signature is necessary. If not, a process **322** updates the flow-entry in the flow-entry database **324** (e.g., via the cache). Updating includes updating one or more statistical measures stored in the flow-entry. In our embodiment, the statistical measures are stored in counters in the flow-entry.

If state processing is required, state process **328** is commenced. State processor **328** carries out any state operations specified for the state of the flow and updates the state to the next state according to a set of state instructions obtained form the state pattern and processes database **326**.

The state processor **328** analyzes both new and existing flows in order to analyze all levels of the protocol stack, ultimately classifying the flows by application (level 7 in the ISO model). It does this by proceeding from state-to-state based on predefined state transition rules and state operations as specified in state processor instruction database **326**. A state transition rule is a rule typically containing a test followed by the next-state to proceed to if the test result is true. An operation is an operation to be performed while the state processor is in a particular state—for example, in order to evaluate a quantity needed to apply the state transition rule. The state processor goes through each rule and each state process until the test is true, or there are no more tests to perform.

In general, the set of state operations may be none or more operations on a packet, and carrying out the operation or operations may leave one in a state that causes exiting the system prior to completing the identification, but possibly knowing more about what state and state processes are needed to execute next, i.e., when a next packet of this flow is encountered. As an example, a state process (set of state operations) at a particular state may build a new signature for future recognition packets of the next state.

By maintaining the state of the flows and knowing that new flows may be set up using the information from previously encountered flows, the network traffic monitor **300** provides for (a) single-packet protocol recognition of flows, and (b) multiple-packet protocol recognition of flows. Monitor **300** can even recognize the application program from one or more disjointed sub-flows that occur in server announcement type flows. What may seem to prior art monitors to be some unassociated flow, may be recognized by the inventive monitor using the flow signature to be a sub-flow associated with a previously encountered sub-flow.

Thus, state processor **328** applies the first state operation to the packet for this particular flow-entry. A process **330** decides if more operations need to be performed for this state. If so, the analyzer continues looping between block **330** and **328** applying additional state operations to this particular packet until all those operations are completed—that is, there are no more operations for this packet in this state. A process **332** decides if there are further states to be analyzed for this type of flow according to the state of the flow and the protocol, in order to fully characterize the flow. If not, the conversational flow has now been fully characterized and a process **334** finalizes the classification of the conversational flow for the flow.

In the particular embodiment, the state processor **328** starts the state processing by using the last protocol recognized by the parser as an offset into a jump table (jump vector). The jump table finds the state processor instructions to use for that protocol in the state patterns and processes database **326**. Most instructions test something in the unified flow key buffer, or the flow-entry in the database of known flows **324**, if the entry exists. The state processor may have to test bits, do comparisons, add, or subtract to perform the test. For example, a common operation carried out by the state processor is searching for one or more patterns in the payload part of the UFKB.

Thus, in **332** in the classification, the analyzer decides whether the flow is at an end state. If not at an end state, the flow-entry is updated (or created if a new flow) for this flow-entry in process **322**.

Furthermore, if the flow is known and if in **332** it is determined that there are further states to be processed using later packets, the flow-entry is updated in process **322**.

The flow-entry also is updated after classification finalization so that any further packets belonging to this flow will be readily identified from their signature as belonging to this fully analyzed conversational flow.

After updating, database **324** therefore includes the set of all the conversational flows that have occurred.

Thus, the embodiment of present invention shown in FIG. **3** automatically maintains flow-entries, which in one aspect includes storing states. The monitor of FIG. **3** also generates characteristic parts of packets—the signatures—that can be used to recognize flows. The flow-entries may be identified and accessed by their signatures. Once a packet is identified to be from a known flow, the state of the flow is known and this knowledge enables state transition analysis to be performed in real time for each different protocol and application. In a complex analysis, state transitions are traversed as more and more packets are examined. Future packets that are part of the same conversational flow have their state analysis continued from a previously achieved state. When enough packets related to an application of interest have been processed, a final recognition state is ultimately reached, i.e., a set of states has been traversed by state analysis to completely characterize the conversational flow. The signature for that final state enables each new incoming packet of the same conversational flow to be individually recognized in real time.

In this manner, one of the great advantages of the present invention is realized. Once a particular set of state transitions has been traversed for the first time and ends in a final state, a short-cut recognition pattern—a signature—an be generated that will key on every new incoming packet that relates to the conversational flow. Checking a signature involves a simple operation, allowing high packet rates to be successfully monitored on the network.

In improved embodiments, several state analyzers are run in parallel so that a large number of protocols and applications may be checked for. Every known protocol and application will have at least one unique set of state transitions, and can therefore be uniquely identified by watching such transitions.

When each new conversational flow starts, signatures that recognize the flow are automatically generated on-the-fly, and as further packets in the conversational flow are encountered, signatures are updated and the states of the set of state transitions for any potential application are further traversed according to the state transition rules for the flow. The new states for the flow—those associated with a set of state transitions for one or more potential applications—are added to the records of previously encountered states for easy recognition and retrieval when a new packet in the flow is encountered.

Detailed operation

FIG. **4** diagrams an initialization system **400** that includes the compilation process. That is, part of the initialization generates the pattern structures and extraction operations database **308** and the state instruction database **328**. Such initialization can occur off-line or from a central location.

The different protocols that can exist in different layers may be thought of as nodes of one or more trees of linked nodes. The packet type is the root of a tree (called level 0). Each protocol is either a parent node or a terminal node. A parent node links a protocol to other protocols (child protocols) that can be at higher layer levels. Thus a protocol may have zero or more children. Ethernet packets, for example, have several variants, each having a basic format that remains substantially the same. An Ethernet packet (the root or level 0 node) may be an Ethertype packet—also called an Ethernet Type/Version 2 and a DIX (DIGITAL-Intel-Xerox packet)—or an IEEE 803.2 packet. Continuing with the IEEE 802.3 packet, one of the children nodes may be the IP protocol, and one of the children of the IP protocol may be the TCP protocol.

FIG. **16** shows the header **1600** (base level 1) of a complete Ethernet frame (i.e., packet) of information and includes information on the destination media access control address (Dst MAC **1602**) and the source media access control address (Src MAC **1604**). Also shown in FIG. **16** is some (but not all) of the information specified in the PDL files for extraction the signature.

FIG. **17**A now shows the header information for the next level (level-2) for an Ethertype packet **1700**. For an Ethertype packet **1700**, the relevant information from the packet that indicates the next layer level is a two-byte type field **1702** containing the child recognition pattern for the next level. The remaining information **1704** is shown hatched because it not relevant for this level. The list **1712** shows the possible children for an Ethertype packet as indicated by what child recognition pattern is found offset **12**. FIG. **17**B shows the structure of the header of one of the possible next levels, that of the IP protocol. The possible children of the IP protocol are shown in table **1752**.

The pattern, parse, and extraction database (pattern recognition database, or PRD) **308** generated by compilation process **310**, in one embodiment, is in the form of a three dimensional structure that provides for rapidly searching packet headers for the next protocol. FIG. **18**A shows such a 3-D representation **1800** (which may be considered as an indexed set of 2-D representations). A compressed form of the 3-D structure is preferred.

An alternate embodiment of the data structure used in database **308** is illustrated in FIG. **18**B. Thus, like the 3-D structure of FIG. **18**A, the data structure permits rapid searches to be performed by the pattern recognition process **304** by indexing locations in a memory rather than performing address link computations. In this alternate embodiment, the PRD **308** includes two parts, a single protocol table **1850** (PT) which has an entry for each protocol known for the monitor, and a series of Look Up Tables **1870** (LUT's) that are used to identify known protocols and their children. The protocol table includes the parameters needed by the pattern analysis and recognition process **304** (implemented by PRE **1006**) to evaluate the header information in the packet that is associated with that protocol, and parameters needed by extraction process **306** (implemented by slicer **1007**) to process the packet header. When there are children, the PT describes which bytes in the header to evaluate to determine the child protocol. In particular, each PT entry contains the header length, an offset to the child, a slicer command, and some flags.

The pattern matching is carried out by finding particular "child recognition codes" in the header fields, and using these codes to index one or more of the LUT's. Each LUT entry has a node code that can have one of four values, indicating the protocol that has been recognized, a code to indicate that the protocol has been partially recognized (more LUT lookups are needed), a code to indicate that this is a terminal node, and a null node to indicate a null entry. The next LUT to lookup is also returned from a LUT lookup.

Compilation process is described in FIG. **4**. The source-code information in the form of protocol description files is shown as **402**. In the particular embodiment, the high level decoding descriptions includes a set of protocol description files **336**, one for each protocol, and a set of packet layer selections **338**, which describes the particular layering (sets of trees of protocols) that the monitor is to be able to handle.

A compiler **403** compiles the descriptions. The set of packet parse-and-extract operations **406** is generated (**404**), and a set of packet state instructions and operations **407** is generated (**405**) in the form of instructions for the state processor that implements state processing process **328**. Data files for each type of application and protocol to be

recognized by the analyzer are downloaded from the pattern, parse, and extraction database **406** into the memory systems of the parser and extraction engines. (See the parsing process **500** description and FIG. **5**; the extraction process **600** description and FIG. **6**; and the parsing subsystem hardware description and FIG. **10**). Data files for each type of application and protocol to be recognized by the analyzer are also downloaded from the state-processor instruction database **407** into the state processor. (see the state processor **1108** description and FIG. **11**.).

Note that generating the packet parse and extraction operations builds and links the three dimensional structure (one embodiment) or the or all the lookup tables for the PRD.

Because of the large number of possible protocol trees and subtrees, the compiler process **400** includes optimization that compares the trees and subtrees to see which children share common parents. When implemented in the form of the LUT's, this process can generate a single LUT from a plurality of LUT's. The optimization process further includes a compaction process that reduces the space needed to store the data of the PRD.

As an example of compaction, consider the 3-D structure of FIG. **18**A that can be thought of as a set of 2-D structures each representing a protocol. To enable saving space by using only one array per protocol which may have several parents, in one embodiment, the pattern analysis subprocess keeps a "current header" pointer. Each location (offset) index for each protocol 2-D array in the 3-D structure is a relative location starting with the start of header for the particular protocol. Furthermore, each of the two-dimensional arrays is sparse. The next step of the optimization, is checking all the 2-D arrays against all the other 2-D arrays to find out which ones can share memory. Many of these 2-D arrays are often sparsely populated in that they each have only a small number of valid entries. So, a process of "folding" is next used to combine two or more 2-D arrays together into one physical 2-D array without losing the identity of any of the original 2-D arrays (i.e., all the 2-D arrays continue to exist logically). Folding can occur between any 2-D arrays irrespective of their location in the tree as long as certain conditions are met. Multiple arrays may be combined into a single array as long as the individual entries do not conflict with each other. A fold number is then used to associate each element with its original array. A similar folding process is used for the set of LUTs **1850** in the alternate embodiment of FIG. **18**B.

In **410**, the analyzer has been initialized and is ready to perform recognition.

FIG. **5** shows a flowchart of how actual parser subsystem **301** functions. Starting at **501**, the packet **302** is input to the packet buffer in step **502**. Step **503** loads the next (initially the first) packet component from the packet **302**. The packet components are extracted from each packet **302** one element at a time. A check is made (**504**) to determine if the load-packet-component operation **503** succeeded, indicating that there was more in the packet to process. If not, indicating all components have been loaded, the parser subsystem **301** builds the packet signature (**512**)—the next stage (FIG. **6**).

If a component is successfully loaded in **503**, the node and processes are fetched (**505**) from the pattern, parse and extraction database **308** to provide a set of patterns and processes for that node to apply to the loaded packet component. The parser subsystem **301** checks (**506**) to determine if the fetch pattern node operation **505** completed successfully, indicating there was a pattern node that loaded in **505**. If not, step **511** moves to the next packet component. If yes, then the node and pattern matching process are applied in **507** to the component extracted in **503**. A pattern match obtained in **507** (as indicated by test **508**) means the parser subsystem **301** has found a node in the parsing elements; the parser subsystem **301** proceeds to step **509** to extract the elements.

If applying the node process to the component does not produce a match (test **508**), the parser subsystem **301** moves (**510**) to the next pattern node from the pattern database **308** and to step **505** to fetch the next node and process. Thus, there is an "applying patterns" loop between **508** and **505**. Once the parser subsystem **301** completes all the patterns and has either matched or not, the parser subsystem **301** moves to the next packet component (**511**).

Once all the packet components have been the loaded and processed from the input packet **302**, then the load packet will fail (indicated by test **504**), and the parser subsystem **301** moves to build a packet signature which is described in FIG. **6**

FIG. **6** is a flow chart for extracting the information from which to build the packet signature. The flow starts at **601**, which is the exit point **513** of FIG. **5**. At this point parser subsystem **301** has a completed packet component and a pattern node available in a buffer (**602**). Step **603** loads the packet component available from the pattern analysis process of FIG. **5**. If the load completed (test **604**), indicating that there was indeed another packet component, the parser subsystem **301** fetches in **605** the extraction and process elements received from the pattern node component in **602**. If the fetch was successful (test **606**), indicating that there are extraction elements to apply, the parser subsystem **301** in step **607** applies that extraction process to the packet component based on an extraction instruction received from that pattern node. This removes and saves an element from the packet component.

In step **608**, the parser subsystem **301** checks if there is more to extract from this component, and if not, the parser subsystem **301** moves back to **603** to load the next packet component at hand and repeats the process. If the answer is yes, then the parser subsystem **301** moves to the next packet component ratchet. That new packet component is then loaded in step **603**. As the parser subsystem **301** moved through the loop between **608** and **603**, extra extraction processes are applied either to the same packet component if there is more to extract, or to a different packet component if there is no more to extract.

The extraction process thus builds the signature, extracting more and more components according to the information in the patterns and extraction database **308** for the particular packet. Once loading the next packet component operation **603** fails (test **604**), all the components have been extracted. The built signature is loaded into the signature buffer (**610**) and the parser subsystem **301** proceeds to FIG. **7** to complete the signature generation process.

Referring now to FIG. **7**, the process continues at **701**. The signature buffer and the pattern node elements are available (**702**). The parser subsystem **301** loads the next pattern node element. If the load was successful (test **704**) indicating there are more nodes, the parser subsystem **301** in **705** hashes the signature buffer element based on the hash elements that are found in the pattern node that is in the element database. In **706** the resulting signature and the hash are packed. In **707** the parser subsystem **301** moves on to the next packet component which is loaded in **703**.

The **703** to **707** loop continues until there are no more patterns of elements left (test **704**). Once all the patterns of

elements have been hashed, processes **304**, **306** and **312** of parser subsystem **301** are complete. Parser subsystem **301** has generated the signature used by the analyzer subsystem **303**.

A parser record is loaded into the analyzer, in particular, into the UFKB in the form of a UFKB record which is similar to a parser record, but with one or more different fields.

FIG. **8** is a flow diagram describing the operation of the lookup/update engine (LUE) that implements lookup operation **314**. The process starts at **801** from FIG. **7** with the parser record that includes a signature, the hash and at least parts of the payload. In **802** those elements are shown in the form of a UFKB-entry in the buffer. The LUE, the lookup engine **314** computes a "record bin number" from the hash for a flow-entry. A bin herein may have one or more "buckets" each containing a flow-entry. The preferred embodiment has four buckets per bin.

Since preferred hardware embodiment includes the cache, all data accesses to records in the flowchart of FIG. **8** are stated as being to or from the cache.

Thus, in **804**, the system looks up the cache for a bucket from that bin using the hash. If the cache successfully returns with a bucket from the bin number, indicating there are more buckets in the bin, the lookup/update engine compares (**807**) the current signature (the UFKB-entry's signature) from that in the bucket (i.e., the flow-entry signature). If the signatures match (test **808**), that record (in the cache) is marked in step **810** as "in process" and a timestamp added. Step **811** indicates to the UFKB that the UFKB-entry in **802** has a status of "found." The "found" indication allows the state processing **328** to begin processing this UFKB element. The preferred hardware embodiment includes one or more state processors, and these can operate in parallel with the lookup/update engine.

In the preferred embodiment, a set of statistical operations is performed by a calculator for every packet analyzed. The statistical operations may include one or more of counting the packets associated with the flow; determining statistics related to the size of packets of the flow; compiling statistics on differences between packets in each direction, for example using timestamps; and determining statistical relationships of timestamps of packets in the same direction. The statistical measures are kept in the flow-entries. Other statistical measures also may be compiled. These statistics may be used singly or in combination by a statistical processor component to analyze many different aspects of the flow. This may include determining network usage metrics from the statistical measures, for example to ascertain the network's ability to transfer information for this application. Such analysis provides for measuring the quality of service of a conversation, measuring how well an application is performing in the network, measuring network resources consumed by an application, and so forth.

To provide for such analyses, the lookup/update engine updates one or more counters that are part of the flow-entry (in the cache) in step **812**. The process exits at **813**. In our embodiment, the counters include the total packets of the flow, the time, and a differential time from the last timestamp to the present timestamp.

It may be that the bucket of the bin did not lead to a signature match (test **808**). In such a case, the analyzer in **809** moves to the next bucket for this bin. Step **804** again looks up the cache for another bucket from that bin. The lookup/update engine thus continues lookup up buckets of the bin until there is either a match in **808** or operation **804** is not successful (test **805**), indicating that there are no more buckets in the bin and no match was found.

If no match was found, the packet belongs to a new (not previously encountered) flow. In **806** the system indicates that the record in the unified flow key buffer for this packet is new, and in **812**, any statistical updating operations are performed for this packet by updating the flow-entry in the cache. The update operation exits at **813**. A flow insertion/deletion engine (FIDE) creates a new record for this flow (again via the cache).

Thus, the update/lookup engine ends with a UFKB-entry for the packet with a "new" status or a "found" status.

Note that the above system uses a hash to which more than one flow-entry can match. A longer hash may be used that corresponds to a single flow-entry. In such an embodiment, the flow chart of FIG. **8** is simplified as would be clear to those in the art.

The Hardware System

Each of the individual hardware elements through which the data flows in the system are now described with reference to FIGS. **10** and **11**. Note that while we are describing a particular hardware implementation of the invention embodiment of FIG. **3**, it would be clear to one skilled in the art that the flow of FIG. **3** may alternatively be implemented in software running on one or more general-purpose processors, or only partly implemented in hardware. An implementation of the invention that can operate in software is shown in FIG. **14**. The hardware embodiment (FIGS. **10** and **11**) can operate at over a million packets per second, while the software system of FIG. **14** may be suitable for slower networks. To one skilled in the art it would be clear that more and more of the system may be implemented in software as processors become faster.

FIG. **10** is a description of the parsing subsystem (**301**, shown here as subsystem **1000**) as implemented in hardware. Memory **1001** is the pattern recognition database memory, in which the patterns that are going to be analyzed are stored. Memory **1002** is the extraction-operation database memory, in which the extraction instructions are stored. Both **1001** and **1002** correspond to internal data structure **308** of FIG. **3**. Typically, the system is initialized from a microprocessor (not shown) at which time these memories are loaded through a host interface multiplexor and control register **1005** via the internal buses **1003** and **1004**. Note that the contents of **1001** and **1002** are preferably obtained by compiling process **310** of FIG. **3**.

A packet enters the parsing system via **1012** into a parser input buffer memory **1008** using control signals **1021** and **1023**, which control an input buffer interface controller **1022**. The buffer **1008** and interface control **1022** connect to a packet acquisition device (not shown). The buffer acquisition device generates a packet start signal **1021** and the interface control **1022** generates a next packet (i.e., ready to receive data) signal **1023** to control the data flow into parser input buffer memory **1008**. Once a packet starts loading into the buffer memory **1008**, pattern recognition engine (PRE) **1006** carries out the operations on the input buffer memory described in block **304** of FIG. **3**. That is, protocol types and associated headers for each protocol layer that exist in the packet are determined.

The PRE searches database **1001** and the packet in buffer **1008** in order to recognize the protocols the packet contains. In one implementation, the database **1001** includes a series of linked lookup tables. Each lookup table uses eight bits of addressing. The first lookup table is always at address zero. The Pattern Recognition Engine uses a base packet offset from a control register to start the comparison. It loads this value into a current offset pointer (COP). It then reads the byte at base packet offset from the parser input buffer and uses it as an address into the first lookup table.

Each lookup table returns a word that links to another lookup table or it returns a terminal flag. If the lookup produces a recognition event the database also returns a command for the slicer. Finally it returns the value to add to the COP.

The PRE **1006** includes of a comparison engine. The comparison engine has a first stage that checks the protocol type field to determine if it is an 802.3 packet and the field should be treated as a length. If it is not a length, the protocol is checked in a second stage. The first stage is the only protocol level that is not programmable. The second stage has two full sixteen bit content addressable memories (CAMs) defined for future protocol additions.

Thus, whenever the PRE recognizes a pattern, it also generates a command for the extraction engine (also called a "slicer") **1007**. The recognized patterns and the commands are sent to the extraction engine **1007** that extracts information from the packet to build the parser record. Thus, the operations of the extraction engine are those carried out in blocks **306** and **312** of FIG. **3**. The commands are sent from PRE **1006** to slicer **1007** in the form of extraction instruction pointers which tell the extraction engine **1007** where to a find the instructions in the extraction operations database memory (i.e., slicer instruction database) **1002**.

Thus, when the PRE **1006** recognizes a protocol it outputs both the protocol identifier and a process code to the extractor. The protocol identifier is added to the flow signature and the process code is used to fetch the first instruction from the instruction database **1002**. Instructions include an operation code and usually source and destination offsets as well as a length. The offsets and length are in bytes. A typical operation is the MOVE instruction. This instruction tells the slicer **1007** to copy n bytes of data unmodified from the input buffer **1008** to the output buffer **1010**. The extractor contains a byte-wise barrel shifter so that the bytes moved can be packed into the flow signature. The extractor contains another instruction called HASH. This instruction tells the extractor to copy from the input buffer **1008** to the HASH generator.

Thus these instructions are for extracting selected element (s) of the packet in the input buffer memory and transferring the data to a parser output buffer memory **1010**. Some instructions also generate a hash.

The extraction engine **1007** and the PRE operate as a pipeline. That is, extraction engine **1007** performs extraction operations on data in input buffer **1008** already processed by PRE **1006** while more (i.e., later arriving) packet information is being simultaneously parsed by PRE **1006**. This provides high processing speed sufficient to accommodate the high arrival rate speed of packets.

Once all the selected parts of the packet used to form the signature are extracted, the hash is loaded into parser output buffer memory **1010**. Any additional payload from the packet that is required for further analysis is also included. The parser output memory **1010** is interfaced with the analyzer subsystem by analyzer interface control **1011**. Once all the information of a packet is in the parser output buffer memory **1010**, a data ready signal **1025** is asserted by analyzer interface control. The data from the parser subsystem **1000** is moved to the analyzer subsystem via **1013** when an analyzer ready signal **1027** is asserted.

FIG. **11** shows the hardware components and dataflow for the analyzer subsystem that performs the functions of the analyzer subsystem **303** of FIG. **3**. The analyzer is initialized prior to operation, and initialization includes loading the state processing information generated by the compilation process **310** into a database memory for the state processing, called state processor instruction database (SPID) memory **1109**.

The analyzer subsystem **1100** includes a host bus interface **1122** using an analyzer host interface controller **1118**, which in turn has access to a cache system **1115**. The cache system has bi-directional access to and from the state processor of the system **1108**. State processor **1108** is responsible for initializing the state processor instruction database memory **1109** from information given over the host bus interface **1122**.

With the SPID **1109** loaded, the analyzer subsystem **1100** receives parser records comprising packet signatures and payloads that come from the parser into the unified flow key buffer (UFKB) **1103**. UFKB is comprised of memory set up to maintain UFKB records. A UFKB record is essentially a parser record; the UFKB holds records of packets that are to be processed or that are in process. Furthermore, the UFKB provides for one or more fields to act as modifiable status flags to allow different processes to run concurrently.

Three processing engines run concurrently and access records in the UFKB **1103**: the lookup/update engine (LUE) **1107**, the state processor (SP) **1108**, and the flow insertion and deletion engine (FIDE) **1110**. Each of these is implemented by one or more finite state machines (FSM's). There is bi-directional access between each of the finite state machines and the unified flow key buffer **1103**. The UFKB record includes a field that stores the packet sequence number, and another that is filled with state information in the form of a program counter for the state processor **1108** that implements state processing **328**. The status flags of the UFKB for any entry includes that the LUE is done and that the LUE is transferring processing of the entry to the state processor. The LUE done indicator is also used to indicate what the next entry is for the LUE. There also is provided a flag to indicate that the state processor is done with the current flow and to indicate what the next entry is for the state processor. There also is provided a flag to indicate the state processor is transferring processing of the UFKB-entry to the flow insertion and deletion engine.

A new UFKB record is first processed by the LUE **1107**. A record that has been processed by the LUE **1107** may be processed by the state processor **1108**, and a UFKB record data may be processed by the flow insertion/deletion engine **1110** after being processed by the state processor **1108** or only by the LUE. Whether or not a particular engine has been applied to any unified flow key buffer entry is determined by status fields set by the engines upon completion. In one embodiment, a status flag in the UFKB-entry indicates whether an entry is new or found. In other embodiments, the LUE issues a flag to pass the entry to the state processor for processing, and the required operations for a new record are included in the SP instructions.

Note that each UFKB-entry may not need to be processed by all three engines. Furthermore, some UFKB entries may need to be processed more than once by a particular engine.

Each of these three engines also has bi-directional access to a cache subsystem **1115** that includes a caching engine. Cache **1115** is designed to have information flowing in and out of it from five different points within the system: the three engines, external memory via a unified memory controller (UMC) **1119** and a memory interface **1123**, and a microprocessor via analyzer host interface and control unit (ACIC) **1118** and host interface bus (HIB) **1122**. The analyzer microprocessor (or dedicated logic processor) can thus directly insert or modify data in the cache.

The cache subsystem **1115** is an associative cache that includes a set of content addressable memory cells (CAMs) each including an address portion and a pointer portion pointing to the cache memory (e.g., RAM) containing the

cached flow-entries. The CAMs are arranged as a stack ordered from a top CAM to a bottom CAM. The bottom CAM's pointer points to the least recently used (LRU) cache memory entry. Whenever there is a cache miss, the contents of cache memory pointed to by the bottom CAM are replaced by the flow-entry from the flow-entry database **324**. This now becomes the most recently used entry, so the contents of the bottom CAM are moved to the top CAM and all CAM contents are shifted down. Thus, the cache is an associative cache with a true LRU replacement policy.

The LUE **1107** first processes a UFKB-entry, and basically performs the operation of blocks **314** and **316** in FIG. **3**. A signal is provided to the LUE to indicate that a "new" UFKB-entry is available. The LUE uses the hash in the UFKB-entry to read a matching bin of up to four buckets from the cache. The cache system attempts to obtain the matching bin. If a matching bin is not in the cache, the cache **1115** makes the request to the UMC **1119** to bring in a matching bin from the external memory.

When a flow-entry is found using the hash, the LUE **1107** looks at each bucket and compares it using the signature to the signature of the UFKB-entry until there is a match or there are no more buckets.

If there is no match, or if the cache failed to provide a bin of flow-entries from the cache, a time stamp in set in the flow key of the UFKB record, a protocol identification and state determination is made using a table that was loaded by compilation process **310** during initialization, the status for the record is set to indicate the LUE has processed the record, and an indication is made that the UFKB-entry is ready to start state processing. The identification and state determination generates a protocol identifier which in the preferred embodiment is a "jump vector" for the state processor which is kept by the UFKB for this UFKB-entry and used by the state processor to start state processing for the particular protocol. For example, the jump vector jumps to the subroutine for processing the state.

If there was a match, indicating that the packet of the UFKB-entry is for a previously encountered flow, then a calculator component enters one or more statistical measures stored in the flow-entry, including the timestamp. In addition, a time difference from the last stored timestamp may be stored, and a packet count may be updated. The state of the flow is obtained from the flow-entry is examined by looking at the protocol identifier stored in the flow-entry of database **324**. If that value indicates that no more classification is required, then the status for the record is set to indicate the LUE has processed the record. In the preferred embodiment, the protocol identifier is a jump vector for the state processor to a subroutine to state processing the protocol, and no more classification is indicated in the preferred embodiment by the jump vector being zero. If the protocol identifier indicates more processing, then an indication is made that the UFKB-entry is ready to start state processing and the status for the record is set to indicate the LUE has processed the record.

The state processor **1108** processes information in the cache system according to a UFKB-entry after the LUE has completed. State processor **1108** includes a state processor program counter SPPC that generates the address in the state processor instruction database **1109** loaded by compiler process **310** during initialization. It contains an Instruction Pointer (SPIP) which generates the SPID address. The instruction pointer can be incremented or loaded from a Jump Vector Multiplexor which facilitates conditional branching. The SPIP can be loaded from one of three sources: (1) A protocol identifier from the UFKB, (2) an immediate jump vector form the currently decoded instruction, or (3) a value provided by the arithmetic logic unit (SPALU) included in the state processor.

Thus, after a Flow Key is placed in the UFKB by the LUE with a known protocol identifier, the Program Counter is initialized with the last protocol recognized by the Parser. This first instruction is a jump to the subroutine which analyzes the protocol that was decoded.

The State Processor ALU (SPALU) contains all the Arithmetic, Logical and String Compare functions necessary to implement the State Processor instructions. The main blocks of the SPALU are: The A and B Registers, the Instruction Decode & State Machines, the String Reference Memory the Search Engine, an Output Data Register and an Output Control Register

The Search Engine in turn contains the Target Search Register set, the Reference Search Register set, and a Compare block which compares two operands by exclusive-or-ing them together.

Thus, after the UFKB sets the program counter, a sequence of one or more state operations are be executed in state processor **1108** to further analyze the packet that is in the flow key buffer entry for this particular packet.

FIG. **13** describes the operation of the state processor **1108**. The state processor is entered at **1301** with a unified flow key buffer entry to be processed. The UFKB-entry is new or corresponding to a found flow-entry. This UFKB-entry is retrieved from unified flow key buffer **1103** in **1301**. In **1303**, the protocol identifier for the UFKB-entry is used to set the state processor's instruction counter. The state processor **1108** starts the process by using the last protocol recognized by the parser subsystem **301** as an offset into a jump table. The jump table takes us to the instructions to use for that protocol. Most instructions test something in the unified flow key buffer or the flow-entry if it exists. The state processor **1108** may have to test bits, do comparisons, add or subtract to perform the test.

The first state processor instruction is fetched in **1304** from the state processor instruction database memory **1109**. The state processor performs the one or more fetched operations (**1304**). In our implementation, each single state processor instruction is very primitive (e.g., a move, a compare, etc.), so that many such instructions need to be performed on each unified flow key buffer entry. One aspect of the state processor is its ability to search for one or more (up to four) reference strings in the payload part of the UFKB entry. This is implemented by a search engine component of the state processor responsive to special searching instructions.

In **1307**, a check is made to determine if there are any more instructions to be performed for the packet. If yes, then in **1308** the system sets the state processor instruction pointer (SPIP) to obtain the next instruction. The SPIP may be set by an immediate jump vector in the currently decoded instruction, or by a value provided by the SPALU during processing.

The next instruction to be performed is now fetched (**1304**) for execution. This state processing loop between **1304** and **1307** continues until there are no more instructions to be performed.

