**2019-2041**

# United States Court of Appeals
# for the Federal Circuit

PACKET INTELLIGENCE LLC,

*Plaintiff-Appellee,*

– v. –

NETSCOUT SYSTEMS, INC., NETSCOUT SYSTEMS TEXAS, LLC,
fka Tektronix Texas, LLC dba Tektronix Communications,

*Defendants-Appellants.*

*On Appeal from the United States District Court for the
Eastern District of Texas in No. 2:16-cv-00230-JRG,
J. Rodney Gilstrap, Judge*

## BRIEF FOR PLAINTIFF-APPELLEE

PAUL J. SKIERMONT
SADAF R. ABDULLAH
STEVEN W. HARTSELL
STEVEN J. UDICK
SKIERMONT DERBY LLP
1601 Elm Street, Suite 4400
Dallas, Texas 75201
(214) 978-6600
pskiermont@skiermontderby.com
sabdullah@skiermontderby.com
shartsell@skiermontderby.com
sudick@skiermontderby.com

MIEKE K. MALMBERG
SKIERMONT DERBY LLP
800 Wilshire Boulevard, Suite 1450
Los Angeles, California 90017
(213) 788-4500
mmalmberg@skiermontderby.com

*Counsel for Plaintiff-Appellee*

OCTOBER 15, 2019



## CERTIFICATE OF INTEREST

Pursuant to Fed. Cir. R. 47.4, counsel for Appellee Packet Intelligence LLC,

certifies the following:

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10% or more of stock in that party |
|---|---|---|
| Packet Intelligence LLC | Packet Intelligence LLC | None. |

4.      The name of all law firms and the partners and associates that appeared for

the party or amicus now represented by us in the trial court or agency or are

expected to appear in this court (and who have not or will not enter an appearance

in this case) are:

| Law Firm | Counsel |
|---|---|
| Skiermont Derby LLP | Sarah E. Spires, Alexander E. Gasser, Elliot J. Walker (deceased), Shellie Stephens (no longer affiliated with Skiermont Derby LLP) |
| The Davis Firm, PC | William Ellsworth Davis, III |

5.      The title and number of any case known to me to be pending in this or any

other court or agency that will directly affect or be affected by this court's decision

in the pending appeal are:

Packet Intelligence LLC v. NetScout Systems, Inc., et al., C. A. No. 2:16-cv-

00230.

Dated: October 15, 2019                   Respectfully submitted,

*/s/ Paul J. Skiermont*
Paul J. Skiermont
Sadaf R. Abdullah
Steven W. Hartsell
Steven J. Udick
SKIERMONT DERBY LLP
1601 Elm Street, Suite 4400
Dallas, TX 75201
pskiermont@skiermontderby.com
sabdullah@skiermontderby.com
shartsell@skiermontderby.com
sudick@skiermontderby.com

Mieke K. Malmberg
SKIERMONT DERBY LLP
800 Wilshire Blvd., Suite 1450
Los Angeles, CA 90017
mmalmberg@skiermontderby.com

*Attorneys for Appellee*
*Packet Intelligence LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................v

STATEMENT OF RELATED CASES ..................................................1

TABLE OF ABBREVIATIONS/REFERENCES ...................................2

COUNTER-STATEMENT OF THE CASE ...........................................3

I.      The Parties .................................................................................4

II.     Technological Background ........................................................5

III.    The Dietz Patents ......................................................................6

IV.     The Infringing Products ............................................................9

SUMMARY OF THE ARGUMENT ..................................................11

LEGAL STANDARD...........................................................................16

ARGUMENT .......................................................................................18

I.      Substantial Evidence Supports the Jury's Verdict of Infringement. .............18

        A.     PI Presented Ample Evidence of Infringement at Trial..................21

II.     More than Substantial Evidence Supports the Jury's Finding of
        Validity. ...................................................................................29

        A.     NetScout's Anticipation Arguments Fail. .......................................30

               1.    Expert Testimony and Admissions Support the Jury's
                     Verdict. ..................................................................................31

               2.    Inventor Testimony Supports the Jury's Verdict. ..........................34

        B.     NetScout's Improper Inventorship Defense Fails...........................37

III.    The District Court Correctly Denied NetScout's Post-Trial
        Section 101 Motion..................................................................40

        A.     The Asserted Claims Are Directed to An Improvement in
               Computer Functionality, Not an Abstract Idea Under
               Step One. ......................................................................................40

B.   The District Court Correctly Found that NetScout Failed to Meet Its Burden to Establish by Clear and Convincing Evidence that the Asserted Claims Lack an Inventive Concept under Step Two. ..........................................................................................46

IV.   This Court Should Reject NetScout's Attempt to Vacate the Jury's Pre-suit Damages Award. ..............................................................................49

A.   NetScout Waived Any Challenges to the Marking Instruction. ......51

B.   NetScout Did Not Seek a New Trial Following *Arctic Cat*............54

C.   NetScout Failed to Carry its Burden Under the Agreed Marking Instruction...........................................................................................55

1.   NetScout Failed to Establish at Trial that MeterFlow Products Constitute "Patented Articles." .......................................................55

2.   Specific Cisco and Huawei Products Were Not Identified at Trial. ...............................................................................................58

D.   NetScout's Direct Infringement Independently Supports the Jury's Pre-suit Damages Verdict........................................................60

V.   The Jury's Willfulness Finding is Supported by Substantial Evidence. ........63

CONCLUSION & PRAYER FOR RELIEF ...........................................................68

# TABLE OF AUTHORITIES

## Cases

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
  841 F.3d 1288 (Fed. Cir. 2016) .................................................................. 45, 49

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
  876 F.3d 1350 (Fed. Cir. 2017) .................................................................. 14, 49

*Baisden v. I'm Ready Prods., Inc.*,
  693 F.3d 491 (5th Cir. 2012) .................................................................. 16

*Barrientes v. Johnson*,
  221 F.3d 741 (5th Cir. 2000) .................................................................. 51

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016) .................................................................. 48

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018) .................................................................. 17, 47

*Broussard v. State Farm Fire & Cas. Co.*,
  523 F.3d 618 (5th Cir. 2008) .................................................................. 16

*CEATS, Inc. v. Continental Airlines, Inc.*,
  526 Fed. Appx. 966 (Fed. Cir. 2013) .................................................................. 16

*DDR Holdings, LLC v. Hotels.com*,
  773 F.3d 1245 (Fed. Cir. 2014) .................................................................. 46

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016) .................................................................. 40, 42, 44, 45

*ePlus, Inc. v. Lawson Software, Inc.*,
  700 F.3d 509 (Fed. Cir. 2012) .................................................................. 21

*Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*,
  No. 2:15-CV-00011-RSP, 2018 WL 2149736 (E.D. Tex. May 10, 2018) ... 65, 66

*Exergen Corp. v. Kaz USA, Inc.*,
  725 F. App'x 959 (Fed. Cir. 2018) .................................................................. 17

*Farrar v. Cain,*
  756 F.2d 1148 (5th Cir. 1985) .............................................................51

*Finjan, Inc. v. Blue Coat Sys., Inc.,*
  879 F.3d 1299 (Fed. Cir. 2018) ............................................. 42, 46, 49

*Funai Elec. Co. v. Daewoo Elecs. Corp.,*
  616 F.3d 1357 (Fed. Cir. 2010) .............................................................51

*Halo Elecs., Inc. v. Pulse Elecs., Inc.,*
  136 S. Ct. 1923 (2016) .......................................................................64

*Hewlett-Packard Co. v. Mustek Sys., Inc.,*
  340 F.3d 1314 (Fed. Cir. 2003) ..........................................................36

*Hiltgen v. Sumrall,*
  47 F.3d 695 (5th Cir. 1995) ................................................................16

*In re VerHoef,*
  888 F.3d 1362 (Fed. Cir. 2018) ..................................................... 39, 40

*INO Therapeutics LLC v. Praxair Distribution Inc.,*
  No. 2018-1019, 2019 WL 4023576 (Fed. Cir. Aug. 27, 2019)...........16

*Int'l Ins. Co. v. RSR Corp.,*
  426 F.3d 281 (5th Cir. 2005) ..............................................................16

*Jimenez v. Wood Cty.,*
  660 F.3d 841 (5th Cir. 2011) ..............................................................53

*Johnson v. United States,*
  520 U.S. 461 (1997) ...........................................................................53

*MobileMedia Ideas LLC v. Apple Inc.,*
  780 F.3d 1159 (Fed. Cir. 2015) ..........................................................36

*Nalpropion Pharm., Inc. v. Actavis Labs. FL, Inc.,*
  934 F.3d 1344 (Fed. Cir. 2019) ..........................................................47

*Paez v. Gelboym,*
  578 Fed. Appx. 407 (5th Cir. 2014) ............................................. 56, 60

*Pfizer, Inc. v. Apotex, Inc.,*
  480 F.3d 1348 (Fed. Cir. 2007) ..........................................................30

*Pressure Prod. Med. Supplies, Inc. v. Greatbatch Ltd.*,
   599 F.3d 1308 (Fed. Cir. 2010) .................................................................. 30, 37

*Realtime Data, LLC v. Actian Corp.*,
   No. 6:15-CV-463 RWS-JDL, 2017 WL 3048886 (E.D. Tex. May 15, 2017) ..... 49

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
   653 F.3d 1296 (Fed. Cir. 2011) .................................................................. 29, 36

*SAP Am, Inc. v. IvestPic, LLC,*
   898 F.3d 1161 (Fed. Cir. 2018) ........................................................................17

*Semcon IP Inc. v. Huawei Device USA, Inc.,*
   2:16-cv-00437-JRG-RSP, 2017 WL 6343771 (E.D. Tex. Dec. 12, 2017) ..........58

*Serio-US Indus., Inc. v. Plastic Recovery Techs. Corp.*,
   459 F.3d 1311 (Fed. Cir. 2006) ........................................................................53

*Shell Offshore, Inc. v. Tesla Offshore*, L.L.C.,
   905 F.3d 915 (5th Cir. 2018) ............................................................................57

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
   918 F.3d 1368 (Fed. Cir.) ..................................................................................64

*Two-Way Media Ltd. v. Comcast Cable Commn'cs, LLC,*
   874 F.3d 1329 (Fed. Cir. 2017) ........................................................................42

*Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*,
   342 F.3d 1298 (Fed. Cir. 2003) ........................................................................37

*Versata Software, Inc. v. SAP Am., Inc.*,
   717 F.3d 1255 (Fed. Cir. 2013) ........................................................................21

*VirnetX, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014) ........................................................................30

*Weeks v. Angelone*,
   528 U.S. 225 (2000) ..........................................................................................63

**Rules**

Fed. R. Civ. P. 37(c)...................................................................59

Fed. R. Civ. P. 50.....................................................................16

Fed. R. Civ. P. 51.....................................................................53

## STATEMENT OF RELATED CASES

United States Patent Nos. 6,665,725 ("the '725 patent"), 6,839,751 ("the '751 patent"), and 6,954,789 ("the '789 patent"), the patents at issue in this appeal, until recently, were the subject of two cases in the United States District Court for the Eastern District of Texas: *Packet Intelligence LLC v. Nokia of Am. Corp.*, No. 2:18-cv-00382 (dismissal entered September 28, 2019) and *Packet Intelligence LLC v. Ericsson Inc.*, No. 2:18-cv-00381 (dismissal entered September 17, 2019). The same patents are also the subject of the following cases pending in the United States District Court for the Northern District of California: *Palo Alto Networks, Inc. v. Packet Intelligence LLC*, No. 3:19-cv-02471 and *Packet Intelligence LLC v. Juniper Networks, Inc.*, No. 3:19-cv-04741.

