No. 2019-2041

# In the United States Court of Appeals For the Federal Circuit

PACKET INTELLIGENCE LLC,

*Plaintiff-Appellee,*

v.

NETSCOUT SYSTEMS, INC., NETSCOUT SYSTEMS TEXAS, LLC, FKA TEKTRONIX TEXAS, LLC DBA TEKTRONIX COMMUNICATIONS,

*Defendant-Appellants.*

Appeal from the United States District Court for the Eastern District of Texas, No. 2:16-cv-00230-JRG, Chief District Judge J. Rodney Gilstrap

## APPELLANTS' REPLY BRIEF

Michael J. Lyons
Ahren C. Hsu-Hoffman
Michael F. Carr
Thomas Y. Nolan
Morgan, Lewis & Bockius LLP
1400 Page Mill Road
Palo Alto, CA 94304
650.843.4000

William R. Peterson
Morgan, Lewis & Bockius LLP
1000 Louisiana St., Suite 4000
Houston, TX 77002
713.890.5000

Eric Kraeutler
Julie Goldemberg
Morgan, Lewis & Bockius LLP
1701 Market St.
Philadelphia, PA 19103
215.963.5000

Jason D. Frank
Morgan, Lewis & Bockius LLP
One Federal Street
Boston, MA 02110
617.341.7700

Karon N. Fowler
Morgan, Lewis & Bockius LLP
77 West Wacker Drive
Chicago, IL 60601
312.324.1000

***Counsel for Defendant-Appellants NetScout Systems, Inc., NetScout Systems Texas, LLC fka Tektronix Texas, LLC dba Tektronix Communications***

# CERTIFICATE OF INTEREST

Counsel for Appellants NetScout Systems, Inc. and NetScout Systems Texas, LLC (fka Tektronix Texas, LLC dba Tektronix Communications) certify the following:

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10% or more of stock in the party |
|---|---|---|
| NetScout Systems, Inc. | None | BlackRock Inc. |
| NetScout Systems Texas, LLC | None | NetScout Systems, Inc. |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

Morgan, Lewis & Bockius LLP: Adam A. Allgood,* W. Scott Tester

Gillam & Smith, LLP: Harry L. Gillam, Jr., Melissa R. Smith

Locke Lord LLP: Paul D. Lein, Scott D. Wofsy, Christopher Capelli, Charles E. Phipps

*No longer with Morgan, Lewis & Bockius LLP.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47. 4(a)(5) and 47.5(b). (The parties should attach continuation pages as necessary).

*Palo Alto Networks, Inc. v. Packet Intelligence LLC*, 3-19-cv-02471 (N.D. Cal.); *Packet Intelligence LLC v. Juniper Networks, Inc.*, 3-19-cv-04741 (N.D. Cal.).

Respectfully submitted,

By: */s/ Eric Kraeutler*

Dated: November 22, 2019

Michael J. Lyons
Ahren C. Hsu-Hoffman
Michael F. Carr
Thomas Y. Nolan
Morgan, Lewis & Bockius LLP
1400 Page Mill Road
Palo Alto, CA 94304
650.843.4000

William R. Peterson
Morgan, Lewis & Bockius LLP
1000 Louisiana St., Suite 4000
Houston, TX 77002
713.890.5000

Eric Kraeutler
Julie Goldemberg
Morgan, Lewis & Bockius LLP
1701 Market St.
Philadelphia, PA 19103
215.963.5000

Jason D. Frank
Morgan, Lewis & Bockius LLP
One Federal Street
Boston, MA 02110
617.341.7700

Karon N. Fowler
Morgan, Lewis & Bockius LLP
77 West Wacker Drive
Chicago, IL 60601
312.324.1000

***Counsel for Defendant-Appellants NetScout Systems, Inc., NetScout Systems Texas, LLC fka Tektronix Texas, LLC dba Tektronix Communications***

## TABLE OF CONTENTS

**Page**


Certificate of Interest ....................i

Table of Authorities ....................v

Introduction ....................1

Argument ....................3

I. The Asserted Claims Are Not Eligible for Patent Protection Under Section 101. ....................3

  A. The Asserted Claims Are Directed to an Abstract Idea. ....................3

  B. The Asserted Claims Do Not Contain an Inventive Element. ....................5

II. The Accused Products Do Not Infringe the Asserted Claims. ....................7

  A. PI Concedes the Accused Products Recognize and Store Only Connection Flows. ....................8

  B. PI's Arguments Conflict with the Claim Language. ....................9

  C. The Court's Construction Supports NetScout, Not PI. ....................13

III. The Asserted Claims Are Invalid. ....................16

  A. The Asserted Claims Are Invalid Under Section 102(f). ....................16

    1. The claims do not require "maintaining separate connection flow entries for each connection flow." ....................18

    2. The claims do not require "visibility into application content." ....................21

  B. The Asserted Claims Are Anticipated ....................21

IV. PI Is Not Entitled to Presuit Damages. ....................22

  A. PI Failed To Prove Marking Under Section 287(a). ....................23

    1. PI's waiver argument fails as a matter of law. ....................23

    2. There was no evidence that MeterFlow does not practice the '789 patent. ....................25

    3. PI had notice of unmarked Cisco and Huawei products. ....................26

  B. There Was No Evidence of Damages for the Method Claims. ....................27

# TABLE OF CONTENTS
(continued)

**Page**

V. The Willfulness Verdict Was Not Supported by Substantial Evidence. ......29
Conclusion ..........32
Proof of Service ..........33
Certificate of Compliance ..........34

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*,
728 F.3d 1336 (Fed. Cir. 2013) ....................................................................4

*Air-Sea Forwarders, Inc. v. Air Asia Co.*,
880 F.2d 176 (9th Cir. 1989) ......................................................................24

*Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*,
939 F.3d 1355 (Fed. Cir. 2019) ....................................................................4

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
876 F.3d 1350 (Fed. Cir. 2017) ...................................................23, 26, 27, 29

*Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*,
249 F.3d 1341 (Fed. Cir. 2001) ..................................................................30

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988).....................................................................................23