At this stage, a check is made in **1309** if the processing on this particular packet has resulted in a final state. That is, is the analyzer is done processing not only for this particular packet, but for the whole flow to which the packet belongs, and the flow is fully determined. If indeed there are no more states to process for this flow, then in **1311** the processor finalizes the processing. Some final states may need to put

a state in place that tells the system to remove a flow—for example, if a connection disappears from a lower level connection identifier. In that case, in **1311**, a flow removal state is set and saved in the flow-entry. The flow removal state may be a NOP (no-op) instruction which means there are no removal instructions.

Once the appropriate flow removal instruction as specified for this flow (a NOP or otherwise) is set and saved, the process is exited at **1313**. The state processor **1108** can now obtain another unified flow key buffer entry to process.

If at **1309** it is determined that processing for this flow is not completed, then in **1310** the system saves the state processor instruction pointer in the current flow-entry in the current flow-entry. That will be the next operation that will be performed the next time the LRE **1107** finds packet in the UFKB that matches this flow. The processor now exits processing this particular unified flow key buffer entry at **1313**.

Note that state processing updates information in the unified flow key buffer **1103** and the flow-entry in the cache. Once the state processor is done, a flag is set in the UFKB for the entry that the state process or is done. Furthermore, If the flow needs to be inserted or deleted from the database of flows, control is then passed on to the flow insertion/deletion engine **1110** for that flow signature and packet entry. This is done by the state processor setting another flag in the UFKB for this UFKB-entry indicating that the state processor is passing processing of this entry to the flow insertion and deletion engine.

The flow insertion and deletion engine **1110** is responsible for maintaining the flow-entry database. In particular, for creating new flows in the flow database, and deleting flows from the database so that they can be reused.

The process of flow insertion is now described with the aid of FIG. **12**. Flows are grouped into bins of buckets by the hash value. The engine processes a UFKB-entry that may be new or that the state processor otherwise has indicated needs to be created. FIG. **12** shows the case of a new entry being created. A conversation record bin (preferably containing 4 buckets for four records) is obtained in **1203**. This is a bin that matches the hash of the UFKB, so this bin may already have been sought for the UFKB-entry by the LUE. In **1204** the FIDE **1110** requests that the record bin/bucket be maintained in the cache system **1115**. If in **1205** the cache system **1115** indicates that the bin/bucket is empty, step **1207** inserts the flow signature (with the hash) into the bucket and the bucket is marked "used" in the cache engine of cache **1115** using a timestamp that is maintained throughout the process. In **1209**, the FIDE **1110** compares the bin and bucket record flow signature to the packet to verify that all the elements are in place to complete the record. In **1211** the system marks the record bin and bucket as "in process" and as "new" in the cache system (and hence in the external memory). In **1212**, the initial statistical measures for the flow-record are set in the cache system. This in the preferred embodiment clears the set of counters used to maintain statistics, and may perform other procedures for statistical operations requires by the analyzer for the first packet seen for a particular flow.

Back in step **1205**, if the bucket is not empty, the FIDE **1110** requests the next bucket for this particular bin in the cache system. If this succeeds, the processes of **1207**, **1209**, **1211** and **1212** are repeated for this next bucket. If at **1208**, there is no valid bucket, the unified flow key buffer entry for the packet is set as "drop," indicating that the system cannot process the particular packet because there are no buckets left in the system. The process exits at **1213**. The FIDE **1110** indicates to the UFKB that the flow insertion and deletion operations are completed for this UFKB-entry. This also lets the UFKB provide the FIDE with the next UFKB record.

Once a set of operations is performed on a unified flow key buffer entry by all of the engines required to access and manage a particular packet and its flow signature, the unified flow key buffer entry is marked as "completed." That element will then be used by the parser interface for the next packet and flow signature coming in from the parsing and extracting system.

All flow-entries are maintained in the external memory and some are maintained in the cache **1115**. The cache system **1115** is intelligent enough to access the flow database and to understand the data structures that exists on the other side of memory interface **1123**. The lookup/update engine **1107** is able to request that the cache system pull a particular flow or "buckets" of flows from the unified memory controller **1119** into the cache system for further processing. The state processor **1108** can operate on information found in the cache system once it is looked up by means of the lookup/update engine request, and the flow insertion/deletion engine **1110** can create new entries in the cache system if required based on information in the unified flow key buffer **1103**. The cache retrieves information as required from the memory through the memory interface **1123** and the unified memory controller **1119**, and updates information as required in the memory through the memory controller **1119**.

There are several interfaces to components of the system external to the module of FIG. **11** for the particular hardware implementation. These include host bus interface **1122**, which is designed as a generic interface that can operate with any kind of external processing system such as a microprocessor or a multiplexor (MUX) system. Consequently, one can connect the overall traffic classification system of FIGS. **11** and **12** into some other processing system to manage the classification system and to extract data gathered by the system.

The memory interface **1123** is designed to interface to any of a variety of memory systems that one may want to use to store the flow-entries. One can use different types of memory systems like regular dynamic random access memory (DRAM), synchronous DRAM, synchronous graphic memory (SGRAM), static random access memory (SRAM), and so forth.

FIG. **10** also includes some "generic" interfaces. There is a packet input interface **1012**—a general interface that works in tandem with the signals of the input buffer interface control **1022**. These are designed so that they can be used with any kind of generic systems that can then feed packet information into the parser. Another generic interface is the interface of pipes **1031** and **1033** respectively out of and into host interface multiplexor and control registers **1005**. This enables the parsing system to be managed by an external system, for example a microprocessor or another kind of external logic, and enables the external system to program and otherwise control the parser.

The preferred embodiment of this aspect of the invention is described in a hardware description language (HDL) such as VHDL or Verilog. It is designed and created in an HDL so that it may be used as a single chip system or, for instance, integrated into another general-purpose system that is being designed for purposes related to creating and analyzing traffic within a network. Verilog or other HDL implementation is only one method of describing the hardware.

In accordance with one hardware implementation, the elements shown in FIGS. **10** and **11** are implemented in a set of six field programmable logic arrays (FPGA's). The boundaries of these FPGA's are as follows. The parsing

subsystem of FIG. **10** is implemented as two FPGAS; one FPGA, and includes blocks **1006**, **1008** and **1012**, parts of **1005**, and memory **1001**. The second FPGA includes **1002**, **1007**, **1013**, **1011** parts of **1005**. Referring to FIG. **11**, the unified look-up buffer **1103** is implemented as a single FPGA. State processor **1108** and part of state processor instruction database memory **1109** is another FPGA. Portions of the state processor instruction database memory **1109** are maintained in external SRAM's. The lookup/update engine **1107** and the flow insertion/deletion engine **1110** are in another FPGA. The sixth FPGA includes the cache system **1115**, the unified memory control **1119**, and the analyzer host interface and control **1118**.

Note that one can implement the system as one or more VSLI devices, rather than as a set of application specific integrated circuits (ASIC's) such as FPGA's. It is anticipated that in the future device densities will continue to increase, so that the complete system may eventually form a sub-unit (a "core") of a larger single chip unit.

Operation of the Invention

FIG. **15** shows how an embodiment of the network monitor **300** might be used to analyze traffic in a network **102**. Packet acquisition device **1502** acquires all the packets from a connection point **121** on network **102** so that all packets passing point **121** in either direction are supplied to monitor **300**. Monitor **300** comprises the parser sub-system **301**, which determines flow signatures, and analyzer subsystem **303** that analyzes the flow signature of each packet. A memory **324** is used to store the database of flows that are determined and updated by monitor **300**. A host computer **1504**, which might be any processor, for example, a general-purpose computer, is used to analyze the flows in memory **324**. As is conventional, host computer **1504** includes a memory, say RAM, shown as host memory **1506**. In addition, the host might contain a disk. In one application, the system can operate as an RMON probe, in which case the host computer is coupled to a network interface card **1510** that is connected to the network **102**.

The preferred embodiment of the invention is supported by an optional Simple Network Management Protocol (SNMP) implementation. FIG. **15** describes-how one would, for example, implement an RMON probe, where a network interface card is used to send RMON information to the network. Commercial SNMP implementations also are available, and using such an implementation can simplify the process of porting the preferred embodiment of the invention to any platform.

In addition, MIB Compilers are available. An MIB Compiler is a tool that greatly simplifies the creation and maintenance of proprietary MIB extensions.

Examples of Packet Elucidation

Monitor **300**, and in particular, analyzer **303** is capable of carrying out state analysis for packet exchanges that are commonly referred to as "server announcement" type exchanges. Server announcement is a process used to ease communications between a server with multiple applications that can all be simultaneously accessed from multiple clients. Many applications use a server announcement process as a means of multiplexing a single port or socket into many applications and services. With this type of exchange, messages are sent on the network, in either a broadcast or multicast approach, to announce a server and application, and all stations in the network may receive and decode these messages. The messages enable the stations to derive the appropriate connection point for communicating that particular application with the particular server. Using the server announcement method, a particular application communicates using a service channel, in the form of a TCP or UDP socket or port as in the IP protocol suite, or using a SAP as in the Novell IPX protocol suite.

The analyzer **303** is also capable of carrying out "in-stream analysis" of packet exchanges. The "in-stream analysis" method is used either as a primary or secondary recognition process. As a primary process, in-stream analysis assists in extracting detailed information which will be used to further recognize both the specific application and application component. A good example of in-stream analysis is any Web-based application. For example, the commonly used PointCast Web information application can be recognized using this process; during the initial connection between a PointCast server and client, specific key tokens exist in the data exchange that will result in a signature being generated to recognize PointCast.

The in-stream analysis process may also be combined with the server announcement process. In many cases in-stream analysis will augment other recognition processes. An example of combining in-stream analysis with server announcement can be found in business applications such as SAP and BAAN.

"Session tracking" also is known as one of the primary processes for tracking applications in client/server packet exchanges. The process of tracking sessions requires an initial connection to a predefined socket or port number. This method of communication is used in a variety of transport layer protocols. It is most commonly seen in the TCP and UDP transport protocols of the IP protocol.

During the session tracking, a client makes a request to a server using a specific port or socket number. This initial request will cause the server to create a TCP or UDP port to exchange the remainder of the data between the client and the server. The server then replies to the request of the client using this newly created port. The original port used by the client to connect to the server will never be used again during this data exchange.

One example of session tracking is TFTP (Trivial File Transfer Protocol), a version of the TCP/IP FTP protocol that has no directory or password capability. During the client/server exchange process of TFTP, a specific port (port number **69**) is always used to initiate the packet exchange. Thus, when the client begins the process of communicating, a request is made to UDP port **69**. Once the server receives this request, a new port number is created on the server. The server then replies to the client using the new port. In this example, it is clear that in order to recognize TFTP; network monitor **300** analyzes the initial request from the client and generates a signature for it. Monitor **300** uses that signature to recognize the reply. Monitor **300** also analyzes the reply from the server with the key port information, and uses this to create a signature for monitoring the remaining packets of this data exchange.

Network monitor **300** can also understand the current state of particular connections in the network. Connection-oriented exchanges often benefit from state tracking to correctly identify the application. An example is the common TCP transport protocol that provides a reliable means of sending information between a client and a server. When a data exchange is initiated, a TCP request for synchronization message is sent. This message contains a specific sequence number that is used to track an acknowledgement from the server. Once the server has acknowledged the synchronization request, data may be exchanged between the client and the server. When communication is no longer required, the client sends a finish or complete message to the server, and the server acknowledges this finish request with

a reply containing the sequence numbers from the request. The states of such a connection-oriented exchange relate to the various types of connection and maintenance messages.

Server Announcement Example

The individual methods of server announcement protocols vary. However, the basic underlying process remains similar. A typical server announcement message is sent to one or more clients in a network. This type of announcement message has specific content, which, in another aspect of the invention, is salvaged and maintained in the database of flow-entries in the system. Because the announcement is sent to one or more stations, the client involved in a future packet exchange with the server will make an assumption that the information announced is known, and an aspect of the inventive monitor is that it too can make the same assumption.

Sun-RPC is the implementation by Sun Microsystems, Inc. (Palo Alto, Calif.) of the Remote Procedure Call (RPC), a programming interface that allows one program to use the services of another on a remote machine. A Sun-RPC example is now used to explain how monitor **300** can capture server announcements.

A remote program or client that wishes to use a server or procedure must establish a connection, for which the RPC protocol can be used.

Each server running the Sun-RPC protocol must maintain a process and database called the port Mapper. The port Mapper creates a direct association between a Sun-RPC program or application and a TCP or UDP socket or port (for TCP or UDP implementations). An application or program number is a 32-bit unique identifier assigned by ICANN (the Internet Corporation for Assigned Names and Numbers, www.icann.org), which manages the huge number of parameters associated with Internet protocols (port numbers, router protocols, multicast addresses, etc.) Each port Mapper on a Sun-RPC server can present the mappings between a unique program number and a specific transport socket through the use of specific request or a directed announcement. According to ICANN, port number **111** is associated with Sun RPC.

As an example, consider a client (e.g., CLIENT 3 shown as **106** in FIG. **1**) making a specific request to the server (e.g., SERVER 2 of FIG. **1**, shown as **110**) on a predefined UDP or TCP socket. Once the port Mapper process on the sun RPC server receives the request, the specific mapping is returned in a directed reply to the client.

1. A client (CLIENT **3**, **106** in FIG. **1**) sends a TCP packet to SERVER **2** (**110** in FIG. **1**) on port **111**, with an RPC Bind Lookup Request (rpcBindLookup). TCP or UDP port **111** is always associated Sun RPC. This request specifies the program (as a program identifier), version, and might specify the protocol (UDP or TCP).
2. The server SERVER **2** (**110** in FIG. **1**) extracts the program identifier and version identifier from the request. The server also uses the fact that this packet came in using the TCP transport and that no protocol was specified, and thus will use the TCP protocol for its reply.
3. The server **110** sends a TCP packet to port number **111**, with an RPC Bind Lookup Reply. The reply contains the specific port number (e.g., port number 'port') on which future transactions will be accepted for the specific RPC program identifier (e.g., Program 'program') and the protocol (UDP or TCP) for use.

It is desired that from now on every time that port number 'port' is used, the packet is associated with the application program 'program' until the number 'port' no longer is to be associated with the program 'program'. Network monitor **300** by creating a flow-entry and a signature includes a mechanism for remembering the exchange so that future packets that use the port number 'port' will be associated by the network monitor with the application program 'program'.

In addition to the Sun RPC Bind Lookup request and reply, there are other ways that a particular program—say 'program'—might be associated with a particular port number, for example number 'port'. One is by a broadcast announcement of a particular association between an application service and a port number, called a Sun RPC portMapper Announcement. Another, is when some server—say the same SERVER 2—replies to some client—say CLIENT 1—requesting some portMapper assignment with a RPC portMapper Reply. Some other client—say CLIENT 2—might inadvertently see this request, and thus know that for this particular server, SERVER 2, port number 'port' is associated with the application service 'program'. It is desirable for the network monitor **300** to be able to associate any packets to SERVER 2 using port number 'port' with the application program 'program'.

FIG. **9** represents a dataflow **900** of some operations in the monitor **300** of FIG. **3** for Sun Remote Procedure Call. Suppose a client **106** (e.g., CLIENT 3 in FIG. **1**) is communicating via its interface to the network **118** to a server **110** (e.g., SERVER 2 in FIG. **1**) via the server's interface to the network **116**. Further assume that Remote Procedure Call is used to communicate with the server **110**. One path in the data flow **900** starts with a step **910** that a Remote Procedure Call bind lookup request is issued by client **106** and ends with the server state creation step **904**. Such RPC bind lookup request includes values for the 'program,' 'version,' and 'protocol' to use, e.g., TCP or UDP. The process for Sun RPC analysis in the network monitor **300** includes the following aspects.:

Process **909**: Extract the 'program,' 'version,' and 'protocol' (UDP or TCP). Extract the TCP or UDP port (process **909**) which is **111** indicating Sun RPC.

Process **908**: Decode the Sun RPC packet. Check RPC type field for ID. If value is portMapper, save paired socket (i.e., dest for destination address, src for source address). Decode ports and mapping, save ports with socket/addr key. There may be more than one pairing per mapper packet. Form a signature (e.g., a key). A flow-entry is created in database **324**. The saving of the request is now complete.

At some later time, the server (process **907**) issues a RPC bind lookup reply. The packet monitor **300** will extract a signature from the packet and recognize it from the previously stored flow. The monitor will get the protocol port number (**906**) and lookup the request (**905**). A new signature (i.e., a key) will be created and the creation of the server state (**904**) will be stored as an entry identified by the new signature in the flow-entry database. That signature now may be used to identify packets associated with the server.

The server state creation step **904** can be reached not only from a Bind Lookup Request/Reply pair, but also from a RPC Reply portMapper packet shown as **901** or an RPC Announcement portMapper shown as **902**. The Remote Procedure Call protocol can announce that it is able to provide a particular application service. Embodiments of the present invention preferably can analyze when an exchange occurs between a client and a server, and also can track those stations that have received the announcement of a service in the network.

The RPC Announcement portMapper announcement **902** is a broadcast. Such causes various clients to execute a

similar set of operations, for example, saving the information obtained from the announcement. The RPC Reply portMapper step **901** could be in reply to a portMapper request, and is also broadcast. It includes all the service parameters.

Thus monitor **300** creates and saves all such states for later classification of flows that relate to the particular service 'program'.

FIG. **2** shows how the monitor **300** in the example of Sun RPC builds a signature and flow states. A plurality of packets **206–209** are exchanged, e.g., in an exemplary Sun Microsystems Remote Procedure Call protocol. A method embodiment of the present invention might generate a pair of flow signatures, "signature-**1**" **210** and "signature-**2**" **212**, from information found in the packets **206** and **207** which, in the example, correspond to a Sun RPC Bind Lookup request and reply, respectively.

Consider first the Sun RPC Bind Lookup request. Suppose packet **206** corresponds to such a request sent from CLIENT 3 to SERVER 2. This packet contains important information that is used in building a signature according to an aspect of the invention. A source and destination network address occupy the first two fields of each packet, and according to the patterns in pattern database **308**, the flow signature (shown as KEY**1** **230** in FIG. **2**) will also contain these two fields, so the parser subsystem **301** will include these two fields in signature KEY **1** (**230**). Note that in FIG. **2**, if an address identifies the client **106** (shown also as **202**), the label used in the drawing is "$C_1$". If such address identifies the server **110** (shown also as server **204**), the label used in the drawing is "$S_1$". The first two fields **214** and **215** in packet **206** are "$S_1$" and "$C_1$" because packet **206** is provided from the server **110** and is destined for the client **106**. Suppose for this example, "$S_1$" is an address numerically less than address "$C_1$". A third field "$p^1$" **216** identifies the particular protocol being used, e.g., TCP, UDP, etc.

In packet **206**, a fourth field **217** and a fifth field **218** are used to communicate port numbers that are used. The conversation direction determines where the port number field is. The diagonal pattern in field **217** is used to identify a source-port pattern, and the hash pattern in field **218** is used to identify the destination-port pattern. The order indicates the client-server message direction. A sixth field denoted "$i^1$" **219** is an element that is being requested by the client from the server. A seventh field denoted "$s_1a$" **220** is the service requested by the client from server **110**. The following eighth field "QA" **221** (for question mark) indicates that the client **106** wants to know what to use to access application "$s_1a$". A tenth field "QP" **223** is used to indicate that the client wants the server to indicate what protocol to use for the particular application.

Packet **206** initiates the sequence of packet exchanges, e.g., a RPC Bind Lookup Request to SERVER 2. It follows a well-defined format, as do all the packets, and is transmitted to the server **110** on a well-known service connection identifier (port **111** indicating Sun RPC).

Packet **207** is the first sent in reply to the client **106** from the server. It is the RPC Bind Lookup Reply as a result of the request packet **206**.

Packet **207** includes ten fields **224–233**. The destination and source addresses are carried in fields **224** and **225**, e.g., indicated "$C_1$" and "$S_1$", respectively. Notice the order is now reversed, since the client-server message direction is from the server **110** to the client **106**. The protocol "$p^1$" is used as indicated in field **226**. The request "$i^1$" is in field **229**. Values have been filled in for the application port number, e.g., in field **233** and protocol ""$p^2$"" in field **233**.

The flow signature and flow states built up as a result of this exchange are now described. When the packet monitor **300** sees the request packet **206** from the client, a first flow signature **210** is built in the parser subsystem **301** according to the pattern and extraction operations database **308**. This signature **210** includes a destination and a source address **240** and **241**. One aspect of the invention is that the flow keys are built consistently in a particular order no matter what the direction of conversation. Several mechanisms may be used to achieve this. In the particular embodiment, the numerically lower address is always placed before the numerically higher address. Such least to highest order is used to get the best spread of signatures and hashes for the lookup operations. In this case, therefore, since we assume "$S_1$"<"$C_1$", the order is address "$S_1$" followed by client address "$C_1$". The next field used to build the signature is a protocol field **242** extracted from packet **206**'s field **216**, and thus is the protocol "$p^1$". The next field used for the signature is field **243**, which contains the destination source port number shown as a crosshatched pattern from the field **218** of the packet **206**. This pattern will be recognized in the payload of packets to derive how this packet or sequence of packets exists as a flow. In practice, these may be TCP port numbers, or a combination of TCP port numbers. In the case of the Sun RPC example, the crosshatch represents a set of port numbers of UDS for $p^1$ that will be used to recognize this flow (e.g., port **111**). Port **111** indicates this is Sun RPC. Some applications, such as the Sun RPC Bind Lookups, are directly determinable ("known") at the parser level. So in this case, the signature KEY-1 points to a known application denoted "$a^1$" (Sun RPC Bind Lookup), and a next-state that the state processor should proceed to for more complex recognition jobs, denoted as state "$st_D$" is placed in the field **245** of the flow-entry.

When the Sun RPC Bind Lookup reply is acquired, a flow signature is again built by the parser. This flow signature is identical to KEY-1. Hence, when the signature enters the analyzer subsystem **303** from the parser subsystem **301**, the complete flow-entry is obtained, and in this flow-entry indicates state "$st_D$". The operations for state "$st_D$" in the state processor instruction database **326** instructs the state processor to build and store a new flow signature, shown as KEY-2 (**212**) in FIG. **2**. This flow signature built by the state processor also includes the destination and a source addresses **250** and **251**, respectively, for server "$S_1$" followed by (the numerically higher address) client "$C_1$". A protocol field **252** defines the protocol to be used, e.g., "$p^2$" which is obtained from the reply packet. A field **253** contains a recognition pattern also obtained from the reply packet. In this case, the application is Sun RPC, and field **254** indicates this application "$a^2$". A next-state field **255** defines the next state that the state processor should proceed to for more complex recognition jobs, e.g., a state "$st^1$". In this particular example, this is a final state. Thus, KEY-2 may now be used to recognize packets that are in any way associated with the application "$a^2$". Two such packets **208** and **209** are shown, one in each direction. They use the particular application service requested in the original Bind Lookup Request, and each will be recognized because the signature KEY-2 will be built in each case.

The two flow signatures **210** and **212** always order the destination and source address fields with server "$S_1$" followed by client "$C_1$". Such values are automatically filled in when the addresses are first created in a particular flow signature. Preferably, large collections of flow signatures are kept in a lookup table in a least-to-highest order for the best spread of flow signatures and hashes.

Thereafter, the client and server exchange a number of packets, e.g., represented by request packet **208** and response packet **209**. The client **106** sends packets **208** that have a destination and source address $S_1$ and $C_1$, in a pair of fields **260** and **261**. A field **262** defines the protocol as "$p^2$", and a field **263** defines the destination port number.

Some network-server application recognition jobs are so simple that only a single state transition has to occur to be able to pinpoint the application that produced the packet. Others require a sequence of state transitions to occur in order to match a known and predefined climb from state-to-state.

Thus the flow signature for the recognition of application "$a^2$" is automatically set up by predefining what packet-exchange sequences occur for this example when a relatively simple Sun Microsystems Remote Procedure Call bind lookup request instruction executes. More complicated exchanges than this may generate more than two flow signatures and their corresponding states. Each recognition may involve setting up a complex state transition diagram to be traversed before a "final" resting state such as "$st_1$" in field **255** is reached. All these are used to build the final set of flow signatures for recognizing a particular application in the future.

Re-Using Information from Flows for Maintaining Metrics

The flow-entry of each flow stores a set of statistical measures for the flow, including the total number of packets in the flow, the time of arrival, and the differential time from the last arrival.

Referring again to FIG. **3**, the state processing process **328** performs operations defined for the state of the flow, for example for the particular protocol so far identified for the flow. One aspect of the invention is that from time to time, a set of one or more metrics related t the flow may be determined using one or more of the statistical measures stored in the flow-entry. Such metric determining may be carried out, for example, by the state processor running instructions in the state processor instruction and pattern database **326**. Such metrics may then be sent by the analyzer subsystem to a host computer connected to the monitor. Alternatively, such metric determining may be carried out by a processor connected to the flow-entry database **324**. In our preferred hardware implementation shown in FIG. **10**, an analyzer host interface and control **1118** may be configured to configured to access flow-entry records via cache system **1115** to output to a processor via the host bus interface. The processor may then do the reporting of the base metrics.

FIG. **15** describes how the monitor system can be set up with a host computer **1504**. The monitor **300** sends metrics from time to time to the host computer **1504**, and the host computer **1504** carries out part of the analysis.

This following section describes how the monitor of the invention can be used to monitor the Quality of Service (QOS) by providing QOS Metrics.

Quality of Service Traffic Statistics (Metrics)

This next section defines the common structure that may be applied for the Quality of Service (QOS) Metrics according to one aspect of the invention. It also defines the "original" (or "base") set of metrics that may be determined in an embodiment of the invention to support QOS. The base metrics are determined as part of state processing or by a processor connected to monitor **300**, and the QOS metrics are determined from the base metrics by the host computer **1504**. The main reason for the breakdown is that the complete QOS metrics may be computationally complex, involving square roots and other functions requiring more computational resources than may be available in real time. The base functions are chosen to be simple to calculate in real time and from which complete QOS metrics may be determined. Other breakdowns of functions clearly are possible within the scope of the invention.

Such metric determining may be carried out, for example, by the state processor running instructions in the state processor instruction and pattern database **326**. Such base metrics may then be sent by the analyzer subsystem via a microprocessor or logic circuit connected to the monitor. Alternatively, such metric determining may be carried out by a microprocessor (or some other logic) connected to the flow-entry database **324**. In our preferred hardware implementation shown in FIGS. **10** and **11**, such a microprocessor is connected cache system **1115** via an analyzer host interface and control **1118** and host bus interface. These components may be configured to access flow-entry records via cache system **1115** to enable the microprocessor to determine and report the base metrics.

The QOS Metrics may broken into the following Metrics Groups. The names are descriptive. The list is not exhaustive, and other metrics may be used. The QOS metrics below include client-to-server (CS) and server-to-client (SC) metrics.

Traffic Metrics such as CSTraffic and SCTraffic.

Jitter Metrics such as CSTraffic and CS Traffic.

Exchange Response Metrics such as CSExchangeResponseTimeStartToStart, CSExchangeResponseTimeEndToStart, CSExchangeResponseTimeStartToEnd, SCExchangeResponseTimeStartToStart, SCExchangeResponseTimeEndToStart, and SCExchangeResponseTimeStartToEnd.

Transaction Response Metrics such as CSTransactionResponseTimeStartToStart, CSApplicationResponseTimeEndToStart, CSApplicationResponseTimeStartToEnd, SCTransactionResponseTimeStartToStart, SCApplicationResponseTimeEndToStart, and SCApplicationResponseTimeStartToEnd.

Connection Metrics such as ConnectionEstablishment and ConnectionGracefulTermination, and ConnectionTimeoutTermination.

Connection Sequence Metrics such as CSConnectionRetransmissions, SCConnectionRetransmissions, and CSConnectionOutOfOrders, SCConnectionOutOfOrders.

Connection Window Metrics, CSConnectionWindow, SCConnectionWindow, CSConnectionFrozenWindows, SCConnectionFrozenWindows, CSConnectionClosedWindows, and SCConnectionClosedWindows.

QOS Base Metrics

The simplest means of representing a group of data is by frequency distributions in sub-ranges. In the preferred embodiment, there are some rules in creating the sub-ranges. First the range needs to be known. Second a sub-range size needs to be determined. Fixed sub-range sizes are preferred, alternate embodiments may use variable sub-range sizes.

Determining complete frequency distributions may be computationally expensive. Thus, the preferred embodiment uses metrics determined by summation functions on the individual data elements in a population.

The metrics reporting process provides data that can be used to calculate useful statistical measurements. In one embodiment, the metrics reporting process is part of the state processing that is carried out from time to time according to the state, and in another embodiment, the metrics reporting

process carried out from time to time by a microprocessor having access to flow records. Preferably, the metrics reporting process provides base metrics and the final QOS metrics calculations are carried out by the host computer **1504**. In addition to keeping the real time state processing simple, the partitioning of the tasks in this way provides metrics that are scalable. For example, the base metrics from two intervals may be combined to metrics for larger intervals.

Consider, for example is the arithmetic mean defined as the sum of the data divided by the number of data elements.

$$\overline{X} = \frac{\sum x}{N}$$

Two base metrics provided by the metrics reporting process are the sum of the x, and the number of elements N. The host computer **1504** performs the division to obtain the average. Furthermore, two sets base metrics for two intervals may be combined by adding the sum of the x's and by adding the number of elements to get a combined sum and number of elements. The average formula then works just the same.

The base metrics have been chosen to maximize the amount of data available while minimizing the amount of memory needed to store the metric and minimizing the processing requirement needed to generate the metric. The base metrics are provided in a metric data structure that contains five unsigned integer values.

N count of the number of data points for the metric.

$\Sigma X$ sum of all the data point values for the metric.

$\Sigma(X^2)$ sum of all the data point values squared for the metric.

$X_{max}$ maximum data point value for the metric.

$X_{min}$ minimum data point value for the metric.

A metric is used to describe events over a time interval. The base metrics are determined from statistical measures maintained in flow-entries. It is not necessary to cache all the events and then count them at the end of the interval. The base metrics have also been designed to be easily scaleable in terms of combining adjacent intervals.

The following rules are applied when combining base metrics for contiguous time intervals.

N $\Sigma N$

$\Sigma X$ $\Sigma(\Sigma(X))$

$\Sigma(X^2)$ $\Sigma(\Sigma(X^2))$

$X_{max}$ $MAX(X_{max})$

$X_{min}$ $MIN(X_{min})$

In addition to the above five values, a "trend" indicator is included in the preferred embodiment data structure. This is provided by an enumerated type. The reason for this is that the preferred method of generating trend information is by subtract an initial first value for the interval from the final value for the interval. Only the sign of the resulting number may have value, for example, to determine an indication of trend.

Typical operations that may be performed on the base metrics include:

Number N.

$$Frequency\frac{N}{TimeInterval}.$$

Maximum $X_{max}$.

Minimum $X_{min}$.

Range $R = X_{max} - X_{min}$.

$$\text{Arithmetic Mean } \overline{X} = \frac{\sum X}{N}.$$

$$\text{Root Mean Square } RMS = \sqrt{\frac{\sum (X^2)}{N}}.$$

$$\text{Variance } \sigma^2 = \frac{\sum (X-\overline{X})^2}{N} = \frac{\left(\sum X^2\right) - 2\overline{X}\left(\sum X\right) + N(\overline{X}^2)}{N}.$$

$$\text{Standard Deviation } \sigma = \sqrt{\frac{\sum ((X-\overline{X})^2)}{N}} = \sqrt{\frac{(\sum X^2)) - 2\overline{X}(\sum X) + N(\overline{X}^2)}{N}}.$$

Trend information, which may be the trend between polled intervals and the trend within an interval. Trending between polled intervals is a management application function. Typically the management station would trend on the average of the reported interval. The trend within an interval is presented as an enumerated type and can easily be generated by subtracting the first value in the interval from the last and assigning trend based on the sign value.