Each of the patents at issue in this appeal were, until recently, also the subject of petitions for *inter partes* review filed with the Patent Trial and Appeal Board: *Nokia of Am. Corp. v. Packet Intelligence*, Nos. IPR2019-01291 ('725 patent) (proceeding terminated September 26, 2019), IPR2019-01289 ('751 patent) (proceeding terminated September 26, 2019), and IPR2019-01293 ('789 patent) (proceeding terminated September 26, 2019).

## TABLE OF ABBREVIATIONS/REFERENCES

| Citation | Reference |
| --- | --- |
| '725 | U.S. Patent No. 6,665,725 |
| '751 | U.S. Patent No. 6,839,751 |
| '789 | U.S. Patent No. 6,954,789 |
| Dietz Patents | '725, '751, and '789 Patents |
| JMOL | Motion for Judgment as a Matter of Law |
| PI | Packet Intelligence |

## COUNTER-STATEMENT OF THE CASE

The inventions claimed in the Dietz Patents revolutionized the utility of packet monitoring and classification at a time when the proliferation of internet traffic posed significant challenges for the industry. Prior to 1999, companies routinely monitored single connections comprised of packets exchanged between devices and networks to gain insight into network speeds, congestion, and other network-related information. But what they could not see were which network connections were related because they were attributable to the same activity, such as the use of an application (e.g., Facebook) that spawned numerous separate connections. Russell Dietz and his co-inventors changed that when they invented apparatuses and methods to identify, classify, and store packet flows in a way that determined whether multiple connections were the result of the same user activity—i.e., whether the multiple connections were part of the same "conversational flow." The Dietz Patents "describe how disjointed connection flows can be associated with a single conversational flow to more precisely associate traffic with a particular application or protocol." (Appx47.)

At the time of trial, the Dietz Patents had been cited by more than 500 other U.S. patents and patent publications. (Appx1192(62:6-12).) Multiple leading data technology companies—particularly, Cisco and Huawei—licensed the Dietz Patents. (Appx1201(71:2-10); Appx1198-1199(68:18-69:19).) Lead inventor

Dietz, now Chief Security Officer and General Manager of Industrial Internet

Cyber Security at General Electric, continued to receive recognition from his peers

for the inventors' advancement of the field. (Appx1047(48:18-21); Appx1079-

1080(80:3-81:4).) On October 13, 2017, after PI presented overwhelming evidence

showing infringement and validity, a jury found NetScout liable for damages and

found willful infringement. In view of the evidence before it and the jury's

findings, the district court denied NetScout's JMOLs, denied NetScout's post-trial

motion under § 101, and awarded PI ongoing royalties and enhanced damages.

## I.    THE PARTIES

PI is a patent licensing business formed in 2012 by Brad Brunell and Phil

Vachon. (Appx1181(51:4-16); Appx1185(55:19-20).) Before forming PI, Brunell

worked for Microsoft Corporation as General Manager for Intellectual Property

Licensing (Appx1176(46:6-8); Appx1177-1178(47:15-48:22)) and Vachon

licensed intellectual property on behalf of Oracle Corporation. (Appx1186-

1187(56:12-57:5).) Based on their experience analyzing and valuing patents and

their examination of the Dietz Patents, Brunell and Vachon recognized a market

opportunity surrounding the pioneer Dietz Patents and sought to pursue that

opportunity through PI. (Appx1187(59:6-21); Appx1188-1190(58:14-60:18).)

NetScout is a company based in Massachusetts and Texas that manufactures

network probes to analyze networks. (Appx1540-1541(25:22-26:6;

4

Appx1544(29:11-24).) In 2015, it acquired Tektronix, which developed the

infringing GeoProbe and GeoBlade products. (Appx1477-1480(98:20-99:6).)

## II.    TECHNOLOGICAL BACKGROUND

The Dietz Patents relate to the field of network monitoring and classifying

network traffic by examining packets. (Appx1232(102:4-21).) As data flows back

and forth on network connections, network monitoring systems seek to identify

"the underlying protocols, the applications that are being used, and the user activity

that's caused those packets to flow through the network to try and achieve an

understanding about how the network is being used." (*Id.*)

A packet is a unit of network traffic that comprises a small portion of

transmitted data. (Appx1050-1051(51:25-52:13).) Wrapped around the data is a

header, which contains numerous layers that correspond with different protocols.

The header of a packet yields information about those protocols. A single stream of

packets between two computers using the same protocols and ports is a

"connection flow." (Appx174(2:43-45) ("The term 'connection flow' is commonly

used to describe all the packets involved with a single connection.").)

As network-delivered content became more complex, applications delivering

this content could spawn hundreds of connection flows. For example, an internet

user's connection to the ESPN website may require numerous different

connections to different servers, even though they all relate to one activity—that

user's accessing ESPN. (Appx1053(54:4-20).) This "richness" in content began to increase in network usage around the time of the invention. (Appx1052-1053(53:19-54:25).)

## III.    THE DIETZ PATENTS

PI's Dietz portfolio includes ten U.S. patents, six Chinese patents, seven Australian patents, two European patents, and three Japanese patents, all related to packet monitoring and classification technology. (Appx1190(60:11-18).) The asserted Dietz Patents vary in scope, but all include the key ability of classifying packets as belonging to activity-related "conversational flows." (Appx154-315.)

"Conversational flow" is a term coined by the inventors, and is specifically defined in the Dietz Patents' specifications as "the sequence of packets that are exchanged in any direction as a result of an activity—for instance, the running of an application on a server as requested by a client…[and where s]ome conversational flows involve more than one connection, and some even involve more than one exchange of packets between a client and server." (Appx174(2:45-53).) The parties agreed that this definition describes the claimed "conversational flow," and the district court adopted it in its Claim Construction Order. (Appx417.)

As Dietz described at trial, in 1998 the inventors "noticed … more and more connection flows were…related to what it is that you were doing in the application and how that was happening was missing…[I]n other words, you couldn't really

6

see it." (Appx1054(55:11-19).) He explained that network providers "were having a very difficult time being able to make sure that the services that were provided to present those apps or web pages to you were being delivered and that they could figure out that that app that you're running is actually related to all of those connection flows." (Appx1055(56:4-16).) As a result, Dietz and his team of co-inventors developed

> …a new way of associating all of those packets that I…described, pulling information out of all those packets that I described earlier, and…associating that information back with all of these different…connection flows. [W]hat we came up with was a way to take information from all of those different packets in each of those connection flows and create a conversational flow. And the conversational flow…can be 3 or 300 or 30 different connection flows, but they're all associated now to that one application, the app on your phone and that web page.

(Appx1055-1058(56:17-59:16).)

The specifications describe the state of the prior art, including discussing an RMON2 Working Group and state "Though … RMON2, and other network monitors are available for the real-time monitoring of networks, they lack visibility into application content and are typically limited to providing network layer level information." (Appx173(2:33-37).) Application layer visibility is the hallmark of the invention resulting in the ability to classify multiple, simultaneously active connection flows into one or more conversational flows. Claim 19 of the '789 Patent is exemplary of an apparatus claim embodying the Dietz inventions. (Appx191-192(36:30-37:2).) Significantly, parsed information stored in the flow

7

entry database is precisely what allows the identification of conversational flows. (Appx176(5:25-41).)

NetScout's defense that prior art NetScout probes implementing "TrackSessions" anticipate the Dietz Patents—which the jury and district court rejected—rests on a flawed characterization of the claimed inventions. NetScout asserts that the RMON-2 Working Group—a committee of engineers working under the standard-setting body the Internet Engineering Task Force ("IETF")— "invented" the subject matter of the Dietz Patents through a functionality called "TrackSessions" disclosed in one of the Working Group's papers. (NS.Br.43-45.) But Dietz, who was a part of the Working Group, testified that TrackSessions is markedly different from the Dietz Patents because a device implementing it **does not recognize disjointed flows as part of the same conversational flow or user activity.** (Appx1108-1111(109:7-112:4).) Under NetScout's flawed view of the claims and the district court's constructions, switching packets in one connection flow from one device port to another port for the same connection flow, and recording the new port number, anticipates the invention. (NS.Br.46.) But instead of identifying disjointed flows as part of an activity-based conversational flow, TrackSessions creates a flow entry for a connection and, when the port changes, it completely overwrites the flow entry, obliterating any distinction between the two, disjointed flows. This is not the claimed "conversational flow." (Appx1923-

1924(28:15-29:5); Appx1924(29:6-14).) Indeed, no one outside of NetScout and its paid expert has equated TrackSessions with the Dietz Patents in the almost twenty years since the patent applications were filed. (Appx1078(79:10-19).)

## IV.   THE INFRINGING PRODUCTS

NetScout's infringing GeoProbe family of products comprise the G10 probes, introduced in 2010, and the GeoBlade probes, launched in 2014 ("Infringing Products"). (Appx1477(98:11-19).) The evidence at trial established that NetScout's GeoProbe products meet each and every claim limitation of the asserted claims, including the ability to classify packets as belonging to conversational flows in accordance with the claimed invention. PI presented documentary evidence, source code, the testimony of NetScout's corporate designee on technical matters, and the expert testimony of Dr. Kevin Almeroth to show that the Flow State Block and related functions in the GeoProbe products satisfy the claim limitations requiring there be a memory for storing a database comprising none or more flow-entries for previously encountered conversational flows, each flow-entry identified by identifying information stored in the flow-entry. (*See* record cites in Argument Section I, *infra*.) On the other hand, NetScout's expert, Mr. Waldbusser, admitted that his opinions of non-infringement relied on no evidence—neither documents, source code, nor testimony—relating to the GeoProbe products. (Appx1835-1841(85:20-91:8).)

The jury agreed with PI and returned a verdict that NetScout infringed the Dietz Patents. (Appx19; Appx117-123.) The jury also found NetScout's infringement willful and rejected NetScout's theory of the case that the Dietz Patent inventors "stole" their inventions from others. (Appx117-123; Appx1490-1492(109:14-111:10).)

# SUMMARY OF THE ARGUMENT

The district court, after a careful examination of the evidence and arguments presented at trial and during a post-trial § 101 motion, correctly determined that substantial evidence supports the jury's verdict of willful infringement and validity, the damages award, and that the subject matter of the Dietz Patents is patent-eligible. NetScout rehashes all of the same unsuccessful scattershot of arguments made to the jury and to the district court post-trial, but fails again to show that the Final Judgment lacks substantial evidence in support.

Substantial evidence supports the jury's infringement verdict. NetScout contends no reasonable jury could find that the Infringing Products join flow entries into conversational flows entries in the flow-entry database (which NetScout alternatively describes as "joining" connection flows, or "correlating" connection flows "into" conversational flows). But the asserted claims as construed do not require joining flow entries into specific, individual conversational flow entries, and NetScout's sufficiency of the evidence argument is nothing more than post-trial claim construction in disguise. NetScout implicitly acknowledges, as it did before the district court post-trial, that its sole non-infringement argument relies entirely on claim construction. NetScout spends much of its non-infringement argument attempting to justify adding parenthetical language to the claims that are not contained in the claims as construed—and NetScout does not

appeal any aspect of the district court's claim construction order. The claim language, the district court's uncontested claim construction order, and the trial record are clear. PI's expert applied the district court's unappealed claim constructions and testified at length—citing a wealth of evidence—showing how the Infringing Products meet every limitation of the properly construed claims. NetScout's expert, on the other hand, argued non-infringement solely based on his view that the Infringing Products contain only "separate connection flows" and do not "meet the definition of conversational flows" because they do not "do that critical step of joining together in the same flow." (Appx1770-1773(20:1-23:24); Appx1777(27:5-10 (testifying the Infringing Products' flow state block "doesn't have the ability" to "join those entries together")).) The jury rejected that argument, as did the district court when NetScout presented this exact same argument in post-trial motions. This Court should do the same because substantial evidence—including NetScout's documents, source code, and fact witness testimony, as well as PI's expert testimony—support the jury's verdict.