*Broadcom Corp. v. Emulex Corp.*,
732 F.3d 1325 (Fed. Cir. 2013) ..................................................................25

*BSG Tech LLC v. Buyseasons, Inc.*,
899 F.3d 1281 (Fed. Cir. 2018) ................................................................6, 7

*Electric Power, LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016) ................................................................3, 4

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) ....................................................................3

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
839 F.3d 1089 (Fed. Cir. 2016) ....................................................................6

*In re VerHoef*,
888 F.3d 1362 (Fed. Cir. 2018) ..................................................................17

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*INO Therapeutics LLC v. Praxair Distrib. Inc.*,
No. 2018-1019, 2019 WL 4023576 (Fed. Cir. Aug. 27, 2019) ............................6

*Intellectual Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. 2016)..............................................................................4

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmBH v. Dana Corp.*,
383 F.3d 1337 (Fed. Cir. 2004) .....................................................................31

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) .........................................................................24

*Ormco Corp. v. Align Tech., Inc.*,
463 F.3d 1299 (Fed. Cir. 2006) .....................................................................28

*Power Integrations v. Fairchild Semiconductor Int'l, Inc.*,
843 F.3d 1315 (Fed. Cir. 2016) .....................................................................19

*Promega Corp. v. Life Techs. Corp.*,
875 F.3d 651 (Fed. Cir. 2017) .......................................................................29

*Safeclick, LLC v. Visa Int'l Serv. Ass'n*,
208 Fed. App'x 829 (Fed. Cir. 2006) ............................................................27

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
930 F.3d 1295 (Fed. Cir. 2019) .....................................................................30

*St. Louis v. Praprotnik*,
485 U.S. 112 (1988)........................................................................................23

*TechSearch, L.L.C. v. Intel Corp.*,
286 F.3d 1360 (Fed. Cir. 2002) .....................................................................25

*United States v. Buck*,
324 F.3d 786 (5th Cir. 2003) .........................................................................16

*Versata Dev. Grp., Inc. v. SAP Am., Inc.*,
793 F.3d 1306 (Fed. Cir. 2015) .......................................................................6

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

## RULES

Fed.R.Civ.P.
37 .....27
50 .....14, 23, 24, 25

## INTRODUCTION

Packet Intelligence LLC ("PI") advances multiple and irreconcilable readings of the "conversational flow" limitations at the heart of the alleged invention, but fails to ground these interpretations in the language of the asserted claims.

To preserve eligibility, PI acknowledges the claims are directed to "constructing conversational flows that associate connection flows with each other." This claim construction, however, fatally undermines PI's infringement theory because it is undisputed the accused products store unassociated connection flows without constructing "conversational flows."

To save its infringement claim, PI reverses course, arguing that the very feature that purportedly confers eligibility—the classification of "conversational flows"—need not be present in the accused products. According to PI, the accused products need not classify "conversational flows" so long as the accused products store information that hypothetically "could be used" to do so. But this argument flatly contradicts claim language requiring "the monitor to classif[y] the packet as belonging to a found existing flow" in the "flow-entries for previously encountered conversational flows."

To rescue the claims from invalidity, PI then abandons its broad infringement reading in favor of a narrow validity construction, contending the claims require that the monitor track parallel "connection flows" while storing them in separate

"connection flow entries." But these arguments are not tied to any language in the claims, which neither recite nor refer to "connection flows" and, for some claims, never even mention "flow entries." PI urges this narrow reading (which undercuts its infringement claim) in a bid to distinguish the Track Sessions technique developed by the RMON Working Group and taught to the named inventors before the filing of the asserted patents. This group was the true inventor of what the patents call "conversational flows."

Claims must be interpreted and applied consistently for eligibility, infringement, and validity. NetScout's analysis respects this maxim, while PI's arguments flout it. The judgment below should be reversed.

# ARGUMENT

## I. The Asserted Claims Are Not Eligible for Patent Protection Under Section 101.

Under *Alice*, *Mayo*, and their progeny, the asserted claims are ineligible for patent protection. The claims are directed to the abstract idea of recognizing "conversational flows," a form of collecting, storing, and associating packet data that is indistinguishable from other data processing claims that this Court has held to be directed to abstract ideas. *See* NetScout Br. 27-28. The claims add no inventive concept to this abstract idea, reciting instead the use of generic components to accomplish this result. PI's contrary arguments rely on details in the specification that are absent from the abstract, functional claims.

### A. The Asserted Claims Are Directed to an Abstract Idea.

PI argues that the claims "are directed to a technical problem (*i.e.*, the need to correlate disjointed connection flows)," PI Br. 41, but a technical problem cannot save the claims. To be eligible, claims must be "directed to a specific implementation of a solution." *Enfish, LLC v. Microsoft Corp*., 822 F.3d 1327, 1339 (Fed. Cir. 2016). Here, the claims recite achieving the goal of recognizing "conversational flows" while offering no specific implementation solving this "technical problem." PI Br. 41; *see* NetScout Br. 28-30. Like the claims in *Electric Power, LLC v. Alstom S.A.*, the claims are ineligible because they are "so result-

focused, so functional, as to effectively cover any solution to an identified problem." 830 F.3d 1350, 1354-56 (Fed. Cir. 2016).

To identify a specific solution to the problem of recognizing "conversational flows," PI points—not to the claims—but to the specification. PI Br. 40-41, 44-45. But this Court has repeatedly explained that "the level of detail in the specification does not transform a claim reciting only an abstract concept into a patent-eligible system or method." *Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013); *see also Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1322 (Fed. 2016) ("[T]echnological details set forth in the patent's specification and not set forth in the claims" cannot confer eligibility.); *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 939 F.3d 1355, 1363 (Fed. Cir. 2019) ("We have repeatedly held that features that are not claimed are irrelevant as to step 1 or step 2 of the *Mayo*/*Alice* analysis.").