Alternate Embodiments

One or more of the following different data elements may be included in various implementation of the metric.

Sum of the deltas (i.e., differential values). The trend enumeration can be based on this easy calculation.

Sum of the absolute values of the delta values. This would provide a measurement of the overall movement within an interval.

Sum of positive delta values and sum of the negative delta values. Expanding each of these with an associated count and maximum would give nice information.

The statistical measurement of skew can be obtained by adding $\Sigma(X^3)$ to the existing metric.

The statistical measurement of kurtosis can be obtained by adding $\Sigma(X^3)$ and $\Sigma(X^4)$ to the existing metric.

Data to calculate a slope of a least-squares line through the data.

Various metrics are now described in more detail.

Traffic Metrics

CSTraffic

Definition

This metric contains information about the volume of traffic measured for a given application and either a specific Client-Server Pair or a specific Server and all of its clients.

This information duplicates, somewhat, that which may be found in the standard, RMON II, AL/NL Matrix Tables. It has been included here for convenience to applications and the associated benefit of improved performance by avoiding the need to access different functional RMON areas when performing QOS Analysis.

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Packets | Count of the # of Packets from the Client(s) to the Server |
| Σ | Applicable | Octets | Sum total of the # of Octets in these packets from the Client(s) to the Server. |
| Maximum | Not Applicable | | |
| Minimum | Not Applicable | | |

SCTraffic

Definition

This metric contains information about the volume of traffic measured for a given application and either a specific Client-Server Pair or a specific Server and all of its clients.

This information duplicates, somewhat, that which may be found in the standard, RMON II, AL/NL Matrix Tables. It has been included here for convenience to applications and the associated benefit of improved performance by avoiding the need to access different functional RMON areas when performing QOS Analysis.

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Packets | Count of the # of Packets from the Server to the Client(s) |
| Σ | Applicable | Octets | Sum total of the # of Octets in these packets from the Server to the Client(s). |
| Maximum | Not Applicable | | |
| Minimum | Not Applicable | | |

Jitter Metrics

CSJitter

Definition

This metric contains information about the Jitter (e.g. Inter-packet Gap) measured for data packets for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, CSJitter measures the Jitter for Data Messages from the Client to the Server.

A Data Message starts with the 1st Transport Protocol Data Packet/Unit (TPDU) from the Client to the Server and is demarcated (or terminated) by 1st subsequent Data Packet in the other direction. Client to Server Inter-packet Gaps are measured between Data packets within the Message. Note that in our implementaions, ACKnowledgements are not considered within the measurement of this metric.

Also, there is no consideration in the measurement for retransmissions or out-of-order data packets. The interval between the last packet in a Data Message from the Client to the Server and the 1st packet of the Next Message in the same direction is not interpreted as an Inter-Packet Gap.

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Inter-Packet Gaps | Count of the # of Inter-Packet Gaps measured for Data from the Client(s) to the Server |
| Σ | Applicable | uSeconds | Sum total of the Delta Times in these Inter-Packet Gaps |
| Maximum | Applicable | uSeconds | The maximum Delta Time of Inter-Packet Gaps measured |
| Minimum | Applicable | uSeconds | The minimum Delta Time of Inter-Packet Gaps measured. |

SCJitter

Definition

This metric contains information about the Jitter (e.g. Inter-packet Gap) measured for data packets for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, SCJitter measures the Jitter for Data Messages from the Client to the Server.

A Data Message starts with the 1st Transport Protocol Data Packet/Unit (TPDU) from the Server to the Client and is demarcated (or terminated) by 1st subsequent Data Packet in the other direction. Server to Client Inter-packet Gaps are measured between Data packets within the Message. Note that in our implementaions, ACKnowledgements are not considered within the measurement of this metric.

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Inter-Packet Gaps | Count of the # of Inter-Packet Gaps measured for Data from the Server to the Client(s). |
| Σ | Applicable | uSeconds | Sum total of the Delta Times in these Inter-Packet Gaps. |
| Maximum | Applicable | uSeconds | The maximum Delta Time of Inter-Packet Gaps measured |
| Minimum | Applicable | uSeconds | The minimum Delta Time of Inter-Packet Gaps measured. |

Exchange Response Metrics

CSExchangeResponseTimeStartToStart

Definition

This metric contains information about the Transport-level response time measured for data packets for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, CSExchangeResponseTimeStartToStart measures the response time between start of Data Messages from the Client to the Server and the start of their subsequent response Data Messages from the Server to the Client.

A Client->Server Data Message starts with the 1st Transport Protocol Data Packet/Unit (TPDU) from the Client to the Server and is demarcated (or terminated) by 1st subsequent Data Packet in the other direction. The total time between the start of the Client->Server Data Message and the start of the Server->Client Data Message is measured with this metric. Note that ACKnowledgements are not considered within the measurement of this metric.

Also, there is no consideration in the measurement for retransmissions or out-of-order data packets.

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Client–> Server Messages | Count of the # Client–>Server Messages measured for Data Exchanges from the Client(s) to the Server |
| Σ | Applicable | uSeconds | Sum total of the Start-to-Start Delta Times in these Exchange Response Times |
| Maximum | Applicable | uSeconds | The maximum Start-to-Start Delta Time of these Exchange Response Times |
| Minimum | Applicable | uSeconds | The minimum Start-to-Start Delta Time of these Exchange Response Times |

CSExchangeResponseTimeEndToStart

Definition

This metric contains information about the Transport-level response time measured for data packets for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, CSExchangeResponseTimeEndToStart measures the response time between end of Data Messages from the Client to the Server and the start of their subsequent response Data Messages from the Server to the Client.

A Client->Server Data Message starts with the 1st Transport Protocol Data Packet/Unit (TPDU) from the Client to the Server and is demarcated (or terminated) by 1st subsequent Data Packet in the other direction. The total time between the end of the Client->Server Data Message and the start of the Server->Client Data Message is measured with this metric. Note that ACKnowledgements are not considered within the measurement of this metric.

Also, there is no consideration in the measurement for retransmissions or out-of-order data packets.

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Client–> Server Messages | Count of the # Client–>Server Messages measured for Data Exchanges from the Client(s) to the Server |
| Σ | Applicable | uSeconds | Sum total of the End-to-Start Delta Times in these Exchange Response Times |
| Maximum | Applicable | uSeconds | The maximum End-to-Start Delta Time of these Exchange Response Times |
| Minimum | Applicable | uSeconds | The minimum End-to-Start Delta Time of these Exchange Response Times |

CSExchangeResponseTimeStartToEnd

Definition

This metric contains information about the Transport-level response time measured for data packets for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, CSExchangeResponseTimeEndToStart measures the response time between Start of Data Messages from the Client to the Server and the End of their subsequent response Data Messages from the Server to the Client.

A Client->Server Data Message starts with the 1st Transport Protocol Data Packet/Unit (TPDU) from the Client to the Server and is demarcated (or terminated) by 1st subsequent Data Packet in the other direction. The end of the Response Message in the other direction (e.g. from the Server to the Client) is demarcated by the last data of the Message prior to the 1st data packet of the next Client to Server Message. The total time between the start of the Client->Server Data Message and the end of the Server->Client Data Message is measured with this metric. Note that ACKnowledgements are not considered within the measurement of this metric.

Also, there is no consideration in the measurement for retransmissions or out-of-order data packets.

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Client–> Server Message Exchanges | Count of the # Client–>Server and Server–>Client Exchange message pairs measured for Data Exchanges from the Client(s) to the Server |
| Σ | Applicable | uSeconds | Sum total of the Start-to-End Delta Times in these Exchange Response Times |
| Maximum | Applicable | uSeconds | The maximum Start-to-End Delta Time of these Exchange Response Times |
| Minimum | Applicable | uSeconds | The minimum Start-to-End Delta Time of these Exchange Response Times |

SCExchangeResponseTimeStartToStart

Definition

This metric contains information about the Transport-level response time measured for data packets for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, SCExchangeResponseTimeStartToStart measures the response time between start of Data Messages from the Server to the Client and the start of their subsequent response Data Messages from the Client to the Server.

A Server->Client Data Message starts with the 1st Transport Protocol Data Packet/Unit (TPDU) from the Server to the Client and is demarcated (or terminated) by 1st subsequent Data Packet in the other direction. The total time between the start of the Server->Client Data Message and the start of the Client->Sever Data Message is measured with this metric. Note that ACKnowledgements are not considered within the measurement of this metric.

Also, there is no consideration in the measurement for retransmissions or out-of-order data packets.

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Server–> Client Messages | Count of the # Server–>Client Messages measured for Data Exchanges from the Client(s) to the Server |
| Σ | Applicable | uSeconds | Sum total of the Start-to-Start Delta Times in these Exchange Response Times |

-continued

| Metric Specification | | | |
|---|---|---|---|
| Metric | Applicability | Units | Description |
| Maximum | Applicable | uSeconds | The maximum Start-to-Start Delta Time of these Exchange Response Times |
| Minimum | Applicable | uSeconds | The minimum Start-to-Start Delta Time of these Exchange Response Times |

SCExchangeResponseTimeEndToStart

Definition

This metric contains information about the Transport-level response time measured for data packets for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, SCExchangeResponseTimeEndToStart measures the response time between end of Data Messages from the Server to the Client and the start of their subsequent response Data Messages from the Client to the Server.

A Server->Client Data Message starts with the 1st Transport Protocol Data Packet/Unit (TPDU) from the Server to the Client and is demarcated (or terminated) by 1st subsequent Data Packet in the other direction. The total time between the end of the Server->Client Data Message and the start of the Client->Server Data Message is measured with this metric. Note that ACKnowledgements are not considered within the measurement of this metric.

Also, there is no consideration in the measurement for retransmissions or out-of-order data packets.

| Metric Specification | | | |
|---|---|---|---|
| Metric | Applicability | Units | Description |
| N | Applicable | Server-> Client Messages | Count of the # Server->Client Messages measured for Data Exchanges from the Client(s) to the Server |
| Σ | Applicable | uSeconds | Sum total of the End-to-Start Delta Times in these Exchange Response Times |
| Maximum | Applicable | uSeconds | The maximum End-to-Start Delta Time of these Exchange Response Times |
| Minimum | Applicable | uSeconds | The minimum End-to-Start Delta Time of these Exchange Response Times |

SCExchangeResponseTimeStartToEnd

Definition

This metric contains information about the Transport-level response time measured for data packets for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, SCExchangeResponseTimeEndToStart measures the response time between Start of Data Messages from the Server to the Client and the End of their subsequent response Data Messages from the Client to the Server.

A Server->Client Data Message starts with the 1st Transport Protocol Data Packet/Unit (TPDU) from the Server to the Client and is demarcated (or terminated) by 1st subsequent Data Packet in the other direction. The end of the Response Message in the other direction (e.g. from the Server to the Client) is demarcated by the last data of the Message prior to the 1st data packet of the next Server to Client Message. The total time between the start of the Server->Client Data Message and the end of the Client->Server Data Message is measured with this metric. Note that ACKnowledgements are not considered within the measurement of this metric.

Also, there is no consideration in the measurement for retransmissions or out-of-order data packets.

| Metric Specification | | | |
|---|---|---|---|
| Metric | Applicability | Units | Description |
| N | Applicable | Client-Server Message Exchanges | Count of the # Server->Client and Client->Server Exchange message pairs measured for Data Exchanges from the Server to the Client(s) |
| Σ | Applicable | uSeconds | Sum total of the Start-to-End Delta Times in these Exchange Response Times |
| Maximum | Applicable | uSeconds | The maximum Start-to-End Delta Time of these Exchange Response Times |
| Minimum | Applicable | uSeconds | The minimum Start-to-End Delta Time of these Exchange Response Times |

Transaction Response Metrics

CSTransactionResponseTimeStartToStart

Definition

This metric contains information about the Application-level response time measured for application transactions for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, CSTransactionResponseTimeStartToStart measures the response time between start of an application transaction from the Client to the Server and the start of their subsequent transaction response from the Server to the Client.

A Client->Server transaction starts with the 1st Transport Protocol Data Packet/Unit (TPDU) of a transaction request from the Client to the Server and is demarcated (or terminated) by 1st subsequent data packet of the response to the transaction request. The total time between the start of the Client->Server transaction request and the start of the actual transaction response from the Server->Client is measured with this metric.

This metric is considered a "best-effort" measurement. Systems implementing this metric should make a "best-effort" to demarcate the start and end of requests and responses with the specific application's definition of a logical transaction. The lowest level of support for this metric would make this metric the equivalent of CSExchangeResponseTimeStartToStart.

| Metric Specification | | | |
|---|---|---|---|
| Metric | Applicability | Units | Description |
| N | Applicable | Client->Svr Transaction Requests | Count of the # Client->Server Transaction Requests measured for Application requests from the Client(s) to the Server |
| Σ | Applicable | uSeconds | Sum total of the Start-to-Start Delta Times in these Application Response Times |
| Maximum | Applicable | uSeconds | The maximum Start-to-Start Delta Time of these Application Response Times |

-continued

| Metric Specification | | | |
|---|---|---|---|
| Metric | Applicability | Units | Description |
| Minimum | Applicable | uSeconds | The minimum Start-to-Start Delta Time of these Application Response Times |

CSApplicationResponseTimeEndToStart
Definition

This metric contains information about the Application-level response time measured for application transactions for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, CSApplicationResponseTimeEndToStart measures the response time between end of an application transaction from the Client to the Server and the start of their subsequent transaction response from the Server to the Client.

A Client->Server transaction starts with the 1st Transport Protocol Data Packet/Unit (TPDU) of a transaction request from the Client to the Server and is demarcated (or terminated) by 1st subsequent data packet of the response to the transaction request The total time between the end of the Client->Server transaction request and the start of the actual transaction response from the Server->Client is measured with this metric

This metric is considered a "best-effort" measurement. Systems implementing this metric should make a "best-effort" to demarcate the start and end of requests and responses with the specific application's definition of a logical transaction. The lowest level of support for this metric would make this metric the equivalent of CSExchangeResponseTimeEndToStart.

| Metric Specification | | | |
|---|---|---|---|
| Metric | Applicability | Units | Description |
| N | Applicable | Client->Svr Transaction Requests | Count of the # Client->Server Transaction Requests measured for Application requests from the Client(s) to the Server |
| Σ | Applicable | uSeconds | Sum total of the End-to-Start Delta Times in these Application Response Times |
| Maximum | Applicable | uSeconds | The maximum End-to-Start Delta Time of these Application Response Times |
| Minimum | Applicable | uSeconds | The minimum End-to-Start Delta Time of these Application Response Times |

CSApplicationResponseTimeStartToEnd
Definition

This metric contains information about the Application-level response time measured for application transactions for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, CSTransactionResponseTimeStartToEnd measures the response time between Start of an application transaction from the Client to the Server and the End of their subsequent transaction response from the Server to the Client.

A Client->Server transaction starts with the 1st Transport Protocol Data Packet/Unit (TPDU) a transaction request from the Client to the Server and is demarcated (or terminated) by 1st subsequent data packet of the response to the transaction request. The end of the Transaction Response in the other direction (e.g. from the Server to the Client) is demarcated by the last data of the transaction response prior to the 1st data of the next Client to Server Transaction Request. The total time between the start of the Client->Server transaction request and the end of the Server->Client transaction response is measured with this metric.

This metric is considered a "best-effort" measurement. Systems implementing this metric should make a "best-effort" to demarcate the start and end of requests and responses with the specific application's definition of a logical transaction. The lowest level of support for this metric would make this metric the equivalent of CSExchangeResponseTimeStartToEnd.

| Metric Specification | | | |
|---|---|---|---|
| Metric | Applicability | Units | Description |
| N | Applicable | Client-> Server Transactions | Count of the # Client<->Server request/response pairs measured for transactions from the Client(s) to the Server |
| Σ | Applicable | uSeconds | Sum total of the Start-to-End Delta Times in these Application Response Times |
| Maximum | Applicable | uSeconds | The maximum Start-to-End Delta Time of these Application Response Times |
| Minimum | Applicable | uSeconds | The minimum Start-to-End Delta Time of these Application Response Times |

SCTransactionResponseTimeStartToStart
Definition

This metric contains information about the Application-level response time measured for application transactions for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, SCTransactionResponseTimeStartToStart measures the response time between start of an application transaction from the Server to the Client and the start of their subsequent transaction response from the Client to the Server.

A Server->Client transaction starts with the 1st Transport Protocol Data Packet/Unit (TPDU) of a transaction request from the Server to the Client and is demarcated (or terminated) by 1st subsequent data packet of the response to the transaction request. The total time between the start of the Server->Client transaction request and the start of the actual transaction response from the Client->Server is measured with this metric.

This metric is considered a "best-effort" measurement. Systems implementing this metric should make a "best-effort" to demarcate the start and end of requests and responses with the specific application's definition of a logical transaction. The lowest level of support for this metric would make this metric the equivalent of SCExchangeResponseTimeStartToStart.

| Metric Specification | | | |
|---|---|---|---|
| Metric | Applicability | Units | Description |
| N | Applicable | Svr->Client Transaction Requests | Count of the # Server-> Client Transaction Requests measured for Application requests from the Server to the Client(s) |

-continued

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| Σ | Applicable | uSeconds | Sum total of the Start-to-Start Delta Times in these Application Response Times |
| Maximum | Applicable | uSeconds | The maximum Start-to-Start Delta Time of these Application Response Times |
| Minimum | Applicable | uSeconds | The minimum Start-to-Start Delta Time of these Application Response Times |

SCApplicationResponseTimeEndToStart
Definition

This metric contains information about the Application-level response time measured for application transactions for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, SCApplicationResponseTimeEndToStart measures the response time between end of an application transaction from the Server to the Client a and the start of their subsequent transaction response from the Client to the Server.

A Server->Client transaction starts with the 1st Transport Protocol Data Packet/Unit (TPDU) of a transaction request from the Server to the Client and is demarcated (or terminated) by 1st subsequent data packet of the response to the transaction request The total time between the end of the Server->Client transaction request and the start of the actual transaction response from the Client->Server is measured with this metric

This metric is considered a "best-effort" measurement. Systems implementing this metric should make a "best-effort" to demarcate the start and end of requests and responses with the specific application's definition of a logical transaction. The lowest level of support for this metric would make this metric the equivalent of SCExchangeResponseTimeEndTostart.

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Svr -> Client Transaction Requests | Count of the # Server -> Client Transaction Requests measured for Application requests from the Server to the Client(s) |
| Σ | Applicable | uSeconds | Sum total of the End-to-Start Delta Times in these Application Response Times |
| Maximum | Applicable | uSeconds | The maximum End-to-Start Delta Time of these Application Response Times |
| Minimum | Applicable | uSeconds | The minimum End-to-Start Delta Time of these Application Response Times |

SCApplicationResponseTimeStartToEnd
Definition

This metric contains information about the Application-level response time measured for application transactions for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, SCTransactionResponseTimeStartToEnd measures the response time between Start of an application transaction from the Server to the Client and the End of their subsequent transaction response from the Client to the Server.

A Server->Client transaction starts with the 1st Transport Protocol Data Packet/Unit (TPDU) a transaction request from the Server to the Client and is demarcated (or terminated) by 1st subsequent data packet of the response to the transaction request. The end of the Transaction Response in the other direction (e.g. from the Client to the Server) is demarcated by the last data of the transaction response prior to the 1st data of the next Server to Client Transaction Request. The total time between the start of the Server->Client transaction request and the end of the Client->Server transaction response is measured with this metric.

This metric is considered a "best-effort" measurement. Systems implementing this metric should make a "best-effort" to demarcate the start and end of requests and responses with the specific application's definition of a logical transaction. The lowest level of support for this metric would make this metric the equivalent of SCExchangeResponseTimeStartToEnd.

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Server -> Client Transactions | Count of the # Server <-> Client request/response pairs measured for transactions from the Server to the Client(s) |
| Σ | Applicable | uSeconds | Sum total of the Start-to-End Delta Times in these Application Response Times |
| Maximum | Applicable | uSeconds | The maximum Start-to-End Delta Time of these Application Response Times |
| Minimum | Applicable | uSeconds | The minimum Start-to-End Delta Time of these Application Response Times |

Connection Metrics
ConnectionEstablishment
Definition

This metric contains information about the transport-level connection establishment for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, ConnectionsEstablishment measures number of connections established the Client(s) to the Server. The information contain, in essence, includes:

- # Transport Connections Successfully established
- Set-up Times of the established connections
- Max. # of Simultaneous established connections.
- # Failed Connection establishment attempts (due to either timeout or rejection)

Note that the "# of CURRENT Established Transport Connections" may be derived from this metric along with the Connection GracefulTermination and ConnectionTimeoutTermination metrics, as follows:

# current connections:=="# successfully established"
"#terminated gracefully"
"#terminated by time-out"

The set-up time of a connection is defined to be the delta time between the first transport-level, Connection Establishment Request (i.e., SYN, CR-TPDU, etc.) and the first Data Packet exchanged on the connection.

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Connections | Count of the # Connections Established from the Client(s) to the Server |
| Σ | Applicable | uSeconds | Sum total of the Connection Set-up Times in these Established connections |
| Maximum | Applicable | Connections | Count of the MAXIMUM simultaneous # Connections Established from the Client(s) to the Server |
| Minimum | Not Applicable | Connections | Count of the Failed simultaneous # Connections Established from the Client(s) to the Server |

ConnectionGracefulTermination

Definition

This metric contains information about the transport-level connections terminated gracefully for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, ConnectionsGracefulTermination measures gracefully terminated connections both in volume and summary connection duration. The information contain, in essence, includes:

# Gracefully terminated Transport Connections

Durations (lifetimes) of gracefully terminated connections.

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Connections | Count of the # Connections Gracefully Terminated between Client(s) to the Server |
| Σ | Applicable | mSeconds | Sum total of the Connection Durations (Lifetimes) of these terminated connections |
| Maximum | Not Applicable | | |
| Minimum | Not Applicable | | |

ConnectionTimeoutTermination

Definition

This metric contains information about the transport-level connections terminated non-gracefully (e.g. Timed-Out) for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, ConnectionsTimeoutTermination measures previously established and timed-out connections both in volume and summary connection duration. The information contain, in essence, includes:

# Timed-out Transport Connections

Durations (lifetimes) of timed-out terminated connections.

The duration factor of this metric is considered a "best-effort" measurement. Independent network monitoring devices cannot really know when network entities actually detect connection timeout conditions and hence may need to extrapolate or estimate when connection timeouts actually occur.

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Connections | Count of the # Connections Timed-out between Client(s) to the Server |
| Σ | Applicable | mSeconds | Sum total of the Connection Durations (Lifetimes) of these terminated connections |
| Maximum | Not Applicable | | |
| Minimum | Not Applicable | | |

Connection Sequence Metrics

CSConnectionRetransmissions

Definition

This metric contains information about the transport-level connection health for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, CSConnectionRetransmissions measures number of actual events within established connection lifetimes in which Transport, data-bearing PDUs (packets) from the Client->Server were retransmitted.

Note that retransmission events as seen by the Network Monitoring device indicate the "duplicate" presence of a TPDU as observed on the network.

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Events | Count of the # Data TPDU retransmissions from the Client(s) to the Server |
| Σ | Not Applicable | | |
| Maximum | Not Applicable | | |
| Minimum | Not Applicable | | |

SCConnectionRetransmissions

Definition

This metric contains information about the transport-level connection health for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, SCConnectionRetransmissions measures number of actual events within established connection lifetimes in which Transport, data-bearing PDUs (packets) from the Server->Client were retransmitted.

Note that retransmission events as seen by the Network Monitoring device indicate the "duplicate" presence of a TPDU as observed on the network.

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Events | Count of the # Data TPDU retransmissions from the Server to the Client(s) |
| Σ | Not Applicable | | |
| Maximum | Not Applicable | | |
| Minimum | Not Applicable | | |

CSConnectionOutOfOrders

Definition

This metric contains information about the transport-level connection health for a given application and either a

specific Client-Server Pair or a specific Server and all of its clients. Specifically, CSConnectionOutOfOrders measures number of actual events within established connection lifetimes in which Transport, data-bearing PDUs (packets) from the Client->Server were detected as being out of sequential order.

Note that retransmissions (or duplicates) are considered to be different than out-of-order events and are tracked separately in the CSConnectionRetransmissions metric.

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Events | Count of the # Out-of-Order TPDU events from the Client(s) to the Server |
| Σ | Not Applicable | | |
| Maximum | Not Applicable | | |
| Minimum | Not Applicable | | |

SCConnectionOutOfOrders

Definition

This metric contains information about the transport-level connection health for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, SCConnectionOutOfOrders measures number of actual events within established connection lifetimes in which Transport, data-bearing PDUs (packets) from the Server->Client were detected as being out of sequential order.

Note that retransmissions (or duplicates) are considered to be different than out-of-order events and are tracked separately in the SCConnectionRetransmissions metric.

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Events | Count of the # Out-of-Order TPDU events from the Server to the Client(s) |
| Σ | Not Applicable | | |
| Maximum | Not Applicable | | |
| Minimum | Not Applicable | | |

Connection Window Metrics

CSConnectionWindow

Definition

This metric contains information about the transport-level connection windows for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, CSConnectionWindow measures number of Transport-level Acknowledges within established connection lifetimes and their relative sizes from the Client->Server.

Note that the number of DATA TPDUs (packets) may be estimated by differencing the Acknowledge count of this metric and the overall traffic from the Client to the Server (see CSTraffic above). A slight error in this calculation may occur due to Connection Establishment and Termination TPDUS, but it should not be significant.

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Events | Count of the # ACK TPDU retransmissions from the Client(s) to the Server |
| Σ | Not Applicable | Increments | Sum total of the Window Sizes of the Acknowledges |
| Maximum | Not Applicable | Increments | The maximum Window Size of these Acknowledges |
| Minimum | Not Applicable | Increments | The minimum Window Size of these Acknowledges |

SCConnectionWindow

Definition

This metric contains information about the transport-level connection windows for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, SSConnectionWindow measures number of Transport-level Acknowledges within established connection lifetimes and their relative sizes from the to Server->Client.

Note that the number of DATA TPDUs (packets) may be estimated by differencing the Acknowledge count of this metric and the overall traffic from the Client to the Server (see SCTraffic above). A slight error in this calculation may occur due to Connection Establishment and Termination TPDUS, but it should not be significant.

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Events | Count of the # ACK TPDU retransmissions from the Server to the Client(s) |
| Σ | Applicable | Increments | Sum total of the Window Sizes of the Acknowledges |
| Maximum | Applicable | Increments | The maximum Window Size of these Acknowledges |
| Minimum | Applicable | Increments | The minimum Window Size of these Acknowledges |

CSConnectionFrozenWindows

Definition

This metric contains information about the transport-level connection windows for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, CS ConnectionWindow measures number of Transport-level Acknowledges from Client->Server within established connection lifetimes which validly acknowledge data, but either

failed to increase the upper window edge,

reduced the upper window edge

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Events | Count of the # ACK TPDU with frozen/reduced windows from the Client(s) to the Server |
| Σ | Not Applicable | | |
| Maximum | Not Applicable | | |
| Minimum | Not Applicable | | |

SCConnectionFrozenWindows

Definition

This metric contains information about the transport-level connection windows for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, SCConnectionWindow measures number of Transport-level Acknowledges from Server->Client within established connection lifetimes which validly acknowledge data, but either

failed to increase the upper window edge,

reduced the upper window edge

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Events | Count of the # ACK TPDU with frozen/reduced windows from the Client(s) to the Server |
| Σ | Not Applicable | | |
| Maximum | Not Applicable | | |
| Minimum | Not Applicable | | |

CSConnectionClosedWindows

Definition

This metric contains information about the transport-level connection windows for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, CSConnectionWindow measures number of Transport-level Acknowledges from Client->Server within established connection lifetimes which fully closed the acknowledge/sequence window.

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Events | Count of the # ACK TPDU with Closed windows from the Client(s) to the Server |
| Σ | Not Applicable | | |
| Maximum | Not Applicable | | |
| Minimum | Not Applicable | | |

SCConnectionClosedWindows

Definition

This metric contains information about the transport-level connection windows for a given application and either a specific Client-Server Pair or a specific Server and all of its clients. Specifically, SCConnectionWindow measures number of Transport-level Acknowledges from Server->Client within established connection lifetimes which fully closed the acknowledge/sequence window.

Metric Specification

| Metric | Applicability | Units | Description |
|---|---|---|---|
| N | Applicable | Events | Count of the # ACK TPDU with Closed windows from the Client(s) to the Server |
| Σ | Not Applicable | | |
| Maximum | Not Applicable | | |
| Minimum | Not Applicable | | |

Embodiments of the present invention automatically generate flow signatures with the necessary recognition patterns and state transition climb procedure. Such comes from analyzing packets according to parsing rules, and also generating state transitions to search for. Applications and protocols, at any level, are recognized through state analysis of sequences of packets.

Note that one in the art will understand that computer networks are used to connect many different types of devices, including network appliances such as telephones, "Internet" radios, pagers, and so forth. The term computer as used herein encompasses all such devices and a computer network as used herein includes networks of such computers.

Although the present invention has been described in terms of the presently preferred embodiments, it is to be understood that the disclosure is not to be interpreted as limiting. Various alterations and modifications will no doubt become apparent to those or ordinary skill in the art after having read the above disclosure. Accordingly, it is intended that the claims be interpreted as covering all alterations and modifications as fall within the true spirit and scope of the present invention.

What is claimed is:

**1**. A method of analyzing a flow of packets passing through a connection point on a computer network, the method comprising:

(a) receiving a packet from a packet acquisition device coupled to the connection point;

(b) for each received packet, looking up a flow-entry database for containing one or more flow-entries for previously encountered conversational flows, the looking up to determine if the received packet is of an existing flow, a conversational flow including an exchange of a sequence of one or more packets in any direction between two network entities as a result of a particular activity using a particular layered set of one or more network protocols, a conversational flow further having a set of one or more states, including an initial state;

(c) if the packet is of an existing flow, identifying the last encountered state of the flow, performing any state operations specified for the state of the flow, and updating the flow-entry of the existing flow including storing one or more statistical measures kept in the flow-entry; and

d) if the packet is of a new flow, performing any state operations required for the initial state of the new flow and storing a new flow-entry for the new flow in the flow-entry database, including storing one or more statistical measures kept in the flow-entry,

wherein every packet passing though the connection point is received by the packet acquisition device, and

wherein at least one step of the set consisting of of step (a) and step (b) includes identifying the protocol being used in the packet from a plurality of protocols at a plurality of protocol layer levels,

such that the flow-entry database is to store flow entries for a plurality of conversational flows using a plurality of protocols, at a plurality of layer levels, including levels above the network layer.

**2**. A method according to claim **1**, wherein step (b) includes

extracting identifying portions from the packet,

wherein the extracting at any layer level is a function of the protocol being used at the layer level, and

wherein the looking up uses a function of the identifying portions.