Substantial evidence also supports the jury's validity verdict. The jury found that NetScout failed to meet its burden of proving anticipation or improper inventorship by clear and convincing evidence, and in view of clear expert testimony distinguishing between the claimed invention and the port-swapping method of TrackSessions that merely substitutes one connection for another, the

jury's finding is supported by substantial evidence. NetScout simply re-argues the same positions it argued to the jury and to the district court without providing any justification for this Court to override the jury's factual findings on these issues.

NetScout's Section 101 arguments find no support in the law or the facts. The district court's 35-page Section 101 opinion properly considered the evidence presented at trial, and found that the Dietz Patents are eligible at Step One because they claim a specific technique for identifying conversational flows that improve the functioning of computer network technology itself. (Appx359-393.) NetScout's arguments, the district court found, were based on over-simplification of the claims. The Dietz Patents are directed to improvements in computer technology in relation to specific technical problems. Further, the district court found under Step Two that NetScout failed to establish the absence of an inventive concept, based on the substantial trial evidence establishing that the claims were not well-understood, routine, or conventional at the time of the invention and advanced the state of the art by solving technology problems with a technological solution.

NetScout seeks to erase the jury's pre-suit damages award by relying on two theories, both of which must succeed, to vacate pre-suit damages. The first theory concerns the alleged failure of certain licensees to mark certain (unidentified) products with the '789 patent, purporting to rely on the post-verdict issuance of *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.,* 876 F.3d 1350, 1368 (Fed.

Cir. 2017). But NetScout waived any argument or objection to the marking jury instruction. The given instruction was based on an agreed instruction to which NetScout did not object, despite acknowledging a pre-*Arctic Cat* split in authority as to the burden of production and persuasion with respect to marking and pre-suit damages, nor did it ever seek a new trial based on *Arctic Cat*.

Under its second theory of no pre-suit damages, NetScout argues that there was insufficient evidence regarding its own pre-suit direct infringement of the methods claimed in the '751 and '725 patents. But the trial record is replete with evidence presented to the jury that NetScout itself directly infringed the method claims when testing the methods, when practicing the methods during installation, and when training its customers on the infringing devices and methods. The jury was entitled to conclude based on this evidence that NetScout's infringement generated and supported sales of the infringing products.

Finally, the jury's willfulness finding and the district court's affirmance is supported by substantial evidence. Under the agreed willfulness instruction, the jury was empowered to "consider all the relevant facts." The trial evidence shows NetScout was determined to paint the inventors as liars and thieves who stole from an industry working group. However, the sponsors of NetScout's litigation narrative at trial admitted to not even reading the asserted patents, and the asserted defenses presented by its experts lacked supporting evidence. The jury was entitled

to conclude that NetScout's defenses and conduct, pursued in bad faith, were

egregious ploys designed to distract from its knowing infringement.

## LEGAL STANDARD

"[A] jury verdict must be upheld unless 'there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did.'" *Hiltgen v. Sumrall,* 47 F.3d 695, 700 (5th Cir. 1995) (quoting Fed. R. Civ. P. 50(a)(1)). The court is to be "especially deferential" to a jury's verdict and must not reverse the jury's findings unless they are not supported by substantial evidence. *Baisden v. I'm Ready Prods., Inc.,* 693 F.3d 491, 499 (5th Cir. 2012). The jury's decision may only be overturned "if the evidence points so strongly and so overwhelmingly in favor" of NetScout "that no reasonable juror could return a contrary verdict." *CEATS, Inc. v. Continental Airlines, Inc.*, 526 Fed. Appx. 966, 969 (Fed. Cir. 2013) (quoting *Int'l Ins. Co. v. RSR Corp.,* 426 F.3d 281, 296 (5th Cir. 2005)). When evaluating the district court's denial of JMOL, consideration is given to "all of the evidence, drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party." *Broussard v. State Farm Fire & Cas. Co.,* 523 F.3d 618, 624 (5th Cir. 2008).

"For entry of judgment under Rule 52(c), we review the district court's factual findings for clear error and its legal conclusions de novo." *INO Therapeutics LLC v. Praxair Distribution Inc.*, No. 2018-1019, 2019 WL 4023576, at *3 (Fed. Cir. Aug. 27, 2019). "Eligibility under 35 U.S.C. § 101 is a question of law, based on underlying facts." *SAP Am, Inc. v. IvestPic, LLC*, 898 F.3d 1161,

1163 (Fed. Cir. 2018) "The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). A district court's conclusions on questions of fact are given clear error deference. *Exergen Corp. v. Kaz USA, Inc.,* 725 F. App'x 959, 965 (Fed. Cir. 2018).

# ARGUMENT

## I.    SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S VERDICT OF INFRINGEMENT.

The sole infringement question before this Court is whether the jury had substantial evidence to conclude the Infringing Products satisfy the asserted claims' "conversational flow" limitations, consistent with the district court's constructions (all of which are unchallenged on appeal and some of which the parties agreed upon).

At trial, PI's expert, Dr. Almeroth—presented a thorough infringement analysis that explained to the jury how he applied the court's claim constructions, NetScout's documents, source code, and testimony, and concluded that the Infringing Products satisfy each limitation of every asserted claim. In rebuttal, NetScout's non-infringement defense was based on the theory that its products do not meet the "conversational flow" limitation because they do not *join* connection flows into a conversational flow: "[NetScout's products] don't meet the definition of conversational flows because none of them are—none of them do that critical step of *joining* together in the same flow".[1] (Appx1770-1773(20:1-23:24)

---

[1] During JMOL, PI argued NetScout's *joining* theory of non-infringement was based on a new claim construction argument. (Appx10561-10562.) NetScout tried to disavow its *joining* trial theory, stating that "NetScout **never** argued at trial or in its JMOL that all of the Asserted Claims require a single conversational flow entry." (Appx10679.) PI's sur-reply showed that NetScout's *joining* theory was *the only* non-infringement theory that NetScout presented at trial. (Appx10731.) On

(emphasis added)[2]; Appx1777(27:5-10 (testifying the Infringing Products' flow state block "doesn't have the ability" to "join those entries together")).) The jury also witnessed NetScout's expert, Mr. Waldbusser, admit that not a single demonstrative slide used during his non-infringement presentation had one citation to evidence of non-infringement. (Appx1835-1841(85:20-91:8).) The jury rejected NetScout's joining theory when it determined NetScout's products satisfy the conversational flow limitations. (Appx117-123.) During JMOL, NetScout purported to cite statements from every aspect of this litigation (summary judgment briefing, a companion trial, various statements by the trial court in orders rejecting other of NetScout's defenses)—everywhere except in the language of the claims or the district court's constructions—to argue that the claims *require* joining connection flows into separate conversational flow entries. (Appx10558-10562; Appx10732-10733.) In short, NetScout asks this Court to adopt its joining theory that the jury and the district court would not, arguing there is not sufficient evidence that the Infringing Products join connections flows ***into a single conversational flow***. (NS.Br.40 (arguing error because of Almeroth's alleged

_____

appeal, NetScout appears to have decided to own its non-infringement theory that the claims require "joining" separate connection flows "into the same conversational flow." (NS.Br.40.) But as explained herein that is not a requirement of the claims, and is not how the district court construed "conversational flows."

    [2] All emphasis is added, unless otherwise stated.

admissions and evidence that the Infringing Products "never join [connection

flows] together.").)

The trial court rejected this very argument, finding

The Court finds that the strength and sufficiency of record evidence, as
discussed above, adequately supports the jury's verdict of infringement.
NetScout contends that Dr. Almeroth presented a "new (and erroneous)
interpretation of the Asserted Claims" at trial that contradicted his deposition
testimony and expert report, and that had he provided testimony on the
"proper interpretation" of the claims, no reasonably jury could have found
infringement…Even if true, NetScout never raised the issue during its cross-
examination of Dr. Almeroth. Nor did it object at trial to his testimony as
beyond the scope of the his expert report. The argument was simply never
raised prior to the return of the jury's verdict, and as such, is irrelevant and
improper under Rule 50(b). *See Paez v. Gelboym*, 578 Fed. Appx. 407, 408
n.1 (5th Cir. 2014) ("We do not consider evidence that was not presented to
the jury."); *see also West v. Media Gen. Operations, Inc.*, 250 F. Supp. 2d
923, 947 (E.D. Tenn. 2002) ("When deciding the plaintiffs' Rule 50(b)
motion, the Court is limited to reviewing only the evidence presented to the
jury at trial. The Court cannot grant a Rule 50(b) motion and set aside the
jury's verdict based on information that was not introduced into evidence at
trial and not taken into consideration by the jury.").

(Appx53.)

Further, NetScout's phantom claim requirement that flows must be joined

into *a single conversational flow* does not appear in the claims, and the trial court

never construed the claims to require it. This Court should reject NetScout's

attempts to avoid infringement by engaging in post-trial claim construction

disguised as a sufficiency of the evidence challenge. *See ePlus, Inc. v. Lawson

Software, Inc.*, 700 F.3d 509, 520 (Fed. Cir. 2012) ("[Appellant] is essentially

raising a claim construction argument regarding the meaning of [a claim] term [] in

the guise of a challenge to the sufficiency of the evidence of infringement…Of

course, if [Appellant] desired such a narrow definition, it could (and should) have

sought a construction to that effect.")

NetScout cannot show that "no reasonable jury could have found

infringement." *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1261 (Fed.

Cir. 2013) (applying 5th Circuit law).

### A. PI Presented Ample Evidence of Infringement at Trial.

PI's evidentiary presentation focused on exemplary claim 19 of the '789

Patent. NetScout did not challenge, at trial or after, most claim elements but

focused solely on elements related to the conversational flow requirement, such as

19(d-f). (Appx50-52.) PI presented the jury with substantial evidence of

infringement through NetScout's documents and source code, testimony from

NetScout engineers, Almeroth's expert testimony, and Waldbusser's cross-

examination.

Almeroth testified to the jury that he applied the Court's claim construction

in his analysis of the Infringing Products. (Appx1252-1253(122:9-123:3).) In

relevant part, those claim constructions included the terms "conversational flow"

and "flow-entry database."

Almeroth then presented the jury with a detailed element-by-element

analysis of the Infringing Products, starting with Claim 19 of the '789 Patent.

(Appx49.) He showed the jury documents, source code, and deposition testimony regarding NetScout's Infringing Products, and opined that each element of Claim 19 was present in the Infringing Products. (Appx49-52 (trial court recounting Almeroth's testimony).)

On limitation 19(d)—the claim's first use of the term "conversational flow"—Almeroth testified that the claim required "a memory for storing a database comprising none or more flow-entries for previously encountered conversational flows, each flow-entry identified by identifying information stored in the flow entry." (Appx1264(134:2-6 (quoting Claim 19 text)).) Almeroth testified this limitation, as the district court construed it, requires a database of flow-entries that contains information stored in memory that identifies disjointed flows as related based on a user's activity (for instance, the running of an application on a server as requested by a client). (Appx1247-1248(117:13-118:15).) Using the Flow Records Format trial exhibit, Almeroth testified that the flow records in the Infringing Products, "which include[] information about the flows" obtained from parsing packets as depicted in PTX223 (Appx13079):



(Appx1264-1266(134:11-136:20 (citing Appx13079, Appx13080-13104); *see also* Appx10590-10592.)