As the claims cover only the goal of recognizing "conversational flows," any specific solutions in the specification are irrelevant to their eligibility.[1] Contrary to PI's contentions, this does not mean that NetScout believes the specification is irrelevant. *See* PI Br. 41. Indeed, the specification confirms the invention is directed to recognizing "conversational flows": "[w]hat distinguishes this invention from

[1] While the Figure 2 embodiment describes the prior art Track Sessions technique for recognizing "conversational flows" by remembering the port assignments, *see* NetScout Br. 43-44, the claims do not recite this technique.

prior art network monitors is that it has the ability to recognize disjointed flows as belonging to the same conversational flow." Appx175(3:56-59).

PI concedes the claims "are directed to … correlat[ing] disjointed connection flows." PI Br. 41. But this is an abstract idea, involving nothing more than collecting, analyzing, and storing packet data.

**B. The Asserted Claims Do Not Contain an Inventive Element.**

The claims fail to add an inventive concept to the claimed abstract idea. They recite only using conventional components in conventional ways to accomplish the result of recognizing "conversational flows." As NetScout demonstrated in its opening brief, the district court erred in concluding that this abstract idea was an "unconventional technological solution" constituting the inventive concept. NetScout Br. 30-35.

PI does not defend this error. Nor does PI suggest that the components recited in the claims involve an inventive concept. *See* PI Br. 48. Indeed, PI acknowledges that "the district court did not rely on the [a]sserted [c]laims' recited components, or their 'ability to recognize disjointed flows as belonging to the same conversational flow' for its finding of an inventive concept." *Id.*

Unable to find an inventive concept in the claims, PI relies instead on the specification's description of "benefits achieved by the [a]sserted [c]laims as compared to the prior art." PI Br. 48-49. But unclaimed benefits do not render

claims eligible for patent protection. *See Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1335 (Fed. Cir. 2015) (rejecting contention that "benefits are relevant" when the "supposed benefits [were] not recited in the claims at issue"); *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1097 (Fed. Cir. 2016) ("[C]laims do not recite [the alleged] improvement.").

Moreover, a claim is ineligible when any "benefits … flow from performing an abstract idea in conjunction with a well-known … structure." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1288 (Fed. Cir. 2018); *see also INO Therapeutics LLC v. Praxair Distrib. Inc.*, No. 2018-1019, 2019 WL 4023576, at *10 (Fed. Cir. Aug. 27, 2019) ("These benefits result solely from the alleged discovery of the phenomenon itself—not an inventive application of it"). Eligibility cannot be conferred by any benefits that flow from performing the abstract idea of recognizing "conversational flows" using the recited components.

PI next argues that under *Berkheimer* NetScout "failed to show that the combination of elements recited in the [a]sserted [c]laims would have been regarded as conventional, routine, or well-known by a skilled artisan in the relevant field." PI Br. 46-47. But, as this Court explained in *BSG*, "the relevant inquiry is not whether the claimed invention as a whole is unconventional or non-routine." 899 F.3d at 1290. Rather, "[i]f a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been

transformed into a patent-eligible application of an abstract idea." *Id.* at 1290-91. Thus, it is "irrelevant" whether the abstract idea of recognizing "conversational flows" "may have been non-routine or unconventional as a factual matter." *Id.* at 1291. Although NetScout relied heavily on *BSG* in its opening brief, NetScout Br. 22, 29, 34-35, PI does not address—or even cite—this case.

The claims are directed to the abstract idea of recognizing conversational flows, and they add no inventive concept to this abstract idea. This Court should find the claims ineligible and reverse the judgment below.

## II. The Accused Products Do Not Infringe the Asserted Claims.

PI seeks to save its defective infringement theory by blurring the fundamental distinction between **connection flows** and "**conversational flows**." The common specification explains that prior art monitors "classify packets into connection flows," separately storing "the packets involved with a single connection." Appx174(2:42-45). By contrast, the claimed inventions "identify and classify conversational flows," "the sequence of packets that are exchanged in any direction as a result of an activity" and that may "involve more than one connection." Appx174(2:45-52).

In other words, as PI explained during claim construction, "[t]he network monitor disclosed in the [a]sserted [p]atents categorizes network transmissions into 'conversational flows.'" Appx3013. What PI disparages in its brief as NetScout's

"joining theory," PI Br. 18-19, refers simply to the requirement of performing this categorization. The patents describe this process as to "'virtually concatenate'—that is, to link" disjointed connection flows so that they can "then be correctly identified as being part of the same conversational flow." Appx175(3:8-14).

The claims reflect these requirements. Representative claim 19 recites a lookup engine that examines the database of "previously encountered conversational flows" to determine if "the packet is of an existing flow." It then further requires that "the monitor classifies the packet as belonging to the found existing flow" among the "previously encountered conversational flows."

If a device does not "categoriz[e] network transmissions into 'conversational flows,'" Appx3013, by recognizing different connection flows as part of the same "conversational flow," then it does not infringe. Here, the accused products recognize and store only connection flows and never categorize packets into "conversational flows." They do not infringe.

### A. PI Concedes the Accused Products Recognize and Store Only Connection Flows.

It is undisputed that the accused products do not categorize packet transmissions into "conversational flows." Like the prior art, the accused products only recognize and store connection flows. PI acknowledges these controlling facts. *See* PI Br. 23-24 ("[T]he flow records stored …'are connection flows'"); PI Br. 24 (the flow entries in the database do not have to "represent the conversational flows

themselves"). Because the accused products recognize and store only connection flows, they do not infringe.

### B. PI's Arguments Conflict with the Claim Language.

Unable to identify any evidence of infringement, PI advances an untenable response, which is flatly inconsistent with the claim limitations. According to PI, the accused products infringe because, in the database of flow-entries for connection flows, the accused products store information that could (hypothetically) be used to correlate connections flows into "conversational flows," even though the accused products never actually do so. PI Br. 24-25. But PI has no answer to the fact that the claim limitations require identification of "conversational flows," not merely connection flows.