3. A method according to claim 1, wherein the steps are carried out in real time on each packet passing through the connection point.

4. A method according to claim 1, wherein the one or more statistical measures include measures selected from the set consisting of the total packet count for the flow, the time, and a differential time from the last entered time to the present time.

5. A method according to claim 1, further including reporting one or more metrics related to the flow of a flow-entry from one or more of the statistical measures in the flow-entry.

6. A method according to claim 1, wherein the metrics include one or more quality of service (QOS) metrics.

7. A method according to claim 5, wherein the reporting is carried out from time to time, and wherein the one or more metrics are base metrics related to the time interval from the last reporting time.

8. A method according to claim 7, further comprising calculating one or more quality of service (QOS) metrics from the base metrics.

9. A method according to claim 7, wherein the one or more metrics are selected to be scalable such that metrics from contiguous time intervals may be combined to determine respective metrics for the combined interval.

10. A method according to claim 1, wherein step (c) includes if the packet is of an existing flow, identifying the last encountered state of the flow and performing any state operations specified for the state of the flow starting from the last encountered state of the flow; and wherein step (d) includes if the packet is of a new flow, performing any state operations required for the initial state of the new flow.

11. A method according to claim 10, further including reporting one or more metrics related to the flow of a flow-entry from one or more of the statistical measures in the flow-entry.

12. A method according to claim 11, wherein the reporting is carried out from time to time, and wherein the one or more metrics are base metrics related to the time interval from the last reporting time.

13. A method according to claim 12, wherein the reporting is part of the state operations for the state of the flow.

14. A method according to claim 10, wherein the state operations include updating the flow-entry, including storing identifying information for future packets to be identified with the flow-entry.

15. A method according to claim 14, further including receiving further packets, wherein the state processing of each received packet of a flow furthers the identifying of the application program of the flow.

16. A method according to claim 15, wherein one or more metrics related to the state of the flow are determined as part of the state operations specified for the state of the flow.

17. A packet monitor for examining packets passing through a connection point on a computer network, each packets conforming to one or more protocols, the monitor comprising:

(a) a packet acquisition device coupled to the connection point and configured to receive packets passing through the connection point;

(b) a memory for storing a database for containing one or more flow-entries for previously encountered conversational flows to which a received packet may belong, a conversational flow including an exchange of a sequence of one or more packets in any direction between two network entities as a result of a particular activity using a particular layered set of one or more network protocols, a conversational flow further having a set of one or more states, including an initial state; and

(c) an analyzer subsystem coupled to the packet acquisition device configured to lookup for each received packet whether a received packet belongs to a flow-entry in the flow-entry database, to update the flow-entry of the existing flow including storing one or more statistical measures kept in the flow-entry in the case that the packet is of an existing flow, and to store a new flow-entry for the new flow in the flow-entry database, including storing one or more statistical measures kept in the flow-entry if the packet is of a new flow,

wherein the analyzer subsystem is further configured to identify the protocol being used in the packet from a plurality of protocols at a plurality of protocol layer levels, and

wherein the database is to store flow entries for a plurality of conversational flows using a plurality of protocols, at a plurality of layer levels, including levels above the network layer.

18. A packet monitor according to claim 17, further comprising:

a parser subsystem coupled to the packet acquisition device and to the analyzer subsystem configured to extract identifying information from a received packet,

wherein each flow-entry is identified by identifying information stored in the flow-entry, and wherein the cache lookup uses a function of the extracted identifying information.

19. A packet monitor according to claim 17, wherein the one or more statistical measures include measures selected from the set consisting of the total packet count for the flow, the time, and a differential time from the last entered time to the present time.

20. A packet monitor according to claim 17, further including a statistical processor configured to determine one or more metrics related to a flow from one or more of the statistical measures in the flow-entry of the flow.

21. A packet monitor according to claim 20, wherein the statistical processor determine and reports the one or more metrics from time to time.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO. : 6,839,751 B1 Page 1 of 1
DATED : January 4, 2005
INVENTOR(S) : Dietz et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 6,
Line 65, please change “In so” to -- In some --.

Column 13,
Line 23, please change, “pattern—a signature—an be” to -- pattern—a signature—can be --.

Column 51,
Line 13, please change “claim 1” to -- claim 7 --.

Signed and Sealed this

Eighth Day of March, 2005



JON W. DUDAS
*Director of the United States Patent and Trademark Office*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| PACKET INTELLIGENCE LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>NETSCOUT SYSTEMS, INC., TEKTRONIX COMMUNICATIONS, TEKTRONIX TEXAS, LLC,<br><br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CIVIL ACTION NO. 2:16-CV-00230-JRG** |

**ORDER ADOPTING PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This case was tried to a jury between October 10, 2017, and October 13, 2017. (Dkt. Nos. 239–42). The jury returned a verdict on October 13, 2017, finding willful infringement of the asserted claims, finding none of the asserted claims invalid, and awarding damages in the amount of $5.75 million. (Dkt. No. 237). Following submission of the evidence to the jury, on October 13, 2017, and while the jury deliberated, a bench trial was conducted as to equitable issues. (Dkt. No. 242). The Court entered a Post-Trial Docket Control Order setting the conduct of post-trial proceedings. (Dkt. No. 243).

The Parties[1] submitted Proposed Findings of Fact and Conclusions of Law on January, 29, 2018. (Dkt. No. 295; Dkt. No. 296).

Having reviewed the Parties' submissions and the whole of the record evidence, the Court concludes that Defendant has failed to show that the Asserted Claims are barred under the doctrines

[1] For clarity, Plaintiff Packet Intelligence LLC will be referred to as "Plaintiff," "Packet Intelligence," or "PI." Similarly, Defendants NetScout Systems, Inc., Tektronix Communications, and Tektronix Texas, LLC will be referred to as "Defendants," "NetScout," or the "NetScout Defendants."

of either unclean hands or inequitable conduct. The Court hereby **ADOPTS** the Plaintiff's Proposed Findings of Fact and Conclusions of Law (Dkt. No. 295) in their entirety as its own, and accordingly, for the reasons set forth therein, hereby **DENIES** and **DISMISSES** NetScout's defenses of inequitable conduct and unclean hands.

**So ORDERED and SIGNED this 7th day of September, 2018.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| PACKET INTELLIGENCE LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>NETSCOUT SYSTEMS, INC., TEKTRONIX COMMUNICATIONS, TEKTRONIX TEXAS, LLC,<br><br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CIVIL ACTION NO. 2:16-CV-00230-JRG** |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Court held a jury trial in this case from October 10, 2017 to October 13, 2017. (Dkt. Nos. 239–240, 241.) Ultimately, the jury found that Defendants had willfully infringed the Asserted Patents, rejected Defendants' invalidity arguments, and awarded $5.75 million in damages. (Dkt. No. 237.)

At Defendants' request, the Court now separately issues the following Findings of Fact ("FF") and Conclusions of Law ("CL") addressing Defendants' Rule 52 Motion of Invalidity of the Asserted Patents under 35 U.S.C. § 101 (Dkt. No. 265) ("the Motion"). After considering the evidence and the Parties' arguments, and for the reasons set forth herein, Defendants' Motion is **DENIED**.

# I. FINDINGS OF FACT ("FF")

## A. The Parties

**[FF1]** Plaintiff Packet Intelligence LLC ("Packet Intelligence") is a limited liability company existing under the laws of Texas with its principal place of business at 505 East Travis Street, Suite 209, Marshall, TX 75670. (Dkt. No. 1 at ¶ 1.)

**[FF2]** Defendant NetScout Systems, Inc. ("NetScout") is a corporation existing under the laws of Delaware with its principal place of business at 310 Littleton Road, Westford, MA 01886-4105. (*Id.* at ¶ 2.)

**[FF3]** Defendant Tektronix Communications is a wholly owned subsidiary of NetScout. (*Id.* at ¶ 3.)

**[FF4]** Defendant Tektronix Texas, LLC is a Delaware limited liability company with its principal place of business at 3033 W. President George Bush Highway, Plano, Texas 75075. (*Id.* at ¶ 4.)

## B. Procedural History

**[FF5]** On March 15, 2016, Packet Intelligence sued Defendants NetScout Systems, Inc., Tektronix Communications, and Tektronix Texas, LLC (collectively, "Defendants") alleging infringement of U.S. Patent Nos. 6,651,099 ("the '099 Patent"), 6,665,725 ("the '725 Patent"), 6,771,646 ("the '646 Patent"), 6,839,751 ("the '751 Patent"), and 6,954,789 ("the '789 Patent"). (Dkt. No. 1.)

### 1. Packet Intelligence Narrows the Asserted Patents and Claims

**[FF6]** On May 23, 2017, Packet Intelligence dropped all of its claims relating to the '099 Patent and the '646 Patent. (Dkt. No. 132 at 13.)

**[FF7]** On September 29, 2017, the Court granted Packet Intelligence's request to dismiss all claims and counterclaims relating to the '099 Patent and the '646 Patent from the case based on a lack of subject matter jurisdiction given that these patents were no longer asserted. (Dkt. No. 228 at 12.)

**[FF8]** At trial, the infringement and invalidity arguments presented to the jury related to Claims 10 and 17 of the '725 Patent, Claims 1 and 5 of the '751 Patent, and Claims 19 and 20 of the '789 Patent (collectively, "the Asserted Patents" or "the Asserted Claims"). *See, e.g.,* (Dkt. No. 244, 10/10/17 A.M. Trial Tr. at 14:20–22.)

**2. <u>Defendants Challenge the Asserted Patents under § 101</u>**

**[FF9]** On May 16, 2017, Defendants filed their Answer, in which they argued that the Asserted Patents were "invalid and/or unenforceable" under §§ 101, 102, 103, and 112. (Dkt. No. 14 at ¶ 3.)

**[FF10]** On September 24, 2017, at the Pretrial Conference in this case, Plaintiff argued that Defendants had waived their § 101 defense by either failing to disclose it or by failing to seasonably assert it. (Dkt. No. 221 at 114:19–23 ("[T]hey've also said that they still have a Section 101 defense, even though the time for that clearly would have been, if not at the motion to dismiss stage, then at the dispositive motion stage, if they thought they had a Section 101 defense.").)

**[FF11]** In order to address this argument, the Court ordered the Parties to file letter briefs. (*Id.* at 120:11–16.) In their responsive brief, Defendants urged the Court to consider their § 101 defense after trial and "pursuant to [Rule] 52" because "it would be most appropriate for the Court to consider the § 101 defense after it has heard background regarding the patents, including the testimony of expert witnesses." (Dkt. No. 223-1 at 6–7.)

**[FF12]** After reviewing the Parties' arguments and relevant authorities, the Court concluded that Defendants had properly preserved their § 101 defense. (Dkt. No. 228 at 16 ("[T]he Court finds no reason to conclude that the defense was waived in this case simply for failure to file a motion to dismiss or for summary judgment.").) The Court further ordered the Parties, per Defendants' request, to address the issue of § 101 in post-trial motions under Rule 52. (Dkt. Nos. 228, 256.)

**[FF13]** Jury selection in this case began on October 2, 2017, with trial commencing on October 10, 2017. (Dkt. Nos. 233, 239.)

**[FF14]** Ultimately, the jury found that Defendants had willfully infringed the Asserted Patents, rejected Defendants' invalidity arguments, and awarded $5.75 million in damages. (Dkt. No. 237.)

**[FF15]** After the conclusion of the trial, the Court entered a Post-Verdict Docket Control Order instructing the Parties to address various post-trial issues, including Defendants' invalidity arguments under § 101. (Dkt. No. 243.)

**[FF16]** Accordingly, Defendants timely filed the instant Motion. (Dkt. No. 265 at 25 ("NetScout respectfully requests the Court grant its motion under Rule 52(c) and invalidate all claims asserted by Plaintiff at trial under 35 U.S.C. § 101.").)

### C. Findings of Fact With Respect to Defendants' Motion

#### 1. Overview of the Asserted Patents

**[FF17]** When information is transmitted over a network like the Internet, the information is generally transmitted via groups of packets that flow from one connection point to another. (Dkt. No. 244, 10/10/17 A.M. Trial Tr. at 51:11–52:13.)

**[FF18]** This singular flow of packets, from Point A to Point B, is commonly called a "connection flow." *See, e.g.,* '789 Patent 2:41–43 ("The term 'connection flow' is commonly used to describe all the packets involved with a single connection.").

**[FF19]** Transmitting information over a network often involves transferring packets across multiple connection flows. (Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 108:23–111:12.) For example, an application such as Facebook might transmit pictures and videos via different connection flows even though this content will ultimately be assembled together for display as a single website by a browser. (*Id.*)

**[FF20]** In measuring the amount or type of information being transmitted by a particular application or protocol, a network monitor needs to measure *all* of the connection flows through which that application or protocol transmits packets. For example, if a network monitor cannot associate the traffic caused by Facebook sending pictures via one connection flow with the traffic caused by Facebook sending videos via another connection flow, the network monitor will have an incomplete view of how much traffic on the network is attributable to Facebook. *See, e.g.,* (Dkt. No. 244, 10/10/2017 A.M. Trial Tr. at 55:23–56:16 ("[T]hat web page that you're using [is] made up of lots of these different connection flows. And the problem is . . . how do I know that that's all related to that one app or . . . web page . . . .").)

**[FF21]** This is precisely the problem to which the Asserted Patents are directed. '789 Patent at 1:48–51 ("The present invention relates to computer networks, specifically to the real-time elucidation of packets communicated within a data network, including classification according to protocol and application program."); '751 Patent at 3:2–5 ("[P]rior-art systems cannot collect some important performance metrics that are related to a complete sequence of packets of a flow or to several disjointed sequences of the same flow in a network."); '725 Patent at 1:66–2:6 ("Not only should all the packets be detected and analyzed, but for each of these packets the network monitor should determine the protocol (e.g., http, ftp, H.323, VPN, etc.), the application/use within the protocol (e.g., voice, video, data, real-time data, etc.), and an end user's pattern of use within each application or the application context (e.g., options selected, service delivered, duration, time of day, data requested, etc.).").

**[FF22]** For example, Claim 19 of the '789 Patent recites a process of parsing packets to extract information that can be used to associate packets with a single conversational flow and thus a particular application or protocol.[1] (Dkt. No. 244, 10/10/2017 A.M. Trial Tr. at 57:5–12 ("[W]hat we came up with was a way to take information from all of those different packets in each of those connection flows and create a conversational flow. And the conversational flow, as we see in this picture, can be 3 or 300 or 30 different connection flows, but they're all associated now to that one application, the app on your phone and that web page."); Dkt. No. 245, 10/10/17

[1] This Court previously construed the term "conversational flow" to mean "the sequence of packets that are exchanged in any direction as a result of an activity—for instance, the running of an application on a server as requested by a client—and where some conversational flows involve more than one connection, and some even involve more than one exchange of packets between a client and server." (Dkt. No. 66 at 6.) This construction reflected language agreed to by both Parties at the *Markman* hearing held on March 2, 2017. (*Id.*)

P.M. Trial Tr. at 118:11–15 ("[T]he idea is the packets come in, they're parsed, and you try and associate it with a particular flow.").)

**[FF23]** Figure 3 depicts this process in more detail:



FIG. 3

**[FF24]** Specifically, the parser subsystem "parses the packet and determines the protocol types and associated headers for each protocol layer," "extracts characteristic portions (signature information) from the packet," and builds a "unique flow signature (also called a 'key')" based on the packet. '789 Patent at 12:19–13:28, 33:30–34:33. Next, the analyzer subsystem determines whether the packet, based on this signature or key, has a corresponding entry in the flow-entry database. *Id.* at 13:60–16:52. If it does, then the flow-entry is updated and, as necessary, additional operations may be performed on the packet to "fully characterize" the associated conversational flow. *Id.* at 14:54–61 ("Updating includes updating one or more statistical measures stored in the flow-entry."), 14:63–15:47 (describing state-based operations carried out

to "finalize[]" the characterization of a particular conversational flow), 16:28–33 ("Once a particular set of state transitions has been traversed for the first time and ends in a final state, a short-cut recognition pattern - a signature - can be generated that will key on every new incoming packet that relates to the conversational flow."). If the packet does not have a corresponding entry, then a new entry is created and "a protocol and state identification process 318 further determines . . . the protocols and where in the state sequence for a flow for this protocol's this packet belongs [sic]." *Id.* at 14:44–53.

**[FF25]** Claim 20 of the '789 Patent depends from Claim 19, adding the additional limitation that the packet monitor described in Claim 19 accepts packets in real-time. '789 Patent at Claim 20.

**[FF26]** Claim 10 of the '725 Patent, in part, recites similar steps, including performing certain operations on packets after determining the conversational flow to which they belong. (Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 175:5–10 ("So for the remainder of the wherein limitation, you'll see that it says: Parsing and extracting operations on a packet to extract selected portions of the packet. So for that portion, it's the same kind of evidence that I had pointed to earlier, that the parsing subsystem [of Claim 19 of the '789 Patent] does.").)

**[FF27]** The same is true for Claim 17 of the '725 Patent, *id.* at 177:20–22 (noting that the language of Claim 10 and Claim 17 are "identical" with respect to all limitations except the wherein clause of Claim 17 and concluding that "the same evidence and methodology . . . can be applied to this one remaining piece of Claim 17 of the '725 patent"), Claim 1 of the '751 Patent, *id.* at 157:16–159:13 (noting that the same evidence of infringement that applied to Claim 19 of

the '789 Patent applied to Claim 1 of the '751 Patent because of the similarities between the two claims), and Claim 5 of the '751 Patent, *id.* at 166:1–20 (same).[2]

### 2. Improvements Over the Prior Art

**[FF28]** Network monitors that could recognize various packets as belonging to the same connection flow were well-known in the prior art when the Asserted Patents were filed. *See, e.g.,* '789 Patent at 2:42–44; (Dkt. No. 245, 10/10/2017 P.M. Trial Tr. at 181:22–182:8.)

**[FF29]** However, these prior art monitors could not identify disjointed *connection* flows as belonging to the same *conversational* flow. *See, e.g.,* '789 Patent at 3:56–59 ("What distinguishes this invention from prior art network monitors is that it has the ability to recognize disjointed flows as belonging to the same conversational flow."); (Dkt. No. 245, 10/10/2017 P.M. Trial Tr. at 189:1–5 ("Q. Would you agree that the prior art does not link, in your opinion, conversation -- connection flows into conversation flows? A. Yes."); Dkt. No. 248, 10/11/2017 P.M. Trial Tr. at 132:17–138:16; Dkt. No. 250, 10/12/2017 P.M. Trial Tr. at 42:15–48:22.) This inability to associate different connection flows to each other was a crucial limitation in the prior art because applications often transmit data via multiple connection flows. *See* '751 Patent at 3:2–5 ("[P]rior-art systems cannot collect some important performance metrics that are related to a complete sequence of packets of a flow or to several disjointed sequences of the same flow in a network."); '725 Patent at 12:29–33 (explaining that using the disclosed inventions reveals "[w]hat may seem to prior art monitors to be some unassociated flow . . . to be a sub-flow associated with

[2] The Court is mindful that there are important differences between an infringement and invalidity analysis. However, as Packet Intelligence recognized in offering its expert testimony on infringement, there is substantial overlap between the Asserted Patents, at least with respect to the fact that they all relate to a similar problem, the need to associate various connection flows with the same conversational flow, and thus the same underlying application or protocol. Additionally, the Court focuses on Claim 19 of the '789 Patent because Packet Intelligence has identified this claim as representative of the Asserted Patents. For example, at trial, Packet Intelligence informed the jury that Claim 19 of the '789 Patent was "exemplary" of the other Asserted Claims. (Dkt. No. 244, 10/10/17 A.M. Trial Tr. at 14:23–25 ("[W]hat I'm putting up on your screen is the – an – an exemplary claim, the Claim 19 of the '789 Patent.").)

a previously encountered sub-flow"); '789 Patent at 15:31–34 (same); (Dkt. No. 245, 10/10/2017 P.M. Trial Tr. at 33:10–14 ("Q. And this is the . . . source of the problem that your patent discusses when it says a single activity can result with multiple connections, right? A. Yes, yes. I mean, that was part of the role in the conversational flow.").)

**[FF30]** By contrast, the Asserted Patents describe how disjointed connection flows can be associated with a single conversational flow to more precisely associate traffic with a particular application or protocol. [FF17–27]; *see also* (Dkt. No. 245 at 12:7–23, 102:12–20 ("[W]hat we're talking about is . . . [i]dentifying the underlying protocols, the applications that are being used, and the user activity that's caused those packets to flow through the network to try and achieve an understanding about how the network is being used.").)

**[FF31]** Such an application specific view of network traffic is more granular, nuanced, and useful. For example, a network monitor that can identify the underlying application associated with different connection flows can distinguish between network congestion caused by users watching too many videos and congestion caused by users watching too many videos using a particular application. (Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 16:6–17:25, 18:16–18 ("[I]f you now know what these applications are, then you have a greater ability to control and manage your network."), 102:12–20, 112:18–113:1 ("[P]art of why it's important . . . to have this kind of information is for the Internet service providers to be able to measure and analyze their networks. What activity is happening? Is it more than anticipated? Is there a certain application that's come out that's causing congestion?").)

**[FF32]** The inventions recited by the Asserted Claims, in contrast to the prior art, make this more granular classification possible. *See, e.g.*, '751 Patent at 2:53–56 ("By maintaining statistical measures in the flow-entries related to a conversational flow, embodiments of the present

invention enable specific metrics to be collected in real-time that otherwise would not be possible."); '751 Patent at 3:2–4:6 ("[P]rior-art systems cannot collect some important performance metrics that are related to a complete sequence of packets of a flow or to several disjointed sequences of the same flow in a network . . . In particular, the metrics [made possible by the recited inventions] may be used to monitor and analyze the quality and performance of traffic flows related to a specific set of applications."); '725 Patent at 12:29–33 (explaining that using the disclosed inventions reveals "[w]hat may seem to prior art monitors to be some unassociated flow . . . to be a sub-flow associated with a previously encountered sub-flow"); '789 Patent at 15:31–34 (same); (Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 15:14–17 ("Q. Now, were the probes in the 1997 time frame able to accurately classify the traffic that was coming from these more complicated applications and protocols? A. No, not in the 1998 [sic] time frame."), 16:6–19:3.)

**[FF33]** In addition to improving network monitors' ability to classify and diagnose network congestion, increased network visibility can also help network providers identify and address intrusions, *i.e.* malicious attacks. (Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 119:25–120:16 ("[P]art of protecting networks from intrusion attacks from people trying to get into servers is – is understanding what the traffic is that's coming over a network. And so being able to classify it, there are certain kinds of attacks that have what are called signatures that when an attack is starting to happen, there will be certain kinds of packets that you can look at or certain patterns. And so based on traffic classification, that's the kind of benefit that you can get from some of the technology in the patent.").)

**[FF34]** Ultimately, based on the evidence presented in this case, the Court finds that the Asserted Claims offered improvements over the prior art that existed at the time, particularly in light of the limitations of such art. [FF17–33].

**[FF35]** Similarly, the Court finds that Defendants failed to establish by clear and convincing evidence that the combination of elements recited by the Asserted Claims was conventional, routine, or well-known as compared to the then-existing state of the art and the limitations of such art. [FF17–34].

## II. CONCLUSIONS OF LAW

### A. Legal Standard

#### 1. Federal Rule of Civil Procedure 52

**[CL1]** "If a party has been fully heard on an issue . . . the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 52(c). Such a judgment "must be supported by findings of fact and conclusions of law." *Id.*

**[CL2]** The purpose of these findings is to "afford[] . . . a clear understanding of the ground or basis of the decision of the trial court." *S. S. Silberblatt, Inc. v. U.S. for Use & Benefit of Lambert Corp.*, 353 F.2d 545, 549 (5th Cir. 1965) (internal quotation marks omitted); *see also Schlesinger v. Herzog*, 2 F.3d 135, 139 (5th Cir. 1993) (explaining that trial courts need not "recite every piece of evidence" or "sort through the testimony of . . . dozen[s] [of] witnesses").[3]

**[CL3]** In making a particular finding, the district court "does not . . . draw any inferences in favor of the non-moving party and . . . [instead] make[s] a determination in accordance with its own view of the evidence." *Fairchild v. All Am. Check Cashing, Inc.*, 815

[3] *See Chemlawn Servs. Corp. v. GNC Pumps, Inc.*, 823 F.2d 515, 517 (Fed. Cir. 1987) (procedural aspects of Rule 52 controlled by regional circuit law).

F.3d 959, 964 n.1 (5th Cir. 2016) (internal quotation marks omitted). However, a district court still must arrive at each of its factual determinations based on the applicable burden of proof. *In re Medrano*, 956 F.2d 101, 102 (5th Cir. 1992) (reversing the district court because it applied the preponderance of the evidence standard rather than the clear and convincing standard in making its factual determinations under Rule 52).[4]

**2. <u>The § 101 Inquiry</u>**

**[CL4]** Historically, the only statutory conditions for patentability were novelty and utility. *See, e.g.*, *Lyon v. Bausch & Lomb Optical Co.*, 224 F.2d 530, 535 (2d Cir. 1955) (Hand, J.) ("From 1793, when the second patent act was passed, until the Act of 1952, the only statutory standard for invention was that the discovery should be 'new and useful' . . . .").

**[CL5]** However, in *Hotchkiss v. Greenwood*, 52 U.S. 248, 267 (1850), the Supreme Court concluded "that a patentable invention [must] evidence more ingenuity and skill than that possessed by an ordinary mechanic acquainted with the business." *See Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 11 (1966) (discussing *Hotchkiss*). This rule became known as the "invention" requirement. *Lyon*, 224 F.2d at 535.

**[CL6]** Applying the invention requirement, courts began to invalidate patents that merely claimed abstract ideas or phenomena of nature. *See, e.g.*, *Hotel Sec. Checking Co. v. Lorraine Co.*, 160 F. 467, 469 (2d Cir. 1908) (concluding that a patent "cover[ing] simply a system of bookkeeping made applicable to the conditions existing in hotels and restaurants" failed to "rise to the level of invention" because it claimed a "fundamental principle . . . as old as the art of bookkeeping"); *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 131 (1948) ("The Circuit

[4] Here, the relevant burden of proof is clear and convincing evidence. *Berkheimer v. HP Inc.*, No. 2017-1437, 2018 WL 774096, at *5 (Fed. Cir. Feb. 8, 2018) ("Any fact, such as this one, that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence.").

Court of Appeals thought that Bond did much more than discover a law of nature, since he made an [sic] new and different composition of non-inhibitive strains which contributed utility and economy to the manufacture and distribution of commercial inoculants. But we think that that aggregation of species fell short of invention . . . .").

**[CL7]** Over time, application of the invention requirement became increasingly unpredictable. *Lyon*, 224 F.2d at 535 ("The variants were numberless; and 'invention' became perhaps the most baffling concept in the whole catalogue of judicial efforts to provide postulates for indefinitely varying occasions."); *First Report of the National Patent Planning Commission*, June 18, 1943, H. Doc. 239, 78th Cong. at 10 ("One of the greatest technical weaknesses of the patent system is the lack of a definitive yardstick as to what is invention."); *Efforts to Establish a Statutory Standard of Invention*, Study No. 7, Senate Subcommittee on Patents, Trademarks, and Copyrights, 85th Cong., 1st Sess. (Committee Print, 1958).

**[CL8]** To "stabiliz[e]" this area of law, Congress codified the invention requirement in § 103. *Graham*, 383 U.S. at 12–13, 15–16.

**[CL9]** The rule against patents on abstract ideas and laws of nature, however, found a new home in § 101. Thus, cases addressing the invention requirement, such as *Funk Bros.*, were incorporated into § 101 jurisprudence. *See, e.g.*, *Parker v. Flook*, 437 U.S. 584, 593 (1978) ("*Mackay Radio* and *Funk Bros.* point to the proper analysis for this case . . . ."). This severed the rule against patents on abstract ideas and laws of nature from its moorings in the invention requirement, *i.e.* obviousness, yet similar principles were applied under the new § 101 test. For example, *Flook* began by recognizing that natural phenomenon belong to "the prior art." *Id.* at 594 ("Respondent's process is unpatentable under § 101, not because it contains a mathematical algorithm as one component, but because once that algorithm is assumed to be within the prior art,

the application, considered as a whole, contains no patentable invention."). *Flook* then examined whether the claims recited an "inventive concept," *i.e.* an invention, apart from that prior art. *Id.* ("Even though a phenomenon of nature or mathematical formula may be well known, an inventive application of the principle may be patented. Conversely, the discovery of such a phenomenon cannot support a patent unless there is some other inventive concept in its application."); *Diamond v. Diehr*, 450 U.S. 175, 204 (1981) ("Under this procedure, the algorithm is treated for § 101 purposes as though it were a familiar part of the prior art; the claim is then examined to determine whether it discloses 'some other inventive concept.'") (quoting *Flook*, 437 U.S. at 591–592)); *see also Funk Bros.*, 333 U.S. at 132 ("[O]nce nature's secret of the non-inhibitive quality of certain strains of the species of Rhizobium was discovered, the state of the art made the production of a mixed inoculant a simple step . . . That is to say, there is no invention here unless the discovery that certain strains of the several species of these bacteria are non-inhibitive and may thus be safely mixed is invention. But we cannot so hold . . . .").

**[CL10]** Eventually, the approach taken in *Flook* was distilled into a two-step test for determining whether a patent claims subject matter that is eligible for patent protection.[5] *See Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66 (2012); *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014).

[5] Despite the similarities between the approach taken in *Funk Bros.* and *Flook*, the Supreme Court has made clear that the § 101 inquiry is distinct from §§ 102 and 103. *See Flook*, 437 U.S. at 595 (criticizing an argument that "confuse[d] the issue of patentable subject matter under § 101 with that of obviousness under § 103"); *Diehr*, 450 U.S. at 191 ("A rejection on either of these grounds does not affect the determination that respondents' claims recited subject matter which was eligible for patent protection under § 101.").

a. Step One

**[CL11]** The first step of the *Mayo/Alice* framework requires a court to determine if the claims are "directed to excluded subject matter." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016).

**[CL12]** There is no bright line rule that governs this analysis. *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1294 (Fed. Cir. 2016) ("[A] search for a single test or definition in the decided cases concerning § 101 from this court, and indeed from the Supreme Court, reveals that at present there is no such single, succinct, usable definition or test."), *cert. denied*, 138 S. Ct. 469 (2017).

**[CL13]** However, the approach taken by many courts at the first step of *Mayo/Alice* seems to resemble a sort of abstract idea comparison test. Courts refine a representative claim down to some kernel, focus, or gist, and then seek out cases where other courts' distillations of different claims were framed in similar terms and held to be abstract.

**[CL14]** While the common law tradition has always called on courts to match new facts to old cases, courts addressing § 101 are, perhaps understandably, too often comfortable drawing upon the distillations recited in prior precedent rather than the reasoning, the nuance, and the circumstances discussed in those cases. This has led to several problems.