Almeroth testified that NetScout's Flow Record Format document identifies "a whole number of fields that get associated with a particular flow-entry," in the flow state block, or FSB (and its source code file "Fsb.c"), which is the "portion of the memory where the database is stored that contains the flow-entries." (Appx1265(135:1-10); Appx1265-1266(135:11-136:20).) Almeroth explained on cross-examination that the flow records stored in the FSB "are connection flows

and include information that can be used for previously encountered conversational flows." (Appx1320(190:2-15).) Almeroth cited specific portions of the Flow Record Format that "shows for certain flows that use the HTTP protocol, which is one of the protocols used with Facebook," that there is information in the ID4 or information elements extension block, which contains additional flow information such as the HTTP refer, the URL, and the agent. (Appx1265-1266(135:21-136:20 (citing Appx13080-13104; Appx13079)).) Almeroth then summarized his analysis of the Infringing Products with reference to the requirements of claim 19(d):

> [T]he requirement of the claim is to have a memory for storing a database comprising none or more flow-entries. So I've shown you what the flow-entries are. It says then for previously encountered conversational flows. **And I've shown you some of the information in the flow record that can be used to correlate or associate flow-entries into conversational flows**.
>
> …
>
> I've said that **these entries**, as part of the flow state block, **can be used to associate flow-entries** for previously encountered conversational flows… **It's this information that's sufficient to meet the limitation…**

(Appx1266-1267(136:21-137:15).)

Almeroth confirmed this testimony on cross-examination. NetScout asked Almeroth whether Claim 19(d) "requires storing conversational flows." Almeroth testified that "I believe what it requires is that within the flow-entries, there is information that can be used to create conversational flows. I don't believe that the memory and the database that has to be stored has to represent the conversational flows themselves but include the information that can be related - that can relate

the flow-entries to each other." (Appx1314(184:14-23).) NetScout's counsel

pressed further and asked, and Almeroth responded:

> Q. But they don't need to actually be related, there just has to be information where somebody could do that, is that your testimony?

> A. …[W]hat's required is what the claim language says that you have highlighted, you have to have the database, it has to have flow-entries, those flow-entries can be or have to be for previously encountered conversational flows if they're existing flows as the – **the evidence in the analysis that I did was to point to what's in that database and show** that performs that limitation for previously – **that you have flow-entries for previously encountered conversational flows**.

> Q. But your analysis didn't include a determination whether it actually identified or classified it as a conversational flow; is that right?

> A. **Well, it did. That was the whole example where using entries from the flow record**, it was able to calculate the web page download time. So the existence of analytics or metrics demonstrating that **the flow-entries were related to each other and relatable to each other using information in the flow record shows that the flow entries were for previously encountered conversational flows.**

(Appx1314-1315(184:24-185:22).)

The district court credited this testimony when it denied NetScout's JMOL.

"*To confirm that the Accused Products practice the claimed limitations*, Almeroth

described an optional feature—not itself accused of infringement—called the Web

Page Download Time Estimation, which generates data analytics based on

information stored in the FSB." (Appx51 (emphasis in original).) Almeroth

testified the Web Page Download Time feature can determine certain facts related

to a user's activity (here the time to load a Facebook request) from separate flow-

entries—based on data and records created by the core traffic classification and stored in the FSB of the Infringing Products that are the result of practicing each element of Claim 19; that is, this optional feature could not be possible ***unless the core traffic classification and FSB practiced the conversational flow elements required by Claim 19***. (Appx1267-1268(137:3-138:11); Appx10593-10595 (citing (Appx13080-13104); Appx13105-13122.)

Almeroth testified that the core traffic classification of the Infringing Products—using the information contained in the FSB—identifies separate flows as related based on user activity, as the conversational flow limitation requires. Aside from challenging the existence of "conversational flow" uniformly, NetScout does not challenge Almeroth's testimony that Claim 19 is representative, the evidence concerning any differences in asserted claims, or that the Infringing Products operate in substantially the same way. (Appx52 & n.4-6; Appx49-50 (summarizing Almeroth's testimony).)

In contrast to Almeroth, Waldbusser presented a non-infringement position barren of any evidence. On cross-examination, Waldbusser was walked through every single demonstrative slide used during his non-infringement presentation and asked if there was any evidence for his opinion on any one of those slides. (Appx1835-1841(85:20-91:8).) He categorically admitted there was none. (*Id.*) Instead, Waldbusser's non-infringement position hung on a single argument: the

Infringing Products "don't meet the definition of conversational flows because none of them are – none of them do that critical step of ***joining*** together into the same flow... Ultimately [the FSB] doesn't store any links or join – ***join those entries together***." (Appx1772-1773(22:17-23:3); Appx1776-1777(26:25-27:11)).) Having heard evidence from both sides, the jury reasonably rejected NetScout's sole argument. This verdict is supported by ample—and virtually unrebutted— evidence that the Infringing Products meet every limitation of the asserted claims.

Recognizing it waived any claim construction arguments not presented, NetScout erroneously asserts PI had stipulated or conceded NetScout's position that every use of the term flow in the claims meant "conversational flow" and every "flow entry" meant "conversational flow entry." (NS.Br.16 and n.3, 37-38.) Citing to PI's Response to NetScout's Statement of Material Facts during summary judgment, NetScout represents that "[PI] stipulated to this insertion of "conversational" in brackets in its response." (NS.Br.16 (citing Appx7612-7613).) Yet nowhere in its Brief does NetScout provide PI's actual language in its response, which was "Not disputed ***for the purposes of this motion***." (Appx7612-7613.)[3]

---

[3] PI did not need to dispute it for NetScout's summary judgment motion, which focused solely on mischaracterizations about where Almeroth identified the evidence of infringement: in the core traffic classification of the Infringing Products or in three separately identified features (one including the previously discussed Web Page Download Time feature). (Appx6032-6033.)

PI never agreed to or stipulated to the constructions that NetScout asserts for the first time post-trial. NetScout's pervasive insertion of "conversational" in front of flow in the claim limitations is a claim construction argument raised for the first time post-trial and is waived, incorrect, and not required.

NetScout tries to support its misleading argument with more mischaracterizations that either the trial court, PI, or Almeroth accepted or conceded to its new constructions. For example, NetScout suggests that the district court concurred that the only flow referenced in claim 19 is a "conversational flow" and the only flow-entries recited are for "conversational flows," citing Appx51. (Br.Op.37.) Here NetScout is citing the trial court's ***denial*** of its JMOL of non-infringement and quoting Almeroth's testimony that "the requirement of the claim is to have a memory for storing a database comprising non or more flow-entries," that the claim required "that such flow-entries be for previously encountered 'conversational flows' and that he had similarly 'shown…some of the information in the flow record that can be used to correlate or associate flow-entries into conversational flows." (Appx51.) This citation stands for the opposite of what NetScout suggests—NetScout cites the very theory of infringement that it believes is legally insufficient. NetScout also cites several instances of the trial court discussing the claims and patents, though never in the claim construction order or in the context of even construing the claims. (NS.Br.37-38.) NetScout

28

further suggests that "Almeroth acknowledged that the FSB only stores 'connection flows'" without including the remainder of his answer that "[t]hey are connection flows *and include information that can be used for previously encountered conversational flows*." (NS.Br.39 (citing Appx1320(190:2-15).)

The Court should reject NetScout's non-infringement argument predicated entirely on new claim construction arguments raised for the first-time post-verdict.

## II.    MORE THAN SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S FINDING OF VALIDITY.

NetScout's appeal of the jury's verdict finding the Dietz Patents not invalid misrepresents the facts, mischaracterizes witness testimony, and recasts as "uncontroverted" issues hotly contested at trial. NetScout fails to focus on the central issue—whether the jury's verdict was supported by substantial evidence, particularly in view of NetScout's heavy burden of showing invalidity through clear and convincing evidence—and instead asks this Court to reject the jury's determinations and credit NetScout's expert testimony over the copious evidence that belied that testimony. The district court correctly denied NetScout's JMOL, and so should this Court. (*See* Appx55 ("The Court has conducted a careful review of the trial record and finds no valid reason to depart from the jury's verdict….NetScout summarizes the competing evidence presented at trial and asks the Court to reweigh the evidence in its favor.")); *see also Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1309 (Fed. Cir. 2011) ("Whether a

prior art reference anticipates a claim is a question of fact that we review for substantial evidence when the issue is tried to a jury.") (citation omitted).

### A. NetScout's Anticipation Arguments Fail.

NetScout's trial presentation on invalidity was flawed for several reasons. For example, NetScout relied on multiple versions of its NetScout Probe software for its anticipation arguments (*see* Appx1936-1937(41:4-42:12)), when black letter law requires that a single prior art reference disclose each limitation of the challenged claim. *See, e.g., Pressure Prod. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1318 (Fed. Cir. 2010).

NetScout's expert only focused on two words out of the asserted claims alleging they were present in the NetScout probe or in TrackSessions, ignoring the other limitations of the detailed claims. These failures of proof alone suffice to support the jury's finding under a clear and convincing standard. *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359-60 (Fed. Cir. 2007).

But PI did not simply rest on NetScout's failures. Instead, it introduced evidence through Almeroth and lead inventor Dietz that unambiguously explained the differences between the TrackSessions functionality of the NetScout Probe and the claimed inventions.

1. <u>Expert Testimony and Admissions Support the Jury's Verdict.</u>

***First***, Almeroth reviewed a key limitation of Claim 19, which requires a "memory for storing a database comprising none or more flow-entries for previously encountered conversational flows, each flow-entry identified by identifying information stored in the flow-entry." (Appx191 (claim 19(d)).) Using a demonstrative, Almeroth walked through how a packet monitor practicing the invention uses flow-entries to build conversational flows. (*See* Appx1919-1921(24:9-26:12); Appx10651-10654.) He showed an example in which connection requests and responses are exchanged between a user and a Facebook server explaining "what the packet monitor does in this situation is it will, … using the technology of the invention, would be able to separate all of those different packets into different flows." (Appx1920(25:9-13.)) He further testified:

> So the idea is the flow-entries can be separate, they can contain information about that flow, but that information can then be correlated with information from other flows so that the analyzer understands that those are related flows.

(Appx1920-1921(25:18-26:12).)

***Second***, Almeroth described TrackSessions. (Appx1921-1924(27:11-29:14).) Using Waldbusser's slides 210, 211, and 212, he explained that, with TrackSessions, an initial connection goes to a well-known port, and is then transferred to a dynamically assigned port different from the original port:

So even though there's two different connections that are happening here, what TrackSessions is trying to do is put them into a single flow-entry. And that's what he's shown down here at the bottom. It's not two flow-entries. It's a single flow-entry…**And, for example,** *all of the packets that were exchanged over these two different connections are counted as the one flow-entry.***"**

(Appx1923-1924(28:15-29:5).) NetScout takes Almeroth's testimony about a "single flow-entry" out of context and asserts that the claims do not require any particular number of flow-entries. But the number of connection flows and/or flow entries by itself is immaterial—what matters is the ability to track conversational flows. Almeroth's testimony establishes that the invention was designed to track connection flows that may occur in parallel and relate them to each other as part of the same conversational flow—not simply *replace* tracking of one connection with the tracking of another connection—which is what TrackSessions does.[4]

Almeroth further explained why TrackSessions was incapable of tracking conversational flows, referencing Waldbusser's testimony at trial:

> On cross-examination, [Waldbusser] was asked whether or not there was a way to determine, using this flow-entry, how many packets could be attributed to this first connection versus packets attributed to the second connection. And he answered that there was not. And I agree with that. Because there's the only one flow-entry, all of the packets are associated with that one flow-entry. And so ***there isn't the concept of a conversational flow that can relate different independent flows to each other***.