Claim 19, acknowledged as representative by the parties, requires "a database comprising … **flow-entries for** previously encountered **conversational flows**."[2] Appx191. Claim 19's subsequent references to "flow-entries" concern these "flow-entries for previously encountered conversational flows" and subsequent references to "flows" concern "conversational flows." When a new packet is acquired, claim 19 requires a "lookup engine" to "lookup whether the particular packet … has a matching flow-entry." This lookup engine is "coupled" to the "flow-entry memory" storing "flow-entries for previously encountered conversational flows." If the

[2] Emphasis added throughout unless otherwise noted.

lookup engine determines "the packet is of an existing flow" (*i.e.*, one of the "previously encountered conversational flows"), then "the monitor classifies the packet as belonging to the found existing flow." These limitations thus require packets to be categorized into "conversational flows."

PI's briefing on claim construction acknowledged that packets must be identified as part of a "**conversational flow**": "The Analyzer subsystem takes the information extracted by the Parser and uses that to determine whether the packet belongs to an **existing conversational flow** or indicates a **new conversational flow**." Appx3013; *see also* Appx3597 (same); Appx3012-3013 ("[C]onventional network monitors categorized network transmissions into 'connection flows.' …The network monitor disclosed in the [a]sserted [p]atents categorizes network transmissions into 'conversational flows.'").

Indeed, Figure 3 of the asserted patents confirms that the "flows" into which packets are being categorized are "conversational flows," not connection flows. The identification process shown in Figure 3 corresponds to the operations performed by Claim 19's parser and lookup and flow insertion engines. As step 312 indicates, the parser builds a unique key for a "conversation[al] flow," which is used to lookup whether each packet should be classified as part of an existing or new "conversational flow":




Appx158 (highlighting added). Because the unique key is built for the "conversational flow," the subsequent references to "flows" in the diagram necessarily concern "conversational flows." *See also* Appx181(16:5-6) ("After updating, database 324 therefore includes the set of all the **conversational flows** that have occurred."). PI similarly used "flow" as shorthand for "conversational flow" in its claim construction briefing. *See* Appx3599 (describing step 312 "Build Unique Conversation[al] 'Flow' Key" as "the parser uses the extracted information to create a flow key that helps identify the flow to which this packet belongs").

In other words, both parties correctly understood, consistent with Figure 3 and the plain language of the claims, that the "flows" and "flow-entries" recited in claim 19 all concerned "conversational flows." Representative claim 19 requires the lookup engine to examine the database of "previously encountered conversational

flows" to determine if "the packet is of an existing flow" and then "the monitor classifies the packet as belonging to the found existing flow." This language specifically requires categorizing packets as part of a "conversational flow." This is also true for the claims of the '751 patent that require storing "flow entries for the plurality of conversational flows" (Appx313) and for the claims of the '725 patent that require performing operations based on "a state of the conversational flow of the packet" (Appx266).

PI presented no evidence that the accused products satisfy these limitations. Its expert, Dr. Almeroth, opined only that "information in the [connection] flow record" of the accused products "can be used to correlate or associate [connection] flow-entries into conversational flows." Appx1266-1267. This merely demonstrates that the accused products categorize packets into connection flow entries, and not into the "conversational flow" entries required by the claims.[3]

As PI acknowledges, Dr. Almeroth referred to the Web Page Download Time feature merely to support his testimony that the connection flow entries in the accused products could, hypothetically, be correlated into "conversational flows." *See* PI Br. 26. Since this feature was never sold to or used by any customer, this

[3] NetScout was not required to object to Dr. Almeroth's testimony as outside the scope of his report. NetScout's argument is not that Dr. Almeroth's testimony was inadmissible—it is that his testimony is legally insufficient to prove infringement.

testimony does nothing to show that the accused products meet any claim limitations.

### C. The Court's Construction Supports NetScout, Not PI.

PI incorrectly suggests that the district court's claim construction opinion supports its infringement theory. PI Br. 21.

To the contrary, in rendering its construction on the term "flow-entry database," the district court confirmed that the "conversational flow" requirement "appear[s] in surrounding claim language." Appx421. The district court acknowledged that NetScout had "highlight[ed] that 'every single independent claim involving this limitation recites that a flow-entry database includes flow entries for 'previously encountered conversational flows'" and had thus "conclude[d] that '[a] database that is not configured to store conversational flow entries cannot possibly carry out the claimed inventions.'" Appx418-419. The district court found no need to include "conversational flow" in the construction of "flow-entry database" "[b]ecause such limitations are recited by other claim language." [4] Appx421.

If there was any remaining doubt about the district court's construction, it was resolved during summary judgment. NetScout's motion for summary judgment

[4] The district court similarly construed the claims after trial when ruling on the eligibility issue by finding that the claims recite "a particular approach focused on constructing conversational flows that associate connection flows with each other." Appx389; PI Br. 45.

stated, unequivocally, its understanding that as construed: "Each of the asserted claims requires determining whether packets flowing through a network are part of a 'conversational flow.'" Appx6035. Indeed, NetScout's motion included the specific contention that the lookup in claim 19 required "determining if the packet is of an existing **[conversational] flow**." Appx6037 (emphasis and bracketed "conversational" in original). PI did not dispute this characterization.

If PI disagreed, then its response to NetScout's summary judgment motion was the time to raise the issue. Instead, PI accepted this construction. Appx7612-7613 (PI stating that NetScout's understanding of claim 19 was "[n]ot disputed for the purposes of this motion").

Moreover, at the summary judgment hearing, PI described Dr. Almeroth's infringement opinion as consistent with this agreed construction, arguing that the accused products "correlate two or more connection flows." Appx578; *see also* Appx583 (arguing that "the system gets from individual flows into a correlation of flows that meets the Court's claim construction"). Although wrong factually, PI's argument was fully consistent with the agreed construction.

NetScout made clear in its Rule 50(b) motion that PI had repeatedly acknowledged that the claims required correlating connection flows into "conversational flows." Appx10121-10128. It is telling that, in response, PI could not identify a single prior instance in its suit against NetScout where it articulated its

theory that the claims read on exclusively storing "flow-entries for connection flows."