**[CL15]** First, courts take different approaches to divining the idea that is apparently embodied in a particular claim. *Compare In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) ("[I]n determining whether the claims are directed to an abstract idea, we must be careful to avoid oversimplifying the claims because at some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." (internal quotation marks, brackets, and ellipses omitted)); *Enfish*, 822 F.3d at 1337 ("[D]escribing the

claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule."); *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1345 (Fed. Cir. 2002) ("It is well settled that there is no legally recognizable or protected essential element, gist or heart of the invention . . . Rather, the invention is defined by the claims." (internal citations, quotation marks, and brackets omitted)), *with Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1340 (Fed. Cir. 2017) ("The district court's inquiry centered on determining the 'focus' of the claims, and was thus in accord with our precedent."); *Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1328 (Fed. Cir. 2017) ("[W]e agree with the district court that the heart of the claimed invention lies in creating and using an index to search for and retrieve data."); *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1150 (Fed. Cir. 2016) ("[T]he Asserted Claims are drawn to the abstract idea of: translating a functional description of a logic circuit into a hardware component description of the logic circuit . . . we believe [this] definition more accurately captures the basic thrust of the Asserted Claims." (internal quotation marks omitted)); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012) ("Dealertrack's claimed process in its simplest form includes three steps: receiving data from one source (step A), selectively forwarding the data (step B, performed according to step D), and forwarding reply data to the first source (step C)."); *Becton, Dickinson & Co. v. Baxter Int'l, Inc.*, 127 F. Supp. 3d 687, 692 (W.D. Tex. 2015) ("After stripping away the technicalisms and superfluous verbiage from the claims' language, it is evident that the gist of the claims, and indeed the entire aim of the patent, involves a pharmacist supervising and verifying the work of a nonpharmacist to ensure the work's accuracy."), *aff'd without opinion*, 639 F. App'x 652 (Fed. Cir. 2016).

**[CL16]** As a result, it is often the ***propriety of the district court's characterization*** of the claims that becomes the subject of the ensuing appeal. *Compare Enfish*, 822 F.3d at 1337 ("The district court concluded that the claims were directed to the abstract idea of 'storing, organizing, and retrieving memory in a logical table' . . . ."), *with Enfish*, 822 F.3d at 1337 ("However, describing the claims at such a high level of abstraction . . . all but ensures that the exceptions to § 101 swallow the rule.").

**[CL17]** All of this has led to increasing uncertainty with respect to § 101. *See, e.g.*, *Smart Sys. Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1378 (Fed. Cir. 2017) (Linn, J., dissenting in part) ("Despite the number of cases that have faced these questions and attempted to provide practical guidance, great uncertainty yet remains."). Indeed, distilling claims in this way seems to build abstraction into the process of evaluating whether claims are abstract. *See, e.g., id.* (Linn, J., dissenting in part) ("[I]f we are not to re-characterize the claims, what are we supposed to do? Are we not to ignore any limitations? May we ignore some? If so, which ones? Which limitations matter and which do not?").

**[CL18]** Against this evolving backdrop, the Court simply notes that determining whether certain claims are directed to an unpatentable abstract idea or something else, such as an improvement to computer technology, does not *always* require first restating an oversimplified version of the claim language. Instead, courts can apply general principles articulated by the Supreme Court and Federal Circuit to determine whether the claims themselves are directed to subject matter that is or is not abstract.

**[CL19]** For example, the Federal Circuit has recognized that "[a]bstraction is avoided or overcome when a proposed new application or computer-implemented function is not simply the generalized use of a computer as a tool to conduct a known or obvious process, but instead is

an improvement to the capability of the system as a whole." *Trading Techs. Int'l, Inc. v. CQG, INC.*, 675 F. App'x 1001, 1005 (Fed. Cir. 2017) (unpublished); *see also Alice*, 134 S. Ct. at 2358 ("[T]he claims in *Diehr* were patent eligible because they improved an existing technological process, not because they were implemented on a computer.").

**[CL20]** The Federal Circuit has also authored dozens of opinions that help explain why claims may or may not be directed to improvements to computer functionality. One important consideration in these cases has been whether the claims recited "an unconventional technological solution . . . to a technological problem." *See, e.g., Amdocs*, 841 F.3d at 1300–1301.

**[CL21]** In *Amdocs*, the "unconventional technological solution" involved distributed data gathering, filtering, and enhancing done via a network, which, among other things, helped reduce network congestion. *Amdocs*, 841 F.3d at 1300–1301. This "unconventional technological solution" was patent eligible even though it "involve[d] arguably generic gatherers, network devices, and other components" because these generic components "work[ed] in an unconventional distributed fashion to solve a particular technological problem." *Id.*

**[CL22]** In *Enfish*, the unconventional technical solution was a particular type of data structure, not "*any* form of storing tabular data, but . . . a *self-referential* table for a computer database." 822 F.3d at 1337 (emphasis in original). In particular, according to the relevant specification, this "self-referential" database functioned differently than conventional, "inferior" databases. *Id.* ("[O]ur conclusion that the claims are directed to an improvement of an existing technology is bolstered by the specification's teachings that the claimed invention achieves other benefits over conventional databases, such as increased flexibility, faster search times, and smaller memory requirements."); *see also Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1305 (Fed. Cir. January 10, 2018) ("[T]he self-referential database found patent eligible in *Enfish* did more

than allow computers to perform familiar tasks with greater speed and efficiency; it actually permitted users to launch and construct databases in a new way.").

**[CL23]** In *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014), the unconventional technical solution involved allowing users to click on third-party ads while still displaying this content on the original host website rather than a separate, third-party website. 773 F.3d at 1257. This prevented the host-website from losing visitors who clicked on an advertisement while still "provid[ing] visitors with the opportunity to purchase products from the third-party merchant without actually entering that merchant's website." *Id.* Although this "store within a store" concept had a clear brick and mortar analog, the Federal Circuit observed that the patent at issue addressed "th[e] challenge of retaining control over the attention of the customer in the context of the Internet." *Id.* at 1258–59. This "challenge" had no clear brick and mortar analog, and neither did the solution offered by the claim at issue. *Id.* Moreover, the fact that the solution was achieved using some conventional steps or components was not dispositive. *Id.*

**[CL24]** Finally, in *Finjan*, the representative method claim "employ[ed] a new kind of file that enable[ed] a computer security system to do things it could not do before." *Finjan*, 879 F.3d at 1305. In particular, the file allowed virus scanners to build a security profile that could be used to dynamically identify existing and potential threats. *Id.* Thus, the claims recited an improvement to computer functionality because they allowed virus scanners to do something they could not do before. *Id.* at *3–4.

**[CL25]** By contrast, abstract software claims usually involve implementing well-known concepts or practices using a computer, not as an improvement to the way the computer functions but as a way to simply operationalize the idea itself. This principle is exemplified by *Alice, Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir.

2014), and *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2016), among others.

**[CL26]** In *Alice*, the claims recited "the concept of intermediated settlement" as carried out by a computer program. 134 S. Ct. at 2356–57. As the Supreme Court explained, the need addressed by these claims had been recognized for more than a century. *Id.* The solution presented by the claims had been around just as long. *Id.* What the claims recited, then, was simply a way to operationalize a known solution to an existing problem using a computer. *Id.* Allowing a patent for this sort of combination would, according to the Supreme Court, essentially confer a patent on the idea itself, pre-empting any other use. *Alice*, 134 S. Ct. at 2358 ("[I]f a patent's recitation of a computer amounts to a mere instruction to implement an abstract idea on a computer, that addition cannot impart patent eligibility. This conclusion accords with the pre-emption concern that undergirds our § 101 jurisprudence. Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of additional feature that provides any practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself." (internal citations, quotation marks, ellipses, and brackets ommitted)).

**[CL27]** *Content Extraction* makes a similar point. The relevant claim in that case recited a method for scanning documents so that some information about the documents was digitally identified and stored. *Content Extraction*, 776 F.3d at 1345. The Federal Circuit recognized that neither the solution offered by the relevant claim nor the need to which it was addressed were rooted in technology. *Id.* at 1347. Instead, the claims merely recited functions that "humans ha[d] always performed." *Id.* ("[B]anks have, for some time, reviewed checks, recognized relevant data such as the amount, account number, and identity of account holder, and stored that information in their records."). Thus, the claims were ineligible because the addition

of conventional components did not recite something more than the abstract idea itself. *Id.* at 1347–48; *Alice*, 134 S. Ct. at 2358–59 (cautioning against allowing an applicant to "claim any principle of the physical or social sciences by reciting a computer system configured to implement the relevant concept").

**[CL28]** Likewise, in *Symantec*, the representative claim at issue recited the steps of receiving and filtering e-mail messages. 838 F.3d at 1313. Again, as in *Alice* and *Content Extraction*, not only did this invention have a clear analog, but that analog evidenced that the need addressed by the invention was not technical or new. *Id.* at 1314. Thus, the proffered solution simply performed with a computer what many people had performed in their minds. *Id.* at 1314 ("[I]t was long-prevalent practice for people receiving paper mail to look at an envelope and discard certain letters, without opening them, from sources from which they did not wish to receive mail based on characteristics of the mail.").

**[CL29]** Together, these cases define a category of inventions that are not necessarily abstract, *i.e.* improvements to computer technology. These cases also set forth general principles that can help determine whether particular claims are directed to an abstract idea or not. Moreover, these general principles flow from the circumstances addressed by prior opinions and the analyses provided therein, not from perceived similarities between an abstracted version of asserted claims and the gist, heart, focus, or thrust of previously invalidated inventions.

**[CL30]** Accordingly, the Court draws on these same principles in its analysis in this case.

b. Step Two

**[CL31]** If claims are directed to ineligible subject matter, then a court next "search[es] for an 'inventive concept,' or some element or combination of elements sufficient to ensure that the claim in practice amounts to 'significantly more' than a patent on an ineligible concept." *DDR Holdings*, 773 F.3d at 1255; *see also Bascom Glob. Internet Servs., Inc. v. AT & T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) ("[A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces.").

**[CL32]** The defendant bears the burden under this step to establish by clear and convincing evidence that the Asserted Claims lack an inventive concept. *Berkheimer*, No. 2017-1437, 2018 WL 774096, at *5 ("The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact. Any fact, such as this one, that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence.").

**[CL33]** At times, the inventive concept inquiry may "overlap" with other validity inquiries, including obviousness.[6] *Mayo*, 566 U.S. at 90; *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1347 (Fed. Cir. 2015) ("[P]recedent illustrates that pragmatic analysis of § 101 is facilitated by considerations analogous to those of §§ 102 and 103 as applied to the particular case."); *Trading Techs.*, 675 F. App'x at 1005–06 ("[T]he public interest in innovative advance is best served when close questions of eligibility are considered along with the understanding flowing from review of the patentability criteria of novelty, unobviousness, and enablement . . . .").

[6] Indeed, as explained above, [CL4–CL10], the "inventive concept" inquiry originating from *Flook* and the statutory defense of obviousness have significant historical and analytical overlap. *See Flook*, 437 U.S. at 600 (Stewart, J., dissenting) ("The Court . . . strikes what seems to me an equally damaging blow at basic principles of patent law by importing into its inquiry under 35 U.S.C. § 101 the criteria of novelty and inventiveness." (internal citations omitted)).

**[CL34]** However, the "inventive concept" inquiry remains separate and distinct from §§ 102 and 103. *See, e.g., Diehr*, 450 U.S. at 191 ("A rejection on [novelty or obviousness] grounds does not affect the determination that respondents' claims recited subject matter which was eligible for patent protection under § 101.").

**[CL35]** Thus, our courts have charted a course as to the "inventive concept" inquiry which establishes a pathway that is separate and apart from the well-worn trail of cases defining obviousness. Instead, the focus of step two of *Mayo/Alice* is a search for "something more," something that ensures the claims are "more than a drafting effort designed to monopolize the abstract idea." *Alice*, 134 S. Ct. at 2354–2357 (internal brackets omitted); *see also DDR Holdings*, 773 F.3d at 1259.

**[CL36]** "[S]omething more" may be present "when the claim limitations involve more than performance of well-understood, routine, and conventional activities previously known to the industry." *Berkheimer*, No. 2017-1437, 2018 WL 774096, at *5 (internal quotation marks and brackets omitted).

**[CL37]** "[S]omething more" may also be evidenced by the existence of specific "benefits" provided by the relevant invention as compared to the prior art. *See, e.g., Bascom*, 827 F.3d at 1350 ("The inventive concept described and claimed in the '606 patent is the installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user. This design gives the filtering tool both the benefits of a filter on a local computer and the benefits of a filter on the ISP server."); *Amdocs*, 841 F.3d at 1302 ("The benefits in *BASCOM* were possible because of customizable filtering features at specific locations remote from the user. Similarly, the benefits of the '065 patent's claim 1 are possible because of the distributed, remote enhancement that produced an unconventional result—reduced

data flows and the possibility of smaller databases."); *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259 (Fed. Cir. 2017) ("The patented system achieved greater accuracy than these prior art systems by measuring inertial changes of the tracked object relative to the moving platform's reference frame."); *Enfish*, 822 F.3d at 1337 ("[O]ur conclusion that the claims are directed to an improvement of an existing technology is bolstered by the specification's teachings that the claimed invention achieves other benefits over conventional databases, such as increased flexibility, faster search times, and smaller memory requirement.").

**B. <u>Discussion</u>**

**1. <u>The Role of Factual Findings in the § 101 Context</u>**

**[CL38]** The Federal Circuit has repeatedly acknowledged that the inquiry under § 101 is a legal question that "'may contain underlying factual issues'" *Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1325 (Fed. Cir. 2016); *see also In re Comiskey*, 554 F.3d 967, 975 (Fed. Cir. 2009) ("[T]here may be cases in which the legal question as to patentable subject matter may turn on subsidiary factual issues . . . ."); *Arrhythmia Research Tech., Inc. v. Corazonix Corp.*, 958 F.2d 1053, 1055–56 (Fed. Cir. 1992) ("Whether a claim is directed to statutory subject matter is a question of law. Although determination of this question may require findings of underlying facts . . . . with appropriate recognition of the burdens on the challenger of a duly issued United States patent.").

**[CL39]** The same is true of other legal questions that pervade patent law, including claim construction, obviousness, indefiniteness, and enablement. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 842 (2015) (explaining that construing patent claims sometimes involves making factual determinations); *Graham*, 383 U.S. at 17 ("While the ultimate question of patent validity is one of law . . . [§ 103] lends itself to several basic factual inquiries."); *Akzo*

*Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1343 (Fed. Cir. 2016) ("Indefiniteness is a question of law . . . subject to a determination of underlying facts."); *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1188 (Fed. Cir. 2014) ("Whether a claim satisfies the enablement requirement of 35 U.S.C. § 112 is a question of law . . . although the determination may be based on underlying factual findings . . . .").

**[CL40]** The distinction between legal and factual questions is critical because factual determinations carry with them a burden of proof. *See Microsoft Corp., v. i4i P'ship*, 564 U.S. 91, 114 (2011) (Breyer, J., concurring) ("I believe it worth emphasizing that in this area of law as in others the evidentiary standard of proof applies to questions of fact and not to questions of law.").

**[CL41]** Factual questions are also reviewed under a more deferential standard of review, which promotes uniformity and reflects a proper view of a trial court's factfinding function. *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1312 (Fed. Cir. 2014) (O'Malley, J., dissenting) ("The Supreme Court has made clear, however, that [a] narrow view of the trial court's factfinding function is an inaccurate one."), *cert. granted, judgment vacated sub nom. Lighting Ballast Control LLC v. Universal Lighting Techs., Inc.*, 135 S. Ct. 1173 (2015); *Teva*, 135 S. Ct. at 838 (2015) ("A district court judge who has presided over, and listened to, the entirety of a proceeding has a comparatively greater opportunity to gain that familiarity than an appeals court judge who must read a written transcript or perhaps just those portions to which the parties have referred." (citing *Lighting Ballast*, 744 F.3d at 1312 (O'Malley, J., dissenting)); *In re Bilski*, 545 F.3d 943, 994 (Fed. Cir. 2008) (Newman, J., dissenting) ("Each patent examination center, each trial court, each panel of this court, will have a blank slate on which to uphold or invalidate claims . . . add[ing] delay, uncertainty, and cost . . . ."); *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 701 F.3d 1351, 1362 (Fed. Cir. 2012) (Moore, J., dissenting from denial of

petition for rehearing en banc) ("When we convert factual issues, or mixed questions of law and fact, into legal ones for our de novo review, we undermine the uniformity and predictability goals this court was designed to advance.").

**[CL42]** While neither the Federal Circuit nor the Supreme Court have defined exactly which aspects of the § 101 inquiry are legal or factual in nature, the Federal Circuit has explained that "whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact." *Berkheimer*, No. 2017-1437, 2018 WL 774096, at *5; *see also Aatrix Software. Inc. v. Green Shades Software, Inc.*, No. 2017-1452 (Fed. Cir. February 14, 2018) (same); *Ameritox, Ltd. v. Millennium Health, LLC*, 88 F. Supp. 3d 885, 911 (W.D. Wis. 2015) ("When, as here, Millennium is asking the court to infer that the combination of elements is conventional, it must supply some evidence to convince the trier of fact to accept its version of events. Since those facts are lacking here, Millennium's position is necessarily rejected.").

**[CL43]** Accordingly, the Court has made specific factual findings under the clear and convincing evidence standard with respect to the factual questions that underpin its § 101 analysis, including whether the Asserted Claims involve a combination of elements or steps that were well-understood, routine and conventional from the perspective of a person skilled in the art at the time the Asserted Patents were filed. *See Berkheimer*, No. 2017-1437, 2018 WL 774096, at *5. Where appropriate, the Court has also referenced these findings in discussing both steps of *Mayo/Alice*.[7]

[7] To the extent the Parties have a right to resolve these underlying factual issues through a jury trial, the Court considers this argument waived. Defendants specifically sought relief from this Court by invoking a rule that instructs the district court to make factual findings. *See* Fed. R. Civ. P. 52(c) ("A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a)."); *Seaboard Lumber Co. v. United States*, 903 F.2d 1560, 1563 (Fed. Cir. 1990) ("Waiver requires only that the party waiving such right do so 'voluntarily' and 'knowingly' based on the facts of the case."). In response, Plaintiff did not object on Seventh Amendment grounds at any point in its briefing, at the hearing the Court held on the instant Motion, or at any point thereafter, even as Plaintiff also argued that factual issues were in dispute and should be resolved in its favor. Thus, in this case, Rule 52 is an appropriate mechanism to resolve the § 101 question. However, in future cases, it may not be.

### 2. Step One of *Alice*

**[CL44]** Under step one, the Court begins by analyzing the Asserted Claims to determine whether they are directed to an unpatentable abstract idea or something like an improvement to computer functionality. *See, e.g.*, *Visual Memory*, 867 F.3d at 1259.

**[CL45]** Defendants argue that the Asserted Claims are directed to "the collection, comparison, and classification of information." (Dkt. No. 265 at 15–16.) Defendants then assert that the Federal Circuit has "routinely" found claims directed to similarly abstract ideas to be patent ineligible. (*Id.*)

**[CL46]** Defendants further contend that the Asserted Claims are not directed to an improvement in computer functionality because the recited methods "do not improve the way computers operate." (*Id.* at 17–18.) Instead, Defendants argue, the Asserted Claims use generic components to analyze packets on a network without explaining "how to determine whether any packets belong to a 'conversational flow.'" (*Id.*)

**[CL47]** Plaintiff argues that the Asserted Claims directly relate to problems that arose because of limitations in prior art network monitors, "a problem arising squarely within the realm of computer technology." (Dkt. No. 278 at 10–11.)

**[CL48]** According to Plaintiff, the Asserted Claims address these problems with an unconventional technological solution, combining "both state and application classification functionality . . . into an ordered set of components that allow for the recognition and classification based on conversational flows." (*Id.* at 12–14 ("As the trial testimony and the patents show, the claims describe fundamentally technical solutions to the prior art packet analysis that was unable

to recognize disjointed exchanges of packets between network endpoints related to a single activity or application, a problem firmly rooted in computer technology.").)

**[CL49]** Plaintiff also disputes Defendants' formulation of the Asserted Claims as embodying the abstract idea of collecting, comparing, and classifying information. (*Id.* at 1 ("NetScout's over-simplified and reductivist approach is precisely what courts have criticized—because all claims can be characterized as abstract when reduced to an abstraction.").)

**[CL50]** At the outset, the Court agrees with Packet Intelligence. In fact, even NetScout concedes that its characterization of the claims as reciting nothing more than "the collection, comparison, and classification of information" can only be reached by viewing the Asserted Claims in their "simplest form." (Dkt. No. 265 at 15–16 ("Stripped of technical jargon . . . [and] [d]istilled to their 'simplest form,' the asserted claims are directed to the collection, comparison, and classification of information.").) *But see Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1345 (Fed. Cir. 2002) ("It is well settled that there is no legally recognizable or protected essential element, gist or heart of the invention . . . Rather, the invention is defined by the claims." (internal citations, quotation marks, and brackets omitted)).

**[CL51]** NetScout's reliance on precedent is similarly misguided, focusing on matching the abstract idea apparently lurking beneath the Asserted Claims in this case to high-level distillations offered by other courts with respect to unrelated claims. (Dkt. No. 265 at 16.) As discussed above, [CL11–30], this abstract idea matching approach too often proceeds, as it does in Defendants' analysis, without regard for the very limitations that improve on existing technology.

**[CL52]** By contrast, an examination of the Asserted Claims, in context with the relevant specifications and the evidence presented at trial, demonstrates that the Asserted Claims are

oriented towards solving a discrete technical problem: relating disjointed connection flows to each other. [FF17–21, 28–30]. Even Defendants' own expert conceded that the Asserted Patents are directed towards solving this discrete technical problem. (Dkt. No. 248, 10/11/2017 P.M. Trial Tr. at 136:7–136:16 ("Q. Do the patents describe a problem that they're trying to solve? A. They do. Q. And can you describe that [problem], please? A. Well, the problem they -- they coined a term called the 'disjointed flow problem' . . . [a]nd I'll use those words because they -- they're perfectly good words to describe the problem [of identifying traffic across multiple connection flows as being from the same application or protocol]."), 136:17–137:16.)

**[CL53]** To address this problem, the Asserted Claims recite specific technological solutions, such as identifying and refining a conversational flow so that different connection flows can be associated with each other and ultimately an underlying application or protocol. [FF22–27]. Again, this is something Defendants' expert explained. (Dkt. No. 248, 10/11/2017 P.M. Trial Tr. at 138:4–139:2 ("Q. And how did the inventors indicate they were going to solve this problem? . . . A. They created something called the conversational flow solution. They coined it – the term 'conversational flow' . . . Q. And does the patent describe how you would identify and classify different connections into a conversational flow? A. Yes, it does.").)

**[CL54]** In spite of this evidence, Defendants argue that "the asserted claims are directed to human-practicable concepts, which could be implemented in a 'brick-and-mortar post office.'" (Dkt. No. 265 at 25 (citing *Symantec*, 838 F.3d at 1318).)

**[CL55]** In fact, the Federal Circuit recently revisited *Symantec* in *Finjan*, distinguishing the latter case because the claims at issue "d[id] a good deal more" than recite the steps of filtering messages. *Finjan*, 879 F.3d at 1304. For example, the claims in *Finjan*, read together with the

specification, described how to construct a security profile that allowed for "more flexible and nuanced virus filtering." *Id.*

**[CL56]** In this same vein, the Asserted Claims in this case do more than just recite the idea of filtering and sorting data. [FF22–27]. For this reason, *Amdocs*, *DDR Holdings*, *Enfish*, and *Finjan* are instructive. Together, they describe circumstances, present in this case, which indicate that the Asserted Patents are not merely directed to an abstract idea. In particular, the Asserted Claims recite an "unconventional technological solution," *Amdocs*, 841 F.3d at 1300, not *any* approach to sorting packets, but a particular approach focused on constructing conversational flows that associate connection flows with each other and ultimately specific applications or protocols. *Enfish*, 822 F.3d at 1337; [FF21–34]. This allows packet monitors to classify network traffic in a way that prior network monitors could not. *Finjan*, 879 F.3d at 1305 (noting that the invention "employ[ed] a new kind of file that enable[ed] a computer security system to do things it could not do before"); '751 Patent at 2:53–56 ("By maintaining statistical measures in the flow-entries related to a conversational flow, embodiments of the present invention enable specific metrics to be collected in real-time that otherwise would not be possible."); [FF17–34].

**[CL57]** Nevertheless, Defendants maintain that the Asserted Claims still fail under step one because the claims themselves do not "explain *how* . . . to determine whether any packets belong to a 'conversational flow.'" (Dkt. No. 265 at 18) For example, Defendants argue that the claims "fail[] to recite any specific means or method to classify packets and belonging to the same 'conversational flow.'" (*Id.* at 9, 11 ("[C]laim 1 recites no specific means or methods for accomplishing the stated goal of determining whether packets are part of a 'conversational flow.'"), 14 ("[C]laims 10 and 17 recite performing various operations . . . [but] these operations are generic

and, in particular, fail to specify a means or method for achieving the stated goal of identifying packets as belonging to a 'conversational flow.'").[8]

**[CL58]** This argument fails because it focuses only on the claims in isolation rather than the claims as read in light of the specification. *But see Enfish*, 822 F.3d at 1335 ("[T]he 'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'").

**[CL59]** Taken together, the claims and the specification do teach how to identify that certain packets belong to the same conversational flow. [FF24–27]; *see also* '725 Patent at 7:51–8:29; *see also* '789 Patent at 10:15–11:32; '751 Patent at 7:53–8:30. In fact, Defendants' own expert acknowledged that the Asserted Patents explain how to associate packets from different connection flows with the same conversational flow. *See, e.g.*, (Dkt. No. 248, 10/11/2017 P.M. Trial Tr. at 138:24–139:2 ("Q. And does the patent describe how you would identify and classify different connections into a conversational flow? A. Yes, it does.").)

**[CL60]** Additionally, Defendants' argument essentially collapses a § 112 inquiry into the § 101 inquiry, which is inappropriate.[9] *See Visual Memory*, 867 F.3d at 1261 ("[W]hether a patent specification teaches an ordinarily skilled artisan how to implement the claimed invention presents an enablement issue under 35 U.S.C. § 112, not an eligibility issue under § 101.").

**[CL61]** Ultimately, based on the facts of this case, [FF17–34], the claims themselves, and the claims as read in the context of the specification, the Court concludes that the Asserted Patents are directed to an improvement in computer functionality rather than an unpatentable

[8] Defendants also raise a variety of other arguments under *Mayo*/*Alice* step one, including that the claims recite only generic, purely functional components, which the Court addresses under the second step, acknowledging that the steps in *Mayo*/*Alice* involve significant overlap.

[9] Allowing § 101 to swallow every other invalidity inquiry, as Defendants urge and some courts seem willing to do, essentially relieves defendants of their disclosure obligations. For example, in this case, Defendants did not argue at trial, or before, that the patents were invalid for lack of written description or enablement. Thus, to permit these arguments to be injected for the first time through § 101 unavoidably encourages gamesmanship and trial by ambush.

abstract idea. However, for completeness, the Court still finds it appropriate to discuss the second step of *Mayo*/*Alice*.

### 3. <u>Step Two of *Alice*</u>

**[CL62]** Under step two, Defendants argue that the steps recited in the Asserted Claims, individually or in combination, involve conventional components carrying out the routine steps of parsing and analyzing packets. (*Id.* at 19–24.)

**[CL63]** To support this argument, Defendants chart the Asserted Claims against various prior art references:

| | |
|---|---|
| **a lookup engine** | "[T]he **network data engine** is executed by the CPU to provide the functionality for creating and deleting tables within the memory [] and ***searching the tables*** **according to a plurality of indices.**" Ex. C (Iddon) at 4:6-11.[6] |

(*Id.* at 10.)

**[CL64]** In response, Plaintiff argues that the combination of components recited in the Asserted Claims is inventive. *See, e.g.,* (Dkt. No. 278 at 12–13 ("The Asserted Claims cover the relevant subsystems and unique combination of components and operations that work together to capture and maintain application and state classification."), 24–25.)

**[CL65]** Plaintiff also argues that the "something more" offered by the Asserted Claims is evident from the numerous benefits, discussed by several witnesses at trial, which can be traced to the inventions recited by the Asserted Claims. (Dkt. No. 278 at 20–21; *see also* Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 119:25–120:16 (discussing benefits attributable to the Asserted Claims).)

**[CL66]** With respect to the purported benefits identified by Plaintiff, Defendants reply that these benefits are too generic and too difficult to trace to the Asserted Claims. (Dkt. No. 282 at 5–6 ("PI, however, identifies nothing in the asserted claims that provides a concrete solution to obtain any of these alleged benefits.").)

**[CL67]** At the outset, the Court has already found that Defendants have failed to show that the combination of elements recited in the Asserted Claims would have been regarded as conventional, routine, or well-known by a skilled artisan in the relevant field as compared to the then existing state of the prior art and the limitations of those prior art references, even including the additional references cited by Defendants in the instant Motion. [FF17–FF35]; *Berkheimer*, No. 2017-1437, 2018 WL 774096, at *5 ("The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional.").[10] Defendants have fundamentally failed to establish that the Asserted Claims lack an inventive concept. *Berkheimer*, No. 2017-1437, 2018 WL 774096, at *5.

**[CL68]** However, Plaintiff has also provided significant evidence of benefits achieved by the Asserted Claims as compared to the prior art. [FF28–35]. These benefits are not merely the sort of gains to efficiency or speed that necessarily result in using a computer to carry out any number of routine practices. *Id.* Rather, the Asserted Claims recite ways for network monitors to more precisely monitor network traffic, congestion, and malicious attacks. [FF21–FF35]; (Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 119:4–121:15 ("The idea then of being able to use the patented technology and looking at packets, at flows, and at conversations . . . facilitates the increase in classification that gets you up to that higher tier, that 90 to 95 percent classification capability."));

[10] This conclusion is further bolstered by the jury's verdict in this case, which rejected Defendants' arguments that the conversational flow limitation existed in the prior art or was invented by someone other than the named inventors. *See Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1347 (Fed. Cir. 2015) (A "pragmatic analysis of § 101 is facilitated by considerations analogous to those of §§ 102 and 103 as applied to the particular case."); *Symantec*, 838 F.3d at 1330 (Stoll, J., dissenting) ("While I recognize that validity under §§ 102 and 103 is a distinct inquiry from eligibility under § 101, and may not be dispositive of § 101, the jury verdict nonetheless supports the notion that this particular ordering of the components in claim 7 was not conventional at the time."). This conclusion is also bolstered by the fact that the Asserted Patents have withstood challenges at the PTAB on anticipation and obviousness grounds. (Dkt. No. 278 at 21); *Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*, No. 2:15-CV-00011, 2017 WL 5137401, at *8 (E.D. Tex. Nov. 4, 2017) ("The fact that the PTAB concluded that TCL failed to establish that a person of ordinary skill in the art would be motivated to combine computer-based security software with the relevant mobile platform technology . . . suggests that the systems claimed by the '510 patent are not merely conventional applications of computer technology.").

*see also Finjan*, 879 F.3d at 1304–1305 (distinguishing benefits such as "greater speed and efficiency" from other benefits such as "more flexible and nuanced virus filtering"); *Amdocs*, 841 F.3d at 1300–1301 (recognizing the ability to address network congestion as a benefit).

**[CL69]** Accordingly, Defendants have failed to establish that the Asserted Claims lack an inventive concept.[11]

## III. CONCLUSION

For the reasons set forth above, the Court concludes that Defendants have failed to show that the Asserted Claims are ineligible under § 101. Accordingly, Defendants' Motion (Dkt. No. 265) is **DENIED**.