---

[4] NetScout made this same implausible argument on post-trial JMOL, and PI responded with this same context and evidence. NetScout mischaracterizes PI's arguments as "abandon[ing] its expert's testimony." (NS.Br.45.) To the contrary, PI's expert's testimony is not only sound, but the jury credited it.

(Appx1924(29:6-14).)

Additionally, Almeroth showed the jury portions of the specification specifically discussing TrackSessions. For example, Almeroth testified that the '789 patent specification stated that RMON2 (containing TrackSessions) "lack[s] visibility into application content and [is] typically limited to providing network layer information." (Appx1926-1927(31:16-32:15); Appx174(2:33-37).) He further explained that "[w]hen you think about lack visibility into application content, it's talking about, you know, what is in the data of the message, who the referrers are for web pages, what users are doing through their applications, kind of that level of visibility … And so even [TrackSessions's] ability to look at dynamic port assignments and changing dynamic port assignments was – was not an attempt to look into the application data itself." (Appx1928-1929(33:5-34:3).) Almeroth also contrasted the Dietz Patents' description of TrackSessions with its discussion of the claimed inventions. (Appx1930-1934(35:17-39:15); Appx178-179(10:15-11:34).)

**_Third_**, Almeroth applied these findings to the NetScout 6010 Probe implementing TrackSessions, on an element-by-element basis, and found no anticipation. _See_ (Appx1937-1943(42:22-48:22); Appx10655-10663.) Almeroth testified:

> What happens in the NetScout 6010, consistent with TrackSessions and RMON, is it has a flow-entry for one flow, and then swaps out the port for

33

that flow-entry to the new port. And it maintains a single flow-entry for those two separate connections …And so ***this idea of just having one flow-entry that's changed, as opposed to maintaining existing flow-entries, creating new flow-entries, and then correlating and relating those flow-entries together to create conversational flows is not what happens when you just swap out the port number and maintain one flow-entry***.

(Appx1939-1940(44:17-45:16).) Almeroth showed how this difference means that the NetScout 6010 probe does not anticipate the Asserted Claims. (Appx1942-1943(47:3-48:22); Appx10655-10663).[5]

### 2. Inventor Testimony Supports the Jury's Verdict.

Lead inventor Dietz explained how TrackSessions was different from the invention, including that the RMON standard did not describe any techniques to classify traffic in the manner described by the Asserted Claims. (Appx1088(89:22-25); *see also* Appx1089(90:13-23); Appx1098-1099(99:24-100:21); Appx1108-1109(109:13-110:5); Appx1124-1126(125:14-127:5).) He further told the jury that

---

[5] NetScout's argument that nothing in the Asserted Claims requires maintaining separate connection flow entries for each connection flow in the conversational flow is wrong. The district court's claim construction (which NetScout does not challenge) defines "conversational flow" as "the sequence of packets that are exchanged in any direction as a result of an activity–for instance the running of an application on a server as requested by a client." (Appx417.) To determine that packets from different connection flows belong to the same activity, the system must maintain flow-entries for a period of time that allows identifying future packets of the conversational flow. The other claim limitations also require a lookup, a determination of whether the packets belong to a new or existing flow, and creating and updating flow entries—all impossible if the flow-entries are not maintained. (Appx191-192(claim 19).) The specification further discusses maintaining information about separate flows. (Appx181(15:24-34).)

the RMON standards were written that way intentionally because the Working Group did not want to limit implementation to any one particular option. (Appx1113-1114(114:10-115:10).)

Inventor Maixner further testified that TrackSessions was different from the claimed invention. (Appx1173(43:3-6).) NetScout's brief alleges that Maixner "admitted" that "'TrackSessions'…is indistinguishable from 'conversational flows.'" (NS.Br.20.) But in the portion that NetScout cites, NetScout's counsel asked Maixner a series of questions about the port-mapping method, and then asked about similarities between that and Figure 2 of the patent. (*See* Appx1171-1172(41:1-42:18).) As Almeroth later testified, the patent specification describing Figure 2 "doesn't say that it is building the conversational flows. It's building some of the predicate, some of the pieces that are needed to go into a conversational flow. It's describing how to identify specific flows, but not how you construct the conversational flow from those individual flows." (Appx1929(34:15-24).) Viewed in proper context, then, Maixner's testimony is not an admission of any sort.

At bottom, as the district court noted, "the jury was entitled to credit the testimony of Almeroth over Waldbusser and find that the NetScout Probe does not practice each limitation in the Asserted Claims…Nothing more is required to defeat a Rule 50(b) motion." (Appx59.) "[T]he jury was free to credit or discredit

[expert testimony] in rendering a verdict," and "substantial evidence supports the jury's verdict" of no anticipation. *See Retractable,* 653 F.3d at 1309 (affirming denial of JMOL); *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1168 (Fed. Cir. 2015) ("[T]he jury is permitted to make credibility determinations and believe the witness it considers more trustworthy.").

Finally, NetScout's accusation that "the district court's post-judgment analysis violates the rule against 'reserv[ing] issues of claim construction for the state of post-trial motions'" is a red herring. (NS.Br.48 (citing *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1320 (Fed. Cir. 2003)).) The district court's observation that "Almeroth's opinions represent one fair reading of the claims" (Appx58) is not claim construction. As the court went on to say, "[e]ach party's expert applied the Court's claim constructions to opine on what a person of ordinary skill in the art would understand the claims to require…In view of those competing opinions, the jury was entitled to credit the testimony of Dr. Almeroth over Waldbusser and find that the NetScout Probe does not practice each limitation in the Asserted Claims." (*Id.*) It is squarely within the province of expert testimony to read claims and opine as to their requirements, taking into account the Court's constructions.

"[T]he trial record shows ample support for the jury's judgment that the claimed invention would not have been anticipated…at the time of the invention"

and NetScout "has not show[n] that the jury's verdict on these points was unreasonable or based on insubstantial evidence." *See Pressure Prod. Med. Supplies*, 599 F.3d at 1319 (no error "in denying [defendant's] motion for JMOL on invalidity").

### B. NetScout's Improper Inventorship Defense Fails.

NetScout asks this Court to ignore the jury's rejection of its inventorship defense "even though the [district court] agrees with PI that at least the inventorship defense ***completely collapsed*** during testimony at trial." (Appx336.) The Court should affirm denial of NetScout's JMOL pertaining to § 102(f) for at least the reasons set forth above for the anticipation arguments, because "if the jury had a reasonable basis to find that the NetScout Probe with Track Sessions does not anticipate, the jury necessarily had a reasonable basis to reject NetScout's argument that RMON, the group that devised Track Sessions, have been a named inventor on the Patents-in-Suit." (Appx59, n.7.) Again, under a clear and convincing evidence standard, the jury's verdict is thoroughly supported. *See Univ. of Colo. Found., Inc. v. Am. Cyanamid Co*., 342 F.3d 1298, 1308 (Fed. Cir. 2003). ("There is a presumption that the inventors named on an issued patent are correct, so nonjoinder of inventors must be proven by facts supported by clear and convincing evidence.")

Nevertheless, the evidence at trial persuasively showed that Dietz and his co-inventors—many of whom had no involvement in the RMON Working Group—conceived of and developed the inventions. Each inventor who testified at trial described for the jury how the inventors identified a problem and worked to solve it. Dietz explained the issues presented by increasing traffic on networks and the difficulty in tracking multiple connections that relate to the same application activity, and precisely how he and the other inventors thought of a way to address those challenges. (*See* Appx1050(51:11-17); Appx1051-1058(52:14-59:12); Appx1060-1061(61:6-62:5).) He explained that the solution that he and his co-inventors conceived and reduced to practice as "a way to take information from all of those different packets in each of those connection flows [in a network] and create a conversational flow. And the conversational flow…can be 3 or 300 or 30 different connection flows, but they're all associated now to that one application." (Appx1056(57:1-12).)

Maixner similarly described the invention story. (Appx1145-1146(15:14-16:19); Appx1149-1150(19:10-20:4) ("[W]e developed that technology, you know, literally line-by-line, handwritten, every line of code from the ground up.").) NetScout never challenged this testimony. Therefore, the record shows that the inventors invented the claimed invention.

NetScout's only alleged evidence that Dietz learned of the invention from the RMON Working Group was that he was involved in that Working Group. It is Dietz's very involvement which allowed him to describe at trial the nuances of the RMON-2 MIB, what TrackSessions was, the operational definition of "application" in the RMON-2 context, the reasons the standard was written without regard to implementation, and how it differed from the Asserted Claims. (Appx1068-1073(69:18-74:22); Appx1111-1121(112:5-122:5).) The jury believed Dietz. NetScout's theory concerning Maixner is even more tenuous. Maixner testified that he was not a part of the RMON-2 Working Group, he never worked on TrackSessions, and that his understanding of RMON-2 was that it was just tables. (Appx1149(19:4-9), Appx1150-1151(20:23-21:23), Appx1161-1162(31:25-32:5), Appx1169(39:6-11).)

Even Waldbusser admitted on cross-examination that, when he read the patents-in-suit, he did not think that the inventors took the ideas within from the RMON Working Group. (Appx1789-1790(39:25-40:10).)

NetScout's citation to *In re VerHoef,* 888 F.3d 1362, 1365 (Fed. Cir. 2018) misses the mark. *VerHoef* held the inventorship inquiry is reviewed for substantial evidence—a rule that NetScout ignores. *Id.* Additionally, *VerHoef* reviewed the PTO's rejection of a patent application from inventor VerHoef as a result of a failure to include another inventor—not the denial of a JMOL following a jury

verdict rejecting an inventorship defense at trial. Moreover, in *VerHoef*, the named inventor "**concede[d]** that the [the idea in question] was an essential feature of the claimed invention that was conceived and suggested to him by another…, but argues that he should nonetheless be declared the sole inventor on the…application because he maintained 'intellectual domination and control of the work.'" *Id.* at 1365-66 (emphasis). Here, the inventors vehemently dispute that the "conversational flow" concept originated from anywhere or anyone other than the named inventors of the Dietz Patents.

The district court's denial of JMOL on invalidity was not error because the jury's verdict was supported by more than substantial evidence.

## III.   THE DISTRICT COURT CORRECTLY DENIED NETSCOUT'S POST-TRIAL SECTION 101 MOTION.

### A. The Asserted Claims Are Directed to An Improvement in Computer Functionality, Not an Abstract Idea Under Step One.

*Alice* step one requires a court to determine if the claims are "directed to excluded subject matter" by "ask[ing] whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334-35 (Fed. Cir. 2016). Following a jury trial, as well as a subsequent round of briefing and a hearing relating to NetScout's Rule 52 Motion of Invalidity of the Asserted Patents under 35 U.S.C. § 101, the district court issued a detailed, 35-page Findings of Fact and

Conclusions of Law ("FF/CL") providing a comprehensive § 101 analysis based on the underlying facts adduced at trial. (Appx359-393.) The district court correctly held that "based on the facts of this case, the claims themselves, and the claims read in the context of the specification, the Court concludes that the Asserted Patents are directed to an improvement in computer functionality rather than an unpatentable abstract idea." (Appx390-391 (citing FF17-34).)

The arguments that NetScout makes here are an abbreviated form of what the district court considered and rejected in its FF/CL. For example, NetScout admits that the district court was correct in recognizing that "the [A]sserted [C]laims are directed to a technical problem (*i.e.*, the need to correlate disjointed connection flows)," but argues that "[t]he district court erred by relying on unclaimed features of the disclosed embodiment at Step 1 of *Alice*." (NS.Br.29-30.)

Specifically, NetScout argues that it was legal error for the district court to assess eligibility by looking to the *claims and specification together*, rather than focusing only "on the patent claims and whether they are 'directed to' an abstract idea." (NS.Br.29.) Focusing on the claims in isolation, NetScout argues that they "are not directed to a specific implementation of a solution" to a problem in the software arts, as required for patent eligibility. (NS.Br.29.)