To the extent there has been a forfeiture, it was by PI. *Cf.* PI Br. 28 (representing, incorrectly, that NetScout suggested "for the first time post-trial" that the claims referred to "conversational flows"). NetScout did not have to ask the district court to rule on this claim construction issue a second time when: (1) NetScout understood that the district court had already ruled on it in NetScout's favor; (2) NetScout's understanding was consistent with how PI repeatedly described the technology and claims; and (3) PI had never disputed that understanding, even when set forth unequivocally in NetScout's summary judgment motion. PI cannot adopt a construction pre-trial, stipulate to this construction at summary judgment, opportunistically change its position post-trial, and then argue forfeiture by the opposing party on appeal.

PI's evidence that information stored by the accused products in the connection flow database could, hypothetically, be used to correlate those connection flows into "conversational flows" does not meet the claims as construed and is not evidence of infringement.[5] This Court should render judgment for NetScout.

[5] PI's attack on the testimony of NetScout's expert, Mr. Waldbusser, as "barren of any evidence" is both wrong and irrelevant. Mr. Waldbusser's testimony that his

## III. The Asserted Claims Are Invalid.

NetScout demonstrated in its opening brief that it is entitled to judgment as a matter of law that the patents are invalid, both because they are anticipated and because the patents fail to name all inventors. PI does not identify any legally sufficient basis on which the jury could have ruled in its favor.

In its brief, PI argues that the claims are valid because the prior art—Track Sessions and the NetScout 6010 Probe implementing Track Sessions—did not:

- "[M]aintai[n] separate connection flow entries for each connection flow in the conversational flow." PI Br. 34 n.5.
- Provide "visibility into application content." PI Br. 33.
- Track connection flows in "parallel." PI Br. 32.

But PI fails to tie any of these arguments to any limitation of the claims. They are irrelevant to the issues here. PI's response confirms that NetScout is entitled to judgment as a matter of law.

### A. The Asserted Claims Are Invalid Under Section 102(f).

As NetScout showed in its opening brief, the RMON Working Group (which invented Track Sessions) was the actual inventor of the claimed "conversational

---

slides are not themselves evidence was simply an acknowledgement they are "pedagogical aid[s]" to assist the jury. *See United States v. Buck*, 324 F.3d 786, 791 (5th Cir. 2003); Appx1836-1837 (Mr. Waldbusser explaining the slides are "a description of the evidence"). Even so, PI admits that Mr. Waldbusser is correct: the accused products only store connection flows. *See* Appx1320 (Dr. Almeroth agreeing the accused products only store connection flows).

flow" recognition. NetScout Br. 9-13, 42-50. Because the RMON Working Group contributed an "essential feature," the claims are invalid under Section 102(f). *In re VerHoef*, 888 F.3d 1362, 1366 (Fed. Cir. 2018).

PI attempts to distinguish *VerHoef* because the named inventor in that case conceded an essential feature was devised by another. PI Br. 39-40. But, here, named inventor Mr. Maixner *has* made the same concession, acknowledging that Track Sessions describes a technique for correlating disjointed connection flows essentially identical to the technique shown in the Figure 2 embodiment of the patents. NetScout Br. 18. And PI does not dispute that even absent an inventor admission, if an unnamed inventor conceived an essential feature of the claims, under the legal standard articulated in *VerHoef*, the patents are invalid under Section 102(f).

The remaining controlling facts are undisputed. PI acknowledges that the RMON Working Group devised Track Sessions before the patents were filed, that the alleged "lead inventor," Mr. Dietz, was involved with the RMON Working Group, and that Mr. Dietz understood the "nuances" of Track Sessions. *See* PI Br. 39.

Nor does PI dispute that recognizing "conversational flows" is an "essential feature" of the claims. The specification alleges this feature is the point of novelty distinguishing the prior art. Appx175(3:56-59).

PI's response identifies no evidence that would permit a jury to conclude that the RMON Working Group did not invent an essential feature of the claims. PI's arguments have no grounding in the claims and provide no basis to distinguish the RMON Working Group's Track Sessions from the essential feature of recognizing "conversational flows."

**1. The claims do not require "maintaining separate connection flow entries for each connection flow."**

PI argues that Track Sessions does not recognize "conversational flows" because it "replac[es]" the "tracking of one connection with the tracking of another connection" rather than "track connection flows that may occur in parallel and relate them to each other." PI Br. 32. PI's argument rests on the premise that "the [a]sserted [c]laims require[] maintaining separate connection flow entries for each connection flow in the conversational flow." PI Br. 34 n.5. But this argument has no grounding in the claim language or the district court's construction.

Claim 19 does not require storing any connection flows. Rather, as discussed above in Section II.B, this claim requires "the monitor [to] classif[y] the packet as belonging to the found existing flow" among the "flow-entries for previously encountered **conversational flows**." Claims 1 and 5 of the '751 patent similarly require "flow entries for previously identified **conversational flows**." At a minimum, nothing in the court's construction or the claim language limits flow entries to only connection flows, as PI contends. Claims 10 and 17 of the '725 patent

do not recite "flow entries" of any kind; there is no basis to assert that they require flow entries for connection flows.

Nor do the claims require "parallel" tracking as PI contends. The patents identify protocols such as RPC that generate serial—not simultaneous—connection flows during an activity. Appx157 (Figure 2 showing Sun RPC packet exchanges 206, 207 in first connection (top) followed by subsequent packet exchanges 208, 209 in second connection (bottom)); Appx190(33:14-21, 34:28-30) (explaining sequence of packet exchanges). The patents do not differentiate between recognizing "conversational flows" associated with connection flows that are serial from those that are simultaneous.

PI cannot distinguish Track Sessions as only embodying an essential feature of the claims in some contexts, such as when tracking an RPC activity, even though it might not in another. "Just as an accused product that sometimes, but not always, embodies a claimed method nonetheless infringes, a prior art product that sometimes, but not always, embodies a claimed method nonetheless teaches that aspect of the invention." *Power Integrations v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1335-38 (Fed. Cir. 2016) (internal quotations and citations omitted). Track Sessions discloses an essential feature of the claims regardless whether it ever maintains separate connection flow entries for each connection flow or tracks them in parallel.