**So ORDERED and SIGNED this 14th day of February, 2018.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

[11] Plaintiff also argues, albeit in a single sentence, that even if Defendants prevail under *Mayo/Alice*, the instant Motion is still procedurally deficient because § 282 does not provide for a defense challenging subject-matter eligibility. (Dkt. No. 278 at 9–10 (citing a then pending, now denied petition for certiorari)). The Federal Circuit has essentially rejected this argument. *See Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1330 (Fed. Cir. 2015) ("Section 101 *validity* challenges today are a major industry, and they appear in case after case in our court and in Supreme Court cases . . . ." (emphasis added)); *see also GoDaddy.com LLC v. RPost Commc'ns Ltd.*, No. CV-14-00126-PHX-JAT, 2016 WL 3165536, at *5 (D. Ariz. June 7, 2016) ("Similar to the Federal Circuit in *Versata*, the Court finds that a 'hyper-technical adherence' to the section heading of § 101 is not enough to overcome decades of interpreting § 101 as a valid defense in patent infringement litigation."), *aff'd*, 685 F. App'x 992 (Fed. Cir. 2017) (unpublished), *cert. denied*, No. 17-695, 2017 WL 5237829 (U.S. Dec. 11, 2017). Accordingly, the Court also rejects this argument.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| PACKET INTELLIGENCE LLC,<br><br>Plaintiff,<br>v.<br><br>NETSCOUT SYSTEMS, INC., TEKTRONIX COMMUNICATIONS, and TEKTRONIX TEXAS, LLC<br><br>Defendants. | Civil Action No. 2:16-CV-00230<br>(Lead Case) |

**PACKET INTELLIGENCE'S PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This is a case for patent infringement brought by Plaintiff Packet Intelligence LLC ("Packet Intelligence" or "PI") against Defendants NetScout Systems, Inc., Tektronix Communications, and Tektronix Texas, LLC (collectively, "NetScout"). On October 10, 2017, a jury trial commenced, and the jury returned a unanimous verdict that found willful infringement of at least one of Claims 10 and 17 of U.S. Patent No. 6,665,725; Claims 1 and 5 of U.S. Patent No. 6,839,751; and Claims 19 and 20 of U.S. Patent No. 6,954,789 (the "Asserted Claims"). (Dkt. 237 "Jury Verdict"). The jury also unanimously found that none of the Asserted Claims are invalid. *Id.*

After the close of evidence, and while the jury was deliberating, the Court provided the parties an opportunity to present evidence and argument in support of and in opposition to, as appropriate, any equitable defenses urged by NetScout. At said bench trial, NetScout presented

evidence in support of its inequitable conduct and unclean hands defenses, which the Court then took under advisement.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, and this Court's Oral Order at the January 17, 2018 Hearing, Packet Intelligence respectfully submits the following Proposed Findings of Fact and Conclusions of Law for the Court's consideration.

## I. FINDINGS OF FACT[1]

### A. THE PARTIES

**[FF 1.]** Plaintiff Packet Intelligence is a limited liability company existing under the laws of Texas with its principal place of business at 505 East Travis Street, Suite 209, Marshall, TX 75670. (Dkt. 205 at p. 16).

**[FF 2.]** Defendant NetScout Systems, Inc. ("NetScout") is a corporation existing under the laws of Delaware, with its principal place of business at 310 Littleton Road, Westford, MA 01886-4105, and it is a publicly traded company. (Dkt. 205 at p. 17).

**[FF 3.]** Defendant NetScout Systems Texas, LLC (formerly known as Tektronix Texas, LLC d/b/a Tektronix Communications) is a limited liability company existing under the laws of Delaware, with a principal place of business at 3033 W. President George Bush Highway, Plano Texas 75075. (Dkt. 205 at p. 17).

### B. THE LAWSUIT

**[FF 4.]** On March 15, 2016, Packet Intelligence filed its original complaint in this case. (Dkt. 1). In the complaint, Packet Intelligence alleged that certain NetScout products infringed U.S. Patent Nos. 6,665,725; 6,839,751; 6,954,789; 6,651,099; and 6,771,646. *Id.* The '646 and '099 patents were dropped before trial. (Dkt. 232).

[1] Any finding of fact that the Court concludes should be construed as a conclusion of law should be adopted as such.

### C. THE ASSERTED PATENTS

**[FF 5.]** On December 16, 2003, the USPTO issued U.S. Patent No. 6,665,725 ("the '725 patent") titled, "Processing Protocol Specific Information In Packets Specified By A Protocol Description Language." The named inventors are Russell S. Dietz, Andrew A. Koppenhaver, and James F. Torgerson. (Dkt. 205 at p. 16).

**[FF 6.]** On January 4, 2005, the USPTO issued U.S. Patent No. 6,839,751 ("the '751 patent"), titled, "Re-Using Information From Data Transactions For Maintaining Statistics In Network Monitoring." The named inventors are Russell S. Dietz, Joseph R. Maixner, and Andrew A. Koppenhaver. (Dkt. 205 at p. 16).

**[FF 7.]** On October 11, 2005, the USPTO issued U.S. Patent No. 6,954,789 ("the '789 patent"), titled, "Method And Apparatus For Monitoring Traffic In A Network." The named inventors are Russell S. Dietz, Joseph R. Maixner, Andrew A. Koppenhaver, William H. Bares, Haig A. Sarkissian, and James F. Torgerson. (Dkt. 205 at pp. 16-17).

**[FF 8.]** The '725, '751, and '789 patents are collectively referred to as the "Asserted Patents."

**[FF 9.]** Each of the Asserted Patents claims priority to U.S. Provisional Application No. 60/141,903, filed on June 30, 1999. (Dkt. 205 at p. 17).

**[FF 10.]** Plaintiff Packet Intelligence is the owner of the Asserted Patents. (Dkt. 205 at p. 16).

### D. PRETRIAL RULINGS

**[FF 11.]** At the September 19, 2017 final pretrial conference hearing, this Court granted the portion of Plaintiff's motion (Dkt. 132) striking NetScout's expert opinions regarding a combination of a NetScout RMON Probe and an Internet Engineering Task Force ("IETF")

RMON2 document designated draft-ietf-rmonmib-rmonprot-v2-00.txt. (See Pretrial Conference Minutes, Dkt. 219 at 1).

**[FF 12.]** The portion of the proposed order submitted with Plaintiff's granted motion stated, in relevant part:

> Before the Court is Packet Intelligence's Motion to Strike Certain Opinions of Steve Waldbusser. The Court, having considered the Motion, finds good cause such that the Motion should be GRANTED. It is ORDERED that the following opinions of Mr. Waldbusser are stricken and Mr. Waldbusser is precluded from offering testimony at trial on the following:
>
> 1) The TracksSessions Combination, specifically the combination of NetScout 6010 ver. 4.0.0 RMON Probe and RMON2 tracksSessions from the dtaft-ieft-rmonmib-rmonprot-v2-00.txt contained in Mr. Waldbusser's Opening Report and accompanying Appendices B-01 to B-03;

(Dkt. 132-41).

**[FF 13.]** Any opinion by Mr. Waldbusser on the materiality of the TracksSessions Combination for inequitable conduct purposes depends on and flows from his stricken opinion on the same combination for obviousness purposes.

### E. THE JURY TRIAL

**[FF 14.]** From October 10-13, 2017, the Court held a jury trial on Packet Intelligence's infringement claims. The jury also heard NetScout's patent defenses, which included non-infringement and invalidity. The patent claims at issue at the jury trial were:

- '725 Patent: Claims 10 and 17
- '751 Patent: Claims 1 and 5
- '789 Patent: Claims 19 and 20

(Dkt. 237).

**[FF 15.]** On October 13, 2017, the jury found that NetScout willfully infringed all of the asserted claims and that the claims are valid. (Dkt. 237). The jury awarded $5,750,000 in damages (*Id.* at 5).

### F. THE BENCH TRIAL

**[FF 16.]** After the close of evidence, and while the jury was deliberating, the Court provided the parties an opportunity to present evidence and argument in support of and in opposition to, as appropriate, any equitable defenses urged by NetScout. At said bench trial, NetScout presented evidence in support of its inequitable conduct and unclean hands defenses and Packet Intelligence presented evidence in rebuttal, which the Court then took under advisement. (10/13/2017 Trial Tr. at 93:9-192:19).

**[FF 17.]** Specifically, NetScout argued that the Asserted Patents are unenforceable for inequitable conducts based on (1) inventor Mr. Dietz's participation in the RMON2 Working Group and (2) inventor Mr. Koppenhaver's alleged involvement in the RMON2 Working Group. NetScout contends that Mr. Dietz, Mr. Koppenhaver, and their patent agent Dr. Dov Rosenfeld intentionally failed to disclose an RFC relating to "TracksSessions" prepared by the RMON2 Working Group (DX-58) to the Patent and Trademark Office, and that they made misleading statements to the Examiner in their patent applications in relation to the capabilities of RMON2. (*See*, *e.g.* PTX-9 at 2:33-37.) However, NetScout did not offer any evidence on an intent to deceive or mislead the Patent and Trademark Office. Also, NetScout did not offer at trial any anticipation or obviousness defense based on DX-58, and the jury rejected NetScout's inventorship defense based on DX-58. Further, NetScout argued the Asserted Patents are unenforceable based on unclean hands based on alleged contributor and participant duties purportedly owed by Mr. Dietz (and to a lesser extent, Mr. Koppenhaver) to the IETF under the organizations' intellectual property disclosure policies as set forth in RFC 2026 and RFC 2028. However, NetScout failed to make any closing arguments with respect to its unclean hand hands defense at the conclusion of the bench trial. (10/13/17 Trial Tr. at 185:23-188:14).

## G. INVENTOR RUSSELL DIETZ (GENERALLY)

**[FF 18.]** Mr. Dietz is a named inventor on the Asserted Patents. (PTX Nos. 3, 7 and 9).

**[FF 19.]** Mr. Dietz is currently chief security officer and the general manager of Industrial Internet Cyber-security for General Electric and is responsible for the product security and for the cyber-security for General Electric's industrial Internet of things and their overall industrial products, which includes global cyber warfare protection of power plants, water processing facilities, and gas and oil manufacturing and extraction systems. (10/10/17 AM Trial Tr. at 48:18-49:9 (Dietz Dir.)).

**[FF 20.]** Mr. Dietz has received several security clearances from the United States Government including Top Secret Clearance, which requires background checks, including polygraphs. (10/10/17 AM Trial Tr. at 49:10-20 (Dietz Dir.)).

**[FF 21.]** Mr. Dietz does not have any ownership interest in Packet Intelligence or the outcome of the litigation. (10/10/17 AM Trial Tr. at 50:22-51:1 (Dietz Dir.)). Mr. Dietz testified that the reason he appeared live at trial was to "set the record straight" regarding NetScout's allegations that he and his co-inventors claimed the work of the RMON Working Group. (10/10/17 AM Trial Tr. at 50:13-21 (Dietz Dir.)).

**[FF 22.]** At a high level, Mr. Dietz testified that the claimed invention is about "being able to provide an easier way to show how traffic in a network is -- is really related to the apps or the -- the pages that we browse when we're looking at things across a network." (10/10/17 AM Trial Tr. at 51:11-17 (Dietz Dir.)).

**[FF 23.]** According to Mr. Dietz, the claimed invention was spurred by the increasing complexity and sophistication of the Internet starting in the late 1990s. (10/10/17 AM

Trial Tr. at 52:14-53:4, 53:19-55:10 (Dietz Dir.)). As traffic complexity increased, a single application could generate multiple connections. For example, launching the ESPN app could generate multiple connections to get information like (1) highlights from the ESPN server, (2) advertisements from another server, and (3) news content from another source. *Id.* It is desirable to associate individual connections to an application providing better insight into network resource utilization. (10/10/17 AM Trial Tr. at 54:21-56:16 (Dietz Dir.)).

**[FF 24.]** Part of the inventors' solution was to associate individual connections into a "conversational flow" that contained information about related connection flows. (10/10/17 AM Trial Tr. at 56:17-57:15 (Dietz Dir.)).

### H. PATENT AGENT DOV ROSENFELD (GENERALLY)

**[FF 25.]** Dr. Rosenfeld earned a Bachelor of Science in physics and mathematics. He earned a Bachelor of Engineering with first class honors in electrical engineering, a Master of Science in electrical engineering and a Ph.D. in electrical engineering. The last two from Stanford. The first two from Sydney University. (10/13/17 Trial Tr. at 137:19-138:1 (Rosenfeld Dep.)).

**[FF 26.]** Dr. Rosenfeld served as the patent agent for the Asserted Patents. (10/13/17 Trial Tr. at 138:2-15 (Rosenfeld Dep.)).

**[FF 27.]** Dr. Rosenfeld confirmed that the truthfulness of his testimony is not influenced by any financial interest he has in the Asserted Patents or the litigation. (10/12/17 Trial Tr. at 128:21-129:2 (Rosenfeld Dep.)).

### I. NETSCOUT'S EXPERT STEVE WALDBUSSER (GENERALLY)

**[FF 28.]** Mr. Waldbusser testified as NetScout's technical expert. (10/11/17 PM Trial Tr. at 86:8-11 (Singhal Cross)).

**[FF 29.]** Mr. Waldbusser has never attended law school, taken a bar exam, is not a patent agent, is not routinely asked in his professional life to read, interpret and apply statutes, and has never worked for the Patent Office or been a patent examiner. (10/12/17 AM Trial Tr. at 58:6-21 (Waldbusser Cross)).

**[FF 30.]** Mr. Waldbusser had never conducted an inventorship analysis for any United States patent before this case. (10/12/17 AM Trial Tr. at 57:21-58:5 (Waldbusser Cross)). Mr. Waldbusser could not explain how one would figure out who an alleged inventor is or explain the conception of an invention under applicable the United States patent laws. (10/12/17 AM Trial Tr. 59:10-20) (Waldbusser Cross)).

**[FF 31.]** Mr. Waldbusser previously worked on a prior case involving the Asserted Patents on behalf of Cisco. (10/11/17 PM Trial Tr. at 120:3-13; 10/12/17 AM Trial Tr. at 38:11-16 (Waldbusser Cross)). Mr. Waldbusser approached Cisco via a cold call about serving as their expert (10/12/17 AM Trial Tr. at 47:18-48:20 (Waldbusser Cross)), and also cold-called NetScout after this case was filed (10/12/17 AM Trial Tr. at 50:17-51:4 (Waldbusser Cross)). Mr. Waldbusser stated that from the outset of the Cisco matter he was more interested in working on the defense side of a patent infringement case involving the Asserted Patents before seeing any evidence. (10/12/17 AM Trial Tr. at 91:1-92:16 (Waldbusser Cross)).

**[FF 32.]** Mr. Waldbusser testified that when he initially read the Asserted Patents, he did not believe that the patents covered ideas from the RMON Working Group; that opinion developed as he worked on this case. (10/12/17 AM Trial Tr. at 39:22-40:18 (Waldbusser Cross)).

**[FF 33.]** Mr. Waldbusser testified that when he first heard of the present lawsuit, he knew it had to do with RMON because the front page of the patents disclosed they concerned packet monitoring. (10/12/17 AM Trial Tr. at 51:16-25 (Waldbusser Cross)).

**[FF 34.]** Mr. Waldbusser acknowledged that patent examiners are presumed to be skilled in the art of the technology area they are examining. (10/12/17 AM Trial Tr. at 78:15-19 (Waldbusser Cross)).

**J. PACKET INTELLIGENCE'S EXPERT DR. ALMEROTH (GENERALLY)**

**[FF 35.]** Dr. Kevin Almeroth testified on behalf of Packet Intelligence on technical issues. (See, for example, 10/10/17 PM Trial Tr. at 90:24-179:12; 10/12/17 PM Trial Tr. at 15:10-54:16, 75:9-78:8; 10/13/17 Trial Tr. at 180:22-182:25).

**[FF 36.]** Dr. Almeroth is a tenured professor in the Department of Computer Science at the University of California, Santa Barbara since 1997 (10/1017 PM Trial Tr. at 90:19-21, 94:7-12) (Almeroth Dir.)). He holds a Bachelor's, a Master's, and a Ph.D., all in computer science from the Georgia Institute of Technology. (10/10/17 PM Trial Tr. at 93:13-19 (Almeroth Dir.)).

**[FF 37.]** Dr. Almeroth teaches undergraduate and graduate courses, including about how the Internet works and the protocols that work in the Internet. (10/10/17 PM Trial Tr. at 94:19-95:8 (Almeroth Dir.)).

**[FF 38.]** Dr. Almeroth has collaborated with many companies, as well as the U.S Air Force and Lockheed Martin to help develop the "Next-Generation Internet for the military." (10/10/17 PM Trial Tr. at 97:3-98:15 (Almeroth Dir.)).

**[FF 39.]** Dr. Almeroth is a member of the Association of Computing Machinery ("ACM") and the Institute of Electrical and Electronics Engineers ("IEEE"). (10/10/17 PM Trial

Tr. at 98:15-20 (Almeroth Dir.)). Dr. Almeroth has been recognized a Fellow within the IEEE, a distinction reserved for "for one-tenth of 1 percent of the membership who have been recognized for significant contributions to the field." (10/10/17 PM Trial Tr. at 99:13-24 (Almeroth Dir.)).

**[FF 40.]** Dr. Almeroth does not have any pre-existing relationship with the inventors, Packet Intelligence or its counsel. (10/10/17 PM Trial Tr. at 92:14-93:5 (Almeroth Dir.)).

### K. INEQUITABLE CONDUCT

#### i. The RMON2 TracksSessions feature described in DX-0058 does not describe the patented invention, has limited relevance to the invention, and is not material to patentability of the Asserted Patents

##### a. The RMON2 Working Group standards and the patented invention are distinct

**[FF 41.]** The problems and solutions in the Asserted Patents differ from the work of the RMON Working Group and the disclosures of the RMON2 standards.

**[FF 42.]** The RMON Working Group worked on issues relating to "presenting information or interacting with managing networks. The RMON Working Group was building data structures…ways to present information. It wasn't building anything related to how information [relating to network traffic] was acquired or found or discovered or measured." (10/10/17 AM Trial Tr. at 69:18-70:10 (Dietz Dir.)).

**[FF 43.]** The RMON Working Group was focused on how "to standardize how [the industry] presented information about network systems…[I]nformation was presented in what [the industry] call[s] a MIB, a management information base. And in order to make sure that [network monitors] were able to send information from these remote monitors to a central place, [the Working Group] had to come up with a common way to describe it so that [the industry]

knew how to read it." In essence, the Working Group came "up with a common way to describe information." (10/10/17 AM Trial Tr. at 70:11-25 (Dietz Dir.)).

**[FF 44.]** Unlike the RMON standards, the patented invention allows network traffic passing through a network to be tied to specific applications, which gave rise to a number of advantages for network monitors. The RMON standards did not teach how to tie that traffic to specific applications and did not give rise to the same advantages. (10/10/17 AM Trial Tr. at 72:9-73:4 (Dietz Dir.)).

**[FF 45.]** The patented invention does not require the use of RMON tables; nor does the use of RMON tables require practicing the invention. (10/10/17 AM Trial Tr. at 73:5-10 (Dietz Dir.)).

**[FF 46.]** The RMON Working Group discussions specifically avoided limiting techniques of how to tie network traffic to application activity because the standards had to be designed to outlast any particular technological trend and because the various participants of the RMON Working Group worked with network monitors placed at different points in the network where data would have to be acquired in different ways. (10/10/17 AM Trial Tr. at 73:11-74:17 (Dietz Dir.)).

**[FF 47.]** Mr. Anil Singhal, NetScout's CEO, was a member of the IETF RMON Working Group with Mr. Dietz. (10/11/17 PM Trial Tr. at 42:17-22, 45:16-20, 48:5-8, 56:12-18 (Singhal Dir.)).

**[FF 48.]** Mr. Singhal admitted that during IETF RMON Working Group meetings, members of the group would not exchange information about implementing the standard. (10/11/17 PM Trial Tr. at 81:21-25 (Singhal Cross)).

**[FF 49.]** Mr. Singhal admitted that different companies implemented the RMON standards in their own way. (10/11/17 PM Trial Tr. at 82:1-4 (Singhal Cross)).

**[FF 50.]** No one from the RMON Working Group ever mentioned to Mr. Dietz that they thought the Asserted Patents were the same as the RMON standards of the Working Group, despite having access to the publicly available patents for many years. (10/10/17 AM Trial Tr. at 79:10-80:2 (Dietz Dir.)).

**[FF 51.]** The evidence established that Cisco paid a significant sum to license the Asserted Patents. (10/10/17 PM Sealed Trial Tr. at 3:8-19 (Brunell Dir.); PTX-320). During the trial there was testimony that two of the three main contributors to the RMON2 standard containing TracksSessions were Mr. Bierman of Cisco, and Mr. Bucci, who joined Cisco shortly after the RMON2 standard issued. (10/11/17 PM Trial Tr. at 178:22-180:1 (Waldbusser Dir.), 10/12/17 AM Trial Tr. at 102:3-103:5 (Waldbusser Re-Cross); DX-0058 at NETSCOUT_015144). Such evidence supports the factual inference that it was unlikely that Cisco would have paid a significant sum of money for a license to the Asserted Patents, if, as NetScout alleges, the Asserted Patents claim the invention of Cisco employees. Furthermore, Mr. Dietz testified that the reception to the invention in the industry has been positive. (10/10/17 AM Trial Tr. at 80:3-81:4 (Dietz Dir.).

**[FF 52.]** NetScout admits that the initial IETF RMON Standard, RMON1, covered "organization of packet information after that information is collected," and that the "RMON standard itself did not specify the technique for collecting the data information." (10/11/17 PM Trial Tr. at 78:14-21 (Singhal Cross)). RMON2 and RMON1 are similar in that both tell you how to present statistics after you collect information. (10/11/17 PM Trial Tr. at 81:16-20 (Singhal Cross)).

**[FF 53.]** Dr. Almeroth testified that the RMON2 Working Group's TrackSessions's feature was not the same thing and is not the same thing as conversational flows. They are very different. (10/12/17 PM Trial Tr. at 23:10-15) (Almeroth Dir.)).

**b. DX-0058 is not "but-for" material to the patented invention**

**[FF 54.]** The RMON2 standards reflected in DX-0058 are not material to the patentability of any claim in the Asserted Patents. NetScout presented no evidence—and certainly not clear and convincing evidence—that the Asserted Patents would not have issued had DX-0058 been submitted to the Examiner during prosecution.

**[FF 55.]** RMON2's TracksSessions feature is not the same as any of the claimed inventions because the TracksSessions feature only indicates in a data structure that the represented protocol is being properly reported. (10/13/17 Trial Tr. at 114:10-18 (Dietz Cross)).

**[FF 56.]** The references in the Asserted Patents to "session tracking," do not correspond to TracksSessions as provided in the IETF standard. (10/13/17 Trial Tr. at 119:7-12 (Dietz Re-Dir.)).

**[FF 57.]** DX-0058 is an RMON Working Group protocol identifier document. It only shows "protocol identifiers that specify the implementer has implemented them properly and is reporting them properly. It doesn't say how." (10/10/17 AM Trial Tr. at 100:5-21 (Dietz Cross.); *see also* 109:11-25 (Dietz Re-Dir.)).

**[FF 58.]** The first time Mr. Waldbusser read the Asserted Patents, he did not have a distinct recollection that the technology described allegedly resembled the work of the RMON Working Group. (10/12/17 AM Trial Tr. at 39:22-40:12 (Waldbusser Cross).

**[FF 59.]** Mr. Waldbusser admitted that his invalidity opinions are based on his view that the claimed invention and the RMON TracksSessions technology are the same. (10/12/17 AM Trial Tr. at 59:21-60:13) (Waldbusser Cross)).

**[FF 60.]** Mr. Waldbusser admitted that he referred to the TracksSessions capability of RMON as session tracking during his direct testimony before the jury, essentially using the terms as synonyms for one another with the intent to communicate that TracksSessions and "session tracking" in the Asserted Patents was the same thing. (10/12/17 AM Trial Tr. at 66:22-67:14) (Waldbusser Cross)). Therefore, under Mr. Waldbusser's interpretation, the concept of TracksSessions was disclosed to the Examiner in the specification.

**[FF 61.]** However, notwithstanding Mr. Waldbusser's misinterpretation of "session tracking" as described in the Asserted Patents, as a factual matter the RMON2 TracksSessions functionality is very different from what is claimed in the Asserted Patents. (10/12/17 PM Trial Tr. at 31:13-15 (Almeroth Rebuttal)).

**[FF 62.]** Contrary to NetScout's assertions, Figure 2 of the '789 Patent (PTX-9), is not an embodiment of the invention. As explained within the patent specification at Column 7 lines 46-55, Figure 2, rather than discussing the construction of or representing a conversational flow, instead describes how to identify specific flows and generate flow signatures that are predicates to conversational flows. These are not conversational flows. (10/12/17 PM Trial Tr. at 34:4-35:16 (Almeroth Rebuttal)).

**[FF 63.]** The RMON2 TracksSessions Standard admits: "How an implementation detects this behavior and handles it is beyond the scope of this document." (DX-0058 at 37). This admission is significant as confirmed by Dr. Almeroth. (10/12/17 PM Trial Tr. at 23:10-15 (Almeroth Dir.)) 10/12/17 PM Trial Tr. at 76:5-77:21(Almeroth Rebuttal)).

**c. NetScout's failure of proof on the issue of materiality**

**[FF 64.]** Mr. Waldbusser admitted that he did not provide a claim-by-claim analysis of the RMON TracksSessions documents for every element of any claim from the Asserted Patents. (10/13/17 Trial Tr. at 175:15-21 (Waldbusser Cross)). Accordingly, NetScout provided no expert testimony that any RMON TracksSessions-related document can be material for inequitable conduct purposes on the grounds of anticipation or that the IETF invented the claimed inventions, under 35 U.S.C. §§ 102 and 102(f), respectively.

**[FF 65.]** Mr. Waldbusser admitted that in the section of his expert report addressing materiality, he only offered opinions that relied upon combining the RMON TracksSessions documents with other information, under 35 U.S.C. § 103. (10/13/17 Trial Tr. at 175:22-176:1 (Waldbusser Cross)).

**[FF 66.]** The jury rejected NetScout's invalidity defense that the Asserted Claims were anticipated by NetScout probes implementing the TracksSessions functionality. (10/11/17 PM Trial Tr. at 122:22-123:8, 161:5-162:22, 190:1-18 (Waldbusser Dir.); Dkt. 237). The jury also rejected NetScout's inventorship/derivation arguments under 35 U.S.C. 102(f) that members of the RMON Working Group should have been named inventors in light of the TracksSessions feature. (10/11/17 PM Trial Tr. at 122:22-123:8, 154:25-155:11, 162:24-163:10 (Waldbusser Dir.); Dkt. 237).

**ii. The inventors and their patent agent did not misrepresent capabilities of the RMON2 standard to the USPTO**

**[FF 67.]** NetScout has not shown that Mr. Dietz, Dr. Rosenfeld or the other inventors misrepresented the capabilities of RMON2 to the Patent Office at least because the statements made in the specification are accurate.

**[FF 68.]** The Asserted Patents include the following statement relating to RMON-2 in their specifications:

> Though Netflow® (Cisco Systems, Inc., San Jose, Calif.), RMON2, and other network monitors are available for the real-time monitoring of networks, they lack visibility into application content and are typically limited to providing network layer level information.

(PTX-9 at 2:33-37) (10/12/17 PM Trial Tr. at 31:16-32:15 (Almeroth Rebuttal)).

**[FF 69.]** The term "application," as used in the context of the patented invention is different from the usage of the term "application" by the RMON Working Group during the relevant time period. (10/10/17 AM Trial Tr. at 113:21 (Dietz Re-Dir.)).

**[FF 70.]** DX-89, one of the RMON-2 Working Group documents, describes "application" as "used to identify a class of protocols that is not limited to MAC-layer and network-layer protocols, but can also include transport, session, presentation, and application-layer protocols." This does not limit the term "application" to only the "application layer," which corresponds with the way the patents use the term. (DX-89 at NETSCOUT_253110; 10/10/17 AM Trial Tr. at 112:25-113:21 (Dietz Re-Dir.)).

**[FF 71.]** This definition of "application" in the RMON-2 document was written this way because the goal was to make the standard widely accessible. "[N]ot everybody that was implementing RMON had any capability of really getting to the app or the application. [The Working Group] didn't want to limit the information that [they] were going to put in the tables to only that application [layer]." (10/10/17 AM Trial Tr. at 114:10-115:7 (Dietz Re-Dir.)).

**[FF 72.]** During Working Group discussions in 1999, NetScout advocated a definition of "application" that was different from the one that Mr. Dietz advocated. Mr. Dietz thought that the NetScout definition, taken from a previous RMON-2 standards document, was

out-of-date and not technologically current because "calling an application just any layer in the network was not appropriate because it's really not the true application involved in a network." (10/10/17 AM Trial Tr. at 115:11-119:7 (Dietz Re-Dir.); PX-185).

**[FF 73.]** In view of this difference in the usage of the term "application," the patentee's statement in the specification of the patents relating to RMON is accurate.

**[FF 74.]** The Asserted Patents correctly stated that RMON2 lacked "visibility into application content and are typically limited to providing network layer information." (See, e.g., '789 Patent (PTX-9) at 2:33-37). As Dr. Almeroth testified, "application content" as used in the cited section of the Asserted Patents refers to the data of a message, the identity of the referrers for web pages, and what users are doing through their applications—while existing RMON2's typically were limited to providing network layer information such as well-known ports, IP addresses, and packet counts. (10/12/17 PM Trial Tr. at 31:16-32:16 (Almeroth Rebuttal)).

**[FF 75.]** As Dr. Almeroth further testified, the ability for RMON2's TracksSessions to look at dynamic port assignments and changing dynamic port assignments was not an attempt to look into the application data itself. (10/12/17 PM Trial Tr. at 33:14-16 (Almeroth Rebuttal)).

**[FF 76.]** Mr. Waldbusser admitted that the portion of the above statement relating to RMON2 lacking "visibility into application content," are words or phrases that do not appear in any of the patent claims. (10/13/17 Trial Tr. at 176:12-19 (Waldbusser Cross)).

**[FF 77.]** Mr. Waldbusser admitted that the provisional application that preceded all of the asserted claims, and which was in front of the U.S. Patent Office during the examination of the Asserted Patents, disclosed:

> The term RMON derives from a standard that was first developed in 1992 by the Internet Engineering Task Force (IETF) as an extension to the Simple Network

> Management Protocol (SNMP) Management Information Base (MIB). These MIB extensions are referred to as the Remote MONitoring MIB; which is commonly abbreviated to RMON. The IETF defines 10 RMON Groups for the gathering of information on Ethernet and Token Ring networks, and **in 1997 a second RFC was adopted that allowed the gathering of information at all 7 layers.**

(10/13/17 Trial Tr. at 176:20-177:24 (Waldbusser Cross); DX-253 at YURKERWICH_000630 lines 2-11) (emphasis added).

**[FF 78.]** Mr. Waldbusser agreed that the seven layers in the provisional application paragraph above refer to the seven OSI layers, one of which is the application layer. (10/13/17 Trial Tr. at 178:7-12 (Waldbusser Cross)).

**iii. RMON2 and TracksSessions technology were disclosed to the PTO during prosecution of the Asserted Patents**

**[FF 79.]** RMON2 and TracksSessions was disclosed to the Patent Office at least because it is described in the specification and the provisional application, which is part of the intrinsic record of all of the Asserted Patents.