41

The district court rejected this argument, holding that NetScout's "argument fails because it focuses only on the claims in isolation rather than the claims as read in light of the specification." (Appx390.) In *Enfish*, this Court held that "the 'directed to' inquiry applies…to claims, considered in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'" 822 F.3d at 1335; *see also Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1305 (Fed. Cir. 2018) (the claims, read together with the specification, described how to construct a security profile that allowed for "more flexible and nuanced virus filtering," such that the "'behavior-based' approach to virus scanning [that] was pioneered by Finjan and is disclosed in the '844 patent's specification" "constitutes an improvement in computer functionality.").

In support of its contrary argument, NetScout cites *Two-Way Media*, but that case is inapplicable here. (*See* NS.Br.30.) First, the portion of *Two-Way Media* that NetScout cites relates to *Alice* step two, which already assumes what NetScout is trying to prove—that the Asserted Claims are directed to an abstract idea. *Two-Way Media Ltd. v. Comcast Cable Commn'cs, LLC*, 874 F.3d 1329, 1338-39 (Fed. Cir. 2017). Second, *Two-Way Media* did not look to the claims in isolation, but instead looked at the claims, in light of the patentee's proposed claim constructions tying the claims to particular scalable network architecture recited in the specification, and held that even this was not enough to provide a "saving

inventive concept" because "the constructions recite only conventional computer components." *Id*. *Two-Way Media* thus does not stand for the proposition that *Alice* step one must look at the claims in isolation.

With *Enfish*'s directive in mind, the district court correctly held that "[t]aken together, the claims and the specification do teach how to identify that certain packets belong to the same conversational flow." (Appx390 (citing FF24-27, Appx221(7:51-8:29), Appx178-179(10:15-11:32), Appx292(7:53-8:30)).) Indeed, as the district court noted, even "Defendants' own expert acknowledged that the Asserted Patents explain how to associate packets from different connection flows with the same conversational flow." (Appx390 (citing Appx1653-1654(138:24-139:2 ("Q. And does the patent describe how you would identify and classify different connections into a conversational flow? A. Yes, it does."))).) NetScout does not dispute that the claims viewed in light of the specification, "describe[] a specific technique for correlating connection flows," but instead argues that this description is "not relevant to eligibility." (NS.Br.30.) Because NetScout is wrong on the law, its *Alice* step one argument fails.

In another attempt to fit the Asserted Claims into a failing *Alice* step one box, NetScout backs away from its admission that "the [A]sserted [C]laims are directed to a technical problem (*i.e.*, the need to correlate disjointed connection flows)" (NS.Br.29), and oversimplifies the Asserted Claims by characterizing them

as "fall[ing] into a familiar class of claims directed to a patent-ineligible concept of collecting information, analyzing it, and displaying certain results of the collection and analysis." (NS.Br.27 (quotation omitted).) But as the district court correctly noted, "even NetScout concedes that its characterization of the claims as reciting nothing more than 'the collection, comparison, and classification of information' can only be reached by viewing the Asserted Claims in their 'simplest form.'" (Appx387 (citing Appx8877-8878 ("Stripped of technical jargon…[and] [d]istilled to their 'simplest form,' the asserted claims are directed to the collection, comparison, and classification of information."))) In this way, the district court rightly rejected NetScout's analysis as "misguided, focusing on matching the abstract idea apparently lurking beneath the Asserted Claims in this case to high-level distillations offered by other courts with respect to unrelated claims," and so "proceeds "without regard for the very limitations that improve on existing technology." (Appx387.) *See Enfish*, 822 F.3d at 1337 ("[D]escribing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule.").

The district court then correctly held that "an examination of the Asserted Claims, in context with the relevant specifications and the evidence presented at trial, demonstrates that the Asserted Claims are oriented towards solving a discrete technical problem: relating disjointed connection flows to each other." (Appx387-

388 (citing FF17-21 and 28-30); Appx1652-1653(136:7-137:16).) The district court went on to find that "[t]o address this problem, the Asserted Claims recite specific technological solutions, such as identifying and refining a conversational flow so that different connection flows can be associated with each other and ultimately an underlying application or protocol." (Appx388 (citing FF22-27); Appx1653-1654(138:4-139:2)).)

NetScout tries to avoid its admission that "the [A]sserted [C]laims are directed to a technical problem" (NS.Br.29) by likening this case to *Electric Power Group*. (NS.Br.27-28.) Specifically, NetScout argues that the Asserted Claims "merely require gathering and analyzing information regarding connection flows, and then using the analysis to correlate connection flows of the same 'conversational flow,'" but without "cover[ing] any inventive technology for performing this correlation." (NS.Br.28.)

But the district court correctly rejected this argument. Specifically, the court held that "the Asserted Claims recite an 'unconventional technological solution,' not *any* approach to sorting packets, but a particular approach focused on constructing conversational flows that associate connection flows with each other and ultimately specific applications or protocols." (Appx389 (citing FF21-34); *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300 (Fed. Cir. 2016); *Enfish*, 822 F.3d at 1337).) "This allows packet monitors to classify

network traffic in a way that prior network monitors could not." (Appx389 (citing

FF17-34; Appx289(2:53-56 ("By maintaining statistical measures in the flow-

entries related to a conversational flow, embodiments of the present invention

enable specific metrics to be collected in real-time that otherwise would not be

possible.")); *Finjan*, 879 F.3d at 1305).) This improvement is similar to that in

*Finjan*, where this Court held a patent non-abstract where the invention

"employ[ed] a new kind of file that enable[d] a computer security system to do

things it could not do before." 879 F.3d at 1305.

Because the Asserted Claims are directed to an improvement to computer

functionality rather than an abstract idea, they are patent eligible under *Alice* step

one, and there is no need to proceed to *Alice* step two.

### B. The District Court Correctly Found that NetScout Failed to Meet Its Burden to Establish by Clear and Convincing Evidence that the Asserted Claims Lack an Inventive Concept under Step Two.

Despite finding that the Asserted Claims are patent eligible under *Alice* step

one, the district court discussed step two "for completeness." (Appx391.) In *Alice*

step two, a court "search[es] for an 'inventive concept,' or some element or

combination of elements sufficient to ensure that the claim in practice amounts to

'significantly more' than a patent on an ineligible concept." *DDR Holdings, LLC v.*

*Hotels.com*, 773 F.3d 1245, 1255 (Fed. Cir. 2014). In so doing, the district court

made a factual finding—reviewed for clear error—that NetScout "failed to show

that the combination of elements recited in the Asserted Claims would have been regarded as conventional, routine, or well-known by a skilled artisan in the relevant field." (Appx385; Appx392 (citing *Berkheimer*).) NetScout argues that the district court's holding "is irrelevant." (NS.Br.34.) But since, as the district court noted, NetScout "bears the burden under this step to establish by clear and convincing evidence that the Asserted Claims lack an inventive concept," the court's holding is far from irrelevant. (Appx381.)

NetScout does not dispute the district court's assertion that, to support its step two argument, all NetScout did was "chart the Asserted Claims against various prior art references." (Appx391.) But as this Court has held, "[t]he mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional." *Berkheimer*, 881 F.3d at 1369. For this reason alone, the district court's holding that NetScout "fundamentally failed to establish that the Asserted Claims lack an inventive concept" cannot have been clear error. *See Nalpropion Pharm., Inc. v. Actavis Labs. FL, Inc.*, 934 F.3d 1344, 1348 (Fed. Cir. 2019) ("A factual finding is clearly erroneous when, despite some supporting evidence, [the Court is] left with a definite and firm conviction that the district court was in error. The burden of overcoming the district court's factual findings is, as it should be, a heavy one. Where there are two permissible

views of the evidence, the factfinder's choice between them cannot be clearly erroneous.") (quotations omitted).

Unable to escape its failure of proof before the district court, NetScout argues that the components recited by the Asserted Claims "have repeatedly been found conventional and non-inventive," and that merely "narrowing or reformulating an abstract idea" cannot be an inventive concept, no matter how "non-routine or unconventional" the idea. (NS.Br.30-34.) But these arguments are inapplicable here, as the district court did not rely on the Asserted Claims' recited components, or their "ability to recognize disjointed flows as belonging to the same conversational flow" for its finding of an inventive concept, as NetScout argues. (NS.Br.34.)

Rather, the district court held that "something more" than a patent on an ineligible concept "may also be evidenced by the existence of specific 'benefits' provided by the relevant invention as compared to the prior art." (Appx382-383 (citing, *e.g.*, *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016)).) And the district court found that PI "provided significant evidence of benefits achieved by the Asserted Claims as compared to the prior art." (Appx392 (citing FF28-35).) The court further held that "[t]hese benefits are not merely the sort of gains to efficiency or speed that necessarily result in using a computer to carry out any number of routine practices. Rather, the

Asserted Claims recite ways for network monitors to more precisely monitor network traffic, congestion, and malicious attacks." (Appx392 (citing FF21-35); Appx1634-1636(119:4-121:15); *Finjan*, 879 F.3d at 1304-1305 (distinguishing benefits such as "greater speed and efficiency" from other benefits such as "more flexible and nuanced virus filtering"); *Amdocs*, 841 F.3d at 1300-1301 (recognizing the ability to address network congestion as a benefit)).) NetScout's brief fails to address the district court's finding of "something more" in the benefits the Asserted Claims provide. NetScout's argument therefore also fails as to *Alice* step two.

## IV.    THIS COURT SHOULD REJECT NETSCOUT'S ATTEMPT TO VACATE THE JURY'S PRE-SUIT DAMAGES AWARD.

Prior to *Arctic Cat*, district courts were split regarding the burden of production and persuasion with respect to marking and pre-suit damages. *See Arctic Cat*, 876 F.3d at 1367 (acknowledging split among district courts)). Courts in the Eastern District of Texas followed the rule that the accused infringer was required to identify patented articles. *See Realtime Data, LLC v. Actian Corp.*, No. 6:15-CV-463 RWS-JDL, 2017 WL 3048886, at *1 (E.D. Tex. May 15, 2017) (Appx593-594(158:14-159:16).)

NetScout was aware of the split in authority, as evidenced by its response to an interrogatory propounded by PI, and its JMOL briefing and hearing arguments. (Appx6581-6583; Appx10694 (NetScout noting "the parties' acute disagreement"

concerning marking); Appx13059(60:6-8) ("[T]hat's exactly what the parties

recognized going into trial was that there is an unsettled area of law of where the

burdens lay."). During discovery, PI propounded an interrogatory specifically

asking NetScout to identify any products that it contended required marking—

NetScout refused, stating it "decline[d] to specifically respond to [PI's]

interrogatory." (Appx6583.)

After the close of evidence at trial, the district court conducted a Charge

Conference and provided the following marking instruction:

> NetScout must first show the existence of a "patented article." A "patented
> article" is a licensed product that practices one or more claims of the '789
> patent. **If NetScout does not show the existence of a patented article**,
> Packet Intelligence is permitted to collect damages going six years before
> the filing of the Complaint in this case for the '789 patent.

(Appx150-151.) Despite being aware of the then existing split in authority,

NetScout did not object to the district court's instruction at the conference, nor

when the instruction was given to the jury. (Appx324-325; Appx2051-2052.)

Further, during trial, NetScout did not raise marking and only devoted two

sentences to the issue in passing during its closing. (Appx2088(84:14-19).)

*Arctic Cat* issued two months *after* the jury verdict. *Ten months later*,

NetScout filed a JMOL under Fed. R. Civ. P. 50(b) challenging the sufficiency of

the evidence supporting the jury's pre-suit damages verdict. Importantly, at no

point did NetScout move for relief or request a new trial based on the post-verdict issuance of *Arctic Cat*.