Track Sessions's use of a single "conversational flow" entry to track the two separate connection flows of an RPC activity as a single "conversational flow" discloses the essential "conversational flow" feature. Indeed, the specification identifies RPC as a "protocol[] that may lead to disjointed flows" that are "part of the same conversational flow." Appx175(3:9-21). Dr. Almeroth conceded that Track Sessions aggregated all packets of these two separate RPC connection flows in a single flow-entry. *See* Appx1924(29:1-3) ("[A]ll of the packets that were exchanged over these two different connections are counted as the one flow-entry."). Thus, Dr. Almeroth confirms that Track Sessions discloses an essential feature of the claims.

Named inventor Mr. Maixner's testimony underscores there are no relevant differences between the connection flows aggregated by Track Sessions and recognizing "conversational flows" as described in the asserted patents. To Mr. Maixner's admission that Track Sessions and the Figure 2 embodiment disclose the same technique, PI only responds that Dr. Almeroth testified Figure 2 "doesn't say that it is building the conversational flows." PI Br. 35. But Dr. Almeroth is wrong. The patents expressly state that Figure 2 is "an illustrative example" of "a conversational flow between a client and server on a network" and that it discloses "flow signatures" used in "embodiments of the present invention." Appx177(7:45-55). These "flow signatures" or "keys" are precisely what the patents say are "used

[to] identify further packets of the same conversational flow." Appx176(5:27-30). Thus, the Figure 2 embodiment—what Mr. Maixner admitted was the same as Track Sessions—discloses the very technique for building "conversational flows" taught in the patents.

**2. The claims do not require "visibility into application content."**

PI contends that Track Sessions does not provide "[a]pplication layer visibility," which it describes as "the hallmark of the invention." PI Br. 7, 33; *see id.* at 33. Again, PI's argument is irrelevant because the claims do not require "application layer visibility." If Track Sessions recognizes disjointed RPC connection flows as part of a single "conversational flow," it discloses an essential feature regardless whether it also looks at "application layer" data.

None of PI's arguments are grounded in the claims. The claims are invalid under Section 102(f).

**B. The Asserted Claims Are Anticipated.**

As NetScout demonstrated in its opening brief, the claims are anticipated by the NetScout Probe with Track Sessions. NetScout Br. 51-53. Although PI argues that Track Sessions functionality in the NetScout Probe is different from the claims, PI relies only on the irrelevant distinctions addressed above. Nor is PI correct to argue that "NetScout relied on multiple versions of its NetScout Probe software for its anticipation arguments." PI Br. 30.

Rajeev Nadkarni, NetScout's Vice President and director of engineering, Appx1608-1609, testified that the NetScout Track Sessions Probe implemented the full RMON2 Track Sessions functionality in version 4.5 of the software. Appx1614-1615. NetScout located version 4.5.3 of the software for production and presentation at trial. Appx1618. The uncontroverted evidence presented at trial showed that versions 4.5 and 4.5.3 were identical in all relevant aspects—the ".3" corresponded to a "patch" to version 4.5 for "bug fixes." Appx1621-1623. There was no evidence these bug fixes introduced any material changes. In any event, as Mr. Nadkarni confirmed, version 4.5.3 was released in March 1999, Appx1625-1627(110:3-112:18), before the patents' priority date of June 30, 1999. PI's "different versions" argument fails.

The prior art teaches each limitation of the claims and thus anticipates. This Court should render judgment in favor of NetScout.

## IV. PI Is Not Entitled to Presuit Damages.

PI attempts to defend the presuit damages award, arguing that it either (1) complied with Section 287's marking requirement to permit presuit damages for the '789 patent's apparatus claims or (2) presented substantial evidence of presuit damages based on NetScout's presuit direct infringement of the '751 and '725 patents' method claims. But PI presented no evidence of marking and no evidence

of damages caused by NetScout's own use of the claimed methods. Thus, this Court should render judgment vacating the $3.5 million presuit damages award.

### A. PI Failed To Prove Marking Under Section 287(a).

PI concedes that licensed MeterFlow, Cisco, and Huawei products were not marked with the '789 patent. Because PI failed to carry its burden to prove that these products did not practice the asserted claims, PI incorrectly argues that the jury instructions make this failure of proof irrelevant.

#### 1. PI's waiver argument fails as a matter of law.

PI does not dispute that it bears the "burden to prove [the identified] products … do not practice the patent-at-issue" under this Court's precedent. *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1369 (Fed. Cir. 2017). Instead, PI argues this Court's precedent does not apply because NetScout failed to object to the jury instructions addressing marking. PI Br. 49-55. PI is incorrect.

Any failure to object to jury instructions is irrelevant to NetScout's appeal based on insufficiency of the evidence: "[T]he failure to object to an instruction does not render the instruction 'law of the case' for purposes of appellate review of the denial of a directed verdict or judgment notwithstanding the verdict." *St. Louis v. Praprotnik*, 485 U.S. 112, 120 (1988) (plurality op.) (internal quotations and citations omitted); *see Boyle v. United Techs. Corp.*, 487 U.S. 500, 513-14 (1988) (adopting *Praprotnik*). When a party appeals a JMOL denial under Rule 50, an

appellate court's focus is on "the propriety of [denying] the motion for directed verdict," and "the jury instructions on the points of law contained in the motion for directed verdict are simply outside the scope of that analysis." *Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 183 (9th Cir. 1989); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 975 n.5 (Fed. Cir. 1995) (en banc) ("[T]he appellate court is not bound by the instructions given the jury, even if they were not objected to."). PI's waiver argument is meritless.[6]

NetScout argued that PI bore the burden on marking in its Rule 50(a) motion (Appx1981-1982 (expressly opposing PI's position that it was "NetScout's burden to show a failure to mark" and asserting that PI "has not met its burden of proof" regarding marking)) and after trial in extensive briefing under Rule 50(b) (Appx10192-10194). The argument is fully preserved.

[6] Even if the jury instructions were relevant, they would not support PI's position because they do not require NetScout to prove that PI's licensees' products practiced the '789 patent. *Compare* Appx2051-2052(47:14-48:25) (marking instruction requiring only "show[ing] the existence of a patented article") *with* Appx2029(25:17-22) (infringement instruction requiring proof "products include each and every limitation of element of an asserted claim."). Contrary to the misquotation in PI's brief (at 52), the marking instruction only directed NetScout to identify or show the existence of a practicing product and did not assign NetScout the burden of proving the identified products "practice[] one or more claims of the '789 patent." Appx2051(47:17-19).