**[FF 80.]** The patent specifications specifically reference RMON2. (See, for example, PTX-9 at 2:33-37.)

**[FF 81.]** The provisional application that preceded all of the asserted claims, and which was in front of the U.S. Patent Office during the examination of the Asserted Patents, disclosed:

> The term RMON derives from a standard that was first developed in 1992 by the Internet Engineering Task Force (IETF) as an extension to the Simple Network Management Protocol (SNMP) Management Information Base (MIB). These MIB extensions are referred to as the Remote MONitoring MIB; which is commonly abbreviated to RMON. The IETF defines 10 RMON Groups for the gathering of information on Ethernet and Token Ring networks, and **in 1997 a second RFC was adopted that allowed the gathering of information at all 7 layers.**

(DX-253 at YURKERWICH_000630 lines 2-11). The 1997 second RFC includes TracksSessions.

**[FF 82.]** Mr. Waldbusser admitted that RMON is referred to multiple times in the specifications of the Asserted Patents. (10/12/17 AM Trial Tr. at 73:8-10).

**[FF 83.]** Mr. Waldbusser admitted that the accusations that the inventors failed to disclose the RMON standard were made without first looking to see whether the prior art patents provided the examiner during prosecution discussed the RMON standard. (10/12/17 AM Trial Tr. at 75:4-22 (Waldbusser Cross)).

**[FF 84.]** Evidence was presented at trial that a series of patents were cited in connection with the prosecution of the Asserted Patents and appear as References Cited on the Asserted Patents, including, among others, U.S. Patent No. 5,634,000 to Mr. Robin Iddon—who Mr. Waldbusser admitted was a significant contributor to the RMON2 Working Group standards—showing that the RMON protocols were both known in the art of network monitoring and disclosed to the Patent Office. (10/12/17 AM Trial Tr. at 71:13-78:19) (Waldbusser Cross)).

**[FF 85.]** Mr. Waldbusser admitted that United States Patent Examiners are presumed to be skilled in the art of the technology that they are examining meaning they would have been aware of the RMON standard during prosecution of the Asserted Patents as part of their general knowledge of network monitoring. (10/12/17 AM Trial Tr. at 75:18-78:19) (Waldbusser Cross)).

**iv. NetScout's failure of proof on the issue of intent**

**a. There is no evidence that Mr. Dietz harbored an intent to deceive the PTO**

**[FF 86.]** NetScout offered no evidence the Mr. Dietz or the other inventors made a deliberate decision to deceive or mislead the Patent Office.

**[FF 87.]** Mr. Rosenfeld was a Patent Agent who interfaced between Mr. Dietz and the U.S. Patent Office regarding the prosecution of the applications that matured into the Asserted Patents. (10/10/17 AM Trial Tr. at 59:25-60:10 (Dietz Dir.)).

**[FF 88.]** Mr. Dietz provided Mr. Rosenfeld with access to all working papers that the entire development team had, regular updates were provided to Mr. Rosenfeld, and those updates included any IETF drafts and standards used for any of the protocol decoding that was tested and validated for the invention. (10/13/17 Trial Tr. at 103:12-25; 114:23-115:23 (Dietz Cross and Dietz Dir.)).

**[FF 89.]** Throughout the entire prosecution of the Asserted Patents, Mr. Dietz took seriously his duty to disclose material information to the U.S. Patent Office. (10/13/17 Trial Tr. at 113:23-114:5 (Diretz Dir.):

**[FF 90.]** At no time during the prosecution of the patents did Mr. Dietz ever intentionally mislead or attempt to deceive the Patent Office. (10/13/17 Trial Tr. at 115:24-116:2 (Dietz Dir.)).

**[FF 91.]** Mr. Dietz does not "consider RMON and RMON2 to be relevant to" his invention. (10/13/17 Trial Tr. at 119:4-6 (Dietz Cross).

**b. There is no evidence that Mr. Koppenhaver harbored an intent to deceive the PTO**

**[FF 92.]** NetScout offered no evidence the Mr. Koppenhaver made a deliberate decision to deceive or mislead the Patent Office.

**[FF 93.]** NetScout presented no evidence that Mr. Koppenhaver had any knowledge of information material to patentability that was not disclosed to the Patent Office, or any intent to deceive the Patent Office.

**[FF 94.]** Mr. Koppenhaver used RMON documents such as DTX-490 to develop a MIB compiler for a product called MeterWare while working at Hi/Fn. (10/13/17 Trial Tr. at 120:22-121:20; 123:12-22 (Koppenhaver Dep.)).

**[FF 95.]** DTX-490 is the "Internet standard for the RMON protocol identifier macros," and it "is basically just assigning numbers to well-known Internet protocols." (10/13/17 Trial Tr. at 122:17-123:2 (Koppenhaver Dep.)).

**[FF 96.]** DTX-490 describes the RMON MIB protocol identifier macros, but this document, "doesn't describe how to decode packets. It describes a list of identifiers identifying different protocols." (10/13/17 Trial Tr. at 124:17-23 (Koppenhaver Dep.)). It also does not describe "a protocol description language." (10/13/17 Trial Tr. at 124:24-125:1 (Koppenhaver Dep)).

**c. There is no evidence that Dr. Rosenfeld harbored an intent to deceive the PTO**

**[FF 97.]** NetScout offered no evidence the Dr. Rosenfeld made a deliberate decision to deceive or mislead the Patent Office.

**[FF 98.]** As part of his standard practice, Dr. Rosenfeld informed his clients, such as Mr. Dietz, about the requirements of patent law, including the duty to disclose prior art material to the invention. (10/13/17 Trial Tr. at 138:16-140:11 (Rosenfeld Dep.)).

**[FF 99.]** Dr. Rosenfeld used the standard outlined in Rule 1.56 to determine when to disclose material to the Patent Office during prosecution. (10/13/17 Trial Tr. at 140:1-23 (Rosenfeld Dep.)). Dr. Rosenfeld's standard practice was to err on the side of over-disclosing throughout prosecution. (10/13/17 Trial Tr. at 140:24-141:25 (Rosenfeld Dep.)).

**[FF 100.]** Dr. Rosenfeld testified that he explained to Mr. Dietz the key aspects of patentability. (10/12/17 AM Trial Tr. at 113:2-114:6 (Rosendfled Dep.)). These conversations

included, among other topics, inventorship. (10/12/17 AM Trial Tr. at 115:8-25 (Rosenfeld Dep.)). Some of these conversations occurred via a secured communication application called PGP, which was the "the flavor of the month in those days." (10/12/17 AM Trial Tr. at 114:7-14 (Rosenfeld Dep.)).

**[FF 101.]** Dr. Rosenfeld's practice is to conduct his own research and usually disclose much more than what inventors tell him. His standard practice is to over-disclose information to the U.S. Patent Office. (10/13/17 Trial Tr. at 140:16-141:1 (Rosenfeld Dep.)).

**[FF 102.]** Mr. Rosenfeld did disclose IETF standards to the U.S. Patent Office during prosecution of the Asserted Patents, such as the SUNRPC standard in the asserted patent specifications, as an example of something previously known. (10/13/17 Trial Tr. at 104:8--17 (Rosenfeld Dep.)).

**d. There is no evidence that Mr. Maixner harbored an intent to deceive the PTO**

**[FF 103.]** Mr. Maixner was never a member of the IETF RMON Working Group, and he was never a member or involved with any IETF group. (10/10/17 PM Trial Tr. at 19:4-9 (Maixner Dir.)).

**[FF 104.]** During the development efforts of the claimed invention, Mr. Dietz never communicated to Mr. Maixner that he learned of any particular technique from an RMON meeting that should be implemented in the development of the claimed invention. (10/10/17 PM Trial Tr. at 20:5-11 (Maixner Dir.)).

**[FF 105.]** Mr. Maixner views RMON as "a collection of tables…essentially a database….RMON itself is just a definition of how data can be stored. It doesn't specify or tell you anything about how data gets into it -- into it or out of it." (10/10/17 PM Trial Tr. at 20:24-21:23 (Maixner Dir.)).

**[FF 106.]** Mr. Maixner views the invention as "all about processing packets, right. I mean, processing packets in a real-time, as fast as you can, you're there to benefit, you know, network monitoring applications, firewalls, quality of service things, load balancers, I mean, there's a whole range of other networking-type things you can do." (10/10/17 PM Trial Tr. at 21:11-17 (Maixner Dir.)).

**[FF 107.]** Mr. Maixner testified that it was "ridiculous," and "just unbelievable," to "think that somebody could copy, you know, could [] establish a packet processing, high-speed real-time technology from [] something that's just so different, which is as a database…." (10/10/17 PM Trial Tr. at 21:18-23 (Maixner Dir.)).

**[FF 108.]** Mr. Maixner is not familiar with the TracksSessions segment of the RMON specification, though he remembers there was a section on it, approximately a page within the 100-200 pages of the RMON specification, which he thought was "basically a high-level wish list." (10/10/17 PM Trial Tr. at 32:3-11 (Maixner Dir.)).

**[FF 109.]** As a result, there is no evidence—much less clear and convincing evidence—that any individuals that should have been named as an inventor were not so named; and there is likewise no evidence that any individuals that were named as an inventor on the Asserted Patents were so named with an intent to deceive to the Patent Office with respect to the actual inventors of the claims in the Asserted Patents.

**L. UNCLEAN HANDS**

**[FF 110.]** The Assert Patents are not unenforceable because Inventor Dietz did not have a duty to disclose his patent applications to the IETF RMON working group.

**[FF 111.]** Mr. Waldbusser's testimony at trial (the only testimony offered in support of NetScout's alleged unclean hands defense) did not establish that the claimed invention is equivalent to the RMON2 TracksSessions technology from the RMON Working Group.

**[FF 112.]** NetScout unsuccessfully pursued an anticipation defense that the Asserted Claims were anticipated by NetScout probes implementing the TracksSessions functionality, which the jury rejected. (10/11/17 PM Trial Tr. at 122:22-123:8, 161:5-162:23, 190:1-18 (Waldbusser Dir.); Dkt. 237). Likewise, NetScout also unsuccessfully pursued an inventorship/derivation theory under 35 U.S.C. 102(f) that members of the RMON Working Group should have been named inventors in light of the TracksSessions feature, which the jury ultimately rejected. (10/11/17 PM Trial Tr. at 122:22-123:8, 154:25-155:11, 161:5-163:10 (Waldbusser Dir.); Dkt. 237).

**[FF 113.]** According to Mr. Waldbusser, only two documents are relevant to NetScout's unclean hands defense: RFC2026 and RFC2028. (10/13/17 Trial Tr. at 159:2-10 (Waldbusser Dir.)). Requests for Comments ("RFCs") are documents issued by the IETF.

**[FF 114.]** Mr. Waldbusser became a member of the IETF in 1987 and served as an editor for certain working groups during the relevant time. (10/13/17 Trial Tr. at 157:14-158:13 (Waldbusser Dir.)).

**[FF 115.]** Mr. Dietz was also a member of the IETF's RMON Working Group in the late 1990s and was the only inventor named in the Asserted Patents involved in the RMON Working Group. (10/10/17 AM Trial Tr. at 74:18-22 (Dietz Dir.)).

**[FF 116.]** Mr. Singhal, NetScout's CEO, was a member of the IETF RMON Working Group with Mr. Dietz. (10/11/17 AM Trial Tr. at 123:1-7 (Kenedi Cross); 10/11/17 PM Trial Tr. at 42:17-22, 44:18-45:7, 45:16-20, 48:5-8, 56:12-21 (Singhal Dir.)).

### i. Contributor Duties to Disclose

#### a. RFC2026 (DX-105)[2] does not establish any breached duty

**[FF 117.]** None of the inventors breached any contributor duties to the IETF.

**[FF 118.]** Section 10.1 states: "In all matters of intellectual property rights and procedures, the intention is to benefit the Internet community and the public at large, while respecting the legitimate rights of others." (DX-105 at WALDBUSSER_004523).

**[FF 119.]** RFC 2026 Section 10.3.1 ¶6 states: "The contributor represents that he has disclosed the existence of any proprietary or intellectual property rights in the contribution that are reasonably and personally known to the contributor. The contributor does not represent that he personally knows of all potentially pertinent proprietary and intellectual property rights owned or claimed by the organization he represents (if any) or third parties." (DX-105 at WALDBUSSER_004524; 10/13/17 Trial Tr. at 170:11-20 (Waldbusser Cross)).

#### b. NetScout's failure of proof on any duty to disclose as a contributor

**[FF 120.]** NetScout failed to prove that Mr. Dietz or any of the other inventors had a duty to disclose intellectual property to the IETF as contributors.

**[FF 121.]** Mr. Waldbusser testimony at trial failed to establish that Mr. Dietz (or any of the co-inventors) were obligated to disclose proprietary or intellectual property rights that they are aware of.

**[FF 122.]** Mr. Waldbusser's interprets RFC 2026 Section 10.3.1 ¶6 to require a contributor to disclose proprietary or intellectual property rights they know about. (10/13/17 Trial Tr. at 161:7-10). Mr. Waldbusser testified that he believed that "contributors" are

[2] According to NetScout's admitted exhibit list (Dkt. 255), DX-105 was not tendered for admission into evidence, and thus cannot form any basis of NetScout's unclean hands defense. In an abundance of caution, PI addresses this exhibit in the event the Court decides to consider it.

"members who have submitted draft standards or other -- other documents that we refer to as Internet drafts or as RFCs." (10/13/17 Trial Tr. at 161:11-162:3 (Waldbusser Dir.)).

**[FF 123.]** Mr. Waldbusser admitted under cross-examination that the disclosure referred to in RFC2026 Section 10.3.1 ¶6 is for any proprietary or intellectual property rights in the contribution that are reasonably and personally known. Mr. Waldbusser further admitted that "if the rights are not implicated in the particular contribution, they don't necessarily have to be disclosed" "via this policy." (10/13/17 Trial Tr. at 170:11-171:10 (Waldbusser Cross)).

**[FF 124.]** Mr. Waldbusser admitted on direct examination that the named inventors are not named in the RMON2 standard describing TracksSessions and that indicated to Mr. Waldbusser that none of the inventors "has a significant impact or a significant contribution to the development of TracksSessions":

> Q. I want to go back and take a look at the face of one of the patents that lists the names of the inventors on the patents. Were any of the gentlemen who are listed here, were they recognized in connection with the TrackSessions standards?
> A. No.
> Q. And what -- what is the significance of that, if any, in your opinion?
> A. None of them were -- had a significant impact or a significant contribution to the development of TrackSessions.

(10/11/17 PM Trial Tr. at 164:1-11 (Waldbusser Dir.)).

> Q. Is Mr. Dietz in the group of people that you acknowledged?
> A. No.
> Q. Does -- what, if any, significance does that have to you?
> A. Well, that he wasn't a -- an important contributor to RMON1.

(10/11/17 PM Trial Tr. at 175:11-17 (Waldbusser Dir.)).

**[FF 125.]** NetScout failed to show that Mr. Koppenhaver was required to disclose intellectual property to the IETF. Mr. Waldbusser assumed Inventor Koppenhaver was aware of the TracksSessions functionality based on DX-661, which is an email where Mr. Koppenhaver suggested formatting changes to make the document in question easier to read. (10/11/17 PM

Trial Tr. at 181:10-182:14 (Waldbusser Dir.)). There is no evidence in the record to suggest that Mr. Koppenhaver was an active member in the IETF. Further, there is no evidence in the record suggesting that Mr. Koppenhaver was familiar with the IETF's IPR policies, much less that he was obligated to make any disclosures under those policies during the relevant time

### ii. IETF IPR Disclosures

#### a. RFC2028 (DX-423)[3] does not establish any breached duty

**[FF 126.]** NetScout failed to show that Mr. Dietz or the other inventors breached any duty to disclose intellectual property as participants in the IETF.

**[FF 127.]** RFC2028 Section 3.2 ¶4 states: "To ensure a fair and open process, participants in the IETF and its Working Groups must be able to disclose, and must disclose to the Working Group chairs any relevant current or pending intellectual property rights that are reasonably and personally known to the participant if they participate in discussions about a specific technology." (DX-423 at NETSCOUT_014913; 10/13/17 Trial Tr. at 162:4-17 (Waldbusser Dir.)).

**[FF 128.]** Mr. Singhal admitted that if members of the RMON Working Group did not want their ideas to be part of the standard, then they were not required to disclose them. In other words, only ideas intended for inclusion of an IETF standard needed to be disclosed. (10/11/17 PM Trial Tr. at 82:5-24) (Singhal Cross)).

#### b. Mr. Waldbusser's flawed assumptions

**[FF 129.]** Mr. Waldbusser's testimony is based on unfounded assumptions about IETF IPR policies that are not endorsed by the IETF.

---

[3] According to NetScout's admitted exhibit list (Dkt. 255), DX-423 was not tendered for admission into evidence, and thus cannot form any basis of NetScout's unclean hands defense. In an abundance of caution, PI addresses this exhibit in the event the Court decides to consider it.

**[FF 130.]** According to Mr. Waldbusser, IPR disclosures are made via an electronic form. (10/13/17 Trial Tr. at 168:14-169:3 (Waldbusser Dir.)). Mr. Waldbusser speculates that the lack of any IPR form from Mr. Dietz regarding the Asserted Patents is relevant because the "the key inventive step of the -- that's disclosed in the patent is the same as the TracksSessions technique that's used in the -- in the RMON group." (10/13/17 Trial Tr. at 169:17-25 (Waldbusser Dir.)). In other words, Mr. Waldbusser incorrectly assumed that the claimed invention and the TracksSessions feature are one and the same, which permeated his various opinions: "TracksSessions is the same process using similar technology as the patents asserted in this case." (10/13/17 Trial Tr. at 173:13-19 (Waldbusser Dir.)). But Mr. Waldbusser did not present any claim by claim analysis of TrackSessions and the asserted claims. (10/13/17 Trial Tr. at 176:15-21 (Waldbusser Cross).) Nor did Mr. Waldbusser or NetScout proffered evidence regarding IETF retention policies for IPR disclosure forms, such as how long records are kept, which is a relevant consideration since the timeframe in question in nearly two decades ago.

**c. No Official Testimony from the IETF on its Policies**

**[FF 131.]** No one from the IETF, or authorized to speak on behalf of the IETF, presented any testimony during the jury or bench trials, much less on the interpretation and implementation of any historical intellectual property policies.

**[FF 132.]** Mr. Waldbusser opined in his expert report and testified at trial that IETF IPR disclosures are not reviewed by the IETF. (10/13/2017 Trial Tr. at 171:16-172:10). Mr. Waldbusser also testified that he was unaware of any penalties for failure to comply with the IETF disclosure policies. (10/13/2017 Trial Tr. at 172:11-14 (Waldbusser Cross)). These admissions are fatal to NetScout's unclean hand defense because if no one at the IETF reviewed the disclosure forms, it would not matter if Mr. Dietz filed a form or not.

**[FF 133.]** Mr. Waldbusser admitted that his testimony at trial concerning the interpretation of IETF policies were based on his personal views, that he had not discussed his opinions with the IETF or shared the opinions in his report with anyone at the IETF to see if the organization agreed with his opinions/interpretations, and that no one from the IETF endorsed his opinions. (10/13/2017 Trial Tr. at 172:15-173:12 (Waldbusser Cross)). Mr. Waldbusser further admitted that he did not inform the IETF of his conclusions that the RMON Working Group invented the claimed invention. (10/12/17 AM Trial Tr. at 46:19-47:2 (Waldbusser Cross)).

**d. Mr. Dietz's rights in the Asserted Patents were not relevant to the work of the RMON Working Group**

**[FF 134.]** The Asserted Patents were not relevant to the discussions about RMON2.

**[FF 135.]** Mr. Dietz and his co-inventors independently developed a solution to the growing problem of increased network traffic and traffic sophistication occurring in the late 1990s. (10/10/17 AM Trial Tr. at 55:11-62:5 (Dietz Dir.)).

**[FF 136.]** The claimed invention differed from the work of the RMON Working Group which was primarily concerned with presenting information and building appropriate data structures to standardize how information was presented (which was accomplished via a Management Information Base ("MIB")). The RMON Working Group was not "building anything related to how information was acquired or found or discovered or measured." The RMON MIB enabled information from monitors from various vendors to send information to a central location in a standardized format. (10/10/17 AM Trial Tr. at 69:18-70:25, 71:12-72:8, 78:10-79:9 (Dietz Dir.)).

**[FF 137.]** Significantly, the claimed invention differed from the RMON Working Group standards in that RMON presents data while the claimed invention is concerned with

acquiring information and ascertaining relationships among data flows. (10/10/17 AM Trial Tr. at 72:9-73:4 (Dietz Dir.)). In other words, the claimed invention differs from the RMON standards in that the claimed invention is concerned with how to acquire information about network traffic and associating related traffic (connection flows) to one another in a meaningful way. (10/10/17 AM Trial Tr. at 72:9-73:4 (Dietz Dir.)).

**[FF 138.]** The claimed invention does not require the use of any RMON tables, nor does using the RMON tables does not require practicing the claimed invention – they are independent of one another. (10/10/17 AM Trial Tr. at 73:5-10 (Dietz Dir.)). During the RMON Working Group meetings, the techniques of how to tie traffic to application activity were not discussed among participants (1) to ensure the standing remains useful for many years by not being tied to a particular implementation that might become obsolete and (2) because participants in the Working Group focused on different aspects of network monitoring, and the standards had to be robust to accommodate varied interests. (10/10/17 AM Trial Tr. at 73:11-74:17 (Dietz Dir.)).

**[FF 139.]** The observation that the RMON standard describing TracksSessions does not describe how to implement that functionality was corroborated by expert testimony. (10/13/17 Trial Tr. at 182:12-183:1 (Almeroth Dir.).

**[FF 140.]** RMON Working Group members specifically refrained from discussing how to tie network traffic to application activity because standards were meant to be effective for a long time and describing how information was acquired was not relevant to how information was presented. Further, the RMON members had probes that resided in different places in a network, meaning there would be different ways of acquiring information. (10/10/17 AM Trial Tr. at 73:11-74:17 (Dietz Dir.)).

**[FF 141.]** Mr. Dietz acknowledged a duty to disclose "relevant, current, or pending intellectual property rights that are reasonably and personally known to the participant if you participated in discussions about a specific technology." (10/13/17 Trial Tr. at 112:6-12 (Dietz Cross)).

**[FF 142.]** Mr. Dietz did not disclose the patent applications to the RMON Working Group because the claimed invention "is not related to or required to implement RMON or RMON2 or any of the capabilities in it." (10/13/17 Trial Tr. at 113:1-9 (Dietz Cross)). Mr. Dietz maintained that the TracksSessions feature in the RMON2 standard is not the same as the claimed invention because the TracksSessions feature is "a data structure" that indicates "that the protocol that is represented is being properly reported." (10/13/17 Trial Tr. at 114:10-18 (Dietz Dir.)).

**[FF 143.]** Mr. Dietz contends that the word "relevant" as used in connection with the 4th paragraph under Section 3.2 in RFC 2028 meant "the discussion I was going to have about any potential intellectual property would be required to meet the standard that was under discussion." Therefore, "if an implementation of the – the draft standard or standard was going to require a specific piece of intellectual property, then you were required to disclose it, even if that was under a discussion of -- of the draft standard." (10/13/17 Trial Tr. at 116:19-117:17 (Dietz Dir.)). Under that interpretation, the Asserted Patents are not relevant to the IETF Working Group because the claimed invention is not required to implement the RMON standard. (10/13/17 Trial Tr. at 117:18-23 (Dietz Dir.)).

**[FF 144.]** Mr. Dietz affirmatively disclosed information to the IETF when he believed he was under a duty to disclose. In other words, Mr. Dietz does not have a history of

universally not disclosing intellectual property to the IETF. (10/13/17 Trial Tr. at 117:24-118:13 (Dietz Dir.)).

**[FF 145.]** Mr. Dietz has never withheld or intended to withhold information from the IETF that he would have been required to disclose. (10/13/17 Trial Tr. at 118:18-21 (Dietz Dir.)).

**[FF 146.]** Prior to this litigation, no one from the IETF ever claimed that the Asserted Patents represented a violation of the IETF's IPR policies. (10/13/17 Trial Tr. at 118:14-17; 10/10/17 AM Trial Tr. at 79:10-80:2).

**[FF 147.]** Mr. Waldbusser identified Mr. Andy Bierman of Cisco, Mr. Chris Bucci, and Mr. Robin Iddon as the main contributors and authors of the RMON2 standard that describes the TracksSessions function. (10/11/17 PM Trial Tr. at 163:6-10, 178:22-180:1; DX-58 at NETSCOUT_015144).

**[FF 148.]** The evidence established that Cisco paid a significant sum to license the Asserted Patents in another litigation. (10/10/17 PM Sealed Trial Tr. at 3:10-19 (Bergman Dir.); PTX320). During the trial there was testimony that two of the three main contributors to the RMON2 standard containing track sessions were Mr. Bierman of Cisco, and Mr. Bucci, who joined Cisco shortly after the RMON2 standard issued. (10/11/17 PM Trial Tr. at 178:22-180:1 (Waldbusser Dir.), 10/12/17 AM Trial Tr. at 102:3-103:3 (Re-Cross); DX-58 at NETSCOUT_015144). Such evidence supports the factual inference that it is unlikely that Cisco would have paid a significant sum of money for a license to the Asserted Patents, if, as NetScout alleges, the Asserted Patents claim the invention of Cisco employees. Furthermore, Mr. Dietz testified that the reception to the invention in the industry has been positive. (10/10/17 AM Trial Tr. at 80:3-81:4).

**[FF 149.]** The industry has reacted positively to the claimed invention over the years. (10/10/17 AM Trial Tr. at 80:3-81:4 (Dietz Dir.)).

**[FF 150.]** Mr. Maixner is a named inventor on the '751 and '789 patents. (PTX-7, PTX-9).

**[FF 151.]** Mr. Maixner has no ownership interest in Packet Intelligence and does not have a financial interest in the outcome of this litigation. (10/10/17 PM Trial. Tr. at 6:15-21 (Maixner Dir.)).

**[FF 152.]** Mr. Maixner, like Mr. Dietz, independently confirmed that in the late 1990s Internet traffic was increasing in complexity as seen through the proliferation of new protocols and applications. (10/10/17 PM Trial Tr. at 12:4-19 (Maixner Dir.)). Protocols are standardized formats used by computers to transmit data and communicate with one another. (10/10/17 PM Trial Tr. at 13:21-14:14 (Maixner Dir.)). Applications are computer programs, such as web browsers, email, voice chat, and video conferencing. (10/10/17 PM Trial Tr. at 13:7-20 (Maixner Dir.)).

**[FF 153.]** Mr. Maixner explained to the jury that network probes in the 1997/1998 time frame were not able to accurately classify traffic originating from the new emerging protocols and applications. (10/10/17 PM Trial Tr. at 15:14-17 (Maixner Dir.)). Mr. Maixner and his co-inventors devised a way of handling the new protocols and applications through the use of conversational flows enabling increased and accurate traffic classification, which provides better and more accurate visibility into the data network traffic flow. (10/10/17 PM Trial Tr. at 15:18-17:25 (Maixner Dir.)). Improved network traffic visibility and classification enable improvements to network quality of service and security. (10/10/17 PM Trial Tr. at 18:1-19:3 (Maixner Dir.)).

**[FF 154.]** Mr. Maixner was never a member of the IETF. (10/10/17 PM Trial Tr. at 19:4-9 (Maixner Dir.)).

**[FF 155.]** It took the inventors roughly a year to a year and a half to come up with and develop the claimed invention, which was done "from scratch." (10/10/17 PM Trial Tr. at 19:10-20:4 (Maixner Dir.)).

**[FF 156.]** The claimed invention was not influenced by the work of the RMON Working Group. (10/10/17 PM Trial Tr. at 20:5-11 (Maixner Dir.)). Nor is the claimed invention part of the same efforts of the RMON Working Group because:

> As I see RMON, RMON is a collection of tables. It's essentially a database. It's meant to store information, retain it, you know, for anywhere from -- you know, for days, weeks, months, years. It's not really -- RMON itself is just a definition of how data can be stored. It doesn't specify or tell you anything about how data gets into it -- into it or out of it.
>
> *****
>
> The technology involved with the invention is all about processing packets, right. I mean, processing packets in a real-time, as fast as you can, you're there to benefit, you know, network monitoring applications, firewalls, quality of service things, load balancers, I mean, there's a whole range of other networking-type things you can do.
>
> Frankly, to think that somebody could copy, you know, could -- could establish a packet processing, high-speed real-time technology from a -- from a – from something that's just so different, which is as a database, is to me just really, frankly, ridiculous and, you know, it's just unbelievable.

(10/10/17 PM Trial Tr. at 20:24-21:23 (Maixner Dir.)).

**iii. There is no evidence that Mr. Dietz or Mr. Koppenhaver intended to breach any purported duties to the IETF.**

**[FF 157.]** Mr. Dietz did not intend to breach any IPR disclosure duties to the IETF. (10/13/17 Trial Tr. at 118:18-21). NetScout offered no evidence of intent as to either Mr. Dietz or Mr. Koppenhaver.

## II. CONCLUSIONS OF LAW[4]

### A. PATENT EXAMINERS GENERALLY

**[CL 1.]** "[A]n Examiner is presumed to be skilled in the art relevant to the patent application he reviews." *Server Tech., Inc. v. Am. Power Conversion Corp.*, No. 3:06-CV-00698-LRH-VPC, 2010 U.S. Dist. LEXIS 49101, at *61 (D. Nev. Apr. 16, 2010); see also *In re Beasley*, 117 F. App'x 739, 745 (Fed. Cir. 2004) (Dyk, dissenting) ("both the examiner and the Board are presumed to be skilled in the art") (*citing In re Lee*, 277 F.3d 1338, 1345 (Fed. Cir. 2002) ("The patent examiner and the Board are deemed to have experience in the field of the invention…")); *Duhn Oil Tool, Inc. v. Cooper Cameron Corp.*, 474 F. Supp. 2d 1148, 1167 (E.D. Cal. 2007) ("the Examiner, who is of ordinary skill in the art…").

**[CL 2.]** "[P]rior art described in the specification [ ] is expected to be considered by the Examiner." *Polaroid Corp. v. Eastman Kodak Co.*, 641 F. Supp. 828, 833 (D. Mass. 1986) (citations omitted).

**[CL 3.]** "[A] patent specification need not disclose or teach what is known in the art." *Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367, 1373 (Fed. Cir. 2014) (*citing Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1288 (Fed. Cir. 2012) ("It is well-established . . . that a specification need not disclose what is well-known in the art.")).

### B. INEQUITABLE CONDUCT

#### i. Applicable Law

**[CL 4.]** "Because inequitable conduct renders an entire patent . . . unenforceable, as a general rule, the doctrine should only be applied in instances where the patentee's

---

[4] Any conclusion of law that the Court concludes should be construed as a finding of fact should be adopted as such.

misconduct resulted in the unfair benefit of receiving an unwarranted claim." *Therasense, Inc. v. Beckton Dickinson & Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011).

**[CL 5.]** "To prove inequitable conduct, the challenger must show by clear and convincing evidence that the patent applicant (1) misrepresented or omitted information material to patentability, and (2) did so with specific intent to mislead or deceive the PTO." *In re Rosuvastatin Calcium Patent Litig.*, 703 F.3d 511, 519 (Fed. Cir. 2012) (emphasis added). *See also Price v. Symsek*, 988 F.2d 1187, 1191 (Fed. Cir. 1993) (clear and convincing evidence "produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is highly probable" (internal quotation marks omitted)).