### A. NetScout Waived Any Challenges to the Marking Instruction.

A party's failure to object to a jury instruction waives any objection to claim that a jury verdict was contrary to law or evidence. *See Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1374 (Fed. Cir. 2010) (This Court "review[s] challenges to jury instructions under the law of the regional circuit in which the district court sits[]."); *Barrientes v. Johnson,* 221 F.3d 741, 779 (5th Cir. 2000) (the failure to timely object waives any error in jury instructions unless so prejudicial no instruction could cure the error); *Farrar v. Cain,* 756 F.2d 1148, 1150 (5th Cir. 1985) ("Failure to object to the jury charge in the trial court precludes review on appeal unless the error is so fundamental as to result in a miscarriage of justice").

During discovery and trial, NetScout was acutely aware that district courts had different views of the burden of production and persuasion with respect to marking and pre-suit damages. (Appx6581-6583.) However, not only did NetScout fail to object to the district court's marking instruction, or attempt to make an offer of proof on marking (Appx324-325)—it **agreed** to submit the district court's instruction to the jury and therefore waived any objection to it. (Appx150-151; Appx2051-2052.) That instruction required NetScout to first identify the existence

*of products it contends should have been marked—**and** also show that the identified product "practices one or more claims of the '789 Patent." *Id*. But at trial, NetScout did not identify specific Cisco or Huawei products. As a result, the jury was free to conclude that NetScout did not even carry its burden of production on the marking issue at trial with respect to any Cisco and Huawei products. NetScout further failed to establish that any licensed products (those of Cisco, Huawei, or Exar) practice any claim of the '789 Patent—indeed it did not present any evidence during trial on that issue, even though it was required to do so under the agreed jury instruction and the district court rightly denied NetScout's JMOL. (Appx30 (the "jury had a 'sufficient evidentiary basis' to find that NetScout failed to identify specific Huawei or Cisco products that should have been marked..."); Appx33 ("The Court has conducted a careful review of the trial record and finds that the jury had a substantial evidentiary basis to conclude that PI was not obligated to mark the Meter Products.").)

Lest there be any doubt that NetScout waived any objection to the marking jury instruction—consistent with its agreement to the instruction at the Charge Conference—NetScout's Brief likewise does not object to the marking instruction given to the jury and has again waived any objection to the instruction. In fact, in the underlying proceedings, NetScout not only failed to object to the marking instruction—NetScout actually embraced it. (Appx10200 (quoting the instruction

in support of JMOL).) *See* Fed. R. Civ. P. 51; *Serio-US Indus., Inc. v. Plastic Recovery Techs. Corp.*, 459 F.3d 1311, 1317 (Fed. Cir. 2006) (observing that compliance with Rule 51 "prevents unnecessary repeat trials."); *Jimenez v. Wood Cty.*, 660 F.3d 841, 844 (5th Cir. 2011) (en banc) ("Rule 51 requires a party to object to jury instructions in order to preserve a claim of error for appeal."). Indeed, NetScout affirmatively stated to the district court that the agreed marking instruction complies with *Arctic Cat*. (Appx10694; Appx30, n.3).

NetScout's double waiver of any objection to the marking instruction is fatal. *See* Fed. R. Civ. P. 51(c), (d) (a party may assign error to an instruction given only if that party properly and timely objected); *Cf. Jimenez,* 660 F.3d at 846 (holding that a party that failed to preserve jury instruction error by raising a proper objection could only be reviewed for plain error even where the objection would have been futile in light of controlling precedent, further discussing *Johnson v. United States*, 520 U.S. 461 (1997) and observing in that case that there was near-uniform precedent that changed after trial, but the Supreme Court allowed no exception to the rule allowing unpreserved error to be reviewed only for plain error).

NetScout did not file any motion or make any argument to the district court either post-verdict or post-judgment that the instruction given constituted plain error or that the instruction given affected any substantial rights. NetScout filed its

53

JMOL under Rule 50(b) and **only** under Rule 50(b). Rule 50(b) motions are a challenge to the sufficiency of the evidence presented at trial—and NetScout limited its JMOL to such arguments. Given that NetScout did not advance any argument or objection to the district court's marking instruction, the trial record more than adequately supports the jury's pre-suit damages for the '789 Patent. NetScout defaulted on both its burden of production (identifying specific products) and its burden of persuasion (showing the specific products practice at least one claim) in light of the agreed jury instruction given. And because PI's damages expert, Mr. Bergman, testified without contradiction that his damages calculations do not change based on which patent is infringed (Appx1396-1397(15:20-16:5)), the jury's pre-suit damage award can be sustained on NetScout's adjudicated infringement of the '789 Patent alone.

### B. NetScout Did Not Seek a New Trial Following *Arctic Cat*.

Two months after the jury verdict, *Arctic Cat* issued. Nearly a year later, NetScout filed its post-trial motions. Despite having ample time, at no point did NetScout seek a new trial or other relief based on the issuance of *Arctic Cat*. Rather, NetScout attempted to apply post-verdict law to pre-verdict evidence under the guise of a Rule 50(b) motion, which challenges the sufficiency of the evidence and the jury's consideration of that evidence under the agreed jury instructions. (Appx13061-13062(62:7-63:18).) NetScout could have moved for a new trial

under Fed. R. Civ. P. 59 within twenty-eight days of entry of the Final Judgment, but did not.

During the JMOL, when pressed by the district court about its failure to seek a new trial following the issuance of *Arctic Cat*, NetScout was unable to muster any excuse for not seeking relief. Instead, NetScout stuck with its Rule 50(b) motion challenging the sufficiency of the evidence presented at trial. (Appx13058-13062(59:11-63:18).) NetScout has waived any relief based on the timing of *Arctic Cat*.

### C. NetScout Failed to Carry its Burden Under the Agreed Marking Instruction.

NetScout failed to satisfy its burden at trial per the agreed jury instruction.

#### 1. NetScout Failed to Establish at Trial that MeterFlow Products Constitute "Patented Articles."

NetScout's marking argument based on the Meter products fails due to waiver of any objection to the jury instruction requiring NetScout to show that Meter products practiced at least one claim of the '789 Patent. NetScout did not offer evidence sufficient to establish MeterFlow practiced any claim of the '789 Patent, as required by the agreed marking instruction. NetScout did not present testimony from any knowledgeable witness that any MeterFlow product sold starting in 2009 practices any '789 claim. Despite knowing the burden it bore at trial, NetScout now seeks to run from its obligations under the jury instructions.

And even absent waiver, PI presented evidence sufficient to establish that

the Meter products did not practice any claim of the '789 Patent. In particular,

Dietz unequivocally testified on cross-examination that MeterWorks does not

embody the invention (Appx1104-1105(105:14-16, 105:24-106:3).) When

NetScout attempted to coax Dietz into admitting MeterFlow practiced the

invention based on a sentence from a provisional patent application—Dietz

testified that the inclusion of the cited phrase in the provisional application was in

error, which is why the phrase was removed before the filing of the non-

provisional applications. (Appx1121-1123(122:1-124:1).) Furthermore, NetScout's

Brief cites testimony from the inequitable conduct bench trial conducted outside

the presence of the jury after deliberations began. (NS.Br.57 (citing Appx2099);

Appx2097(93:9-15).) This evidence was not presented to the jury and cannot

support a challenge under Rule 50(b). *See Paez v. Gelboym,* 578 Fed. Appx. 407,

408 n.1 (5th Cir. 2014) ("We do not consider evidence that was not presented to

the jury."). Based on the evidence actually presented to the jury, the district court

correctly observed that "PI presented *unrebutted* testimony that while the

*provisional* application for the '789 Patent referenced MeterFlow as a preferred

embodiment, the *final* application omitted any such statements because the

inventors did not think MeterFlow practiced the invention" and the jury was

entitled to credit this evidence over any paltry competing evidence. (Appx34.)

NetScout also cites the testimony of Exar's corporate representative, Mr. Ham, as allegedly supporting that MeterFlow products practice the '789 Patent. But NetScout selectively quotes from the trial record to imply that the underlying technology for the patents was sold as MeterFlow or MeterWorks. However, Ham unequivocally cannot sponsor the evidence NetScout needs because he testified that he had not read the patents or compared the claims to any Meter product, had never compared the patent claims to any products, and could not represent that any products were commercial embodiments of the patents. (Appx32-33; Appx1888-1892(138:17-25, 141:11-15, 141:24-142:16).) The jury was entitled to discount the limited testimony NetScout relies upon in light of Ham's contrary and damaging testimony. *See Shell Offshore, Inc. v. Tesla Offshore*, L.L.C., 905 F.3d 915, 923 (5th Cir. 2018) ("It is for the jury, and not the court, 'to weigh conflicting evidence and inferences, and determine the credibility of witnesses.'") (citations and quotations omitted). Thus, the district court correctly denied NetScout's JMOL based on Ham's contrary testimony. (Appx32-34.)

As discussed below, NetScout is also precluded under Fed. R. Civ. P. 37(c) from relying on MeterFlow because NetScout refused to identify specific products in response to PI's marking interrogatory during discovery.

NetScout cannot escape the fact that it failed to offer evidence that any MeterFlow product practices any claims of the '789 Patent, as required by the jury instruction.

## 2. Specific Cisco and Huawei Products Were Not Identified at Trial.

NetScout cites to its summary judgment briefing to argue that specific Cisco and Huawei products were identified before trial. This argument fails for several reasons.

*First*, the district court informed the parties at the pre-trial conference that marking was a "live issue" *for trial*. (Appx29; Appx723(101:13-17).) Indeed, NetScout's counsel acknowledged that it would be required to submit marking evidence to the jury. (Appx723(101:18-25) ("That was that was our understanding, Your Honor. And so we believe the -- this is evidence we would submit to the jury, along with other evidence, regarding the Cisco and Huawei agreements and products."). NetScout was on notice that it was required to present *all evidence* of its marking defense *to the jury,* yet NetScout elected to not identify any specific Cisco or Huawei products to the jury.

*Second*, NetScout relies on *Semcon IP Inc. v. Huawei Device USA, Inc.,* 2:16-cv-00437-JRG-RSP, 2017 WL 6343771, at *1 (E.D. Tex. Dec. 12, 2017) to argue that the identification of products in summary judgment briefing satisfies the product identification requirement in *Arctic Cat. Semcon* is inapplicable because

that decision dealt with pre-trial issues, not a Rule 50(b) motion which always

focuses only on whether sufficient evidence supports the jury's verdict. Further, as

the district court correctly noted, in the present case, NetScout's summary

judgment motion was pre-*Arctic Cat* (Appx30), whereas *Semcon* issued post-*Arctic

Cat*. Moreover, while the *Semcon* Court held that the defendant had met its initial

burden of production at summary judgment and that the burden automatically

shifted to the plaintiff at trial, here, the district court denied NetScout's motion for

summary judgment as to pre-suit damages *in totality* (Appx406). Further, as

discussed below, any identification of specific Cisco or Huawei products at trial

would have been precluded under Rule 37(c)(1).

 ***Third***, during discovery, PI propounded an interrogatory asking NetScout to

identify products it contended required marking—NetScout refused to answer the

interrogatory. (Appx6583.) Under Fed. R. Civ. P. 37(c), "[i]f a party fails to

provide information or identify a witness as required by Rule 26(a) or (e), the party

is **not allowed to use that information** or witness **to supply evidence on a

motion, at a hearing, or at a trial**, unless the failure was substantially justified or

is harmless." NetScout never responded to PI's interrogatory. (Appx10711-10712.)