### 2. There was no evidence that MeterFlow does not practice the ’789 patent.

PI acknowledges that NetScout identified Exar’s MeterFlow as an unmarked patent-practicing product. PI. Br. 55-57. PI fails to identify any evidence that MeterFlow did not practice the patent. Indeed, PI conceded that “[t]here is no evidence whatsoever in the record showing what the 2009 and later Meter products did.” Appx10467 n.3 (response to Rule 50(b) motion). This concession ends the inquiry—with “no evidence whatsoever” of how the relevant MeterFlow products operated, PI cannot meet its burden.

PI notes Mr. Dietz’s testimony about “MeterWorks,” PI Br. 56, but as NetScout explained in its opening brief, “MeterWorks” is a different product. NetScout Br. 57. To the extent that Mr. Dietz discussed MeterFlow, PI does not deny that his testimony referred to old, irrelevant versions of the products sold long before the presuit damages period. PI. Br. 56. Nor does PI have any answer to the authority establishing Mr. Dietz’s cursory “blanket statements” of noninfringement are insufficient as a matter law. NetScout Br. 57 (citing *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) and *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1372 (Fed. Cir. 2002)).

As for Mr. Ham’s testimony, PI admits that it “impl[ied] that the underlying technology for the patents was sold as MeterFlow.” PI Br. 57. This testimony

supports a finding that MeterFlow practiced the patent; it is certainly not evidence that MeterFlow did not practice.

#### 3. PI had notice of unmarked Cisco and Huawei products.

PI acknowledges that NetScout identified during "summary judgment briefing" specific unmarked Cisco and Huawei products as practicing the '789 patent. PI Br. 58. This identification satisfied NetScout's initial burden and shifted the burden to PI to prove that the products either did not practice the challenged claims or were marked. *Arctic* Cat, 876 F.3d at 1368-69.

At trial, PI relied on its theory (subsequently rejected in *Arctic Cat*) that NetScout bore the burden to prove that the identified products practiced. *See* Appx1983-1984; Appx10460. PI presented no evidence these products did not practice or were marked.

NetScout identified cases finding pre-trial notice to be adequate, noting the absence of authority supporting PI's novel "jury notice" requirement. NetScout Br. 60-61. In response, PI argues that the district court's statement that marking was a "live issue" for trial somehow shifted the burden back onto NetScout, but PI still offers no supporting authority. NetScout's pretrial disclosure shifted the burden to PI, and no authority supports the proposition that it somehow shifted back.

PI is incorrect that "NetScout never responded to PI's interrogatory" regarding unmarked patent-practicing products. PI Br. 59. NetScout's response

referred to PI's discovery response confirming the Cisco, Huawei, and Exar licenses contain no marking provisions. Appx7968-7969 (referencing Appx4724-4737).[7] Regardless, PI never moved to compel a more complete response or to exclude identification of unmarked licensed products. Accordingly, PI's argument is forfeited. *Safeclick, LLC v. Visa Int'l Serv. Ass'n*, 208 Fed. App'x 829, 835 (Fed. Cir. 2006). And any Rule 37 motion would have been meritless because PI had notice of the relevant products. Appx7943-7945; *see* Fed.R.Civ.P. 37(c)(1) (exclusion applies "unless the failure was … harmless.").

### B. There Was No Evidence of Damages for the Method Claims.

After trial and after *Arctic Cat* issued (confirming that PI bore the burden on marking to be eligible for presuit damages for the product claims of the '789 patent), PI argued for the first time that the $3.5 million presuit award could alternatively be supported by NetScout's internal use or testing, which PI contends infringed the '751 and '725 method claims.[8]

[7] NetScout also identified "MeterFlow … which included all of the claimed limitations of the patents-in-suit" in other responses. Appx5953.

[8] Mr. Bergman's conclusory testimony that his damage calculations do not change depending on which patent is infringed is not substantial evidence of presuit damages from NetScout's use or testing. Indeed, Mr. Bergman never explained how his reasonable royalty damages theory for sales of accused products could somehow be applied to NetScout's use of its own products. Rather, the strategy to rely entirely on presuit sales revenue reflected PI's gamble that it could obtain presuit damages for the '789 patent—a bet PI lost when *Arctic Cat* issued.

It is undisputed that NetScout's presuit sales did not directly infringe the method claims. Method claims are not directly infringed "by the sale of an apparatus that is capable of infringing use." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006). Further, the district court entered summary judgment that there was no presuit indirect infringement from use of the products by NetScout's customers. Appx406.

Nonetheless, PI seeks presuit damages for these noninfringing sales, arguing that NetScout's presuit use of the claimed method "ma[d]e, generate[d] and support[ed] sales." PI Br. 61. PI's theory is unsupported by any evidence. PI presented no evidence of **damages** caused by or resulting from presuit testing or use. PI's response cites only vague references to NetScout's "use[ of] the accused instrumentality in the United States" (Appx1286), "installation" of the G10 (Appx1341-1342), unspecified "equipment to monitor the network" (Appx1362), unspecified "services" (Appx1354), and a "Customer training catalog" for an unspecified product (Appx1360). PI. Br. 61. Nothing in this testimony indicates the frequency of use or how, if at all, it related to securing even a single sale.

None of this describes how NetScout's use damaged PI or generated any revenue that could serve as a presuit royalty base. There certainly was no testimony that presuit use or testing of accused products "contributed to the product sales that

comprise the royalty base," as PI contends. PI Br. 62. And there was no damages theory based upon convoyed or derivative sales. *See* NetScout Br. 65.