**[CL 6.]** "[T]he materiality required to establish inequitable conduct is but-for materiality." *Therasense*, 649 F.3d at 1291. A prior art reference "is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Id.* In making the decision of whether the PTO would have allowed the claim, courts use the preponderance of the evidence standard used by that agency in prosecuting the application. *Id.* at 1291-92.

**[CL 7.]** "Because neither mere nondisclosure of prior art references to the PTO nor failure to mention prior art references in an affidavit constitutes affirmative egregious misconduct, claims of inequitable conduct that are based on such omissions require proof of but-for materiality." *Therasense*, 649 F.3d at 1292-93. Although but-for materiality generally must be proved to satisfy the materiality prong of inequitable conduct, this court recognizes an exception in cases of affirmative egregious misconduct. This exception to the general rule requiring but-for proof incorporates elements of the early unclean hands cases before the Supreme Court, which deals with "deliberately planned and carefully executed scheme[s]" to defraud the PTO and the courts. *Hazel-Atlas*, 322 U.S. at 245.

**[CL 8.]** "Intent to deceive may be found only if specific intent to deceive is 'the single most reasonable inference able to be drawn from the evidence.'" *Transweb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1304 (Fed. Cir. 2016) (quoting *Therasense*, 649 F.3d at 1290). In this case, NetScout must show by clear and convincing evidence that the patentees "knew of the reference, knew that it was material, ***and made a deliberate decision to withhold it***." *Therasense*, 649 F.3d at 1290 (emphasis added).

**[CL 9.]** "Because the party alleging inequitable conduct bears the burden of proof, the 'patentee need not offer any good faith explanation unless the accused infringer first ... prove[s] a threshold level of intent to deceive by clear and convincing evidence.'" *Therasense*, 649 F.3d at 1291 (quoting *Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1368 (Fed. Cir. 2008)). "Only when the accused infringer has met this burden is it incumbent upon the patentee to rebut the evidence of deceptive intent with a good faith explanation for the alleged misconduct." *Star Scientific*, 537 F.3d at 1368.

**[CL 10.]** Intent and materiality are separate requirements. *Hoffmann-La Roche, Inc. v. Promega Corp.*, 323 F.3d 1354, 1359 (Fed. Cir. 2003). A district court should not use a "sliding scale," where a weak showing of intent may be found sufficient based on a strong showing of materiality, and vice versa. Moreover, a district court may not infer intent solely from materiality. Instead, a court must weigh the evidence of intent to deceive independent of its analysis of materiality. Proving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive. See Star, 537 F.3d at 1366 ("the fact that information later found material was not disclosed cannot, by itself, satisfy the deceptive intent element of inequitable conduct"). *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011).

#### ii. NetScout's Failure of Proof

**[CL 11.]** Based on the findings of fact and applicable legal standards discussed above, the Court finds that the NetScout has not carried its burden of establishing the defense of inequitable conduct by clear and convincing evidence—both because the references NetScout alleges should have been disclosed to the PTO were not but-for material to the patentability of any claim in the Asserted Patents, and because even they were the evidence does not establish that the single most reasonable inference to draw from the failure to disclose such references was an intent to deceive the PTO.

#### iii. Materiality

##### a. The RMON2 TracksSessions feature in DX-0058 fails the "But-for" standard for materiality

**[CL 12.]** NetScout has not proven that DX-0058 satisfies the "but-for" test for materiality as required under Federal Circuit precedent.

**[CL 13.]** As an initial matter, based on the Court's pretrial rulings, Mr. Waldbusser is not permitted to use his opinions on obviousness to support any materiality argument concerning DX-0058.

**[CL 14.]** Mr. Dietz, as well as Mr. Maixner and Dr. Almeroth, testified that the claimed invention differs significantly from the TracksSessions feature in that TracksSessions was concerned with the standardized presentation of data via a data structure, whereas the claimed invention is directed to collecting packet information and deriving relationships among data flows.

**[CL 15.]** Also, Mr. Waldbusser's testimony was premised on the notion that the claimed invention and TracksSessions were "the same process using similar technology." (10/13/17 Trial Tr. at 173:13-19 (Waldbusser Cross)). However, NetScout argued to the jury that

a NetScout probe with the TracksSessions functionality anticipated the claimed invention. The jury rejected NetScout's arguments (Dkt. 237), which supports and is consistent with Packet Intelligence's argument and the testimony of the inventors of the Asserted Patents that TracksSessions and the claimed invention are different and not material. Mr. Waldbusser and NetScout provided no evidence or argument as to why a Patent Examiner at the U.S. Patent Office would reach a different result than the one found by the jury on whether the claimed subject-matter of the Asserted Patents is rendered invalid in view of the RMON2 TracksSessions document from the IETF (DX-0058).

**[CL 16.]** Given the testimony of Mr. Dietz, Mr. Maixner, and Dr. Almeroth on the significant differences between the Asserted Patents, and the TracksSessions feature of the RMON2 standard (DX-0058), as well as NetScout's admitted failure to compare the TracksSessions feature to the actual claim language of the Asserted Patents, NetScout has failed to show that the RMON2 TracksSessions feature meets the "but-for" standard for materiality.

**[CL 17.]** NetScout has failed to prove "but-for" materiality, which is fatal to NetScout's inequitable conduct defense, regardless of whether the materiality arguments are based on TracksSessions purportedly rendering the Asserted Patents unpatentable based on anticipation under 35 U.S.C. 102(a) or (b), obviousness under 35 U.S.C. 103, or inventorship under 35 U.S.C. 102(f).

**[CL 18.]** NetScout has failed to show any affirmative egregious misconduct by the Inventors to the Asserted Patents or their Patent Agent during the prosecution of the Asserted Patents.

**[CL 19.]** NetScout improperly characterizes as misleading a reference in the Asserted Patents that RMON2 network monitors "lack visibility into application content." (See,

e.g., PTX-9 at 2:33-37). This characterization of RMON2 monitors in the patent is accurate given the testimony presented at trial. (See, e.g., 10/10/17 AM Trial Tr. at 114:10-119:7) (Dietz Dir.)). But, even if it were incorrect, it does not rise to the level of clear and convincing evidence of "affirmative egregious misconduct."

**[CL 20.]** NetScout failed to show by clear and convincing evidence that the statement in the Asserted Patents regarding RMON2 network monitors lacking application content visibility is misleading or "but-for" material to patentability. Mr. Dietz's and Dr. Almeroth's testimony at trial established that this statement in the Asserted Patents is reasonable and accurate, even if it utilizes a definition of "application" that differs from how the IETF defined and used the term in its RMON2 specification documents. (10/10/17 AM Trial Tr. at 115:11-119:7 (Dietz Dir.); 10/12/17 PM Trial Tr. at 31:16-32:15 (Almeroth Rebuttal); PX-185.)

**b. The RMON2 standard was disclosed to the PTO during prosecution and would have been widely known throughout the network monitoring industry**

**[CL 21.]** The evidence at trial showed that the RMON2 standard was widely known in industry and would have been known to a patent examiner familiar with the art.

**[CL 22.]** Specifically, because RMON2 was specifically referenced within the specifications of the Asserted Patents, and within the provisional application incorporated by reference into the Asserted Patents, the Examiners would have been aware of RMON2. (PTX-9 at 2:33-37; DX-253 at YURKERWICH_000630 lines 2-11).

**[CL 23.]** Further, the patent examiners would also have been aware of RMON2 because during the prosecution of the Asserted Patents, a series of patents (including, among others, U.S. Patent No. 5,634,009 to Mr. Iddon) were cited in connection with the prosecution of the Asserted Patents, from individuals such as Mr. Robin Iddon who Mr. Waldbusser admitted

was a significant contributor to the RMON standards, and these cited patents acknowledged that the RMON protocol is known in the art of network monitoring. (10/12/17 AM Trial Tr. at 75:18-22, 76:15-78:19) (Waldbusser Cross)).

**[CL 24.]** United States Patent Examiners are presumed to be skilled in the art of the technology that they are examining meaning they would have been aware of the RMON standard during prosecution of the Asserted Patents as part of their general knowledge of network monitoring. (10/12/17 AM Trial Tr. at 78:15-78:19) (Waldbusser Cross)).

**[CL 25.]** In view of the above, the RMON1 and RMON2 Standards were disclosed, both directly in the patent documents themselves and in documents disclosed to the PTO in the "References Cited" portion of the Asserted Patents during prosecution of the Asserted Patents, such that the Patent Examiner in charge of examining the Accused Patents would have been aware of both RMON1 and RMON2 standards. The PTO's awareness of these standards, together with the PTO's decision to issue the Asserted Patents in the face of such awareness, is further evidence that the RMON standards were not but-for material to the patentability of the claims in the Asserted Patents.

**iv. Intent to Deceive**

**[CL 26.]** NetScout failed to show that the inventors or Dr. Rosenfeld "knew of the reference, knew that it was material, and made a deliberate decision to withhold it." *Therasense*, 649 F.3d at 1290.

**[CL 27.]** Even if NetScout proved by clear and convincing evidence that the inventors and/or their patent agent knew of the RMON2 TracksSessions document (DX-0058), NetScout's inequitable conduct defense fails because they did not prove by clear and convincing evidence that the inventors and/or their patent agent "knew that the RMON2 TracksSessions

document was material, and made a deliberate decision to withhold it," from the U.S. Patent Office. *See Therasense*, 649 F.3d at 1290 ("A finding that **the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement**.").

**[CL 28.]** "[T]o meet the clear and convincing evidence standard, the specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence." *Id.*

**[CL 29.]** NetScout has not proven that "the single most reasonable inference" to be drawn from the evidence is that one or more of the inventors or their patent agent deliberately withheld the RMON2 TracksSessions document (DX-0058) from the U.S. Patent Office, knowing that the this documentation was material prior art and that withholding it was done to induce the Examiner to issue the Asserted Patents. Nor is the evidence "sufficient to *require* a finding of deceitful intent in light of all the circumstances." *Therasense*, 649 F.3d at 1290.

**[CL 30.]** It is a more reasonable inference—or at least an equally reasonable inference—that the inventors and Dr. Rosenfeld believed that the TracksSessions document (DX-0058), based on their general understanding of TracksSessions, was materially different from the technology described in the Asserted Patents. As stated above, Mr. Dietz testified that the claimed invention differed from the RMON TracksSessions functionality in that TracksSessions was concerned with a standardized method of presenting information and the claimed invention was directed to the acquisition of packet data and deriving the relationship that exists between data flows. Mr. Dietz's testimony (which is bolstered by the testimony of Mr. Maixner and Dr. Almeroth) provides a reasonable explanation as to why Mr. Dietz believed he was not required to disclose his patent applications to the IETF, assuming he was obligated to make such a disclosure.

**[CL 31.]** It is also therefore reasonable to conclude that the TracksSessions document was excluded based on the above understanding of material difference, accurate or not, and not based on a "deliberate decision to withhold." For this reason alone, deceptive intent cannot be the "single most reasonable inference drawn from the evidence," and NetScout's inequitable conduct defense must fail. Nor is the evidence "sufficient to *require* a finding of deceitful intent in light of all the circumstances." *Therasense*, 649 F.3d at 1290.

**[CL 32.]** Mr. Dietz, in the only direct evidence of intent presented at trial, testified that he has never intended to deceive the Patent Office. (10/13/17 Trial Tr. at 115:24-116:2 (Dietz Dir.)). Furthermore, Mr. Maixner independently testified that the Work of the RMON Working Group did not influence the development of the claimed invention, which was developed "from scratch." (10/10/17 PM Trial Tr. at 19:24-20:11 (Maixner Dir.)). This is further evidence weighing against any intent to deceive.

**[CL 33.]** There was ample testimony during the trial that Cisco paid a substantial sum to license the Asserted Patents after litigation commenced. During the trial, there was testimony that two of the three main contributors to the RMON2 standard containing track sessions were Mr. Bierman of Cisco, and Mr. Bucci, who joined Cisco shortly after the RMON2 standard issued. It is unlikely that Cisco would have paid a significant sum of money for a license to the Asserted Patents, if, as NetScout alleges, the Asserted Patents claim the invention of Cisco employees. Furthermore, Mr. Dietz testified that in the many years since the patents issued, no one from the IETF has ever approached him and argued that the claimed invention was copied from the RMON Working Group. (10/13/17 Trial Tr. at 118:14-17; 10/10/17 AM Trial Tr. at 79:10-80:2 (Dietz Dir.)). To the contrary, Mr. Dietz testified that the reception to the

invention in the industry has been positive. (10/10/17 AM Trial Tr. at 80:3-81:4 (Dietz Dir.)). Such evidence does not comport with NetScout's arguments.

**[CL 34.]** Nor did NetScout adduce any evidence of intent to deceive on the part of Mr. Dietz or Dr. Rosenfeld. The Court had the opportunity to observe the witnesses throughout trial and finds no basis to doubt the veracity and sincerity of the testimony of Mr. Dietz, who has been trusted by the United States government with a top-secret clearance and has no financial stake in Packet Intelligence or the outcome of this litigation. Likewise, NetScout adduced no evidence of any intent to deceive by Dr. Rosenfeld, and such an inference is particularly lacking given the disclosures of RMON2 standards in the Asserted Patents, and the disclosure to the PTO of references that discuss RMON2 standards, including the '009 patent issued to Mr. Iddon that appears on the References Cited portion of the specifications. In short, if the prosecuting agent and/or the inventors were trying to hide RMON2 from the patent examiners—such that an intent to deceive is the single most reasonably inference—they would not have discussed such standards in the specification or disclosed prior art noting such standards during prosecution.

**[CL 35.]** On the other hand, there is evidence that Mr. Waldbusser came to this litigation with a bias. As noted above, Mr. Waldbusser approached both Cisco and NetScout about working on this case via cold calls. (10/11/17 PM Trial Tr. at 120:3-13 (Waldbusser Dir.); 10/12/17 AM Trial Tr. at 38:11-16, 47:18-48:20 (Waldbusser Cross)). From the outset of the Cisco matter Mr. Waldbusser stated that he was more interested in working on the defense side to invalidate the patents, which suggests he did not come to his assignment or perform it as a neutral expert witness. (10/12/17 AM Trial Tr. at 91:1-92:16 (Waldbusser Dir.)). Further, under cross-examination, Mr. Waldbusser admitted that when he initially read the Asserted Patents, he did not believe that the patents covered ideas from the RMON Working Group and that his

opinion developed as he worked on this case. (10/12/17 AM Trial Tr. at 39:22-40:18 (Waldbusser Cross)). That testimony is not consistent with Mr. Waldbusser's other testimony that he was intimately involved with the RMON Working Group in the late 1990s and the TracksSessions standard, and that it was undeniable (according to Mr. Waldbusser) that Mr. Dietz and his co-inventors stole the work of the RMON Working Group. The jury appears to have made a similar determination given that NetScout mounted an inventorship defense alleging that the inventors derived the claimed invention from the RMON Working Group, which the jury ultimately rejected. (Dkt. 237).

#### v. Conclusion

**[CL 36.]** For the reasons set forth above, the Court concludes that NetScout has not established that Dr. Rosenfeld, Mr. Dietz, or any other named inventors in the Asserted Patents committed inequitable conduct before the Patent Office. Accordingly, NetScout's defense of inequitable conduct is therefore **DENIED** and **DISMISSED**.

### C. UNCLEAN HANDS

#### i. Applicable Law

**[CL 37.]** The doctrine of unclean hands is based on "the equitable maxim that 'he who comes into equity must come with clean hands.'" *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). "This doctrine operates to prevent litigants who have themselves engaged in misconduct from prevailing on claims in equity." *In re Depomed Patent Litig.*, No. 13-4507 (CCC-MF), 2016 U.S. Dist. LEXIS 166077, at *85 (D.N.J. Sep. 30, 2016).

**[CL 38.]** "The defense of unclean hands is reserved for extreme circumstances." *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, No. 2:15-CV-1202-WCB, 2017 U.S. Dist.

LEXIS 7814, at *20 (E.D. Tex. Jan. 20, 2017). "[F]or a defendant in a patent case to establish the defense of unclean hands, the defendant 'must show that the patentee conducted itself as to shock the moral sensibilities of the judge, or stated otherwise, that the patentee's conduct was offensive to the dictates of natural justice.'" *Id.* (quoting *Ifly Holdings LLC v. Indoor Skydiving Germany GmbH*, No. 2:14-cv-1080, 2016 U.S. Dist. LEXIS 183922 (E.D. Tex. Mar. 25, 2016)).

**[CL 39.]** The party asserting unclean hands bears the burden of proving the defense by clear and convincing evidence. *Astra Aktiebolag v. Andrx Pharm., Inc.* (*In re Omeprazole Patent Litig.*), 483 F.3d 1364, 1374 (Fed. Cir. 2007).

**[CL 40.]** "Importantly, an unclean hands defense requires that there be a nexus between the improper conduct and the legal issues in the case. To successfully invoke the unclean hands doctrine, the defendant must point to an unconscionable act by the patentee that has an 'immediate and necessary relation to the equity' of the relief that the patentee seeks." *Erfindergemeinschaft,* 2017 U.S. Dist. Lexis 7814 at *21 (*quoting Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933).

**[CL 41.]** Judge Bryson explained the nexus requirement in *Erfindergemeinschaft:*

> That nexus requirement has been articulated in different ways. Several courts of appeals, including the Fifth Circuit, have held that proof of nexus requires a showing that the defendant was injured by the wrongful conduct. *See Bailey v. TitleMax of Ga., Inc.*, 776 F.3d 797, 801-802 (11th Cir. 2015) ("To assert an unclean hands defense, a defendant must show that (1) the plaintiff's wrongdoing is directly related to the claim, and (2) the defendant was personally injured by the wrongdoing."); *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 796 (5th Cir. 1999) ("To invoke the doctrine [of unclean hands] a defendant must show that he was injured by the plaintiff's acts."); *Mitchell Bros. Film Grp. v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979) ("The maxim of unclean hands is not applied where plaintiff's misconduct is not directly related to the merits of the controversy between the parties, but only where the wrongful acts 'in some measure affect the equitable relations between the parties in respect of something brought before the court [*22] for adjudication. . . . The alleged wrongdoing of the plaintiff does not bar relief unless the defendant can show that he has personally been injured by the plaintiff's conduct."); *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 451 (11th Cir. 1993) (same); *Lawler v. Gilliam*, 569 F.2d 1283, 1294 (4th Cir. 1978) (defense of unclean

> hands "requires the defendant to show that he himself has been injured by the plaintiff's conduct"); *Bambu Sales, Inc. v. Testini*, No. 87 CV 3190, 1988 U.S. Dist. LEXIS 14601, 1988 WL 138055, at *3 (E.D.N.Y. Dec. 21, 1988) (defendant must show "that he has been personally injured by the plaintiff's conduct."); *Castle v. Cohen*, 676 F. Supp. 620, 627 (E.D. Pa. 1987) (unclean hands doctrine requires that party seeking affirmative relief is guilty of unconscionable conduct that is "directly related to the matter in issue, . . . that injures the other party . . . and affects the balance of equities between the litigants"); *see also* John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 399, at 99 (5th ed. 1941) ("The party to a suit, complaining that his opponent is in court with 'unclean hands' because of the latter's conduct in the transaction out of which the litigation arose, or with which it is connected, must show that he himself has been injured by such conduct, to justify the application of the principle to the case. The wrong must have been done to the defendant himself and not some third party.").

*Erfindergemeinschaft*, 2017 U.S. Dist. LEXIS 7814 at *21-22.

**[CL 42.]** Furthermore, "[t]he Federal Circuit has required a showing of 'materiality' to establish the defense of unclean hands." *Erfindergemeinschaft,* 2017 U.S. Dist. Lexis 7814 at *21 (*citing Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1571 (Fed. Cir. 1997); *J.P. Stevens & Co. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1560 n.7 (Fed. Cir. 1984)).

**[CL 43.]** Finally, "the doctrine of unclean hands generally requires a showing of intent." *In re Depomed Patent Litig.*, No. 13-4507 (CCC-MF), 2016 U.S. Dist. LEXIS 166077, at *87 (D.N.J. Sep. 30, 2016) (*citing Therasense*, 649 F.3d at 1290). "Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence." *Therasense*, 649 F.3d at 1290. However, "deceptive intent must be 'the single most reasonable inference drawn from the evidence.'" *Ohio Willow Wood Co. v. Alps S., LLC*, 813 F.3d 1350, 1358 (Fed. Cir. 2016) (quoting *Therasense* 649 F.3d at 1290). "Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Therasense*, 649 F.3d at 1290-91.

**ii. NetScout has not proven unclean hands by clear and convincing evidence**

**[CL 44.]** Based on the findings of fact and applicable legal standards discussed above, the Court finds that the NetScout has not carried its burden of establishing the defense of unclean hands by clear and convincing evidence.

**[CL 45.]** The crux of NetScout's argument is Inventor Dietz (and to a lesser extent, Mr. Koppenhaver) should have disclosed the patent applications to the IETF per the IPR policies outlined in RFC 2026 and/or RFC 2028. NetScout's arguments fail for several reasons.

**[CL 46.]** First, NetScout failed to proffer any evidence at trial that its proposed interpretation of the IETF's policies reflects the official interpretation of the IETF. As outlined above, Mr. Waldbusser admitted that the interpretations he presented at trial were his own and that he was not authorized to speak on behalf of the IETF and had not shared his opinions/interpretations with the IETF. NetScout did not present any witnesses authorized to speak on behalf of the IETF.

**[CL 47.]** Second, Mr. Dietz, as well as Mr. Maixner, testified that the claimed invention differed from the TracksSessions feature in that TracksSessions was concerned with the standardized presentation of data via a data structure, whereas the claimed invention is directed to collecting packet information and deriving relationships among data flows. Thus, Mr. Dietz's testimony that the claimed invention was not "relevant" under the IETF policy because RMON standard could be implemented without using the claimed invention is reasonable. Therefore, the patent applications were neither relevant nor material to the work of the RMON Working Group at the relevant time.

**[CL 48.]** Also, NetScout presented no evidence that if a disclosure had been made, that it would have impacted the work of the RMON Working Group, which are additional reasons why any alleged failure to disclose is neither relevant or material.

**[CL 49.]** Further, Mr. Waldbusser's testimony was premised on the notion that the claimed invention and TracksSessions were one and the same. (10/13/17 Trial Tr. at 173:13-19). However, NetScout argued to the jury that a NetScout probe with the TracksSessions functionality anticipated the claimed invention. The jury rejected that NetScout's arguments (Dkt. 237), which supports Packet Intelligence's argument and the testimony of the inventors that TracksSessions and the claimed invention are different and arguably did not need to be disclosed to the IETF.

**[CL 50.]** Third, Mr. Waldbusser acknowledged that he is not aware of any penalties for not complying with IETF IPR disclosure policies. (10/13/2017 Trial Tr. at 172:11-14). Mr. Waldbusser also stated in his expert report that "IPR disclosures are not reviewed by the IETF." (Dkt. 130, Ex. B at ¶42). If no one from the IETF reviews the IPR disclosures, no one from the IETF would ever have approached or confronted Mr. Dietz based on the content of any IPR disclosure. Thus, NetScout has failed to prove that any non-disclosure was material.

**[CL 51.]** Fourth, Mr. Dietz testified that he disclosed intellectual property to the IETF in other contexts. (10/13/17 Trial Tr. at 117:24-118:13 (Dietz Cross)). This weighs against NetScout's suggestion that Mr. Dietz purposefully refused to make IPR disclosures when required. In addition, Mr. Dietz, in the only direct evidence of intent presented at trial, testified that he has never intended to deceive the IETF. (10/13/17 Trial Tr. at 118:18-21). Furthermore, Mr. Maixner independently testified that the Work of the RMON Working Group did not influence the development of the claimed invention, which was developed "from scratch." (10/10/17 PM Trial Tr. at 19:24-20:11). Therefore, an intent to deceive is not "the single most reasonable interference" to be drawn from Mr. Dietz's alleged failure to disclose the patent

applications. Nor is the evidence "sufficient to *require* a finding of deceitful intent in light of all the circumstances." *Therasense*, 649 F.3d at 1290.

**[CL 52.]** Fifth, on one hand NetScout argues through Mr. Waldbusser that Mr. Dietz owed contributor duties to the IETF. But when Mr. Waldbusser testified before the jury, he stated that the evidence showed that Mr. Dietz and his co-inventors did not have a "significant impact or a significant contribution to the development of TracksSessions." (10/11/17 PM Trial Tr. at 164:1-11). This contrary testimony undercuts NetScout's present arguments before the Court. Either Mr. Dietz was a contributor or he was not. NetScout cannot change its position to suit the audience.

**[CL 53.]** Sixth, there was ample testimony during the trial that Cisco took a license to the Asserted Patents in another litigation. During the trial there was testimony that two of the three main contributors to the RMON2 standard containing track sessions were Mr. Bierman of Cisco, and Mr. Bucci, who joined Cisco shortly after the RMON2 standard issued. It is unlikely that Cisco would have paid a significant sum of money for a license to the Asserted Patents, if, as NetScout alleges, the patents claim the invention of Cisco employees. Furthermore, Mr. Dietz testified that in the many years since the patents issued, no one from the IETF has ever approached him and argued that the claimed invention was copied from the RMON Working Group. (10/13/17 Trial Tr. at 118:14-17; 10/10/17 AM Trial Tr. at 79:10-80:2). To the contrary, Mr. Dietz testified that the reception to the invention in the industry has been positive. (10/10/17 AM Trial Tr. at 80:3-81:4). Such evidence does not comport with NetScout's arguments.

**[CL 54.]** As stated above, Mr. Dietz testified that the claimed invention differed from the RMON TracksSessions functionality in that TracksSessions was concerned with a standardized method of presenting information and the claimed invention was directed to the

acquisition of packet data and deriving the relationship that exist between data flows. Mr. Dietz's testimony (which is bolstered by the testimony of Mr. Maixner and Dr. Almeroth) provide a reasonable explanation as to why Mr. Dietz believed he was not required to disclose his patent applications to the IETF, assuming he was obligated to make such a disclosure. For this reason alone, deceptive intent cannot be the "single most reasonable inference drawn from the evidence," which is required to establish unclean hands and NetScout's argument fails. Nor is the evidence "sufficient to *require* a finding of deceitful intent in light of all the circumstances." *Therasense*, 649 F.3d at 1290.

**[CL 55.]** Even if there was a technical violation of the IETF IPR disclosure policies, NetScout failed to show a nexus from the alleged non-disclosure to any harm suffered by NetScout, which as set forth above, is a requirement for proving unclean hands. This is especially true given Mr. Waldbusser's admission that no one from the IETF reviewed IPR disclosures. NetScout cannot credibly claim to have suffered any harm because Mr. Dietz did not file a disclosure form that no one reviewed.

**[CL 56.]** Nor did NetScout adduce any evidence of bad intent on the part of Mr. Dietz. The Court had the opportunity to observe the witnesses throughout trial and finds no basis to doubt the veracity and sincerity of the testimony of Mr. Dietz, who has been trusted by the United States government with a top-secret clearance and has no financial stake in Packet Intelligence or the outcome of this litigation.

**[CL 57.]** On the other hand, there is evidence that Mr. Waldbusser came to this litigation with a bias. As noted above, Mr. Waldbusser approached both Cisco and NetScout about working on this case via cold calls. (10/11/17 PM Trial Tr. at 120:3-13; 10/12/17 AM Trial Tr. at 38:11-16, 47:18-48:20). From the outset of the Cisco matter Mr. Waldbusser stated that he

was more interested in working on the defense side to invalidate the patents, which suggests he did not come to the table with a neutral mindset. (10/12/17 AM Trial Tr. at 91:1-92:16). Further, under cross-examination, Mr. Waldbusser admitted that when he initially read the Asserted Patents, he did not believe that the patents covered ideas from the RMON Working Group and that his opinion developed as he worked on this case. (10/12/17 AM Trial Tr. at 39:22-40:18). That testimony is not consistent with Mr. Waldbusser's other testimony that he was intimately involved with the RMON Working Group in the late 1990s and the TracksSessions standard, and that it was undeniable (according to Mr. Waldbusser) that Mr. Dietz and his co-inventors stole the work of the RMON Working Group. The jury appears to have made a similar determination given that NetScout mounted an inventorship defense alleging that the inventors derived the claimed invention from the RMON Working Group, which the jury ultimately rejected. (Dkt. 237).

**[CL 58.]** The facts and evidence presented during the jury and bench trials in this matter do not rise to the "extreme circumstances" required for an unclean hands defense. NetScout has failed to demonstrate any action on the part of Mr. Dietz or Mr. Koppenhaver (on whom NetScout did not focus much) that "shock[s] the moral sensibilities" of the Court or that "was offensive to the dictates of natural justice."

**iii. Conclusion**

**[CL 59.]** For the reasons set forth above, the Court concludes that NetScout has not established by clear and convincing evidence that Mr. Dietz, Mr. Koppenhaver or any of the other inventors engaged in any misconduct or material breach with respect to any IPR policies of the IETF. Accordingly, NetScout's defense of unclean hands is therefore **DENIED** and **DISMISSED**.

Dated: January 29, 2018

Respectfully submitted,

*/s/ Steven W. Hartsell*
Paul J. Skiermont (Bar No. 24033073)
Sarah E. Spires (Bar No. 24083860)
Sadaf R. Abdullah (Bar No. 24093500)
Alexander E. Gasser (Bar No. 1022659WI)
Steven W. Hartsell (Bar No. 24040199)
Steve J. Udick (Bar No. 24079884)
**SKIERMONT DERBY LLP**
1601 Elm Street, Suite 4400
Dallas, Texas 75201
Tel. (214) 978-6600
Fax (214) 978-6601
pskiermont@skiermontderby.com
sspires@skiermontderby.com
sabdullah@skiermontderby.com
agasser@skiermontderby.com
shartsell@skiermontderby.com
sudick@skiermontderby.com

William E. Davis, III
Texas State Bar No. 24047416
**THE DAVIS FIRM, PC**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Telephone: (903) 230-9090
Facsimile: (903) 230-9661
Email : bdavis@bdavisfirm.com

COUNSEL FOR PACKET INTELLIGENCE LLC

**CERTIFICATE OF SERVICE**

I hereby certify that counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3), on this the 29th day of January, 2018.

/s/ *Steven W. Hartsell*

## PROOF OF SERVICE

I hereby certify that on August 19, 2019, I electronically transmitted the Brief of Appellants to the Clerk of the Court using the Court's ECF system. I further certify that counsel of record for Appellant are being served with a copy of this Brief by electronic means via the Court's ECF system.

Dated: August 19, 2019 By: */s/ Eric Kraeutler*

Eric Kraeutler

***Counsel for Defendant-Appellants NetScout Systems, Inc., NetScout Systems Texas, LLC fka Tektronix Texas, LLC dba Tektronix Communications***

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Federal Circuit Rule 32(a). This brief contains 13,999 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman.

Dated: August 19, 2019

By: */s/ Eric Kraeutler*

Eric Kraeutler

***Counsel for Defendant-Appellants NetScout Systems, Inc., NetScout Systems Texas, LLC fka Tektronix Texas, LLC dba Tektronix Communications***