As such, NetScout is precluded from identifying specific products after the close of

fact discovery, including in its JMOL and appeal brief. Rule 37(c) provides an

independent basis to affirm the district court and the jury verdict. (*See also* Appx10645, n.1; Appx10711-10712.)

**Fourth**, this appeal is premised on the district court's denial of NetScout's JMOL under Rule 50(b). Only evidence actually presented to the jury matters. *See Paez,* 578 Fed. App'x. at 408 n.1. NetScout never identified to the jury the specific models identified on page 59 of its Brief, and cannot rely on summary judgment filings, no matter how flawed, to excuse its failure to present evidence *to the jury*.

## D. NetScout's Direct Infringement Independently Supports the Jury's Pre-suit Damages Verdict.

NetScout's direct infringement of the '725 and '751 patents provides an independent basis for sustaining the jury's pre-suit award.

NetScout misconstrues the trial record in arguing an alleged lack of evidence supporting the jury's pre-suit damages award in connection with the '725 and '751 Patents. Significant evidence was presented at trial establishing that NetScout itself used the infringing products and methods in a variety of different ways to promote and support infringing sales. **First**, before the district court, NetScout admitted evidence was presented at trial demonstrating that it tests the infringing products and uses its infringing probes in the field. (Appx10202 ("The only evidence of any such direct infringement of those methods patents by NetScout is a passing mention of incidental 'testing, as well as instances where [NetScout] use[s] those probes out in the field.'").).

60

**Second**, Almeroth testified regarding NetScout's discovery admissions that NetScout uses the infringing products in the United States, including testing the methods and using the methods in the field. (Appx1286(156:7-25).)

**Third**, Mr. Marwaha, NetScout's Product Manager, testified that NetScout technicians implement the infringing systems and methods at customer sites, in addition to training customers and providing ongoing support through the NetScout Service Delivery Organization. (Appx1342(212:1-24); Appx1355(225:4-18); Appx1360(230:4-15).)

**Finally**, Mr. Lindahl, NetScout's Former Sr. Finance and Accounting Director, testified that NetScout "customer[s] will pay us to use our own equipment to monitor the network to do an analysis, a study, to help them solve some sort of issue. And the other one is that we have a business where we monitor -- where we test cell phone towers, network-planning-type work" which may include "tak[ing] one of our own probes and go into a network to perform service." (Appx1362(232:7-24).)

Hence, there was ample evidence presented at trial that NetScout uses its own products, which practice the claimed methods of the '751 and '725 Patents, to make, generate and support sales from its own pre-suit direct infringement comprising developing products, testing products internally, installing products in the field, and training customers on use of the products – a fact correctly

acknowledged by the district court. (Appx35.) All of these activities drive sales of the products and revenue to NetScout—so it was reasonable for the jury to find that evidence of NetScout's pre-suit direct infringement contributed to the product sales that comprise the royalty base, which was consistent with the district court's instructions. (Appx35.)

The jury was also instructed, without objection, that "it is proper to award a damages amount if the evidence shows the extent of the damages as a matter of just and reasonable inference." (Appx2044(40:15-17).) Bergman testified that his damage calculations do not change depending on which patent is infringed. (Appx1396(15:20-16:5).) Therefore, sufficient evidence was presented to support the jury's pre-suit damages award based on infringement of either the '751 or '725 Patents. *See EEOC v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 452 (5th Cir. 2013) ("The jury is free to choose among reasonable constructions of the evidence." (internal quotations and citations omitted)).

To the extent NetScout wanted the jury to have considered how extensive and frequently NetScout used and tested its own products to mitigate any damages awarded, NetScout was free to introduce such evidence at trial – it did not. The fundamental question on appeal is whether there was sufficient evidence supporting the jury's verdict—there was. While NetScout may disagree with the jury's weighing of the evidence, that decision is for the jury to make, especially

considering NetScout adduced no countervailing evidence. In fact, NetScout did not present a damages expert to counter Bergman or any of the testimony from NetScout's own witnesses, which is why "NetScout fail[ed] to respond to the [cited] evidence in its briefing..." before the district court. (Appx36.)

This Court should not disturb the jury's pre-suit damages award.

## V.    THE JURY'S WILLFULNESS FINDING IS SUPPORTED BY SUBSTANTIAL EVIDENCE.

The jury was instructed that it "***may not determine that the infringement was willful just because NetScout knew of the asserted patent and infringed it***…. In determining whether the infringement by NetScout was willful, **you may consider all the relevant facts**." (Appx2036(32:1-18).) NetScout never objected to the instruction at the Charge Conference or when given to the jury (Appx1040; Appx321-322), and "[a] jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

At trial NetScout's corporate representative, Mr. Kenedi, admitted never reading the patents, but took the stand to sponsor NetScout's theory that Dietz lied and stole the claimed inventions (serious allegations), and that NetScout's CEO, Mr. Singhal, could not recall ever carefully reviewing the Asserted Patents, and is certain he did not read the entirety of even a single Asserted Patent. (Appx1490-1491(109:14-110:22); Appx1497(116:18-19); Appx1602-1603(87:11-88:4).) NetScout relies on the same trial cites (NS.Br.67)—but none of those citations

mitigate the egregious nature of NetScout's infringement and its strategy to attack the inventors and accuse them of stealing the subject matter of the Asserted Patents without even having read the Asserted Patents in any detail. The district court, who sat through the entire trial and was able to observe the character and demeanor of the witnesses, agreed with the jury's findings. (Appx37). *See SRI Int'l, Inc. v. Cisco Sys., Inc.*, 918 F.3d 1368, 1380 (Fed. Cir.) ("it is the *circumstances* that transform simple "intentional or knowing" infringement into egregious, sanctionable behavior, and that makes all the difference" (citing *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1936 (2016) (Breyer, J., concurring)).

NetScout reliance on *SRI* is misplaced because there the court discounted that certain engineers in a very large organization (Cisco) had not read the asserted patents until deposition. Here, NetScout's corporate representative sponsored a trial theory predicated on attacking the reputation of industry luminaries, such as Dietz. (Appx1047-1050(48:16-51:1).) That trial strategy also included proffering expert testimony from Waldbusser, who admitted under cross-examination that his non-infringement jury presentation contained no evidence. (Appx1838-1841(85:12-91:18).).

Singhal testified that despite allegedly phasing out the Infringing Products, "if a customer demands the old product, we [i.e., NetScout] *will sell* to [the customer]." (Appx1553-1554(38:20-39:5).) The jury and district court were

entitled to consider NetScout's decision to continue selling the Infringing Products in determining willfulness. Further, NetScout continues to advertise and sell the Infringing Products in defiance of the jury's verdict. (Appx10511-10512; Appx10522-10544.)

As it pertains to NetScout's alleged "good faith" defenses, NetScout cannot simply hide behind its attorneys or experts to insulate itself—particularly in the absence of trial testimony demonstrating any reasonable good-faith reliance or what they were told by experts or lawyers when the evidence established NetScout's principal witnesses were not even interested or engaged enough to bother reviewing the Asserted Patents. "The jury was under no obligation to credit [NetScout's] defenses as reasonable or infer that the defense was evidence of [NetScout's] good-faith belief, particularly where there was no evidence about that belief." *Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*, No. 2:15-CV-00011-RSP, 2018 WL 2149736, at *9 (E.D. Tex. May 10, 2018) (finding substantial evidence supported willfulness verdict and rejected defendant's pleading of good faith where "[w]hat is missing, however, is any evidence from [defendant] regarding its actual, subjective beliefs. The [defendant] employees called by deposition at trial indicated only that they did not read the patent. It would be impossible to conclude that these employees reasonably believed the patent was invalid when the employees admitted they had no beliefs at all about the matter.").

Here the jury and the district court found the willfulness standard satisfied even though it heard the NetScout witnesses' vague and generic testimony about their reliance on attorneys and experts—thus "[t]he jury must have concluded that the defense was not reasonable enough to permit an inference that [NetScout] did not willfully infringe the patent." *Id.*

Nothing in Kenedi's or Singhal's testimony disclosed the timing of any investigations or development of defenses, nor did they disclose that they made any specific business decision after being put on detailed notice of infringement based on any specific defense to the claim other than conclusory testimony about conversations with lawyers or experts—the contents of which were not disclosed to the jury. "The jury's finding that [NetScout's] infringement was both culpable and egregious necessarily means that the jury did not credit [NetScout] with a good faith belief about the [Asserted Patents]. This was not a surprising result given the lack of evidence about the subjective beliefs of [NetScout's] decision makers." *Id*. at *10; *see also id*. at *11 (further holding that the fact that the case was not close contributed to its holding that substantial evidence supported the jury's willfulness finding).

NetScout did not assert an advice of counsel defense to willfulness. Thus, neither counsel's advice nor the steps taken to provide it were disclosed or subject to cross-examination.

Substantial evidence supports the willfulness finding, which should be affirmed.

## CONCLUSION & PRAYER FOR RELIEF

The judgment below should be affirmed.

Dated: October 15, 2019

Respectfully submitted,

/s/ *Paul J. Skiermont*
Paul J. Skiermont
Sadaf R. Abdullah
Steven W. Hartsell
Steven J. Udick
SKIERMONT DERBY LLP
1601 Elm Street, Suite 4400
Dallas, TX 75201
pskiermont@skiermontderby.com
sabdullah@skiermontderby.com
shartsell@skiermontderby.com
sudick@skiermontderby.com

Mieke K. Malmberg
SKIERMONT DERBY LLP
800 Wilshire Blvd., Suite 1450
Los Angeles, CA 90017
mmalmberg@skiermontderby.com

*Attorneys for Appellee*
*Packet Intelligence LLC*

## CERTIFICATE OF SERVICE

I, Melissa Pickett, being duly sworn according to law and being over the age of 18, upon my oath deposes and states that:

Counsel Press was retained by Skiermont Derby LLP for Appellee Packet Intelligence LLC to print this document. I am an employee of Counsel Press.

On October 15, 2019, Skiermont Derby LLP authorized me to electronically file the foregoing Brief of Appellee Packet Intelligence LLC with the Clerk of the Federal Circuit using the CM/ECF System, which will serve e-mail notice of such filing on the following attorneys:

Michael J. Lyons (michael.lyons@morganlewis.com)
Ahren C. Hsu-Hoffman (ahren.hsu-hoffman@morganlewis.com)
Michael F. Carr (michael.carr@morganlewis.com)
Thomas Y. Nolan (thomas.nolan@morganlewis.com)
Eric Kraeutler (eric.kraeutler@morganlewis.com)
Julie Goldemberg (julie.goldemberg@morganlewis.com)
William R. Peterson (william.peterson@morganlewis.com)
Karon N. Fowler (karon.fowler@morganlewis.com)
Jason D. Frank (jason.frank@morganlewis.com)

Upon acceptance by the Court of the e-filed document, I will cause six paper copies of the brief to be filed with the Court, via Federal Express, within the time provided in the Court's rules.

*/s/ Melissa Pickett*
Counsel Press

# CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limitation of Federal Circuit Rule 32(a). It contains 13,814 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

This Brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman.

Dated: October 15, 2019

Respectfully submitted,

/s/ *Paul J. Skiermont*

Paul J. Skiermont
Sadaf R. Abdullah
Steven W. Hartsell
Steven J. Udick
SKIERMONT DERBY LLP
1601 Elm Street, Suite 4400
Dallas, TX 75201
pskiermont@skiermontderby.com
sabdullah@skiermontderby.com
shartsell@skiermontderby.com
sudick@skiermontderby.com

Mieke K. Malmberg
SKIERMONT DERBY LLP
800 Wilshire Blvd., Suite 1450
Los Angeles, CA 90017
mmalmberg@skiermontderby.com

*Attorneys for Appellee*
*Packet Intelligence LLC*