In sum, PI provided no evidence of damages caused by NetScout's presuit use of the method claims, much less a damages theory that supports the $3.5 million presuit damages award. This failure of proof, plus PI's failure to prove compliance with Section 287(a) for the '789 patent, precludes all presuit damages.[9]

## V. The Willfulness Verdict Was Not Supported by Substantial Evidence.

PI's willfulness case rests upon the baseless notion that NetScout's executives were wrong to rely upon technical experts and counsel to develop and present the company's defenses. Relying upon experts and counsel, rather than marketing

---

[9] PI argues that NetScout waived the right to a new presuit damages trial after *Arctic Cat* issued. PI Br. 54. But NetScout does not seek any new trial. The only relief sought on this issue is rendition of a judgment that PI receive no presuit damages. Indeed, PI has never sought a new damages trial in lieu of the requested vacatur. And no new trial should be afforded to PI because, unlike in *Arctic Cat* where the plaintiff "did not have a fair opportunity to develop its case regarding the [unmarked licensed products] at trial," here, PI had a full and fair opportunity to address marking at trial. *Arctic Cat*, 876 F.3d at 1369; Appx723-724(101:9-102:14). PI pursued a defective presuit damages theory based upon an incorrect assignment of the burden on marking, and failed to present any evidence of damages caused by NetScout's prefiling use. PI "elected to make what appears to be a cursory attempt at … proving the ***fact*** of damages" by citing evidence of incidental use, "as opposed to any particular ***amount*** of damages." *See Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 661 (Fed. Cir. 2017). Under these circumstances, if any liability were confirmed on appeal, PI's recovery as a matter of law should be limited to the post-filing $2.25 million damages award. *See id.* at 664-666 (affirming grant of JMOL of no damages and denial of new damages trial, holding that "a patent owner may waive its right to a damages award when it deliberately abandons valid theories of recovery in a singular pursuit of an ultimately invalid damages theory").

executives and "engineers without legal training," is typical, reasonable, and prudent, and certainly not evidence of willfulness. *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1309 (Fed. Cir. 2019).

PI's contention that NetScout's corporate representative, Mr. Kenedi, "took the stand to sponsor NetScout's theory that Mr. Dietz lied and stole the claimed inventions" is incorrect. PI Br. 63-64. Rather, Mr. Kenedi testified about NetScout's and Tektronix's corporate history, the independent development of the accused products, and the failure of PI to provide presuit notice. NetScout Br. 67. Similarly, NetScout's founder and CEO, Mr. Singhal, provided historical context and background for NetScout's early and independent development of network monitor technology. *Id*. at 6-7, 10-11.

Neither senior NetScout executive presented an analysis of PI's patents or NetScout's defenses. Rather, as is customary in patent cases, NetScout relied on its technical expert, Mr. Waldbusser, "an expert in the field of network monitoring." Appx1634. Mr. Waldbusser testified at length about PI's patents and NetScout's noninfringement and invalidity positions. NetScout Br. 41, 51. This rebuts—rather than supports—willfulness. *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1355-56 (Fed. Cir. 2001).

PI argues that NetScout's reliance on experts and counsel evidences willfulness because NetScout did not assert an advice of counsel defense. *See* PI Br.

66 (arguing Mr. Kenedi or Mr. Singhal should have "disclosed to the jury" their "conversations with lawyers or experts"). But an adverse inference cannot be drawn from the failure to waive privilege on an opinion of counsel. *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmBH v. Dana Corp*., 383 F.3d 1337, 1341 (Fed. Cir. 2004).

Further, the district court rejected PI's contention "that NetScout's defenses and conduct, [were] pursued in bad faith." PI Br. 15. The district court found that NetScout's defenses were raised in good faith. Appx335-336.

Finally, PI argues that "NetScout's decision to continue selling the [i]nfringing [p]roducts" makes them a willful infringer. PI Br. 65. To the contrary, as demonstrated by this appeal, NetScout relied on strong and well-supported defenses of noninfringement and invalidity and had every right to continue using technology that was developed—not by PI—but by the RMON Working Group to which NetScout's Mr. Singhal was an acknowledged contributor. *See* NetScout Br. 6-11.

Moreover, PI concedes it never sought an injunction. PI cannot be harmed by ongoing infringement because it sells no products. NetScout Br. 68 n.16. PI sought and obtained only an ongoing royalty on accused product sales. Appx353.

The willfulness judgment and corresponding $2.8 million enhancement of damages should be reversed.

## CONCLUSION

The judgment below should be reversed.

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: */s/ Eric Kraeutler*

Eric Kraeutler

Dated: November 22, 2019

Michael J. Lyons
Ahren C. Hsu-Hoffman
Michael F. Carr
Thomas Y. Nolan
Morgan, Lewis & Bockius LLP
1400 Page Mill Road
Palo Alto, CA 94304
650.843.4000

William R. Peterson
Morgan, Lewis & Bockius LLP
1000 Louisiana St., Suite 4000
Houston, TX 77002
713.890.5000

Eric Kraeutler
Julie Goldemberg
Morgan, Lewis & Bockius LLP
1701 Market St.
Philadelphia, PA 19103
215.963.5000

Jason D. Frank
Morgan, Lewis & Bockius LLP
One Federal Street
Boston, MA 02110
617.341.7700

Karon N. Fowler
Morgan, Lewis & Bockius LLP
77 West Wacker Drive
Chicago, IL 60601
312.324.1000

***Counsel for Defendant-Appellants NetScout Systems, Inc., NetScout Systems Texas, LLC fka Tektronix Texas, LLC dba Tektronix Communications***

## PROOF OF SERVICE

I hereby certify that on November 22, 2019, I electronically transmitted the Brief of Appellants to the Clerk of the Court using the Court's ECF system. I further certify that counsel of record for Appellant are being served with a copy of this Brief by electronic means via the Court's ECF system.

Dated: November 22, 2019 By: */s/ Eric Kraeutler*

Eric Kraeutler

***Counsel for Defendant-Appellants NetScout Systems, Inc., NetScout Systems Texas, LLC fka Tektronix Texas, LLC dba Tektronix Communications***

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Federal Circuit Rule 32(a). This brief contains 6,915 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman.

Dated: November 22, 2019 By: */s/ Eric Kraeutler*

Eric Kraeutler

***Counsel for Defendant-Appellants NetScout Systems, Inc., NetScout Systems Texas, LLC fka Tektronix Texas, LLC dba Tektronix Communications***